No. 20–1891

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

ALFRED BOURGEOIS,
*PETITIONER-APPELLEE,*

v.

SUPERINTENDENT,
USP—TERRE HAUTE,
UNITED STATES OF AMERICA,
*RESPONDENTS-APPELLANTS.*

_____

On Appeal from the United States District Court
for the Southern District of Indiana
No. 2:19–cv–00392, Hon. Jane Magnus-Stinson, Chief J.

**BRIEF OF APPELLEE**

**THIS IS A DEATH PENALTY CASE**

Peter Williams
    *Counsel of Record*
Victor J. Abreu
Katherine Thompson
Assistant Federal Defenders
Federal Community Defender Office for
    the Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215–928–0520

*Counsel for Petitioner-Appellee Alfred
Bourgeois*

Dated: July 16, 2020

**RULE 26.1 DISCLOSURE STATEMENT**

The full name of Petitioner-Appellee is Alfred Bourgeois. Attorneys Victor Abreu, Katherine Thompson, and Peter Williams, of the Federal Community Defender Office for the Eastern District of Pennsylvania, represent Bourgeois before this Court and represented him in the 28 U.S.C. § 2241 proceedings below in the United States District Court for the Southern District of Indiana. Petitioner-Appellee is not a corporation.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................v

GLOSSARY........................................................................................................ ix

INTRODUCTION ................................................................................................1

REQUEST FOR ORAL ARGUMENT ................................................................4

STATEMENT OF JURISDICTION....................................................................4

STATEMENT OF THE CASE .............................................................................4

STATEMENT OF ISSUES PRESENTED FOR REVIEW ...................................12

STANDARD OF REVIEW ................................................................................12

SUMMARY OF ARGUMENT ...........................................................................13

ARGUMENT .....................................................................................................14

I.       THE DISTRICT COURT PROPERLY DETERMINED THAT
         BOURGEOIS ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE
         MERITS OF HIS FDPA CLAIM. ...............................................................15

         A.       Bourgeois Made a Strong Showing that His FDPA Claim Is
                  Cognizable Under § 2241...............................................................15

                  1.      The Government waived any challenge to cognizability. ........16

                  2.      The Government's waiver precludes it from raising any
                          cognizability challenge on appeal.............................................21

                  3.      Even considering the Government's waived arguments,
                          Bourgeois has demonstrated his claim may proceed
                          under § 2241................................................................................27

         B.       Bourgeois Made a Strong Showing that He Is Intellectually Disabled
                  Under Current Diagnostic Standards. ................................................51

II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY CONCLUDING THAT THE REMAINING EQUITABLE CONSIDERATIONS WEIGH IN FAVOR OF A STAY..........................56

CONCLUSION ...........................................................................................60

**APPENDIX**

**VOLUME I**

**Pleadings in 28 U.S.C. § 2241 Proceedings**

Petition for Writ of Habeas Corpus, *Alfred Bourgeois v. Superintendent, USP— Terre Haute, United States of America*, 2:19–cv–992–JMS–DLP (S.D. Ind. Aug. 15, 2019) ...................................................................................... PA–001

Motion for Stay of Execution, *Alfred Bourgeois v. Superintendent, USP—Terre Haute, United States of America*, 2:19–cv–992–JMS–DLP (S.D. Ind. Aug. 15, 2019) ...................................................................................... PA–079

Return to Order to Show Cause, *Alfred Bourgeois v. Superintendent, USP—Terre Haute, United States of America*, 2:19–cv–992–JMS–DLP (S.D. Ind. Oct. 18, 2019).......................................................................................... PA–210

**VOLUME II**

**Pleadings in 28 U.S.C. § 2241 Proceedings (cont.)**

Reply in Support of Petition for Writ of Habeas Corpus and Motion for Stay of Execution, *Alfred Bourgeois v. Superintendent, USP—Terre Haute, United States of America*, 2:19–cv–992–JMS–DLP (S.D. Ind. Nov. 15, 2019).................... PA–318

Motion to Reconsider Order Staying Execution of Alfred Bourgeois, *Alfred Bourgeois v. Superintendent, USP—Terre Haute, United States of America*, 2:19–cv–992–JMS–DLP (S.D. Ind. March 23, 2020).................................. PA–369

Motion for Leave to File Surreply to Petitioner's Reply, *Alfred Bourgeois v. Superintendent, USP—Terre Haute, United States of America*, 2:19–cv–992– JMS–DLP (S.D. Ind. March 23, 2020) ........................................................ PA–375

Surreply to Petitioner's Reply Brief, *Alfred Bourgeois v. Superintendent, USP— Terre Haute, United States of America*, 2:19–cv–992–JMS–DLP (S.D. Ind. March 23, 2020) ...................................................................................... PA–389

**Excerpts from Diagnostic Manuals**

Excerpt from Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition—("DSM–5") ..................................................................................... PA–409

Excerpt from *Intellectual Disability—Definition, Classification, and Systems of Supports—11th Edition*, American Association on Intellectual and Developmental Disabilities (2010) ("AAIDD–10") .............................. PA–432

Excerpt from *User's Guide to Intellectual Disability—Definition, Classification, and Systems of Supports—11th Edition*, American Association on Intellectual and Developmental Disabilities (2012) ("AAIDD–12") .............................. PA–475

Excerpt from *The Death Penalty and Intellectual Disability*, American Association on Intellectual and Developmental Disabilities (2015) ("AAIDD–15"), Chapter 8: Intelligence Testing, by Dale G. Watson, Ph.D ......................................... PA–483

Excerpt from *The Death Penalty and Intellectual Disability*, American Association on Intellectual and Developmental Disabilities (2015) ("AAIDD–15"), Chapter 10: Norm Obsolescence: The Flynn Effect, by Kevin S. McGrew, Ph.D ................................................................................................................. PA–512

# TABLE OF AUTHORITIES

**Cases**

*Arnaout v. Marberry*, 351 F. App'x 143 (7th Cir. 2009)........................................50

*Atehortua v. Kindt*, 951 F.2d 126 (7th Cir. 1991)...............................................49

*Atkins v. Virginia*, 536 U.S. 304 (2002).........................................................1, 28

*Baker v. Lindgren*, 856 F.3d 498 (7th Cir. 2017) ...................................................3

*Bath Indus. v. Blot*, 427 F.2d 97 (7th Cir. 1970) .................................................56

*Blue v. Hartford Life & Acc. Ins. Co.*, 698 F.3d 587 (7th Cir. 2012)......................21

*Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020)...............................44

*Bowersox v. Williams*, 517 U.S. 345 (1996).......................................................13

*Boyers v. Texaco Refining & Marketing, Inc.*, 848 F.2d 809 (7th Cir. 1988) ........26

*Busby v. Davis*, 925 F.3d 699 (5th Cir. 2019) ....................................................48

*Campos v. Cook Cty*, 932 F.3d 972 (7th Cir. 2019) .............................................20

*Chazen v. Marske*, 938 F.3d 851 (7th Cir. 2019)................................................41

*Corcoran v. Wilson*, 651 F.3d 611 (7th Cir. 2011)..............................................27

*Day v. McDonough*, 547 U.S. 198 (2006) ..................................................... 25, 26

*e360 Insight v. The Spamhaus Project*, 500 F.3d 594 (7th Cir. 2007) ...................13

*Ex parte Briseño*, 135 S.W.3d 1 (Tex. Crim. App. 2004) ............................... 28, 34

*Ex parte Moore*, 548 S.W.3d 552 (Tex. Crim. App. 2018)...................................31

*Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001) ............................................ 39, 42

*Hall v. Florida*, 572 U.S. 701 (2014)........................................................... 26, 57

*Hernandez v. Cook Cty. Sheriff's Office*, 634 F.3d 906 (7th Cir. 2011) ................20

*Hicks v. Stancil*, 642 F. App'x 620 (7th Cir. 2016)..............................................18

*Highlands Ins. Co. v. Lewis Rail Service Co.*, 10 F.3d 1247 (7th Cir. 1993)..........13

*In re Davenport*, 147 F.3d 605 (7th Cir. 1998)................................................. 39, 40

*Judge v. Quinn*, 624 F.3d 352 (7th Cir. 2010) .....................................................21

*Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90 (1991) .........................................22

*Kramer v. Olson,* 347 F.3d 214 (7th Cir. 2003)....................................................10

*Manor Healthcare Corp. v. Guzzo*, 894 F.2d 919 (7th Cir. 1990) .........................22

*Moore v. Texas*, 137 S. Ct. 1039 (2017) ........................................................ passim

*Moore v. Texas*, 139 S. Ct. 666 (2019) .......................................................... 1, 6, 31

*Nelson v. Campbell,* 541 U.S. 637 (2004) ...........................................................58

*Nken v. Holder*, 556 U.S. 418 (2009) .................................................................15

*Pinkston v. Madry*, 440 F.3d 879 (7th Cir. 2006)................................................16

*Publishers Resource v. Walker-Davis Publications*, 762 F.2d 557 (7th Cir. 1985) ....................................................................................................................21

*Pullman-Standard v. Swint*, 456 U.S. 273 (1982) ...............................................27

*Queen v. Miner*, 530 F.3d 253 (3d Cir. 2008) .....................................................51

*Roundtree v. Krueger*, 910 F.3d 312 (7th Cir. 2018) ....................................... 50, 51

*Russian Media Grp., LLC v. Cable Am., Inc.*, 598 F.3d 302 (7th Cir. 2010)..........24

*Ryan v. United States*, 688 F.3d 845 (7th Cir. 2012)....................................... 24, 26

*S.E.C. v. Yang*, 795 F.3d 674 (7th Cir. 2015) ......................................................24

*State Farm Mut. Auto Ins. Co. v. C.I.R.*, 698 F.3d 357 (7th Cir. 2012) .................45

*United Central Bank v. KMWC 845, LLC*, 800 F.3d 307 (7th Cir. 2015)...............13

*United States v. Ford*, 683 F.3d 761 (7th Cir. 2012)..............................................24

*United States v. Garcia*, 580 F.3d 528 (7th Cir. 2009)..................................... 17, 23

*United States v. Hook*, 195 F.3d 299 (7th Cir. 1999) ...............................................20

*United States v. Staples*, 202 F.3d 992 (7th Cir. 2000) ............................................17

*United States v. Webster*, 162 F.3d 308 (5th Cir. 1998).............................................45

*United States v. Webster*, 421 F.3d 308 (5th Cir. 2005)...........................................29

*Valona v. United States*, 138 F.3d 693 (7th Cir. 1998) ................................... 10, 49

*Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015).......................................... passim

*Williams v. Chrans*, 50 F.3d 1358 (7th Cir. 1995)....................................................56

*Williams v. Kelley*, 858 F.3d 464 (8th Cir. 2017) ....................................................48

*Wisconsin Music Network v. Muzak Ltd. Partnership*, 5 F.3d 218 (7th Cir. 1993) ........................................................................................................59

*Wood v. Milyard*, 566 U.S. 463 (2012)........................................................... 25, 26

## Statutes

18 U.S.C. § 3596.......................................................................................... passim

28 U.S.C. § 2241.......................................................................................... passim

28 U.S.C. § 2244 ...............................................................................................1, 5

28 U.S.C. § 2254 ................................................................................. 24, 29, 48

28 U.S.C. § 2255 .......................................................................................... passim

# GLOSSARY

| | |
|---|---|
| AAIDD | American Association on Intellectual and Developmental Disabilities |
| AAIDD–10 | *Intellectual Disability—Definition, Classification, and Systems of Supports—11th Edition*, American Association on Intellectual and Developmental Disabilities (2010) |
| AAIDD–12 | *User's Guide to Intellectual Disability—Definition, Classification, and Systems of Supports—11th Edition*, American Association on Intellectual and Developmental Disabilities (2012) |
| AAIDD–15 | *The Death Penalty and Intellectual Disability*, American Association on Intellectual and Developmental Disabilities (2015) |
| APA | American Psychiatric Association |
| DSM–5 | American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition* (2013) |
| GA | Government Appendix |
| GB | Government Brief |
| PA | Petitioner-Appellee's Appendix |

# INTRODUCTION

Alfred Bourgeois, a death-sentenced prisoner at USP Terre Haute, is intellectually disabled ("ID"). His execution is thus prohibited by the Federal Death Penalty Act ("FDPA") and the Eighth Amendment. *See* 18 U.S.C. § 3596(c) ("A sentence of death shall not be carried out upon a person who is mentally retarded."); *Atkins v. Virginia*, 536 U.S. 304, 320 (2002). Yet the only court ever to conduct merits review of Bourgeois's claim of ineligibility for the death penalty—which he raised in a 2007 motion for relief under 28 U.S.C. § 2255—applied non-clinical, unscientific standards that were subsequently declared to violate the Eighth Amendment. *See Moore v. Texas*, 137 S. Ct. 1039 (2017) ("*Moore–I*"); *Moore v. Texas*, 139 S. Ct. 666 (2019) ("*Moore–II*").

Following *Moore–I*, Bourgeois sought to have his ID claim reviewed under current constitutional standards via a second § 2255 motion. The Fifth Circuit Court of Appeals denied his request on procedural grounds, ruling that 28 U.S.C. § 2244(b)(1) forbids Bourgeois from raising his intellectual disability a second time despite the new legal standards. GA369. Bourgeois then filed in the Southern District of Indiana a petition under 28 U.S.C. § 2241, which provides a habeas corpus remedy when § 2255 is "inadequate or ineffective to test the legality of" a prisoner's detention or sentence. § 2255(e) ("savings clause"). Bourgeois also moved for a stay of execution.

In his petition, Bourgeois set forth extensive evidence demonstrating that he is intellectually disabled under the medical community's current standards, application of which is required by *Moore–I* and *–II*. He asserted two separate and independent claims for relief under § 2241. The first—which is not at issue in this appeal—is a challenge to the *imposition* of his sentence that relies on new legal and diagnostic bases. The second—relevant here—is a challenge to the *execution* of his sentence that relies, in pertinent part, on the plain language of the FDPA prohibiting *the carrying out* of a death sentence against a prisoner who "is" ID.

Despite submitting a lengthy response opposing Bourgeois's petition and stay request, the Government failed to challenge any aspect of Petitioner's FDPA claim. It put forth no evidence or argument disputing that Bourgeois satisfies the current medical criteria governing a diagnosis of ID, relying instead on the contra-diagnostic analysis employed by the district court in Bourgeois's § 2255 proceedings. Nor did it dispute that Petitioner is entitled to review under § 2241 because the FDPA bars the *carrying out* of a death sentence against an intellectually disabled prisoner. Indeed, it did not even mention the FDPA. In his subsequent reply, Bourgeois highlighted the Government's omissions, but the Government made no attempt to rectify this deficiency.

The district court stayed Bourgeois's execution pending the resolution of his FDPA claim and ordered an evidentiary hearing. It found that Bourgeois

demonstrated a likelihood of success on that claim because: (i) the Government waived any argument against its cognizability; (ii) Bourgeois made a "strong showing" that he is ID under current diagnostic standards; and (iii) the equitable factors favored a stay. GA5–12. Because Bourgeois satisfied the standard for a stay based on his FDPA claim, the Court did not reach his challenge under the Eighth Amendment. GA5 n.3.

The Government then sought to undo its waiver of the FDPA claim, but without success. Denying a motion for reconsideration, the district court held that the Government failed to show the court committed a manifest error of law or fact in finding a waiver of objections to the FDPA claim. The court also rejected the Government's attempt to "file a surreply after the fact to circumvent the prior waivers." GA19. The Government appeals both orders. It not only challenges the district court's waiver determination based on its untimely arguments below, but adds an entirely new set of arguments against Bourgeois's FDPA claim and the equities governing a stay.

The Government's appeal is without merit. This Court has repeatedly held that issues not addressed in a response are waived, regardless of whether they were subsequently presented in a motion for reconsideration, and that arguments not presented to a district court will not be reviewed on appeal. *E.g.*, *Baker v. Lindgren*, 856 F.3d 498, 503 (7th Cir. 2017). Moreover, even considering its

3

eleventh-hour attempt to challenge the cognizability of the FDPA claim, the Government fails to demonstrate that the district court abused its discretion by issuing a stay. The rulings below should be affirmed so that an evidentiary hearing can be held and the district court can give this claim a full and fair review.

## REQUEST FOR ORAL ARGUMENT

Bourgeois respectfully requests oral argument to assist the court's consideration of the issues presented.

## STATEMENT OF JURISDICTION

Bourgeois concurs with the Government's jurisdictional statement.

## STATEMENT OF THE CASE

*Trial and Initial § 2255 Proceedings*

In 2004, Bourgeois was convicted of murder and sentenced to death in the Southern District of Texas. The Fifth Circuit affirmed Bourgeois's conviction and sentence on direct appeal, GA26–34, and the Supreme Court denied certiorari in 2006.

Bourgeois then filed a § 2255 motion challenging his conviction and sentence, including a claim that he is intellectually disabled and ineligible for execution. After an evidentiary hearing held in 2010, the district court denied Petitioner's motion. GA35–259. In assessing the ID claim, the court applied then-valid Fifth Circuit precedent, which largely disregarded medical standards

4

governing the diagnosis of intellectual disability in favor of a lay assessment of the prisoner's functioning. Applying this "legal" approach, rather than a "psychological" approach, *see* GA88, 102, the district court rejected Bourgeois's ID claim. The many differences between the Texas district court's "legal" approach from 2011, and the clinical approach that governs Bourgeois's FDPA claim, are developed further below. *See infra* at 32–39.

### *Moore–I and Petitioner's Motion to File a Successive Habeas Petition in the Fifth Circuit*

In 2017, the Fifth Circuit's *Atkins* precedent was abrogated by the Supreme Court's decision in *Moore–I*, which made clear that courts must apply current clinical standards to ID claims and rejected a number of the specific practices as contrary to those standards—practices that were also employed by Bourgeois's § 2255 court. *See Moore–I*, 137 S. Ct. at 1050–53. Following *Moore–I*, Bourgeois timely requested authorization from the Fifth Circuit to file a second § 2255 motion under § 2255(h)(2), which allows for successive motions based on a new, retroactive rule of constitutional law that was previously unavailable.

Nevertheless, on August 23, 2018, the Fifth Circuit denied Bourgeois's application, holding that he was barred from raising his intellectual disability claim a second time under § 2244(b)(1). GA369. The circuit court did not question the merits of Petitioner's ID claim or his argument that *Moore–I* effectively overruled

Fifth Circuit precedent that had required the § 2255 district court to reject his *Atkins* claim.

### *Moore–II and the Scheduling of Bourgeois's Execution*

On February 19, 2019, the Supreme Court issued *Moore–II*, reversing the decision of the Texas Court of Criminal Appeals on remand from *Moore–I*. Specifically, although the state court purported to base its post-*Moore–I* denial of relief on a credibility finding between different opinions from experts, the *Moore–II* Court found in the state court's opinion "too many instances in which, with small variations, it repeats the analysis we previously found wanting, and these same parts are critical to its ultimate conclusion." 139 S. Ct. at 670. Because the district court that denied Bourgeois's initial *Atkins* claim likewise relied on contra-diagnostic criteria in crediting the Government's adaptive-behavior expert over the defense expert, *Moore–II* further strengthened Bourgeois's clam that he is now entitled to relief.

On July 25, 2019, the Government announced that it had developed a new lethal injection protocol after lacking one for eight years, and also that the Attorney General had scheduled Bourgeois's execution for January 13, 2020.

### *Bourgeois's § 2241 Petition and Request for Stay of Execution, the Government's Response, and Petitioner's Reply*

Having been denied the opportunity to file a successive petition under § 2255, Bourgeois filed his § 2241 petition in the Southern District of Indiana. His

petition began by establishing that he is ID under current diagnostic criteria. There are three criteria to a finding of ID: deficits in intellectual functioning ("prong one"); deficits in adaptive functioning ("prong two"); and an age of onset before the age of 18 ("prong three"). *See* PA424. Relying on two IQ tests, two neuropsychological assessments, broad-based achievement testing, formal tests of adaptive behavior, and accounts from over twenty collateral reporters regarding Bourgeois's functioning, Bourgeois demonstrated in his § 2241 petition that he satisfies all three diagnostic requirements.

Bourgeois was given an IQ test in 2007 and one in 2004. He received scores of 70 and 75, respectively, both of which satisfy prong one. PA427 (per DSM–5, prong one "involves a score of 65-75 (70 ± 5)"). When corrected for the Flynn Effect,[1] they drop to 67 and 68, which again satisfy prong one. PA16–23.

Bourgeois's adaptive functioning is similarly deficient. Prong two is satisfied when there is a significant limitation in at least one of three domains: conceptual, social, or practical. *See* PA428. Bourgeois has significant deficits in all three. PA25–38. From a very young age through to adulthood, whether for chores, academics, recreation, money management, work, social interactions, or basic

---

[1] Under current diagnostic standards, IQ scores must be corrected for the Flynn Effect, which is a well-established finding that IQ scores inflate at a rate of 0.3 points per year after the data upon which the IQ test was generated. PA427; PA479.

living skills, Bourgeois required repeated instruction, had trouble understanding and retaining information, had impaired language development, showed poor problem-solving skills, and was consistently behind his peers in a broad range of areas. PA25–38. Throughout his life, he was variously described as "slow," and someone who "couldn't catch on," who "couldn't grasp things," whose "grasp of learning was weaker than the rest of the children," and who "could not reason through a problem." PA25–37. These accounts were confirmed by impairments reflected in neuropsychological assessments and broad-ranged achievement testing administered in 2004, 2007, and 2009. PA25–35.

His academic performance was abysmal. He was retained in the third grade, was shunted to a self-contained classroom that was his school district's equivalent of special education, and received poor grades on the only school records that have been preserved. His adult academic functioning was similarly deficient. Even though he was technically a high school graduate, on the broad-ranged achievement testing he was administered when he was 45 years old, he scored below age-related expectations on twelve of thirteen areas measured and at the elementary school level on eleven of thirteen areas. The one area where he functioned age-appropriately—spelling—was conceptually unsophisticated and involved rote learning only. PA25–31; ECF No. 1–1 at 24.

Psychologist Victoria Swanson, Ph.D., who conducted the adaptive behavior

assessment for Bourgeois in connection with his § 2255 proceedings, also administered a formal adaptive behavior measure to a family friend who knew Bourgeois for an extended period of time and was familiar with his functioning across multiple domains. This testing returned ID-range scores in all three domains and in a composite score capturing overall functioning. These scores were confirmed by an adaptive behavior measure given by one of the Government's experts to Bourgeois's sister, who again returned ID range scores in all categories. The Government relied on testing to three individuals whose contact with Bourgeois was limited—generally to a work setting—and whose scores were invalidated by guessing on responses. PA40–42; PA345–48.

Finally, Bourgeois's impairments were present long before the age of 18. His deficits in adaptive functioning were present from early childhood and correspond to the intellectual and adaptive impairments observed during adulthood. While it is not necessary to establish the cause of ID to make out the diagnosis, there are risk factors for ID in Bourgeois's history that are recognized causes for the disorder, including, inter alia, childhood physical and sexual abuse, poverty, and impaired parenting. All of these risk factors confirm the diagnosis and explain its origin. PA45–51.

Having established that he is ID under current diagnostic standards, Bourgeois then set forth two independent claims for relief under § 2241, both

9

based on the fact that he is intellectually disabled. The first claim challenged *the imposition* of Petitioner's sentence on the basis of the legal developments brought by *Moore–I* and *Moore–II* and the requirement that courts assess ID claims under established clinical standards, as well as diagnostic manuals that had not yet been published at the time of his § 2255 proceedings. PA46–71.

Second, Bourgeois challenged *the execution* of his sentence under both the FDPA and the Eighth Amendment. In support of his FDPA claim, he established that: (i) the plain language of the FDPA expressly prohibits the *execution* of an intellectually disabled prisoner whether or not the prisoner's death sentence was legal when imposed; and (ii) the legislative history confirms that Congress intended to allow for challenges to be brought under the FPDA at any time. PA5, 7, 14, 50, 76–77, 84. He also explained that the legality of his execution is governed by whether he qualifies as ID under current legal and diagnostic standards, which § 2255 is ineffective to assess because he was denied authorization to file a second § 2255 motion at the Government's insistence. PA71–73. Lastly, he cited to this Court's jurisprudence holding challenges to the execution of a prisoner's sentence to be cognizable under § 2241, as by its terms, § 2255 only allows a prisoner to challenge the imposition of his sentence. PA71 (citing *Kramer v. Olson,* 347 F.3d 214, 217 (7th Cir. 2003); *Valona v. United States*, 138 F.3d 693, 694 (7th Cir. 1998)). Bourgeois advanced the same claims in

10

his motion for stay of execution. PA85–87.

The Government's lengthy response failed to challenge any aspect of Bourgeois's claim that he is entitled to review under § 2241 because the FDPA bars the carrying out of a death sentence against an intellectually disabled prisoner. GA5–6, 18–19; PA210–317. In fact, the response does not contain a single reference to the FDPA, or to this Court's jurisprudence holding § 2241 to be the appropriate vehicle for challenges to the execution of a federal prisoner's sentence. PA210–317.

In his reply to the Government's response, Bourgeois pointed to the Government's omission under a heading that read: "The Government Has Not Challenged that Bourgeois May Proceed Under § 2241 Because He Challenges the Execution, as Well as the Imposition, of His Sentence." PA363. Bourgeois also reiterated his arguments in support of his FDPA claim. PA326, 361–64. The Government made no attempt to rectify its pleading failure. *See* GA6.

### *The Orders Under Review*

On March 10, 2020, the district court stayed Bourgeois's execution pending the resolution of his FDPA claim. As relevant here, the court found that the Government had waived the cognizability of the FDPA claim on § 2241 by failing to address Bourgeois's FDPA claim at all. GA5–6. The court went on to observe that Bourgeois is likely intellectually disabled under current clinical standards,

11

based on (i) the IQ test results to date, (ii) "strong" evidence of adaptive deficits in multiple domains, regardless of any adaptive "strengths" that are diagnostically irrelevant, and (iii) the onset of Bourgeois's limitations before he reached adulthood. GA6–9. Twelve days later, the Government sought to undo its waiver by bringing motions for reconsideration and for leave to file a surreply. On May 29, the court denied both of the Government's motions in a single order, adhering to its earlier finding that the Government had waived the FDPA claim. GA16–20. The Government now appeals both orders.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      Given the fact that the Government did not address the cognizability and merits of Bourgeois's FDPA claim when opposing a stay of execution, did the district court abuse its discretion by holding the Government to its waiver?

2.      In light of the district court's findings that the Government waived the FDPA claim, that Bourgeois is likely intellectually disabled under the current clinical standards that govern the claim, that Bourgeois and the public share an interest in avoiding an unlawful execution, and that the Government itself had delayed the setting of an execution by several years, did the district court abuse its discretion by issuing a stay?

## STANDARD OF REVIEW

The Court reviews "factual determinations upon which a district court

predicates a finding of waiver for clear error and the legal question of whether the conduct amounts to waiver de novo." *e360 Insight v. The Spamhaus Project*, 500 F.3d 594, 599 (7th Cir. 2007). It reviews for abuse of discretion the district court's enforcement of such waivers (*United Central Bank v. KMWC 845, LLC*, 800 F.3d 307, 310 (7th Cir. 2015)), the denial of reconsideration (*Highlands Ins. Co. v. Lewis Rail Service Co.*, 10 F.3d 1247, 1249 (7th Cir. 1993)), and the decision to stay an execution (*Bowersox v. Williams*, 517 U.S. 345, 346 (1996)).

## SUMMARY OF ARGUMENT

The Government's appeal focuses overwhelmingly on the district court's finding that Bourgeois made a sufficient showing that his FDPA claim is cognizable under § 2241. However, the Government concedes it did not mention the FDPA in its response below, and the district court correctly determined that the Government waived any argument on this issue. GA5–6, 16–19. Because the Government provides no compelling reason that this Court should rule on arguments not properly presented—and in some instances not presented at all— below, the Court should not disturb the district court's cognizability finding. Furthermore, even considering the Government's waived arguments, it still has not meaningfully challenged Bourgeois's showing that the FDPA entitles an ID person to prove he is statutorily ineligible for death at the time of his execution or that such a claim is cognizable under § 2241.

13

The Government also argues that the district court erred in finding that Bourgeois established a likelihood of success on the merits of his FDPA claim. But the Government does not even allege, let alone establish, that the district court erred in applying *Moore–I* and current diagnostic standards in assessing the merits of Bourgeois's claim. Nor does it put forth any evidence to counter the finding that, under those standards, Bourgeois has made a strong showing that he is ID. Instead, the Government merely complains that the court reached a different conclusion than the Texas district court that denied Bourgeois's *Atkins* claim in his initial § 2255 proceedings. But that was to be expected, given that the district court in the § 2241 proceedings correctly applied different legal and diagnostic standards than were used in 2011.

Lastly, the Government challenges that the remaining stay factors favor Bourgeois. Despite once again relying on arguments waived below, however, the Government fails to establish an abuse of discretion with regard to any of the individual stay factors or in weighing them collectively.

## ARGUMENT

The district court correctly identified and applied the recognized factors governing a stay of execution:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will

substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

GA4 (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)). The district court also correctly observed that the "first two factors . . . are the most critical," *id.* (quoting *Nken*, 556 U.S. at 434), and found that all factors favored a stay.

The Government took no issue with Bourgeois's FDPA claim until after the district court entered a stay on the basis of that claim, but it now seeks reversal based on arguments that were untimely presented below, as well as other arguments that it advances for the first time on appeal. None of these arguments shows that the district court abused its discretion at the time of exercising it in favor of a stay, or in denying reconsideration.

## I.      THE DISTRICT COURT PROPERLY DETERMINED THAT BOURGEOIS ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE MERITS OF HIS FDPA CLAIM.

### A.      Bourgeois Made a Strong Showing that His FDPA Claim Is Cognizable Under § 2241.

The Government chiefly relies on Bourgeois's unsuccessful litigation under § 2255, arguing that Bourgeois cannot now "relitigate" his intellectual disability under the FDPA and § 2241. The argument fails for the straightforward reason that the Government waived the FDPA claim, as the district court twice observed. GA 5–6, 16–19. In any event, the Government fails to acknowledge that Bourgeois brings a different claim governed by current diagnostic standards, *see* § 3596(c),

15

fails to show that Bourgeois could have brought the claim in earlier post-conviction proceedings, and fails to demonstrate that Bourgeois should be barred from challenging an execution that would violate an Act of Congress.

### 1. The Government waived any challenge to cognizability.

In its initial stay order, the district court determined the Government had waived its challenge to the FDPA claim because "Bourgeois specifically argue[d] both in his habeas petition and in his motion to stay that his FDPA claim can proceed under § 2241," but the Government's response "fail[ed] to even mention [that] claim, let alone explain why it cannot be brought in a § 2241." GA5–6; *see also* GA18 ("There is no dispute that Respondent's pre-March 10 pleadings do not mention, let alone respond to, Bourgeois's FDPA claim."). It also found the Government's failure to address the FDPA claim "was more intentional than inadvertent" because "Bourgeois's reply highlighted Respondent's failure to address the FDPA claim," and the Government nevertheless "failed to seek leave to file a surreply addressing the claim." GA6.

Despite claiming there is "nothing in the record" to support the district court's waiver determination, GB14, the Government is unable to show any error in the court's factual findings, let alone clear error that leaves "the definite and firm conviction that a mistake has been committed." *Pinkston v. Madry*, 440 F.3d 879, 888 (7th Cir. 2006). Each of Bourgeois's pleadings below contains explicit

16

arguments about his ability to proceed under § 2241 based on the FDPA's language barring the "carry[ing] out" of an execution against someone who "is" ID. *See* GA19 (citing examples). The Government's response brief, which is the only pleading it filed prior to the issuance of the stay order, does not contain a single reference to the FDPA. PA210–317. The Government now concedes that it did not "expressly address the FDPA in its response below," and that "it would have been better to" do so. GB40.

Nor was the district court wrong to conclude that the Government's actions constituted waiver. According to the Government, the court erred because waiver is a "deliberate decision not to present a ground for relief," and "[n]othing in the government's submissions below suggests that it intentionally relinquished or abandoned any defense to Bourgeois's claim." GB36. But this Court has held that, when a party is expressly alerted to its failure to raise a defense and does nothing in response, it intentionally waives that defense. *See, e.g.*, *United States v. Garcia*, 580 F.3d 528, 542 (7th Cir. 2009) (concerning drug quantity calculation disclosed in PSR); *United States v. Staples*, 202 F.3d 992, 995 (7th Cir. 2000) (similar). There is no meaningful difference between these cases and what occurred here, other than the Government's claim that its status as sovereign should exempt it from the rules that apply to all other parties in the adversarial system. *See* GB38–39. The Court has already rejected that contention in circumstances such as these.

17

*See*, *e.g.*, *Hicks v. Stancil*, 642 F. App'x 620, 621 (7th Cir. 2016) ("We need not decide whether Hicks meets this [savings clause] exception because the government waives its defense that he does not, and its waiver allows us to decide the petition because failure to satisfy § 2255(e) does not affect the subject matter jurisdiction to consider a § 2241 petition.").

The Government attempts to escape waiver by claiming that, despite not mentioning the FDPA anywhere in its response, it always intended that the savings clause and abuse-of-the-writ arguments set forth in its response apply equally to Bourgeois's Eighth Amendment claim and his FDPA claim. According to the Government, "there would have been no strategic reason" for it to argue against one aspect of Petitioner's claim while waiving the same defense to another aspect. GB37. The Government also suggests that Bourgeois invited it to conflate the two legal claims. *See id.* (Government only referred to "*Atkins* claim" in its response because "that is the language that Bourgeois himself used in referring to his substantive claim"). And, the Government claims, "to the extent there was any ambiguity" as to whether it intended that the arguments made in its response apply to the FDPA claim, that ambiguity was resolved when the Government sought leave to file a surreply. GB37–38.

The Government's effort to recast its response brief as addressing both the Eighth Amendment claim and the FDPA claim is unpersuasive. As an initial

18

matter, the entire premise is belied by the fact that the Government's opening brief to this Court contains *seven pages* of new arguments against the cognizability of the FDPA claim. *See* GB27–33 (addressing text and drafting history of FDPA, as well as jurisprudence holding § 2241 relief appropriate when petitioner challenges execution of his sentence). None of these arguments—which now represent the bulk of the Government's challenge to the cognizability of the FPDA claim—was made in the Government's response brief below, and most were not even made in its untimely proposed surreply. *See* PA210–317, 389–408 (no discussion of text or drafting history of FDPA). As the district court made clear in its stay order, no binding authority governs whether § 2241 encompasses a claim that the prisoner is ID and cannot be executed under the FDPA. *See* GA6. Had the Government intended to challenge the FDPA claim below, there is simply no reason that it would not have included the explicit arguments it now makes based specifically on the text and history of the FDPA and the separate theory of cognizability that Bourgeois pled in conjunction with his FDPA claim.

Furthermore, the Government cannot escape the consequences of its waiver by blaming Bourgeois for "conflating" the constitutional and statutory claims. The district court acknowledged that the merits of the Eighth Amendment and FDPA claims rely on the same definition of ID, but went on to cite several specific examples from Bourgeois's pleadings in which he set forth arguments "distinct" to

19

the FDPA claim. GA18. If the district court was able to discern two separate legal claims, there is no reason that the Government's failure to do so should be excused. Additionally, the Government had no basis for expecting the district court would divine its purported "true" intent to challenge both claims. "A party's failure to develop an argument constitutes a waiver of that claim, as it is not the [court's obligation] to research and construct the legal arguments open to parties." *United States v. Hook*, 195 F.3d 299, 310 (7th Cir. 1999) (quotation omitted).

Neither is the Government aided by its attempted surreply, which it sought to file more than *four months* after Bourgeois's reply and *twelve days* after the district court's stay order. As the district court correctly held, the Government "may not file a surreply after the fact to circumvent the prior waivers." GA19; *see also Campos v. Cook Cty*, 932 F.3d 972, 976 n.2 (7th Cir. 2019) ("Parties waive arguments which they develop for the first time in a reply brief."); *Hernandez v. Cook Cty. Sheriff's Office*, 634 F.3d 906, 913 n.9 (7th Cir. 2011) ("[D]eficient discussion in an opening brief [can]not be redeemed by fuller treatment in a reply brief.").

Just as the Government cannot show that the district court erred, clearly or otherwise, by finding a waiver, it cannot show the court abused its discretion by denying the motion for reconsideration. Relief under Rule 59(e) requires a showing "(1) that the court committed a manifest error of law or fact, or (2) that newly

discovered evidence precluded entry of judgment." GA16–17 (quoting *Blue v. Hartford Life & Acc. Ins. Co.*, 698 F.3d 587, 598 (7th Cir. 2012)). "The rule does not provide an opportunity 'for a party to undo its own procedural failures . . . or advance arguments that could and should have been presented to the district court prior to judgment.'" GA17 (citation omitted). Here, the only grounds that the Government raised in its motion for reconsideration were that the court erred in finding waiver, and that it should reverse its determination about the cognizability of the FDPA claim based on the Government's previously-waived arguments. But the Government is unable to show that the district court committed *any* error in reaching its waiver finding, and it points to no controlling law ignored by the court. Nor is the Government able to show the court erred in refusing to consider its newly raised arguments, as a motion to reconsider cannot "serve as the occasion to tender new legal theories for the first time." *Publishers Resource v. Walker-Davis Publications*, 762 F.2d 557, 561 (7th Cir. 1985).

2.    **The Government's waiver precludes it from raising any cognizability challenge on appeal.**

This Court has long held that arguments not raised to the district court are waived on appeal, including where the argument is first raised in a motion for reconsideration. *See Judge v. Quinn*, 624 F.3d 352, 360 (7th Cir. 2010) ("This court will not overturn an injunction based on an argument not presented to the

district court."); *Manor Healthcare Corp. v. Guzzo*, 894 F.2d 919, 922 n.4 (7th Cir. 1990) ("Raising an issue in a motion for reconsideration does not save the issue for appeal.").

The Government argues that even assuming waiver is established, this Court should nevertheless review its arguments because, "[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties." GB38–39. But the case the Government quotes to support this argument—*Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90 (1991)— does not stand for the proposition that an appellate court *should* undertake its own legal research to fill in any gaps left by the parties' pleadings. Rather, the Court merely held that *if* an appellate court *chooses* to rule on an issue insufficiently briefed by the parties, it cannot invent and apply a new rule of federal common law in place of an unpled (but applicable) state law rule. Indeed, the Court was clear that it did "not mean to suggest that a court of appeals *should not treat an unasserted claim as waived* or that the court has *no discretion to deny a party the benefit of favorable legal authorities* when the party fails to comply with reasonable local rules on the timely presentation of arguments." *Id.* at 99 n.5.[2] Here, after determining that the Government "can waive the legal issue of whether

---

[2] Any emphasis in this brief is supplied.

22

a claim can be brought in a § 2241 petition," the district court reasonably declined to rule on an issue for which "there is no binding legal authority" without having received briefing from both parties. GA6. This Court should likewise "treat [the] unasserted claim as waived," rather than excusing the Government's failure "to comply with reasonable local rules on the timely presentation of arguments." *Kamen*, 500 U.S. at 99 n.5.

The Government also contends that its newly asserted FDPA challenges should be reviewed because its failure to advance the arguments below was "at most an unintentional forfeiture, as opposed to an intentional waiver." GB38. There are several problems with this position.

First, as addressed in the forgoing section, the Government has failed to identify any error with the lower court's finding that its waiver "was more intentional than inadvertent." GA6. Again, the Government asserts that the "stakes of the litigation" and the "absence of a strategic reason for failing to object" should "have led the district court to find a forfeiture and not a waiver." GB38. The Government cites to this Court's opinion in *Garcia* to support this argument, but *Garcia* held that the record demonstrated waiver, not forfeiture, under circumstances similar to those that occurred here. *See Garcia*, 580 F.3d at 542. Furthermore, the basis for a litigant's decision to waive is "irrelevant," and "a mistake in reaching a decision to withhold a known defense does not make that

decision less a waiver." *Ryan v. United States*, 688 F.3d 845, 848 (7th Cir. 2012).

Here, Bourgeois directly alerted the Government to its failure to respond to the

FDPA claim. The district court had no duty to "delve into the deliberational

process that preceded" the Government's decision to forgo filing a surreply until

two weeks after the court had issued its order finding waiver. *See id.*

Second, even if the Government's failure to raise any arguments against the

FDPA claim was unintentional, there is no basis for treating the Government's

waiver as a reviewable forfeiture—itself a distinction that the Government first

urges on appeal. The distinction between waiver and forfeiture primarily applies in

the criminal context; waived issues are unreviewable, whereas forfeited issues are

reviewed for plain error. *See, e.g.*, *S.E.C. v. Yang*, 795 F.3d 674, 679 (7th Cir.

2015) ("While we may consider a new argument on appeal in criminal cases under

plain error review, *see* Fed. R. Crim. P. 52(b), our ability to review for plain error

in civil cases is severely constricted."); *Russian Media Grp., LLC v. Cable Am.,

Inc.*, 598 F.3d 302, 308 (7th Cir. 2010) ("In civil litigation, issues not presented to

the district court are normally forfeited on appeal."). The Government's reliance on

criminal cases such as *United States v. Ford*, 683 F.3d 761 (7th Cir. 2012), is

therefore unavailing in this civil proceeding. And although the Supreme Court has

held that certain defenses may be "forfeited" as opposed to "waived" in the context

of habeas corpus cases brought under § 2254, it has done so only with respect to

24

"equitable defenses . . . rooted in concerns of comity and finality that arise when federal courts collaterally review state criminal convictions." *Wood v. Milyard*, 566 U.S. 463, 476 (2012) (Thomas, J., concurring); *see also Day v. McDonough*, 547 U.S. 198, 208–10 (2006) (permitting § 2254 district court to raise AEDPA statute of limitations sua sponte because defense implicates same concerns of comity and federalism as nonexhaustion and procedural default defenses). No such considerations are at issue here, when a federal court considers the implementation of a federal criminal judgment.

Third, because the Government's forfeiture theory is based on the premise that its defenses to Bourgeois's Eighth Amendment claim should cross-apply to the FDPA claim, even if accepted, the theory applies *at most* to those arguments. The Government's response contained no reference to its current arguments about the meaning and legislative history of the FDPA, or the availability of the FDPA to challenge the illegal execution of the prisoner's sentence. See GB27–33. Having abandoned those arguments in the district court altogether, the Government fails to "state why" it abandoned them, let alone why "relief should nonetheless be granted." 7th Cir. R. 22(c)(2).

Finally, even if this Court considers certain of the Government's arguments forfeited rather than waived, the Court should find that this case is not among the "exceptional cases" that would justify deciding an appeal on a forfeited ground.

*Ryan*, 688 F.3d at 848 (citing *Wood*, 566 U.S. at 471); *see also Day*, 547 U.S. at 201 (same). The Government argues otherwise on the ground that Bourgeois should not be able to "relitigate" a claim, "with no intervening change in the law or facts." GB40. But that fundamentally mischaracterizes Petitioner's FDPA claim, which is based on legal holdings and diagnostic criteria not available and not applied at the time of his § 2255 proceedings. *See infra* at 32–39. The Government fares no better invoking the "substantial costs" in holding an evidentiary hearing "long after the crime," GB40, as this Court believes that concerns of efficiency (along with fairness and integrity) favor *enforcing* a party's waiver on appeal, not excusing it. *See Boyers v. Texaco Refining & Marketing, Inc.*, 848 F.2d 809, 811–12 (7th Cir. 1988) ("[T]he requirement that parties may raise on appeal only issues which have been presented to the district court maintains the efficiency, fairness, and integrity of the judicial system for all parties.").

The Government's final justification for review of its waived claims—the costs to the victim's family "imposed by the continued lack of finality in this case"—ignores that "[n]o legitimate penological purpose is served by executing a person with intellectual disability," such as Bourgeois, *Hall v. Florida*, 572 U.S. 701, 707 (2014), let alone by contradicting the expressed will of Congress, *see* § 3596(c) ("A sentence of death shall not be carried out upon a person who is mentally retarded."). Furthermore, as the district court observed, the Government

26

waited several years after the conclusion of Petitioner's initial § 2255 proceedings before it ever scheduled an execution date. *See* GA11. This delay calls into question the weight that should be assigned to the Government's concern about finality.

At a minimum, even if the Court believes the Government's savings-clause and abuse-of-the-writ challenges to the FDPA claim were forfeited rather than waived, and that they warrant review, it should remand to the district court for consideration in the first instance. *See e.g.*, *Pullman-Standard v. Swint*, 456 U.S. 273, 292 n.22 (1982) ("Where the trial court fails to make findings, or to find on a material issue, and an appeal is taken, the appellate court will normally vacate the judgment and remand the action for appropriate findings to be made."); *Corcoran v. Wilson*, 651 F.3d 611, 614 (7th Cir. 2011) (remanding for determination of unresolved habeas claims).

### 3. Even considering the Government's waived arguments, Bourgeois has demonstrated his claim may proceed under § 2241.

Bourgeois has never received judicial review of his claim that he is ID under clinical diagnostic standards—current or otherwise. Nevertheless, the Government argues that Bourgeois is precluded from obtaining such review under § 2241 because: (i) his claim does not fit within the facts of certain prior § 2241 cases; and (ii) nothing in the FDPA or this Court's § 2241 jurisprudence allows a petitioner to

"relitigate" a claim that was denied in § 2255 proceedings. Alternatively, the Government argues that the FDPA claim is an abuse of the writ. Each of these arguments is without merit, as discussed in detail below. However, because each relies on the Government's misguided assertion that Bourgeois received full and fair review of his ID claim in his initial § 2255 proceedings, and that the Texas district court complied with the standards of *Moore–I* and *–II* in denying him relief in those proceedings, Petitioner begins by responding to the errors in that allegation.

### a. Bourgeois's ID claim has never been reviewed under constitutionally-mandated diagnostic standards.

#### i. Background

In *Atkins*, the Supreme Court held that the execution of intellectually disabled individuals violates the Eighth Amendment, but largely left "to the States the task of developing appropriate ways to enforce the constitutional restriction." *Atkins*, 536 U.S. at 317. The Texas Court of Criminal Appeals purported to implement *Atkins*'s Eighth Amendment holding in *Ex parte Briseño*, 135 S.W.3d 1 (Tex. Crim. App. 2004). Under *Briseño*, courts must evaluate *Atkins* claims not according to the medical standards used to diagnose ID in other contexts, but according to a list of factors ("*Briseño* factors") and other practices aimed at defining "that level and degree of mental retardation at which a consensus of Texas citizens would agree that a person should be exempted from the death penalty." *Id.*

28

at 6.

For its part, the Fifth Circuit applied essentially the same contra-diagnostic standards used by Texas state courts in evaluating *Atkins* claims. For instance, in 2005, it upheld the denial of Bruce Webster's § 2255 *Atkins* claim under an analysis that disregarded clinical standards and employed a number of practices that were later found to be invalid in *Moore–I*.[3] The Fifth Circuit also repeatedly denied relief under § 2254 to Texas prisoners whose *Atkins* claims had been denied based on *Briseño* factors. *See* PA59 (listing cases). As detailed below, the Texas district court that evaluated Bourgeois's § 2255 ID claim relied on the Fifth Circuit's precedent in *Webster* and § 2254 *Atkins* cases in denying his claim. However, that precedent was effectively abrogated by the Supreme Court's 2017 and 2019 decisions in *Moore–I* and *–II*.

In *Moore–I*, the Court overturned a Texas case applying the *Briseño* factors and held that the "medical community's *current standards*" are binding when assessing a claim of intellectual disability. 137 S. Ct. at 1050–53 (citing DSM–5,

---

[3] In *Webster*, the Fifth Circuit: treated risk factors for ID as alternative explanations for Webster's low functioning, as opposed to contributors to it; used his perceived adaptive strengths to discount his deficits; and relied on erroneous stereotypes that individuals with ID look and talk differently from the general population, are completely incompetent, and are unable to acquire social or functional skills. *United States v. Webster*, 421 F.3d 308, 313 (5th Cir. 2005). As set forth, *infra*, all of these practices were rejected in *Moore–I*.

AAIDD–10, and AAIDD–12 and explaining that, "[r]eflecting improved understanding over time, . . . current manuals offer the 'best available description of how mental disorders are expressed and can be recognized by trained clinicians'"). The Court also rejected the Texas approach as contrary to those standards. For example, *Moore–I* addressed the state court's finding, based on factors unique to Moore, that his IQ score of 74 did not satisfy prong one when the standard error of measurement range of ± 5 encompassed scores of 70 or below. *Id.* at 1047. The Supreme Court reversed the state court's finding and held that prong one was met where—as with Moore—"an individual's IQ score, adjusted for the test's standard error, falls within the clinically established range for intellectual-functioning deficits." *Id.*

Next, the Court invalidated a number of diagnostically inappropriate practices employed by courts when assessing adaptive deficits, including: (i) making an adaptive behavior determination based on an individual's strengths, rather than weaknesses; (ii) relying on erroneous stereotypes regarding the intellectually disabled; (iii) viewing environmental risk factors known to cause ID as evidence undermining the diagnosis of ID, rather than identified causes thereof; (iv) employing "lay perceptions of intellectual disability," rather than the clinical definitions; (v) viewing co-occurring disorders as undermining a diagnosis of ID; and (vi) considering behavior in prison and other highly-structured environments

30

as part of an adaptive behavior analysis. *Id.* at 1049–53. Finally, the Court rejected the so-called *Briseño* factors, as they relied on inaccurate stereotypes of the intellectually disabled, and thus could "not be used . . . to restrict qualification of an individual as [ID]." *Id.* at 1044.

On remand following *Moore–I*, the state court again found insufficient evidence of Moore's adaptive deficits, purporting to use "current medical diagnostic standards." *Ex parte Moore*, 548 S.W.3d 552, 563 (Tex. Crim. App. 2018). The Supreme Court summarily reversed, rejecting the state court's credibility determinations as invalid because those determinations were based on many of the same diagnostically inappropriate factors that were rejected in *Moore–I*. *See Moore–II*, 139 S. Ct. at 670–72.

### ii. Bourgeois's § 2255 court employed the same non-clinical standards that were rejected in *Moore–I* and *–II*.

Relying on then-binding Fifth Circuit precedent, the district court in the Southern District of Texas rejected diagnostic standards in evaluating Bourgeois's § 2255 claim, as explained below.

**Prong One Analysis:** There is no dispute that Bourgeois's only two full-scale IQ scores—75 and 70—meet the diagnostic threshold for significantly deficient intellectual functioning. The Texas district court did not "invalidate" those test scores, or question that the "psychological profession accepts 75 as a

qualifying score for a diagnosis of [ID]." GA88. Instead, the court explained that "[i]n the *legal context*, whether an inmate had significantly subaverage intellectual functioning is a question of fact that the court decides," and it went on to determine that despite his IQ scores, Bourgeois's "true" intellectual functioning "does not correspond to a finding of significant intellectual limitations." GA88–89. This finding alone contradicts *Moore–I* and current diagnostic standards, which *require* that courts find prong one satisfied and proceed to prong two where an inmate's IQ scores fall "within the clinically established range." *Moore–I*, 137 S. Ct. at 1049–50.

Additionally, the court contradicted *Moore–I* and current standards by relying on unscientific, erroneous stereotypes of the intellectually disabled to support its conclusion that Bourgeois's "true" IQ did not satisfy prong one. For instance, the court perceived that Bourgeois "answers the questions asked of him, engages in conversation, has logical thoughts, and does not otherwise give any impression of mental retardation;" "lived a life which, in broad outlines, did not manifest gross intellectual deficiencies;" "worked for many years as a long haul truck driver," "bought a house, purchased cars, and handled his own finances;" and "otherwise carried himself without any sign of intellectual impairment." GA76, 93, 95. Even assuming this testimony accurately represented Bourgeois—who has a long history of masking his ID and soliciting supports that obscured his deficits,

32

*see* PA38–40—none of the "skills" cited by the court conflicts with a finding of ID. To the contrary, each aligns with the erroneous but commonly held stereotypes identified by the AAIDD. *See* PA482 (per AAIDD–12, such stereotypes include that persons with ID: "look and talk differently from persons in the general population," "are completely incompetent and dangerous," "cannot acquire vocational and social skills necessary for independent living," "cannot do complex tasks," "are characterized only by limitations and do not have strengths that occur concomitantly with their limitations," "cannot get driver's licenses, buy cars, and drive cars," "do not (and cannot) support their families," and "cannot acquire vocational and social skills necessary for independent living").

The district court's finding that Bourgeois's "skills" were inconsistent with ID is further contradicted by the DSM–5, which expressly recognizes that persons with significant adaptive deficits can maintain regular employment in jobs that do not emphasize conceptual skills, and can age-appropriately attend to personal care. *See* PA424–25. The Texas district court also relied on its own lay assessment of Bourgeois's intellectual functioning. GA97 ("The Court had sufficient interaction with Bourgeois to make a lay assessment of whether he functions at the low level described by his expert witnesses. . . . Based on this Court's own observations, the testimony that Bourgeois has significant intellectual limitations is not credible or persuasive."). As noted above, *Moore–I* rejected lay assessments of ID as

33

improper. The Texas court's findings also invoke several of the "*Briseño* factors" that were struck down by the *Moore–I* Court, including: "Has the person formulated plans and carried them through or is his conduct impulsive?;" "Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?;" and "Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?" *Briseño*, 135 S.W.2d at 8.

Furthermore, the Texas court credited the Government expert's opinion that Bourgeois's "inability to test well" could be explained by the fact that he "is someone who has been somewhat culturally deprived, didn't profit from education as much as someone else, [and did] not experience things that were intellectually academically enriching." GA92. As the *Moore-I* court noted, these are risk factors for ID that make the diagnosis *more* likely. *Moore-I*, 137 S. Ct. at 1044. Finally, the Texas court refused to apply the Flynn Effect, GA87 n.37, while the AAIDD–10 and the DSM–5 require that IQ scores be Flynn-corrected. *See* PA447; PA427.

**<u>Prong Two Analysis:</u>** Turning to adaptive deficits, the Texas district court again applied the unscientific standards that were later rejected in *Moore–I* and *–II*. The court began its analysis by dismissing the clinical approach to adaptive functioning, observing: "An examination for mental retardation, and particularly the adaptive–skills component of that inquiry, *involves the subjective evaluation* of

skills, aptitudes, and life experiences." GA81. This view contradicts both the DSM–5 and the AAIDD–10, which require the use of "clinical judgment" in evaluating prong two. PA427; PA463, 471–72.

The court further rejected diagnostic standards by differentiating between a "legal" and a "psychological" approach to adaptive functioning. GA68 (although the "mental health community ignores an individual's strengths when looking at adaptive functioning," the "federal inquiry into adaptive deficits takes on a much different flavor"). Contrary to *Moore–I*'s dictate that adaptive behavior assessments focus on the individual's *deficits*, rather than strengths, *Moore–I*, 137 S. Ct. at 1050, the Texas court adopted what it viewed as the "legal" approach and weighed what it perceived to be a defendant's strengths against his adaptive deficits. GA102 ("The law will compare the deficiencies to positive life skills, presuming that adaptive successes blunt the global effect of reported insufficiencies.").

The Texas court also departed from diagnostic criteria by resorting to unscientific and outdated stereotypes to determine that Bourgeois's functioning was inconsistent with a diagnosis of ID. *E.g.*, GA76 ("Bourgeois had lived a life which, in broad outlines, did not manifest gross intellectual deficiencies.); GA95 ("[T]hose who knew [Bourgeois] as an adult did not suspect that he was mentally retarded."); *id.* (working as a long-haul trucker "inconsistent with mental

retardation"); GA115 (describing Bourgeois's well-groomed appearance). Just as with the prong-one analysis, relying on these "skills" to undermine a prong-two finding is contrary to diagnostic standards and employs the stereotypes rejected in *Moore–I*. *See* PA424 (per the DSM–5, individuals with significant deficits in the practical domain "may function age-appropriately in personal care" and "*often*" experience "competitive employment" in "jobs that do not emphasize conceptual skills"); PA482 (per AAIDD–12, listing examples of erroneous but commonly held stereotypes of the intellectually disabled). Furthermore, whether the person's "family, friends, teachers, [and] employers" thought the defendant was ID— another consideration the Texas court used against Bourgeois—was one of the *Briseño* factors expressly struck down by *Moore–I*, 137 S. Ct. at 1051.

Similarly, the Texas court relied on the dysfunctional elements of Bourgeois's background as alternate explanations for his impairments. *E.g.*, GA118 (theorizing that Petitioner's poor academic performance may have been due to "his unstable home life" or "the hampering effects of a deprived home environment"); GA124 ("record does not *conclusively link*" Bourgeois's problems as child "to mental retardation rather than a culturally deprived upbringing, poverty, or abuse"). These are all risk factors for intellectual disability that *explain* the diagnosis. They do not undermine it. *Moore–I*, 137 S. Ct. at 1051. Likewise, the Texas court improperly used comorbid diagnoses to explain away adaptive

deficits. GA120 (minimizing Bourgeois's poor adaptive behavior because it was "more likely related to his personality disorder, especially his impulsivity and sense of entitlement"). This practice was also later rejected by *Moore–I*, 137 S. Ct. at 1051.

As with prong one, the Texas court also gave significant weight to its own lay assessment of Bourgeois's communication skills. GA90. In this way, the court employed erroneous stereotypes and relied on a contra-diagnostic *Briseño* factor. GA75 n.55, 81; AAIDD–12 at 26 (listing "[p]eople with ID look and talk differently from person from the general population" as an erroneous stereotype); *Moore–I*, 137 S. Ct. at 1046 n.7 (rejecting the *Briseño* factor: "Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?" as unscientific). And finally, it relied on Bourgeois's writings, all of which were produced from prison and constitute prison functioning. GA61–62, 95–96; *cf.* PA477 (prohibiting use of prison behavior in prong two); *Moore–I*, 137 S. Ct. at 1050 (same).

Finally, the Texas district court's refusal to follow diagnostic criteria caused it to credit the Government's adaptive-behavior expert, Dr. Moore, over the defense expert, Dr. Swanson. According to the court, Dr. Moore "took a full range of behavior into consideration when evaluating informal accounts for adaptive deficits," whereas "Dr. Swanson lessened her credibility when she only focused on

information supporting mental retardation without giving weight to or reconciling factors that disproved her conclusions." GA87. In fact, Dr. Swanson testified that she considered both strengths and deficits throughout her evaluation, and acknowledged several of Bourgeois's strengths (such as his ability to copy well and recognize words). *See* PA66–67 (citing testimony). But, consistent with diagnostic criteria, she also explained that these strengths did not offset Bourgeois's deficits in any given area. *Id.*

The court also criticized Dr. Swanson for "refus[ing] to factor Bourgeois' long colloquies with the Court" into its assessment. GA121 n.69. And, the court complained that a "persistent feature of the testimony from Bourgeois' experts"— including Dr. Swanson—"was a failure to consider fully his alleged intellectual limitations against the whole background of his life." GA121. The court based this conclusion on its finding that "testimony from various individuals questioned his intellect when younger, [but] those who knew him as an adult did not suspect that he was mentally retarded." *Id.* As discussed above, all of this analysis is contradicted by *Moore–I* and *–II,* as reliance on verbal functioning and lay opinions on whether Bourgeois was ID relies on erroneous stereotypes, runs contrary to diagnostic standards, and employs *Briseño* factors.

**In sum,** § 3596(c) entitles Bourgeois to establish he is ID under the principles adopted in *Moore–I* and *–II* and current clinical standards before the

38

Government may carry out his execution. Because the Texas court eschewed medical standards in denying relief in 2011, Bourgeois has never received such review. Accordingly, to the extent that the Government claims in its various challenges to the cognizability of Bourgeois's FDPA claim that he is merely relitigating his § 2255 ID claim, the Government is wrong.

### b. This Court's precedent supports the availability of § 2241 to redress Bourgeois's claim.

The Government describes three cases—*In re Davenport*, 147 F.3d 605 (7th Cir. 1998); *Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001); and *Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015)—in which this Court held § 2241 review appropriate, and argues that Bourgeois's FDPA claim cannot proceed because it "does not fall within the narrow categories of habeas claims" identified in these cases. GB24–27. Yet this Court has never held that these three cases represent the only circumstances under which the savings clause is available. To the contrary, the *Webster* court made clear that the only requirement for establishing § 2241 jurisdiction through the savings clause is that there be "some kind of structural problem with section 2255." *Webster*, 784 F.3d at 1136; *see also id.* at 1137 (describing *Garza* as "*one illustration* of a situation in which petitioner was entitled under the savings clause to use section 2241 to attack a sentence").

Hence, although Bourgeois does not fit within the precise facts of *Davenport*, *Garza*, or *Webster*, he need not do so. The enduring theme throughout all three cases is that § 2241 was designed "to give a prisoner a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence." *Davenport*, 147 F.3d at 609. In each case, this Court faced a setting where the defendant was unable to effectively raise the claim in question during his initial § 2255 proceedings and was simultaneously unable to file a successive petition under § 2255(h). In *Davenport*, the claim relied on a new, retroactive rule of statutory law; in *Garza*, it was an opinion by an international tribunal that could not have been issued until after Garza's initial § 2255 proceedings were complete; and in *Webster*, it was newly-discovered evidence supporting an ID claim that Webster had unsuccessfully litigated at trial and in § 2255 proceedings. In all three of these settings, the Court granted savings clause review because the petitioner had identified "some kind of structural problem with section 2255." *Webster*, 784 F.3d at 1136.

By establishing that he is presently ID but without an avenue under § 2255 to vindicate his FDPA claim, Bourgeois has likewise established a structural defect with § 2255. Just as in *Davenport*, Bourgeois "could not have raised his claim in his first § 2255 motion because of then-binding precedent that [*Moore–I* and *–II*] later abrogated." GB21 (citing *Davenport*). "He also could not raise his claim in a

40

second or successive § 2255 motion" due to the strict limits erected by § 2255(h). GB21 (citing *Davenport*). The Government argues that Bourgeois is nevertheless unable to satisfy the rule established by *Davenport* because *Moore–I* and *–II* are constitutional cases, rather than statutory, and they do not apply retroactively. GB25–26. But the parties agree that the legal and diagnostic standards governing a claim under § 3596(c) are the same as an *Atkins* claim, meaning that *Moore–I* and *–II* apply equally to Bourgeois's FDPA claim as to his *Atkins* claim. And, even assuming *Moore–I* and *–II* are not retroactive, the language of the FDPA—which states that an execution "shall not be carried out" against a person who "is" ID— calls for an inquiry governed by present-day diagnostic standards. *See* GA7–8 n.5 (district court explaining FDPA claim requires application of "current law"). Lastly, not even the Government challenges that the unlawful execution of the intellectually disabled would be a "miscarriage of justice." *See Chazen v. Marske*, 938 F.3d 851, 856 (7th Cir. 2019) (establishing requirements for *Davenport*-type § 2241 claim, including that petitioner demonstrate unavailability of § 2255 results in "miscarriage of justice").

Bourgeois's claim also parallels those at issue in *Garza* and *Webster*. Just as it was "literally impossible" for Garza to have raised his § 2241 claim in his initial § 2255 motion because it relied on a decision post-dating his § 2255 proceedings, it was "literally impossible" for Bourgeois to rely on the *Moore* decisions and current

diagnostic standards in his initial § 2255 proceedings. *Garza*, 253 F.3d at 922–23. And just as the *Webster* Court deemed it "Kafkaesque" that a procedural rule (namely, § 2255(h)), "would (or could) lead to" the unconstitutional execution of a petitioner who developed a meritorious ID claim *after* his § 2255 proceedings), it is no less "Kafkaesque" that the same procedural rule could allow the Government to carry out an illegal execution against Bourgeois, who also developed a meritorious ID claim *after* his § 2255 proceedings. *Webster*, 784 F.3d at 1139.

Still more Kafkaesque would be for Bourgeois to lack a remedy after litigating his disability as he has over the years. The Fifth Circuit denied Bourgeois leave to file a successive § 2255 petition on account of his previous *Atkins* claim, even though the same court has *twice* allowed other prisoners to bring successive petitions under *Moore–I* after not previously asserting an *Atkins* claim at all—and on the grounds that the prisoners may not have been disabled enough to bring plausible claims under pre-*Moore* standards. *See In re Cathey*, 857 F.3d 221, 232 (5th Cir. 2017); *In re Johnson*, 935 F.3d 284, 293 (5th Cir. 2019). Bourgeois, then, was precluded from bringing a successive petition because he was *more* diligent than Messrs. Cathey and Johnson. Nothing in this Court's precedent requires such an arbitrary result.

**c.** **The Government's arguments against Bourgeois's use of § 2241 to challenge the execution of his sentence under the FDPA are unpersuasive.**

Next, the Government contends that, although "styled" as a challenge to the execution of his death sentence, Bourgeois's FDPA claim is nothing more than an improper attempt to relitigate his § 2255 *Atkins* claim. To support this position, the Government argues: (i) Bourgeois must be raising the same claim he raised in his initial § 2255 proceedings because his disability cannot have changed; (ii) the FDPA does not allow for relitigation of an ID claim that has already been subject to collateral review; and (iii) the FDPA claim cannot be a challenge to the *execution* of Bourgeois's sentence because, in § 2255 proceedings, he asserted his intellectual disability to challenge the *imposition* of his sentence. Each argument is without merit.

**i.** **Bourgeois does not claim a change in his disability.**

The Government claims that Bourgeois is *necessarily* raising the same ID claim that was adjudicated in his § 2255 proceedings because he "cannot have developed intellectual disability after the Texas district court adjudicated his claim." GB29. This contention misses the point. The language of the FDPA—which states that an execution "shall not be carried out" against a person who "is" ID—calls for an inquiry governed by present-day legal and diagnostic standards. And, as explained in detail above, the Texas district court that denied Bourgeois's

43

§ 2255 claim refused to apply the diagnostic standards applicable at the time, let alone current diagnostic standards; and it engaged in many of the specific counter-diagnostic analyses that the Supreme Court found to be unconstitutional in *Moore–I* and *–II. Supra* at 32–39. Accordingly, although Bourgeois's impairments have not changed, the legal and diagnostic standards used to analyze those impairments—and as a result, his entitlement to relief—have changed.

### ii. The plain text of the FDPA unambiguously bars Bourgeois's execution.

Although the Government raises—for the first time—various arguments targeted at the text of the FDPA, it cannot reasonably dispute that the plain text of § 3596(c) bars the "carr[ying] out" of the execution of a person who "is" ID under the diagnostic standard applicable at the time of the execution. As the Supreme Court recently affirmed, a statute is to be interpreted "in accord with the ordinary public meaning of its terms," as "only the words on the page constitute the law adopted by Congress and approved by the President." *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731, 1738 (2020).

The Government points out that § 3596(b) prohibits the execution of "a woman *while* she is pregnant," and that Congress did not use the conjunction "while" in § 3596(c). GB30 n.11. However, a contextual interpretation of this portion of the FDPA only supports Bourgeois's point. The relevant sub-paragraphs

read, in their entirety:

(b) **Pregnant woman** – A sentence of death shall not be carried out upon a woman while she is pregnant.

(c) **Mental capacity** – A sentence of death shall not be carried out upon a person who is mentally retarded. A sentence of death shall not be carried out upon a person who, as a result of mental disability, lacks the mental capacity to understand the death penalty and why it was imposed on that person.

§§ 3596(b)–(c).

All three prohibitions—pregnancy, mental incompetence, and intellectual disability—are forward-looking and assess the prisoner's status at the time of execution, rather than at the time of sentencing. The FDPA constrains the execution of any such sentences, whether or not they were validly imposed, and even if the prisoner at the time of trial was non-pregnant, mentally competent, and non-disabled under the standards prevailing at trial. There is no reason to differentiate intellectual disability from the other two Congressionally-created exemptions to execution. "One of the more reliable canons of statutory construction—the normal practice—is that a term or phrase is ordinarily given the same meaning throughout a statute." *State Farm Mut. Auto Ins. Co. v. C.I.R.*, 698 F.3d 357, 370 (7th Cir. 2012). If a pregnant or mentally incompetent prisoner who faces imminent execution may seek relief under § 2241, then so may a prisoner who is intellectually disabled under current legal and diagnostic standards. *See United States v. Webster*, 162 F.3d 308, 352 (5th Cir. 1998) (finding significant

Congress's "placement" of the intellectual-disability exemption among "restriction[s] on who could be executed . . . rather than in the earlier sections" on who could be sentenced to death).

Legislative history confirms that Congress understood that the FDPA would allow defendants to raise such claims "at any time," including between judgment and execution. *See* 136 Cong. Rec. S6873–03, S6876, 1990 WL 69446, 101st Cong., 2d Sess. (May 24, 1990) (comments by Sen. Orrin Hatch). The Government attempts to distinguish this commentary by arguing that Senator Hatch "made the cited statement in support of an amendment to allow imposition of the death penalty on the intellectually disabled" and that Senator Hatch's amendment failed. GB31 n.13. This fact only strengthens Bourgeois's position. Congress, knowing the implications that the FDPA's prohibition on the execution of the intellectually disabled, *rejected* Senator Hatch's amendment and *chose* to include this prohibition. That Senator Hatch opposed the clause does not change its meaning.

The Government similarly attempts to distinguish an ID claim from one based on mental incompetency on the ground that the latter can be lost or gained over time, whereas ID is a permanent condition that must have manifested before the age of eighteen. As before, this argument misses the point. While Bourgeois's impairments have not changed, the diagnostic and legal standards under which those impairments are assessed have changed. Because Bourgeois meets the

46

current diagnostic and legal standards for a claim of intellectual disability, § 3596(c) prohibits his execution.

The Government's next argument discusses what the text of the FPDA does *not* say, namely, it "does not suggest that Congress intended to enable prisoners to *re*litigate intellectual-disability claims at any time." GB29. The Government repeats this assertion with respect to the drafting history of the FPDA. *See* GB30–31. Yet Bourgeois has never claimed that the text or drafting history of the FDPA support *relitigation* of a challenge that had been reviewed under the same legal and diagnostic standards applicable at the time of execution. His argument is that, under a plain reading of the FDPA, he is entitled to prove he is ineligible for execution under current legal and diagnostic standards not available at the time he previously litigated his ID claim. The Government has never—and does not now— challenge that proposition. It never disputed below, for example, that Bourgeois's claim of ID under §§ 2241 and 3596 is governed by current clinical standards as the district court held. *See* GA7 n.4 ("When, as here, a claim can be brought via § 2241, the Court applies current law.").

Equally unavailing is the Government's reliance on stray language from *Webster*, in which the Court "assume[d]" that the FDPA alone would not allow Webster's claim to proceed on his "new evidence" claim under § 2241. GB28 (citing *Webster*, 784 F.3d at 1139). Webster's § 2241 petition did not present any

47

arguments under the FDPA, let alone bring a claim analogous to that asserted by Bourgeois here. Nor did Webster assert that his § 2255 *Atkins* claim was denied under contra-diagnostic standards that have since been declared unconstitutional. Accordingly, as the Government acknowledges, the *Webster* Court did not "address the contours of the FDPA." GB28.

Also unhelpful are the out-of-circuit cases that the Government describes as "reject[ing] similar attempts to relitigate intellectual-disability claims." GB31 (citing *Williams v. Kelley*, 858 F.3d 464 (8th Cir. 2017) and *Busby v. Davis*, 925 F.3d 699 (5th Cir. 2019)). As set forth *supra*, Bourgeois is not trying to "relitigate" an ID claim, but is raising this claim based on intervening changes in the legal and diagnostic standards. Moreover, these cases are irrelevant because they both involve an *Atkins* claim brought by a state prisoner under 28 U.S.C. § 2254. Hence, neither of the decisions addresses the language of § 3596(c) prohibiting the carrying out of an execution against a federal prisoner who is ID. Nor is either decision pertinent to whether an FDPA claim may be brought under § 2241, as there is no equivalent to the § 2255(e) savings clause available to state prisoners whose claims are barred by § 2254's limitations on second or successive petitions. *See Williams*, 858 F.3d at 473.

### iii. Bourgeois properly challenges the execution of his sentence under § 2241.

The Government next argues that the claim "is far afield from a claim that challenges *only* the execution of a sentence and not its legality." GB32. Yet neither of the two cases cited by the Government establishes that a petitioner cannot challenge *both* the imposition *and* the execution of an unlawful sentence. In *Atehortua v. Kindt*, 951 F.2d 126, 129 (7th Cir. 1991), the Court held that the petitioner could not avail himself of § 2241 because he had "failed to demonstrate that a § 2255 motion is inadequate to test the legality of his detention." Here, Bourgeois's FDPA challenge to the execution of his sentence relies on legal and diagnostic criteria not available at the time of his initial § 2255 proceedings, and which cannot be raised in a successive § 2255 petition. Bourgeois is therefore in an entirely different procedural posture than was the petitioner in *Atehortua*. And in *Valona*, 138 F.3d at 694, the Court noted that a petitioner cannot "use a petition under § 2241 to call into question the *validity* of a conviction or sentence *that has already been subject to collateral review*." Bourgeois's FDPA challenge is to the execution of his sentence, not its validity, and the claim he now asserts has not already been subject to collateral review.

The final problem with the Government's argument that Bourgeois cannot

proceed under § 2241 is that it defies the language of and intent behind the FDPA, as well as Supreme Court and Seventh Circuit jurisprudence upholding the prohibition against executing the intellectually disabled. The Government's position would necessarily exclude challenges from petitioners—like Bourgeois— who were determined not to be ID under the legal standards prevailing at the time of § 2255 proceedings, but are ID under current legal and diagnostic standards. If it were to be accepted, the Government's position would create the precise situation that the Supreme Court, this Court, and Congress have sought to avoid: "an unacceptable risk that persons with intellectual disability will be executed." *See Moore–I*, 134 S. Ct. at 1990; *Webster*, 784 F.3d at 1139; § 3596(c).

### d.      The FDPA claim is not an abuse of the writ.

The Government next characterizes Bourgeois's claim as an abuse of the writ. The Government chiefly relies on *Roundtree v. Krueger*, 910 F.3d 312 (7th Cir. 2018). The Court in *Roundtree*, however, observed that § 2241 does not permit "relitigation . . . of a contention that was actually resolved in a proceeding under § 2255, *unless the law changed after the initial collateral review*." *Id.* at 313. Roundtree's § 2241 petition was properly dismissed because he did not "contend that the law has changed in the slightest after the Eighth Circuit rejected his contentions." *Id.* at 313–14. The Government's other cases are similar. *See Arnaout v. Marberry*, 351 F. App'x 143, 144–45 (7th Cir. 2009) (petitioner did

"not contend that the law ha[d] changed or that new facts ha[d] come to light");

*Queen v. Miner*, 530 F.3d 253, 255 (3d Cir. 2008) (§ 2241 petition was properly dismissed because prisoner's claim "either had been, or could have been, decided in his previous habeas action"). Bourgeois's claim, by contrast, relies on changes in the law and in the facts that postdate his initial collateral proceedings, as he seeks review of his ID claim under current diagnostic standards as required by *Moore–I, Moore–II*, and the FDPA alike.

The Government attempts to analogize Bourgeois's case to *Roundtree* by asserting that, because the Supreme Court has not declared that *Moore–I* and *Moore–II* apply retroactively, "nothing has changed legally" since Bourgeois's initial § 2255 proceedings. GB34. But the abuse-of-the-writ doctrine does not limit actionable changes in the law to those deemed retroactive by the Supreme Court, *Roundtree*, 910 F.3d at 314, and in any event, the FDPA speaks of the prisoner's current ID status and thus incorporates current clinical standards. The law from *Moore–I* and *Moore–II* thus apply to Bourgeois's claim concerning his current ID status regardless of whether they apply retroactively.

**B.      Bourgeois Made a Strong Showing that He Is Intellectually Disabled Under Current Diagnostic Standards.**

After determining that the Government had waived any challenge to the cognizability of Bourgeois's FDPA claim, the district court found that he "made a

51

strong showing that he is intellectually disabled and thus the FDPA forbids his execution." GA2. The Government's appeal of this finding does not allege, let alone establish, that the district court erred in applying *Moore–I* and current diagnostic standards. *See* GA7 n.4. Nor does the Government put forth evidence countering the finding that Bourgeois made a strong showing that he is ID under these standards. Instead, the Government complains that "the district court below cast aside the Texas district court's findings" from 2011 and reached a different conclusion. GB44. But that fact is entirely unsurprising, given that the district court in these proceedings applied different legal and diagnostic standards than were used in 2011, *the propriety of which the Government does not challenge*.

Addressing the issue of diagnostic standards first, the Government defends the Texas court's decision on the ground that it "recognized the *Atkins* standard and adhered to the AAIDD–[10] and DSM–IV definitions of intellectual disability." GB41. But *Moore–I* and *Moore–II* make clear that applying the clinical definition of intellectual disability is much more than simply reaching opinions on the three prongs of the diagnosis. Because the state court in *Moore* assessed those three prongs with reference to standards that violated the "medical community's diagnostic framework," the Supreme Court held that this approach "creat[ed] an unacceptable risk that persons with intellectual disability will be executed." *Moore–I*, 137 S. Ct. at 1048, 1053. The same is true of the Texas federal court's

52

ruling in Bourgeois's case. *See supra* at 32–39 (providing multiple instances of the court rejecting application of diagnostic criteria).

In any event, the Government ignores that, even if the Texas district court had faithfully applied diagnostic criteria in its analysis (instead of expressly eschewing them), it could not have relied on the AAIDD–12, DSM–5, or AAIDD–15, as each was published after the § 2255 court issued its decision in 2011. This fact is significant because the diagnostic standards have changed in several respects, including:

- The AAIDD–12 makes clear that it is critical to avoid the use of stereotypes in assessing adaptive functioning, and it identifies a number of the same factors relied upon by the Texas district court as erroneous misconceptions about persons with ID. *Supra* at 32–33, 36–37.

- The DSM–5 provides clinical descriptions of significant adaptive deficits, many of which contradict the Texas district court's conclusions. *Supra* at 34–36.

- The DSM–5 makes clear that IQ test scores must be evaluated pursuant to "clinical judgment," not the Texas district court's lay assessment of Bourgeois's "true" intellectual abilities. PA447.

- With the DSM–5, the APA joined the AAIDD in mandating the application of the Flynn Effect. PA427.

The Government also disputes "that the Texas district court's analysis was incompatible with *Moore–I* and *Moore–II*" because, according to the Government, the court "did not rely on the factors articulated" in *Briseño*. GB45. However, the Government only addresses *two* of the myriad ways the Texas district court's

analysis violated the requirements of *Moore–I* and *–II*. *Supra* at 32–39. Furthermore, even with respect to the two "claims of specific error" that the Government addresses, its defenses of the Texas court are contradicted by the record.

First, the Government states that "Bourgeois is incorrect that the Texas district court's decision is contrary to *Moore–I* and current diagnostic standards" with regard to application of the Flynn Effect, noting the Texas court "expressly cited the AAIDD–[10]" as informing that "best practices require recognition" of the effect. GB45. But the Government fails to mention that the court nevertheless declined to apply those "best practices" and correct for the Flynn Effect. The Government also notes that Bourgeois's own expert testified that the Flynn Effect was "'not relevant' because Bourgeois's scores satisfied *Atkins* in and of themselves." *Id.* But this does not vindicate the Texas district court, since it also (i) recognized that both of Bourgeois's valid IQ scores were "qualifying score[s] for a diagnosis of" ID without the Flynn Effect; (ii) nevertheless determined that he failed to demonstrate subaverage intellectual functioning in the contra-diagnostic "legal context;" and (iii) based that determination on a lay assessment of Bourgeois's conduct in the courtroom and various unscientific stereotypes about the intellectually disabled. GA89–99; *supra* at 32–35. Thus, regardless of whether the Texas court was required to apply the Flynn Effect, its treatment of the

intellectual-functioning prong of ID was contradicted by *Moore–I* and current diagnostic standards.

Next the Government denies that the Texas district court "counteract[ed] [Bourgeois's] adaptive deficits by overemphasizing adaptive strengths and unscientific stereotypes of intellectually disabled individuals." GB46. In fact, as it did under prong one, the court expressly announced that, notwithstanding the medical criteria directing otherwise, it would *intentionally* counteract Bourgeois's deficits by looking to his adaptive strengths. GA102. The Government attempts to argue otherwise by reframing the Texas court's findings as the product of a credibility determination of competing experts. GB46. But *Moore–II* made clear that credibility findings based on diagnostically inappropriate analyses cannot trump a court's obligation to apply clinical standards when deciding what evidence to believe. *See* 139 S. Ct. at 670. Here, because the Texas court's assessment of each experts' credibility was based on scientifically invalid analyses, those credibility findings are similarly invalid. *Supra* at 38–39.

Lastly, although the Government criticizes the district court below for devoting "less than two pages of analysis" to the likelihood that Bourgeois will succeed on the merits, *see* GB44, it is worth reiterating that the Government presented *no evidence* to challenge Bourgeois's ID claim under current standards, but relied solely on the Texas district court's now-invalid analysis. Thus, the

55

district court correctly summarized the substantial evidence Petitioner submitted through his pleadings and found it to be sufficient to warrant a stay—itself a limited inquiry made for the purpose of maintaining the status quo. *See Bath Indus. v. Blot*, 427 F.2d 97, 111 (7th Cir. 1970) (court need not "review the case in its entirety on the merits" before granting preliminary injunction").

## II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY CONCLUDING THAT THE REMAINING EQUITABLE CONSIDERATIONS WEIGH IN FAVOR OF A STAY.

After determining that Bourgeois had satisfied the first of the stay factors, it turned to the remaining considerations. First, the district court addressed irreparable harm, explaining that the Government's response did not address this factor, "likely because 'irreparable harm is taken as established in a capital case.'" GA10 (quoting *Williams v. Chrans*, 50 F.3d 1358, 1360 (7th Cir. 1995)). Accordingly, the court found Bourgeois has established irreparable injury.

Despite this Court's jurisprudence holding there "can be no doubt that a defendant facing the death penalty at the hands of the state faces irreparable injury," *id.*, and the fact that it waived any objection to Bourgeois satisfying this factor, the Government now challenges it. Specifically, the Government argues that "Bourgeois will only suffer irreparable injury . . . if his position on the merits of his claim is correct." GB47. This contention warrants no consideration, not only because it is waived, but also because it is merely an attempt to reargue the first

stay factor.

Turning to the potential harm to the Government and the public interest, the district court began by recognizing that the United States generally has a "strong interest" in enforcing judgments, but found it significant that the Government waited until 2019 to set an execution date, even though Bourgeois's § 2255 proceedings concluded in 2013. GA10–11. It also noted that the Government "did not even have an execution protocol for eight years (from 2011 until 2019)." *Id*. The court thus soundly determined that the Government's "interest in enforcing its judgment is not as strong as it suggests," and does not "outweigh Bourgeois's strong interest in not facing execution when the FDPA may forbid it." *Id.*

The Government challenges this finding on the ground that, by considering the Government's own delay, the district court created "a perverse incentive for the [G]overnment to rush all executions, rather than act in a prudent and deliberate manner." GB48. But the court also observed that "the public interest favors ensuring that [Bourgeois] is not unlawfully executed." GA11. If the Government were "to rush all executions," the public interest would only weigh *further* in favor of staying an execution, particularly in the case of a prisoner who colorably claims to be legally ineligible for execution. *See Hall*, 572 U.S. at 707 ("No legitimate penological purpose is served by executing a person with intellectual disability."); § 3596(c) ("A sentence of death *shall not be carried out* upon a person who *is*

mentally retarded.").

Lastly, the court considered whether Bourgeois had unnecessarily delayed bringing his claim. GA11 (citing *Nelson v. Campbell,* 541 U.S. 637, 649–50 (2004)). The court remarked that the Government did not "address this question at all, let alone suggest that Bourgeois has not diligently pursued [his] claims." *Id*. Nevertheless, the court conducted its own inquiry and concluded that the "timeline shows that Bourgeois has not unnecessarily delayed bringing his claims," noting that he sought to bring his claim via § 2255 within one year of *Moore–I* and "[o]nce that avenue was foreclosed, Bourgeois sought to bring his claims here via § 2241 less than a year later." *Id.* "Thus, this is not a case where an inmate waited several years to bring his claims." *Id.*

Once again ignoring that it has waived any challenge to this finding, the Government now baldly asserts that Bourgeois delayed his claim. GB48. But the Government finds no fault with the court's timeline, and even notes another factor in Bourgeois's *favor*, namely, that he brought his § 2241 petition less than six months after the Supreme Court issued *Moore–II*. Nor does it allege that Bourgeois unnecessarily delayed in a manner that was "abusive" or "manipulative," as was found to be the case in *Nelson*. *See* 541 U.S. at 649–50. The mere suggestion that Bourgeois could have filed his petition in fewer than six months following *Moore–II* does not approach demonstrating that the district court abused its discretion in

58

finding Bourgeois had not "unnecessarily" delayed his filing, or that the delay was so significant that it should outweigh all of the other equities in his favor.

This Court affords "substantial deference" to a district court's grant of preliminary relief. *Wisconsin Music Network v. Muzak Ltd. Partnership*, 5 F.3d 218, 221 (7th Cir. 1993). The question "is whether the judge exceeded the bounds of permissible choice in the circumstances, not what [this Court] would have done if [it] had been in [judge's] shoes." *Id.* The Government fails to show that the district court abused its discretion, either in analyzing the individual stay factors or in finding that balance of them weighs in favor of allowing Bourgeois to litigate his colorable claim through an evidentiary hearing and otherwise. The rulings below should be affirmed.

# CONCLUSION

For the reasons set forth above, this Court should affirm the district court's stay of execution and its denial of the Government's motion for reconsideration.

Respectfully submitted,

/s/ *Peter Williams*
Peter Williams
   *Counsel of Record*
Victor J. Abreu
Katherine Thompson
Assistant Federal Defenders
Federal Community Defender Office for
   the Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215–928–0520

Dated: July 16, 2020

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P.

28.1(e)(2)(B) and Seventh Circuit Rule 32(c) because it contains 13,834 words,

excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5),the type style requirements of Fed. R. App. P. 32(a)(6), and Seventh

Circuit Rule 32(b), because it has been prepared in a proportionally spaced

typeface using Microsoft Word 2010 in 14 point Times New Roman.

/s/ *Peter Williams*
Peter Williams

## CERTIFICATE OF SERVICE

I, Peter Williams, hereby certify that on July 16, 2020, I electronically filed the foregoing brief with the Clerk of Court for the Seventh Circuit by using the appellate CM/ECF system. I further certify that I will cause 15 paper copies of the brief to be received by the Clerk within seven days of the Notice of Docket Activity generated upon acceptance of the brief, in compliance with Seventh Circuit Rule 31(b) and ECF Procedure (h)(2).

Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ *Peter Williams*
Peter Williams