No. 20–1891

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

ALFRED BOURGEOIS,
*PETITIONER-APPELLEE,*

v.

SUPERINTENDENT,
USP—TERRE HAUTE,
UNITED STATES OF AMERICA,
*RESPONDENTS-APPELLANTS.*

_____

On Appeal from the United States District Court
for the Southern District of Indiana
No. 2:19–cv–00392, Hon. Jane Magnus-Stinson, Chief J.

**APPENDIX TO BRIEF OF APPELLEE
VOLUME I : (PAGES PA-001 TO PA-317)**

**THIS IS A DEATH PENALTY CASE**

Peter Williams
　　*Counsel of Record*
Victor J. Abreu
Katherine Thompson
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215–928–0520

*Counsel for Petitioner-Appellee Alfred
Bourgeois*

Dated: July 16, 2020

# TABLE OF CONTENTS

## VOLUME I

### Pleadings in 28 U.S.C. § 2241 Proceedings

Petition for Writ of Habeas Corpus, *Alfred Bourgeois v. Superintendent, USP— Terre Haute, United States of America*, 2:19–cv–992–JMS–DLP (S.D. Ind. Aug. 15, 2019) ...................................................................................... PA–001

Motion for Stay of Execution, *Alfred Bourgeois v. Superintendent, USP—Terre Haute, United States of America*, 2:19–cv–992–JMS–DLP (S.D. Ind. Aug. 15, 2019) ...................................................................................... PA–079

Return to Order to Show Cause, *Alfred Bourgeois v. Superintendent, USP—Terre Haute, United States of America*, 2:19–cv–992–JMS–DLP (S.D. Ind. Oct. 18, 2019)...................................................................................... PA–210

## VOLUME II

### Pleadings in 28 U.S.C. § 2241 Proceedings (cont.)

Reply in Support of Petition for Writ of Habeas Corpus and Motion for Stay of Execution, *Alfred Bourgeois v. Superintendent, USP—Terre Haute, United States of America*, 2:19–cv–992–JMS–DLP (S.D. Ind. Nov. 15, 2019).................. PA–318

Motion to Reconsider Order Staying Execution of Alfred Bourgeois, *Alfred Bourgeois v. Superintendent, USP—Terre Haute, United States of America*, 2:19–cv–992–JMS–DLP (S.D. Ind. March 23, 2020) .................................... PA–369

Motion for Leave to File Surreply to Petitioner's Reply, *Alfred Bourgeois v. Superintendent, USP—Terre Haute, United States of America*, 2:19–cv–992– JMS–DLP (S.D. Ind. March 23, 2020) ......................................................... PA–375

Surreply to Petitioner's Reply Brief, *Alfred Bourgeois v. Superintendent, USP— Terre Haute, United States of America*, 2:19–cv–992–JMS–DLP (S.D. Ind. March 23, 2020).................................................................................... PA–389

## Excerpts from Diagnostic Manuals

Excerpt from Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition—("DSM–5") ................................................................................. PA–409

Excerpt from *Intellectual Disability—Definition, Classification, and Systems of Supports—11th Edition*, American Association on Intellectual and Developmental Disabilities (2010) ("AAIDD–10") ............................... PA–432

Excerpt from *User's Guide to Intellectual Disability—Definition, Classification, and Systems of Supports—11th Edition*, American Association on Intellectual and Developmental Disabilities (2012) ("AAIDD–12") ............................... PA–475

Excerpt from *The Death Penalty and Intellectual Disability*, American Association on Intellectual and Developmental Disabilities (2015) ("AAIDD–15"), Chapter 8: Intelligence Testing, by Dale G. Watson, Ph.D ......................................... PA–483

Excerpt from *The Death Penalty and Intellectual Disability*, American Association on Intellectual and Developmental Disabilities (2015) ("AAIDD–15"), Chapter 10: Norm Obsolescence: The Flynn Effect, by Kevin S. McGrew, Ph.D ................................................................................................... PA–512

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

_____

ALFRED BOURGEOIS,

    Petitioner,

 V.

SUPERINTENDENT, USP–Terre Haute,
UNITED STATES OF AMERICA,

    Respondents.

_____

CIVIL ACTION
(Capital Habeas Corpus)

Case No. 2: 19-cv-392

**CAPITAL CASE
EXECUTION SCHEDULED FOR
JANUARY 13, 2020**

_____

## PETITION FOR WRIT OF HABEAS CORPUS
_____

Victor J. Abreu
Katherine Thompson
Peter Williams
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West—The Curtis Center
Philadelphia, PA 19106
215–928–0520
Victor_Abreu@fd.org
Katherine_Thompson@fd.org
Pete_Williams@fd.org

Counsel for Petitioner

Dated: August 15, 2019

**PA-001**

**PRELIMINARY STATEMENT**

Petitioner Alfred Bourgeois shall be referred to as Petitioner, Mr. Bourgeois, or, when discussed in conjunction with other members of the Bourgeois family, Alfred. Respondents shall be referred to as the Government. Citations to witness declarations and affidavits shall be referred to as "Dec." and "Aff.," respectively, followed by the name of the relevant witness. Citations to expert reports shall be referred to as "Report," followed by the name of the expert, the date, and the page number. All declarations, reports, affidavits, and other relevant records cited herein are provided in Appendix A filed with this Petition. Cites to pages in Appendix A shall be referred to by the initial "A" and relevant page number.

Relevant transcripts from Petitioner's § 2255 level proceedings are provided in Appendix B filed with this Petition. Cites to pages from the transcript shall be referred to as "Tr.," followed by the relevant date and page number.

All other citations are either self–explanatory or will be explained.

All emphasis in this Petition is supplied unless otherwise indicated.

i

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................................................I

I.  INTRODUCTION ........................................................................................................ 1

II.  PROCEDURAL HISTORY AND STATEMENT OF THE CASE .................................. 3

    A.  Trial and Initial Habeas Proceedings ............................................................. 3

    B.  *Moore v. Texas* and Petitioner's Motion to File a Successive Habeas Petition in the Fifth Circuit.......................................................................................................... 7

    C.  Subsequent Developments .............................................................................. 9

III.  MR. BOURGEOIS IS INTELLECTUALLY DISABLED AND IS INELIGIBLE FOR THE DEATH PENALTY UNDER THE FEDERAL DEATH PENALTY ACT AND *ATKINS V. VIRGINIA* AND ITS PROGENY. ................................................... 10

    A.  Introduction................................................................................................... 10

    B.  Deficits in Intellectual Functioning .............................................................. 12

       1.  The diagnostic criteria........................................................................... 12

       2.  Mr. Bourgeois has deficits in intellectual functioning........................... 14

    C.  Deficits in Adaptive Functioning.................................................................. 16

       1.  The diagnostic criteria........................................................................... 16

       2.  The adaptive behavior assessment ........................................................ 17

       3.  Mr. Bourgeois has significant deficits in adaptive functioning. ........... 21

       4.  Formal test of adaptive behavior........................................................... 36

    D.  Onset Prior to Age Eighteen ........................................................................ 38

    E.  Risk Factors for Intellectual Disability ........................................................ 39

       1.  Child abuse............................................................................................. 39

       2.  Sexual abuse........................................................................................... 41

       3.  Neglect and impaired parenting ............................................................ 41

       4.  Low socioeconomic status ..................................................................... 43

       5.  History of learning difficulties................................................................ 44

       6.  Family heredity risk ............................................................................... 44

    F.  Conclusion .................................................................................................... 45

IV.  RELIEF IS APPROPRIATE UNDER 28 U.S.C. § 2241. .......................................... 45

    A.  Petitioner's *Atkins* Claim Relies on Supreme Court Jurisprudence and Diagnostic Criteria Not Available to Him in § 2255 Proceedings.................................... 46

       1.  Background: *Atkins*, *Ex Parte Briseño*, *Moore–I*, and *Moore–II* ......................... 48

       2.  The district court denied Mr. Bourgeois's *Atkins* claim under the same unconstitutional standards struck down in *Moore–I* and *Moore–II*...................... 53

       3.  This claim is reviewable under § 2241. ................................................. 68

PA-003

B.  Petitioner's Claim Challenges the Execution of his Sentence, as Well as the
    Fundamental Legality of that Sentence........................................................................ 71

REQUEST FOR RELIEF ................................................................................................ 74

**PA-004**

I.      INTRODUCTION

Alfred Bourgeois, a death–sentenced inmate currently housed at the United States Penitentiary, Terre Haute, is intellectually disabled ("ID"). His execution is categorically barred by the Federal Death Penalty Act ("FDPA") and per se unconstitutional pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002), and its progeny. There is no doubt that Mr. Bourgeois meets the three prongs of the clinical definition of intellectual disability under current clinical definitions: subaverage intellectual functioning, adaptive deficits, and onset before age eighteen. He has been IQ tested twice in his lifetime. His scores of 70 and 75 (corrected under clinically–accepted standards to 67 and 68) each falls within the presumptive range for ID. Standardized testing, clinical evaluation, contemporaneous records, and numerous witnesses attest to his significant adaptive impairments in conceptual, social, and practical skills, any one of which is by itself sufficient to establish adaptive deficits. And Petitioner's lifelong intellectual and adaptive impairments long predate his eighteenth birthday.

The only court to review Mr. Bourgeois's claim of categorical ineligibility for the death penalty applied non–clinical, unscientific standards; relied largely on commonly held, but erroneous stereotypes of intellectually disabled persons; and employed a number of the so–called "*Briseño* factors," which the United States Supreme Court later described as factors "untied" to the "medical community's information" that "creat[ed] an unacceptable risk that persons with intellectual disability will be executed." *Moore v. Texas*, 137 S. Ct. 1039 (2017) ("*Moore–I*"). For example, the district judge:

- set aside diagnostic standards and relied on her own armchair assessment of Mr. Bourgeois's conduct to determine that his "true" intellectual functioning did not satisfy the IQ component for intellectually disability, despite the fact that all of his IQ scores fall within the presumptive range for ID;

1

- found that Mr. Bourgeois's perceived adaptive *strengths* counteracted the evidence of his adaptive *deficits*, despite acknowledging that the medical community focuses strictly on deficits;

- applied unscientific stereotypes of intellectually–disabled persons—including that ID persons look and talk differently than the general population and are incapable of driving or maintaining a job—to support her conclusion that Mr. Bourgeois's adaptive functioning was inconsistent with a diagnosis of ID; and

- treated risk factors and comorbidities as alternate *explanations for* Mr. Bourgeois's deficits, as opposed to *contributors to* his intellectual disability.

The district court's approach was subsequently declared unconstitutional by the United States Supreme Court in *Moore–I* and *Moore v. Texas*, 139 S. Ct. 666 (2019) ("*Moore–II*"), which held that courts must apply the medical community's current standards in assessing *Atkins* claims, and which specifically criticized many of the analytical errors that plagued the initial review of Petitioner's claim, including reliance on the *Briseño* factors. Following *Moore–I*, Mr. Bourgeois sought to have his *Atkins* claim reviewed under current constitutional standards, but was denied the opportunity to do so when the Fifth Circuit ruled that additional review under *Moore–I* would amount to an impermissible "second or successive" petition for post–conviction relief under 28 U.S.C. § 2255.

A federal habeas petitioner is entitled to review under § 2241 when § 2255 is "inadequate or ineffective to test the legality of his detention" or sentence. 28 U.S.C. § 2255(e); *see also Brown v. Caraway*, 719 F.3d 583 (7th Cir. 2013). Cognizable claims include those that rely on a new legal or factual basis not available at the time of the petitioner's trial proceedings or his § 2255 proceedings. *See, e.g.*, *Webster v. Daniels*, 784 F.3d 1123, 1136 (7th Cir. 2015); *In re Davenport*, 147 F.3d 605, 607–11 (7th Cir. 1998). Section 2241 is also the appropriate vehicle where a petitioner challenges the execution, as opposed to the imposition, of the sentence. *See, e.g.*, *Kramer v. Olson*, 347 F.3d 214, 217 (7th Cir. 2003). Mr. Bourgeois's claim relies on the

2

*Moore–I* and *Moore–II* decisions, which rendered unconstitutional Fifth Circuit precedent rejecting the application of medical standards to *Atkins* claims, as well as newly–adopted diagnostic criteria. Additionally, Mr. Bourgeois challenges the execution of his fundamentally illegal death sentence. The FDPA requires such prospective relief to be available, providing as it does that "[a] sentence of death shall not be carried out upon a person who is mentally retarded." 18 U.S.C. § 3596(c); *see also Atkins*, 536 U.S. at 320 (establishing "categorical rule making [intellectually disabled] offenders ineligible for the death penalty").

On July 25, 2019, the Government notified Mr. Bourgeois that his execution has been scheduled for January 13, 2020. Mr. Bourgeois now stands to be among the first individuals executed by the federal government in over fifteen years, even though his scheduled execution is per se unconstitutional, even though no court has ever reviewed his claim of ID under constitutionally–mandated current medical standards, and even though the FDPA specifically prohibits the execution of an intellectually–disabled prisoner. The unique circumstances of the case require this Court's careful review, and thereafter, a grant of habeas corpus under 28 U.SC. § 2241 to prevent Mr. Bourgeois's unlawful execution.

## II.    PROCEDURAL HISTORY AND STATEMENT OF THE CASE

### A.    Trial and Initial Habeas Proceedings

1.    In 2004, Mr. Bourgeois was convicted of capital murder and sentenced to death in the United States District Court for the Southern District of Texas for the 2002 death of his two–year–old daughter, J.G. On August 25, 2005, the Fifth Circuit affirmed Mr. Bourgeois's conviction and sentence on direct appeal. *United States v. Bourgeois*, 423 F.3d 501 (5th Cir. 2005). The Supreme Court denied his petition for writ of certiorari on May 15, 2006. 547 U.S. 1132 (2006).

2.    On May 14, 2007, Mr. Bourgeois filed a Motion for Relief Pursuant to 28 U.S.C.

§ 2255 challenging his conviction and sentence of death, including a claim that he is intellectually disabled and his death sentence is unconstitutional pursuant to *Atkins*.

3.      The district court held evidentiary hearings on September 10, 2010, and September 20–24, 2010. Additionally, the parties deposed several witnesses. In support of his *Atkins* claim, Mr. Bourgeois presented testimony from: neuropsychologist Donald E. Weiner, Ph.D.; neuropsychologist Michael Gelbort, Ph.D.; clinical psychologist Victoria Swanson, Ph.D.; and numerous lay witnesses who, collectively, were able to testify to Petitioner's low intellectual functioning in various domains throughout his life. The Government presented testimony from forensic psychologist Roger Bryan Moore, Jr., Ph.D.; neuropsychologist J. Randall Price, Ph.D.; and a small number of lay witnesses, each of whom knew Mr. Bourgeois only in the context of work and only as an adult.

4.      On May 19, 2011, the district court denied Petitioner's § 2255 motion and denied a Certificate of Appealability ("COA") on all claims. *United States v. Bourgeois*, No. C–02–CR–216, 2011 WL 1930684 (S.D. Tex. May 19, 2011). The Fifth Circuit denied Mr. Bourgeois's request for a COA on August 5, 2013. *United States v. Bourgeois*, 537 F. App'x. 604 (5th Cir. 2013).

5.      In dismissing Petitioner's *Atkins* claim, the district court applied the Fifth Circuit's then–valid precedent, which largely disregarded medical standards governing the diagnosis of intellectual disability. For instance, although both of the leading diagnostic authorities in the field of intellectual disability—the American Association on Intellectual and Developmental Disabilities ("AAIDD") and the American Psychiatric Association ("APA")—recognize that an IQ score of 75 or below falls within the presumptive range for intellectual disability, the district court disregarded Mr. Bourgeois's two qualifying scores. Instead, the court

PA-008

relied on various unscientific stereotypes to determine that Petitioner's "true" intellectual functioning did not satisfy the IQ component of ID. *See id.* at \*22–29 (finding Mr. Bourgeois's low intellectual functioning to be belied by the fact that he "answers the questions asked of him, engages in conversation, [and] has logical thoughts"; "lived a life which, in broad outlines, did not manifest gross intellectual deficiencies"; "worked for many years as a long haul truck driver . . . bought a house, purchased cars, and handled his own finances"; had a "well–groomed appearance"; and "otherwise carried himself without any sign of intellectual impairment"); *see also id.* at \*27 ("[T]he Fifth Circuit has denied relief when . . . notwithstanding borderline IQ scores, an inmate's intelligence is more consistent with the higher end of the confidence interval.").

6.      The district court also relied on Fifth Circuit precedent for the proposition that there is a "legal" and a "psychological" approach to assessing the adaptive functioning prong of ID, and that "the federal inquiry into adaptive deficits takes on a much different flavor than that done by mental health professionals." *Id.* at \*32. Applying the "legal" approach, the district court found that Mr. Bourgeois's perceived adaptive strengths counteracted the evidence of his adaptive deficits, despite acknowledging that the medical community focuses strictly on deficits:

> [T]he AAIDD manual has expressly adopted as an underlying "assumption" in the definition of mental retardation that "within an individual, limitations often coexist with strengths. . . ." The Fifth Circuit, however, teaches that the *Atkins* inquiry should not be so narrow as to ignore that which an inmate can do, even if the psychological profession approaches the issue differently. . . . [T]he federal inquiry probes more deeply the accuracy of the reported deficiencies and aims to put them into context. . . .
>
> A broad review of the evidence does not make Bourgeois' claim of adaptive deficits believable. . . . The record shows strengths that more than coexist with weaknesses, they call into question the depth and accuracy of reports of those weaknesses. The Court finds that Bourgeois has not shown substantial adaptive deficits by a preponderance of the evidence.

5

*Id.* *33–34, 44 (citing, inter alia, *United States v. Webster*, 421 F.3d 308, 313 (2005), another case denying *Atkins* relief under § 2255); *see also id.* at *42 (disparaging the credibility of defense expert Dr. Swanson because she recognized that Mr. Bourgeois demonstrated certain adaptive strengths, but explained—consistent with diagnostic standards—that these strengths did not "offset the other deficits" that Mr. Bourgeois has in any given area).

7.      Furthermore, as with its assessment of Mr. Bourgeois's intellectual functioning, the court relied upon unscientific stereotypes of persons with ID to support its conclusion that Mr. Bourgeois's adaptive functioning was inconsistent with a diagnosis of ID. For instance, the court noted that Mr. Bourgeois was competent at his job as a truck driver, that "[h]is appearance and grooming were beyond presentable," and that individuals who knew him through his work as a truck driver did not perceive him as intellectually disabled. *Id.* at *39. Again, this was consistent with Fifth Circuit jurisprudence in 2011, *see, e.g.*, *Webster,* 421 F.3d at 313, but current diagnostic standards make clear that none of these "skills" conflicts with a medical diagnosis of intellectual disability. *See, e.g.*, AAIDD *User's Guide* (11th ed. 2012) ("AAIDD–12") (identifying numerous commonly held but erroneous stereotypes about persons with ID, including that they "look and talk differently from persons from the general population," "are completely incompetent and dangerous," "cannot get driver's licenses, buy cars, or drive cars," "cannot acquire vocational and social skills necessary for independent living," and "are characterized only by limitations and do not have strengths that occur concomitantly with the limitations"); Am. Psychiatric Assoc'n, Diagnostic and Statistical Manual of Mental Disorders—5th Edition ("DSM–5") (explaining that persons with ID can, inter alia, maintain regular employment in jobs that do not emphasize conceptual skills, function age–appropriately in personal care, and develop a variety of recreational skills").

6

8. Other unscientific aspects of the district court's analysis included that the court gave significant weight to its own lay assessment of Mr. Bourgeois's communication skills, which it found incompatible with ID; considered evidence of a deficit to be evidence of a strength so long as Mr. Bourgeois eventually learned to perform the task; and treated risk factors and comorbidities as *alternate explanations for* Mr. Bourgeois's deficits, as opposed to *contributors to* his intellectual disability. In short, practically every aspect of the court's ID analysis violated current clinical standards.

**B.** ***Moore v. Texas* and Petitioner's Motion to File a Successive Habeas Petition in the Fifth Circuit**

9. While the district court's approach to analyzing Mr. Bourgeois's *Atkins* claim was consistent with Fifth Circuit precedent at the time, that precedent was abrogated by the Supreme Court's decision in *Moore–I*. *Moore–I* made clear that courts must apply *Atkins* according to current clinical standards; that adaptive deficits must be analyzed according to a defendant's impairments, not his strengths; that lay stereotypes are an improper and unconstitutional substitute for the scientific evaluation of intellectual disability; and that the *Briseño* factors created an unacceptable risk that ID persons would be unconstitutionally executed.

10. Following *Moore–I*, Petitioner requested authorization from a panel of the Fifth Circuit to file a successive habeas petition under 28 U.S.C. § 2255(h)(2), which allows for successive motions based on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." In his motion, Petitioner argued that *Moore–I* rendered *Atkins* newly available to him by invalidating Fifth Circuit precedent governing such claims at the time of his trial and his initial § 2255 proceedings. In support of his claim, Mr. Bourgeois cited to *Cathey v. Davis (In re Cathey)*, 857 F.3d 221, 232 (5th Cir. 2017), in which the Fifth Circuit held that *Atkins* was "previously

unavailable" to a petitioner whose first habeas petition was filed after *Atkins*, but who failed to raise an ID claim because the circuit's pre–*Moore–I* precedent precluded a finding of intellectual disability at the time of the initial habeas petition.[1] The only distinctions between Mr. Bourgeois's application and that of Mr. Cathey were that Mr. Bourgeois was seeking to raise a successive petition under § 2255, as opposed to § 2254, and that Mr. Bourgeois had previously litigated his *Atkins* claim. However, as Mr. Bourgeois argued in his application to the Fifth Circuit, the § 2244(b)(1) re–litigation bar is expressly limited to petitions brought by state prisoners under § 2254. *See* 28 U.S.C. § 2254(b)(1) ("A claim presented in a second or successive habeas corpus application *under section 2254* that was presented in a prior application shall be dismissed."). Nor is there any discernable reason that Mr. Bourgeois should be punished for having been *more diligent* than Mr. Cathey in attempting to litigate his *Atkins* claim in earlier proceedings.

11.     Nevertheless, on August 23, 2018, the Fifth Circuit denied Mr. Bourgeois's request on procedural grounds, holding that he was barred from re–litigating his *Atkins* claim under 28 U.S.C. § 2244(b)(1), despite the plain language of the statute limiting its applicability to petitions under § 2254. *In re Bourgeois*, 902 F.3d 446 (5th Cir. 2018). The circuit court did not question Petitioner's argument that *Moore–I* effectively overruled Fifth Circuit precedent that had required the district court to (erroneously) reject Mr. Bourgeois's *Atkins* claim.

---

[1] The Fifth Circuit recently reached the same holding in another case. *See In re Johnson*, No. 19–20552, 19–70013, 2019 WL 3814384, at *5–6 (5th Cir. Aug. 14, 2019) (granting state habeas petitioner's request to file a successive petition to raise an *Atkins* claim because *Atkins* was "unavailable" to petitioner prior to *Moore–I* and the publication of new diagnostic standards that "included significant changes in the diagnosis of intellectual disability").

**C.      Subsequent Developments**

12.      On February 19, 2019, the United States Supreme Court issued *Moore–II*, reversing the decision of the Texas Court of Criminal Appeals ("CCA")[2] on remand from *Moore–I*. Specifically, although the state court purported to base its post–*Moore–I* denial of relief on a finding that the State's expert was more credible than those presented by Mr. Moore, the *Moore–II* Court found in the CCA's opinion "too many instances in which, with small variations, it repeats the analysis we previously found wanting, and these same parts are critical to its ultimate conclusion." *Id.* at 670. Because the district court that denied Mr. Bourgeois's initial *Atkins* claim likewise relied on contra–diagnostic criteria in crediting the Government's adaptive–behavior expert over the defense expert, *Moore–II* further strengthened Mr. Bourgeois's claim that he is entitled to *Atkins* relief.

13.      On July 25, 2019, with no prior indication that the Government had adopted revisions to the Bureau of Prisons' Lethal Injection Protocol used to effectuate federal death sentences, the Government notified Mr. Bourgeois that he is scheduled to be executed on January 13, 2020. This petition, seeking review of Mr. Bourgeois's *Atkins* claim under current medical standards under 28 U.S.C. § 2241 follows.

14.      A federal habeas petitioner is entitled to review under § 2241 when § 2255 is "inadequate or ineffective to test the legality" of his detention or sentence. 28 U.S.C. § 2255(e). The Seventh Circuit has expressly recognized that claims based on legal authority not available at the time of a petitioner's § 2255 proceedings are cognizable under § 2241. *See, e.g.*, *Webster*, 784 F.3d at 1136; *In re Davenport*, 147 F.3d at 609. This includes cases where the district court and appellate panel would have been required by erroneous circuit precedent to deny the § 2255

---

[2] The CCA is Texas's court of last resort in criminal cases. *See* Tex. Const. Art. 5, § 5.

claim. Section 2241 is also available where, inter alia, a petitioner challenges the execution of his sentence, and where a prisoner would otherwise be precluded from obtaining review of a legal theory that addresses the "fundamental legality" of his sentence.

15.     Here, Fifth Circuit precedent erroneously precluded Mr. Bourgeois from successfully challenging his unconstitutional death sentence in his initial § 2255 proceedings. *See infra* Section IV.A.2. And, while Mr. Bourgeois again attempted to raise his *Atkins* claim in a successive § 2255 petition filed after *Moore–I* effectively reversed that precedent, the Fifth Circuit denied him the opportunity to do so, despite acknowledging elsewhere that "new diagnostic guidelines" have brought "significant changes in the diagnosis of intellectual disability" and that "it is correct to equate legal availability with changes in the standards for psychiatric evaluation of the key intellectual disability factual issues raised by *Atkins*." *In re Johnson*, 2019 WL 3814384, at *5–6. There can be no doubt that § 2255 is "inadequate or ineffective" under these circumstances. Furthermore, this petition is reviewable under § 2241 because Mr. Bourgeois challenges the execution of his fundamentally illegal death sentence. The FDPA requires such prospective relief to be available, providing as it does that "[a] sentence of death shall not be carried out upon a person who is mentally retarded." 18 U.S.C. § 3596(c).

16.     In light of the foregoing, discussed in detail below, Mr. Bourgeois is: (i) entitled to raise his *Atkins* claim via § 2241; and (ii) entitled to relief from his unconstitutional sentence of death, which is scheduled to be carried out in a matter of months.

**III.   MR. BOURGEOIS IS INTELLECTUALLY DISABLED AND IS INELIGIBLE FOR THE DEATH PENALTY UNDER THE FEDERAL DEATH PENALTY ACT AND *ATKINS V. VIRGINIA* AND ITS PROGENY.**

**A.      Introduction**

17.     In *Atkins*, the United States Supreme Court ruled that the Eighth Amendment categorically bars the execution of intellectually disabled individuals. As the Court explained:

Those mentally retarded persons who meet the law's requirements for criminal responsibility should be tried and punished when they commit crimes. Because of their disabilities in areas of reasoning, judgment, and control of their impulses, however, they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct.

536 U.S. at 306.[3]

18.     In *Moore–I*, the Court made clear that current, prevailing clinical definitions are binding in the task of determining whether an individual should be exempted from the death penalty under *Atkins*. *See Moore–I*, 137 S. Ct. at 1049, 1052–53. It also identified the two main diagnostic authorities in the field of intellectual disability as the prevailing medical standards: the AAIDD, publisher of the *Intellectual Disability: Definition, Classification, and Systems of Supports Definition Manual* (11th ed. 2010) ("AAIDD–10"); and the APA, which has most recently set forth its definition of intellectual disability in the DSM–5. These current standards, and not outdated standards employed in the past, govern the disposition of Mr. Bourgeois's *Atkins* claim. *See Moore–I*, 137 S. Ct. at 1053.

19.     Pursuant to the definitions set forth by the APA and the AAIDD and endorsed by the Supreme Court, there are three prongs to a finding of intellectual disability: (1) deficits in intellectual functioning/subaverage intellectual functioning ("prong one"), (2) deficits in adaptive functioning ("prong two"), and (3) onset before age eighteen ("prong three"). *See* A0075 (DSM–5 at 33); A0088 (AAIDD–10 at 5). As the voluminous evidence summarized below shows, Mr. Bourgeois satisfies these criteria.

---

[3] *Atkins* referred to this diagnosis as mental retardation, which was the name used in the field at the time. Since *Atkins* was decided, the diagnosis of mental retardation has been renamed as intellectual disability. In 2014, the Supreme Court acknowledged this change in nomenclature and adopted the term intellectual disability instead of mental retardation. *Hall v. Florida*, 572 U.S. 701 (2014). Accordingly, this petition uses the term intellectual disability or the abbreviation "ID." However, the terms "mental retardation" or "mentally retarded" are also used in their historic context relevant to this case.

11

**B.      Deficits in Intellectual Functioning**

**1.      The diagnostic criteria**

20.      Under the classification schemes outlined by the APA and the AAIDD, deficient intellectual functioning is defined as an intelligence quotient of approximately 70 with a confidence interval derived from the standard error of measurement ("SEM") taken into consideration. Because a margin for measurement error or "confidence interval" on IQ tests generally involves a measurement error of five points, at a minimum, scores up to 75 also fall within the presumptive range for intellectual disability. A0079 (DSM–5 at 37). *See also* A0098 (AAIDD–10 at 36) (finding the consideration of the standard error of measurement or "SEM" and reporting an IQ score with a confidence interval deriving from the SEM to be critical considerations in the appropriate use of IQ tests).

21.      Consistent with the AAIDD's and APA's diagnostic criteria, the Supreme Court held in *Hall v. Florida* that because the SEM is "a statistical fact, a reflection of the inherent imprecision of the test itself," at a minimum, full–scale IQ scores of 75 or below will establish the diagnosis of intellectual disability if the other two prongs are met. *Hall*, 572 U.S. at 712, 723; *see also Brumfield v. Cain*, 135 S. Ct. 2269, 2278 (2015) (IQ score of 75 was "squarely in the range of potential intellectual disability").

22.      In addition, both the AAIDD and the APA have rejected fixed cutoff points for IQ in the diagnosis of intellectual disability and mandated that any test score be evaluated according to clinical judgment. In its 2010 Guidelines, the AAIDD specified:

> It is clear from th[e] significant limitations criterion used in this Manual that AAIDD . . . *does not* intend for a fixed cutoff point to be established for making the diagnosis of ID. Both systems (AAIDD and APA) require clinical judgment regarding how to interpret possible measurement error. Although a fixed cutoff for diagnosing an individual as having ID is not intended, and cannot be justified psychometrically, it has become operational in some states [citation omitted]. It must be stressed that the diagnosis of ID is intended to reflect a clinical judgment

12

rather than an actuarial determination. A fixed point cutoff score for ID is not psychometrically justifiable.

A0102 (AAIDD–10 at 40) (emphasis in original).

23.     Similarly, the DSM–5 makes clear that "[c]linical training and judgment are required to interpret [IQ] test results and assess intellectual performance" and "clinical judgment is needed in interpreting the results of IQ tests." A0079 (DSM–5 at 37).

24.     IQ scores must also be corrected for the Flynn Effect. The Flynn Effect reflects a well–established finding that the average IQ score of the population increases at a rate of 0.3 points per year or three points per decade. Indeed, the Psychological Corporation, which publishes the Wechsler tests that Mr. Bourgeois was administered, *see infra*, first acknowledged the existence of the Flynn Effect and its inflation rate of 0.3 points per year in 1997. *See* Technical Manual, Wechsler Adult Intelligence Scale, the Psychological Corporation 8–9 (3d ed. 1997).

25.     Accordingly, the AAIDD requires that any IQ score be corrected downwards at a rate of 0.3 points per year since the test was normed.[4] *See* A0099 (AAIDD–10 at 37); A0131 (AAIDD–12 at 23); A170–76 (McGrew, K., Norm Obsolescence: The Flynn Effect, *The Death Penalty and Intellectual Disability*, AAIDD (2015) at 160–66 ("AAIDD–15")); A0141–42 (Watson, Dale G. Intelligence Testing, *The Death Penalty and Intellectual Disability*, AAIDD–15 at 118–19). The McGrew article elaborates:

> Not only is there a scientific consensus that the Flynn [E]ffect is a valid and real phenomenon, there is also a consensus that individually obtained IQ test scores derived from tests with outdated norms must be adjusted to account for the Flynn [E]ffect, particularly in *Atkins* cases. . . . [Hence,] in cases where current or historical IQ test scores are impacted by norm obsolescence (i.e., Flynn [E]ffect), and the scores are to be used as part of the diagnosis of ID in *Atkins* or other high

---

[4] Norming is a statistical term to describe how the creators of a given test are able to assign percentile ranks to given scores.

stakes decisions, the global scores impacted by outdated norms should be adjusted downward by 3 points per decade (0.3 points per year) of norm obsolescence.

McGrew, *supra* at 162–65.

26.     The APA also recognizes that "[f]actors that may affect test scores include . . . the 'Flynn effect' (i.e. overly high scores due to out–of–date test norms)" and mandates that IQ scores be interpreted using clinical judgment and training. A0079 (DSM–5 at 37). Test score interpretation using clinical judgment includes correction for the Flynn Effect.

27.     The AAIDD and APA also mandate that the spurious inflation of IQ scores arising from prior administrations of intelligence tests—the "practice effect"—be taken into consideration when interpreting IQ testing. *See, e.g.*, A0100 (AAIDD–10 at 38); A0079 (DSM–5 at 37).

### 2.     Mr. Bourgeois has deficits in intellectual functioning.

28.     Mr. Bourgeois's IQ has been tested on two occasions. In both instances, Petitioner's intellectual capacity fell in the intellectually disabled range.

29.     First, one week prior to trial, on February 28, 2004, Mr. Bourgeois was evaluated by neuropsychologist Dr. Donald E. Weiner. Petitioner obtained a full–scale IQ of 75[5] on this administration of the Wechsler Adult Intelligence Scale–Revised ("WAIS–R"). *See* Tr. 9/20/10 at 218–19; *see also* A0060 (Dr. Weiner Score Sheet from WAIS–R); A0053–59 (Declaration of Dr. Donald E. Weiner and Attached Report of 3/03/04). Although Mr. Bourgeois's results on Dr. Weiner's test administration put him in the range of intellectual disability, his score of 75

---

[5] This score was reported as a 76 in Dr. Weiner's report, however this was a typographical error. The data sheet has the score as 75. *See Bourgeois*, 2011 WL 193064, at *37, 25 (noting the discrepancy and the fact that Dr. Weiner clarified that the error during the evidentiary hearing); *see also* Tr. 9/20/10 at 218–19.

14

*overestimates* his actual IQ due to the Flynn Effect discussed above. Dr. Weiner used the WAIS–R in assessing Mr. Bourgeois's intelligence, despite the availability of the re–normed and updated Wechsler Adult Intelligence Scale–III ("WAIS–III").[6] The WAIS–R was normed in 1978, twenty–six years prior to its administration to Mr. Bourgeois. Accordingly, Dr. Weiner's testing must be "Flynn–corrected." Appropriately adjusted, Mr. Bourgeois's 2004 IQ score is more accurately reflected as a score of 68. *See* Tr. 9/10/10 at 33 (Dr. Gelbort); Tr. 9/20/10 at 222–23 (Dr. Wiener); *id.* at 37 (Dr. Swanson).

30.     Second, in preparation for Mr. Bourgeois's initial habeas petition, neuropsychologist Dr. Michael Gelbort conducted extensive psychological and neuropsychological testing that yielded even further evidence demonstrating Petitioner's intellectual disability. *See* Tr. 9/10/10 at 32–52; *see also* A0039–41 (Declaration of Michael M. Gelbort, Ph.D. – 05/11/2007, ¶ 3). These results include an IQ of 70 (Verbal 67 and Performance 78) on the WAIS–III,[7] which was the then–current version of the test given by Dr. Weiner. *See* Tr. 9/10/10 at 32; *see also* A0039–41 (Gelbort Declaration, ¶ 3). The WAIS–III was normed in 1995–96, eleven years before it was administered to Mr. Bourgeois in 2007, yielding a Flynn–corrected IQ score of 67.

31.     That these IQ tests validly measured Mr. Bourgeois's intellectual functioning is confirmed by the consistency between the full–scale scores he received on each test, as well as

---

[6] Dr. Weiner testified that he employed the older test because he felt that insufficient research had been done on the WAIS–III at the time of his evaluation. *See* Tr. 9/20/10 at 217. The fact that the WAIS–R had been replaced by the WAIS–III at the time of its administration in this case does not make it invalid. Indeed, Dr. Swanson explained that neuropsychologists often use "the Wechsler instruction that has the greatest amount of research associated with it at the time," even if a newer test is available. *Id.* at 37.

[7] The WAIS–III is considered the "gold standard" of IQ tests. *Bourgeois*, 2011 WL 193064, at *25 n.33 (citing *Thomas v. Quarterman*, 335 F. App'x 386, 391 (5th Cir. 2009)).

the consistency in the overall pattern of correct and incorrect answers on each test. *See* Tr. 9/10/10 at 32. As Dr. Gelbort explained, it would be very difficult for an individual to "feign bad" in the same way on two tests administered three years apart. *Id.* at 33–35; *see also* Tr. 9/20/10 at 223–25, 229 (Dr. Weiner testifying similarly); *id.* at 31 (Dr. Swanson testifying similarly). Furthermore, the scores are consistent with Mr. Bourgeois's history of impaired functioning, *see infra*, and the manner in which he presented during his clinical interview. *See* Tr. 9/10/10 at 38–39; Tr. 9/20/10 at 264–65. Even Government expert Dr. Price testified that he did not have any evidence that Mr. Bourgeois "malinger[ed]." Tr. 9/23/10 at 258.[8]

32.     In sum, Mr. Bourgeois has scored well within the range of subaverage intellectual functioning on two psychometrically–valid and comprehensive tests of intelligence.[9] He has satisfied prong one of the definition for ID.

### C.     Deficits in Adaptive Functioning

#### 1.     The diagnostic criteria

33.     The AAIDD–10 defines adaptive behavior as "the collection of conceptual, social, and practical skills that have been learned and performed by people in their everyday lives."

---

[8] While Dr. Price opined that Mr. Bourgeois did not try as hard as he could have, that conclusion is inconsistent with other testimony in which Dr. Price stated that Mr. Bourgeois engaged in "adult impression management," "portray[ing] himself with abilities and accomplishments that are exaggerations." Tr. 9/23/10 at 204; *see also* Tr. 9/24/10 at 161–62 (Government expert Dr. Moore similarly testifying that Petitioner "tends to want to make himself look better than he really is").

[9] In his § 2255 proceedings, the district court observed: "IQ testing before trial resulted in low scores, but one expert nonetheless described his intelligence in a manner inconsistent with mental retardation." *Bourgeois*, 2011 WL 193064, *18. While the court provides no citation for this (erroneous) finding, it presumably refers to trial expert Dr. Carlos Estrada's finding that Mr. Bourgeois was of "above average intelligence," a finding which was unsupported by any IQ testing and which Dr. Estrada subsequently retracted. *See* Tr. 9/10/10 (a.m.) at 71; *see also* Tr. 9/24/10 at 48–49 (Dr. Price testifying that Dr. Estrada's conclusion was "clearly wrong").

A0115 (AAIDD–10 at 55). The DSM–5 defines adaptive deficits as "how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background." A0079 (DSM–5 at 37).

34.     Both the AAIDD–10 and DSM–5 state that the adaptive deficits prong is satisfied if there is a significant limitation in one of three types of adaptive behavior—conceptual, social, or practical—or in the composite of the individual's adaptive functioning. A0103 (AAIDD–10 at 43); A0079 (DSM–5 at 37).

35.     Skills included in the conceptual realm are: executive functioning (judgment, planning, impulse control, and problem solving), memory, language, functional academic skills, and self–direction. The social realm encompasses skills and characteristics such as: social judgment and competence, interpersonal responsibility, self–esteem, gullibility, naiveté, following rules, obeying laws, and avoiding victimization. The practical realm refers to skills such as: activities of daily living/learning and self–management across life settings, occupational skills, use of money, health and safety, and other self–care skills.

### 2.     The adaptive behavior assessment

36.     Current diagnostic standards specify several parameters to be followed in the process of assessing adaptive behavior.

37.     First, as it is expected that strengths co–exist with weaknesses, analysis of adaptive behavior is based on the presence of weaknesses, not the absence of strengths. As stated in the AAIDD–10, "significant limitations in conceptual, social or practical adaptive skills [are] not outweighed by the potential strengths in some adaptive skills." A0107 (AAIDD–10 at 47); *see also Moore–I*, 137 S. Ct. at 1050 ("[T]he medical community focuses the adaptive–functioning inquiry on adaptive *deficits*.") (emphasis in original); *Moore–II*, 139 S. Ct. at 670 (CCA erred in relying "less upon the adaptive *deficits* to which the trial court had referred than

17

upon Moore's apparent adaptive *strengths*") (emphasis in original); Tr. 9/10/10 at 43–45, 79; Tr. 9/20/10 at 17–18.

38.     Second, the concept of deficits in adaptive functioning includes both acquisition deficits, or the failure to acquire a skill, and performance deficits, or the failure to perform a skill even though it has been acquired. For this reason, the focus for an individual's adaptive behavior is on an individual's typical level of adaptive functioning rather than maximal functioning or what he or she may be capable of achieving at a given point in time in the future, etc. Therefore, if an individual *can* do something, but typically does not do it, that still constitutes a deficit in adaptive functioning. *See* A0076–77 (DSM–5 at 34–35); A0089 (AAIDD–10 at 27).

39.     Third, the APA warns against the use of prison functioning to assess adaptive behavior, and the AAIDD outright precludes it. *See* A0080 (DSM–5 at 38) ("Adaptive functioning may be difficult to assess in a controlled setting (e.g., prisons, detention centers)."); A0129 (AAIDD–12 at 20) ("The diagnosis of ID is not based on the person's . . . behavior in jail or prison."); *Moore–I*, 137 S. Ct. at 1050 ("Clinicians . . . caution against reliance on adaptive strengths developed 'in a controlled setting,' as a prison surely is." (citing DSM–5 at 38 and AAIDD–12 at 20)); *Moore–II*, 139 S. Ct. at 669 (same).

40.     Fourth, a diagnosis of ID is not a diagnosis of exclusion. Rather, "[c]o–occurring mental, neurodevelopmental, medical, and physical conditions are frequent in intellectual disability, with rates of some conditions (e.g., mental disorders, cerebral palsy, and epilepsy) three to four times higher than in the general population." A0082 (DSM–5 at 40); *see also* A0117–22 (AAIDD–10 at 58–63). Hence, "the existence of a personality disorder or mental–health issue . . . is not evidence" that a person does not also have adaptive deficits. *Moore–I*, 137 S. Ct. at 1051; *see also Moore–II*, 139 S. Ct. at 669 (same). "The diagnosis of intellectual

18

disability should be made whenever Criteria A, B, and C [i.e., prongs one, two, and three] are met." A0081 (DSM–5 at 39).

41.     Fifth, and of particular importance to Mr. Bourgeois's case, it is critical to avoid the use of stereotypes in assessing adaptive functioning. *See* A0134 (AAIDD–12 at 26) (identifying "a number of incorrect stereotypes" about ID that "can interfere with justice"); *see also Moore–I*, 137 S. Ct. at 1051–52 (holding Texas's approach to *Atkins* claims unconstitutional because it had no basis in either medicine or law, but instead relied on inaccurate stereotypes of the intellectually disabled by laypeople); *Moore–II*, 139 S. Ct. at 671 (faulting CCA for continued "reliance upon what we earlier called 'lay stereotypes of the intellectually disabled,'" such as citing to evidence that Moore had a girlfriend and a job as "tending to show he lacks intellectual disability"). Among the commonly held, but erroneous, stereotypes relating to individuals with intellectual disability are that individuals with ID: "look and talk differently from persons from the general population," "are completely incompetent and dangerous," "cannot do complex tasks," "cannot get driver's licenses, buy cars, or drive cars," "do not (and cannot) support their families," "cannot romantically love or be romantically loved," "cannot acquire vocational and social skills necessary for independent living," and "are characterized only by limitations and do not have strengths that occur concomitantly with the limitations." A0134 (AAIDD–12 at 26). The DSM–5 confronts several of these stereotypes by expressly recognizing that persons with significant adaptive deficits can, inter alia, have romantic relationships in adulthood, maintain regular employment in jobs that do not emphasize conceptual skills, function age–appropriately in personal care, arrange for their own transportation and manage money with support, raise a family with support, and develop a variety of recreational skills. *See* A0076–77 (DSM–5 at 34–35).

19

42.     Sixth, the diagnostician must employ "clinical judgment," which is defined as a "special type of judgment rooted in a *high level of clinical expertise and experience* and judgment that emerges directly from extensive training, experience with the person, and extensive data." A0092 (AAIDD–10 at 29). The type of data that should inform clinical judgment includes clinical interviews with third–party reporters, record review, and individually administered and psychometrically sound neuropsychological and achievement testing. A0079 (DSM–5 at 37). The AAIDD–10 further explains that clinical judgment is "characterized by its being systematic (i.e., organized, sequential, and logical), formal (i.e., explicit and reasoned), and transparent (i.e., apparent and communicated clearly)." A0123 (AAIDD–10 at 86).

43.     Finally, the AAIDD warns that persons with mild ID often try to "mask their deficits and attempt to look more able and typical than they actually are." A0111–12 (AAIDD–10 at 51–52); *see also* A0132 (AAIDD–12 at 24) (explaining that an ID individual will commonly attempt to "'fake good' so as to hide their [intellectual disability] and try to convince others that he or she is more competent"); Tr. 9/10/10 at 65 (Dr. Gelbort explaining that ID individuals may try to "steer conversations" to talk about "what they know about or what they think they know about" and hide their deficiencies in other areas); Tr. 9/20/10 at 101–02 (Dr. Swanson testifying similarly). This is in part a symptom of impaired problem solving skills. A0118 (AAIDD–10 at 159). It also results from a history of teasing and maltreatment caused by their impairments. *Id*.; Tr. 9/20/10 at 102 ("When you are functioning at a lower level it probably doesn't bother you, but when you are mild you have enough cognitive ability to recognize the difference, and it's a self–esteem issue. You would like to present better and you would like to be like the other people that you know.").

20

### 3.  Mr. Bourgeois has significant deficits in adaptive functioning.

44.  In connection with Petitioner's § 2255 *Atkins* claim, clinical psychologist Victoria Swanson, Ph.D., conducted a broad–based adaptive behavior assessment of Mr. Bourgeois, considering formal testing; records; third–party interviews with family members, former neighbors, and former colleagues; testimony; the reports of Drs. Weiner and Gelbort; the reports of Government experts Dr. Price and Dr. Moore; the video recordings of the evaluations conducted by Drs. Price and Moore; and her own clinical evaluation of Mr. Bourgeois. *See* Tr. 9/20/10 at 19–21, 82–85. Dr. Swanson, who has spent her career diagnosing and providing services to intellectually disabled individuals and who served as the President of the National Psychology Division of the AAIDD from 2003 to 2005, was eminently qualified to conduct this evaluation. *See* A0001 (Declaration of Victoria Swanson, Ph.D., ¶ 2). Based on her evaluation, Dr. Swanson concluded that Petitioner suffered from significant adaptive deficits before the age of eighteen, satisfying the second prong of ID as defined by the AAIDD and the DSM–5. *See* Tr. 9/20/10 at 104. Her conclusions are supported by extensive lay–witness evidence, records, and formal testing, as detailed below.

### a.  Conceptual domain

#### i.  Academic functioning

45.  One element of the conceptual domain is academic functioning. Due to Mr. Bourgeois's age, no records from elementary school are available. Likewise, there is no record of his achievement on standardized testing.[10] However, family members reported to Dr. Swanson

---

[10] While there are no records that Mr. Bourgeois was ever tested for special education, neither is there evidence that such services were even available. Indeed, the availability of services for Mr. Bourgeois is highly doubtful in light of the fact that his older brother Anthony, who suffered from cerebral palsy, did not receive any services in the state of Louisiana until 2001, when he was middle–aged. *See* Tr. 9/20/10 at 41, 78–79; *see also id.* at 79 (Dr. Swanson

21

that Petitioner failed a grade in elementary school[11] and participated in speech therapy. *See* Tr. 9/20/10 at 98; A0006 (Swanson Supplemental Report at 3); *see also* Tr. 9/21/10 at 323–24 (cousin Carl Henry testifying that Alfred had to repeat fourth grade and that, unlike other children at his school, he had to stay in the same class all day, which was considered "special education" at the time). "Reporters also advise[d] that Mr. Bourgeois had significant problems in learning, and that relatives would spend hours with him every night reviewing his school work and trying to teach him basic skills, and that he was delayed when compared to his peers in areas like reading and counting money." *Id.* at 3; *see also* Tr. 9/21/10 at 27, 37–38, 58–59 (older sister Claudia Williams testifying that as a young child, Alfred had trouble with basic things like learning the alphabet and how to count); *id.* at 98–99 (neighbor Beverly Frank testifying that Alfred couldn't count money at the age of nine).

46. Mr. Bourgeois's Lutcher High School transcript confirms that he was an adolescent with low intelligence who struggled in school. He achieved poor grades across all subjects in high school, with a median score of C to D. In addition, he attended basic level classes. For example, the highest level of math studied was first year algebra. This was only a half credit course taken in his third year of high school, and he obtained a D. *See* A0216 (Lutcher High School Transcript dated 05/24/83).

47. Non–academic records further corroborate that Mr. Bourgeois struggled in the academic realm. For instance, in 1985, Mr. Bourgeois attempted to qualify for permanent

---

testifying that special education services were not available in the area of southern Louisiana where Mr. Bourgeois grew up prior to approximately 1980). Dr. Swanson also testified that, even if such services were available, the fact that Anthony was severely impaired may have (incorrectly) signaled to Alfred's family members that he was merely slow, but by comparison to Anthony, not intellectually disabled. *Id.* 81–82.

[11] This is confirmed by a subsequent record, albeit not a school record. *See infra.*

employment with the St. John the Baptist Parish Sheriff's Office, but was unable to pass the necessary examinations. His training instructor, Lt. David M. Wilson, described Mr. Bourgeois's conceptual difficulties, noting that Mr. Bourgeois was given two opportunities to pass the firearms test, and he participated in fifty–four hours of training in preparation for the test. In Lt. Wilson's view, Petitioner's failure on the firearms test, and his "poor performance scholastically," made further training "unfruitful and unwarranted." *See* A0218 (Letter from Lt. David M. Wilson to Sheriff Lloyd B. Johnson dated 5/6/85).

48.     Mr. Bourgeois also underwent a psychological evaluation pursuant to his application to the St. John the Baptist Parish Sheriff's Office. The resulting report notes that Mr. Bourgeois had to repeat a grade in school. *See* A0219–22 (Psychological Evaluation by Morris & McDaniel, Inc., dated 5/22/85).

49.     Finally, Petitioner's results on the Woodcock–Johnson Third Edition Tests of Achievement ("WJ–III") confirm his low level of academic functioning. Dr. Swanson administered the WJ–III to Mr. Bourgeois in 2009. Tr. 9/20/10 at 43–44; *see also id.* at 44–46 (explaining that the WJ–III is a "battery of many tests assessing many types of adaptive skills and then collapsing them into broad areas," revealing scores that indicate an individual's current academic functioning).

50.     Overall, the achievement testing showed that Mr. Bourgeois's "academic fluency is at the fifth grade level and his actual ability to apply academics actually is at the third grade level," which is "consistent with what you would see with a person who has mild mental retardation." Tr. 9/20/10 at 58. Petitioner's individual achievement test scores on the WJ–III include: story recall at a kindergarten level; applied problem solving at a second–grade level; oral comprehension and passage comprehension at a third–grade level; writing samples and

understanding directions at a fourth–grade level; calculation, reading fluency, and writing fluency at a fifth–grade level; and math fluency at a sixth–grade level. *See* A0020 (WJ–III Score Report).

51.     The fact that so many of Mr. Bourgeois's individual scores—as well as his overall "academic fluency" and "ability to apply academics"—fell at or below the sixth–grade level is significant. At the time of Petitioner's § 2255 proceedings, the Diagnostic and Statistical Manual of Mental Disorders—4th Edition, Text Revision ("DSM–IV–TR") provided that, "by their late teens," individuals with mild intellectual disability could "acquire academic skills up to approximately the sixth–grade level." DSM–IV–TR at 43. The current DSM–5 uses no grade–specific cut off in the description of mild ID, and only requires that an individual's functional use of academic skills be impaired for deficits to be present. *See* A0076 –77 (DSM–5 at 34–35).[12] Hence, under current diagnostic standards, Petitioner's achievement scores indicate that he is not just mildly intellectually disabled, but falls within the moderate level of severity.[13]

---

[12] The DSM–5 description for functional academics at *mild* level of ID states: "For school–age children and adults, there are difficulties in learning academic skills involving reading, writing, arithmetic, time, or money, with support needed in one or more areas to meet age–related expectations. In adults, abstract thinking, executive function . . ., and short–term memory, as well as functional use of academic skills (e.g., reading, money management) are impaired." A0076 (DSM–5 at 34).

[13] Government expert Dr. Moore disagreed that Mr. Bourgeois's WJ–III scores were low enough to indicate ID. However, Dr. Moore based this conclusion on the "scaled score" column of the test results, rather than the "age and grade equivalent" column, despite agreeing with the proposition that "experienced neuropsychologists would be able to rely on the age and education equivalence" score. Tr. 9/24/10 at 180–85. Furthermore, Dr. Moore conceded that, based on the age and equivalency column, Mr. Bourgeois has "far more grade equivalents below the sixth grade," the grade level which the then–current version of the DSM recognized as attainable for a "person with mild mental retardation." *Id.* at 181–82. And, as mentioned above, the current DSM–5 uses no grade–specific cut off in the description of mild ID, and only requires that an individual's functional use of academic skills be impaired for deficits to be present. *See* A0076–77 (DSM–5 at 34–35).

24

52.    Meanwhile, the only tests on which Mr. Bourgeois scored above a sixth–grade level—namely, letter–word identification (eighth grade) and spelling (thirteenth grade)—are tests that implicate mere rote learning, as opposed to any problem solving, analysis, or higher–level thinking. The primary significance of these higher scores, therefore, is that they support Dr. Swanson's conclusion that Mr. Bourgeois was not malingering; he scored well where he could, even if the scores still reflect limited academic functioning for an adult. *See* Tr. 9/20/10 at 57–58.

53.    The validity of Petitioner's achievement testing is further confirmed by the fact that he scored low in areas in which he demonstrated deficits during the Government's experts' clinical evaluations, such as reading comprehension, writing fluency, and abstract reasoning. *Id.* at 47–51, 57–60. Likewise, his overall pattern of scores on the WJ–III mirrored the pattern of scores on the WAIS–R and WAIS–III administered by Drs. Weiner and Gelbort, respectively. *Id.* at 56–58.

### ii.  Executive functioning and self–direction

54.    Along with academic functioning, another element of deficits in the conceptual domain is limited executive functioning and self–direction. In Mr. Bourgeois's case, such deficits were apparent from a very young age. Family members and friends recall that he was slow to learn and comprehend concepts as a child. *See, e.g.*, Tr. 9/21/10 at 13–14, 17 (older sister Claudia Williams testifying that Alfred was "very slow" and "couldn't catch on" when she was trying to teach him things, so she had to "constantly show him . . . over and over what to do"); *id.* at 36 (same); *id.* at 97–98 (childhood neighbor Beverly Frank testifying that Alfred was "slow" and "couldn't grasp the things" that other children his age talked about or the games they played); A0193 (Declaration of Beverly Frank, ¶ 7) ("Growing up, Alfred wasn't a bright child. His grasp of learning was weaker than the rest of the children."); Tr. 9/21/10 at 135 (childhood neighbor Brenda Goodman testifying that Alfred was "slow" as a child); *id.* at 399–400 (cousin

25

Murray Bourgeois testifying that he tried to teach ten–year–old Alfred how to work on cars, but Alfred was "slow to catch on" and the "mechanic thing was like too fast of a pace for him"); *id.* at 324 (cousin Carl Henry testifying Alfred was "slow" and had "trouble catching on to" new games and activities other children would play).

55.     Alfred also had trouble understanding and following directions, even after he had received repeated instructions. *See, e.g.*, Tr. 9/21/10 at 100 (Ms. Frank testifying that her grandmother, with whom Alfred lived for several years as a child, would have to continually re–teach Alfred things like how to button his shirt, even at the age of nine or ten); *id.* at 138 (Ms. Goodman testifying Alfred "could not follow instructions"); A0193 (Frank Declaration, ¶ 8) ("My grandmother had a lot of patience with Alfred. She tried to teach him to cook simple things, like frying an egg or frying toast. He had trouble following directions, remembering simple tasks."); A0214 (Declaration of Claudia Williams, ¶ 5) ("He would get beat [by our mother] for the same thing over and over like he just couldn't learn."); A0189 (Declaration of Lawanda Cook, ¶ 4) ("I always thought Alfred was really slow like a child. He never seemed to understand anything. I used to have to repeat the same thing over and over again to him and even then I'm not sure he understood what I was saying to him.").

56.     These problems continued into adulthood. *See, e.g.*, Tr. 9/21/10 at 401 (cousin Murray Bourgeois testifying that, as an adult, Alfred was "slower than most of the guys, you know, catching on to a lot of things"); *id.* at 325–29 (cousin Carl Henry, who worked for the same supermarket as Alfred, testifying that Alfred was slower to advance from warehouse porter to truck driver than other employees because he had difficulty learning the necessary skills for the latter position); *id.* at 371–72 (Donald Reese, a co–worker at a long haul trucking company, describing one occasion when Petitioner was driving and became very lost, taking them some

PA-030

400 miles out of the way, despite Mr. Reese having explicitly given Mr. Bourgeois straightforward directions); A0181–82 (Declaration of Michelle Armont, ¶ 8) ("[Alfred] did not have the ability to think of different ways to solve problems with his wives and girlfriends. His mind just did not work that way. He could not reason through a problem."); *id.* ("Things that would be obvious to a normal person were not obvious to Alfred."); A0212 (Declaration of Michelle Warren, ¶ 16) ("It was like [Alfred] had a block and could not reason things out or change his behavior."); A0207 (Declaration of Ivy Thomas, ¶ 4) ("Alfred was really slow. I remember that I used to have to explain things to him several times, and even then it seemed like he didn't always understand what I was trying to say.").

57.     Mr. Bourgeois's decreased ability to comprehend and problem solve meant that he was destined to repeat mistakes and was unable to learn from his actions. In the words of his half–sister, Michelle Armont, "Alfred could not consider the consequences of his actions." A0181–82 (Armont Declaration, ¶ 8).

58.     The results of the neuropsychological testing performed by Dr. Weiner and Dr. Gelbort confirm these witness reports. Both doctors found that Mr. Bourgeois's ability to process new information and comprehend new topics is significantly impaired. *See* Tr. 9/10/10 at 26 (Dr. Gelbort testifying that Petitioner's "learning is problematic, especially when he has to understand conceptually the information being presented to him"); Tr. 9/20/10 at 238 (Dr. Weiner testifying that Mr. Bourgeois is "likely to have difficulty adjusting to new and unfamiliar situations"). Additionally, testing of his memory shows mild to moderate impairment. More generally, Dr. Gelbort explained that the testing overall demonstrated that Mr. Bourgeois has trouble with "things that are more conceptual[,] that require higher level processing, that require him to think about more things at once and then work with them in a goal–directed fashion." Tr. 9/20/10 at

27

239–40; *see also id.* at 52. Likewise, after reviewing this testing, combined with her "own observations and evaluations," Dr. Swanson concluded that "Mr. Bourgeois is deficient in his ability to absorb and understand information" and "is significantly impaired in his ability to solve problems." A0006 (Swanson Supplemental Report at 3). This testing is further evidence of Mr. Bourgeois's conceptual deficits, and also explains his deficits in other domains as it reflects his inability to make decisions, acquire knowledge, and control his emotions and impulses.

### iii. Communication

59.     An individual's ability to effectively communicate also falls within the conceptual domain. Mr. Bourgeois had difficulty communicating from a young age. According to family members and friends, "when he was much younger he was pretty much silent and non–communicative." Tr. 9/20/10 at 91; *see also* Tr. 9/21/10 at 100 ("[H]e couldn't really explain himself real well. . . . [I]t was a thing of not being able . . . just to explain his self, you know, if he wanted to do something."). Mr. Bourgeois was eventually placed in speech therapy because he spoke with a stutter. Tr. 9/20/10 at 91.

60.     These communication deficits continued into adulthood, as demonstrated by Petitioner's results on the WJ–III, which includes tests for oral comprehension, oral language, and listening comprehension. Tr. 9/20/10 at 58. Mr. Bourgeois's scores in these areas were at the third– and fourth–grade level, or the 9th to 16th percentile. *Id.* at 59. As discussed above, the DSM–5 states that adults whose "functional use of academic skills" is "impaired" have significant conceptual deficits at the mild level of ID. That Petitioner functioned at the third– to –fourth–grade level went far beyond an impairment.

61.     Mr. Bourgeois's communications deficits were also apparent in Dr. Swanson's clinical evaluation of Mr. Bourgeois. *See* Tr. 9/20/10 at 58 (explaining that her "clinical judgment" of Petitioner's communication deficits were "back[ed] up" by his standardized scores

28

on achievement testing); *id.* at 105 ("He may have good expressive language when he is on a familiar topic but he doesn't have a good underlying understanding.").

### b.   Social domain

62.     Childhood playmates recall Petitioner's difficulties in the social realm. His family and neighbors remember him as a slow and awkward child who had difficulty playing with the other children and "fitting in." *See* Tr. 9/21/10 at 97–98 (Beverly Frank testifying that Alfred could not understand the games played by other children his age); *id.* at 120 (Alfred was "shy in making friends"); A0205 (Declaration of Louis Russell, Jr., ¶ 3) ("Growing up Alfred had a hard time. He was a big and awkward kid. We would all laugh at how he played sports. He had big feet that he was always falling over. Alfred always tried to fit in with other kids. Alfred has always had an awkward nature."); A0183 (Declaration of Nathaniel Banks, ¶ 3) ("Alfred wasn't any good at sports. He didn't play sports with us.").

63.     Alfred did not handle the rejection of his peers well. *See, e.g.*, Tr. 9/21/10 at 102 ("Alfred was teased a lot. He used to come home crying from school. . . . [H]e used to cry a lot."); A0183 (Banks Declaration, ¶ 3) ("Alfred was a fragile child. He spent a lot of time by himself. People used to pick on Alfred a lot. . . . I just remember Alfred crying at anything. Someone would tease him and he would break down crying."). These witness reports of crying inappropriately and uncontrollable behavior are evidence of adaptive impairments seen in persons with mild intellectual disability. *See* A0076 (DSM–5 at 34) (significant deficits in the social domain include "difficulties regulating emotion and behavior in age–appropriate fashion"); Elaine E. Castles, *We're People First: The Social and Emotional Lives of Individuals with Mental Retardation*, at 26 (1996) ("Cognitive disabilities may [] affect an individual's ability to cope with emotional discomfort and stressful interpersonal situations.").

29

64.     As described in relation to his conceptual deficits, Mr. Bourgeois also had trouble effectively communicating from a young age. *See, e.g.*, Tr. 9/20/10 at 91 (describing young Alfred as "pretty much silent and non–communicative"); Tr. 9/21/10 at 100 (relaying that as a child, Petitioner could not explain when he "wanted to do something"). Mr. Bourgeois was eventually placed in speech therapy because he spoke with a stutter. Tr. 9/20/10 at 91.

65.     Mr. Bourgeois's ability to communicate was also hindered by his lack of "internal monitor." A0202 (Declaration of Claudia Mitchell dated 9/16/07, ¶ 3). As his half–sister Claudia Mitchell explained, teenaged Alfred "just blurted stuff out and that made him come across as bold but it was really that anything he thought just came out of his mouth." *Id.*

66.     Mr. Bourgeois's social abilities did not improve with age. A psychiatric evaluation conducted in 1985, when Petitioner was twenty–one years old, reported that Mr. Bourgeois had problems in evaluating his self–worth and had low self–esteem, which reflects deficiencies in social adaptive functioning. *See* A0219–22 (Psychological Evaluation). His communication deficits also continued past the developmental period, as demonstrated by Mr. Bourgeois's achievement testing placing him at the third– and fourth–grade level, or the 9th to 16th percentile, in the areas of oral comprehension, oral language, and listening comprehension. *See* Tr. 9/20/10 at 58.

67.     Lastly, Mr. Bourgeois proved unable to maintain a healthy intimate relationship. He was married to four different women. *See* A0046–48 (Declaration of Kathleen Kaib, M.S.S., M.L.S.P., L.S.W. – 05/04/2007, ¶¶ 5–12). Consistent with the executive functioning and emotional dysregulation issues discussed above, each marriage was characterized by dysfunction

30

and ultimately failed. *Id.* Indeed, all of his relationships were "chronically unstable due to his inability to regulate his emotions." *Id.* at ¶ 4.[14]

### c. Practical domain

68.    As noted above, as a child, Mr. Bourgeois proved unable to follow simple directions, which implicates both the conceptual and the practical domain. Reporters also told Dr. Swanson that Petitioner "was delayed compared to his peers in learning simple skills like tying his shoes and counting money," and it "took young Alfred much more time than his peers to learn how to ride a bike." A0007 (Swanson Supplemental Report at 4); *see also* Tr. 9/20/10 at 90–91; Tr. 9/21/10 at 98–100 (Ms. Frank testifying that at the age of nine, Alfred couldn't count money or dress himself; he was always putting on mismatched socks and could not tie his shoes or button a shirt even when he was "really up in age"); *id.* at 137–39 (Ms. Frank's cousin, Brenda Goodman, corroborating Ms. Frank's account of Petitioner's difficulties dressing himself); *id.* at 324, 360 (Alfred's cousin testifying that young Alfred had difficulty learning new games and how to ride a bike). Mr. Bourgeois was generally described as someone who had to rely on family and friends "in order to perform daily life activities." A0005 (Swanson Supplemental Report at 2).

69.    As with the other realms, Petitioner's practical deficits persisted as he grew older. Half–sister Claudia Mitchell, who first met Alfred when he was a teen, explained:

> Alfred stayed with me in Texas for a while. When he got here he was wearing clothes that were too small for him. He could not cook at all. He could not really function on his own so he started to feed off my life. He would ride on my accreditation. I helped him with paperwork. I filled out applications for him. His pattern was to just try to look good and hide his failings, then he could connect

---

[14] Although Ms. Kaib took the stand in Petitioner's § 2255 proceedings, the court would not allow her to testify as to her interviews with Mr. Bourgeois's ex–wives and ex–girlfriends. *See* Tr. 9/20/10 at 383–93.

31

with someone who could help him function so that he could continue to try and feel less inferior to everyone else. There were other people at other times that filled this role for Alfred.

A0203 (Mitchell Declaration dated 9/16/07, ¶ 7).[15]

70.     Several reporters also recall Alfred's impaired financial abilities. *See* A0181–82 (Armont Declaration, ¶ 8) ("[Alfred] did not understand that he could not afford the things he bought. . . . He just bought things without understanding how hard it would be to make the payments."). Based on her interviews of Petitioner's family, friends, and co–workers, as well as her review of financial records, Dr. Swanson concluded that Mr. Bourgeois had "difficulty understanding and managing money." Tr. 9/20/10 at 164–66; 172–76.[16]

71.     As with the other realms, his practical deficits persisted through adulthood. Several reporters recall Alfred's impaired financial abilities. *See* A0181–82 (Armont Declaration, ¶ 8) ("[Alfred] did not understand that he could not afford the things he

---

[15] Ms. Mitchell had planned to testify at Petitioner's § 2255 evidentiary hearing, but was unable to do so because her husband suffered a debilitating stroke shortly before the hearing. *See* A0204 (Declaration of Claudia Mitchell dated 8/26/10, ¶¶ 3–6).

[16] In her testimony, Dr. Swanson stated that Mr. Bourgeois has "deficits in the area of conceptual and social," but only referred to "limitations" in the practical realm. Tr. 9/20/10 at 104. Dr. Swanson found that Mr. Bourgeois was someone who had to rely on family and friends "in order to perform daily life activities," A0005 (Swanson Supplemental Report at 2), and who had "difficulty understanding and managing money." Tr. 9/20/10 at 164–66; 172–76. These limitations would qualify Mr. Bourgeois as someone with adaptive deficits in the practical domain as described in the DSM–5. *See* A0076 (DSM–5 at 34) (individuals with adaptive deficits in the practical domain include those who "need some support with complex daily living tasks in comparison to peers," including in the areas of "banking and money management"). In addition, several deficits relevant to the conceptual and social domains (in which Dr. Swanson found there were "definitely" adaptive deficits), also serve to establish deficits in the practical realm. For instance, his inability to understand and follow directions (conceptual) affects his ability to cook for himself and acquire new vocational skills (practical).  Likewise, his inability to control his emotions and effectively communicate (social) affect all aspects of his daily living, including occupational skills and self–care (practical).

bought. . . . He just bought things without understanding how hard it would be to make the payments."). Based on her interviews of Petitioner's family, friends, and co–workers, as well as her review of financial records, Dr. Swanson concluded that Mr. Bourgeois had "difficulty understanding and managing money." Tr. 9/20/10 at 164–66; 172–76.[17]

72.     Mr. Bourgeois is also described as oblivious towards safety. Family members and neighbors recall that as a teenager, Alfred drove a four–wheeler "straight into a pole." A0205 (Russell, Jr. Declaration, ¶ 4); *see also* A0214 (Williams Declaration, ¶ 6). An acquaintance later in life, Lawanda Cook, likewise remembers Alfred taking "crazy chances in the truck he drove. . . . [O]ne time he was driving the truck and I was sitting in the back near the sleeper compartment. He stood up in his seat and turned around to talk to me then he acted like he was going to walk back to me. I was scared to death and it didn't seem to affect him at all." A0189 (Cook Declaration, ¶ 3). Donald Reese, Mr. Bourgeois's co–worker at a long haul trucking company, testified about a time when Mr. Bourgeois drove their truck into a ditch along the wall of a mountain and Mr. Reese had to take over and get the truck out. Tr. 9/21/10 at 372–75. After that, Mr. Reese refused to accept jobs that would require him to ride with Mr. Bourgeois. *Id.* at

---

[17] In her testimony, Dr. Swanson stated that Mr. Bourgeois has "deficits in the area of conceptual and social," but only referred to "limitations" in the practical realm. Tr. 9/20/10 at 104. Dr. Swanson found that Mr. Bourgeois was someone who had to rely on family and friends "in order to perform daily life activities," A0005 (Swanson Supplemental Report at 2), and who had "difficulty understanding and managing money." Tr. 9/20/10 at 164–66; 172–76. These limitations would qualify Mr. Bourgeois as someone with adaptive deficits in the practical domain as described in the DSM–5. *See* A0076 (DSM–5 at 34) (individuals with adaptive deficits in the practical domain include those who "need some support with complex daily living tasks in comparison to peers," including in the areas of "banking and money management"). In addition, several deficits relevant to the conceptual and social domains (in which Dr. Swanson found there were "definitely" adaptive deficits), also serve to establish deficits in the practical realm. For instance, his inability to understand and follow directions (conceptual) affects his ability to cook for himself and acquire new vocational skills (practical).  Likewise, his inability to control his emotions and effectively communicate (social) affect all aspects of his daily living, including occupational skills and self–care (practical).

375–76; *see also id.* at 400 (cousin Murray Bourgeois testifying that another of Alfred's co–workers, who was also one of his good friends, warned people not to ride with Alfred because he was so unsafe).

### d.  Masking

73.     Like many individuals with intellectual disability, *see* A0125–27 (AAIDD–10 at 158–59), Mr. Bourgeois tried hard to "mask" his deficits. Indeed, each of the mental health experts that evaluated Mr. Bourgeois in connection with his § 2255 *Atkins* claim found that he actively sought to portray himself as far more gifted, intelligent, and accomplished than the objective evidence showed. *See, e.g.*, Tr. 9/23/10 at 204 (Dr. Price testifying Mr. Bourgeois engaged in "adult impression management," "portray[ing] himself with ability and accomplishments that are exaggerations"); Tr. 9/24/10 at 161–62 (Dr. Moore testifying Petitioner "tends to want to make himself look better than he really is"); Tr. 9/20/10 at 229 (Dr. Weiner testifying that Mr. Bourgeois had a history of "attempting to present himself in a much more favorable light in terms of grades, functioning, than actually was the case"); *id.* at 60 (Dr. Swanson testifying that Mr. Bourgeois "overestimates everything he can do" and "likes to present himself in the best possible manner"); *id.* at 101–02 (very important to Mr. Bourgeois that he appear able to do everything his non–impaired older brother could do); Tr. 9/10/10 (p.m.) at 65 (Dr. Gelbort testifying that Mr. Bourgeois would mask his low intellect by steering the conversation to talk about things he felt he knew about, "rather than just simply answering questions").

74.     Lay witnesses explained that Mr. Bourgeois had been engaged in such masking behavior for most of his life. For instance, cousin Carl Henry testified that Alfred was a "proud guy" who "wanted everybody to feel he was on the same playing field." Tr. 9/21/10 at 339–40; *see also id.* at 329–30 (explaining that Alfred was skillful at soliciting help from others to cover

up his deficits); A0181–82 (Armont Declaration, ¶ 8) ("Alfred wanted to be accepted. Because of

his limitations he tried to gain the acceptance he wanted by getting possessions and by telling

people things he thought would make them like him."). Aunt Elnora Bourgeois McGuffy recalls:

> Alfred was not as smart as [his brother] Lloyd, but he wanted everyone to think
> that he was. Alfred would brag on himself, even when it wasn't true. You never
> know how much Alfred knew about anything because he was always
> exaggerating so much. He had a problem with that. Alfred would try to make
> himself seem like he was doing better that [sic] he was more successful than he
> was and smarter than he was.

A0200 (McGuffy Declaration, ¶ 7). Nathaniel Banks confirms:

> Alfred wanted to impress people. Alfred lied a lot. I remember that Alfred would
> say things that you just knew weren't true. I used to work for the sheriff's office.
> Alfred told people he worked there. He was never a proper deputy. Alfred tried to
> build himself up—present himself as more than he was. I think Alfred lied so
> much he started to believe it.

A0183 (Banks Declaration, ¶ 4).

75.     Even the district court that (erroneously) rejected Mr. Bourgeois's *Atkins* claim in

2011 made observations tending to confirm that, with age, Mr. Bourgeois became masterful at

masking his deficits. *See, e.g.*, *Bourgeois*, 2011 WL 1930684, at *30 ("Bourgeois' ability to

appear intelligent likely stems from his narcissism and desire to look good."); *id.* at *29 ("While

testimony from various individuals questioned his intellect when younger, those who knew him

as an adult did not suspect that he was mentally retarded."); *id.* at *28 (quoting Government

expert Dr. Price, who testified that Mr. Bourgeois is very good at talking positively about

"himself, his life, his situation," but that when it came to "objective testing," he "kind of shuts

down a little bit"); *id.* at *30 (referring to Dr. Price's opinion that "Bourgeois' verbal abilities

and social skills give off the impression that he is smarter that he is").

35

76.     Regardless of how successfully Mr. Bourgeois was able to mask his disability, the evidence discussed above demonstrating his significant lifelong intellectual and adaptive deficits is irrefutable.

### 4.     Formal test of adaptive behavior

77.     Adaptive behavior can also be assessed using formal instruments. However, even under ideal circumstances, an adaptive behavior determination is not meant to be based only on adaptive behavior scores. The DSM–5 does not require a particular score on a test of adaptive functioning to establish prong two or identify any range of scores as being in the presumptive range for intellectual disability. A0079 (DSM–5 at 37). The AAIDD–10 provides that scores that are approximately two standard deviations below the mean (70–75) are in the presumptive range for intellectual disability. A0106 (AAIDD–10 at 46). These scores can be on any one of the three domains or the composite score. Nevertheless, the AAIDD acknowledges that formal adaptive behavior testing instruments are generally imperfect, and even fail to assess certain areas of adaptive functioning. *Id.* at 51. These instruments are far less reliable than IQ or neuropsychological tests as they assess a collateral reporter's opinion of the individual's functioning, rather than directly assessing performance in a given task. Moreover, under both the DSM–5 and the AAIDD–10, scores from formal tests of adaptive behavior are intended to be interpreted with clinical judgment and considered alongside other sources of information such as third party interviews, other medical and mental health evaluations, and records review. A0079 (DSM–5 at 37); A0112 (AAIDD–10 at 52).

78.     As one part of her extensive evaluation, Dr. Swanson administered both of the "gold standard" adaptive assessment tests—the Vineland Adaptive Behavior Scales, 2d Edition ("Vineland–II") and the Adaptive Behavior Assessment System, 2d Edition ("ABAS–II")—to Beverly Frank, the granddaughter of a woman with whom Mr. Bourgeois lived as a child for

PA-040

several years. Dr. Swanson chose Ms. Frank because she fit the description of a "good informant" set forth by the publishers of the Vineland–II and ABAS–II: she knew Mr. Bourgeois well over an extended period and was also able to recall his functioning at a specific point in time (namely, when he was seven years old). Tr. 9/20/10 at 65–66. Furthermore, Ms. Frank observed a full spectrum of Petitioner's abilities, as opposed to a single area such as work. *Id.* at 67, 72. Lastly, Dr. Swanson explained that it was important to use an informant who knew Mr. Bourgeois at a young age, before he developed the ability to mask. *Id.* at 103; *see also infra* Section III.C.3.d (detailing Mr. Bourgeois's long history of hiding his deficits and exaggerating his capabilities and achievements).

79.     Dr. Swanson also explained why she administered both the Vineland–II and the ABAS–II to Ms. Frank, even though she believes the former is a far better test. The ABAS–II is a test that the informant completes alone; there is no interaction between the test–taker and the administrator. By contrast, the Vineland–II employs a semi–structured interview format that allows the administrator to ask follow–up questions to ensure an accurate score is being assigned for each function. Hence, Dr. Swanson used the ABAS–II more as a screening device to confirm that there were no large gaps in Ms. Frank's knowledge of Mr. Bourgeois and, having found this to be true, she then administered the Vineland–II to obtain a better sense of Petitioner's true functioning. *Id.* at 70–73; *see also id.* at 73–74 (explaining she feels the "Vineland is a more accurate estimate of where [Mr. Bourgeois] really is in compared to the ABAS").[18]

---

[18] As Dr. Swanson explained, the differences between the test formats accounts for what the district court described as "inconsistencies" in Ms. Frank's answers. *See* Tr. 9/20/10 at 73–74, 154, 191; *Bourgeois*, 2011 WL 1930684, at *36. Additionally, Dr. Swanson testified that the ABAS–II is less accurate in measuring the functioning of an individual with mild ID, as opposed to someone more profoundly impaired, which explains why the ABAS–II results suggested Mr. Bourgeois is more impaired than did the Vineland–II results. Tr. 9/20/10 at 74–78.

PA-041

80.     Dr. Swanson's testing indicates profound deficits in adaptive functioning in all three of the domains recognized by the AAIDD–10 and the DSM–5 (conceptual, practical, and social), as well as in the composite score of Petitioner's overall adaptive functioning. In all three of those domains and the composite score, Dr. Swanson's testing returned scores that were more than two standard deviations below the mean[19] and well into the impaired range. As she summarizes in her declaration:

> Mr. Bourgeois scored a 66 on the Vineland–II. On the sub–scales he scored a 69 in Communication; a 66 in Daily Living Skills; and 66 in Socialization. These scores place him well within the range of mental retardation in the sphere of adaptive deficits. They also corroborate what the other psychologists had already learned through interviews and affidavits of Mr. Bourgeois's relatives and neighbors.

A0002 (Swanson Dec., ¶ 5); *see also* Tr. 9/20/10 at 74–75.[20]

81.     Although these scores are significant, consistent with the directive of the DSM–5 and AAIDD–10 discussed above, Dr. Swanson considered the scores merely as one piece of information among many, including third party interviews, medical and mental health evaluations, neuropsychological testing, and records review. *See* Tr. 9/20/10 at 19–21, 82–85.

**D.      Onset Prior to Age Eighteen**

82.     A diagnosis of intellectual disability requires that the deficits in intellectual functioning and adaptive deficits manifested prior to the age of eighteen.

83.     Evidence of Mr. Bourgeois's intellectual disability has existed since his early childhood. As detailed above, people who have known Mr. Bourgeois since childhood attest that, throughout his youth and into adulthood, he exhibited intellectual and adaptive impairments that

---

[19] The mean is a score of 100 and one standard deviation is fifteen points.

[20] Ms. Frank's testing resulted in a composite score of 42 on the ABAS–II. *See* A0008–19 (Swanson ABAS Score Report).

affected all facets of his life. Furthermore, based on interviews with these people and other sources, Dr. Swanson concluded that "it is absolutely clear that the onset of Mr. Bourgeois' deficiencies in both his intellectual and adaptive functioning began before age 18 and continued into adulthood." A0007 (Swanson Supplemental Report at 4); *see also* Tr. 9/20/10 at 104.

### E.     Risk Factors for Intellectual Disability

84.     No etiology is required to establish a diagnosis of intellectual disability, and the majority of intellectual disability diagnoses have no confirmed etiology. *See* A0116–21 (AAIDD–10 at 57–62). Nevertheless, presence of risk factors can corroborate a diagnosis of intellectual disability and explain its origins. A0081 (DSM–5 at 39); A0116–21 (AAIDD–10 at 57–62). Both the DSM–5 and the AAIDD–10 identify risk factors for ID, including biomedical factors that result in direct insults to cognition, as well as environmental risk factors in the social, educational, and behavior domains. *See* A0081 (DSM–5 at 39); A01119 (AAIDD–10 at 60); *see also* Tr. 9/24/10 at 52 (Government expert Dr. Price testifying that "risk factors for intellectual disability can include impaired child giving [sic] interaction, lack of adequate stimulation, family poverty, chronic illness in the family, things of that nature. So environmental factors can contribute to a person's development of [intellectual disability]").

85.     Mr. Bourgeois's diagnosis of intellectual disability is reinforced by the presence of a number of recognized risk factors for intellectual disability in his life history.

#### 1.     Child abuse

86.     Witnessing the abuse of others, and being the victim of abuse, increase the risk of intellectual disabilities in children. A0134 (AAIDD–12 at 26); *see also* Tr. 9/20/10 at 89. Mr. Bourgeois experienced both.

87.     Numerous witnesses reported that Petitioner's mother took out her hard life and troubles on her children, with a special focus on Alfred. *See, e.g.*, Tr. 9/21/10 at 13–15 (sister

Claudia Williams testifying that their mother used to beat all of the children, but was particularly abusive toward Alfred, whom she beat "constantly"); *id.* at 78 ("She beat all of us, but she didn't beat us like she beat him."); A0214 (Williams Declaration, ¶ 5) ("Alfred got more whippings than the rest of us. . . . Like the rest of us he got beat sometimes for nothing and then he got beat because he was just stupid and kept doing things that got him beat."); Tr. 9/21/10 at 97 (Ms. Frank testifying "Alfred was really mistreated by his mom"); *id.* at 142 (Ms. Goodman testifying Eunice would curse and beat Alfred, and that she "was harder on him than the other kids"); *id.* at 322–23 (cousin Carl Henry testifying that Eunice resented Alfred because her relationship with Alfred's biological father "didn't work out" and she "took the misery of . . . that relationship out on him").[21]

88.     Eunice's abuse of Alfred was not only more frequent than her abuse of his siblings, but also more violent. As his sister Claudia explained, all of the children would receive "whippings," but Alfred was whipped so hard that he would be "blue black" and have blood coming from his back and legs. Tr. 9/21/10 at 13–15; *see also id.* at 14 (Eunice once used a meat cleaver to cut off the tip of his finger while the family ate dinner); *id.* at 15 (Eunice would lock young Alfred in a closet with no lights on and leave him there).

---

[21] *See also* A0191 (Frank Declaration, ¶ 3) ("Alfred's mother treated him differently than her other children."); A0194 (Declaration of Allen Henry, ¶ 3) ("Eunice used to be rough on Alfred. She used to chastise him more than other kids and used to beat him more than the others. . . . Eunice treated Alfred differently from her other children. She scolded him more and whipped him more. She also didn't pay enough attention to him."); A0185 (Declaration of Murray Bourgeois, ¶ 3) ("Eunice was the kind of person who yelled at her kids and whipped them all the time, but Alfred got more beatings than any of them. She was really hard on Alfred."); A0198 (Declaration of Yvonne Robinson Joseph, ¶ 3) ("Alfred's mother used to pick on him and treat him bad. She treated him much worse than she did her other children. She was always fussing at him and whipped him more than the others. She used to call him 'little yellow bastard' and slap him for nothing.").

### 2.    Sexual abuse

89.    In addition to the parental abuse and neglect Petitioner experienced, he was also a victim of sexual abuse as a child. Specifically, although neighbor Miss Mary's home was intended to be a "safe" place where young Alfred would be spared the abuse from his mother, while there, Alfred was raped over the course of several years by Miss Mary's son. *See* Tr. 9/21/10 at 142–43; Tr. 9/20/10 at 292.

### 3.    Neglect and impaired parenting

90.    The AAIDD identifies neglect as a risk factor for ID, and also lists other factors relevant to the types of neglect suffered by Mr. Bourgeois as a child, including impaired child–caregiver interaction, impaired parenting, rejection of parenting, and chronic maternal illness. *See* A0119 (AAIDD–10 at 60).

91.    Alfred was the fifth of seven children born to Eunice Bourgeois. All seven children were born in a time span of under nine years and were conceived by four different fathers. *See* Tr. 9/21/10 at 6–7. Eunice was "overwhelmed" by the number of children in her care. *Id.* at 132–33; *see also id.* at 260–61, 265 (Dr. Mark Cunningham testifying that there were indications that Petitioner suffered psychological damage from being raised in an "overwhelmed family system").[22]

92.    Eunice was chronically depressed by the time Alfred was born. She first became depressed when the father of her first three children suddenly abandoned her. A0200 (Declaration of Elnora Bourgeois McGuffey, ¶ 2); A0196 (Declaration of Jersey Henry, ¶ 3). Her

---

[22] Dr. Cunningham, a forensic psychologist, was retained by trial counsel as a "mitigation expert," but never called to testify. He never evaluated Mr. Bourgeois for ID, but testified in Petitioner's § 2255 proceedings regarding, inter alia, mitigating aspects of Mr. Bourgeois's background that he could have presented if called at trial.

41

depression worsened when her mother died while Eunice was in the hospital delivering her fourth son. A0187–88 (Declaration of Wilmer Bourgeois, Sr., ¶ 7). That son, Anthony, was born severely disabled. Tr. 9/21/10 at 10; A0214 (Williams Declaration, ¶ 3). Subsequently, her first son Clyde died at the age of twelve when he fell out of a boat and drowned. *See* Tr. 9/21/10 at 6–7; A0209 (Warren Declaration, ¶ 3); *see also* A0214 (Williams Declaration, ¶ 3) (Alfred's older sister, Claudia, explaining that these last two factors—Anthony's disability and Clyde's death—were particularly hard on their mother and took her away from her other children).

93.     Eunice was also an alcoholic. *See* Tr. 9/21/10 at 132–34 (neighbor testifying that Eunice drank "excessively," getting intoxicated "every day"); *id.* at 397 (relative of Eunice testifying that she "drank every day").

94.     According to family neighbor Brenda Goodman, Eunice's alcoholism and the stress of raising so many children on her own caused her to forget what "was important in life regarding raising her children," including such basic tasks as sending them to school. *Id.* at 132–33. Family members concurred that Eunice failed to fulfill her role as a parent to Petitioner and his siblings. *See, e.g.*, A0187(Wilmer Bourgeois, Sr., Declaration, ¶ 4) ("Eunice did not know how to raise children. She didn't raise them right or teach them the right things. She didn't spend enough time with her kids. My sister Eunice should have never been a mother."); A0224 (Memoranda Generated by Gerald Bierbaum at 39) (quoting Harry Bourgeois, Eunice's cousin, as saying: "Alfred's momma didn't do shit for him. . . . All her kids raised they self. . . . It was like he didn't have no momma."); A0202 (Mitchell Declaration dated 9/16/07, ¶ 2) (Alfred's half–sister remarking: "His mother had basically just thrown Alfred away.").

95.     Ultimately, Alfred was cast out by his mother, who sent him at the age of seven to live with an elderly neighbor, Miss Mary Clayton. *See* Tr. 9/21/10 at 93. Even after Miss Mary

42

died several years later, Alfred still was not welcomed home, but instead had to live with his paternal half–sister, Michelle Armont. *See* Tr. 9/21/10 at 38.

96.     Meanwhile, Petitioner was completely abandoned by his paternal father, Alfred Sterling, who "provided no support and made no effort to exercise any sort of relationship with Mr. Bourgeois." A0029 (Declaration of Mark D. Cunningham, Ph.D., ABPP – 05/11/2007, ¶ 19); A0202 (Mitchell Declaration dated 9/16/07, ¶ 2) ("Since [his mother] had rejected him he was looking for a family where he could be accepted. Our father, Alfred Sterling, was not the answer that Alfred was looking for. Alfred tried to make his way into his father's life but Alfred Sterling was a manipulative, mentally abusive man and could not be the father that Alfred wanted and needed.").

### 4.     Low socioeconomic status

97.     Poverty is another risk factor for intellectual disability. *See* A0119 (AAIDD–10 at 60); Tr. 9/20/10 at 89–90. Mr. Bourgeois grew up in an impoverished, isolated neighborhood on the banks of the Mississippi River, about fifty miles from New Orleans. His community, called "the Bend," consisted of a one lane dirt road connecting about twenty homes, representing two or three different family units. Tr. 9/21/10 at 8–9; *id.* at 131; *id.* at 395. A family friend who was raised in the same neighborhood described it as consisting of "[p]oor black families." A0227 (Excerpt from Trial Transcript dated 3/23/04); *see also* Tr. 9/21/10 at 131 ("It was very poor."). The neighborhood was surrounded by sugar cane fields, and hemmed in on one side by the river. Tr. 9/21/10 at 9. The Bend was not connected to a sewage line. *Id.* at 141.

98.     While poverty is itself one social risk factor, low socioeconomic status also signals the presence of others, including malnutrition, educational inadequacy, insufficient stimulation, and deficient medical and/or educational interventions. *See* A0119 (AAIDD–10 at 60). Thus, as explained by Government expert Dr. Price, Alfred's "lack of education, . . .

43

impoverishment and the lack of cultural enrichment" bore a "relationship to his low intelligence." Tr. 9/24/10 at 51–52; *see also* Tr. 9/23/10 at 232 (Dr. Price acknowledging that Petitioner's "cultural, spiritual, [and] economic" impoverishment was relevant to "his cognitive intelligence").

### 5. History of learning difficulties

99. Childhood learning difficulties also constitute risk factors for intellectual disabilities as they correlate with declines in IQ during the developmental period. As discussed above, Alfred is reported to have failed a grade in elementary school and required speech therapy. A0206 (Swanson Supplemental Report at 3); *see also* Tr. 9/21/10 at 323–24. He is also said to have "had significant problems in learning, and that relatives would spend hours with him every night reviewing his school work and trying to teach him basic skills." A0206 (Swanson Supplemental Report at 3); *see also* Tr. 9/21/10 at 27, 37–38, 58–59; *id.* at 98–99.

### 6. Family heredity risk

100. Having a parent or sibling with intellectual disability significantly increases the likelihood of having an intellectual disability. *See* A0081 (DSM–5 at 39) (comprehensive evaluation for ID involves identification of genetic etiologies, including "three–generational family pedigree"); A0121 (AAIDD–10 at 62) (same).

101. Mr. Bourgeois has a family history of intellectual and adaptive impairments. His older brother, Anthony, was born with cerebral palsy. Tr. 9/21/10 at 10. He was profoundly disabled, unable to feed, bathe, or dress himself throughout his life. *Id.*; *see also* A0200 (McGuffy Declaration, ¶¶ 2–4) (describing Anthony as afflicted with life–long developmental problems); *see also* A0214 (Williams Declaration, ¶ 3) ("We lost [brother] Clyde and then our brother Anthony took a lot of extra care due to his disabilities.").

102.     Additionally, Petitioner's mother, Eunice, was described by her brother as "not that smart and slow in understanding." A0187 (Wilmer Bourgeois, Sr., Declaration, ¶ 3); *see also* A0224 (Bierbaum Memorandum at 39) (quoting Harry Bourgeois, Eunice's cousin, describing Eunice as "half–ass retarded").

### F.     Conclusion

103.     For the reasons set forth above, Mr. Bourgeois has established that he is an intellectually disabled person. He suffers from significant deficits in intellectual and adaptive functioning, which have been present since very early in the developmental period. Accordingly, this Court should find Mr. Bourgeois intellectually disabled and categorically ineligible for execution.

## IV.     RELIEF IS APPROPRIATE UNDER 28 U.S.C. § 2241.

104.     This claim is appropriately brought under 28 U.S.C. § 2241. A federal habeas petitioner is entitled to review under § 2241 when § 2255 is "inadequate or ineffective to test the legality of his detention" or sentence. 28 U.S.C. § 2255(e); *see also Brown*, 719 F.3d at 588 (§ 2241 applies to challenges to a habeas petitioner's sentence, in addition to his conviction). "The essential function [of § 2241] is to give a prisoner a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence." *In re Davenport*, 147 F.3d at 609 (internal quotations omitted); *Webster*, 784 F.3d at 1136 (same).

105.     Cognizable claims include those that rely on a new legal or factual basis not available at the time of the petitioner's trial proceedings or his § 2255 proceedings. *See, e.g.*, *Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001); *Davenport*, 147 F.3d at 607–09; *Webster*, 784 F.3d at 1136. The majority of circuit courts of appeal—including the Seventh Circuit—have also expressly recognized that § 2241 is available to petitioners if circuit precedent would have required the district court and appellate panel to erroneously reject petitioner's claim at the time

45

of his § 2255 motion. *See, e.g.*, *Davenport*, 147 F.3d at 611.[23]

106.    Section 2241 is also the appropriate vehicle where a petitioner challenges the execution of his sentence. *Kramer*, 347 F.3d at 217; *Valona v. United States*, 138 F.3d 693, 694 (7th Cir. 1998) ("A motion seeking relief on grounds concerning the execution but not the validity of the conviction and sentence . . . may not be brought under § 2255 and therefore falls into the domain of § 2241."). Likewise, § 2255 is "inadequate" when it prevents a prisoner from obtaining review of a legal theory that addresses the "fundamental legality" of a sentence. *Webster*, 784 F.3d at 1124–25.

107.    As detailed below, Mr. Bourgeois's claim that his intellectual disability renders him categorically ineligible for the death penalty fits within the category of claims cognizable under § 2241, as § 2255 was and remains inadequate or ineffective to test the legality of his sentence. That purpose is all the more apt because Congress and the United States Supreme Court have both expressly forbidden the *execution* of any prisoner who is intellectually disabled. *See* 18 U.S.C. § 3596(c) ("A sentence of death shall not be carried out upon a person who is mentally retarded."); *Atkins*, 536 U.S. at 320 (establishing "categorical rule making [intellectually disabled] offenders ineligible for the death penalty").

   **A.    Petitioner's *Atkins* Claim Relies on Supreme Court Jurisprudence and Diagnostic Criteria Not Available to Him in § 2255 Proceedings.**

108.    As stated above, a federal prisoner may proceed under § 2241 when asserting a habeas claim that relies on a legal or factual basis not available at the time of petitioner's trial or

---

[23] *See also United States v. Barrett*, 178 F.3d 34, 51–52 (1st Cir. 1999); *Triestman v. United States*, 124 F.3d 361, 363 (2d Cir. 1997); *In re Dorsainvil*, 119 F.3d 245, 247–48, 251 (3d Cir. 1997); *United States v. Wheeler*, 886 F.3d 415, 434 (4th Cir. 2018); *Reyes–Requena v. United States*, 243 F.3d 893, 904 (5th Cir. 2001); *Martin v. Perez*, 319 F.3d 799, 805 (6th Cir. 2003); *Alaimalo v. United States*, 645 F.3d 1042, 1047 (9th Cir. 2011); *In re Smith*, 285 F.3d 6, 8 (D.C. Cir. 2002).

§ 2255 proceedings. *See Garza*, 253 F.3d at 924–25; *Davenport*, 147 F.3d at 607. For instance, in *Garza*, the § 2241 petitioner challenged his conviction and death sentence based on the issuance of an opinion from the Inter–American Commission on Human Rights, which found his execution would violate international law. *Id.* at 923. Because the opinion upon which the *Garza* petitioner relied could not have been generated until § 2255 proceedings had ended and Mr. Garza's legal claim did not satisfy the conditions necessary for a successive § 2255 petition, the Seventh Circuit found that Mr. Garza's claim was reviewable under § 2241. Similarly, in *Davenport*, the Seventh Circuit reviewed a claim based on a retroactive change in the United States Supreme Court's interpretation of federal statutory law under § 2241, explaining that § 2255 was not available because the Court's decision related to statutory, and not constitutional law. 147 F.3d at 607–11.

109.    In *Webster*, the habeas petitioner had been convicted of federal capital charges and sentenced to death. At his trial, Mr. Webster claimed that he was intellectually disabled and challenged his eligibility for the death penalty under *Atkins*, a claim the trial court rejected. *Webster*, 784 F.3d at 1125–33. Mr. Webster then presented newly discovered evidence of his intellectual disability that could not have been discovered at the time of trial by diligent counsel. *Id.* at 1133. Because Mr. Webster's execution would be constitutionally prohibited if his *Atkins* claim was meritorious and he could not seek review of this evidence under a successor § 2255 petition, the Seventh Circuit ruled that Mr. Webster's renewed *Atkins* claim and the new evidence were appropriately reviewed under § 2241. *Id.* at 1146.

110.    As discussed in detail below, Mr. Bourgeois's *Atkins* claim fundamentally relies on the Supreme Court's decisions in *Moore–I* and *Moore–II*, as well as the current diagnostic manuals that *Moore–I* and *Moore–II* require courts to use in evaluating ID claims. Because

47

*Moore–I* and *Moore–II* were decided in 2017 and 2019, respectively, they constitute legal bases that were not available at the time of Mr. Bourgeois's initial § 2255 proceedings. Likewise, because the AAIDD–12, AAIDD–15, and the DSM–5 were each adopted after Petitioner filed his 2007 habeas, they constitute new factual bases not available at the time of Mr. Bourgeois's initial § 2255 proceedings. Finally, because the Fifth Circuit denied Petitioner's request to file a second § 2255 petition following *Moore–I*, there is no question that § 2255 is an "inadequate and ineffective" means to challenge Mr. Bourgeois's sentence under these new legal and factual bases. Accordingly, the claim is properly asserted under § 2241.

**1.      Background: *Atkins*, *Ex Parte Briseño*, *Moore–I*, and *Moore–II***

111.    In *Atkins*, the Supreme Court held that the execution of intellectually disabled individuals violates the Eighth Amendment's prohibition against cruel and unusual punishment, but "left the contours of that new exemption murky." *Bourgeois*, 2011 WL 1930684, at *23. The Court recognized that "clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self–care, and self–direction that became manifest before age 18." *Atkins*, 536 U.S. at 318 (referring to the then–current diagnostic criteria for intellectual disability). For the most part, however, the *Atkins* Court left "to the States the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences." *Id.* at 317.

112.    The approach that was adopted for determining *Atkins* claim in Texas was first set forth in the case of *Ex parte Briseño*, 135 S.W.3d 1 (Tex. Crim. App. 2004), *abrogated by Moore–I*, 137 S. Ct. 1039. Despite the fact that *Atkins* excluded the "entire class" of intellectually disabled individuals from execution, 536 U.S. at 321, the CCA in *Briseño* explicitly stated that its goal was to "define that level and degree of mental retardation at which a consensus of Texas citizens would agree that a person should be exempted from the death

48

penalty," 13 S.W.3d at 6. The court also opined that the narrow group of individuals who satisfy this "Texas consensus" may be defined by their "level and degree of mental retardation," pointing to the fictional character "Lennie" from John Steinbeck's *Of Mice and Men* as someone who "might" be considered entitled to *Atkins* relief. *Id.*

113.    To effectuate its goal of limiting *Atkins* to those individuals who would be considered ID by a consensus of Texas laypersons, the CCA first instructed courts to adopt a "flexible" approach to prong one, observing that "sometimes a person . . . whose IQ tests below 70 may not be mentally retarded." *Id.* at 7 n.24; *see also id.* at 14 (crediting the trial court's finding that that petitioner's IQ scores of 72 and 74 "understated [his] intellectual functioning"). With regard to prong two, the CCA held that courts must evaluate adaptive functioning according to seven non–clinical factors it deemed incompatible with a diagnosis of intellectual disability.[24] *Id.* at 8–9. Finally, the court held that, "[a]lthough experts may offer insightful opinions on the question of whether" an individual meets the "diagnostic criteria" for ID, "the

---

[24] These seven factors, commonly referred to in subsequent caselaw and commentary as the "*Briseño* factors," were:

> (1) Did those who knew the person best during the developmental stage—his family, friends, teachers, employers, authorities—think he was mentally retarded at that time, and, if so, act in accordance with that determination? (2) Has the person formulated plans and carried them through or is his conduct impulsive? (3) Does his conduct show leadership or does it show that he is led around by others? (4) Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable? (5) Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject? (6) Can the person hide facts or lie effectively in his own or others' interests? (7) Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

*Briseño*, 135 S.W.2d at 8.

ultimate issue of whether this person is, in fact, mentally retarded for purposes of the Eighth Amendment ban on excessive punishment is one for the finder of fact." *Id.* at 9.

114. Yet in 2017, the United States Supreme Court rejected the CCA's approach to *Atkins* claims as unconstitutional. *Moore–I*, 137 S. Ct. at 1044. The Court began by stressing that lower courts do not have "unfettered discretion to define the full scope of the constitutional protection" recognized in *Atkins*. *Id.* at 1052–53. Rather, courts are required to apply the "medical community's *current standards*" when assessing a claim of intellectual disability. *Id.* at 1053. Citing the current manuals from the APA and the AAIDD, the Court explained that "[r]eflecting improved understanding over time, . . . current manuals offer the 'best available description of how mental disorders are expressed and can be recognized by trained clinicians.'" *Id.* (quoting DSM–5 at xli).

115. The Court went on to conclude that the CCA's disregard of current diagnostic standards created an unconstitutional risk that persons with mild intellectual disability would be executed. *Id.* at 1044, 1053; *see also id.* at 1048 (stressing that "the Constitution 'restrict[s] . . . the State's power to take the life of' *any* intellectually disabled individual" (quoting *Atkins*, 536 U.S. at 321) (emphasis in original)). In reaching this conclusion, the *Moore–I* Court identified several problematic aspects of the Texas approach that are relevant to Mr. Bourgeois's case.

116. Considering prong one first, the Court faulted the CCA's "flexible" approach to assessing intellectual functioning, rejecting the argument that courts may disregard scores falling in the "lower end of the standard–error range" based on factors "unique" to the petitioner. *Id.* at 1049. Mr. Moore had an IQ score of 74, which, "adjusted for the standard error of measurement, yields a range of 69 to 79." *Id.* Because this score placed him in the range for intellectual disability, the CCA was wrong to conclude that he did not satisfy the first criteria of the

50

definition of ID. *Id.* at 1050. Rather, "where an individual's IQ score, adjusted for the test's standard error, falls within the clinically established range for intellectual–functioning deficits," prong one is established and courts must continue the inquiry on to prong two.

117. *Moore–I* also rejected the CCA's approach to prong two,[25] criticizing the state court for the myriad ways its adaptive–functioning analysis disregarded current diagnostic criteria. First, the Supreme Court concluded that the CCA had "overemphasized Moore's perceived adaptive strengths"—e.g., he "lived on the streets, mowed lawns, and played pool for money"—when "the medical community focuses the adaptive–functioning inquiry on adaptive *deficits*." *Id.* at 1050 (emphasis in original).

118. Second, the Supreme Court faulted the CCA for finding that risk factors for intellectual disability somehow "detracted from a determination that [Moore's] intellectual and adaptive deficits were related." *Id.* at 1051. Contrary to the CCA's findings, the Supreme Court explained that "[c]linicians rely on such factors as cause to explore the prospect of intellectual disability further, not to counter the case for a disability determination." *Id.* (citing AAIDD–10 at 59–60).

119. Third, the Supreme Court reasoned that emphasis on Mr. Moore's conduct while in confinement was not relevant to an ID determination under the medical standards. *Id.* at 1050. Specifically, the Court warned that "[c]linicians . . . caution against reliance on adaptive strengths developed 'in a controlled setting,' as a prison surely is." *Id.* (citing DSM–5 at 38 and AAIDD–12 at 20).

---

[25] Despite having determined that Mr. Moore failed to satisfy prong one, the CCA went on to find that "[e]ven if applicant had proven that he suffers from significantly sub–average general intellectual functioning, his *Atkins* claim fails because he has not proven by a preponderance of the evidence that he has significant and related limitations in adaptive functioning." *Ex Parte Moore*, 470 S.W.3d at 520.

51

120.    Fourth, the Court found that the CCA "departed from clinical practice by requiring Moore to show that his adaptive deficits were not related to 'a personality disorder.'" *Moore–I*, 137 S. Ct. at 1051 (quoting decision below, in which CCA observed that Moore's problems in kindergarten were "more likely cause[d]" by "emotional problems" than by intellectual disability). The Court explained that "many intellectually disabled people also have other mental or physical impairments, for example, attention–deficit/hyperactivity disorder, depressive and bipolar disorders, and autism." *Id.* (citing DSM–5 at 40). "The existence of a personality disorder or mental–health issue, in short, is not evidence that a person does not also have intellectual disability." *Id.*

121.    Finally, the Court held that the CCA's "attachment to the seven *Briseño* evidentiary factors further impeded its assessment of Moore's adaptive functioning." *Id.* at 1051. The Court explained that the *Briseño* factors had no basis in either medicine or law, but instead relied on inaccurate stereotypes of the intellectually disabled. *Id.* at 1051–52; *see also id.* at 1053 ("I agree with the Court today that [the *Briseño*] factors are an unacceptable method of enforcing the guarantee of *Atkins*.") (Roberts, C.J., dissenting). The Supreme Court concluded that:

> As we instructed in *Hall*, adjudications of intellectual disability should be "informed by the views of medical experts." That instruction cannot sensibly be read to give courts leave to diminish the force of the medical community's consensus. Moreover, the several factors *Briseño* set out as indicators of intellectual disability are an invention of the CCA untied to any acknowledged source. Not aligned with the medical community's information, and drawing no strength from our precedent, the *Briseño* factors "creat[e] an unacceptable risk that persons with intellectual disability will be executed." Accordingly, they may not be used, as the CCA used them, to restrict qualification of an individual as intellectually disabled.

*Id.* at 1044 (internal citations omitted).

122.    On remand following *Moore–I*, the CCA again found insufficient evidence of Mr. Moore's adaptive deficits, purporting to use "current medical diagnostic standards," but

52

nevertheless crediting the conclusion of the State's expert, Dr. Kristi Compton, that Mr. Moore's "adaptive functioning was too great to support an intellectual-disability diagnosis." *Ex parte Moore*, 548 S. W. 3d 552, 563 (Tex. Crim. App. 2018), *abrogated by Moore–II*, 139 S. Ct. at 672.

123. The Supreme Court summarily reversed, per curiam, and rejected the CCA's credibility determinations as invalid. *Moore-II* noted that the CCA's determination:

- relied on Mr. Moore's adaptive strengths, rather than focusing on his adaptive *deficits*;

- required Mr. Moore to show that his adaptive deficits were unrelated to emotional problems, in violation of *Moore-I*'s directive that a comorbid mental health issue "is not evidence that a person does not also have ID";

- focused on "adaptive improvements made in prison," which was "difficult to square with [the Supreme Court's] caution against relying on prison-based development"; and

- employed certain *Briseño* factors, despite claiming that it had abandoned reliance on them

*Moore–II*, 139 S. Ct. at 670-72 (citations omitted).

124. Because the CCA's analysis was inappropriate, the Supreme Court overturned the CCA's credibility determination and found that Mr. Moore was intellectually disabled. *Id.* at 672.

**2. The district court denied Mr. Bourgeois's *Atkins* claim under the same unconstitutional standards struck down in *Moore–I* and *Moore–II*.**

125. Prior to *Moore–I*, the Fifth Circuit applied the same contra–diagnostic standards that the CCA had used in analyzing claims of intellectual disability. For instance, in 2005, the Fifth Circuit upheld the district court's denial of an *Atkins* claim raised by § 2255 petitioner Bruce Webster with the following analysis:

53

> Looking at all the evidence presented by both sides at trial, while it is undisputed that Webster has had low I.Q. scores on almost every I.Q. test that has been administered to him, these scores are, according to even defense witness Dr. Keyes, attributable to "nonorganic" factors, which this Court understands to mean his lack of quality formal education and any positive or productive home life. Nevertheless, the evidence presented at trial does reflect that Webster has adapted to the criminal life that he chose and has illustrated the ability to communicate with others, care for himself, have social interaction with others, live within the confines of the "home" he has been in since he was sixteen, use community resources within this home, read, write, and perform some rudimentary math. This evidence therefore supports a finding that Webster does not have a deficit in adaptive skills.

*Webster*, 421 F.3d at 313. In other words, just like the CCA in the *Ex Parte Moore* decisions, the Fifth Circuit:  disregarded clinical standards in assessing Mr. Webster's claim; treated risk factors for ID as alternative explanations for his low functioning, as opposed to contributors to it; used Mr. Webster's perceived adaptive strengths to discount his deficits; and relied on erroneous stereotypes that ID persons look and talk differently from non–ID persons, are completely incompetent, and are unable to acquire social or functional skills.[26]

---

[26] Notably, the Fifth Circuit went on to chastise Mr. Webster for having raised in habeas an *Atkins* claim that had been denied at trial, saying that he could not "continue to litigate this claim hoping that some court eventually will agree with him." *Id.* at 314; *see also id.* ("Webster failed to convince *either* the district court that he is retarded or, moreover, a majority of the jurors that he is or even *may* be retarded.") (emphasis in original). Yet, as mentioned above, Mr. Webster did relitigate his claim before this Court via a § 2241 petition and, applying current diagnostic standards as required by *Moore–I*, this Court determined him to be intellectually disabled and ineligible for death.  *See Webster v. Lockett*, No. 2:12–v–86–WTL–MJD, 2019 WL 2514833 (S.D. Ind. June 18, 2019). While the Court cited to some new evidence not presented to the Fifth Circuit, it also took an entirely different approach to analyzing Mr. Webster's adaptive functioning. For instance, the Court explained that, "in accordance with guidance from the medical community and as instructed by the Supreme Court," its focus was on adaptive deficits over adaptive strengths. *Id.* at *10. Additionally, the Court gave "little weight" to evidence of Mr. Webster's adaptive functioning in prison, citing *Moore–I* for the proposition that "[c]linicians . . . caution against reliance on adaptive strengths developed in a controlled setting, as a prison surely is." *Id.* (citing *Moore–I*, 137 S. Ct. at 1050) (internal quotation marks omitted). Likewise, the Court gave "little weight" to the testimony of the Government expert, who relied on such evidence as Mr. Webster's "musical ability, excellent hygiene, ability to drive" and "ability to engage in conversation" to conclude he failed to establish prong two. *Id.* After reviewing this evidence, the Court did not find the "conclusions that [the expert] has drawn to be

54

126.     While Mr. Webster and Mr. Bourgeois have been the only § 2255 petitioners to raise an *Atkins* claim in the Fifth Circuit pre–*Moore–I*, the circuit court has repeatedly denied relief to Texas prisoners who sought *Atkins* relief under 28 U.S.C. § 2254. *See, e.g., Clark v. Quarterman*, 457 F.3d 441, 445–47 (5th Cir. 2006) (affirming state court denial of *Atkins* relief based on *Briseño*); *Woods v. Quarterman*, 493 F.3d 580, 586–87 (5th Cir. 2007) (same); *Williams v. Quarterman*, 293 F. App'x. 298 (5th Cir. 2008) (same); *Eldridge v. Quarterman* 325 F. App'x. 322, 328–29 (5th Cir. 2009); *Thomas v. Quarterman*, 335 F. App'x. 386, 389–91 (5th Cir. 2009) (same); *Esparza v. Thaler*, 408 F. App'x. 787, 790–96 (5th Cir. 2010) (same).

127.     Citing to the precedent established by *Webster*, as well as the Fifth Circuit's § 2254 jurisprudence, the district court that evaluated Mr. Bourgeois's 2007 *Atkins* claim adopted the same non–clinical approach.

### a.   The district court's erroneous prong–one analysis

128.     As discussed *supra*, an IQ score of 75 or below satisfies prong one of *Atkins*. *Hall*, 572 U.S. at 712, 723. Mr. Bourgeois's only two full–scale IQ scores met this threshold: a 75 on the WAIS–R and a 70 on the WAIS–III. *See* Tr. 9/10/10 at 32; Tr. 9/20/10 at 217–19; *see also* A0060 (Dr. Weiner Score Sheet from WAIS–R); A0053–59 (Declaration of Dr. Donald E. Weiner and Attached Report of 3/3/04); A0039–41 (Gelbort Declaration, ¶ 3). The district court did not "invalidate or ignore Bourgeois' IQ test scores." *Bourgeois*, 2011 WL 1930684, at *31; *see also* Section III.B.2 (discussing various experts' testimony that Mr. Bourgeois did not "feign bad" on his IQ testifying). Nor did the court question that the "psychological profession accepts 75 as a qualifying score for a diagnosis of mental retardation." *Id.* at *25; *see also id.* at *26

---

persuasive." *Id.* at *10, n.21. In short, by applying diagnostic criteria, this Court found Mr. Webster to have significant adaptive deficits based on largely the same evidence that the Fifth Circuit had used to deny his claim pre–*Moore–I*.

55

("The psychological profession allows any score falling along [the range of 65–75] to qualify for a diagnosis of mental retardation. Accordingly, psychologists generally do not question whether an inmate's true IQ falls in the higher or lower end of that range."). Nevertheless, the court found that "[i]n the *legal context*, whether an inmate had significantly subaverage intellectual functioning is a question of fact that the court decides." *Id.* at *26; *see also id.* (stressing that Fifth Circuit had repeatedly denied relief to inmates who had IQ scores below 70 based on a determination that the inmate's "intelligence is more consistent with the higher end of the confidence interval"); *Briseño*, 135 S.W.2d at 7 n.24, 14 (endorsing a "flexible" approach to prong one, not dependent on IQ scores).

129.    The court, like the CCA in Mr. Moore's case, went on to determine that despite his IQ scores, Mr. Bourgeois's "true" intellectual functioning "does not correspond to a finding of significant intellectual limitations." *Id.* at *26, 31. This finding alone violated *Moore–I*[27] and current diagnostic standards, which *require* that courts find prong one satisfied and proceed to prong two "where an individual's IQ score, adjusted for the test's standard error, falls within the clinically established range for intellectual–functioning deficits." *Moore–I*, 137 S. Ct. at 1049-50; *accord United States v. Roland*, 281 F. Supp. 3d 470, 528 n.76 (D.N.J. 2017) ("where the lower end of a defendant's score falls at or below 70—as two of Roland's Flynn-adjusted IQ scores do here—the deciding court must move on to consider the defendant's adaptive functioning."); *United States v. Wilson*, 170 F. Supp. 3d 347, 366 (E.D.N.Y. 2016) (prong two analysis required "if even one valid IQ test score generates a range that falls to 70 or below"). Furthermore, the district court violated *Moore–I* and current diagnostic standards by relying on

---

[27] The *Moore–II* Court did not address prong one, as the CCA focused only on prong two in re–evaluating Mr. Moore's claim on remand following *Moore–I*. *See Moore–II*, 139 S. Ct. at 670.

unscientific, erroneous stereotypes of intellectually disabled persons in support of its conclusion that Mr. Bourgeois's "true" IQ did not satisfy prong one. According to the court, the conclusion that "Bourgeois' behavior and characteristics are inconsistent with an IQ that would fall below 70" was demonstrated by the following: Mr. Bourgeois "answers the questions asked of him, engages in conversation, has logical thoughts, and does not otherwise give any impression of mental retardation," *id*. at \*28; he "lived a life which, in broad outlines, did not manifest gross intellectual deficiencies," *id* at \*22; he "worked for many years as a long haul truck driver . . . bought a house, purchased cars, and handled his own finances" *id.* at \*29; and "otherwise carried himself without any sign of intellectual impairment," *id*.

130.    Even assuming this testimony accurately represented Mr. Bourgeois—who has a long history of masking his ID[28] and soliciting supports that obscured his deficits[29]—none of the "skills" cited by the court conflicts with a finding of intellectual disability. To the contrary, each one is implicated in the erroneous but commonly held stereotypes identified by the AAIDD–12, as demonstrated in the following chart:

---

[28] *See* Section III.C.3.d (summarizing testimony from experts and lay witnesses describing Mr. Bourgeois's long history of masking his deficits).

[29] *See, e.g.*, Tr. 9/20/10 at 106; Tr. 9/21/10 at 42–43.

PA-061

| District court findings of "skills" that are inconsistent with ID | Commonly held, but erroneous stereotypes of persons with ID |
|---|---|
| Mr. Bourgeois "answers the questions asked of him, engages in conversation, has logical thoughts, and does not otherwise give any impression of mental retardation." *Bourgeois*, 2011 WL 1930684, at *28. | Persons with ID "look and talk differently from persons in the general population." A0134 (AAIDD–12 at 26). |
| Mr. Bourgeois "lived a life which, in broad outlines, did not manifest gross intellectual deficiencies." *Bourgeois*, 2011 WL 1930684, at *22. | Persons with ID "are completely incompetent and dangerous," "cannot acquire vocational and social skills necessary for independent living," "cannot do complex tasks," and "are characterized only by limitations and do not have strengths that occur concomitantly with their limitations." A0134 (AAIDD–12 at 26). |
| Mr. Bourgeois "worked for many years as a long haul truck driver, . . . bought a house, purchased cars, and handled his own finances." *Bourgeois*, 2011 WL 1930684, at *29. | Persons with ID "cannot get driver's licenses, buy cars, and drive cars," "do not (and cannot) support their families," and "cannot acquire vocational and social skills necessary for independent living." A0134 (AAIDD–12 at 26). |
| Mr. Bourgeois "otherwise carried himself without any sign of intellectual impairment." *Bourgeois*, 2011 WL 1930684, at *29. | Persons with ID "look and talk differently from persons in the general population." A0134 (AAIDD–12 at 26). |

131.    The district court's findings that the above–referenced "skills" were inconsistent with a finding of ID is further contradicted by the DSM–5, which expressly recognizes that persons with significant adaptive deficits can, among other things, maintain regular employment in jobs that do not emphasize conceptual skills and function age–appropriately in personal care. *See* A0076–77 (DSM–5 at 34–35). At the same time, the findings invoke several of the "*Briseño* factors" struck down by the *Moore–I* Court has having no basis in medicine or law, including: "Has the person formulated plans and carried them through or is his conduct impulsive?"; "Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is

socially acceptable?"; and "Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?" *Briseño*, 135 S.W.2d at 8.

132. In addition to relying on false stereotypes of ID persons to discount Mr. Bourgeois's IQ scores, the court also placed significant weight on its own lay assessment of Mr. Bourgeois's intellectual functioning. *See Bourgeois*, 2011 WL 1930684, at *30 ("The Court had sufficient interaction with Bourgeois to make a lay assessment of whether he functions at the low level described by his expert witnesses. . . . Based on this Court's own observations, the testimony that Bourgeois has significant intellectual limitations is not credible or persuasive."). But *Moore–I* expressly condemned lay assessments of ID, uninformed by "medical and clinical appraisals," saying such lay diagnoses should "spark skepticism." *Moore–I*, 137 S. Ct. at 1051 (citing, inter alia, AAIDD–12 at 25–27).

133. Additionally, the court acted contrary to *Moore–I* and current standards in crediting Dr. Price's opinion that Mr. Bourgeois's "inability to test well" could be explained by the fact that he "is someone who has been somewhat culturally deprived, didn't profit from education as much as someone else, [and did] not experience things that were intellectually academically enriching." *Bourgeois*, 2011 WL 1930684, at *28. Yet per *Moore–I* and current diagnostic guidelines, Mr. Bourgeois's limited education and stimulation are factors that make intellectual disability *more*, not *less*, likely. *See Moore–I*, 137 S. Ct. at 1044; *cf. id.* at 1049 ("[T]he presence of other sources of imprecision in administering [an IQ] test to a particular individual cannot *narrow* the test-specific standard-error range.") (emphasis in original); *see also supra* Section III.E. And of course, an "inability to test well" is itself something that would be expected of an individual with low intellectual functioning, not a factor that counters a finding of low intelligence.

59

134.    Lastly, the district court's prong–one analysis violated *Moore–I* and diagnostic standards because the court refused to apply the Flynn Effect. *See Bourgeois*, 2011 WL 1930684, at \*26 n.37. As discussed above, both the AAIDD–10 and the DSM–5 require that IQ scores be Flynn–corrected. *See* A0099 (AAIDD–10 at 37); A0079 (DSM–5 at 37); *see also* Tr. 9/23/10 at 227 (Government expert Dr. Price testifying that the Flynn Effect "should be considered and noted when you are using a test that's older"); Tr. 9/24/10 at 89, 187 (Government expert Dr. Moore testifying that AAIDD–10 directs that individual scores should be corrected for the Flynn Effect). Yet the district court merely mentioned the Flynn Effect in a footnote, concluding that there was nothing to "require the adoption of the Flynn Effect as a legal method to lower an inmate's Full Scale IQ Score." *Bourgeois*, 2011 WL 1930684, at \*26 n.37.

135.    In short, the district court rejected prong one after considering unscientific and erroneous factors that led the court to reach a layperson's conclusion that Mr. Bourgeois's "true" intelligence did not satisfy the IQ component for ID. Furthermore, it rejected a prong–one finding after setting aside the medical diagnostic standards applicable to ID. While consistent with Fifth Circuit jurisprudence upholding *Briseño* that remained good law at the time, such an analysis is utterly at odds with current Supreme Court law and diagnostic criteria.

#### b.   The district court's erroneous prong–two analysis

136.    Despite finding that Mr. Bourgeois had failed to satisfy prong one, the district court went on to analyze prong two of his *Atkins* claim, which the court also rejected. In so doing, the court again applied the unscientific standards that the Supreme Court has now identified as unconstitutionally divergent from current clinical criteria. Indeed, the court began its analysis by explicitly dismissing the clinical approach to adaptive functioning, observing: "An examination for mental retardation, and particularly the adaptive–skills component of that inquiry, *involves the subjective evaluation* of skills, aptitudes, and life experiences." *Bourgeois*,

60

2011 WL 1930684, at *24. This view contradicts both the DSM–5 and the AAIDD–10, which

require the use of "clinical judgment" in evaluating prong two. A0079 (DSM–5 at 37); A0115

(AAIDD–10 at 55). The AAIDD–10 provides further detail, explaining:

> Clinical judgment is defined as a special type of judgment rooted in a high level of clinical expertise and experience and judgment that emerges directly from extensive training, experience with the person, and extensive data. . . . [It] is characterized by its being systematic (i.e., organized, sequential, and logical), formal (i.e., explicit and reasoned), and transparent (i.e., apparent and communicated clearly). . . . [It] should not be thought of as justification for abbreviated evaluation, a vehicle for stereotypes and prejudice, a substitute for insufficiently explored questions, an excuse for incomplete or missing data, or a way to solve political problems.

A0123–24 (AAIDD–10 at 86–87).

137.    The court further expressed its disregard for diagnostic standards by

differentiating between a "legal" and a "psychological" approach to adaptive functioning:

> The mental health community ignores an individual's strengths when looking at adaptive functioning. . . . In fact, the 11th edition of the AAIDD manual has expressly adopted as an underlying "assumption" in the definition of mental retardation that *"within an individual, limitations often coexist with strengths."* The mental health profession looks only at what an individual cannot do, presumably as a function of its role in providing support and services to impaired individuals.

> The Fifth Circuit, however, teaches that the *Atkins* inquiry should not be so narrow as to ignore that which an inmate can do, even if the psychological profession approaches the issue differently. The subjective *Atkins* question is not myopic and must take into account the whole of an individual's capabilities. . . . Accordingly, the federal inquiry into adaptive deficits takes on a much different flavor than that done by mental health professionals.

*Bourgeois*, 2011 WL 1930684, at *32 (citations omitted); *see also id.* at 33 ("The law will

compare the deficiencies to positive life skills, presuming that adaptive successes blunt the

global effect of reported insufficiencies.").

138.    This approach was expressly discredited by both *Moore–I* and *Moore–II*, in which

the Supreme Court rejected the CCA's attempt to make an *Atkins* determination on the

61

defendant's strengths rather than his or her weaknesses *Moore–I*, 137 S. Ct. at 1050 (CCA erred by "overemphasiz[ing] Moore's perceived adaptive strengths" because "the medical community focuses the adaptive-functioning inquire on adaptive *deficits*"); *see also Moore–II*, 139 S. Ct. at 670 (CCA erred in relying "less upon the adaptive *deficits* to which the trial court had referred than upon Moore's apparent adaptive *strengths*") (emphasis in original). That criticism applies equally to the district court's prong–two analysis in Petitioner's case, in which the court wrongly discounted the extensive evidence of Mr. Bourgeois's adaptive deficits and denied relief relying on the things it found he *could* do.

139.    Similarly to the CCA in *Ex Parte Moore–II*, the court's refusal to follow diagnostic criteria also caused it to wrongly credit the Government's adaptive–behavior expert, Dr. Moore, over Dr. Swanson. According to the court, Dr. Moore "took a full range of behavior into consideration when evaluating informal accounts for adaptive deficits," whereas "Dr. Swanson lessened her credibility when she only focused on information supporting mental retardation without giving weight to or reconciling factors that disproved her conclusions." *Bourgeois*, 2011 WL 1930684, at *42. In fact, Dr. Swanson testified that she "considered the different *strengths or deficits* that [she] saw . . . when [she] was doing [her] assessment with [Mr. Bourgeois] and talking to people who knew him growing up." Tr. 9/20/10 at 19; *see also id.* at 136 ("Overall he functions at about the third or fourth grade level, but he has some other unique strengths in his ability."). More specifically, Dr. Swanson expressly recognized that: Mr. Bourgeois "copies very well," *id.* at 34; his adaptive functioning tests revealed that "he does have some significant strengths," *id.* at 45; there are "things he does actually quite well with reading," *id.* at 46; "recognizing words. . . is a particular strength for him," *id.*; "he can spell extremely well," *id.* at 50; and he has a strength in "expressive language," *id.* at 132. But,

consistent with diagnostic criteria, she also explained that these strengths did not "offset the other deficits" the Mr. Bourgeois has in any given area. *Id.* at 159. *Atkins* and current diagnostic standards require prong–two determinations to be made based on what the individual does not do, rather than what he or she can do. Because the district court focused on what Mr. Bourgeois could do, rather than what he did not do, its determination violated *Moore–I* and *Moore–II* and current diagnostic standards.

140. In addition to improperly considering Petitioner's perceived adaptive strengths as undermining his adaptive deficits, the court violated the *Moore* decisions and diagnostic criteria by once again resorting to unscientific and outdated stereotypes to determine Mr. Bourgeois's functioning was inconsistent with a diagnosis of ID. For instance, the court supported its conclusion that Mr. Bourgeois did not satisfy prong two by citing to testimony that he was competent at his job as a truck driver, that "[h]is appearance and grooming were beyond presentable," and "none of the Government's witnesses suspected that Bourgeois had mental impairments." *Bourgeois*, 2011 WL 1930684, at \*39; *see also id.* at \*22 ("Bourgeois had lived a life which, in broad outlines, did not manifest gross intellectual deficiencies.); *id.* at \*29 ("[T]hose who knew [Mr. Bourgeois] as an adult did not suspect that he was mentally retarded."); *id.* (citing Dr. Price's opinion that having a job as a long–haul trucker was "inconsistent with mental retardation."); *id.* at \*38–39 (describing Mr. Bourgeois's competence at his truck driving job); *id.* at \*39 (describing his well–groomed appearance); *id.* (his work as a truck driver belied any intellectual disability).

141. Just as with its prong–one analysis, none of the "skills" cited in the court's prong–two assessment conflicts with a finding of intellectual disability. Indeed, while the court cites Mr. Bourgeois's "presentable" appearance and grooming as evidence countering a diagnosis of

63

ID, the DSM–5 expressly states that individuals with significant deficits in the practical domain "may function age–appropriately in personal care." A0076 (DSM–5 at 34). The same is true for the fact that Mr. Bourgeois had a job. Specifically, the DSM–5 states that individuals with significant deficits in the practical domain "*often*" experience "competitive employment . . . in jobs that do not emphasize conceptual skills." *Id.* Truck driving surely falls under this description. Other "skills" cited by the court align directly with many of the erroneous stereotypes of ID identified by the AAIDD. *See* A0134 (AAIDD–12 at 26) (erroneous stereotypes of ID persons include that they "look and talk differently from persons in the general population," "cannot acquire vocational and social skills necessary for independent living," "cannot do complex tasks," "cannot get driver's licenses, buy cars, or drive cars," and "are completely incompetent and dangerous"); *see also supra* Section III.C.2.

142.   Furthermore, the fact that none of the Government's witnesses described Mr. Bourgeois as ID does nothing to rebut the showing of his many deficits. To be sure, one of the *Briseño* factors expressly struck down by *Moore–I* instructed courts to consider whether the person's "family, friends, teachers, [and] employers" thought he was ID. *Moore–I*, 137 S. Ct. at 1051 (citing *Briseño*, 135 S.W.3d at 8). The *Moore–I* Court singled out this particular factor for criticism, explaining: "[T]he medical profession has endeavored to counter lay stereotypes of the intellectually disabled. Those stereotypes, much more than medical and clinical appraisals, should spark skepticism." *Id.* (citing, inter alia, AAIDD–12 at 25–27).

143.   The district court also inappropriately gave significant weight to its own assessment of Mr. Bourgeois's communication skills, which it found incompatible with ID. *See, e.g.*, *Bourgeois*, 2011 WL 1930684, at *22 (Mr. Bourgeois's trial testimony, colloquies with the court, and writings never called into question his intellectual functioning); *id.* at *28 ("Bourgeois

64

answers the questions asked of him, engages in conversation, has logical thoughts"); *id.* (Mr. Bourgeois produces "voluminous amounts of writing"); *id.* at *30 ("Bourgeois's extensive writings, while not polished masterpieces, certainly do not contain gross indicia of mental impairment."); *id.* ("During trial, Bourgeois communicated with this Court on several occasions. . . . Bourgeois never gave the Court any impression that he functioned at an intellectual level equal to that of a child."); *id.* at *43 ("Bourgeois can engage in the give–and–take of normal conversation without any hint of impairment."). With this analysis, the district court employed yet another of the *Briseño* factors struck down in *Moore–I*: whether the individual could "respond coherently, rationally, and on point to oral or written questions." *Moore–I*, 137 S. Ct. at 1044, 1046 n.6; *see also* A0129 (AAIDD–12 at 20) (ID determinations should not be based on verbal behavior).[30] Additionally, to the extent it relied on Mr. Bourgeois's "writings," all of which were produced while he was in prison, the district court ran afoul of the prohibition on use of prison behavior as evidence of adaptive functioning. *See* A0129 (AAIDD–12 at 20); A0080 (DSM–5 at 38); *Moore–I*, 137 S. Ct. at 1050; *Moore–II*, 139 S. Ct. at 669; *see also* Tr. 9/23/10 at 221 (Dr. Price testifying that relying on an individual's writings is "complicat[ed]" by the fact that he may have received help and we don't know how long the writings took to complete); *id.* ("Yes, it may look good but did they, they have plenty of time, obviously, and did they just spend so much time on this that it looks as good as it is.").

144.    Yet another problem with the district court's analysis is that it considered evidence of a deficit to be evidence of a strength so long as Mr. Bourgeois eventually learned to

---

[30] As Government expert Dr. Moore testified, relying on "verbal behavior" to assess adaptive behavior or intellectual disability is particularly inappropriate in a "case like this" where the person being evaluated "dissimilates" and "tends to want to make himself look better than he really is." Tr. 9/24/10 at 161–62.

perform the task. For instance, while noting that Mr. Bourgeois was slow to learn "his ABCs" as a child, the court stressed that it is a skill at which he now "excels." Bourgeois, 2011 WL 1930684, at *39; *see also id.* at *38 (court observing that Mr. Bourgeois had difficulty "becom[ing] proficient at driving," but was eventually able to do so). However, persons with mild ID, like everyone, can grow and mature. As Dr. Price acknowledged, "if [Mr. Bourgeois] relied on people to teach him things and was able eventually to learn to drive a truck and to . . . handle some financial matters and as an adult to dress himself, that doesn't mean he's not having adaptive deficits as a child. . . pre–18." Tr. 9/23/10 at 284–85; *see also* Tr. 9/20/10 at 104–05 ("[H]e got a lot of supports and he gradually learned to master [certain skills]. . . . [T]hat's not uncommon with people with mild mental retardation, they find people that will help them."). Thus, the question is not whether an individual ultimately acquires a skill, the question is "how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background." A0079 (DSM–5 at 37). The fact that Mr. Bourgeois was slower than his peers in learning the alphabet is evidence of impaired conceptual functioning as it demonstrated that he needed support "in one of more areas to meet age-related expectations." The fact that he "excels" in "his ABCs" as an adult does nothing to undermine this finding.

145.    Also, as it did in its prong–one analysis, the district court departed from clinical standards by treating risk factors as alternate explanations for Mr. Bourgeois's deficits. Specifically, the court theorized that Petitioner's poor academic performance may have been due to "his unstable home life" or "the hampering effects of a deprived home environment." *Bourgeois*, 2011 WL 1930684, at *41; *see also id.* at *44 ("To the extent that Bourgeois may have had difficulties when younger, the record does not *conclusively link* those problems to

66

mental retardation rather than a culturally deprived upbringing, poverty, or abuse."). But an unstable home life, deprived upbringing, poverty, and abuse are all risk factors that *support* a diagnosis of intellectual disability. As *Moore–I* explains, an individual's "record of academic failure, along with the childhood abuse and suffering he endured," are "traumatic experiences [that] count in the medical community as '*risk factors*' for intellectual disability." *Moore–I*, 137 S. Ct. at 1051. Accordingly, "clinicians rely on such factors as cause to explore the prospect of intellectual disability further, not to counter the case for a disability determination." *Id*.

146.     Similarly, the district court treated comorbidities as alternative explanations to Mr. Bourgeois's deficits, rather than supporting evidence of his adaptive deficits, as is appropriate under clinical standards. As noted *supra*, *Moore–I* rejected any requirement that defendants prove that adaptive deficits were not related to other mental health issues as "mental–health professionals recognize [that] many intellectually disabled people also have other mental or physical impairments." *Moore–I*, 137 S. Ct. at 1051; *see also Moore–II*, 139 S. Ct. at 671 (criticizing CCA for determining on remand that Moore failed to show that the "cause of [his] deficient social behavior was related to any deficits in general mental abilities" rather than "emotional problems"). The district court took the opposite approach to comorbidities, minimizing Mr. Bourgeois's poor adaptive behavior because it was "more likely related to his personality disorder, especially his impulsivity and sense of entitlement." *Bourgeois*, 2011 WL 1930684, at *41.

147.     In sum, Mr. Bourgeois has presented overwhelming evidence that he satisfies the criteria for a diagnosis of intellectual disability under current clinical standards, and the district court's 2011 denial of *Atkins* relief carries no weight after *Moore–I* and *Moore–II*.

67

### 3.     This claim is reviewable under § 2241.

148.     The principles from *Moore–I* and *Moore–II* articulated above were not available to Mr. Bourgeois during his initial § 2255 proceedings. In rejecting his *Atkins* claim in 2011, the district court relied on Fifth Circuit jurisprudence, including *Webster*, that was not invalidated until 2017, when the Supreme Court decided *Moore–I*. Accordingly, post–*Moore–I*, Mr. Bourgeois was in the same position as the petitioner in *Cathey*, in which the Fifth Circuit determined that *Atkins* was "previously unavailable" to a petitioner who had filed his first habeas petition after *Atkins* was decided because, under the now–invalidated nonclinical standards applied in the Fifth Circuit at that time, he did not qualify as intellectually disabled. *See Cathey*, 857 F.3d at 233 (an *Atkins* claim was previously unavailable to Mr. Cathey because "a claim must have some possibility of merit to be considered available"). Nevertheless, the Fifth Circuit denied Mr. Bourgeois's attempt to renew his *Atkins* claim via a successive § 2255 petition, relying on procedural grounds unrelated to the merits of his claim. Accordingly, § 2255 is plainly not an effective mechanism by which Mr. Bourgeois can raise his meritorious *Atkins* claim under the new law established in *Moore–I* and *Moore–II*, meaning this court has jurisdiction under § 2241.

149.     Additionally, the new diagnostic criteria cited above from the AAIDD–12, the AAIDD–15, and the DSM–5, each of which was published after the district court denied Mr. Bourgeois's § 2255 petition, constitute new factual bases not available at the time of his § 2255 proceedings. As the Fifth Circuit recently recognized in granting a state habeas petitioner's request to file a successive petition to raise an *Atkins* claim under current standards, the "DSM–5 manual *changed the diagnostic framework* for intellectual disability." *In re Johnson*, 2019 WL 3814384, at *5 (5th Cir. 2019). The court also affirmed that "it is correct to equate legal

68

availability with changes in the standards for psychiatric evaluation of the key intellectual disability factual issues raised by *Atkins*." *Id.* at 6.

150.    Among the specific changes to the diagnostic framework relevant to Mr. Bourgeois's claim is that the DSM–5 makes clear that IQ test scores must be evaluated pursuant to "clinical judgment," not the court's lay assessment of a petitioner's "true" intellectual abilities. A0079 (DSM–5 at 37); *see also In re Johnson*, 2019 WL 3814384, at *5 (noting that the DSM–5 "included significant changes in the diagnosis of intellectual disability, which changed the focus from specific IQ scores to clinical judgment"). Likewise, while the AAIDD mandated application of the Flynn Effect as early as 2007, the APA did not do so prior to the publication of the DSM–5 in 2013, and the AAIDD–15 reiterated the AAIDD's earlier position. *See supra* Section III.B.1.

151.    Furthermore, under prong two, both the AAIDD–12 and the DSM–5 made clear that it is critical to avoid the use of stereotypes in assessing adaptive functioning, specifically identifying a number of the same factors relied upon by the district court in Mr. Bourgeois's case as erroneous misconceptions about persons with ID. *See supra* Section III.C.2; A0134 (AAIDD–12 at 26); A0076–77 (DSM–5 at 34–35).

152.    Another new development relevant to prong two of Mr. Bourgeois's claim is that the DSM–5 now includes descriptors of the typical adaptive functioning for individuals with significant deficits in each of the three domains. *See* A0076–78 (DSM–5 at 34–36).

153.    As discussed above, the DSM–5 also did away with the DSM–IV–TR's provision that, "by their late teens," individuals with mild intellectual disability could "acquire academic skills up to approximately the sixth–grade level." DSM–IV–TR at 43. By contrast, the DSM–5

69

summarizes the level of functioning necessary for significant impairments in the conceptual domain as follows:

> For school–age children and adults, there are difficulties in learning academic skills involving reading, writing, arithmetic, time, or money, with support needed in one or more areas to meet age–related expectations. In adults, abstract thinking, executive function . . ., and short–term memory, as well as functional use of academic skills (e.g., reading, money management) are impaired.

A0076 (DSM–5 at 34). This difference reinforces the fact that the district court's *Atkins* determination violates *current* diagnostic standards.  The district court relied on the fact that certain achievement test scores were at the seventh or eighth grade, rather than the elementary school, level. The DSM-5 does not require elementary school functioning to establish academic deficits, only that functioning in this area be impaired. As discussed *supra*, the achievement testing showed that Mr. Bourgeois's academic functioning has more than met this standard. Moreover, even if Mr. Bourgeois's academic functioning showed no deficits, under current diagnostic standards, this would do nothing to preclude a finding of ID as academic functioning is only one aspect of one domain. A relative strength in this area would do nothing to rule-out deficits in other areas of conceptual functioning or deficits in the social or practical domains. *See supra* Section III.C.2.

154.    As explained above, the Fifth Circuit has afforded petitioners who were in a nearly identical procedural posture to Mr. Bourgeois the opportunity to pursue *Atkins* relief through successive habeas petitions. *See In re Cathey*, 857 F.3d at 232; *In re Johnson*, 2019 WL 3814384, at *5–6. It did so *prior to* Mr. Bourgeois's own request to file a successive *Atkins* claim, finding that *Atkins* was "previously unavailable" to Mr. Cathey because the circuit's pre–*Moore–I* precedent precluded a finding of intellectual disability at the time of his initial habeas petition. *In re Cathey*, 857 F.3d at 232. And it did so *since* rejecting Mr. Bourgeois's request to file a successor, finding that the publication of the DSM–5 had changed the diagnostic landscape

70

in a manner that rendered *Atkins* "previously unavailable" to Mr. Johnson. *In re Johnson*, 2019 WL 3814384, at \*5–6. Mr. Bourgeois's *Atkins* claim relies on *both* legal and diagnostic changes that have occurred since his initial § 2255 petition. Nevertheless, the Fifth Circuit arbitrarily denied him the same opportunity for review that it granted to Mr. Cathey and Mr. Johnson. This disparate treatment starkly demonstrates that § 2241 is the only vehicle through which Mr. Bourgeois may challenge his unconstitutional sentence.

> **B.      Petitioner's Claim Challenges the Execution of his Sentence, as Well as the Fundamental Legality of that Sentence.**

155.    As explained above, § 2241 is the appropriate vehicle for claims that challenge the execution of a petitioner's sentence. This use of § 2241 has been explained as follows:

> [F]ederal prisoners challenging some aspect of the execution of their sentence, such as denial of parole, may proceed under Section 2241. This difference arises from the fact that Section 2255, which like Section 2241 confers habeas corpus jurisdiction over petitions from federal prisoners, is expressly limited to challenges to the validity of the petitioner sentence. Thus, Section 2241 is the only statute that confers habeas jurisdiction to hear the petition of a federal prisoner who is challenging not the validity but the execution of his sentence.

*Coady v. Vaughn*, 251 F.3d 480, 485 (3d Cir. 2001); *see also Valona*, 138 F.3d at 694 (7th Cir. 1998) ("A motion seeking relief on grounds concerning the execution but not the validity of the conviction and sentence . . . may not be brought under § 2255 and therefore falls into the domain of § 2241.").

156.    Here, Mr. Bourgeois is not claiming that his sentence violated *Atkins* at the time it was imposed. Rather, consistent with the Supreme Court's decision in *Moore–I*, he claims that the execution of his sentence would now be unconstitutional under newly recognized legal and diagnostic standards. *See Moore–I*, 137 S. Ct. at 1050–53 (reversing Texas's denial of petitioner's *Atkins* claim, in part, because Texas employed diagnostic standards in effect at the time of petitioner's sentencing, as opposed to those current at the time of post–conviction

71

review); *see also Atkins*, 536 U.S. at 320 (establishing "categorical rule making [intellectually disabled] offenders ineligible for the death penalty").

157.    Moreover, by its plain language, the FDPA states that "[a] sentence of death *shall not be carried out* upon a person who is mentally retarded." 18 U.S.C. § 3596(c); *see also United States v. Webster*, 162 F.3d 308, 352 (5th Cir. 1998) (finding significant Congress's "placement" of the intellectual–disability exemption among "restriction[s] on who could be executed . . . rather than in the earlier sections" on who could be sentenced to death). And legislative history tends to confirm that Congress understood the placement and language it was importing into the FDPA would allow defendants to raise such claims "at any time," including between judgment and execution. *See* 136 Cong. Rec. S6873–03, S6876, 1990 WL 69446, 101st Cong., 2d Sess. (May 24, 1990) (comments by Sen. Hatch). Accordingly, Mr. Bourgeois's challenge goes to the execution of his sentence, making his claim appropriate under § 2241.

158.    Section 2241 is also the appropriate avenue of relief where the petitioner challenges the "fundamental legality" of his or her sentence. *Webster*, 784 F.3d at 1124–25 (7th Cir. 2015). The *Webster* court held that the petitioner had properly filed a § 2241 petition to establish that his intellectual disability made him ineligible for the death penalty. It described the "'Kafkaesque' nature of a procedural rule that, if construed to be beyond the scope of the savings clause, would (or could) lead to an unconstitutional punishment." *Id*. at 1139. It accordingly recognized that, where a "structural problem" prevents a petitioner from bringing a second § 2255 motion, the petitioner may in some circumstances (there, because of the availability of new facts), bring a § 2241 petition. *Id*. "To hold otherwise," the Seventh Circuit explained, "would lead in some cases . . . to the intolerable result of condoning an execution that violates the Eighth

72

PA-076

Amendment." *Id.*; *see also id.* (noting that "a core purpose of habeas corpus is to prevent a custodian from inflicting an unconstitutional sentence").

159.    Under current legal and diagnostic standards, Mr. Bourgeois is an intellectually disabled person. As such, precluding him from raising his *Atkins* claim under § 2241 to challenge the execution and fundamental legality of his unconstitutional death sentence would lead to precisely the "intolerable result" against which the *Webster* court warned.

73

## REQUEST FOR RELIEF

For all of the above reasons, and based upon the full record of this matter, Petitioner

requests that the Court provide the following relief:

A)      That Petitioner be granted a stay of execution pending a final resolution of the claim raised in this Petition;

B)      That leave to amend this Petition, if necessary, be granted;

C)      That Respondents be Ordered to respond to this Petition;

D)      That Petitioner be permitted to file a Reply and/or a Traverse addressing Respondents' affirmative defenses and arguments;

E)      That an evidentiary hearing be conducted on the merits of Petitioner's claims, any procedural issues, and all disputed issues of fact;

F)      That habeas relief from Petitioner's convictions and sentences, including his sentence of death, be granted.

Respectfully submitted,

/s/ Peter Williams
Peter Williams
Victor J. Abreu
Katherine Thompson
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West—The Curtis Center
Philadelphia, PA 19106
215–928–0520
Victor_Abreu@fd.org
Katherine_Thompson@fd.org
Pete_Williams@fd.org

Counsel for Petitioner

Dated: August 15, 2019

74

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA**

_____

| | | |
|---|---|---|
| ALFRED BOURGEOIS, | : | CIVIL ACTION |
| | : | (Capital Habeas Corpus) |
| Petitioner, | : | |
| | : | Case No.   2:19-cv-392 |
| V. | : | |
| | : | **CAPITAL CASE** |
| SUPERINTENDENT, USP–Terre Haute, | : | **EXECUTION SCHEDULED FOR** |
| UNITED STATES OF AMERICA, | : | **JANUARY 13, 2020** |
| | : | |
| Respondents. | : | |

_____ :

_____

**MOTION FOR STAY OF EXECUTION**
_____

Victor J. Abreu
Katherine Thompson
Peter Williams
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West—The Curtis Center
Philadelphia, PA 19106
215–928–0520
Victor_Abreu@fd.org
Katherine_Thompson@fd.org
Pete_Williams@fd.org

Counsel for Petitioner

Dated: August 15, 2019

**PA-079**

**PRELIMINARY STATEMENT**

Petitioner Alfred Bourgeois shall be referred to as Petitioner or Mr. Bourgeois.

Pursuant to Local Criminal Rule 6–1(h), the following documents are included in the Appendix filed with this Motion: (i) a listing of prior petitions, with docket numbers, filed in any state or federal court challenging the conviction and sentence challenged in the current petition; and (ii) a copy of, or a citation to, each state or federal court opinion, memorandum, decision, order, transcript of oral statement of reasons, or judgment involving an issue presented in the petition.

All emphasis in this Motion is supplied unless otherwise indicated.

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................................... i

A.    Mr. Bourgeois Can Demonstrate a Significant Possibility of Success on the Merits of His Claim. ............................................................................................... 4

B.    Mr. Bourgeois Will Suffer Irreparable Injury Without a Stay. ........................... 6

C.    A Stay Will Not Substantially Harm the Government; the Potential Injury to Mr. Bourgeois Outweighs Any Harm to Respondents. ....................................... 7

D.    The Public Interest Weighs Strongly in Favor of a Stay. .................................... 9

REQUEST FOR RELIEF ............................................................................................ 10

**PA-081**

**INTRODUCTION**

Petitioner Alfred Bourgeois respectfully requests a stay of execution pending the Court's consideration of his Petition for Writ of Habeas Corpus Pursuant to 29 U.S.C. § 2241 ("Petition").

In his Petition, Mr. Bourgeois establishes that he is intellectually disabled ("ID"), based on his IQ scores of 70 and 75 (corrected under clinically–accepted standards to 67 and 68), each of which falls within the presumptive range for ID; his demonstrated adaptive deficits in academic skills and otherwise; and the undisputed onset of these deficiencies before the age of eighteen. Therefore, his execution is categorically barred by the Federal Death Penalty Act ("FDPA") and per se unconstitutional under *Atkins v. Virginia*, 536 U.S. 304 (2002), and its progeny.

Mr. Bourgeois further establishes that the only court to ever consider his *Atkins* claim denied it under non–clinical, unscientific standards. *See United States v. Bourgeois*, No. C–02–CR–216, 2011 WL 1930684 (S.D. Tex. May 19, 2011). For example, the district judge:

- set aside diagnostic standards and relied on her own armchair assessment of Mr. Bourgeois's conduct to determine that his "true" intellectual functioning did not satisfy the IQ component for intellectually disability, despite the fact that all of his IQ scores fall within the presumptive range for ID;

- found that Mr. Bourgeois's perceived adaptive *strengths* counteracted the evidence of his adaptive *deficits*, despite acknowledging that the medical community focuses strictly on deficits;

- applied unscientific stereotypes of intellectually–disabled persons—including that ID persons look and talk differently than the general population and are incapable of driving or maintaining a job—to support her conclusion that Mr. Bourgeois's adaptive functioning was inconsistent with a diagnosis of ID; and

- treated risk factors and comorbidities as alternate *explanations for* Mr. Bourgeois's deficits, as opposed to *contributors to* his intellectual disability.

1

The district court's approach was subsequently declared unconstitutional by the United States Supreme Court in *Moore v. Texas*, 137 S. Ct. 1039 (2017) ("*Moore–I*"), and *Moore v. Texas*, 139 S. Ct. 666 (2019) ("*Moore–II*"), which held that courts must apply the medical community's current standards in assessing *Atkins* claims, and which specifically criticized many of the analytical errors that plagued the initial review of Petitioner's claim.

Following *Moore–I*, Mr. Bourgeois diligently sought to file a successive habeas petition in the same court under 28 U.S.C. § 2255(h), but the Fifth Circuit Court of Appeals denied his request on procedural grounds. Habeas relief pursuant to § 2255 being unavailable to Mr. Bourgeois, he now seeks review of his meritorious claim before this Court under § 2241. *See* 28 U.S.C. § 2255(e) (federal habeas petitioner is entitled to review under § 2241 when § 2255 is "inadequate or ineffective to test the legality" of his detention or sentence).

On July 25, 2019, the Government notified Mr. Bourgeois that his execution has been scheduled for January 13, 2019. Mr. Bourgeois had no reason to anticipate the setting of his execution date, as the federal government has not carried out an execution since 2003 and has had no execution protocol in place since 2011.[1] Yet Mr. Bourgeois now stands to be among the first individuals federally executed in over fifteen years, even though his scheduled execution is per se unconstitutional, even though no court has ever reviewed his claim of ID under constitutionally–mandated current medical standards, and even though the FDPA specifically

---

[1] *See Roane, et al. v. Barr, et al.*, Case 1:05–cv–02337–TSC–DAR (D.D.C.), Parties' Joint Motion to Continue the August 2, 2011 Status Conference and Briefing Schedule Governing the Above–Captioned Case (July 28, 2011) (ECF No. 288) (Government informing the court presiding over litigation challenging the previously–existing lethal injection protocol "that the Federal Bureau of Prisons has decided to modify its lethal injection protocol"). Subsequent status reports filed by the Government with the court indicated that it was continuing to develop a new protocol, but it was not until July 25, 2019—the day Mr. Bourgeois received his warrant—that any new protocol was announced.

provides that "a sentence of death shall not be carried out upon a person who is mentally retarded." 28 U.S.C. § 3596(c).

Given the fact–intensive nature of an *Atkins* claim, Mr. Bourgeois's Petition includes requests for further pleadings by the parties and an evidentiary hearing before this Court. He also seeks a stay of execution so that the Court can fully and fairly review his compelling claim for relief.

## PROCEDURAL HISTORY

In 2004, Mr. Bourgeois was convicted of capital murder and sentenced to death in the United States District Court for the Southern District of Texas for the 2002 death of his two–year–old daughter, J.G. On August 25, 2005, the Fifth Circuit affirmed Mr. Bourgeois's conviction and sentence on direct appeal. *United States v. Bourgeois*, 423 F.3d 501 (5th Cir. 2005). The Supreme Court denied his petition for writ of certiorari on May 15, 2006. 547 U.S. 1132 (2006).

On May 14, 2007, Mr. Bourgeois filed a Motion for Relief Pursuant to 28 U.S.C. § 2255 challenging his conviction and sentence of death, including a claim that he is intellectually disabled and his death sentence is unconstitutional pursuant to *Atkins*.

On May 19, 2011, the district court denied Petitioner's § 2255 motion and denied a Certificate of Appealability ("COA") on all claims. *Bourgeois*, 2011 WL 1930684. The Fifth Circuit denied Mr. Bourgeois's request for a COA on August 5, 2013. *United States v. Bourgeois*, 537 F. App'x. 604 (5th Cir. 2013).

On March 27, 2018, Petitioner requested authorization from a panel of the Fifth Circuit to file a successive habeas petition under 28 U.S.C. § 2255(h)(2). On August 23, 2018, the Fifth Circuit denied Mr. Bourgeois's request. *In re Bourgeois*, 902 F.3d 446 (5th Cir. 2018).

3

**PA-084**

## **MR. BOURGEOIS IS ENTITLED TO A STAY OF EXECUTION.**

The standard for issuance of a stay is like that for issuance of a preliminary injunction. The moving party must show: (i) a significant possibility of success on the merits; (ii) irreparable harm will result in the absence of the stay; (iii) the balance of harms is in favor of the moving party; and (iv) the public interest supports a stay. *Hill v. McDonough*, 547 U.S. 573, 584 (2006). Mr. Bourgeois meets these requirements.

**A.     Mr. Bourgeois Can Demonstrate a Significant Possibility of Success on the Merits of His Claim.**

Mr. Bourgeois is able to demonstrate a "significant possibility of success on the merits" of his *Atkins* claim. *Hill*, 547 U.S. at 584. As discussed in detail in his Petition, there is no doubt that Mr. Bourgeois meets the three prongs of the clinical definition of intellectual disability under current clinical definitions: subaverage intellectual functioning, adaptive deficits, and onset before age eighteen. His uncorrected IQ scores of 70 and 75, like his properly corrected scores of 65 and 68, each establish subaverage intellectual functioning. Standardized testing, clinical evaluation, contemporaneous records, and numerous witnesses attest to his significant adaptive impairments in conceptual, social, and practical skills, any one of which is by itself sufficient to establish adaptive deficits. It is also clear that Petitioner's lifelong intellectual and adaptive impairments long predate his eighteenth birthday. Lastly, while no etiology is required, Mr. Bourgeois's diagnosis of intellectual disability is corroborated by the presence of a number of recognized risk factors for ID in his life history, including: child abuse, sexual abuse, neglect and impaired parenting, low socioeconomic status, history of learning difficulties, and family heredity risk.

Mr. Bourgeois's Petition also demonstrates that his claim is cognizable under § 2241. A

4

federal habeas petitioner is entitled to review under § 2241 when § 2255 is "inadequate or ineffective to test the legality of his detention" or sentence. 28 U.S.C. § 2255(e); *see also Brown v. Caraway*, 719 F.3d 583 (7th Cir. 2013) (§ 2241 applies to challenges to a habeas petitioner's sentence, in addition to his conviction). Cognizable claims include those that rely on a new legal or factual basis not available at the time of the petitioner's trial proceedings or his § 2255 proceedings. *See, e.g.*, *Webster v. Daniels*, 784 F.3d 1123, 1136 (7th Cir. 2015) (petitioner's *Atkins* claim cognizable under § 2241 based on newly–discovered evidence establishing innocence of death penalty); *In re Davenport*, 147 F.3d 605, 607–11 (7th Cir. 1998) (legal claim was unavailable to petitioner at time of initial habeas proceedings because circuit precedent would have required the district court and appellate panel to erroneously reject petitioner's claim at the time of his § 2255 motion). Section 2241 is also the appropriate vehicle where a petitioner challenges the execution of the sentence. *Kramer v. Olson*, 347 F.3d 214, 217 (7th Cir. 2003); *Valona v. United States*, 138 F.3d 693, 694 (7th Cir. 1998).

Mr. Bourgeois's claim relies on the *Moore–I* and *Moore–II* decisions, which rendered unconstitutional Fifth Circuit precedent rejecting the application of medical standards to *Atkins* claims, as well as newly–adopted diagnostic criteria. Notably, the Fifth Circuit has authorized the filing of successive habeas petitions by petitioners who were in a nearly identical procedural posture. *See, e.g.*, *Cathey v. Davis (In re Cathey)*, 857 F.3d 221, 232 (5th Cir. 2017) (holding *Atkins* was "previously unavailable" to Mr. Cathey because the circuit's pre–*Moore–I* precedent precluded a finding of intellectual disability at the time of his initial habeas petition); *In re Johnson*, No. 19–20552, 19–70013, 2019 WL 3814384, at *5–6 (5th Cir. Aug. 14, 2019) (holding that "new diagnostic guidelines" have brought "significant changes in the diagnosis of intellectual disability" and that "it is correct to equate legal availability with changes in the

5

standards for psychiatric evaluation of the key intellectual disability factual issues raised by *Atkins*"). Nevertheless, the Fifth Circuit denied Mr. Bourgeois's own request to file a successive habeas petition, making § 2241 the only remaining vehicle by which he may obtain review of his unconstitutional sentence. Additionally, Mr. Bourgeois challenges the execution of his fundamentally illegal death sentence. The FDPA requires such prospective relief to be available, providing as it does that "[a] sentence of death shall not be carried out upon a person who is mentally retarded." 18 U.S.C. § 3596(c); *see also Atkins*, 536 U.S. at 320 (establishing "categorical rule making [intellectually disabled] offenders ineligible for the death penalty").

**B.      Mr. Bourgeois Will Suffer Irreparable Injury Without a Stay.**

The harm to Mr. Bourgeois of being put to death without ever receiving full and fair review of the constitutionality of his execution cannot be overstated. Both the FDPA and *Atkins* categorically prohibit the execution of intellectually disabled persons, and Mr. Bourgeois has set forth a substantial claim that he is ID under current standards. Yet if no stay of execution is granted, Mr. Bourgeois will be killed on January 13, 2020, before any court has the opportunity to review that claim. Plainly, this would constitute irreparable harm. *See, e.g.*, *Wainwright v. Booker*, 473 U.S. 935, 935 n.1 (1985) (Powell, J., concurring in decision to vacate stay of execution) ("The third requirement—that irreparable harm will result if a stay is not granted—is necessarily present in capital cases."); *Evans v. Bennett*, 440 U.S. 1301, 1306 (1979) (granting stay of execution in light of the "obviously irreversible nature of the death penalty"); *Williams v. Chrans*, 50 F.3d 1358, 1360 (7th Cir. 1995) ("There can be no doubt that a defendant facing the death penalty at the hands of the state faces irreparable injury.").

The risk of harm to Mr. Bourgeois is aptly illustrated by the case of Bruce Webster. Mr. Webster, like Mr. Bourgeois, was convicted and sentenced to death under the Federal Death

6

Penalty Act in Texas. Also like Mr. Bourgeois, Mr. Webster was denied *Atkins* relief on habeas review based on Fifth Circuit precedent that called for the application of non–clinical standards in assessing intellectual disability. *See United States v. Webster*, 421 F.3d 308, 313 (2005). Like Mr. Bourgeois, Mr. Webster then raised his *Atkins* claim before this Court in a § 2241 petition. This Court initially dismissed Mr. Webster's petition on jurisdictional grounds, but the Seventh Circuit reversed, explaining that to hold otherwise might lead to the "intolerable result of condoning an execution that violates the Eighth Amendment." *Webster*, 784 F.3d at 1139. Had the Seventh Circuit not authorized this Court's review of Mr. Webster's § 2241 petition, Mr. Webster could very well have been among the federal inmates now facing a scheduled execution. Yet, as this Court established after reviewing Mr. Webster's petition on the merits, Mr. Webster is intellectually disabled and ineligible for death. *See Webster v. Lockett*, No. 2:12–cv–86–WTL–MJD, 2019 WL 2514833, at *1 (S.D. Ind. June 18, 2019). Mr. Bourgeois deserves the opportunity to make the same showing.

**C.      A Stay Will Not Substantially Harm the Government; the Potential Injury to Mr. Bourgeois Outweighs Any Harm to Respondents.**

The Government's interest in securing Mr. Bourgeois's execution before full and fair judicial review of his *Atkins* claim is adherence to an arbitrary schedule announced mere days ago. Mr. Bourgeois's request for a stay is not based on any delay on his part. He moved diligently in the wake of the *Moore–I* decision to seek permission from the Fifth Circuit to file a successive habeas petition. That request was denied on August 23, 2018. Petitioner diligently filed his § 2241 Petition after his application to file a successive § 2255 motion was denied. Furthermore, as noted above, Mr. Bourgeois had no reason to anticipate the setting of his execution date, as the federal government has not carried out an execution since 2003 and has had no execution protocol in place since 2011.

**PA-088**

Given the circumstances, Mr. Bourgeois was undeniably diligent in bringing his § 2241 petition, and the posture of his litigation therefore stands in contrast to those cases where last–minute stay requests have been denied due to a prisoner's delay. *See, e.g.*, *Nelson*, 541 U.S. at 649 (court may deny a stay of execution based on a civil rights claim when prisoner is abusive, *citing*, *Gomez v. United States Dist. Court for Northern Dist. of Cal.*, 503 U.S. 653 (1992)); *Hill*, 547 U.S. at 584 ("A court considering a stay must also apply a strong equitable presumption against the grant of a stay *where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay.*") (internal quotation marks and citations omitted).

In any event, under no scenario can the Government's interest in adhering to an execution schedule set more than fifteen years after the last federal execution outweigh the interest of the Petitioner and the public in ensuring that a person with an intellectual disability not be put to death. *See Moore–I*, 137 S. Ct. at 1048 (Eighth Amendment limits a state's "power to take the life of *any* intellectually disabled individual.") (emphasis in original) (quotation marks and citation omitted). As the Supreme Court in *Atkins* explained: "[t]hose mentally retarded persons who meet the law's requirements for criminal responsibility should be tried and punished when they commit crimes. Because of their disabilities in areas of reasoning, judgment, and control of their impulses, however, they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct." *Atkins*, 536 U.S at 306. Therefore, "[n]o legitimate penological purpose is served by executing a person with intellectual disability. To do so contravenes the Eighth Amendment, for to impose the harshest of punishments on an intellectually disabled person violates his or her inherent dignity as a human being." *Hall v. Florida*, 134 S. Ct. 1986, 1992 (2014).

8

**D.      The Public Interest Weighs Strongly in Favor of a Stay.**

There can be no public interest in an unconstitutional execution. "The public interest clearly favors the protection of constitutional rights." *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 178 (3d Cir. 1992) (affirming preliminary injunction to protect plaintiffs' free exercise rights where the harm to the borough of posting items on utility poles is outweighed by the harm to plaintiffs of being unable to practice their religion). Injunctive relief, in fact, will serve the Government's and the public's interest in executing the death sentence in a manner consistent with the Constitution. *See Trop v. Dulles*, 356 U.S. 86, 100 (1958) ("The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. While the State has the power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized standards.").

To the extent there is a public interest in timely enforcement of a death sentence, that interest does not outweigh the public interest in knowing that the federal government will carry out an execution in conformity with the Constitution and the will of Congress. *See* 28 U.S.C. § 3596(c).

PA-090

**REQUEST FOR RELIEF**

WHEREFORE, for the foregoing reasons and those explained in his § 2241 Petition, Mr.

Bourgeois respectfully requests that the Court stay his execution pending its consideration of his

*Atkins* claim.

Respectfully submitted,

*/s/ Peter Williams*

Peter Williams
Victor J. Abreu
Katherine Thompson
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West—The Curtis Center
Philadelphia, PA 19106
215–928–0520
Victor_Abreu@fd.org
Katherine_Thompson@fd.org
Pete_Williams@fd.org

Dated: August 15, 2019

10

**CERTIFICATE OF SERVICE**

I, Peter J. Williams, hereby certify that on this date, a copy of the within document has

been caused to be served upon the following party via first class mail at the address listed below:

Paula C. Offenhauser
Assistant United States Attorney
U.S. Attorney's Office for the
Southern District of Texas
1000 Louisiana, Suite 2300
Houston, TX 77002


*/s/ Peter Williams*
Peter Williams
Federal Community Defender Office
    for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West—The Curtis Center
Philadelphia, PA 19106
215–928–0520
Pete_Williams@fd.org

Dated: August 15, 2019

**PA-092**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA

_____

ALFRED BOURGEOIS,                          :        CIVIL ACTION
                                           :        (Capital Habeas Corpus)
                                           :
                   Petitioner,             :
                                           :        Case No.2:19-cv-392
        V.                                 :
                                           :        **CAPITAL CASE**
                                           :        **EXECUTION SCHEDULED FOR**
SUPERINTENDENT, USP–Terre Haute,           :        **JANUARY 13, 2020**
UNITED STATES OF AMERICA,                  :
                                           :
                   Respondents.            :
_____  :


_____

**APPENDIX TO**
**MOTION FOR STAY OF EXECUTION**

_____


Victor J. Abreu
Katherine Thompson
Peter Williams
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West—The Curtis Center
Philadelphia, PA 19106
215–928–0520
Victor_Abreu@fd.org
Katherine_Thompson@fd.org
Pete_Williams@fd.org

Counsel for Petitioner


Dated: August 15, 2019

**PA-093**

**List of Prior Petitions**

1. *Petitioner's Motion for Relief Pursuant to 28 U.S.C. Section 2255, or In The Alternative Pursuant to 28 U.S.C. 2241*, United States District Court for the Southern District of Texas – Corpus Cristi Division, Case No. 2:02-cr-00216, Doc. #396, 5/14/2007

2. *Petitioner's Notice of Filing of Appendix In Support of Section 2255 Motion*, United States District Court for the Southern District of Texas – Corpus Cristi Division, Case No. 2:02-cr-00216, Doc. #397, 5/15/2007

3. *Petitioner's Motion for Opportunity to File Memorandum of Law in Support of Section 2255 Motion*, United States District Court for the Southern District of Texas – Corpus Cristi Division, Case No. 2:02-cr-00216, Doc. #398, 6/4/2007

4. *Petitioner's Memorandum of Law In Support of Motion for Relief Pursuant to 28 U.S.C. Section 2255, or In The Alternative Pursuant to 28 U.S.C. 2241*, United States District Court for the Southern District of Texas – Corpus Cristi Division, Case No. 2:02-cr-00216, Doc. #402, 10/5/2007

5. *Second Motion to Vacate Sentence Pursuant to 28 U.S.C. Section 2255*, United States District Court for the Southern District of Texas – Corpus Cristi Division, Case No. 2:02-cr-00216, Doc. #682, 3/27/2018

**Opinions**

1. *United States v. Bourgeois*, No. C-02-CR-216, 2011 WL 1930684 (S.D. Tex. May 19, 2011)

2. *In re Bourgeois*, 902 F.3d 446 (5th Cir. 2018)

**PA-094**

Westlaw.

Page 1

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

H

Only the Westlaw citation is currently available.
United States District Court,

S.D. Texas,
Corpus Christi Division.
UNITED STATES of America,
v.
Alfred BOURGEOIS.
Criminal Action No. C–02–CR–216.

C.A. No. C–07–223.
May 19, 2011.

Michael Wiseman, Office of the Federal Public Defender, Philadelphia, PA, for Alfred Bourgeois.

James L. Turner, Paula C. Offenhauser, Tony R. Roberts, Mark Michael Dowd, Financial Litigation, U.S. Attorneys Office, Houston, TX, Elsa Salinas, Patricia Hubert Booth, Office of the U.S. Attorney, U.S. Marshal, U.S. Pretrial Svcs, U.S. Probation, Corpus Christi, TX, for United States of America.

**MEMORANDUM AND ORDER**

JANIS GRAHAM JACK, District Judge.

**\*1** In 2004, a jury found Alfred Bourgeois guilty of murdering his two-year-old daughter, JG1999. After a separate punishment phase, the same jury decided that he should receive a death sentence. After he unsuccessfully appealed his conviction and sentence to the Court of Appeals for the Fifth Circuit, Bourgeois' appointed counsel filed a lengthy Motion for Relief Pursuant to 28 U.S.C. Section 2255 or in the Alternative Pursuant to 28 U.S.C. § 2241. (DE 396). Bourgeois also filed an extensive memorandum of law supporting his motion. (DE 402). The Court has liberally allowed Bourgeois to develop the factual basis for his post-conviction claims, including through the presentation of testimony and evidence in several hearings. The Government has filed a response arguing that Bourgeois' claims are all procedurally insufficient or substantively without merit. (DE 442).

The Court has fully considered the arguments, evidence, and law supporting Bourgeois' claims. The Court has given ample consideration to the voluminous pleadings filed by the parties. After a full review of the record, and with particular emphasis on this Court's own observations from trial and afterward, the Court finds that Bourgeois has not shown that the Government secured his conviction and sentence in violation of the Constitution or laws of the United States. *See* 28 U.S.C. § 2255.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

**TABLE OF CONTENTS**

| | | | |
|---|---|---|---|
| BACKGROUND .......... | | | 6 |
| I. | The Crime .......... | | 8 |
| | A. | Bourgeois Fathers JG1999, Gains Custody, and Begins His Abuse .......... | 10 |
| | B. | JG1999's Last Month .......... | 12 |
| | C. | The Murder .......... | 13 |
| II. | Defense Counsel's Pre–Trial Preparation .......... | | 14 |
| III. | The Trial .......... | | 20 |
| | A. | Guilt/Innocence Phase .......... | 20 |
| | B. | Sentencing Phase .......... | 25 |
| IV. | Appeal .......... | | 35 |
| V. | Post–Judgment Proceedings and Evidentiary Hearing .......... | | 36 |
| PROCEDURAL ADEQUACY OF BOURGEOIS' CLAIMS .......... | | | 40 |
| ANALYSIS .......... | | | 42 |
| I. | Bourgeois' Alleged Mental Retardation (claim one) .......... | | 42 |
| | A. | Background of Bourgeois' *Atkins* claim .......... | 43 |
| | B. | Intellectual Functioning .......... | 49 |
| | | 1. Bourgeois' IQ Scores .......... | 50 |
| | | 2. Legal Evaluation of Intelligence *in Atkins Cases* .......... | 52 |

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

| | | | |
|---|---|---|---|
| | 3. | Bourgeois' IQ Does Not Persuasively Fall at the Lower End of the Confidence Interval .......... | 55 |
| C. | | Significant Limitations in Adaptive Skill Areas .......... | 65 |
| | 1. | Assessment by Testing Instruments .......... | 68 |
| | | a. The Woodcock–Johnson | 71 |
| | | b. The ABAS–II and the Vineland | 72 |
| | 2. | Lay Accounts of Bourgeois' Functioning .......... | 77 |
| | 3. | Bourgeois' Adaptive Abilities .......... | 8 1 |
| D. | | Manifestation of Limitations Before Age 18 .......... | 91 |
| E. | | Trial Counsel's Failure to Develop Evidence of Mental Retardation .......... | 92 |
| F. | | Conclusion of Bourgeois' *Atkins* Claim .......... | 95 |
| II. | | Ineffective Assistance of Counsel for Failing to Present Mitigating Evidence (claim two) .......... | 95 |
| A. | | The *Strickland* Standard .......... | 97 |
| B. | | Trial Counsel's Investigation and Preparation of Mitigating Evidence .......... | 100 |
| | 1. | Counsel's Early Efforts to Prepare a Mitigation Defense .......... | 100 |
| | 2. | Preparations Before the Guilt/Innocence Phase .......... | 105 |

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

|   |   |   |   |
|---|---|---|---|
| | 3. | Trial Counsel Made a Constitutionally Sound Investigation .......... | 113 |
| C. | | The Unpresented Evidence .......... | 114 |
| | 1. | Lay Witnesses .......... | 115 |
| | 2. | Expert Testimony .......... | 122 |
| | | a. Dr. Cunningham's testimony | 123 |
| | | b. Borderline personality disorder | 129 |
| | | c. Neurological impairment | 137 |
| | | d. Premeditation | 142 |
| D. | | Conclusion of Deficient Performance Analysis .......... | 144 |
| E. | | Cumulative Effect of Prejudice .......... | 14 5 |
| III. | | Jurisdiction (claim three) .......... | 148 |
| A. | | The Autopsy and Trial Testimony .......... | 149 |
| B. | | Bourgeois' Post–Judgment Arguments and Post–Conviction Testimony .......... | 152 |
| C. | | Evidence of Recent, Extensive, and Fatal Head Trauma .......... | 160 |
| IV. | | Trial Counsel Provided Ineffective Assistance by Failing to Call an Expert Witness to Rebut Forensic Evidence Indicting Sexual Assault (claim four) .......... | 165 |
| A. | | The Trial Evidence .......... | 165 |
| B. | | Dr. Benton's Observation of Sexual Trauma .......... | 170 |

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**PA-098**

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

| | C. | Forensic Evidence of Semen .......... | 172 |
|---|---|---|---|
| | D. | Prejudice From Trial Counsel's Defense Against Allegations of Sexual Assault .......... | 180 |
| V. | | Trial Counsel Provided Ineffective Assistance by Not Litigating a *Daubert* Challenge to Three of the Government's Expert Witnesses (claims five and six) .......... | 182 |
| | A. | Dr. Oliver's Reliance on the Digitally Enhanced Autopsy Photographs (claim six) .......... | 182 |
| | B. | Testimony from Dr. Senn and Dr. Chrz Concerning Bite–Mark Evidence (claim five) .......... | 189 |
| VI. | | The Government Violated its Duty under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by Failing to Disclose That the Government Promised Inmates Some Benefit for Testifying Against Bourgeois (claim seven) .......... | 194 |
| | A. | No Evidence of Concealed Deals with Government Witnesses .......... | 196 |
| | B. | Materiality .......... | 201 |
| VII. | | Trial Counsel Labored under a Conflict of Interest Because of His Representation of Clients Associated with this Case (claim eight) .......... | 204 |
| VIII. | | The Government Engaged in Misconduct by Making Improper Argumentative Statements in the Guilt/Innocence and Penalty Phases (claim nine) .......... | 207 |
| IX. | | Trial Counsel Provided Ineffective by Not Rebutting Evidence of Bourgeois' Indifferent Demeanor (claim ten) .......... | 214 |
| X. | | A Witness Improperly Relied on Bourgeois' Interactions with Counsel as a Basis to Formulate an Adverse Opinion about Him (claim eleven) .......... | 217 |
| XI. | | Ineffective Assistance of Appellate Counsel (claim twelve) .......... | 219 |
| XII. | | Cumulative Error (claim thirteen) .......... | 223 |
| XIII. | | Lethal Injection (claim fourteen) .......... | 223 |

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

CERTIFICATE OF APPEALABILITY ..........                    224

CONCLUSION ..........                    225

## BACKGROUND

**\*2** Where, as in this case, a jury has found a defendant's crime worthy of the death penalty, federal law guarantees a full and fair inquiry into his conviction and sentence. Bourgeois has raised several claims requiring serious judicial consideration. The events surrounding the murder Bourgeois committed, the pre-trial preparation by his appointed attorneys, and the circumstances of his trial provide an important context to the matters he now brings before the Court. The Court will discuss at length the background for Bourgeois' post-conviction challenge.

In doing so, this Court's role presiding over trial provides a particularly useful vantage point. Cold transcripts often do not convey the nuances and color of the trial itself. Post-conviction proceedings frequently fail to depict the tempestuous trial atmosphere. The printed page dulls the personalities, character, and credibility of the parties and the witnesses. Decisions made in the heat of trial lose some urgency when subjected to harsh light of hindsight. The slow pace and detachment of post-conviction review divorces itself from the stress, fear, and anxiety of trial. For example, passing years have dimmed the powerful effect of some testimony, such as that of Bourgeois' daughter AB1994 as she described the murder. In general, this Court's familiarity with the trial atmosphere, parties, and witnesses provides a colored mosaic that may otherwise be obscured on the black-and-white page.

This is especially the case with respect to the trial attorneys, Douglas Tinker and John Gilmore, whose efforts Bourgeois vigorously attacks at this stage of the case.[FN1] Lamentably, the record suffers because Mr. Tinker passed away after Bourgeois filed his 2255 motion. With all sensitivity and respect, the Court allowed the parties to glean what information they could from Mr. Tinker before he succumbed to cancer. With the omission of his testimony, a hole exists in the written record about his efforts to defend Bourgeois.

> FN1. Except as necessary to identify one of his attorneys, the Court will refer to Bourgeois' lawyers conjunctively as "trial counsel" or "defense counsel."

This Court's experience and observation partially fill in the otherwise empty spaces in the record. For example, this Court's familiarity with Mr. Tinker and Mr. Gilmore as attorneys, both in this case and in others, informs the consideration of Bourgeois' grounds for relief. The legal community highly regards both men as competent and zealous attorneys. Their extensive experience, trial lawyering, and overall sterling character cannot be gainsaid.[FN2] The Court appointed these attorneys because they were among the best in the legal community. As an example of their character, the Court had to goad Mr. Tinker into filing vouchers for his representation; his concern was for the client, not for a paycheck.

> FN2. As the Court observed at the close of the sentencing hearing: "I don't think ... your client[ ] could have had a better ... advocate or voice in the courtroom ... throughout what has been a very difficult process." (DE 342 at 102).

This is not to say that counsel was mistake-free. The Court will not manufacture justifications for mistakes plainly in the record.[FN3] Nevertheless, this Court's familiarity with defense counsel's efforts reinforces the "strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect." *Harrington v. Richter,* ––– U.S. ––––, 131 S.Ct. 770, 790, 178 L.Ed.2d 624 (2011) (quotations omitted). Thus, this Court must "not simply ... give the attorneys the benefit of the doubt," but also "affirmatively entertain the range of possible reasons ... counsel may have had for proceeding as they did [.]" *Cullen v. Pinholster,* ––– U.S. ––––, 131 S.Ct. 1388, ––– L.Ed.2d ––––, 2011 WL 1225705, \*16 (2011).

> FN3. Bourgeois' attorneys have argued that Mr. Tinker's absence now leaves them "kind of wrestling with a ghost, in quite a literal sense." (DE 646 at 88). While Mr. Tinker's passing removes the ability to place his strategic decisions on the record, *Strickland*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

is an objective standard which is also "highly deferential" to counsel's actions. *Premo v. Moore,* ––– U.S. ––––, 131 S.Ct. 733, 740, 178 L.Ed.2d 649 (2011); *Strickland v. Washington,* 466 U.S. 668, 693, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *see also Harrington v. Richter,* ––– U.S. ––––, 131 S.Ct. 770, 791, 178 L.Ed.2d 624 (2011) (*"Strickland* ... calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind").

**\*3** With this understanding, the Court will first provide a general background before addressing Bourgeois' individual grounds for relief.

### I. The Crime

On June 27, 2002, Bourgeois, a long-haul trucker, arrived to deliver a load on the Naval Air Station Corpus Christi with his wife (Robin), the two daughters they shared (AB1994 and AB2001), and his out-of-wedlock daughter (JG1999). [FN4] An hour later, Robin frantically begged workers to call an ambulance for two-year-old JG1999 who lay motionless on the ground. Robin said that JG1999 had slipped and fallen from the truck. Concerned bystanders looked on as efforts were made to save the child's life. Alfred Bourgeois, well aware that his daughter lay dying on the pavement, indifferently supervised the unloading of his trailer and arranged for his next load.

> FN4. This Court's review of the facts comes from the entirety of the trial and post-trial record, with particular emphasis on the highly credible testimony AB1994 and Robin Bourgeois provided at trial.

Emergency personnel arrived and tried to save the dying little girl. As the ambulance sped away, Bourgeois insistently remained behind to finish unloading his truck in preparation for another run. He casually mentioned that it was a "shame what happened" to the infant. Only with extensive prodding, and the fact that he could not continue making deliveries because his truck had become a crime scene, did Bourgeois follow his daughter to the hospital.

At the hospital, doctors soon saw that the extent of JG1999's injuries far exceeded the explanation given. Finding blood behind her eyes, the doctors ordered an MRI. Medical personnel disbelieved the explanation for her injuries; the extent of her head trauma was much worse than that which would be expected from a four-to-five-foot fall. Numerous other injuries in various stages of healing also raised suspicions. When doctors informed Bourgeois that they needed to transport JG1999 to another facility and that she may not live much longer, Bourgeois seemed unfazed.

Given the injuries to the infant, Child Protection Services (CPS) began an investigation. Bourgeois told Robin that, if CPS took custody of the other two children, he did not want them to stay with her parents. Bourgeois' preference was unsurprising; he had physically assaulted his mother-in-law not long before. Bourgeois told Robin not to panic and to "stick with the story." Suspicion increased when AB1994 told CPS workers that the falling-out-of-the-truck fiction was "the story my dad said to tell."

As the life ebbed from JG1999's body, Bourgeois returned to the naval base set on continuing his deliveries. After unsuccessfully trying to get back on the road, Federal Bureau of Investigation officers took Bourgeois back to the hospital. Bourgeois told agents the story from which he has not deviated: while driving to the Corpus Christi Naval Exchange, JG1999 sat on his lap and sang her ABC's. When they arrived, he unloaded his trailer until someone informed him that JG1999 had fallen from the truck. He claimed that he rushed to her and began CPR, using a towel to wipe blood from her head or nose. He would not explain the numerous injuries to JG1999 other than to say that he never whipped his children. He seemed singularly unconcerned with JG1999's critical injuries. He said that he "didn't want *it* to suffer" and saw no problem continuing his truck route because "her mother's going to be here in town. I'm coming back."

**\*4** Robin, however, began to change her story. When doctors seemed incredulous, Robin divulged to FBI agents that Bourgeois had abused JG1999, but kept up the story that she fell from the truck. Only when JG1999 died did Robin admit that Bourgeois had actually killed his daughter. Witness accounts and forensic evidence began to unfold a horrific tale of savage abuse that culminated in Bourgeois beating JG1999 to death.

### A. Bourgeois Fathers JG1999, Gains Custody, and Begins His Abuse

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

Robin and Bourgeois had a turbulent relationship. Since before their marriage in 1995, Bourgeois beat Robin, threatened to kill her, periodically refused to provide for his family, and repeatedly had extramarital affairs. Robin twice sought restraining orders against her husband. During a separation, Robin also had an affair with a man who owned a limousine service. As part of their reconciliation, Robin and Bourgeois vandalized her paramour's work vehicles. Bourgeois threatened to kill Robin on numerous occasions. Violence, disharmony, and selfishness defined Bourgeois' relationship with his wife.

Bourgeois fathered JG1999 during an extramarital affair he had with Katrina Harrison, a woman he met while on a truck route. In April 2002, the State of Texas initiated paternity proceedings against Bourgeois. In addition to the two daughters he shared with Robin, Bourgeois was already paying child support for two other children. Without telling Robin where he was going, Bourgeois left for Livingston, Texas, to reacquaint himself with Ms. Harrison. They shared a bedroom while he visited his daughter.

When he returned, Bourgeois told Robin about the paternity suit. A confirmatory blood test debunked his claim that he did not know Ms. Harrison. In May 2002, Bourgeois took Robin, his two children, and a niece to a child support hearing in Texas. The Texas court ordered Bourgeois to pay around $160 a month child support. Bourgeois in turn asked for visitation rights. Immediately after the court hearing, Ms. Harrison prepared a suitcase for JG1999, who left with Bourgeois.

Bourgeois then entered into a pattern of conduct aimed at controlling or killing his child. Bourgeois contacted Child Protective Services in Louisiana and falsely claimed that JG1999's mother abused and neglected her. The Louisiana authorities contacted Texas Child Protective Services, who found no basis for the claim of neglect. The social worker became concerned that Bourgeois did not want custody, he wanted power over and possession of JG1999. Fearing that JG1999 was in danger, the social worker asked Child Protective Services in Louisiana to monitor Bourgeois' custody of JG1999. No government agency became aware of the vicious abuse JG1999 suffered until she died.

On May 18, 2002, Robin found blood in JG1999's diaper. Dr. Scott Benton, a forensic pediatrician, examined the little girl and found no evidence of abuse. His examination would be a baseline against which to measure Bourgeois' inhumane treatment.

**\*5** Bourgeois' abuse of JG1999 began soon after they arrived at his home. Robin began noticing bruises, marks, and injuries on the infant. She noticed sores on JG1999's feet which would not heal because Bourgeois kept pressing his thumbs into the wounds. Bourgeois began calling JG1999 names like the "trifling little bitch" and "a mother fucker." When Bourgeois bathed the infant, Robin could hear screaming as he whipped her. A few days after JG1999 came to live at the Bourgeois home, Bourgeois proclaimed that he would teach her to swim. As a video recorder captured his actions, Bourgeois repeatedly tossed her into the air and let her fall into the swimming pool where she sank until Bourgeois pulled her out, coughing and gasping for breath. For approximately 30 minutes, Bourgeois brought the young girl to the brink of drowning until he let her go.

Bourgeois assumed control over potty training JG1999. Bourgeois would strike JG1999 if the two-year-old wet her pants. He began a systematic pattern of beating JG1999, often with electrical cords or other objects. While no conclusive evidence of sexual abuse existed, strange behavior hinted that Bourgeois engaged in sexual activity with his daughters. For example, by this point in their relationship Robin no longer shared a bed with Bourgeois, but each night Bourgeois would lock himself in the bedroom with AB1994 and JG1999. JG1999 would spend the night tied to her potty chair under a window.

Bourgeois' brutal abuse of JG1999 intensified. Some nights Robin could hear pounding in the bedroom accompanied by crying. A bloodstain confirmed that one loud thump Robin heard was Bourgeois throwing JG1999 against a wall. Bourgeois' maltreatment of JG1999 stood in stark contrast to that of AB1994 whom he treated "like an angel."

### B. JG1999's Last Month

For the last month of the little girl's life, Bourgeois' abuse extended beyond harsh discipline; a particular viciousness attended his continual maltreatment. Bourgeois took his family on the road. The five people—Bourgeois, Robin, their two children AB1994 and AB2001, and JG1999—traveled across

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

America in the tractor-trailer. JG1999 stayed on her potty chair as they drove. Bourgeois sent postcards to JG1999's mother describing a vacation to amusement parks and full of outdoor activity. In terse phone calls to her mother, Bourgeois instructed the formerly talkative JG1999 to tell her mother that she was all right. The reality, however, was far different from the picture Bourgeois portrayed.

AB1994 saw her father repeatedly bite JG1999 on her hands, feet, and forehead. Once, Bourgeois beat JG1999 with a belt so hard that it broke. JG1999 began to show bruises all over her body. Her hands and feet were swollen and had open sores. He beat her with electrical cords. He once beat her until she lost consciousness. He occasionally taped her mouth shut. He hit her with his shoe. She spent her days and nights on the potty chair. Bourgeois would curse at her. He once locked Robin out of the truck for hours while he remained in the cab alone with the girls. He hit JG1999 in the eyes with all his strength until she had to wear sunglasses to mask the injuries. He once forced JG1999 to drink urine from a bottle he used to relieve himself while driving. He beat her with a toy baseball bat until her head swelled "like a football." He told JG1999 that she made him want to kill her. Robin began to notice injuries such as a hole the same size as a cigarette lighter in the infant's foot. He repeatedly held JG1999 under the waves on a trip to the beach. Foreshadowing her murder, Bourgeois once knocked JG1999 unconscious by striking her head against the truck's steering wheel because she referred to herself by her mother's, not his, surname.

**\*6** As Bourgeois' violence increased, JG1999 became sullen. Bourgeois had broken her once vivacious spirit. It soon became apparent that Bourgeois' abuse would end in the child's death. Bourgeois told Robin he wanted to kill the child. Once he had killed her, he planned on leaving her body in the woods or in a swamp and having Robin report her as kidnaped.

### C. The Murder

Bourgeois delivered the killing blows on the naval base on June 27, 2002. The day before, the Bourgeois family stopped at their home in Louisiana to collect the mail. Bourgeois received a court order requiring him to pay $519.99 a month in child support for another daughter. After delivering a load to the Ingleside Naval Station, Robin went to sleep. Bourgeois' truck entered the Corpus Christi Naval Air Station at around 10:00 a.m. After asking for directions and having his truck

break down, Bourgeois approached the warehouse where he was to make a delivery. Robin was still sleeping in the back. After the truck stopped, JG1999 wiggled on her potty chair and tipped it over. Bourgeois angrily ordered AB1994 to hand him the toddler. Bourgeois pulled down the child's pants and spanked her. He then grabbed her by the shoulders and slammed her head into the window four times. JG1999's face became "real sad." Bourgeois handed the child to AB1994 and he exited the truck.

Robin woke up and saw the child sitting motionless. She touched the infant, but JG1999's arm fell limply. Robin began trying to revive JG1999. Panicking, she honked the truck's horn. She confronted Bourgeois when he returned to the truck, asking: "What did you do to her? She's dying." Bourgeois bluntly said he had to finish unloading his truck when Robin begged him to take the child to the emergency room.

Robin began performing CPR, but fluid came out of JG1999's mouth. Robin handed Bourgeois the child and began crying hysterically. She implored: "You're going to have all of us going to jail." Bourgeois then crafted their story: AB1994 forgot to close the cab door as she exited and JG1999 fell as she followed. Bourgeois took JG1999 out of the truck and laid her on the ground. Moments later, Robin exited, saw JG1999 laying on the ground, and began administering CPR again. Paramedics took over the CPR. While Robin was "very upset" and could not "keep her eyes off the baby," Bourgeois was "on the phone most of the time trying to see about getting ... his next load ... [to] Kingsville."

As bystanders questioned what happened, Robin said the "little girl fell from the truck." With time, it became apparent that no one believed Bourgeois' story. Robin first told authorities about Bourgeois' cruelty toward the child. Finally, by the morning of the day that JG1999 died, Robin admitted that the story about her falling from the truck was a lie. Bourgeois was arrested.

### II. Defense Counsel's Pre–Trial Preparation

On July 25, 2002, a grand jury returned a two-count indictment charging Bourgeois with murder under 18 U.S.C. §§ 7 and 1111, and injury to a child under 18 U.S.C. § 13. The Court appointed John Gilmore on October 2, 2002, to represent Bourgeois. Mr. Gilmore had extensive experience handling capital cases. As a prosecutor, he had tried two death penalty cases. As defense counsel, he represented ten or eleven

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

defendants facing a death sentence. He also tried several capital cases in which the prosecution did not seek a death sentence. Outside the death-penalty context, he maintained an active criminal practice, trying an estimated twenty cases each year. In 2000 and 2008, the local bar named him criminal defense attorney of the year. Mr. Gilmore brought to the defense a background rich in criminal trial experience.

**\*7** Soon after his appointment, Mr. Gilmore interviewed his client. Mr. Gilmore did not observe any indication of mental illness or mental retardation in Bourgeois' presentation. During their initial conversations, Mr. Gilmore discussed with Bourgeois the possibility of seeking a favorable plea deal with the Government. Bourgeois refused to talk about a plea, making his position clear and unmoveable: he blamed the murder on Robin.[FN5]

> [FN5.] In a hearing, Bourgeois expressed his steadfast decision not to plead guilty: "Your Honor, my mind is made up[.] I'm not going to plea.... My mind was made up when I got arrested that I wasn't going to plea. I don't want to plea. I don't want to talk about a plea." (DE 356 at 16–17). In fact, Bourgeois wrote the Court asking to dismiss his attorneys when they tried to discuss reaching a plea agreement with the Government. (DE 356 at 5–17).

Mr. Gilmore began preparing a defense. Mr. Gilmore requested, and the Court granted, appointment of expert and investigative assistance. (DE 32, 33). Initially, the Court appointed Douglas Tenore as an investigator. Mr. Tenore would assist in the preparations throughout the course of the trial proceedings. As the defense team continued preparing for trial, the Court appointed additional investigative and expert assistance.

On April 9, 2003, a grand jury returned a superceding indictment against Bourgeois listing two counts: unlawful killing with premeditation and malice aforethought under 18 U.S.C. § 7 and 111, and physical assault of a child under 18 U.S.C. § 13 and Texas Penal Code § 22.04(a)(1). At rearraignment, Bourgeois again pleaded not guilty. (DE 44). At this stage of the proceedings, Mr. Douglas Tinker volunteered to help represent Bourgeois. (DE 86).[FN6] Mr. Tinker brought a wealth of experience to the table. He had represented over a dozen clients facing a death sentence. In 1995, the Criminal Justice Section of the State Bar of Texas named him

Outstanding Criminal Defense Lawyer of the Year. He often spoke at conferences for state and national criminal defense attorney organizations. He was well known as a "defense attorney's defense attorney." Importantly, his experience with cases involving genetic material gave him the reputation as an expert in DNA. The Court appointed Mr. Gilmore and Mr. Tinker because the Court's interaction with them showed that they were among the most zealous, competent attorneys in the local bar.

> [FN6.] The Court issued a written order appointing Mr. Tinker on July 28, 2003. (DE 83). The Court later amended the appointment of counsel to reflect his work on the case before his official designation as attorney of record. (DE 86).

Defense counsel began a double-pronged effort to avert a death sentence even before the Government certified this as a capital case. *See* 18 U.S.C. § 3593(a) (requiring the Government to serve the defendant with notice of its intent to seek a death sentence "a reasonable time before the trial or before acceptance by the court of a plea of guilty").[FN7] First, defense counsel tried to convince the Government not to seek a death sentence. Mr. Gilmore met with the United States Attorney for the Southern District of Texas and had discussions with members of the Attorney General's Office in Washington, D.C., lobbying against the Government seeking a death sentence.

> [FN7.] The attorneys divided the responsibilities for defending Bourgeois. According to Mr. Tinker's recollection: "Mr. Gilmore was responsible for handling all of the government's lay witnesses and law enforcement witnesses. Additionally, he was in charge of coordinating the investigation of the availability of non-expert defense witnesses and presenting their testimony at trial." Mr. Tinker, however, "was in charge of dealing with the government's expert witnesses and obtaining and presenting rebuttal expert testimony." The two attorneys, however, "made the majority of the trial decisions jointly." (PX–82 at 4).

Second, defense counsel realistically evaluated the case against their client, acknowledging that a jury would likely convict and then have to decide his sentence. Accordingly, the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

defense began preparations for a capital sentencing hearing even before the Government noticed this as a death-penalty case. Defense counsel requested the appointment of a mitigating investigator and received authorization to expend significant funds in preparation for a mitigation case. On June 30, 2003, Mr. Gilmore contacted Dr. Marc Cunningham, a well-known psychologist who has routinely testified in capital trials, to secure his assistance. Dr. Cunningham agreed to participate as an expert witness on mitigation evidence and on violence in prison society. Dr. Cunningham outlined the assignment of responsibilities as he saw them: a mitigation investigator would examine Bourgeois' background and then Dr. Cunningham would "conduct more strategic interviews[.]" Dr. Cunningham informed trial counsel that, "assuming an investigator began aggressively working on a social history," he could be ready for a January trial date. (PX–8).[FN8]

> FN8. The Court will refer to the exhibits introduced by Bourgeois in the evidentiary hearing held September 20 through 24, 2010, as "PX" and the Government's exhibits as "GX."

**\*8** On July 9, 2003, trial counsel asked Dr. Cunningham if he could recommend a competent investigator for the penalty phase preparation. Dr. Cunningham provided trial counsel a list of experienced mitigation specialists, including Lisa Milstein. After trying to contact others, trial counsel secured the help of Ms. Milstein. She, in turn, solicited help from her associate Gerald Bierbaum, an attorney who now works for the Capital Habeas Unit of the Federal Defender's Office in Las Vegas, Nevada. At Dr. Cunningham's recommendation trial counsel had every reason to trust that they would perform a competent and probing review of Bourgeois' life history.

In a status conference on July 16, 2003, the Government announced that they received authorization to seek a death sentence. (DE 74). The Government outlined the aggravating factors it would rely on as required by 18 U.S.C. § 3593(a). (DE 78, 79).[FN9] The Court set trial for February 16, 2004. (DE 76).

> FN9. The Government's notice that it would seek a death sentence listed the following factors that the jury would eventually consider in evaluating whether Bourgeois' crime merited a death sentence: (1) the heinous, cruel, or depraved manner in which he committed the offense; (2) the substantial planning and premeditation that went into the crime; (3) the likelihood that Bourgeois would commit future acts of violence; (4) the impact of the victim's loss to the family and her personal characteristics as a human being; and (5) the vulnerability of the victim. (DE 78, 79); *see also* 18 U.S.C. § 3592 (outlining the statutorily defined aggravating and mitigating factors).

On July 25, 2003, Mr. Gilmore sent Dr. Cunningham an email describing their efforts to secure the services of a mitigation expert and informing him that: "The case was reset to February 2004, to allow you to gather information for your evaluation.... There is one problem, however. The judge has ordered reciprocal discovery and has set a deadline of mid-December to disclose your information. Please let me know if you can work within these parameters." (PX–8 at 15). The Court, however, later changed the required discovery deadline until the end of jury selection. (DE 185). With several months remaining before the trial date, the defense team consisted of two highly experienced attorneys, an investigator, two mitigation investigators, and an expert witness on mitigation evidence.[FN10] In addition, Bourgeois himself took an intensely active part in the defense. An expert witness attested that Bourgeois seemed more like a member of the defense team than a defendant. (DE 348 at 286).

> FN10. In the months before trial, the mitigation investigators interviewed dozens of potential witnesses, some of them several times. The Court also liberally allowed the defense to retain other experts, including a jury selection specialist, a forensic pathologist, and two mental-health experts.

Yet defending Bourgeois would be a herculean undertaking for several reasons. The obviously horrendous facts of the case would trouble any juror. Expert and lay witnesses would chronicle at trial the unrelenting abuse that JG1999 suffered at Bourgeois' hands. Bourgeois had wished for the infant's death and made plans for disposing her body. His brutal beatings assured the toddler's eventual demise. He indifferently manipulated others into supporting his transparent attempt to label her death an accident. The crime itself made his conviction a near certainty. The jury would not see Bourgeois as a sympathetic defendant.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

Also, Bourgeois often provided misinformation to the defense team, making a mitigation defense difficult. Additionally, Bourgeois' violent behavior continued while he was incarcerated as a pre-trial detainee. Bourgeois threatened to have witnesses killed.[FN11] His threats were not toothless; witnesses, including JG1999's mother, were murdered before trial. (DE 24). Notwithstanding court orders designed to halt all communication (DE 24, 28), Bourgeois continued to imperil the safety of those involved in his trial. His threats to harm and attempted assaults on jailors and United States Marshals assured that custody could not contain his violent behavior. In a case where the punishment phase would examine his ability to comport to the rules and regulations of prison life, Bourgeois hobbled his attorneys' efforts to demonstrate that he could be a model prisoner if the jury spared his life.[FN12]

> FN11. Bourgeois also threatened to kill prosecutors, FBI agents, and the trial judge. Even though Bourgeois made the threats at the same time, the Court decided that only those made against witnesses could come before the jury. (DE 387 at 8–10).

> FN12. The Court cautioned Bourgeois:

>> There's some indication that you've intimidated witnesses, attempted to intimidate witnesses, get your brother on them or other family members. It's all going to come out at trial. It's certainly not going to be helpful to you. And you're in a deep enough hole right now without making it any worse.

>> So you have two of the greatest lawyers I've ever known representing you. You're going to have to put your trust in them. You're going to have to let them do the work that we've got them to do, whether it's mitigation experts or school records or interviews with people. They have really worked hard. And you're putting your whole defense at risk by doing this. I cannot emphasize it strongly enough. Not only are you disobeying this-there's nothing I can do to punish you for the contempt of court that you've done. You're already there. You're already in jail. And that may be why you're continuing to do it because you know that there's

very little I can do. But, what you are doing is putting the sand over your head, as we speak, with every one of these letters.

>> (DE 351 at 36).

**\*9** And critically, Bourgeois' insistence that he bore no culpability for JG1999's death compounded the challenges trial counsel faced. The Constitution guaranteed that Bourgeois, if he so chose, could have his day in court. His truculent assertions of innocence in light of overwhelming evidence, however, limited his counsel's strategic choices. Aside from a brief flirtation with pleading guilty immediately before trial to save AB1994 from testifying (PX–8 at 31), Bourgeois eschewed any discussion of a favorable plea. Notwithstanding the highly incriminating evidence against him, Bourgeois took the stand in both phases of trial to blame his wife for JG1999's death. These vocal protestations of innocence posed a dilemma for counsel. Counterpoised between Bourgeois' persistent attempt to deflect responsibility and the character of the evidence against him, his attorneys were sometimes required to present inconsistent information to the jury.

**III. The Trial**

**A. Guilt/Innocence Phase**

The Government called three groups of witnesses in the guilt/innocence phase. First, several individuals put the murder into context. Witnesses described Bourgeois' first delivery on the day of the murder, his entry onto the naval base, the breakdown of his truck before reaching the warehouse, and the events immediately after he killed. The Government called several witnesses who observed Bourgeois' reaction to his daughter's life-threatening injuries, describing him as casual, preoccupied with making his deliveries, and indifferent. An FBI agent summed up Bourgeois' attitude: "He seemed to be more concerned about the delivery of his next load than he was about the welfare of his soon to be deceased daughter[.]" (DE 338 at 102). Other law enforcement witnesses described their interaction afterward with Bourgeois and Robin. They explained how Robin's story broke down as the victim died.

Second, forensic witnesses described the injuries JG1999 sustained at her father's hands, both on the day of the murder and weeks before. Carole McLaughlin, a registered nurse on duty when JG1999 arrived, observed injuries on the infant such

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

as bruising around the eyes, swollen extremities, and hard, calloused hands and feet. Dr. Noorullah Akhtar testified that JG1999 was "virtually dead" when she arrived at the hospital. (DE 344 at 95). He opined that falling from a truck could not cause the extensive blood in and edema of JG1999's brain. Instead, her injuries were equivalent to her falling "four or five stories, head first, on a hard floor." (DE 344 at 93). A CT scan showed "blood in all areas in and around the brain, and the brain is swollen." (DE 344 at 96). The injuries were so severe that JG1999 would not last long. When Dr. Akhtar told Robin that information she cried; Bourgeois "didn't show much expression or grief." (DE 344 at 97). In addition to the blood in her eyes, Dr. Ronald R. Kuffel, Jr., an ophthalmologist, observed several recent head injuries, including a fresh hemorrhage on the right of her head above the hair line.

*10 Dr. Elizabeth A. Rouse performed the autopsy which revealed both the severe head injuries that caused her death and numerous non-lethal wounds all over her body. Of the ten different head injuries, Dr. Rouse identified internal injuries corresponding to the external wounds. Other than the brutal head wounds, Dr. Rouse observed scratch marks near the ears, deep injuries to the hands and feet, looped injuries as if struck with an electrical cord, burns possibly from a cigarette lighter, and deep tissue bruising in nearly every part of her body.

Dr. Scott Anthony Benton, a medical doctor who had examined JG1999 a month before her murder, reviewed the autopsy photographs. He observed a completely different child; none of the injuries had been present before. Aside from intense head injuries, he also saw evidence of abuse all over her body. Of particular note, he concluded that there was some evidence of vaginal trauma since his earlier examination. (DE 346 at 45–46). Another witness testified that rectal swabs taken from the victim after her death suggested the presence of semen.

William Russell Oliver, an expert in forensic pathology and forensic imaging, enhanced the autopsy photographs to accentuate the external injuries. He estimated that she had suffered the following external injuries: 25 to 26 whip marks, 78 healed scars, 73 to 105 nonspecific contusions, 8 pattern contusions, 9 to 10 abrasions or excoriations, 7 to 9 healing ulcerations, a possible bite mark, and three lacerations. (DE 345 at 226). Dr. David Senn, a forensic odontologist, could not exclude Bourgeois, Robin, or AB1994 as the probable biter for

an injury on JG1999's arm. He could, however, exclude Robin and AB1994 as the possible biters for wounds on her back, leaving Bourgeois as the only possible biter with access to JG1999. Another forensic odontologist, Dr. Bryan Chrz, agreed that Bourgeois was probably the one who bit JG1999 on the back.

The final category of testimony came from the witnesses who observed Bourgeois' unrelenting, escalating, and homicidal abuse, saw the effects of the beatings, or heard his confessions to those acts. Some witnesses described seeing various injuries on JG1999's body, most of which Bourgeois attributed to her natural mother. The Government called three inmates—Darick Moore, Orlando Campos, and Wiley Taylor—who had been housed in county jail facilities with Bourgeois. These men explained that Bourgeois initially claimed that the victim died in an accident, but later, "as he ... got comfortable, he started like telling [them] really what happened." (DE 344 at 205). Bourgeois said he killed his daughter and was going to make it look like an accident. (DE 344 at 219). Bourgeois admitted that he beat JG1999 with several objects. Bourgeois described his daughter as a "bad child" who "[u]sed to shake her butt all the time[.]" (DE 344 at 205). Also, Bourgeois described "with pride" how he beat his wife. (DE 344 at 219).

*11 Bourgeois' sister Claudia Williams testified that he had made comments foreshadowing the murder. He told Ms. Williams: "You get your black dress out.... I'm just going through a lot. I don't know what I'm going to do." (DE 223 at 8). Ms Williams became so concerned that she asked Robin if Bourgeois had any weapons in the truck. (DE 223 at 9).

The most damning testimony of the trial came from those who observed Bourgeois' cruelty firsthand. Robin Bourgeois was asleep when her husband murdered JG1999, but she could still describe his incessant prior abuse and his manufacture of the story afterward. The most chilling testimony came from AB1994 as she described how her father killed her little sister. She credibly, and bravely, chronicled the events leading to the murder and sadly reported on how her father killed JG1999. Nothing weakened her testimony or challenged her version of events.[FN13]

> FN13. In his Motion to Vacate, Bourgeois brazenly argues that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

[t]rial counsel also failed to present readily available evidence through either crossexamination or through the presentation of live witnesses of the bad character and reputation in the community of Robin and AB–1994 for being truthful and honest. The credibility of these witnesses was critical to the Government's case—simply put, if the jury believed either of these witnesses Petitioner was going to be convicted.

(DE 396 at 61). Bourgeois has not supported his accusations with any evidence calling AB1994's credibility or honesty into question. Any attempt by trial counsel to impugn her credibility would have seriously backfired. This Court vividly remembers AB1994's heart-wrenching account of her father's abuse and murder. Time cannot obscure her forthright testimony and its effect on the jury. The only lies AB1994 told were those she initially conveyed at Bourgeois' direction. The jury accepted her eyewitness testimony of the murder as a valid report of how Bourgeois killed his daughter, and Bourgeois has given the Court no reason to supercede its judgment.

After the Government rested, the defense moved for an instructed verdict, arguing that insufficient evidence proved Bourgeois' guilt and his premeditation for the murder. The Court denied the motion.

Notwithstanding the overwhelming evidence against Bourgeois, the trial attorneys followed their client's instructions. The cross-examination of witnesses tried to place reasonable doubt on whether Robin could have been the killer. Bourgeois himself was the only witness called by the defense in the guilt/innocence phase. Bourgeois' testimony stuck to the same story he told investigators: that JG1999 fell from the truck. Notwithstanding the extensive credible testimony about the abuse JG1999 had suffered, Bourgeois testified that he never harmed her, never touched her inappropriately, and never killed her. (DE 338 at 5–6). A blistering cross-examination left Bourgeois looking even worse before the jury. Bourgeois admitted that he had disciplined JG1999 twice by spanking her, but disclaimed any other abuse. As the Government asked about the numerous injuries found on the infant's body,

Bourgeois began supplying implausible excuses for each wound. With some injuries, such as the whip marks found on her thighs, Bourgeois denied having any knowledge about them. Instead, he cast blame on Robin Bourgeois. When asked to explain testimony that inculpated him, such as that given by his sister and others, he accused the witnesses of lying. Even with all the testimony showing his detached and indifferent demeanor about the loss of his baby, he unpersuasively claimed: "How can you say I'm not upset. I lost my baby. Yes, I'm upset I'm highly hurt by this." (DE 338 at 54).

The parties delivered their closing arguments on Tuesday, March 16, 2004. The Government emotionally and forcefully outlined the evidence showing that Bourgeois abused and killed the victim, emphasizing that Bourgeois had planned to kill his daughter beforehand. Both Mr. Tinker and Mr. Gilmore made closing arguments in the guilt/innocence phase. Mr. Tinker begged the jury not to be swayed by emotion and the horrible circumstances of the victim's death, but to look at the facts. Like Bourgeois' own testimony, Mr. Tinker tried to pin the murder on Robin Bourgeois. He hoped that the jury would find that she had a motive to kill the child and had abused the little girl herself. He tried to minimize the testimony about Bourgeois' indifferent actions after the murder. In the event that the jury believed Robin and AB1994's account, Mr. Tinker discounted the testimony showing intent and premeditation, making the murder an act of momentary anger.

**\*12** Mr. Gilmore also briefly argued that the Government had ignored Robin Bourgeois' role in the killing. He characterized Robin Bourgeois as one whose evolving story increasingly blamed Bourgeois as it exculpated herself.

The jury deliberated for less than two hours before finding Bourgeois guilty of both counts in the indictment.

**B. Sentencing Phase**

The defense's focus shifted to securing a life sentence for Bourgeois. Months before trial, the mitigation experts had interviewed many of Bourgeois' friends and family members. Although their reports of each conversation were brief, the investigators gave trial counsel and their expert Dr. Cunningham an outline of Bourgeois' background. As the actual sentencing hearing approached, trial counsel were still deciding precisely which witnesses to call, depending on the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 15

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

case put on by the Government. Before the hearing, defense counsel rented a conference room in a hotel nearby the courthouse. Over the course of a day, the attorneys spoke with approximately 50 individuals, shifting through their testimony to find that which would benefit and not harm Bourgeois. Trial counsel also still had to make difficult decisions about using its expert witnesses, including whether to call Dr. Cunningham to the stand.[FN14]

> [FN14.] For instance, on the first day of the sentencing hearing the Court noted that trial counsel did not want the jury instructed before proceeding on specific mitigating factors but "want[ed] to build their case as it goes along." (DE 348 at 7). The defense chose to have the mitigating factors listed in the jury's final charge.

The sentencing hearing began on Monday March 22, 2004. The course of the Government's case would shape the defense's response. The prosecutor's opening promised to bring forth witnesses who would "testify about Alfred Bourgeois, about the last couple of decades of [his] life, so you know who this Defendant is; other acts of cruelty and violence he has committed, so that you may use those and apply those with what you have already heard." (DE 348 at 24).

As a threshold matter, the jury had to find that Bourgeois intentionally killed the victim. Also, the Government alleged as statutory aggravating factors: that (1) Bourgeois killed in an "especially heinous, cruel, or depraved manner" that involved "torture and serious physical abuse"; (2) he killed after "substantial planning and premeditation"; and (3) JG1999 was "particularly vulnerable due to her youth." Non-statutory aggravating factors included that (1) Bourgeois "is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to the lives and safety of others"[FN15] and he "caused injury, harm, and loss to the family of JG1999 because of [her] personal characteristics as an individual human being and the impact upon the victim's family." The instructions required the jury to find any of those issues beyond a reasonable doubt.

> [FN15.] The Government alleged that Bourgeois had (a) threatened others with violence, (b) demonstrated low rehabilitating potential, and/or demonstrated lack of remorse.

The defense alleged that it had proven the following mitigating factors by a preponderance of the evidence: (1) Bourgeois had an impaired capacity to understand the wrongfulness of his conduct; (2) he was under "unusual and substantial duress"; (3) he did not have a "significant prior history of other criminal conduct"; (4) he committed the offense under "severe mental or emotional disturbance"; and (5) other relevant information. As non-statutory mitigating factors, the defense hoped the jury would find that (1) Bourgeois had been abused as a child; (2) other persons "who may be culpable in the offense may not be punished"; (3) he was "under stress from family and economic factors"; and (4) at the time of the offense he "was driving across the country with three children and one other adult in the cab of an 18–wheeler truck."

**\*13** The Government adduced the following information in the punishment phase:

• Bourgeois' mother-in-law Veronica Batiste who described how, while Robin was in the hospital giving birth to AB2001, Bourgeois confronted Mrs. Batiste at her home. When Mrs. Batiste expressed disapproval of how Bourgeois abused Robin, he responded: "I'll beat her if I want. That's my fucking wife." (DE 348 at 35). After a heated, profanity-laden tirade by Bourgeois, she asked him to leave. He punched her in the mouth, grabbed a lamp and struck her with it, and then continued beating her. AB1994 witnessed the whole confrontation. (DE 348 at 35–37). Felony charges from the incident remained pending at the time of trial. (DE 348 at 38). At Bourgeois' wedding he fought with his brother-in-law when he told Bourgeois never to beat Robin. (DE 348 at 42–43). Bourgeois repeatedly hit Robin, including at a neighborhood gas station. (DE 348 at 48).

• A young nephew testified that once while driving Bourgeois got angry, pulled him from the car, and held him by the feet over the side of a high bridge. (DE 348 at 52–53). Bourgeois laughed as the scared child cried. That same day, Bourgeois again held the child by his ankles over a pier at a boat launch. (DE 348 at 53–54). Another time, Bourgeois repeatedly dunked the child who could not swim well under the water, even after he threw up from swallowing so much water. (DE 348 at 56–57). Once, Bourgeois woke the child from his sleep by grabbing his ankles. Bourgeois swung him around until the child's head hit their dog. (DE 348 at 55).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 16

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

• Bourgeois' first wife, Sheila Bourgeois described how during their four-month marriage Bourgeois argued with her, pushed her, and choked her, even when she was pregnant. When he pushed her over a chair and she "busted up" her nose, she left him. (DE 348 at 61–62).

• Another ex-wife, Cynthia Bourgeois, explained how her young child from another relationship would "shake every time [Bourgeois] would come in her presence." (DE 348 at 70). Once when Bourgeois took the girl away alone she returned with a "big knot" on her head, a swollen forehead, a limp, and a mark like a footprint on her back. (DE 348 at 70–71). The child said that Bourgeois "had pulled her hair out, put her head in the commode." (DE 348 at 74). Cynthia left her husband and never let him see the child again.[FN16]

> FN16. Trial counsel's cross-examination showed that she only divorced Bourgeois after she had an affair. (DE 348 at 79). Bourgeois had hired an investigator to follow her and prove she was committing adultery. (DE 348 at 79).

• Another wife, Gaynell Belvin James, testified that one time after she divorced Bourgeois she let him take their son for the day. The three-year-old child returned "very shaky, nervous" and "withdrawn" with a bruise on his thigh. (DE 348 at 82). The child was too afraid to go with Bourgeois again for many years. When he was thirteen, Bourgeois took him for what was supposed to be a day. Bourgeois kept him for a month. (DE 348 at 87).

• Another wife, Gaynell Collins Bourgeois, testified that Bourgeois had a bad temper. During their marriage he would push and choke her. (DE 348 at 100). Bourgeois had an affair with Robin and got her pregnant while married to Gaynell. She saw Bourgeois repeatedly hit Robin while she was pregnant. (DE 348 at 102).

*14 • Before trial, Bourgeois told a Deputy United States Marshal, "If I was going to hit somebody, I would hit you." (DE 348 at 108). Later, Bourgeois lunged at the officer during a transfer. (DE 348 at 109).

• Bourgeois' cousin, Isaac Bourgeois, III, got in a scuffle with Bourgeois over insults to his mother. Bourgeois bit his

pinky finger to the bone. (DE 348 at 115). The next day Bourgeois and his brother Lloyd confronted Isaac and his mother with pistols and threatened to kill them. They then got in Lloyd's truck, circled around the two, and told them they "could die today." (DE 348 at 116). Bourgeois was convicted of disorderly conduct as a result of the incident. (DE 348 at 118). Isaac's mother, Beatrice Bourgeois, also testified about the event. She explained that, while Lloyd later apologized for the assault, Bourgeois never did. (DE 348 at 124).

• Inmates testified about Bourgeois' incriminating admissions and threats while incarcerated before trial.[FN17] Bourgeois knew that inmate Adam Longoria was a member of the Texas Syndicate prison gang. When a jailor jokingly told Bourgeois that Longoria was a hit man, Bourgeois communicated that he wanted his cousin Lisa Monroe killed because "he wrote a threatening letter to her, and she turned it in to the Judge." (DE 348 at 155). He said he also wanted his wife and girlfriend "eliminated." (DE 348 at 155–56, 162). Bourgeois gave Longoria "names, addresses and everything." (DE 348 at 156). He promised that his brother Lloyd would give Longoria "[a] $100,000 18–wheeler, and names of people for drug runs[.]" (DE 348 at 157, 162). Bourgeois confessed that he beat JG1999 "[w]ith a bat, some extension cords." (DE 348 at 166). Bourgeois told inmate Orlando Campos that he "beat[ ] up his ex-girlfriends" and "was going to kill [Robin] when he got out[.]" (DE 341 at 81). He told Wiley Taylor and Darick Venore Moore that he beat his wives and girlfriends. (DE 341 at 82, 87). He told Taylor he "was trying to have [Robin] killed ... so that she wouldn't testify against him." (DE 341 at 83). Bourgeois also confessed that he and his brother made most of his money from running drugs and illegal aliens (DE 341 at 83, 87).

> FN17. In a carefully crafted instruction, the Court informed the jury that "the parties have stipulated that as of January 23 of the year 2003, as part of the terms and conditions of Mr. Bourgeois's confinement, he was prohibited from communicating with any other inmate. He could only communicate with his attorneys or guards or the Court." (DE 348 at 144).

• Robin Bourgeois testified that Bourgeois admitted that he did not have a conscience. (DE 248 at 188). Robin read a lengthy letter that Bourgeois had written to her uncle. (DE

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

348 at 188–211). Bourgeois intended her uncle to tell Robin about the letter's contents. In the letter, Bourgeois repeatedly insulted Robin and accused her of dishonesty. Bourgeois wrote: "in the name of God, Robin['s] days will be short. That niece of yours will have a short life." (DE 348 at 196, 199). Robin understood the letter to be a threat against her. (DE 348 at 211). Bourgeois' letter also alternated between accusing Robin of killing JG1999 and writing that she "fell out of the truck." (DE 348 at 202). He claimed: "All this shit about extension cord beatings, biting this child, brutalizing this child, your niece told those people all this." (DE 348 at 198, 203). Bourgeois discussed extensively his view of the forensic evidence in the case. (DE 348 a 206–08).

**\*15** • JG1999's grandmother provided sympathetic victim-impact testimony about the toddler's life. (DE 348 at 219–41).

• An FBI agent's testimony further indicated that Bourgeois was a liar and manipulative. (DE 348 at 249–51).

On the first day of the punishment hearing, the Government called Dr. Estrada to testify. As anticipated by the parties' agreement to his appointment as a witness, Dr. Estrada's testimony both hurt and helped Bourgeois' case. Dr. Estrada, a psychiatrist, conducted an evaluation of Bourgeois before trial which included reviewing letters and phone calls Bourgeois made while incarcerated.

Dr. Estrada briefly testified for the Government, primarily identifying aggravating psychological issues from his testing. Dr. Estrada opined that Bourgeois had a "narcissistic personality disorder" which made his "basic motivation in life ... the aggrandizing of his self-esteem." (DE 348 at 284). He "need[ed] to have this continuous positive feedback for [his] self-esteem [.]" (DE 348 at 284). Bourgeois' narcissism made him "lively, likeable. exciting, interesting, sometimes very persuasive or charismatic," but his self-interest would inevitably "result in friction that may lead to simply break-up of relationships ... or actual violence." (DE 348 at 285). As a function of his narcissism, Bourgeois' self-reporting to Dr. Estrada exposed that he was a liar.[FN18]

> **FN18.** For instance, while Bourgeois claimed to lose consciousness from a car accident, Dr. Estrada could not corroborate that. (DE 348 at 276). Also, Dr.

Estrada could not confirm that Bourgeois was as wealthy as he claimed to be. (DE 348 at 276).

Dr. Estrada also found that Bourgeois met "a number of specific items that have been found associated with violence" such as "being the subject of rejection, neglect, and abandonment, being the survivor of actual physical or sexual or emotional abuse," all of which can create "a very high predisposition for violence as adults." (DE 348 at 281). Because of that background, Bourgeois had "a much higher tendency toward violence than an ordinary person." (DE 348 at 285). In sum, Dr. Estrada found Bourgeois to be both narcissistic and violent.

The defense began its case for mitigation through the much-longer cross-examination of Dr. Estrada which left the jury with a more sympathetic picture of Bourgeois' life.[FN19] Dr. Estrada began by putting Bourgeois' early life into context. He was the child from an illegitimate relationship. He did not know his father when young. His mother singled him out for abuse. (DE 341 at 24). Importantly, Dr. Estrada showed how Bourgeois' early life transformed him into a violent adult. Dr. Estrada explained that, when he asked about abusive childhood, Bourgeois was "initially kind of vague and a little reluctant." (DE 341 at 22). Dr. Estrada was not surprised because "individuals who later may be abusive of their own children ... either gloss over or give excuses to their own parents' neglect or abuse." (DE 341 at 23). Bourgeois "had suffered neglect and rejection, and there was some physical abuse by his mother." (DE 341 at 23).

> **FN19.** This tactic allowed trial counsel to argue in closing that Dr. Estrada "is their expert. Dr. Estrada is some who—who they say you as a jury should believe. They wouldn't put him on there if they didn't think that you should be able to rely on what he tells you." (DE 342 at 57).

Dr. Estrada tied the abuse of JG1999 to Bourgeois' background and the stressors he felt at the time. Dr. Estrada explained that adults who abuse their children had commonly been abused themselves. (DE 341 at 39). Bourgeois lived in a "family or subcultural type of environment where a certain measure of violence in family relationships is accepted[.]" (DE 341 at 45). Because of his own abused childhood and the lack of cultural opprobrium of abuse, "[i]t is not unusual in that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

culture or context to be physically harsh in the disciplining of children." (DE 341 at 47). The stress Bourgeois found himself under exacerbated his violent tendencies. Dr. Estrada explained:

**\*16** My opinion was that Mr. Bourgeois at the time was going through a number of stresses. Number one, he was-discovered that he had had an affair and a child as a result of that affair. He was very angry about that. Second, he was under financial stress with debts. Third, he had a serious marital problem with his wife, they had been arguing about a number of things, and their mutual affairs. And they were in a confined situation that made any little accident in the toilet the trigger for an explosion of anger that came from a number of different directions, and ended up focus[ed] on the child.

(DE 341 at 41). Notwithstanding his problems, Dr. Estrada opined that Bourgeois was not a sociopath. (DE 341 at 66).

Dr. Estrada explained that Bourgeois was hard working, had a successful career as a trucker, and had no history of violence outside the family context. (DE 341 at 46). Because he had "a pattern of abusive relationships again and again and again," Dr. Estrada opined that Bourgeois would continue to be violent "in a family situation." (DE 341 at 50). Dr. Estrada, however, could not reliably predict whether "the conditions in which he will be in the future are going to be such that will allow [violent] behaviors to manifest itself or not." (DE 341 at 50, 51). Dr. Estrada conceded that with "higher ... supervision available" Bourgeois would have a "lesser degree of all kinds of violent incidents[.]" (DE 341 at 52). Dr. Estrada could not predict how Bourgeois would act in a prison situation, but he anticipated Bourgeois would be in a highly structured environment and, given his age, would adjust better than others may. (DE 341 at 51–52).

The Government's redirect of Dr. Estrada questioned whether Bourgeois had actually suffered abuse as a child. (DE 341 at 54–56). The Government, however, got Dr. Estrada to agree to this summary of his testimony: "he's self-centered, ... he's angry, and ... he has a high risk towards violence." (DE 341 at 62).

The record plainly shows that trial counsel struggled with which other witnesses to call. (DE 341 at 5). At the time of trial, the defense had "a whole room full of witnesses[.]" (DE 342 at 91–92). Of those, trial counsel selected three people to testify in the penalty phase, each of whom knew Bourgeois as a child. Bourgeois' sister Michelle Denise Armont, his cousin Carl Kevin Henry,[FN20] and former neighbor Herman Clayton, Jr., described his impoverished and abused childhood. The witnesses described how Bourgeois "suffered a lot of abuse ... from his mother." (DE 341 at 113). He received many "whippings." (DE 341 at 125). His mother singled him out for abuse and even "whipped [him] for something someone else did[.]" (DE 341 at 125). His mother would also "chastise" him severely. (DE 341 at 114). The witnesses described some specific incidents displaying his mother's cruelty. She would clean his nose with her long fingernails "and as time go on it developed a real, real bad sore" that "always would be bloody." (DE 341 at 114). His mother would "whip[ ] him with the extension cord from the fan" (DE 341 at 114). One time she threw the telephone receiver at him and hit him in the head. (DE 341 at 115). This abuse continued until he reached high-school age. (DE 341 at 115).

> FN20. Bourgeois insisted that trial counsel call Mr. Henry as a witness. The Government impeached Mr. Henry, a former police officer, with his prior convictions for insurance fraud.

**\*17** During his childhood, Bourgeois went to live with Mary Clayton, an elderly neighbor who everyone called Ms. Mary. (DE341 at98). Ms. Mary repeatedly asked Bourgeois' mother to let him come live with her. Conditions improved for him as Ms. Mary "made sure that he had all his basic needs as far as going to school, his clothing, his books, and all his necessities[.]" (DE 341 at 116). Even so, children in the neighborhood teased him, primarily because his father was not around. (DE 341 at 116). His siblings joined in the teasing. When Ms. Mary died, Bourgeois went to live with his sister, Ms. Armont. (DE 341 at 99). He did not move back in with his mother "because there was a conflict that he had with his mother at that time[.]" (DE 341 at 99). Bourgeois had a temper and would "get[ ] red in the face," but his sister could usually calm him down. (DE 341 at 100). Despite her past abuse, however, Ms. Armont testified that Bourgeois and his mother "resolved the problem [in] the end[.]" (DE 341 at 98).

Bourgeois also addressed the jury himself in the punishment phase. He told jurors:

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

My sympathy goes out to the soul of JG1999, my baby, her family, relatives and friends, and I'm very sorry for the death of my child. It's a hurting pain and a sorrowful thing that happened. And I feel or believe that I have been wrongfully accused of this crime that I've been convicted for....

So I feel like you all have been misled and I've been wrongfully convicted, and I'm just sorry for the pain and suffering, that I've been wrongfully accused for the death of my baby, and I did not kill my baby.

I just want to close with that I loved JG1999, she's an infant that didn't actually come in this world and I think the real murderer got off with this crime. I just think you all should know that I have been wrongfully convicted. I feel my wife had a lot to do with this and she walked away free, and I just had to say this. If I never get an opportunity to say this to nobody else, my family, Katrina's family, JG1999 came from a lovely family. When I picked her up, when she got in my custody I had no problems with JG1999. She was a lovely kid, very lovely. I realize some of the pictures that you all seen in the swimming pool, I will say I was a little rough like that. I'm like that with all my children. And I just feel you all have been wrongfully misled.

I just think I want to close with that, saying that I love my baby, I love her family, I love my family. And I thank each and every one of you for participating, the lawyers for the job they did, and for everybody that communicated. And God bless all of you all.

(DE 342 at 23–24).

Mr. Gilmore's closing argument began with the recognition that defense counsel faced a daunting task: "[I]t's difficult for me to come up here and argue to you about this punishment and what you're going to do [to] him knowing that [Bourgeois] maintains his innocence, and knowing that you don't believe that [.]" (DE 342 at 45). The bulk of his argument, however, assumed that Bourgeois killed JG1999. After discussing the jury's role, Mr. Gilmore discussed mitigating factors in Bourgeois' background. Mr. Gilmore highlighted that "his brothers and sisters made fun of him. And his mother singled him out for abuse." (DE 342 at 47). Mr. Gilmore argued that Bourgeois' abused background was not an excuse, but put

context into the crime. The highly stressful environment around Bourgeois—with economic, marital, and other difficulties—compounded lingering problems from his childhood. In the context of the events swirling around Bourgeois, Mr. Gilmore encouraged the jury to find that he "snapped. Intending to discipline her, ... it got out of hand and it ended up killing her. That's not to excuse his behavior; it's to—in an attempt to try to explain what happened." (DE 342 at 50). Mr. Gilmore urged the jury to find that life imprisonment would be a sufficient, and violence-inhibiting, punishment for Bourgeois.

**\*18** Mr. Tinker emphasized the severity of a life sentencing, including the high security that would surround Bourgeois. Mr. Tinker also wanted the jury to understand "who is Alfred Bourgeois?" (DE 342 at 58). He discussed how Bourgeois was an "unwanted child in a large family" with a mother who abused him. (DE 342 at 56). He discussed how, notwithstanding his turbulent background, Bourgeois finished high school and worked as a trucker. Still, his poor home life—where "he grew up in a society where it was accepted conduct to hit children with items, sticks, switches, electrical cords"—was the "kind of rearing Alfred Bourgeois had and that's why he is what he is today." (DE 342 at 60). His culture allowed that violence as a means of dealing with other stressors, independent of the child's actions. (DE 342 at 61). But even so, Mr. Tinker argued that living his life in "a cage within a cage within a cage" would prevent him from acting violently. (DE 342 at 63). Mr. Tinker then begged the jury not to impose a death sentence. (DE 342 at 66).

The jury instructions required a death sentence if the jury unanimously found that the aggravating factors outweighed the mitigating factors. After five-and-a-half hours deliberation, the jury returned a verdict of death. The jury found that the Government had proven all of the aggravating and non-aggravating mitigating factors. The jury only found that Bourgeois had shown two mitigating factors: six jurors found that he was under stress and all found that he was driving across the country. (DE 299). The Court sentenced Bourgeois to die by lethal injection. (DE 303).

### IV. Appeal

Mr. Gilmore and Mr. Tinker represented Bourgeois on appeal to the Court of Appeals for the Fifth Circuit. Bourgeois'

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

appeal focused on the constitutionality of the aggravating factors that made his a death-eligible offense. Specifically, Bourgeois raised four claims:

(1) the government failed to charge any aggravating factors in the indictment, (2) the FDPA statutory-intent factor that renders a defendant with a reckless state of mind eligible for the death penalty violates the Eighth Amendment, (3) the district court erred when it delegated to the Director of the Federal Bureau of Prisons supervision over Bourgeois's execution, and (4) the aggravating factors used in his sentencing were vague and ambiguous.

*United States v. Bourgeois,* 423 F.3d 501, 502 (5th Cir.2005). In a detailed opinion, the Fifth Circuit found no reversible error. The Fifth Circuit commented that: "This is not a close case. Bourgeois fails to prove that there was any error, much less plain error, in any aspect of his trial. Bourgeois's conviction and sentence are, in all respects, AFFIRMED." *Id.* at512. The United States Supreme Court refused certiorari review. *United States v. Bourgeois,* 547 U.S. 1132, 126 S.Ct. 2020, 164 L.Ed.2d 786 (2005). [FN21] The instant proceedings followed.

> FN21. Keith S. Hampton and Adrienne Urrutia represented Bourgeois before the United States Supreme Court.

**V. Post–Judgment Proceedings and Evidentiary Hearing**

**\*19** This Court appointed counsel to represent Bourgeois in this post-judgment action. Bourgeois filed a lengthy Motion for Relief Pursuant to 28 U.S.C. Section 2255 or in the Alternative Pursuant to 28 U.S.C. 2241. (DE 396). Bourgeois also filed a Memorandum of Law in support of his motion. (DE 402). Federal law focuses a 2255 action on whether an inmate's sentence "was imposed in violation of the Constitution or laws of the United States, or that the Court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255. "Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice." *United States v. Vaughn,* 955 F.2d 367, 368 (5th Cir.1992). Section 2255 actions are not aretrial. *See United States v. Kastenbaum,* 613 F.2d 86, 89 (5th

Cir.1980) ( "The guilt or innocence of the defendant is not in issue on a § 2255 proceeding, but rather the validity and the fairness of the proceedings against him."). By this point, the presumption of innocence has run its course and the inmate appears as one lawfully convicted. *See Strickland v. Washington,* 466 U.S. 668, 697, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ("[T]he presumption that a criminal judgment is final is at its strongest in collateral attacks on that judgment."); *United States v. Cervantes,* 132 F.3d 1106, 1109 (5th Cir.1998) ("Following a conviction and exhaustion or waiver of the right to direct appeal, we presume a defendant stands fairly and finally convicted."). A movant bears the ultimate burden of establishing his claims of error by a preponderance of the evidence. *See Wright v. United States,* 624 F.2d 557, 558 (5th Cir.1980).

Bourgeois' section 2255 motion raises the following grounds for relief:

1. Bourgeois suffers from mental retardation, making him ineligible for execution under *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and the Federal Death Penalty Act.

2. Trial counsel provided ineffective assistance at the punishment phase of trial by failing to present available mitigating evidence, including that of his alleged mental retardation.

3. Bourgeois' conviction violates due process because the fatal injury occurred outside the Territorial Jurisdiction of the United States. Trial counsel should have disputed the location of the crime.

4. Trial counsel provided ineffective assistance by failing to present available expert testimony that would have shown that Bourgeois did not sexually assault the victim.

5. Trial counsel provided ineffective assistance by not litigating a *Daubert* challenge to testimony from Dr. Senn and Dr. Chrz concerning bite-mark evidence.

6. Trial counsel provided ineffective assistance by not litigating a *Daubert* challenge to testimony from Dr. Oliver concerning the digitally enhanced autopsy photographs.

**\*20** 7. The Government violated its duty under *Brady v.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

*Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose that four inmates were promised some benefit for testifying against Bourgeois.

8. Trial counsel labored under a conflict of interest because of his representation of clients associated with this case.

9. The Government engaged in misconduct by making improper argumentative statements in the guilt/innocence and penalty phases.

10. Trial counsel provided ineffective assistance by not rebutting evidence of Bourgeois' indifferent demeanor at trial.

11. A witness improperly relied on Bourgeois' interactions with counsel as a basis to formulate an adverse opinion about him.

12. Appellate counsel provided ineffective assistance by failing to advance several claims.

13. The cumulative effect of the claimed errors results in a constitutional violation.

14. The method by which the Government would carry out Bourgeois' execution violates the Constitution.

Respondent filed an answer and motion to dismiss arguing that Bourgeois' claims are all either procedurally insufficient or substantively without merit. (DE 442). Afterward, Bourgeois filed a motion asking the Court to hold an evidentiary hearing on his claims. (DE 460). A court should hold an evidentiary hearing and make findings of fact, "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." § 2255(b); *see also* Rule 8, RULES GOVERNING SECTION 2255 PROCEEDINGS FOR THE UNITED STATES DISTRICT COURTS (requiring an evidentiary hearing when "warranted"). The Court held oral arguments on April 20, 2010, to designate the issues needing resolution through an evidentiary hearing. (DE 496). In the end, the Court has, to a greater or lesser extent, allowed Bourgeois to present testimony and evidence supporting nearly all his section 2255 claims. This Court has liberally allowed Bourgeois to prepare the factual basis for his post-judgment claims through expert and investigative assistance. The parties

have developed a rich factual record through the submission of written interrogatories, declarations, and record documents.

The Court held a week-long evidentiary hearing for the parties to present witnesses.[FN22] Testimony during that week often extended long after normal court hours. Aside from the witnesses called during that hearing, the Court has heard testimony at different dates and allowed the taking of video depositions of other witnesses.[FN23] The Court has spent many hours reviewing the testimony of the out-of-court witnesses. The Court has afforded Bourgeois a full and fair opportunity to develop his arguments.

> FN22. Bourgeois called the following witnesses in the hearing: Dr. Victoria Swanson, Dr. Donald Weiner, Dr. Jethro Toomer, Kathleen Kaib, Claudia Williams, Beverly Frank, Brenda Goodman, Dr. Mark Cunningham, Carl Henry, Donald Reese, Murray Bourgeois, Jon Dailey, George Walker Holden, Jennifer Valdez, Dr. Charles Michael Bowers, John Gilmore, Kerry Brown, Timothy Allen, and Gerald Bierbaum. The Government called Danny Clark, Robert Patterson, William Shotts, Christopher Key, Rhonda Davis, Dr. J. Randall Price, and Dr. Roger Bryan Moore, Jr.

> FN23. On September 10, 2010, the parties deposed Dr. Carlos Estrada. On that same date, Dr. Michael M. Gelbort gave live testimony in this Court. Most of the witnesses testified in the evidentiary hearing held from September 20 through September 24, 2010. The parties deposed Dr. William Russell Oliver and Dr. Manfred Schenk on October 28, 2010. The parties also took additional deposition testimony from Dr. Randall Price on November 10, 2010. They also deposed Dr. Jan. E. Leetsma on January 10, 2011. On January 13, 2011, the Court heard testimony from William Edward May, Jr., James Sales, Dr. Elizabeth Aldrich Rouse, Debra Hohle, and Patti Hubert Booth.

The witnesses and evidence before the Court fall into three groups. First, Bourgeois called witnesses who challenged particular pieces of forensic evidence presented at trial. Specifically relating to claims 3, 4, 5, and 6, witnesses alleged that the Government's case at trial relied on inaccurate evidence about where Bourgeois killed JG1999, whether he

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

sexually assaulted her, and if he was the one who bit her. Second, several witnesses provided testimony relating to claims 1 and 2. This testimony included testimony from trial counsel Mr. Gilmore, one of Bourgeois' trial investigators, and people who knew him while growing up. Importantly, experts provided detailed testimony about Bourgeois' alleged intellectual and psychological deficiencies. Finally, witnesses provided information about Bourgeois' seventh claim that the Government withheld the fact that it had made deals with trial witnesses. These three categories of witnesses inferentially provided testimony relating to the remaining claims, such as that the cumulative effect of the alleged errors prejudiced Bourgeois.

**\*21** The Court will address the relevance, importance, and credibility of each post-conviction witness' testimony in conjunction with the related ground for relief.

### PROCEDURAL ADEQUACY OF BOURGEOIS' CLAIMS

Before turning to the substance of Bourgeois' claims, he must show that he brings them before the Court in a procedurally adequate manner. Respondent argues that Bourgeois has defaulted claims 3, 7–9, 11, 13, and 14 by not raising them on direct appeal. Post-judgment relief exists only for errors that an inmate could not raise on direct appeal. *See Massaro v. United States,* 538 U.S. 500, 504, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003) (finding that, with the exception of ineffective-assistance-of-counsel claims, "claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice"). Bourgeois could, and should, have raised some issues on direct appeal. For instance, his allegations that the Government did not prove the jurisdictional element of his crime beyond a reasonable doubt (claim three); the Government's closing argument amounted to prosecutorial misconduct (claim nine); and a witness' testimony improperly relied on Bourgeois' trial demeanor to form an opinion (claim eleven), all rest on the trial record. Also, as the Court will discuss later, his fourteenth claim that attacks the Government's method-of-execution is not properly before the Court. The merits of those claims are not fully available for the Court's consideration.

However, the Court also finds that aspects of the challenged claims extend beyond the record as it existed on appeal. For instance, a portion of Bourgeois' third claim imputes ineffective assistance to trial counsel for failing to

challenge the Government's proof of jurisdiction. Bourgeois' *Brady* claim (claim seven) and his conflict-of-interest claim (claim eight) both involve factual bases not available at the time of appeal. His cumulative-error claim (claim thirteen) asks the Court to take into consideration issues that he properly raised for the first time in his Motion to Vacate. The Court, therefore, finds that a procedural bar only forecloses consideration of Bourgeois' ninth, eleventh, and part of his third claims.

A procedural bar is not insuperable. An inmate may overcome the procedural bar by (1) demonstrating "cause" for not raising the issue on direct appeal and "actual prejudice" resulting from the error or (2) showing that he is "actually innocent" of the crime for which he was convicted. *See United States v. Frady,* 456 U.S. 152, 157, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *United States v. Kallestad,* 236 F.3d 225, 227 (5th Cir.2000); *United States v. Flores,* 981 F.2d 231, 234–37 (5th Cir.1993).[FN24] Bourgeois does not claim to be actually innocent. Instead, Bourgeois argues that he can overcome any procedural bar because appellate counsel's failure to raise the defaulted issues amounts to ineffective assistance. As the Court will discuss at greater length with respect to Bourgeois' related substantive ineffective-assistance-of-appellate-counsel claim (claim twelve), he has not shown that his appellate counsel violated his constitutional rights by omitting any issue on appeal. The Court, therefore, finds that a procedural bar forecloses relief on Bourgeois' ninth, eleventh, and part of his third claim. Given the severity of the sentence Bourgeois faces and the importance of ensuring the fundamental fairness of capital trials, however, the Court will briefly address the merits of the procedurally barred claims in their respective order.

> FN24. Bourgeois also argues that the International Covenant on Civil and Political Rights (ICCPR) trumps the American judicial system's procedural-bar jurisprudence. Bourgeois has not pointed to any authority forgiving procedural deficiencies based on that, or another, international treaty. The Supreme Court has found that other international treaties do not preempt the operation of procedural bars. *See Medellin v. Texas,* 552 U.S. 491, 512, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008); *Sanchez–Llamas v. Oregon,* 548 U.S. 331, 351, 126 S.Ct. 2669, 165 L.Ed.2d 557 (2006).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

### ANALYSIS

#### I. Bourgeois' Alleged Mental Retardation (claim one)

**\*22** Bourgeois alleges that mental retardation precludes his execution under *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). No mental health professional identified Bourgeois as mentally retarded until after he received a death sentence. Up to that point, Bourgeois had lived a life which, in broad outlines, did not manifest gross intellectual deficiencies. Bourgeois graduated from high school at age 18, with the only record of his grades showing B's, C's, and D's. He worked for many years as a long-haul truck driver. He bought a house, purchased cars, and handled his own finances. IQ testing before trial resulted in low scores, but one expert nonetheless described his intelligence in a manner inconsistent with mental retardation. Trial counsel's extensive interaction with Bourgeois did not hint that he was mentally retarded. Bourgeois' trial testimony, long colloquies with the Court, and detailed writings never called into question his intellectual functioning.

Bourgeois now claims that the accomplishments of his life mask an intellect falling within the lowest two percent of the population. According to Bourgeois, his loved ones always considered him to have low intelligence. He owed his academic grades and high school graduation to social promotion, not intellectual competency. Success, such as it came to him, only resulted from significant support and assistance from others. Through his life, Bourgeois purportedly compensated for his low intelligence by subtly eliciting the help. However, no one ever tested Bourgeois for mental retardation until the Government charged him with capital murder. Until after he received a death sentence, Bourgeois allegedly hid his mental deficiencies and gave the appearance of operating with adequate intelligence. This left his current attorneys with the task of trying to prove his mental retardation through retroactive assessment—something the psychological profession did not design its tests to do.

Bourgeois has amassed lay accounts and expert opinions to support his claim that he falls within the category of offenders the Supreme Court intended to exempt from execution. He also argues that trial counsel provided deficient performance by failing to recognize and develop evidence of his mental retardation. The Government has responded with significant evidence showing that, while Bourgeois' intellectual functioning maybe below normal, he is not mentally retarded. A full review of the evidence and applicable law demonstrates that Bourgeois' *Atkins* claim is without merit.

#### A. Background of Bourgeois' *Atkins* claim

Bourgeois claims both statutory and Constitutional law precludes his execution. In *Atkins,* the Supreme Court found under the Eighth Amendment's "evolving standards of decency" review that "death is not a suitable punishment for a mentally retarded criminal." *Atkins,* 536 U.S. at 321. Even before *Atkins,* however, the Federal Death Penalty Act of 1994 mandated that "[a] sentence of death shall not be carried out upon a person who is mentally retarded." 18 U.S.C.A. § 3596(c).[FN25] "The only substantive change ... ushered in by *Atkins* with respect to federal capital defendants, then, is the recognition of a new source of federal law (i.e., constitutional) that bars their execution." *United States v. Webster,* 421 F.3d 308, 311 (5th Cir.2005).[FN26]

> FN25. A dearth of jurisprudence exists with regard to *Atkins* cases under the FDPA. Federal cases do not meaningfully distinguish *Atkins* cases under the FDPA from those originating in state court. The Court, therefore, will look to death penalty cases arising from state jurisdictions, which federal courts evaluate whether a judgment is "contrary to, or involved an unreasonable application of, clearly established Federal law[.]" 28 U.S.C. § 2254(d)(1).

> FN26. In the memorandum of law supporting his section 2255 motion, Bourgeois argues that his history of mental problems should prevent his execution. (DE 402 at 15). In other words, Bourgeois asks the Court to extend *Atkins* beyond prohibiting the execution of the mentally retarded to anyone with mental illness. The Fifth Circuit has found that, absent any indication of insanity, the Constitution does not prevent the execution of mentally ill inmates. *See ShisInday v. Quarterman,* 511 F.3d 514, 521 (5th Cir.2007). Bourgeois has not alleged that he is incompetent for execution, and nothing in the record at this point suggests a similar mental condition. Bourgeois has not shown that this Court should extend the *Atkins* decision to mentally ill death row inmates.

**\*23** The *Atkins* Court, however, approached the new constitutional constraint on executions with caution. While

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 24

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

acknowledging that prevalent societal norms protected the mentally retarded, the Supreme Court left the contours of that new exemption murky. The *Atkins* Court conceded that "[t]o the extent that there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded." 536 U.S. at 317. Instead of creating a bright-line test to determine intellectual ineligibility for death, the Supreme Court "did not provide definitive procedural or substantive guides for determining when a person who claims mental retardation will be so impaired as to fall within *Atkins'* compass." *Bobby v. Bies,* ―― U.S. ――, 129 S.Ct. 2145, 2150, 173 L.Ed.2d 1173 (2009) (quotation omitted); *see also Moore v. Quarterman,* 454 F.3d 484, 493 (5th Cir.2006) ("[T]he Atkins Court did not adopt a particular criteria for determining whether a defendant is mentally retarded[.]").

Accordingly, a "welter of uncertainty follow[ed] *Atkins"* because "the Supreme Court neither conclusively defined mental retardation nor provided guidance on how its ruling should be applied to prisoners already convicted of capital murder." *Bell v. Cockrell,* 310 F.3d 330, 332 (5th Cir.2002). Time has produced a patchwork of judicial standards, all informed to a greater or lesser extent by the psychological profession's understanding of mental retardation. This case, like many following in *Atkins'* wake, depends on the interplay between constitutional law and psychological science.

The psychological profession generally agrees as to what standards govern a diagnosis of mental retardation, though the experts in this case have differed drastically in their application of those standards. Two sources provide equally valid definitions of mental retardation. The *Atkins* Court relied on the definition provided by the American Association on Mental Retardation ("AAMR"), which is now known as the American Association on Intellectual and Developmental Disabilities ("AAIDD"):

Mental retardation refers to substantial limitations in present functioning. It is characterized by *significantly subaverage intellectual functioning,* existing concurrently with *related limitations* in two or more of the following applicable *adaptive skill areas:* communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests *before age 18.*

*Atkins,* 536 U.S. at 309 n. 3 (quoting AMERICAN ASSOCIATION OF MENTAL RETARDATION, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 5 (9th ed. 1992) ("AAMR 9th")) (emphasis added).[FN27] In addition to the AAMR, the *Atkins* Court also referenced the American Psychiatric Association's ("APA") definition of mental retardation. *See Atkins,* 536 U.S. at 309 n. 3 (quoting DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41 (4th ed. 2000) ("DSM–IV–TR"). The APA definition states

FN27. The *Atkins* Court relied on the AAMR 9th edition's understanding of mental retardation. In May 2002, the AAMR released a 10th edition that slightly modified its definition: "Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18." AAMR 10TH at 1 (10th Ed.2002). The AAIDD has recently published an 11th edition of the manual, with the following definition: "Intellectual disability is characterized by significant limitations both in intellectual functioning and adaptive behavior as expressed in conceptual, social, and practical skills. This disability originates before age 18." AAIDD 11th at 1. The definition now includes five "assumptions":

(1) limitations in present functioning must be considered within the context of community environments typical of the individual's age peers and culture;

(2) valid assessment considers cultural and linguistic diversity as well as differences in communication, sensory, motor, and behavioral factors;

(3) within an individual, limitations often coexist with strengths;

(4) an important purpose of describing limitations is to develop a profile of needed supports; and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

(5) with appropriate personalized supports over a sustained period, the life functioning of the person with intellectual disability generally will improve.

*Id.* Dr. Swanson and Dr. Moore relied on the 11th edition. Dr. Price relied on the DSM–IV definition, but mentioned the AAMR 9th standards. Dr. Gelbort did not specifically assess for adaptive deficits, but mentioned a standard similar to the 10th or 11th editions. The experts did not describe any meaningful distinction between the various editions as to the substance of what constitutes mental retardation. Dr. Price explained that the 11th edition is "a restatement of the same thing" without "significant differences." (DE 595 at 282). To date, the Fifth Circuit "has never distinguished between" the various editions of the psychological manual. *Moore v. Quarterman,* 342 F. App'x 65, 72 n.6 (5th Cir.2009). The Court will generally refer to the 11th edition when referring to the evidence in this case, but will also occasionally mention the earlier editions under which significant *Atkins* jurisprudence has developed.

**\*24** The essential feature of Mental Retardation is *significantly subaverage general intellectual functioning* (Criterion A) that is accompanied by *significant limitations in adaptive functioning* in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academics, work, leisure, health, and safety (Criterion B). The onset must occur *before age 18 years* (Criterion C).

DSM–IV–TR at 41 (emphasis added). Together, the APA and the AAIDD standards for mental retardation thus contain three indispensable criteria for arriving at a diagnosis of mental retardation: (1) significantly subaverage intellectual functioning; (2) related significant limitations in adaptive skill areas; and (3) manifestation of those limitations before age 18. *See Clark v. Quarterman,* 457 F.3d 441, 446 (5th Cir.2006).[FN28]

> FN28. Because the witnesses referred to the AAIDD by both its current and former names, the Court will also do so interchangeably. The AAIDD currently uses the term "intellectual disability" instead of

mental retardation. *See* AAIDD 11th at xvi. The APA, however, has not yet adopted the term "intellectual disability" and the current diagnostic manual still contains the phrase "mental retardation." To preserve continuity with existing jurisprudence, the Court will use the term "mental retardation" throughout this Memorandum and Order.

Courts have uniformly accepted this tripartite formulation for deciding whether an inmate qualifies for *Atkins* protection. Yet courts have also struggled to guarantee that convicted capital murderers who claim to be mentally retarded are evaluated in a nonarbitrary manner. An examination for mental retardation, and particularly the adaptive-skills component of that inquiry, involves the subjective evaluation of skills, aptitudes, and life experiences. Transposing the psychological community's understanding of mental retardation unto the legal context amplifies the subjectivity of this analysis.

Here, as in *most Atkins* cases, equally qualified experts have examined Bourgeois and his life and reached drastically different professional opinions about his intellectual functioning. *See Wiley v. Epps,* 625 F.3d 199, 215 (5th Cir.2010) (noting that most *Atkins* cases involve "essentially a battle of the experts, who gave competing opinions as to [an inmate's] IQ and intellectual functioning"). As will be discussed below, Bourgeois' experts conclude that he is mentally retarded. The law, however, has not completely turned the question of eligibility for execution over to the psychological community. *See Clark,* 457 F.3d at 445 (recognizing that the Supreme Court in *Atkins* did not hold that courts *"must* track the approach of the [AAIDD] or the APA exactly"). The law observes that "[p]sychiatry is not ... an exact science, and psychiatrists disagree widely and frequently on what constitutes mental illness, on the appropriate diagnosis to be attached to given behavior, [and] on cure and treatment[.]" *Ake v. Oklahoma,* 470 U.S. 68, 81, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); *see also Jones v. United States,* 463 U.S. 354, 365, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983) ("The only certain thing that can be said about the present state of knowledge and therapy regarding mental disease is that science has not reached finality of judgment.").[FN29] The *Atkins* decision did not delegate to psychologists the determination of whether an inmate should not face execution, but left the contours of the constitutional protection to the courts. Thus, psychology informs, but does not determinatively decide, whether an

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 26

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

inmate is exempt from execution. *See Hall v. Quarterman,* 534 F.3d 365, 395 (5th Cir.2008) (observing that federal courts cannot "commit the ultimate decision of mental retardation to the experts" alone).

> FN29. The psychological community's understanding of mental retardation is evolving. The few short years since the *Atkins* decision has seen change in the definition of mental retardation, renovation of the name of the most prominent advocacy organization, and even abandonment of the very term mental retardation. Adoption of the phrase "intellectual disability" is only the most-recent terminology in the psychological community's developing understanding of mental retardation. *See* AAIDD 11th at 7–11 (outlining the various definitions of and terms for mental retardation used by the mental health community in the last century). As the AAIDD observed in the 10th edition of its guidebook:
>
> > The field of mental retardation is currently in a state of flux regarding not just a fuller understanding of the condition of mental retardation, but also the language and process used in naming, defining, and classifying. For example, we are in the midst of discussions about the nature of intelligence; the relationship between intelligence; the implementation of the supports paradigm; the best way to conceptualize disabling conditions; the impact of consumer and reform movements; and the effects of terminology upon individual lives.
> >
> > This state of flux is both frustrating and challenging. It is frustrating because it prohibits one from relying on past language, definitions, and models of mental retardation that can be a source of stability and permanence to some. However, the state is also challenging, as it provides the opportunity to incorporate the current and evolving understanding of the condition of mental retardation and the factors that influence the lives of people in their societies. Whether perceived from a positivistic or social perspective, the condition of mental retardation is being thought of differently today throughout the world.

> AAMR 10th at xii.

**\*25** With those principles in mind, the Court turns to the expert and lay evidence relating to mental retardation.[FN30]

> FN30. An inmate bears the burden of proof on his *Atkins* claim and must prove the existence of mental retardation. *See Lockett v. Anderson,* 230 F.3d 695, 707 (5th Cir.2000) (holding that a habeas petitioner generally has "[t]he burden of demonstrating that a constitutional violation occurred"). Yet neither *Atkins* nor the Federal Death Penalty Act clarify what standard governs mental-retardation claims. Circuits have held that the Constitution prohibits the application of a beyond-a-reasonable-doubt standard to *Atkins* claims. *See Hill v. Schofield,* 608 F.3d 1272, 1278–82 (11th Cir.2010); *Webster,* 421 F.3d at 311. Under 18 U.S.C. § 4241, district courts generally resolve matters regarding mental illness and competency under a preponderance-of-the-evidence standard. Some state courts have adopted a similar standard in adjudicating *Atkins* claims. *See Webster,* 421 F.3d at 312 (reviewing state cases). Others, however, require a defendant to prove mental retardation by clear and convincing evidence. *See State v. Grell,* 135 P.3d 696, 523 (Ariz.2006). The Fifth Circuit has, in another context, questioned whether " 'some heightened standard of proof might apply to sentencing determinations which bear significantly on the severity of sentence.' " *United States v. Greer,* 158 F.3d 228, 240 (5th Cir.1998) (quoting *Almendarez–Torres v. United States,* 523 U.S. 224, 248, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998)). For instance, a defendant has the burden of proving the affirmative defense of insanity under a clear-and-convincing evidence standard. *See* 18 U.S.C. § 17. While the application of a stringent burden of proof in *Atkins* cases would impose "a significant risk of an erroneous determination," *Cooper v. Oklahoma,* 517 U.S. 348, 363, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996), this Court need not decide which standard governs Bourgeois' claim. As the Court will discuss at length above, Bourgeois has not shown mental retardation even if he must only meet a preponderance-of-the-evidence standard.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 27

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

**B. Intellectual Functioning**

To qualify for a diagnosis of mental retardation, an individual must first show significantly substantial limitations in intellectual functioning. The psychological profession uses a Full–Scale IQ score "of about 70 or below (approximately 2 standard deviations below the mean)." as the key indicator of intellectual ability. *Atkins,* 536 U.S. at 309 n. 5. Because IQ tests typically have a standard error of measurement (also called a "confidence interval" or "confidence band"), a base IQ score actually represents a range that could be five points higher or lower. Thus, the psychological profession accepts 75 as a qualifying score for a diagnosis of mental retardation. *See* DSM–IV–TR at 41–42; *Clark,* 457 F.3d at 445. A higher IQ score signifies borderline intellectual functioning, not mental retardation.[FN31]

> FN31. The APA recognizes four categories of mental retardation: mild, moderate, severe, and profound. *See* DSM IV–TR at 42–44. Individuals with IQ scores between 55 and 70—around 85% of the mentally retarded population—are classified as mildly mentally retarded if they satisfy the adaptive-functioning and age-at-onset criteria. *See also* AAIDD11th at 32 (observing that between 75% to 89% of the population with mental retardation is mildly mentally retarded). The law has not drawn a distinction between these categories of mental retardation for the purpose of *Atkins* protection.

*1. Bourgeois' IQ Scores*

The record contains two IQ scores for Bourgeois, both of which potentially qualify him for a diagnosis of mental retardation. One week before trial, Dr. Donald Weiner, a psychologist, administered the Wechsler Adult Intelligence Scale–Revised ("WAIS–R") test to Bourgeois. Bourgeois obtained a Verbal Score of 76, a Performance Score of 76, and a Full Scale score of 75 on the WAIS–R. [FN32] The WAIS–R, however, was not the most-current version of the Wechsler. By the time of trial, that test was outdated, the up-to-date testing instrument being the Wechsler Adult Intelligence Scale–III (WAIS–III).[FN33] Dr. Weiner's purpose in examining Bourgeois, however, was not to diagnose or rule out mental retardation; the defense retained him to identify neurological deficits. (DE 594 at 267). Dr. Weiner chose to administer the outdated test because more research was available linking WAIS–R scores

to neurological deficiencies than was available for the WAIS–III. (DE 594 at 218, 263, 251).[FN34]

> FN32. Due to a transcription error, Dr. Weiner initially recorded the Full–Scale score as 76. Dr. Weiner explained in the evidentiary hearing:
>
> > [T]his report had to be gotten out very quickly in the context of other things that were scheduled and I don't remember, I might have typed this one myself to get it back in time and if so I just made a typographical error, looking at the results from the test and then transcribing it; and if it was my typist, who is usually very accurate, she then would have gotten this report back to me much more quickly than usual and could have made an error that I just didn't catch.
>
> (DE 594 at 219). At the time of trial, this error made little difference because Dr. Weiner "wasn't asked to do an assessment for mental retardation." (DE 594 at 263).

> FN33. Federal courts have recognized the WAIS–III as a "gold standard" testing instrument. *See Thomas v. Quarterman,* 335 F. App'x 386, 391 (5th Cir.2009). A fourth version of the Wechsler, the WAIS–IV, is the currently updated test. No expert has administered the WAIS–IV to Bourgeois.

> FN34. On some subtests of the WAIS–R, Bourgeois exhibited "low average abilities," in others, average. He only exhibited "a significant deficit in assembling an object from its parts." Dr. Weiner also administered the Wide Range Achievement Test, Third Edition ("WRAT–III"). Bourgeois WRAT–III scores showed higher aptitude. Bourgeois obtained high-school equivalent scores in reading and spelling, but only at the sixth-grade level for arithmetic. Dr. Weiner opined that Bourgeois "is functioning at the expected level for a high school graduate in reading and spelling. Arithmetic is an area of weakness for him, but he does not have any specific learning disabilities." However, in his videotaped examination by Dr. Price, Bourgeois seemed able to do mental mathematical computations adequately. Notwithstanding his low scores on the WAIS–R, Dr.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

Weiner opined that, while his "overall level of intellectual functioning is in the borderline range," he "shows no indications of having any specific learning disabilities."

Dr. Michael Gelbort performed the only psychological testing intended to assess whether Bourgeois has substantial limitations in intellectual functioning. Bourgeois' current attorneys did not ask Dr. Gelbort to make a final diagnosis of mental retardation, only to evaluate his intellectual capacity. (DE 560 at 78). In 2007 Dr. Gelbort administered the WAIS–III, with Bourgeois obtaining a Verbal Score of 67, a Performance Score of 78, and a Full Scale Score of 70. Bourgeois' Full Scale IQ scores facially make a diagnosis of mental retardation possible.

Bourgeois relies on the naked IQ scores to satisfy *Atkins'* first prong. Bourgeois called Dr. Gelbort in the evidentiary hearing to explain the results of his examination. Dr. Gelbort testified that:

> Mr. Bourgeois is of limited intellectual ability. He comes out—he tests out pretty much in the borderline to mildly defective range. He shows indication of difficulties, ... of having frontal lobe impairments, that he did take the tests as requested and put forth good effort. His learning is problematic, especially when he has to understand conceptually the information being presented to him. So he can memorize adequately, but he has trouble taking in or encoding and forming new memories and making lasting memories for information that's more conceptual or complex.

**\*26** (DE 560 at 29).[FN35] Dr. Gelbort's testimony did not address whether Bourgeois' life manifested intellectual deficiencies outside of the testing context. He explained: "when I'm basing an assessment of their intellect, I'm going to use my intellectual tests" and not factor in information such as whether Bourgeois' interactions with the Court manifest mental retardation. (DE 560 at 134).

> FN35. Dr. Gelbort did not administer any formal instrument to assess whether Bourgeois was malingering. (DE 560 at 113). Dr. Gelbort based his opinion that Bourgeois put forth good effort based on "how the data line[d] up," both internally and in comparison to Dr. Weiner's testing, because "there's

good consistency across time." (DE 560 at 31–32, 34).

*2. Legal Evaluation of Intelligence in Atkins Cases*

Even though Bourgeois' testing has twice resulted in scores that possibly qualify him for mental retardation, the law has not recognized an IQ score below 75 as automatically meeting the significantly substantial limitations prong. *Atkins* itself did not establish a cut-off IQ score that exempts inmates from execution. Much of the case law since *Atkins* has focused on inmates who score in the borderline area around 70. While the Fifth Circuit has specified that "mental retardation *can be found* in range of 70–75," *Moore v. Quarterman,* 342 F. App'x 65, 68 n. 5 (5th Cir.2009) (emphasis added), all cases in which the Fifth Circuit has found that an inmate warrants *Atkins* relief have involved at least one base score below 70 without adjustment. *See Thomas v. Quarterman,* 335 F. App'x 386, 388 (5th Cir.2009) ("[S]ubaverage intellect ... is typically established ... a score of 70 or below.").[FN36]

> FN36. The Fifth Circuit has only granted relief on *Atkins* claims in three cases, and each presented at least one score below 70. *See Wiley v. Epps,* 625 F.3d 199, 2010 WL 4227405, at \* 7 (5th Cir.2010) (noting a childhood score of 68); *Moore v. Quarterman,* 342 F. App'x 65, 68 (5th Cir.2009) (finding significantly subaverage intellectual functioning with IQ scores ranging from 66 to 76); *Rivera v. Quarterman,* 505 F.3d 349, 361 (5th Cir.2007) (finding mental retardation with scores as low as 66). In each of those cases, the AEDPA's deferential standard did not constrain the federal analysis. Most often, the Fifth Circuit has denied relief when an inmate has IQ scores both under and over 70. *See Hall v. Thaler,* 597 F.3d 746, 746–47 (5th Cir.2010) (scores ranging from 67 to 84); *Thomas v. Quarterman,* 335 F. App'x 386, 388–89 (5th Cir.2009) (three IQ tests scoring 67, 75, and 77); *Rosales v. Quarterman,* 291 F. App'x 558, 561 (5th Cir.2008) (a pre-*Atkins* score of 82 and a *post-Atkins* scores of 61 and 73); *Moore v. Quarterman,* 517 F.3d 781, 784 (5th Cir.2008) (finding no mental retardation with full-scale IQ scores of 63, 68, 72, 76, and 76); *Morris v. Quarterman,* No. 07–70012 (5th Cir. Apr. 17, 2008) (pre-*Atkins* score of 97 and post-*Atkins* scores of 53 and 64); *Perkins v. Quarterman,* 254 F. App'x 366,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

369 (5th Cir.2007) (scores ranging from 66 to 80); *Taylor v. Quarterman,* 498 F.3d 306, 307–08 (5th Cir.2007) (pre-*Atkins* score of 75 and post-*Atkins* scores of 65 and 69); *Woods v. Quarterman,* 493 F.3d 580, 585–86 (5th Cir.2007) (pre-*Atkins* scores of 78 and 80 and post-*Atkins* score of 68); *Clark v. Quarterman,* 457 F.3d 441, 445–46 (5th Cir.2006) (pre-*Atkins* score of 74 and post-*Atkins* scores of 65 and 68). The Fifth Circuit has also denied relief when an inmate's scores all fall above 70. *See Pierce v. Thaler,* 604 F.3d 197, 214–15 (5th Cir.2010) (WAIS–III score of 70); *Williams v. Quarterman,* 293 F. App'x 298, 310–11 (5th Cir.2008) (three different IQ tests scoring a 70 or 71); *Eldridge v. Quarterman,* 325 F. App'x 322, 325 (5th Cir.2009) (scores ranging from 72 to 112).

As previously mentioned, psychology does not look at IQ as a fixed point, but as existing along a range. The confidence interval associated with WAIS–R and WAIS–III scores means that a given score may actually represent an IQ five points higher or lower. *See Clark,* 457 F.3d at 444.[FN37] The psychological profession allows any score falling along that range to qualify for a diagnosis of mental retardation. Accordingly, psychologists generally do not question whether an inmate's true IQ falls in the higher or lower end of that range. Indeed, with the main purpose of most IQ testing being to qualify an individual for needed supports or services, the mental health community has little reason to question the results of IQ testing.

> FN37. Bourgeois asks the Court to treat his results on the WAIS–R as much lower than the raw full scale score of 75 based on a phenomenon known as the Flynn Effect. "The Flynn Effect ... posits that, over time, the IQ scores of a population rise without corresponding increases in intelligence and thus the test must be re-normalized over time." *In re Mathis,* 483 F.3d 395, 398 n. 1 (5th Cir.2007). The AAIDD 11th edition advises that "best practices require *recognition* of a potential Flynn Effect when older editions of an intelligence test (with corresponding older norms) are used in the assessment or interpretation of an IQ score." AAIDD 11th, at 37 (emphasis added). All the experts who testified in the evidentiary hearing agreed that the Flynn Effect is a

phenomenon that exists in IQ scores throughout society, but they disagreed about whether the general elevation of IQ scores over time requires adjustment of individual test results. For instance, Dr. Swanson testified that the Flynn Effect would place Bourgeois' scores to a "true score ... somewhere between 68 and 70," (DE 594 at 37), but qualified that the Flynn Effect was "not relevant" in "this particular case because the scores are there ... they are the scores we are looking for in an *Atkins* case." (DE 594 at 35). Yet she also explained that "[t]here's two large schools of thought on that. The [AAIDD] ... say [s] you should adjust the individual score. The other camp is you can't take a group statistic study and adjust a single score on that, there's no science for doing this yet." (DE 594 at 36). Dr. Weinsten would have applied the Flynn Effect to his scores. Dr. Weiner explained that, "since that WAIS–R has older normative data[,] ... his true IQ is probably four or five points lower than that." (DE 594 at 222–23). Nevertheless, Dr. Moore explained that adjusting IQ scores based on the Flynn Effect is "significantly controversial." (DE 599 at 89). In another case, a district court found credible Dr. Moore's testimony that "he had only observed the IQ score adjusted downward for the Flynn effect in evaluations done by the defense in mental retardation hearings." *Sasser v. Hobbs,* 751 F.Supp.2d 1063, 2010 WL 4569870, at *13 (W.D.Ark. Nov.3, 2010). Here, Dr. Swanson conceded that the term "Flynn Effect is primarily used in a courtroom setting," (DE 594 at 156), and the Government argued that it is "[a] litigation tool to try to lower scores and enable people to apply [the *Atkins*] defense to them[.]" (DE 646 at 82). Nevertheless, the Fifth Circuit has not adopted the Flynn Effect "as scientifically valid," *Maldonado,* 625 F.3d at 238 (citing *In re Salazar,* 443 F.3d 430, 433 n. 1 (5th Cir.2006)). The testimony in this case did not persuasively show a consensus among psychologists that would require the adoption of the Flynn Effect as a legal method to lower an inmate's Full Scale IQ Score.

Courts, however, endeavor to determine whether a borderline score represents an intelligence capacity above or below the mental-retardation threshold. In the legal context,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

whether an inmate had significantly subaverage intellectual functioning is a question of fact that the Court decides. *See Clark,* 457 F.3d at 444 (citing *United States v. Webster,* 162 F.3d 308, 351–52 (5th Cir.1998)). In oral argument, Bourgeois' attorneys conceded that this Court must look at the IQ scores but then reach its own determination of whether he has significantly subaverage intelligence (DE 646 at 79–80). Federal law does not require a court "to find [an inmate] to be mentally retarded merely because the low end of [his] confidence band was below 70, just as it would not be required to find that [he] could be executed on the basis that the high end of this band fell above 70." *Clark,* 457 F.3d at 446. When faced with a borderline IQ score, courts assess whether an inmate's intellectual faculty demonstrates the characteristics of mental retardation, rather than low intelligence. In doing so, the Fifth Circuit has denied relief when the evidence more persuasively suggests that, notwithstanding borderline IQ scores, an inmate's intelligence is more consistent with the higher end of the confidence interval. *See Clark,* 457 F.3d at 446.

**\*27** Here, two factors suggest that Bourgeois' IQ score does not fall in the lower end of the confidence interval. First, the circumstances do not suggest that Bourgeois' testing resulted in a valid measure of his intellectual abilities. Second, a full review of Bourgeois' life signals that he has not suffered the impairment associated with mental retardation and that he functions at the highest end of the confidence interval, if not even higher. The evidence before the Court shows that it is much more probable that Bourgeois' true IQ exists above the threshold cutoff for mental retardation.

*3. Bourgeois' IQ Does Not Persuasively Fall at the Lower End of the Confidence Interval*

The Government primarily rebutted Dr. Gelbort's testimony through Dr. Price who examined Bourgeois in 2010.[FN38] Because he worried that videotaping his administration of psychological testing would compromise its integrity, Dr. Price did not give Bourgeois any normed IQ test but still performed a probing psychological examination. Dr. Price agreed that with Dr. Gelbort on some important issues, such as that Bourgeois' test results placed him in the borderline deficient range for intellectual functioning. (DE at 595 at 238). Also, Dr. Price agreed with Dr. Gelbort that Bourgeois did not malinger during his testing. (DE 595 at 258). Dr. Price,

however, did not agree that Bourgeois was eligible for a formal diagnosis of mental retardation. Dr. Price credibly testified that aspects of Bourgeois' testing, such as his ability to concentrate for a length of time, was inconsistent with mental retardation. (DE 595 at 201). Dr. Price found it discrepant "to be able to read and understand and conceptualize some of the things that he was able to talk about[.]" (DE 599 at 50). Importantly, Dr. Price credibly explained that Bourgeois' "cognitive abilities exceed his measured cognitive intelligence." (DE 595 at 215).

> FN38. In addition to those two witnesses, others briefly testified about Bourgeois' IQ scores. For instance, Dr. Moore primarily testified about Bourgeois' adaptive behaviors, but agreed with Dr. Price that the scores on WAIS subtests were "puzzling" when compared to his life and aptitudes. (DE 599 at 100). Dr. Swanson did not question the results of the IQ testing as a precursor to a diagnosis of mental retardation. Dr. Toomer only affirmed that the IQ scores qualified him for a diagnosis of mental retardation (DE 594 at 324) Dr. Toomer said: "I did not evaluate him specifically with regard to mental retardation, but as part of the evaluative process information presents itself that serves as a basis for the provisional opinion[.]" (DE 594 at 324). Dr. Estrada opined that he would put no credence on the IQ test results, but would base his whole mental-retardation opinion of adaptive deficits. Dr. Swanson found no errors in the administration of the IQ tests. She also observed that the two administering experts "noticed no signs of malingering and they felt he had put forth good effort." (DE 594 at 30). Comparing the subtests between the two IQ test administrations, Dr. Swanson observed that the "scores are fairly consistent across administrations." (DE 594 at 31). Insofar as other experts had observed some strengths in his testing, Dr. Swanson opined that "it's not atypical for a person with mental retardation to have a strength ... in one area[.]" (DE 594 at 34). Dr. Swanson opined that "Mr. Bourgeois ... functions with very low cognition, and his cognitive ability is in the mild deficit range for these tests, and so no matter what, no matter if we don't go any further, we are looking at a person who has extremely low cognitive ability. That criteria I think is clearly met." (DE 594 at 39).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**PA-124**

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

Dr. Price did not trust that the IQ testing adequately measured Bourgeois' intelligence. Psychology recognizes that an individual's performance and intentions may influence testing results. Various factors may cause artificially low scores on the WAIS testing instrument. *See Maldonado v. Thaler,* 625 F.3d 229, 238 (5th Cir.2010) ("[T]he WAIS–III manual instructs that an artificially low score may result from, among other factors,' [c]ultural or linguistic discrepancy from the test standardization table, distractability, anxiety, deafness, poor motivation or inadequate persistence[.]' "). While IQ scores should represent an accurate measure of the inmate's intellectual functioning, the Fifth Circuit has routinely weighed IQ scores against factors such as an inmate's poor performance during testing and whether the scores adequately comport with other information about his intelligence.[FN39]

> FN39. Several Fifth Circuit cases have refused to credit IQ scores when the evidence suggested that an inmate had malingered or not put forth his best effort. *See Esparaza v. Thaler,* 408 F. App'x 787, 2010 WL 4559214 at *6 (5th Cir.2010) (finding "pervasive evidence of poor test taking attitude characterized by low motivation, poor attention and concentration, and low task involvement and persistence."); *Eldridge,* 325 F. App'x at 325 (refusing to honor a score of 72 as a predicate for mental retardation when the expert who administered the test failed to assess for malingering or a lack of effort, to consider possibilities other than mental retardation for the test results, and relied on limited information about the inmate's background); *Williams,* 293 F. App'x at 311 (refusing to credit IQ scores when the record suggested that the inmate had malingered and "the evidence as a whole ... was inconsistent with a finding of mental retardation."); *Moore,* 517 F.3d at 784 (refusing to find mental retardation after tests showing 63, 68, 72, 72, 76 and 76 because of "other expert indicating that [the inmate] did not suffer from such functioning and he underperformed on at least some of the tests); *Woods,* 493 F.3d at 586–87 (emphasizing earlier, higher IQ scores when the later scores were less reliable and the inmate has "a motivation to score poorly"); *Clark,* 457 F.3d at 445 (finding that state court's determination was not unreasonable when it refused to credit an IQ score when the inmate "had motivation to lower his scores

deliberately"). The Fifth Circuit has also refuse to find adaptive deficits when, notwithstanding an IQ score of 64, the inmate "appeared to be poorly motivated and may have exaggerated his deficits." *Moreno,* 450 F.3d at 164.

Although none of the experts accused Bourgeois of outright malingering on his IQ test, a lack of malingering does not mean that other factors may not have compromised the validity of his test results. Dr. Price credibly provided two reasons to believe that Bourgeois' IQ scores may not reflect his true level of intellectual functioning. As Dr. Price explained, "I would not say that it's malingering. I would say that it's not putting forth full effort and carelessness." (DE 595 at 210); *see also* DE 595 at 225 (explaining that "it's not intentionally trying to get the wrong answer on easy things, it's just not trying" and is "careless, sub optimal effort, not putting forth good effort, with not trying hard").

**\*28** Bourgeois is apparently an individual who does not perform well on standardized testing instruments. Dr. Price suggested that Bourgeois' idiosyncratic abilities may have caused the testing to underestimate his intellectual level:

he, like a number of different kinds of people, doesn't test well. I mean he doesn't, it's harder to get him involved in objective testing. It's very easy to get him involved in talking about himself, his life, his situation. It's easy to engage him there. It's even difficult to ... disengage him from doing that. But objective testing, he kind of shuts down a little bit.

(DE 595 at 202). Bourgeois' inability to test well could be because he "is someone who has been somewhat culturally deprived, didn't profit from education as much as someone else, not experience things that were intellectually academically enriching or didn't profit from those, but the abilities are there and that's inconsistent with mental retardation." (DE 595 at 216). Poor testing taking skills could have caused Bourgeois to underperform on the psychological testing, thus giving an incorrect interpretation of his intellectual ability. *See Esparaza v. Thaler,* 408 F. App'x 787, 2010 WL 4559214 at *6 (5th Cir.2010) (finding that an inmate's low IQ scores did not amount to subaverage intellectual functioning after testimony that the inmate had "pervasive evidence of poor test taking attitude characterized by low motivation, poor attention and concentration, and low task involvement and persistence.").

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

In a related vein, some of the experts suggested that Bourgeois may have not put forth his best effort during the examinations. Dr. Price explained that a lack of effort is "a response style that can invalidate the results. It's more difficult to assess. It's less severe. It's present in a lot of cases for a lot of reasons other than the intentional ... feigning or gross exaggeration of a condition for an external incentive." (DE 595 at 258).[FN40] This Court's observations match Dr. Price's opinion. Even independent of the expert testimony, this Court finds that Bourgeois did not put forth his best effort in the psychological testing. The Court has viewed many hours of video from the examination by Dr. Price and Dr. Moore. Bourgeois answers the questions asked of him, engages in conversation, has logical thoughts, and does not otherwise give any impression of mental retardation. Certain features of Bourgeois' examination suggest he underperformed on the psychological testing. For instance, when the examiner was in the room, Bourgeois answered questions sluggishly. Yet when he was unobserved, Bourgeois moved through the answers quickly. In another example, Bourgeois took an unreasonably long amount of time to compose a paragraph at Dr. Price's request. (PX–159). Dr. Swanson considered the time which he took to write as indication of mental retardation. (DE 594 at 55). Nevertheless, the speed in which he wrote that paragraph contrasts sharply with his voluminous amount of writings each of which, if written at that pace, would have taken days to finish.[FN41]

FN40. Dr. Price elaborated:

Effort and response style are on a continuum. At one end is full-blown malingering where the person is feigning, completely making something up for an external incentive. At the other end of the continuum is someone that is doing their very best on the test and being as honest as they possibly can be.... So everybody falls someplace on that continuum that's being evaluated, the closer you get to the end, whether malingering comes closer to that. Poor effort is someplace in the middle, and so it needs to be considered about the validity of the findings.

(E 595 at 259–60).

FN41. Moreover, Dr. Swanson looked at the "overall grammar and syntax of" the statement and found that "it would be similar to someone who is third grade." (DE 594 at 136). The paragraph read:

I Alfred Bourgeois strongly believe without a shadow of a doubt that I have been framed and railroaded by Rush of Judgement and have been wrongfully convicted of a crime that was fought by vengeance. I believe this child [JK1999] was not murdered, and without a doubt was not injured in the State of Texas nor on federal land. I believe Robin M. Bourgeois is assaulted my belovth baby long before arriving in Texas or long before on the naval ground. This case is tainted and fabricated.

(PX–159). Dr. Swanson's testimony in that regard is not credible as the content of the paragraph and complexity of thought transcend what society expects of the average third grader.

**\*29** This was possibly not a conscious behavior. Nevertheless, with an awareness that the results of the IQ testing would affect his death eligibility, Bourgeois certainly had reason to put lackluster effort into his testing. The Court finds highly credible Dr. Price's testimony that Bourgeois underperformed on his testing. Bourgeois' performance on the testing instruments does not indicate that his actual IQ score should fall at the lower, rather than higher, end of the confidence interval.

This finding harmonizes with a broader review of how Bourgeois' level of intelligence has manifested itself throughout his life.[FN42] Even when an inmate scores within the range psychology has set for a diagnosis of mental retardation, the Fifth Circuit has reviewed the whole record to decide if an inmate has exaggerated his deficits or if the circumstances of his life are inconsistent with mental retardation. *See, e.g., Moreno v. Dretke,* 450 F.3d 158, 165 (5th Cir.2006) (finding a post-*Atkins* score of 64 did not meet *Atkins'* first prong). The most perplexing feature of Bourgeois' intellectual testing is that his abilities seem to surpass that anticipated by his IQ score. Dr. Price testified that it was "very unusual" that the results of academic achievement scores administered by Dr. Gelbort, Dr. Weiner, and Dr. Swanson which mostly showed high-school age proficiency were higher than his IQ scores. (DE 595 at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

270). Nonetheless, Bourgeois' experts placed his intellectual functioning as equal to that of a child. A disconnect exists between the level at which Bourgeois' experts said he could function and what he could actually do. Reviewing Bourgeois' life, independent of the psychological test results, should manifest a markedly low level of intelligence. Bourgeois' life, however, contradicts such pervasive mental impairment; Bourgeois' behavior and characteristics are inconsistent with an IQ that would fall below 70. *See Williams v. Quarterman,* 293 F. App'x 298, 309–11 (5th Cir.2008) (looking at "the evidence as a whole-including [the petitioner's] performance in the classroom and on standardized achievement tests, his writing ability, and the opinions of numerous witnesses who did not believe that [he] was retarded" in deciding that his "IQ scores [were] not an accurate indication of his intellectual functioning").

> FN42. This review does not conflate the *Atkins* prongs, but recognizes that a person whose IQ falls within the lowest two percent of the population should manifest commensurate impairments throughout their life. Intelligence of that low level should be obvious.

A persistent feature of the testimony from Bourgeois' experts was a failure to consider fully his alleged intellectual limitations against the whole background of his life. While testimony from various individuals questioned his intellect when younger, those who knew him as an adult did not suspect that he was mentally retarded. Bourgeois graduated from high school,[FN43] worked for years as an over-land trucker,[FN44] bought a house, managed his own finances, wrote intricate and detailed letters, communicated without difficulty, participated actively in his own defense, and otherwise carried himself without any sign of intellectual impairment. With respect to his employment and other areas, Bourgeois' experts apparently believed that he only performed his job with a system of supports in place. The testimony before the Court did not support that conclusion. Rather, Dr. Price credibly explained that "it's highly inconsistent for him to have had a job as a cross-country truck driver and performed as he did, just totally inconsistent with mental retardation." (DE 595 at 208).

> FN43. Bourgeois has at times claimed to have gone to college, though the record has never substantiated his claims. Ms. Armont, however, told Dr. Moore that he

had attended college classes. (DE 599 at 158–59).

> FN44. The AAIDD 11th particularly notes that an employment history is not consistent with mental retardation, but the kind of work Bourgeois did possibly is. "Although it is true that people with [mental retardation] who have higher IQ scores are more likely to be employed than people with lower IQ scores, their employment rate (27.6%) is far below the national average in the general community (75.1%) and more often consists of part-time work in entry-level service jobs, with low wages and minimal benefits." AAIDD 11th at 157.

**\*30** Courts routinely review an inmate's written correspondence for indicia of mental impairment. *See Maldonado,* 625 F.3d at 243; *Eldridge v. Quarterman,* 325 F. App'x 322, 326 (5th Cir.2009). The record contains numerous items written by Bourgeois. *See, e.g.,* GX–23 through 27, 32, 33, 176 through 200. Bourgeois' extensive writings, while not polished masterpieces, certainly do not contain indicia of gross mental impairment. Dr. Price credibly described his writings: "[T]hey are very detailed, very, very detailed. Now, his sentence structure, his syntax is not that of an attorney or a person that's been to college, perhaps, but it's certainly, he can communicate when he writes. He can express himself in complete thoughts, and very detailed complete thoughts." (DE 595 at 220). Dr. Moore explained:

He certainly appears to be able to use written communication effectively.... [C]ertainly the vocabulary is good. The ideas are complex. The sentences are often compound. He's able to follow a flow of thought, communicate his ideas effectively. He certainly seems to be a vigilant record keeper, well aware of dates and perhaps locations.

(DE 599 at 139).[FN45] Bourgeois' writings show an ability to observe the world around him, process relevant information, form strategy, and communicate his thoughts to others. His letters exceed the complexity and sophistication expected of someone operating at a grade-school level. Bourgeois' own writings discount the possibility that he is mentally retarded.

> FN45. A brief sample from correspondence early in this case exemplifies his lack of mental retardation. He instructed trial counsel: "I, Alfred Bourgeois, have

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

every intention of winning my case. I have been falsely arrested, and please take your time and read this letter real well. This will explain how we can win this case in the death of my child, [JG1999]." (DE 598 at 148). In another letter he asked: "Dear Mr. Gilmore, I want a copy of your strategy on my case. I would like to know how you plan to attack my case and what you think the outcome will be. I would appreciate if you could put together a brief memorandum in support of me, Alfred Bourgeois, your Defendant, and position, regarding to my trial." (DE 598 at 151).

Notably, this Court's interactions with Bourgeois have provided an important point of observation. *See Esparaza,* 408 F. App'x at ——, 2010 WL 4559214, at *6 (denying an *Atkins* claim when "[t]hroughout his trial testimony, [Esparza] furnished coherent, even combative testimony fully responsive to both his own trial counsel's and the prosecutor's questions and demonstrated a detailed understanding of the testimony and other evidence introduced during his capital murder trial."). During trial, Bourgeois communicated with the Court on several occasions. The Court viewed his testimony before the jury in both phases of trial. The Court had sufficient interaction with Bourgeois to make a lay assessment of whether he functions at the low level described by his expert witnesses. Bourgeois never gave the Court any impression that he functioned at an intellectual level equal to that of a child. He completely understood the proceedings against him, intelligently assessed the circumstances he faced, actively participated in his defense, formulated strategy, intelligibly communicated his version of events, cogently answered questions put to him, and otherwise appeared to have an adequate level of intelligence. Based on this Court's own observations, the testimony that Bourgeois has significant intellectual limitations is not credible or persuasive.[FN46]

> FN46. Over the 17 years that the undersigned has presided on the bench, more than 4,750 criminal defendants have come before the Court, almost a 11 of whom the undersigned has interviewed for signs of incompetency or other mental impairment. This experiences informs the Court's lay assessment that, until it became expedient to avoid execution, Bourgeois never manifested any indication of mental retardation.

This does not mean that Bourgeois has high, or even necessarily average, intelligence. True, his intellectual ability was bewildering. He scored low on the testing, but exhibited many obvious intellectual aptitudes. For example, Dr. Estrada's pre-trial report—made without the benefit of any direct examination for mental retardation—commented that Bourgeois was of above-average intelligence. Dr. Price disagreed, opining that Bourgeois' verbal abilities and social skills give off the impression that he is smarter that he is. Bourgeois' ability to appear intelligent likely stems from his narcissism and desire to look good.[FN47] But Dr. Swanson's testimony that Bourgeois has "extremely low cognitive ability" and functions in about the "lowest two percent of the population" seems ludicrous when looking beyond his IQ scores. (DE 594 at 39). The testimony finding no disconnect between his test scores and his life lacked credibility. He does not operate as a child.

> FN47. A constant theme throughout the evidentiary hearing was that, as a narcissist, Bourgeois would make himself look better than he was. Dr. Gelbort explained:
>
> The narcissism oftentimes coupled with what I'm calling low intellect, because that's what I believe is here, you get individuals who are trying to cover or mask or hide their deficiencies. And one of the ways they do that, especially when you have a gregarious narcissistic person who talks a lot, is that they try to steer conversations or they tell you what they want to know, or more often than not, they tell you what they know about or what they think they know about, rather than just simply answering questions.
>
> (DE 560 at 65). Dr. Price, however, credibly described how Bourgeois'
>
> presentation was not consistent with mental retardation. The most similar thing to that that is talked about in the literature often is this idea of the cloaking of competence or masking where a person with limited intellectual abilities will say they can do things that they can't. His, in my opinion, really exceeded that and had a different flavor to it in that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

it was, I mean he would admit when he couldn't do something but he certainly wanted to impress. And his history and the records, I see that that's been a style of his, to impress others that he's very successful and has been—even though he has been occupationally. It was, it went beyond the cloaking of competence.

(DE 595 at 205).

**\*31** In the end, "[t]he calculation of a person's IQ score is imprecise at best and may come down to a matter of the examiner's judgment." *Wiley v. Epps,* 625 F.3d 199, 215 (5th Cir.2010). The Court does not invalidate or ignore Bourgeois' IQ test scores, but finds that a fuller view of his abilities does not correspond to a finding of significant intellectual limitations. This is not a case where a man's life depends on a few points' difference in test results. As the Court will discuss below, Bourgeois' functional ability and healthy adaptive skills are inconsistent with mental retardation. Even assuming that Bourgeois has low intelligence, his ability to function independently in society contradict the modifier in *"significantly* subaverage intellectual functioning" as a distinctive feature of mental retardation. The question of whether he has significantly substantial limitations in intellectual functioning is not close. The Court finds that Bourgeois has not met the first prong of the mental-retardation analysis.

## C. Significant Limitations in Adaptive Skill Areas

While failing to meet one prong of the *Atkins* analysis dooms Bourgeois' claim, in the interest of justice the Court will address the other requirements for a diagnosis of mental retardation. As Dr. Estrada explained, "the IQ ... [is] like a snapshot of the individual function at one given point in time." (PX–163 at 72). Psychology, thus, relies on "adaptive skill areas" or "adaptive functioning," *Atkins,* 536 U.S. at 318, as an "assessment of the way the person deals with the real issues in their life," (DE PX–163 at 72). The AAIDD defines deficits in adaptive skill areas as "significant limitations in an individual's effectiveness in meeting the standards of maturation, learning, personal independence, and/or social responsibility that are expected for his or her age level and cultural group[.]' " *Maldonado,* 625 F.3d at 241 (quotation omitted). Or, in other words, "how effectively individuals cope with common life

demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." DSM–IV–TR at 42 (quoted in *Wiley,* 625 F.3d at 216).

The AAIDD and APA definitions for mental retardation both break the adaptive-limitations inquiry into subcategories of deficiencies. The AAIDD evaluates "significant limitations ... in adaptive behavior as expressed in conceptual, social, and practical adaptive skills." AAMR 11th at 1.[FN48] The APA looks for "significant limitations in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." DSM–IV–TR at 41. While collapsing the adaptive deficits into distinct subgroups, the APA and AAIDD approaches apparently capture the same range of functional aptitude.

> FN48. The AAIDD 11th gives examples of multidimensional representative skills within the three categories: (1) conceptual skills involve "language; reading and writing; and money, time, and number concepts"; (2) social skills mean "interpersonal skills, social responsibility, self-esteem, gullibility, naivete (i.e., wariness), follows rules/obeys laws, avoid being victimized, and social problem solving"; and (3) practical skills include "activities of daily living (personal care), occupational skills, use of money, safety, health care, travel/transportation, schedules/routines, and use of the telephone." AAIDD 11th at 44.

**\*32** Both Dr. Swanson and Dr. Moore formally measured Bourgeois' adaptive functioning, though other experts touched on the same inquiry informally. Psychologists look to multiple sources for data about an inmate's adaptive abilities. Psychology prefers that "adaptive deficits ... be 'determined by clinical assessment and, usually, standardized scales[.]' " *Maldonado,* 625 F.3d at 241 (quotation omitted). Other sources of information, such as lay accounts of an individual's aptitude, educational history, and vocational records, also contribute to the adaptive functioning analysis. Both Dr. Swanson and Dr. Moore augmented the results of their psychological testing by interviewing several people who knew Bourgeois.[FN49] In addition, Dr. Swanson relied on her own "informal functional assessments" of Bourgeois' ability to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

perform certain tasks. (DE 594 at 23).

> FN49. Dr. Swanson also interviewed Claudia Williams (maternal sister); Michelle Armont (paternal sister); Murray Bourgeois (maternal cousin); Carl Henry (maternal cousin and former co worker); Lloyd Ferdinand (maternal brother); Donald Reese (former co-worker); Gwendolyn Thomas Smith (special education teacher); and Fred Thompkins (former co-worker). (PX–33 at 2).

Dr. Swanson found that Bourgeois possessed deficits in all three of the AAIDD domains and three of the skill areas (health and safety, functional academics, and social/interpersonal skills) from the DSM–IV–TR. Dr. Swanson concluded that these functional deficits were present in Bourgeois' youth and persisted into adulthood. She attributed his apparently competent life skills to support from others. Dr. Moore, however, used similar methods and still concluded that Bourgeois did not have deficits in any adaptive skill area.

Before turning to the evidence, the Court notes the difference between the legal and psychological inquiries into possible mental retardation. The mental health community ignores an individual's strengths when looking at adaptive functioning. Forinstance, Dr. Swanson testified that "in order to diagnose mental retardation you are looking for a collection of deficits in these areas, intellectual or adaptive, but it doesn't mean that someone couldn't have a strength as well." (DE 594 at 17–18). In fact, the 11th edition of the AAIDD manual has expressly adopted as an underlying "assumption" in the definition of mental retardation that "within an individual, limitations often coexist with strengths." AAIDD 11th at 1.<sup>FN50</sup> The mental health profession looks only at what an individual cannot do, presumably as a function of its role in providing support and services to impaired individuals.

> FN50. Dr. Swanson testified that when a psychologist encounters a strength
>
> > in a person that has an accumulation of deficits and you want to know why is the strength there, is the strength there for a specific reason or is it there because people have put supports in place throughout this person's life to make it look like a strength, or is it an area that that person had a

unique opportunity as a child.

(DE 594 at 18). Dr. Swanson acknowledged that she looked for strengths in Bourgeois' life, but only did so to see if he has had a unique opportunity to become competent in that area or had supports that would allow him to succeed (DE 594 at 18). Positive abilities did not influence her to weigh the influence of negative ones.

The Fifth Circuit, however, teaches that the *Atkins* inquiry should not be so narrow as to ignore that which an inmate can do, even if the psychological profession approaches the issue differently. *See Williams,* 293 F. App'x at 314; *Clark,* 457 F.3d at 447; *Webster,* 421 F.3d at 313. The subjective *Atkins* question is not myopic and must take into account the whole of an individual's capabilities. The law makes a holistic view of an individual, recognizing that a few reported problems may not negate an inmate's ability to communicate, to abstract from mistakes, to learn from experience, to engage in logical reasoning, and to have healthy relationships with others. Accordingly, the federal inquiry into adaptive deficits takes on a much different flavor than that done by mental health professionals.

**\*33** To that end, the federal inquiry probes more deeply the accuracy of the reported deficiencies and aims to put them into context. Thus, for example, a declaration in which someone has cherry-picked a few incidents where an inmate exhibited maladaptive behavior may be sufficient to diagnose mental retardation, but the law will seek to verify the described incidents and to understand if they represent a pervasive disability. The law will compare the deficiencies to positive life skills, presuming that adaptive successes blunt the global effect of reported insufficiencies. This review includes information about an inmate's positive adaptive ability after his eighteenth birthday.

With the holistic nature of the federal review of *Atkins* claims in mind, the Court turns to Bourgeois' arguments that he has deficits in adaptive functioning.

*1, Assessment by Testing Instruments*

The experts in this case used three testing instruments to assess Bourgeois' functional adaptive skills. Dr. Swanson gave

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 37

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

Bourgeois the Woodcock–Johnson Test of Cognitive Abilities "which is a battery of academic tests, as well as tests for listening comprehension, oral expression." (DE594 at 23). Also, experts used what Dr. Swanson described as "two gold standards for adaptive assessments": the Vineland Adaptive Behavior Scale, Second Edition ("VABS–II" or "Vineland") and the Adaptive Behavior Assessment System, Second Edition ("ABAS–II"). (DE 594 at 42). These tests decide, through a series of ratings, the extent to which an individual can do certain things. Psychologists can administer these tests to the inmate himself or to a reporting party who has sufficient familiarity with the inmate to assess his abilities. To that end, Dr. Swanson administered the VABS–II and the ABAS–II to one person, Beverly Frank, who knew Bourgeois as a youth.

Dr. Moore had four people who knew Bourgeois as an adult answer questions from the ABAS–II: Michelle Armont (a childhood friend), Rhonda Davis (co-worker), Danny Clark (coworker); and Nathaniel Banks (childhood friend). Both Dr. Swanson and Dr. Moore asked the reporting individuals to fill out the VABS–II and the ABAS–II which, through a long series of questions, explored Bourgeois' proficiency at certain activities.

Experts in *Atkins* cases measure retrospectively what an inmate could do at a given point in time, often decades before. Here, for example, Dr. Swanson asked reporting individuals to recount what aptitudes Bourgeois had in his young childhood, nearly thirty years earlier. Dr. Swanson and Dr. Moore came to diametrically opposed conclusions about Bourgeois' abilities, confirming that "[t]he assessment of adaptive functioning deficits is no easy task." *Wiley,* 625 F.3d at 217. *Atkins* has made that inquiry a particular challenge for the mental health practitioners. Designers intended that the testing instruments which measure adaptive skills would make a contemporaneous assessment of functioning. By definition, psychology's conceptualization of mental retardation centers on the formative period, which ends for their purposes on an individual's eighteenth birthday. Yet the Constitution prohibits infliction of a death sentence before age 18, *see Roper v. Simmons,* 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), ensuring that observations in an *Atkins* case will take place after the developmental period. As Dr. Swanson explained, the *Atkins* inquiry asks the psychological profession to do something its testing instruments were never designed to do: make a retrospective evaluation of an individual's adaptive behavior. (DE 594 at 193).

**\*34** Caution attends undue reliance on those backward-glancing assessments. The retrospective review assumes that those reporting on an inmate's past adaptive abilities can provide competent, honest, and objective observations of his abilities. Thus, the AAIDD 11th Edition warns to use respondents who are "very familiar with the person and have known him/her for some time and have had the opportunity to observe the person function across community settings and times." AAIDD 11th at 47. Care must be taken to extract information from those with sufficient familiarity and understanding to provide reliable data. The professional organizations recommend "that because the adaptive functioning assessment typically takes the form of interviewing third-parties, the respondent should be someone who is well acquainted with the subject's behavior over an extended period, such as a parent, teacher, or direct-service provider." *Wiley,* 625 F.3d at 218 (quoting AAMR 10th ed. at 85). Also, as became a concern in this case, the responder should be one with sufficient age, maturity, and understanding during the time period they observed the inmate to provide a reliable assessment of their behavior. To that end, the AAIDD 11th instructs "for clinicians to assess the reliability of any respondent providing adaptive behavior information." AAIDD 11th, at 47.[FN51]

> FN51. Dr. Swanson agreed that the adaptive-deficits tests were normed for retrospective evaluations, their reliability in that capacity is unknown, and thus their results should be interpreted with caution. (DE 594 at 145).

The process also assumes that time has not dimmed accurate memory. For instance, the experts administering the standardized assessment tests turned the reporting individual's attention to a specific point in the developmental period, highlighting attendant concerns about memory loss and other factors which degrade the reliability of information. As Dr. Moore explained, "the struggle with the adaptive functioning measures in an adult is the farther you go back, the less reliable the information is." (DE 599 at 197). The testing performed by Bourgeois' experts asked people to look back over decades to evaluate what Bourgeois could do at a young age. Time blurs memories, relationships may taint perspective, and a lack of contemporaneous accounts degrades reliability. This concern becomes particularly important when, knowing that their

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

information may make a difference between life and death, mental health professionals ask loved ones to look back decades and evaluate an individual's aptitudes.

While psychology has apparently tried to provide its practitioners a means to ascertain intelligence retrospectively, *see* AAIDD 11th at 95–96, mental retardation as understood by *Atkins* complicates the traditional methods of the mental health community. To that end, Dr. Swanson acknowledged that the reliability of using the adaptive-functions measures in a retrospective evaluation was unknown and that caution should attend reviewing the results. (DE 594 at 145).

a. The Woodcock–Johnson

Dr. Swanson administered the Woodcock–Johnson to assess whether Bourgeois had deficits in the functional academic or conceptual categories. She explained that the "Woodcock–Johnson would meet the gold standard of an academic achievement test. It's actually a battery of many tests assessing many types of adaptive skills and then collapsing them into broad areas." (DE 594 at 44). As a result of his Woodcock–Johnson scores, Dr. Swanson determined that Bourgeois lacked adaptive skills in two subcategories of the AAIDD's conceptual domain. She testified that, in the functional academic category, his scoring showed the intelligence of an elementary school child: "His academic fluency is at the fifth grade level and his actual ability to apply academics actually is at the third grade level, so this is consistent with what you would see with a person who has mild mental retardation." (DE 594 at 58). In oral communication, she opined:

**\*35** [I]n that test you give them oral comprehension and other tests that probe for oral language and listening comprehension. On ... the first two broad cluster scores ... his scores ... were at the third grade level and the fourth grade level. Overall that was like at a 9th to 16th percentile, which is consistent, in my opinion, with people having communication deficits which is also under conceptual.

(DE 594 at 58–59). Because Dr. Swanson explained that individuals with mental retardation may "function overall at about as high as a sixth grade level," (DE 594 at 45), she opined that his lowest scores on the Woodcock–Johnson indicated impairments in the conceptual adaptive domain under the AAIDD and the functional academics area of the APA.

Nevertheless, Dr. Swanson conceded on cross-examination that Bourgeois scored well in several areas of the Woodcock–Johnson. (DE 594 at 143–44). In essence, she focused on his areas of weakness without fully considering his strengths. Dr. Moore described Bourgeois' scores: "By and large, he's functioning in the lower part of the low average range, with a couple of areas that he was significantly below in." (DE 599 at 109). Based on Bourgeois' scores which generally fell outside the impaired range, Dr. Moore disagreed that Bourgeois' Woodcock–Johnson scores indicated global adaptive deficits. He testified that, "in comparison to the general population," Bourgeois was not impaired. (DE 599 at 108–09).

b. The ABAS–II and the Vineland

Dr. Swanson administered the ABAS–II and the VABS–II to Ms. Frank, asking her to focus on Bourgeois' adaptive abilities when he lived with her grandmother, Ms. Mary, at age seven. Dr. Swanson's testing served as the basis for other experts to find adaptive deficits. Dr. Cunningham, for instance, accepted Dr. Swanson's testing as a valid measure of Bourgeois' abilities. Based on several answers on the ABAS–II and the Vineland, the Court questions whether Ms. Frank could accurately assess Bourgeois' aptitudes. As discussed below, Ms. Frank's answers suggest that Dr. Swanson should have exhibited more care in selecting her only informant.

Dr. Swanson characterized Ms. Frank as a "prime subject to whom to administer the Vineland–II instrument." (GX–175 at 2; DE 459 at 28). Interestingly, Dr. Swanson did not select an informant who lived with Bourgeois or knew him for a long period of time. Ms. Frank is approximately sixteen years older than Bourgeois.[FN52] She moved away from the Bend-the community Bourgeois grew up in-when she was a teenager, but "came in daily to check with her grandmother. She sometimes stayed at night with her grandmother." (DE 594 at 68). Her daily observation, however, only lasted for several months while she was unemployed. (DE 597 at 94–95). Dr. Swanson selected as an informant someone who only saw Bourgeois daily for only a brief period when he was a young child.

FN52. Dr. Swanson asked Ms. Frank to evaluate Bourgeois for the time period when he was seven years old. Dr. Swanson erroneously assumed that Ms. Frank was a teenager when she observed Bourgeois,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

(DE 594 at 72), when she was actually in her early twenties. Bourgeois was seven years old when he moved in with Ms. Mary, making Ms. Frank about 23 or 24. She had moved away from the community before Bourgeois was born. However, she would visit her grandmother "two or three times a week, and sometimes on weekends" but visited her more frequently when she was out of work. (DE 597 at 93, 95). Ms. Frank had contact with Bourgeois for about two years. (DE 597 at 113). After that, she only saw him occasionally. (DE 597 at 117).

Dr. Swanson testified that, in her opinion, Ms. Frank "got to observe her grandmother as she was working with him, so she had direct knowledge on a daily basis of how he met these different skills." (DE 594 at 72). In a supplemental report, Dr. Swanson described Ms. Frank as someone who was "in a position to observe [Bourgeois] extensively, across multiple settings, over a long period of time." (PX–33 at 2).[FN53] However, Ms Frank's limited contact with Bourgeois during a brief period of his youth constrained her ability to answer questions reliably. Dr. Swanson conceded that the best practice would have been to pick an informant who could assess the inmate nearer his eighteenth birthday. (DE 594 at 147, 155). Still, she thought that Ms. Frank could answer her questions most clearly. (DE 594 at 147).

> FN53. Still, Dr. Swanson testified that she "had a lot of concerns on whether Ms. Franks was a good informant or not and how much she would remember[.]" (DE 594 at 73). Dr. Swanson seemed to base her conclusion that Ms. Franks was a reliable informant on the fact that she answered all the questions on the ABAS–II. After finding that Ms. Franks could answer all the questions on the ABAS–II, she administered the Vineland. (DE 594 at 73). The Vineland produced scores in "the mild deficit range[.]" (DE 594 at 75).

**\*36** Ms. Frank's assessment of Bourgeois' abilities presumed a confidence in her memory that negated the decades since she had observed him. Ms. Frank answered questions on the testing without making any guesses at how Bourgeois could function. Dr. Moore found it "surprising ... that she was able to recall back to that and not guess on anything." (DE 599 at 222). The conflicting answers she gave suggest that Ms. Frank

could not reliably assess Bourgeois' adaptive abilities. For instance, on the Vineland Ms. Frank reported that Bourgeois could not even hold a fork at age seven, which indicates a degree of impairment far greater than that even suggested by his low IQ scores. In contradiction, on the Vineland Ms. Frank said he could correctly hold a fork. (DE 594 at 152).[FN54] She reported on the ABAS II that Bourgeois could not form a sentence using nouns and verbs. Aside from indicating that she could not properly assess Bourgeois, this answer conflicted with her answer on the Vineland that he could form proper sentences. (DE 594 at 153–54). In her evidentiary hearing testimony, Dr. Swanson acknowledged these problematic answers but explained that they would not weigh against using Ms. Frank as an informant. The best Dr. Swanson could say is that it would be more reliable to have had more than one reporting individual, and preferably someone who knew Bourgeois along a variety of settings closer to age 18. (DE 594 at 155).

> FN54. While Dr. Swanson did not rely in the ABAS–II in her report, her evidentiary hearing testimony treated the results from both testing instruments as valid.

Dr. Moore also administered the ABAS–II, but did so to multiple respondents. Dr. Moore explicated: "we want to have people who know the individual well and across a variety of settings. Certainly, we want to be aware of whether the person has a vested interest in the outcome. So we want to make sure we get good and objective data. And in a forensic setting, that becomes even more of a challenge." (DE 599 at 104). His focus, however, was not on Bourgeois' childhood; Dr. Moore selected respondents who observed Bourgeois both closer to age 18 and when he was older. Dr. Moore explained that he selected informants who had "known Mr. Bourgeois over a fairly extended period—in this case, I was trying to look for, you know, a number of years—and they had been able to spend social time with him, had seen him on a more casual basis[.]" (DE599 at 174). Because Dr. Moore doubted the validity of the results on the ABAS–II from two of the four informants he selected,[FN55] he only based his assessment on the information provided by Michelle Davis and Nathaniel Banks.

> FN55. Dr. Moore discounted the results he obtained from Ms. Armont. He explained: "In looking at the results of the ABAS that Ms. Armont had completed,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 40

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

there were significant questions about validity of that measure. I had concerns while she was taking it, but in looking at the results, those concerns were certainly verified." (DE 599 at 118). Ms. Armont claimed that Bourgeois was so debilitated that he could not perform functions which the record amply proved that he could do. Dr. Moore suggested that someone had instructed her to answer the questions in a way that would make Bourgeois seem retarded. (DE 599 at 188). Dr. Moore testified: "And Ms. Armont's scores, or the results from the administration to Ms. Armont was significantly below that, significantly different from that. He was in the, basically in the average range, average to slightly above average on the conceptual, social, practical and global for Davis and Clark. He was in the significantly impaired range for Ms. Armont." (DE 599 at 131). Dr. Moore also discounted the scores from Bourgeois' co-worker for fifteen years, Danny Clark. Dr. Moore explained: "Mr. Clark, it became apparent that he had not fully understood the instructions for the ABAS, and thus had completed the form in a manner that invalidated the scores." (DE 599 at 123). Specifically, he made too many guesses about Bourgeois' abilities. (DE 599 at 165). Mr. Clark, however, testified in the evidentiary hearing. From his testimony, he obviously never considered Bourgeois mentally retarded. He described Bourgeois as a competent driver, neat and clean in his appearance, polite, and in other ways much different than the severely impaired individual described by Dr. Swanson. Dr. Moore also attempted to administer the ABAS–II to Claudia Williams, but "she decided not to complete the ABAS because she indicated she didn't want to do anything that could be potentially of harm to her brother." (DE 599 at 119).

Ms. Davis was a dispatcher at the trucking company where Bourgeois worked for years. She "and her family had known [Bourgeois] for many, many, many years, but also she talked about some of the times that they had talked when her mom brought meals in and things like that." (DE 599 at 174). Ms. Davis' answers on the ABAS–II resulted in generally average or above average score.[FN56] Ms. Davis testified in the evidentiary hearing. She was a friendly, credible witness who seemed to have fond remembrances of Bourgeois. She testified that nothing hinted that he was mentally retarded or even slow.

(DE 595 at 151, 184).

FN56. While Ms. Davis made many guesses on the ABAS–II, Dr. Moore opined that it did not invalidate her scoring because "she was certainly a very fastidious, perhaps over-cautious, in endorsing guessed items. But she made seemingly, was vigilant to, if she didn't see it happen, that she checked a guess on there. So there was certainly a lot of guessed responses on there, and she appeared to be, again, taking that, you know, very much tuned into that issue." (DE 599 at 126).

**\*37** Mr. Banks did not testify in the evidentiary hearing. Dr. Moore explained that Mr. Banks "was a childhood friend of Mr. Bourgeois and knew him throughout his childhood up to the point that they graduated from—well, knew him throughout his life, but had ongoing contact with him until he was about 18." (DE 599 at 196).[FN57] Dr. Moore relied on Mr. Banks because "it seemed clear that they knew each other well, that they had a good friendship, but also that Mr. Banks seemed willing to ask his friend about inconsistencies, and seemed to be really trying to get a bead or understanding about what had happened." (DE 599 at 216). Importantly, Dr. Moore asked Mr. Banks to assess Bourgeois age right at about 18. Mr. Banks' assessment was somewhat lower than the others Dr. Moore used, but that suggested "an upward course of improvement in adaptive functioning." (DE 599 at 218). Even so, Mr. Banks only rated Bourgeois below average in two areas, the rest being average or above average. (DE 599 at 218).[FN58]

FN57. Mr. Banks testified in the guilt/innocence phase that Bourgeois and his family visited before the murder. Mr. Banks described JG1999 as sad and bruised. Bourgeois told him that he natural mother neglected her and her mother's boyfriend abused her. (DE 344 at 109–111).

FN58. In the evidentiary hearing, Bourgeois objected to any discussion of Nathaniel Banks' ABAS–II responses because the Government did not call him as a witness. (DE 599 at 120–21). The Court sustained that objection. (DE 599 at 121). Bourgeois, however, later opened the door to consideration of Mr. Banks' responses by asking Dr. Moore about them. (DE 599

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

ay 198, 215).

Dr. Moore's ABAS–II testing generally resulted in scores falling within the average range, with only a few in the below-average category. None of the responses in Dr. Moore's testing suggested significant impairment. In Dr. Moore's opinion, Bourgeois' "adaptive functioning was generally in the skill level expected of the average adult male." (GX–15 at 12). Dr. Moore's testimony, which the Court still must approach with caution because of its retrospective focus, more credibly measured Bourgeois' functioning. As discussed below, the lay testimony that came before the Court amply supported the conclusions from Dr. Moore's testing.

*2. Lay Accounts of Bourgeois' Functioning*

Standardized testing instruments cannot provide the only data for finding functional adaptive deficits. The AAIDD 11th instructs that "[o]btaining information from multiple respondents and other relevant sources (e.g., school records, employment history, previous evaluations) is essential to providing corroborating information that provides a comprehensive picture of the individual's functioning." AAIDD 11th, at 47.[FN59] Dr. Swanson provided a supplemental declaration after she interviewed several informants. (PX–33). From those interviews, she painted the picture of Bourgeois as a profoundly impaired individual. She described Bourgeois as a "significantly deficient" person who relied on "family, friends, and co-workers ... in order to perform daily life activities." (PX–33 at 2). Of those informants, Claudia Williams, Beverly Frank, Brenda Goodman, Carl Henry, Murray Bourgeois, and Donald Resse testified in the evidentiary hearing. A review of the evidentiary hearing testimony confirms that Dr. Swanson should have more critically examined the data upon which she based her conclusions. The testimony from Bourgeois' witnesses was as follows:

> FN59. "If adaptive behavior assessment are used and reported in the records reviewed, clinicians should weigh the extent to which (a) multiple informants were used and multiple contexts samples; (b) that limitations in present functioning were considered within the context of community environments typical of the individual's age peers and culture; (c) important social behavioral skills, such as gullibility and naivete, were assessed; (d) behaviors that are

currently viewed as developmentally and socially relevant were included; and (e) adaptive behavior was assessed in reference to typical and actual functioning in the community." AAIDD 11th, at 46.

• Bourgeois' sister Claudia Williams could provide broad outlines showing that he had a difficult childhood, but she was not a good historian. To some extent, her confusion was understandable. She was young when she interacted with Bourgeois and was asked to evaluate his aptitude based on her childhood observations.[FN60] Her testimony showed that she had unreasonable expectations about the tasks Bourgeois should have been able to perform as a child. For example, Ms. Williams expected Bourgeois to clean the bathroom by himself at age four. (DE 597 at 29–30). She described how, when she was about twelve, she would occasionally help him with his Kindergarten homework because he was "very slow." Her assistance, though, consisted of mostly helping him "writing [his] ABC's," a skill that the experts agree he excels at now. (DE 597 at 36–38, 58–59). Unlike some other witnesses, Ms. Williams observed Bourgeois near the end of the developmental period. Bourgeois moved in with Ms. Williams when he was "probably about 18 or 19, something like that." (DE 597 at 39). Dr. Swanson primarily used Ms. Williams' account from that time period to assume that Bourgeois would "rely on [Ms. Williams] for cooking and washing his clothes and things like that." (DE 594 at 91). It was not clear, however, that Bourgeois was incapable of performing those actions; it was clear from her testimony that Ms. Williams was the one in the house that cooked. (DE 597 at 64). She reported that by then Bourgeois dressed himself and had good hygiene. (DE 597 at 40–41). In all, her testimony, while somewhat confused, suggested that any gross impairment in Bourgeois' youth did not extend into his later teenage years.

> FN60. The Government's objection to her testimony summarized the inherent problems with relying on her as a reliable witness: "Your Honor, I'm going to object. She's asking for some kind of retroactive interpretation of a 12–year–old, that's how old she would have been ... How can she make, how can she make that opinion? I mean, it's ludicrous, a 12–year–old, from the eyes of a 12–year–old, and what is she now? At least 39." (DE 597 at 31).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 42

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

**\*38** • Beverly Frank provided detailed testimony about Bourgeois. As previously noted, she observed him as a youth when she, in her twenties, visited her grandmother's house. Ms. Frank explained that he was slow and had problems understanding the games played by the other children. (DE 597 at 98). She identified problems he had at about age seven such as counting change, dressing in mismatched clothing, and properly buttoning a shirt. (DE 597 at 98–99, 109–10). She, however, did not have contact with him as he aged.

• Brenda Goodman, another of Ms. Mary's granddaughters who was 12 years older than Bourgeois, also testified. Ms. Goodman moved away from the Bend around the time of Bourgeois' birth, but would visit regularly. She testified that when young Bourgeois could not put his shoes on the right feet, wear appropriate clothing, button his shirt, or follow directions well. (DE 597 at 138–39). He had problems communicating because he stuttered. (DE 597 at 139). She, however, also testified that Bourgeois would "pitch in" to help with his brother who had cerebral palsy. (DE 597 at 134). Her testimony, nevertheless, did not address Bourgeois' functioning closer to the end of the developmental period.

• Donald Reese, a co-worker from when Bourgeois first began driving, testified about events that led him to question Bourgeois' intelligence. However, he could not provide specific information that conclusively pointed to mental retardation. For example, Dr. Swanson relied on Mr. Reese to assume that Bourgeois only secured his driver's licence by obtaining the exam answers beforehand. Mr. Reese related that many drivers cheated on the examination for their chauffeur's licence, however he had no personal knowledge if Bourgeois cheated. (DE 597 at 391–92). Dr. Swanson relied on Mr. Reese to show Bourgeois' alleged difficulty in operating a truck independently. For example, Mr. Reese said on the first day he and Bourgeois were assigned as team drivers, Bourgeois got in the cab and began pushing buttons randomly until he found one to make the truck go. (DE 597 at 368–69). However, from his testimony it became clear that he did not know if Bourgeois had been trained on that particular truck. Mr. Reese himself did not know what all the buttons did. (DE 597 at 380–83). Mr. Reese described two occasions in which Bourgeois became lost, one of which landed the trailer in a ditch. (DE 597 at 371–75). He also

suspected that Bourgeois did not prepare properly for a three-week route (DE 597 at 377–78), but did not specifically testify that he had problems with hygiene. Mr. Reese's testimony added little to the question of whether Bourgeois is mentally retarded.

• Bourgeois' cousin, Carl Henry, testified that he had problems as a child learning new games and riding a bicycle. (DE 597 at 324, 360). After Bourgeois had already been employed at his first job, Mr. Henry played some part in Bourgeois getting a position to drive a "buggy truck" that picked up shopping carts in local neighborhoods. Mr. Henry did not describe any problems Bourgeois had in performing that job. When they moved him up to a delivery truck, but "he had a few problems," so they moved him back to the buggy truck. (DE 597 at 326). With additional training, however, he moved back to the delivery truck. (DE 597 at 327). Mr. Henry, however, still had to help Bourgeois fill out forms. (DE 597 at 329). Years later, when Mr. Henry drove with Bourgeois he noticed that he would not use the new communication system in his truck, but would call the dispatcher instead. (DE 597 at 337). He still then had others help with his paperwork. (DE 597 at 338). This testimony, however, conflicted with that from the Government's witnesses who said that Bourgeois could perform all the duties of a truck driver without assistance.

**\*39** • Murray Bourgeois testified how, when he returned from military service and his cousin was ten, Bourgeois hung around his mechanic's shop but he could not grasp how to work on cars. (DE 597 at 399). He explained that Bourgeois was "slow to catch on. This mechanic thing was like too fast of a pace for him. (DE 597 at 399–400). He testified that Bourgeois had problems when first driving an 18–wheeler and was unsafe. (DE 597 at 400). As an adult, Bourgeois was "slower than most of the guys, you know, catching on to a lot of things." (DE 597 at 401). One time, Bourgeois claimed to be able to ride a three-wheeler ATV, but crashed it. (DE 597 at 402–03). His testimony, however, only showed that Bourgeois "wasn't used to riding it." (DE 597 at 403, 413).

Taken together, the testimony about Bourgeois' childhood and young adulthood suggests that he was slower than other youth, but the reliability of those accounts are impaired somewhat by a failure to have age-appropriate expectations for

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

his behavior. Most of the impairments described consisted of difficulty learning new concepts or activities. For instance, Mr. Henry described how Bourgeois had some difficulty learning to drive some vehicles, but he obviously became proficient with time. Bourgeois succeeded when given more time or training. While Murray Bourgeois still considered him slow, he could obviously learn to operate competently in society. Bourgeois' childhood friends and his relatives testified that he was slow as a youth, but the information was mixed as he got older.

The Government's witnesses described competent adaptive abilities as an adult. The Government called Danny Clark, Robert Patterson, William Shots, Christopher Key, and Rhonda Davis as witnesses to describe Bourgeois' aptitudes as an adult. Each of the Government's witnesses knew Bourgeois in the work context, some of whom had worked for the same trucking company as him for many years. Their descriptions of his work ability ranged from being a competent truck driver (DE 595 at 7) to an "above-average driver" (DE 595 at 59) to one of the "top two or three drivers" (DE 595 at 62) to one who customers often complimented and requested (DE 595 at 75–77, 114). Bourgeois completed entries in his log book satisfactorily (DE 595 at 60, 85) and examined his load slips for accuracy (DE 595 at 184). He could figure out how many miles he had traveled and how many more he could travel in order to comply with regulations. (DE 595 at 18). One witness assured that Bourgeois knew how to work the onboard computer because he was the only one in the truck at times. (DE 595 at 100).[FN61] He did not just travel dedicated routes but navigated throughout the nation without apparent difficulty. (DE 595 at 93–94). [FN62] In fact, one witness described him as an "overachiever." (DE 595 at 113). His appearance and grooming were beyond presentable, but noteworthy. He had a "very professional appearance." (DE 595 at 149). In short, none of the Government's witnesses suspected that Bourgeois had mental impairments. The Court found each of the Government's witnesses to be credible, reliable informants of Bourgeois' abilities as an adult.

> FN61. After the murder Bourgeois told FBI agents that "the trucking company could see his location and send him messages via his computer, and he could send messages back to them via computer." (DE 344 at 181).

FN62. Dr. Price's videotaped examination showed that Bourgeois could use a map to navigate.

*3. Bourgeois' Adaptive Abilities*

**\*40** The evidentiary hearing and record create a complex picture of Bourgeois' life, resulting in an entangled mosaic of strengths and limitations. Without question, Bourgeois' life manifested some level of difficulty at certain points in his life. This Court's task in reviewing *Atkins* second prong is to decide whether, on a global level, those problems amount to significant deficits in adaptive functioning. As previously mentioned, this Court's review differs from that employed by the psychological community. The Court looks at the underlying credibility of the witnesses who reported about Bourgeois' scores on the ABAS and Vineland. Also, the Court compares the alleged deficiencies against his whole life experience.

In some respects, Bourgeois is a subject whose precise faculties are difficult to pin down. Bourgeois' narcissistic tendencies make him exaggerate his abilities and present himself as more capable than he is. He overestimates what he can do and likes to present himself in the best possible manner. Dr. Swanson correctly noted that "he wants to present well, he presents very well." (DE 594 at 101). Bourgeois' narcissism may mask impairments and camouflage poor adaptive skills. At the same time, exaggeration of weaknesses gives a distorted view of his complete capacities.

One persistent problem in this case has been that Dr. Swanson took at face value statements made about Bourgeois' abilities without assessing them for credibility, testing them for validity, or weighing them against things known about his life. As previously noted, some of the witnesses who testified in the evidentiary hearing lacked a reliable ability to remember credibly events that transpired many years before. Also, the inherent desire to save a loved one from a death sentence can alter recollections in his favor. Dr. Swanson's failure to test the validity of the lay interviews highlights the challenge in adjudicating *Atkins'* second prong and makes her conclusion that he had adaptive deficits not credible. Unlike Bourgeois' experts, the Court cannot rely on his scores from his expert's adaptive-limitations testing because the witnesses could not accurately report his abilities.

A fuller examination of Bourgeois' life calls into question

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 44

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

the testimony implying that he had severe impairments as a child. The tenuousness of the evidence supporting his claim of having deficient adaptive functioning becomes evident when considering the three areas that Dr. Swanson identified as supporting a diagnosis of mental retardation: functional academics; social/interpersonal skills; and health and safety).[FN63]

> FN63. Because her evidentiary hearing testimony mentioned that she found adaptive deficits, but did not extensively discuss which factors supported each category, the Court's discussion also relies on Dr. Swanson's supplemental report.

*Conceptual Domain–Functional* Academics Dr. Swanson based her opinion of Bourgeois' aptitude in functional academics on his scores on the Woodcock–Johnson and on her lay interviews.[FN64] The experts debated whether his scores on the Woodcock–Johnson supported a diagnosis of mental retardation. Dr. Moore explained that most of his scores on that test were not low enough to indicate mental retardation.[FN65] Bourgeois scored low on some areas, but also in the high school range for spelling and reading. The testing provided a mixed picture of Bourgeois' mental abilities, but on the whole, he scored in a range above that signaling significant impairment. His testing on other instruments such as the WRAT–III confirmed that, while his scores in arithmetic dropped to the threshold allowable for mental retardation, the remainder of his scores were in the high school proficiency range.[FN66] Test scores did not persuasively show that Bourgeois had adaptive deficits.

> FN64. Dr. Swanson opined that the DSM–IV–TR's functional academic skill area overlaps with the AAIDD's conceptual domain. (PX–33 at 3).

> FN65. Dr. Moore explained that "a person with mental retardation is significantly impaired. Generally about two standard deviations below the mean. And the standard scores here have a mean of 100 and a standard deviation of 15. So two standard deviations below the mean or significantly impaired would be a score of about 70 or below." (DE 599 at 108). Most of Bourgeois' scores were at 80 or above, though five subparts were at 70 or below (brief math, story recall, applied problems, and story recall delay).

> FN66. Dr. Weiner and Dr. Gelbort administered the Wide Range Achievement Test–Ill (WRAT–III). Dr. Gelbort testified that the Woodcock–Johnson "is much more in depth and gets at the same stuff, but with a lot more accuracy and validity [that the WRAT–III], because it's looking at a deeper level." (DE 560 at 43). On both tests, Bourgeois scored at the grade equivalent of high school in reading and spelling, and at the fifth or sixth grade level in arithmetic. Dr. Swanson relied on the low score in arithmetic to find deficits in functional academics.

*41 Lay depictions of Bourgeois' schooling should bolster his scoring on objective testing. As explained in her supplemental report, Dr. Swanson based her finding of functional academics on the following factors:

• individuals said that Bourgeois failed a grade early in school;

• others helped him with his elementary school homework, but he did not seem to understand the concepts;

• in elementary school he received speech therapy; [FN67]

> FN67. Dr. Swanson never explained how speech therapy necessarily showed mental retardation instead of some other impairment.

• he relied on others for help, including in high school he had others do his homework;

• others helped him complete job applications;

• he received written answers to driver's licence examinations beforehand;

• he had difficulty managing and understanding money.

(PX–33 at 3).

The evidentiary hearing testimony, however, failed to verify or support most of those factors. Some testimony suggested that Bourgeois was held back a grade in elementary school. Even so, the record leaves silent whether this was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

because of mental retardation, another learning disability, or even absenteeism. The unavailability of educational records hampered a probing look into his school years, but existent material shows that he graduated from high school with adequate grades. While testimony suggested that he may have been held back from one grade, his unstable home life does not preclude excessive absences, the hampering effects of a deprived home environment, or a general lack of effort from being the cause for that decision.

The record now before the Court does not suggest that Bourgeois did not earn the admittedly low, but not failing, grades he attained in high school. No one testified that Bourgeois needed assistance with homework in high school. Bourgeois graduated from high school with all passing grades. His school records do not show any accommodation for mental retardation and no one testified that he did not earn the grades he received. Even taking into account the testimony that he had problems learning in the early years, no one testified about his ability to perform in high school, the only period for which records remain.[FN68]

> FN68. Dr. Swanson apparently selected evidence that supported her conclusion that Bourgeois had mental retardation, but never probed that information for validity or reliability. For instance, she never explored the extent to which Bourgeois needed help in school and how long that need persisted. Claudia Williams testified that Bourgeois had problems doing his homework in elementary school and he "was very slow. You had to constantly show him what to do and how to do it." (DE 597 at 17, 27). But Ms. Williams was confused about when she helped, what she helped with, and how much help he needed. On cross-examination, Ms. Williams testified that Bourgeois received better grades than she did in high school. (DE 597 at 62).

Also, Dr. Swanson opined that she had received information from Donald Resse, a former coworker, that Bourgeois had received the answers to the driver's licence exam beforehand. (DE 594 at 162). However, Mr. Reese testified that it was common for applicants to have the answers beforehand, but he had no personal knowledge that Bourgeois had received help. (DE 597 at 392). Dr. Swanson assumed that Bourgeois had cheated on his driver's licence exam, but did not

explore whether the facts would prove that supposition. Dr. Swanson also assumed that his employer recruited him because he was mentally retarded, though she admitted that she did not have any personal information that it was so. (DE 594 at 95).

In addition, while considering that Bourgeois had problems with money Dr. Swanson did not consider the whole of his financial dealings. Dr. Swanson looked at a limited amount of information suggesting that Bourgeois made poor financial decisions. (DE 594 at 163–64). In her supplemental report, Dr. Swanson listed the information she relied upon to find an inability to manage finances: Bourgeois' brother "provided him a lot of assistance in financial matters. He had signed a lease that had put him in considerable debt on this truck that he had. He had fallen behind on paying on his house. He owed money on credit cards." (DE 594 at 164). But it was evident that Dr. Swanson had not looked at all his financial deals nor factored into her consideration his whole abilities. She saw how he meticulously tracked his financial affairs, as later explained by Dr. Moore. (DE 599 at 133–38). She watched his interview with Dr. Moore in which he elaborated on how he successfully operated in the trucking industry. (DE 594 at 163). She heard how Bourgeois blamed his financial misfortunes on Robin Bourgeois' overspending. (DE 594 at 163, 174). Dr. Swanson, however, only factored into her analysis at information that suggested poor money skills without probing the reliability of the information before her, the etiology of the alleged problems, whether financial difficulties came from mental retardation or other factors, or strong indications that Bourgeois understood how to handle money. Bourgeois was not a financial genius, but the evidence did not persuasively demonstrate that mental retardation was to blame for his money problems. Dr. Price credibly thought that "[l]iving beyond his means and being in financial trouble is more likely related to his personality disorder, especially his impulsivity and sense of entitlement." (GX–1 at 9). Bourgeois' money management showed "a personality disorder trait or ... a maladaptive personality trait," not mental retardation. (DE 595 at 223).

**\*42** Dr. Swanson's reliance on Bourgeois' writing ability to show adaptive deficits exemplifies her myopic review. For instance, Dr. Swanson included her observations of how long it took Bourgeois to write a paragraph as an indicator of deficits. (DE 594 at 50–51, 54). She felt that he took an unreasonable amount of time to write, but would not factor the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

content of his writing into her analysis. When the Government challenged her conclusions, Dr. Swanson became defensive and would not accommodate any information that disproved her conclusions. Dr. Swanson admitted that the content of his letters provided "an example that does not support [her] conclusion," but did not revise her conclusion on that basis. In another example, Dr. Swanson assumed that Bourgeois had difficulty understanding and managing money because he made unwise financial deals, (DE 594 at 163), although he assiduously maintained his checking account. Dr. Swanson opined that it "took [Bourgeois] much, much longer than it did the typical person" to learn to drive a truck, but he did learn and apparently did it with adequate proficiency. (DE 594 at 100). Cherry-picking information in isolation limits the data from which an expert draws conclusions, thus guiding the analysis.[FN69] Choosing narrowly the information that experts will consider leads them toward a conclusion that may not represent the inmate's full abilities.

> FN69. In fact, Dr. Swanson later refused to factor Bourgeois' long colloquies with the Court because "you can't use ... one comment or conversation to infer and make a total global assessment of someone's adaptive abilities." (DE 594 at 179). In fact, she herself based her finding of adaptive deficits on selected, isolated information without considering the whole.

Dr. Moore, on the other hand, took a full range of behavior into consideration when evaluating informal accounts for adaptive deficits. Dr. Moore criticized picking out individual and isolated problems because "[w]hen we look at adaptive functioning, we're looking at far more broad-based than that." (DE 599 at 206). According to Dr. Moore, Bourgeois' letter writing discounted adaptive deficits. (DE 599 at 13). Factors such as his fastidious record keeping, cogent letter writing, competent spelling, and others signal that insufficient evidence supports a finding of deficits in functional academics. Dr. Swanson lessened her credibility when she only focused on information supporting mental retardation without giving weight to or reconciling factors that disproved her conclusions.

*Practical Domain–Health and safety* Dr. Swanson based her finding of deficits in the practical domain on Bourgeois' work history. She claimed that he has "profound delays in learning new skills." (PX–33 at 3). According to her,

Bourgeois only got his first job because of his mental retardation. She related that he took longer than most to learn how to drive a commercial truck and was "sheltered at one trucking job by a relative who held a supervisory position [.]" (PX–33 at 3). Even later, he had difficulty driving and often got lost, ran over things, and received speeding tickets. He relied on others to navigate the roadways. Through his decades as a truck driver, "he would ask people to join him on his over the road jobs so that they could help him with directions and other tasks." (PX–33 at 4).

**\*43** The testimony from the evidentiary hearing did not confirm that Bourgeois received his first job because of mental retardation.[FN70] While possibly showing that it took him longer to learn skills, the abundant evidence before the Court shows that Bourgeois was not only competent in his work skills, but he excelled at his employment.[FN71] While he initially had problems at his first job, he learned to drive different kinds of trucks and mastered driving tractor-trailers. (DE 597 at 358–59). Dr. Swanson never interviewed any of the witnesses who testified about Bourgeois' successful decades as a truck driver.[FN72] Dr. Moore explained that his employment as a truck driver was inconsistent with mental retardation: "This isn't a simple repetitive job that he went to in a factory putting lids on widgets, but a job that had him going out and around the country, living, at least driving independently, picking up loads, taking care of his self-care during that period, interacting with people across a lot of different certainly social styles, as we move across the country." (DE 599 at 133).

> FN70. Dr. Swanson assumed that Ms. Mary got Bourgeois first job. (DE 594 at 93). The testimony was mixed about whether Bourgeois got his first job on his own. Only Ms. Williams, who provided less-than-believable testimony otherwise, said that her husband got him the job. *Compare* DE 597 at 43 *with* DE 597 at 350. Mr. Henry did not testify that retardation played any part in Bourgeois' hiring, his duties, accommodations made for him, or other employment decisions.

> FN71. Dr. Swanson also mentioned that Bourgeois had problems tying shoes, counting money, and riding a bike. Testimony about Bourgeois' impeccable dress and ability to maintain his own finances when older undercut the testimony about his inability to dress

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

properly or count money when young, even if it may have taken him longer to do so as a youth.

FN72. Testimony from Donald Resse included incidents where Bourgeois was lost or confused while driving, though he complained that since "[t]hat was over 20 years ago" he could not remember some specifics. (DE 597 at 386). What Dr. Swanson did not figure into her analysis was the decades afterward that Bourgeois apparently worked as a truck driver without significant difficulty. Even the trial testimony showed Bourgeois maneuvering about the country with an able understanding of direction and an apparent comprehension of how to perform his job effectively. Bourgeois' many years successfully performing his job duties undercut Mr. Reese's testimony. Other witnesses described Bourgeois' employment skills in a way that precluded blaming the problems Mr. Reese identified on mental retardation.

Dr. Swanson also found deficits in the APA's related area of health and safety. Dr. Swanson based her finding that he met the health and safety prong on specious evidence. For instance, she found that Bourgeois "had problems keeping himself safe" and mentioned how he "drove himself into a pole, causing himself serious injury." (PX–33 at 4). While Murray Bourgeois testified that Bourgeois had crashed an ATV, his testimony attributed the accident more to unfamiliarity than mental impairment. Dr. Swanson also relied on other unsafe practices, speeding tickets, and his getting lost as a support for her conclusion. She ignored, however, the fact that he drove a tractor-trailer across the country for decades without a major accident. His work put him on the roadways continually and the testimony did not indicate that he had ever crashed, caused a major accident, or received anything but minor injuries himself from carelessness. Given his long and successful history as a truck driver, Dr. Swanson's finding of adaptive deficits based on his work history lessens her credibility and implies that she only searched for information that would support her conclusion.

*Social Domain—Social/interpersonal skills* Finally, Dr. Swanson weakly found deficits in Bourgeois' social skills. Dr. Swanson listed Bourgeois talkativeness, which according to her made him "absolutely unable to participate in a two-way

conversation" as the primary basis for this diagnosis. (PX–33 at 4; DE 594 at 166–67). Dr. Swanson saw it as a deficit, mainly because he dominated conversations. (PX–33 at 4). Dr. Price saw Bourgeois' loquacious nature, "the gift of gab," as a positive factor. (GX–1 at 8). This Court communicated with Bourgeois many times during the trial. As the record of those colloquies amply shows, Bourgeois may be talkative, but he can engage in the give-and-take of normal conversation without any hint of impairment.[FN73] This Court's observation of Bourgeois, both in the courtroom and in his video recordings, does not suggest any impairment in the social domain.

FN73. Dr. Swanson also mentioned how Bourgeois' family "tolerated [his] odd manner" and how he had "informal supports to help him initiate and maintain any semblance of relationships." (PX–33 at 4). The record simply did not bear out these extreme statements.

*44 In the end, Dr. Swanson failed to make a full review of available evidence relating to Bourgeois' adaptive abilities. To the extent that Bourgeois may have had difficulties when younger, the record does not conclusively link those problems to mental retardation rather than a culturally deprived upbringing, poverty, or abuse. Dr. Swanson did not explore whether or not his childhood problems found their root in substantial mental impairment.

Nothing suggested that deficiencies endured into maturity.[FN74] Dr. Moore more credibly explained: "while his functioning may have been relatively impaired in his early childhood, he appears to have developed greater independence of functioning by the time he finished high school." (GX–15 at 16).[FN75] Bourgeois operated with remarkable competency in the free world for one with low IQ scores. A broad review of the evidence does not make Bourgeois' claim of adaptive deficits believable. To the extent that Bourgeois showed problems in his life, such as in functional academics, the evidence does not unquestionably place the blame for those deficiencies on mental retardation, instead of on a failure to exert sufficient effort, possibly in conjunction with additional psychological or behavioral problems. Bourgeois has not made a convincing showing that he suffers from significant adaptive deficits that would serve as a predicate for mental retardation. The record shows strengths that more than coexist with weaknesses, they call into question the depth and accuracy of reports of those

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

weaknesses. The Court finds that Bourgeois has not shown substantial adaptive deficits by a preponderance of the evidence.

> FN74. Of the DSM–IV–TR's three areas, Dr. Swanson only found conclusive evidence of one as Bourgeois aged. She testified that there was "firm evidence of conceptual deficits persisting into adulthood." (DE 594 at 105). While she saw "problems in his practical skill[s]," she explained that they were not "sufficient deficits that would qualify in the area of practical." (DE 594 at 104). She saw "a lot of deficits in the area of social" which merged with his personality disorder, but seemed more unsure of whether they were significant deficits. (DE 594 at 104–06).

> FN75. Dr. Estrada explained: "I have seen reports from his school indicating very low performance, reports from family members and friends indicating that he was slow to understand things, had difficulty making correct decisions, et cetera, et cetera. And I have also read reports and information of being able to take care of business and good reports, so I have had a mixed review regarding his cognitive capacities throughout his life." (PX–163 at 32). Again, the record "gives a mixed picture of good things, bad things" but Bourgeois clearly "had a good adaptive capacity in many areas of functioning." (PX–163 at 37). Dr. Estrada blamed other psychological issues, like rage episodes, for the problems in Bourgeois' life.

**D. Manifestation of Limitations Before Age 18**

The evidence before the Court failed to point to any pronounced intellectual impairment before Bourgeois' eighteenth birthday. Bourgeois has not shown that he is now, was at the time of the crime, or was during the developmental period, mentally retarded. Some evidence indicated that Bourgeois was a slow learner and took additional time to complete tasks while young. The Court, however, must balance that information against indications that mental retardation did not plague his youth.

As previously discussed, problems with time and perspective plague the most-developed lay testimony about his intellectual functioning as a youth. The evidence may show some problems before Bourgeois eighteenth birthday, but does

not convincingly point to a diagnosis of mental retardation before that point in time.[FN76] The Court finds that Bourgeois has failed to meet all three prongs of the *Atkins* analysis.

> FN76. Even to the extent that Bourgeois has shown some signs of intellectual disability, his claim to have suffered traumatic brain injury hampers his *Atkins* claim. According to Dr. Moore, the brain injuries Bourgeois' allegedly suffered cloud the question of pre-adult mental retardation:
>
>> But in this particular case there is the contention that there were two significant injuries, two significant head injuries, one of which purportedly led to a behavioral change. And to me, that would create a snag or a difficulty to being able to extrapolate those scores back. We don't know whether those head injuries would have led to a decrease in his IQ functioning. And in fact, if they were significant and led to behavioral change, it's likely that they could have led to a change. So I can't take the scores of the present and simply extrapolate them back and say there's been no change in intellectual functioning.
>
> (DE 599 at 145–46). Bourgeois' medical records, however, did not substantiate his claim to have had head injuries that put him a coma, calling into question the severity of any alleged head trauma.

**E. Trial Counsel's Failure to Develop Evidence of Mental Retardation**

In conjunction with his *Atkins* claim, Bourgeois faults defense counsel for not developing evidence of his alleged mental retardation at the time of trial. Evidence of possible mental retardation would play two roles in the sentencing phase. First, mental retardation could preclude a death sentence under the FDPA, 18 U.S.C.A. § 3596(c), and *Atkins.* Second, trial counsel could develop evidence of Bourgeois' possible mental retardation as testimony to mitigate against a sentence of death. While the Court has explicitly found that Bourgeois is not mentally retarded, that ultimate conclusion would not foreclose counsel from presenting the same information to show that Bourgeois has below average or low intelligence.

**\*45** "Mental retardation as a mitigator and mental retardation under *Atkins* ... are discrete legal issues." *Bies, ——*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

U.S. at ——, 129 S.Ct. at 2153. Even when an inmate has valid IQ scores suggesting low intelligence, an attorney faces difficult questions when deciding whether to present such evidence to the jury because "[b]orderline retardation is not always viewed as a mitigating circumstance." *Riley v. Dretke,* 362 F.3d 302, 307 (5th Cir.2004). *Atkins* recognized that "reliance on mental retardation as a mitigating factor can be a two-edged sword that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury." 536 U.S. at 321; *see also* *Penry v. Lynaugh,* 492 U.S. 302, 324, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) ("Penry's mental retardation ... is a two-edged sword: it may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future."). The Fifth Circuit has previously found no *Strickland* prejudice in failing to present evidence of low IQ because " 'the upper borderline of mild retardation' does not amount to 'any significant organic damage or mental illness.' " *Riley,* 362 F.3d at 307 (quoting *Smith v. Black,* 904 F.2d 950, 977–78 (5th Cir.1990)).

The Court finds that trial counsel did not violate Bourgeois' constitutional rights by not investigating Bourgeois' mental retardation further. Trial counsel initially withheld any judgment about Bourgeois' level of intelligence until after Dr. Estrada's testing. (DE 388 at 7). However, Mr. Gilmore testified in the hearing that he never thought that Bourgeois was mentally retarded. (DE 598 at 145). Bourgeois was "very active in the defense team." (DE 598 at 145). Bourgeois wrote his attorneys detailed letters giving them precise instructions on the handling of his defense. He even asked his attorneys to provide him a copy of their defense strategy in written form. (DE 598 at 151). He informed his attorneys which witnesses he wanted to testify. (DE 598 at 154). Bourgeois gave him no reason to question Dr. Estrada's statement that he had above-average intelligence. (DE 598 at 156). Mr. Tinker explained: "Based on the information we had, from experts and family members, we were unaware that Mr. Bourgeois was mentally retarded, or near retardation level." PX–82 at 9).

Dr. Weiner's testing resulted in an IQ score that on its face fell within the range eligible for a diagnosis of mental retardation. The purpose of Dr. Weiner's testing, however, was to identify neurological deficits. He did not test for mental retardation, and thus did not encourage counsel to investigate that possible defense further. Dr. Weiner explained why he did not investigate Bourgeois' intellectual functioning:

Well, I really didn't have any way to reliably determine what his actual level of functioning was because he presented himself as someone who had better grades in school than he actually made, who went to college, which to my knowledge he didn't, who didn't tell me about multiple stressful circumstances in his life, the abuse and so on, so it would, in all likelihood, even if I could have administered an adaptive behavior instrument to Mr. Bourgeois, it would have been invalid because he would have probably exaggerated, made himself look like he was more capable of performing out in the world than he actually is.

**\*46** (DE 594 at 267).[FN77]

> FN77. Mr. Tinker dealt with Dr. Weiner exclusively. (DE 598 at 215).

Even though trial counsel did not seek expert assistance in that regard, Mr. Gilmore testified that he was left "just a gut feeling" that he was not mentally retarded. (DE 598 at 214). The evidence adduced after trial has shown that, had trial counsel chosen that defense strategy, the resultant information would not have excluded Bourgeois from execution. As discussed at greater length with respect to Bourgeois' failure-to-present-mitigating-evidence claim, reliance on evidence of a low IQ alone would not have brought about a reasonable probability of a different result. Bourgeois cannot show *Strickland* deficient performance or actual prejudice on trial counsel's failure to argue that Bourgeois is mentally retarded.

**F. Conclusion of Bourgeois'** *Atkins* **Claim**

This Court has afforded Bourgeois a full and fair opportunity to show whether mental retardation precludes his execution. A holistic review of Bourgeois' life does not manifest the characteristics *that Atkins* identified as making mentally retarded offenders less culpable:

Because of [mentally retarded offenders'] impairments ... by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. There is no evidence that they are more

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 50

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders.

*Atkins,* 536 U.S. at 318 (footnote omitted). Bourgeois' life indicates that he can communicate effectively, learn from experience, and engage in logical thinking.[FN78] Bourgeois' intellectual and adaptive functioning, while possibly low, does not bear the characteristics that would render his sentence a cruel and unusual punishment. The Court finds that Bourgeois has not shown by a preponderance of the evidence that he is mentally retarded. This Court denies Bourgeois' first ground for relief.

> FN78. While some expert witnesses focused on Bourgeois' impaired ability to control impulses, they attributed that deficit to other psychological deficiencies, rather than ment al retardation.

## II. Ineffective Assistance of Counsel for Failing to Present Mitigating Evidence (claim two)

Bourgeois' second ground for relief faults trial counsel's preparation and presentation of evidence to mitigate against a punishment of death. The importance of mitigating evidence in a capital case cannot be gainsaid. A capital sentencing jury must have the opportunity to consider "relevant facets of the character and record of the individual offender or the circumstances of the particular offense" including "compassionate or mitigating factors stemming from the diverse frailties of humankind." *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *see also Abdul–Kabir v. Quarterman,* 550 U.S. 233, 263–64, 127 S.Ct. 1654, 167 L.Ed.2d 585 (2007) ( "[B]efore a jury can undertake the grave task of imposing a death sentence, it must be allowed to consider a defendant's moral culpability and decide whether death is an appropriate punishment for that individual in light of his personal history and characteristics and the circumstances of the offense.").

**\*47** Capital defense attorneys carry a heavy burden in identifying and developing evidence to mitigate against a sentence of death. *See Florida v. Nixon,* 543 U.S. 175, 191, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004). Nevertheless, "[t]rial counsel's failure to present mitigating evidence during the penalty phase is not per se ineffective assistance" if based on reasoned strategic decision making. *Smith v. Quarterman,* 515

F.3d 392, 405 (5th Cir.2008); *see also Villegas v. Quarterman,* 274 F. App'x 378, 382 (5th Cir.2008); *Riley v. Cockrell,* 339 F.3d 308, 316–17 (5th Cir.2003); *Moore v. Johnson,* 194 F.3d 586, 615 (5th Cir.1999); *Ransom v. Johnson,* 126 F.3d 716, 723 (5th Cir.1997). Although the Constitution does not "require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be" or "require defense counsel to present mitigating evidence ... in every case," *Wiggins,* 539 U.S. at 533–34, "defense counsel has the obligation to conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances." *Neal v. Puckett,* 286 F.3d 236, 236–37 (5th Cir.2002) (quoting *Baldwin v. Maggio,* 704 F.2d 1325, 1332 (5th Cir.1983)) Bourgeois alleges that trial counsel did little to explore his background and gave the jury only a thumbnail sketch of the available evidence.

As previously discussed, Bourgeois' trial attorneys presented the jury with some information about his background. Bourgeois now argues that "the jury in this case was not provided with the true, accurate and available mitigating evidence" about (1) childhood physical abuse; (2) childhood sexual abuse; (3) cognitive impairments, including borderline mental retardation and organic brain damage; (4) current mental disorders such as borderline personality disorder; and (5) mental health evidence about how his abusive childhood influenced his adult behavior. (DE 396 at 18–20). Bourgeois claims that trial counsel should have built a sturdier case against a death sentence through both lay witnesses and expert assistance.

The Court has before it an ample view of available evidence and counsel's decision making. Bourgeois supported his Motion to Vacate with declarations from numerous individuals attesting to the difficult circumstances in his childhood. He selected a few of those individuals to testify in the evidentiary hearing. Coupled with that information, mental health experts testified about the lingering psychological effects of his childhood and other mental problems. The Court has provided Bourgeois a full and fair opportunity to present evidence on this claim. The Court will now review the standards governing defense attorneys' representation, pre-trial efforts, selection of lay witnesses, use of expert witnesses, and finally the cumulative effect of their choices.

### A. The *Strickland* Standard

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

PA-144

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Strickland* established a familiar two-pronged analysis under which a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's *performance* falls below an objective standard of reasonableness and thereby *prejudices* the defense." *Yarborough v. Gentry,* 540 U.S. 1, 3, 124 S.Ct. 1, 157 L.Ed.2d 1, (2003) (emphasis added); *see also Wiggins v. Smith,* 539 U.S. 510, 520, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland,* 466 U.S. at 700.

**\*48** To establish deficient performance, an inmate must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed ... by the Sixth Amendment." *Strickland,* 466 U.S. at 687. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct." *Wiggins,* 539 U.S. at 521. Instead, "[t]here are countless ways to provide effective assistance in any given case." *Strickland,* 466 U.S. at 689. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland,* 466 U.S. at 688.[FN79] In reviewing ineffectiveness claims, "judicial scrutiny of counsel's performance must be highly deferential," *id.* at 689, and courts afford counsel a "strong presumption of competence[.]" *Cullen v. Pinholster,* ––– U.S. ––––, 131 S.Ct. 1388, ––– L.Ed.2d ––––, 2011 WL 1225705, at \*16 (2011); *see also Premo v. Moore,* ––– U.S. ––––, 131 S.Ct. 733, 742, 178 L.Ed.2d 649 (2011) ("[S]ubstantial deference must be accorded to counsel's judgment[.]"); *Rompilla v. Beard,* 545 U.S. 374, 381, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (recognizing the "heavy measure of deference to counsel's judgments"). Even when the record fails to explain all of trial counsel's decision making, as it does in some places here, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Bell v. Cone,* 535 U.S. 685, 698, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (quotation omitted); *see also Gentry,* 540 U.S. at 8 ("When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect."); *Strickland,* 466 U.S. at 690 (stating that counsel is "strongly presumed" to make decisions in the exercise of

professional judgment).[FN80] In assessing an attorney's performance with respect to a capital sentencing proceeding, courts "look to such factors as what counsel did to prepare for sentencing, what mitigating evidence he had accumulated, what additional 'leads' he had, and what results he might reasonably have expected from these leads." *Neal,* 286 F.3d at 237.

> FN79. Movant extensively argues that trial counsel's representation fell short of the American Bar Association's *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* ("Guidelines"). Recent Supreme Court precedent has relied on the Guidelines as a useful measure of what activities a reasonable attorney should engage in when representing a capital defendant. *See Rompilla v. Beard,* 545 U.S. 374, 387, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005); *Wiggins,* 539 U.S. at 524; *see also Strickland,* 466 U.S. at 688–89 ("Prevailing norms of practice as reflected in American Bar Association standards and the like ... are guides to determining what is reasonable"). Nevertheless,
>
> > [n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. Indeed, the existence of detailed guidelines for representation could distract from the overriding mission of vigorous advocacy of the defendant's cause.
>
> *Strickland,* 466 U.S. at 688–89. The Supreme Court has not held that the guidelines are a checklist to effective representation. Guidelines established by professional organizations do not supplant, but rather inform, *Strickland's* penetrating performance and prejudice inquiry. *See Wiggins,* 539 U.S. at 521; *Roe v. Flores–Ortega,* 528 U.S. 470, 477, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000).
>
> FN80. The Court has before it an incomplete account of the efforts by trial counsel, the investigators, and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

the expert witnesses to advert a death sentence. Gaps exist in the record, partially owing to Mr. Tinker's passing, partially due to the nature of the information submitted. For instance, Mr. Gilmore's testimony clearly showed that Mr. Tenore played an important part in the defense team and interacted regularly with the mitigation investigators, but his entire role cannot be ascertained from the material. (DE 598 at 192). Some email communications between the defense team members are before the Court, but many are one-sided, without responses, and capture only a portion of an obviously on-going conversation. Nevertheless, the record provides a sufficient basis to decide "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [his client's] background was itself reasonable." *Wiggins,* 539 U.S. at 523.

To establish actual prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland,* 466 U.S. at 694; *see also Wiggins,* 539 U.S. at 534. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *See Strickland,* 466 U.S. at 689; *Wiggins,* 539 U.S. at 534. The Court does not consider prejudice in a vacuum. "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland,* 466 U.S. at 695.

A court reviewing for error under *Strickland* recognizes that the years that have passed may distort the landscape as viewed through trial counsel's eyes. *See Harrington v. Richter,* —— U.S. ——, —— S. Ct —— (2011) ("Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge."); *Strickland,* 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight [and] to reconstruct the circumstances of counsel's challenged conduct[.]"). Thus, an ineffective-assistance claim focuses on "counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct[,]" because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence[.]" *Id.* at 689–90; *see also*

*Richter,* ——U.S. at ——, 131 S.Ct. at 790 ("After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome.").

**B. Trial Counsel's Investigation and Preparation of Mitigating Evidence**

**\*49** Bourgeois claims that trial counsel's investigation was too hasty, too superficial, and too truncated to pass constitutional muster. This Court has already briefly recounted trial counsel's case at the penalty phase. From the transcript alone, it is obvious that this is not a case where defense counsel completely abandoned the heavy duty to investigate and present mitigating evidence. The Court, however, will discuss at length trial counsel's efforts to build an effective punishment defense.

*1. Counsel's Early Efforts to Prepare a Mitigation Defense*

Early on, Bourgeois established himself as the one who would guide his defense, as evinced by a letter he wrote to trial counsel: "Dear Mr. Gilmore, I want a copy of your strategy on my case. I would like to know how you plan to attack my case and what you think the outcome will be. I would appreciate if you could put together a brief memorandum in support of me, Alfred Bourgeois, your Defendant, and position regarding to my trial." (GX–180). Bourgeois, who was "very active in the defense team," decided that the defense's theory would be that "his wife committed the crime" and never wavered from that defense. (DE 598 at 144–45). Accordingly, trial counsel "built [their] case around" that theory. (DE 598 at 145).

Contemplating that Bourgeois' chosen defensive theory would not be greeted with success, his attorneys began preparing a mitigation case before the Government certified that it would seek a death sentence. The defense first retained the services of Doug Tenore as an investigator. Mr. Gilmore retained Dr. Cunningham who advised him to secure the assistance of a mitigation investigator.[FN81] At Dr. Cunningham's recommendation, Lisa Milstein and Gerald Bierbaum joined the defense team.

> FN81. Mr. Gilmore sent Dr. Cunningham an email on July 25, 2003, informing him of his appointment. He described how "[t]he case was reset to February 2004, to allow you to gather information for your evaluation." He told Dr. Cunningham that he had

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 53

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

contacted an investigator for "your investigation." The record does not contain any communication from Dr. Cunningham clarifying the relationship he expected between the attorneys, the investigators, and the experts.

After the Government gave notice that this would be a capital case, the Court set jury selection to begin on February 12, 2004. Trial counsel had seven months to prepare for trial. From the outset, defense counsel pursued both lay witnesses and expert assistance. While the mitigation investigators delayed the beginning of their investigation into lay witnesses, this is certainly not a case where the defense "did not even take the first step of interviewing witnesses or requesting records." *Porter v. McCollum,* ––– U.S. ––––, 130 S.Ct. 447, 453, 175 L.Ed.2d 398 (2009).

The mitigation investigators met with Bourgeois for the first time on October 23, 2003. (PX–165; DE 351 at 12). Throughout the investigators' interaction with Bourgeois, he was extremely useful but also paradoxically deceptive. Mr. Gilmore explained that Bourgeois "gave [them] names and telephone numbers of everybody that [they] should contact." (DE598 at 146). Testimony from the evidentiary hearing showed that Bourgeois himself communicated with the investigator, Mr. Tenore, about the individuals who could provide information. (DE 598 at 184). Bourgeois, however, also provided misinformation. Bourgeois, for instance, untruthfully told his attorneys that he had been in an accident on a three-wheeled ATV and had been in a coma for two months. He exaggerated the successes in his life. Bourgeois' dishonesty hampered the defense's development of evidence.

*50 In the weeks after the first meeting, the investigators interviewed several individuals.[FN82] Their efforts, however, were not universally expeditious. On December 1, 2003, Dr. Cunningham's office sent the defense attorneys an email inquiring about the status of the mitigation investigation. Dr. Cunningham's office then informed counsel that they had not yet received any information from the mitigation investigators. Counsel immediately responded and indicated that the mitigation experts had requested more time to prepare, which would require a trial continuance. Counsel asked Dr. Cunningham for clarification on whether the mitigation investigators should feed him information or whether it should go to both of them. The record does not contain a response

from Dr. Cunningham. (DE 598 at 193).

> FN82. In October 2003, the defense informed the Court that their mitigation investigators had started interviewing witnesses and had been in Corpus Christi the week before. (DE 351 at 17).

At the recommendation of the mitigation investigators, on December 9, 2003, defense counsel filed a motion for a continuance to allow them more time to explore Bourgeois' background. (DE 134).[FN83] By this point, the mitigation investigators had already interviewed several of Bourgeois' relatives. (PX–165). Trial counsel informed the Court that the mitigation investigators "cannot properly complete their investigation of this case until August, 2004." (DE 134). The Court held a hearing on December 10, 2003. (DE 358). The Court expressed concern that the mitigating investigators had delayed their efforts to that point. The Court cautioned the defense that a failure to get the investigation "done in a timely manner" was "very close to bad faith." (DE 358 at 4).[FN84] The Court told the defense that the mitigation investigation "had to be finished by trial." (DE 358 at 14).

> FN83. That same day defense counsel filed a motion for a psychological examination because they observed "highly unusual, often bizarre behavior, listened to abnormal conversations, and ... noticed an unnatural writing style[.]" (DE 132 at 1). Around this same time, trial counsel even requested, and received, funds to employ a jury selection specialist. (DE 129). Also, they had experts look at the bite-mark and DNA evidence.

> FN84. Bourgeois emphasizes the concerns this Court expressed in that hearing as evidence that trial counsel's mitigation investigation fell below acceptable standards. Bourgeois' motion for a continuance, however, has to be considered in the context of that time. Trial counsel assured the Court that the mitigation investigators could complete their investigation in five months before the February 2004 trial setting. Trial counsel's motion asking for an additional lengthy amount of time came before the Court at the same time as serious concerns arose about the safety of witnesses. Bourgeois had, through correspondence, threatened to kill witnesses. At least

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**PA-147**

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

one had been killed. The Court told defense counsel: "I have to believe the past representation of [the Government] that every month delayed puts these witnesses in danger." (DE 358 at 14). This Court had to balance security concerns against the period needed for an adequate investigation. As the Court informed trial counsel: "this may be a matter of life and death for many people besides your client." (DE 358 at 101).

In the same hearing, the parties discussed the appointment of expert witnesses. The Court has already appointed experts to explain why Bourgeois killed and whether he premeditated the murder.[FN85] The defense wanted to retain Dr. Estrada as a mental-health expert. To trial counsel's "dismay," Dr. Estrada was already retained by the Government. (DE 598 at 156; DE 118; DE 358 at 11). By the time of trial, Mr. Gilmore had worked with Dr. Estrada for a decade and considered him a trusted, candid witness. (DE 595 at 154–57). Trial counsel believed that they could still get the information they needed on cross-examination. While the Government expressed concern that the motion for a mental-health evaluation was only a delay tactic by the defense (DE 132), the parties agreed to have Dr. Estrada examine Bourgeois. (DE 135, 149).

> FN85. The defense sought the assistance of other experts whose participation in the defense do not play a major role in the instant proceeding. For instance, trial counsel also secured the help of Dr. Joseph C. Rupp, a forensic pathologist, to testify about whether the forensic evidence suggested that Bourgeois committed a premeditated killing. (DE 350 at 82). The Court would not allow Dr. Rupp to testify in the guilt/innocence phase and questioned its relevance to the punishment proceedings. (DE 350 at 91–92). Trial counsel chose not to call Dr. Rupp as a witness. Trial counsel had retained a jury selection specialist. (DE 129). On October 10, 2003, the Court appointed Dr. George W. Holden to provide psychological explanation for Bourgeois' crime, focusing on "provid[ing] the jury with insight about dynamics of family violence as they related to Mr. Bourgeois' intent and state of mind at the time of the death of his infant daughter." (PX–20 at 1). Trial counsel provided Dr. Holden a "box of material" relating to Bourgeois' background. After reviewing the available material,

Dr. Holden provided an explanation for the murder: Bourgeois was upset about the potty training failure, was stressed from living with his family in the truck, and had little attachment to the victim. Dr. Holden suspected that Bourgeois had been abused as a child and thus learned that violence was an appropriate parenting technique. Dr. Holden explained that, "although this is evidently a case of horrible child physical abuse, it appears to be largely understandable and not uncommon—just a more extreme case with a tragic end." (DE 397, Exhibit 9). Dr. Holden filed an addendum letter on February 25, 2004, in which he addressed his opinion as to whether Bourgeois premeditated the killing. (DE 397, Exhibit 10). In a March 1, 2004 hearing, the Court found that Dr. Holden could not provide a physiological justification for the murder in the guilt/innocence phase. (DE 350 at 69).

After the December 10th hearing, trial counsel moved to withdraw its request for a continuance. (DE 145). Trial counsel informed the Court that the mitigation investigators had said "they would suspend their work on other investigations and concentrate on completing their investigation on this case." (DE 145 at 1). The mitigation investigators "assured counsel that their work [would] be completed in time for the February trial setting." (DE 145 at 1).

*2. Preparations Before the Guilt/Innocence Phase*

**\*51** As the trial date neared, the defense ramped up efforts to prepare a mitigation defense. The mitigation investigators began interviewing witnesses in earnest, contacting dozens of individuals in the two months left before jury selection began. (PX–165). Mr. Bierbaum "spent a significant amount of time in Louisiana." (DE 342 at 16). Before trial, the mitigation investigators would interview each of Bourgeois' siblings (except the one who suffers from cerebral palsy). The investigators spoke with several members of Ms. Mary's family, long-time friends of Bourgeois, and other family members. Their investigation would inform decisions made by trial counsel and the defense experts.

On January 20, 2004, Dr. Estrada submitted a forensic evaluation finding Bourgeois competent to stand trial and sane at the time of the offense. Importantly, Dr. Estrada found that Bourgeois "appears to have an above average intelligence and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**PA-148**

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

memory and an average knowledge commensurate with his level of education and experience." (DE 152 at 6). Dr. Estrada found that he could "remember and describe the details and postulate alternative theories for his defense; none of which involves disturbed mental status." (DE 152 at 7). Also, Dr. Estrada's review of taped telephone conversations with family members showed "no altered mental status at the time, no presence of delusions, and no presence of irrational thinking or irrational behavior or inability to know right and wrong." (DE 152 at 7).[FN86]

> FN86. Bourgeois gave Dr. Estrada some untruthful information. He claimed to have attended Louisi ana State University for two years and to have worked as a police officer. Importantly, Dr. Estrada reported that "[h]e denies any history of childhood abuse, physical or sexual, neglect or trauma." (DE 152 at 4). Other information, such as his employment history with trucking companies, was correct. Dr. Estrada made observations about Bourgeois' presentation. He found him "alert, attentive, well-oriented to the four spheres.... His thought processes show no thought disorder, no delusions, no hallucination, no obsessions, and no compulsions." (DE 152 at 6).

On January 21, 2004, Mr. Gilmore told the Court that the defense was "still in the process of investigating mitigating evidence" and was still waiting for a final report from the mitigation investigators. (DE 389 at 8–9). The next few weeks included frequent communication between the mitigation investigators and Dr. Cunningham. On January 30, 2004, mitigation investigators sent Dr. Cunningham and trial counsel "a bunch of material from Bourgeois' case" and expressed a desire to set up a meeting. (PX–60 at 1). Still, the mitigation investigation continued. In a subsequent email, the mitigation investigator advised that there remained "about 10 more probab[l]e witnesses and about 20 more witnesses to contact." (PX–60 at 2). Dr. Cunningham's records also show continual phone calls and correspondence with the defense team throughout February and March. (PX–151).[FN87] Mr. Bierbaum created a memorandum recording the results of a lengthy interview he and Mr. Tinker conducted with Bourgeois in late January, 2004. The memorandum records significant details about the abuse Bourgeois' mother heaped on him, along with other significant mitigating circumstances. (PX–61).

> FN87. For instance, the defense asked Dr. Cunningham for advice about what questions to ask prospective jurors (PX–60 at 5), promised to send him photographs of Bourgeois and video tapes (PX–60 at 6), and updated him on additional interviews and investigation (PX–60 at 8–12).

In early February, trial counsel got authorization for Dr. Cunningham to come to Corpus Christi. Dr. Cunningham interviewed Bourgeois, met with trial counsel, and made his own phone calls to potential witnesses. (PX–151). Dr. Cunningham interviewed Bourgeois for 5/4 hours. He also described conducting "extended telephone interviews" with Bourgeois' older siblings.[FN88] From that investigation, Dr. Cunningham became concerned that Bourgeois had a history of rage episodes that could be related to a traumatic brain injury he reportedly suffered. Four days later, Dr. Cunningham advised counsel to have a neurological evaluation performed to provide explanatory and mitigating evidence about Bourgeois' behavior. He also advised counsel to obtain Bourgeois' medical records, which trial counsel had already ordered.[FN89] Nothing suggests that Dr. Cunningham expressed any contemporaneous concern that insufficient time remained to be ready for trial. (DE 182).

> FN88. Despite characterizing the interviews as "extended" in 2004, Dr. Cunningham now downplays the information he solicited and blames others for what he later considered to be inadequate preparation:
>
> Given the eleventh-hour realization of this problem, occasioned by defense counsel not providing me with reliable investigation data in a timely manner, and the simultaneous demands of other professional obligations, I did not conduct as many interviews as needed to be accomplished, and the ones that I did conduct were not as comprehensive as I would have preferred. Given more time, and more reliable reports of preliminary interviews, I believe I would have been able to find even more psychologically significant information.
>
> (DE 397, Exhibit 6).
>
> FN89. On January 29, 2004, the defense filed a motion for a subpoena requesting medical records for

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

Bourgeois, his mother, his wife, and his daughters. Trial counsel received Bourgeois' medical records in late February. (PX–81).

**\*52** The defense team formed strategy through emails, including correspondence with Dr. Cunningham, on how to deal with trial matters such as Bourgeois' choice to testify. (PX–60 at 16). The defense scheduled another meeting and requested Dr. Cunningham's presence telephonically. (PX–60 at 14). Trial counsel also asked Dr. Cunningham to provide a summary of his findings and opinions regarding possible mitigation evidence. (PX–2, 3). In a short letter Dr. Cunningham listed "a number of adverse developmental factors that singly and collectively increased the likelihood of an adverse and/or criminally violent outcome in adulthood," including: abandonment by his father, emotional rejection and abuse, physical abuse, the death of his older brother, and rage attacks related to a head injury. (PX–2). Dr. Cunningham also pointed to "pro-social patterns and positive relationship patterns" including a good work history, that he "[w]as an involved father who provided economic support as well relationship [*sic*] to his children," and "[d]isplayed an ongoing interest in and was a constructive influence on his nieces and nephews." [FN90] Dr. Cunningham also gave trial counsel a separate letter describing his opinion of whether Bourgeois would be a risk of committing violent acts while incarcerated. (PX–3). Dr. Cunningham's report seemed detached from Bourgeois' record of misconduct after his arrest.[FN91] Additionally, Dr. Cunningham compared Bourgeois to studies of life-sentenced capital inmates. He observed that most life-sentenced capital inmates had a 20–30% risk exists for acts of assaultive violence and an 8–10% chance of "a more chronic violence problem" in prison. Dr. Cunningham thought that Bourgeois' incarceration history would reduce his own risk to around one or two percent. Dr. Cunningham emphasized that Bourgeois age, work history, and "continuing relationships with family members" would further reduce his likelihood of violence.

> FN90. Dr. Cunningham's conclusions seem detached from the facts of this case considering that the Government would argue that Bourgeois reluctance to support more children played into his murder. Also, the Government would use Bourgeois' abusive treatment of a nephew as an aggravating factor.

> FN91. By this point, Bourgeois had threatened to kill several individuals before trial, had been prohibited from communicating with anyone other than his attorneys but still smuggled out letters nonetheless, had threatened to assault jailors, and lunged at a Federal Marshal. Bourgeois' threats and violence required him to be isolated from all other inmates. Dr. Cunningham told trial counsel that "it is my understanding that Mr. Bourgeois has not engaged in any assaults on inmates or staff and further that he has received few if any disciplinary write-ups." Dr. Cunningham recognized that Bourgeois had made threats of inflicting some violence from prison, but stated that "the credibility of these reports has not been determined." Dr. Cunningham disregarded Bourgeois' ability to order any violence from prison because, in his opinion, he lacked sufficient financial resources or ties to organized criminal groups to carry them out. He also expressed confidence that, "should the Department of Justice conclude that there is good cause to fear Mr. Bourgeois' violent reach, special conditions of confinement can be brought to bear that would restrict and monitor his communications," without recognizing that Bourgeois had already bypassed similar conditions before trial. Dr. Cunningham cannot blame trial counsel or mitigation experts for his misunderstanding about the heightened security due to Bourgeois' threats and violence. He had already interviewed Bourgeois in jail, witnessed his level of security, and, with his professed expertise in incarceration, should have recognized the exceptional efforts made to isolate Bourgeois.

Jury selection began on February 19, 2004. Trial counsel continued preparing expert testimony for trial. At Dr. Cunningham's recommendation, trial counsel explored whether neurological issues contributed to Bourgeois' crime. (PX–1). Trial counsel had received court funds to employ a neurologist to perform an EEG and other studies to investigate Bourgeois' rage episodes. (DE 182). The results of the EEG did not reveal any abnormalities. On February 28, 2004, Dr. Donald Weiner performed a neuropsychological evaluation of Bourgeois that found him in the "impaired range, although some tests were only slightly impaired." [FN92] His performance on other parts of the test suggested results consistent with individuals who "have a tendency to exhibit inappropriate behavior under stress

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**PA-150**

Page 57

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

circumstances, without always being aware of the inappropriateness of their actions."

> FN92. Bourgeois told Dr. Weiner that he had been in a three-wheeler accident in 1984 which resulted in "his being in a coma for 1–2 months." Bourgeois' performance on neurological testing suggested "mild overall cerebral damage, with moderate cerebral damage in the posterior portion of the cerebral cortex ... likely die to the injuries sustained in the three-wheeler accident[.]" Dr. Weiner administered for tests: the Wechsler Adult Intelligence Scale–Revised ("WAIS–R"); the Wide Range Achievement Test–Third Edition ("WRAT–III"); the Halstead–Reitan Neurological Test Battery for Adults, and the Test of Memory Malingering. Dr. Weiner found no evidence of malingering and believed that his test results were "a valid indication of his current level of neuropsychological functioning." (DE 391, Exhibit 16). As previously mentioned, Bourgeois relies on Dr. Weiner's testing to support his *Atkins* claim. Dr. Cunningham's billing records show that he reviewed Dr. Weiner's neurological report on March 4, 2004. (PX–151 at 3; DE. 597 at 248). It is telling, given his knowledge of Dr. Weiner's results, his expertise, and his own personal interaction with Bourgeois, that Dr. Cunningham never recommended that the defense pursue mental retardation as a mitigation defense.

Jury selection ended on February 25, 2004. The guilt/innocence phase began on March 1, 2004. As the punishment phase approached, trial counsel began to choose which mitigating witnesses would testify. The investigators and attorneys had contacted "over 50 people" to discuss mitigating evidence. (DE 598 at 184). FN93 The mitigation investigators had provided trial counsel detailed summaries of their interviews with possible witnesses and with Bourgeois himself. (PX–61 at 24–39). The record plainly shows that the mitigation investigators had already pursued various avenues of investigation and interviewed many family members. After Bourgeois' conviction, trial counsel informed the Court that they were meeting with witnesses and would let the Court know who they planned to call. (DE 347 at 99).

> FN93. One time line records interviews by the

mitigation team with nearly 40 individuals, and some were interviewed multiple times. (PX–165). At trial, Mr. Tenore testified in a hearing that they had contacted "probably over 50" potential witnesses. (DE 342 at 15).

**\*53** Despite the defense efforts, not everyone was willing to testify on Bourgeois' behalf. Bourgeois family did not all look favorably on the prospect of testifying. His ex-wives and others still feared him. Others felt constrained in talking about his childhood because they did not want to disparage his still-living mother. Mr. Tinker explained: "My recollection is that information was gathered that might have helped our case, but that other information gathered would have a negative impact on our case. I don't recall the specifically [*sic* ] what the information was, but I recall family members being split on the issue." (PX–82 at 9).

Prior to the punishment phase, trial counsel met with a large group of family members—possibly as many as fifty-and interviewed them personally. Mr. Gilmore explained in the evidentiary hearing:

The Government: And let me ask you, on some of the people that Mr. Bourgeois told you to go to and speak to, did you—was what they were saying not good for your defense?

Mr. Gilmore: We brought down—I think we spoke with over 50, at least through the investigators, spoke with over 50 people.

The Government: And let me ask you, during the trial, did you rent a room, a little conference room over in the hotel that's next to here?

Mr. Gilmore: We got a small conference room and then a bigger room. We had all the witnesses in the big room, and then we'd take them individually into the conference room and talk to them individually.

The Government: And how many witnesses do you think were there when you did that?

Mr. Gilmore: I don't remember. It was a lot. It took most of the day talking to them.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**PA-151**

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

The Government: Okay. And after you went through this group of witnesses, is that when you decided, after talking, decide which ones to call?

Mr. Gilmore: We make a decision, you know, how they're going to present in court and whether or not they have relevant evidence, whether or not they've got too much baggage in terms of prior convictions, things like that.

(DE 598 at 184–85). Trial counsel sorted through those and chose to call only ones whose testimony would help more than it hurt.

But trial counsel did not make those decisions unilaterally. Mr. Gilmore testified that the trial attorneys "always discussed the witnesses with Mr. Bourgeois." (DE 598 at 154). For instance, Bourgeois insisted that his defense call his cousin as a witness, even though he had prior convictions. (DE 598 at 185).

With that background, the defense decided to present its mitigating case through the cross-examination of one expert witness and the somewhat-brief testimony of three lay witnesses. Because Dr. Cunningham's proposed testimony "did not fit with [the chosen] defense," (DE 598 at 182), they decided not to have him testify. To recount the punishment-phase defense briefly, cross-examination of Dr. Estrada established that Bourgeois "had suffered neglect and rejection, and there was some physical abuse by his mother." (DE 341 at 23). In fact, his mother singled him out for abuse. (DE 341 at 24). That abusive background contributed to Bourgeois' own abuse of children. (DE 341 at 47). Also, violence in Bourgeois' past caused him to be violent when under stress. Specifically, heavy stress around the time of the murder caused Bourgeois to explode in anger at JG1999. (DE 341 at 41). Three lay witnesses, Bourgeois' sister Michelle Denise Armont, his cousin Carl Kevin Henry, and former neighbor Herman Clayton, Jr., described his impoverished and abused childhood. The witnesses explained that Bourgeois "suffered a lot of abuse" and received many "whippings" from his mother including with "the extension cord from the fan." (DE 341 at 113–14, 125). For instance, witnesses described how his mother cruelly cleaned his nose with her long fingernails "and as time go on it developed a real, real bad sore" that "always would be bloody." (DE 341 at 114). Neighborhood children, and even his own siblings, teased him,

primarily because his father was not around. (DE 341 at 116). Bourgeois developed problems with anger and would "get[ ] red in the face," but his sister could usually calm him down. (DE 341 at 100).

**\*54** Trial counsel's closing argument discussed mitigating factors in Bourgeois' background. Trial counsel highlighted abuse from his mother and teasing from his siblings.[FN94] Trial counsel claimed that, with the lingering effects of childhood and stress swirling about him, Bourgeois just "snapped" and "it got out of hand and it ended up killing her. That's not to excuse his behavior; it's to-in an attempt to try to explain what happened." (DE 342 at 50).

> FN94. Trial counsel stated:
>
> The things that we have shown you about Alfred Bourgeois, knowing that you feel that he's guilty of this crime, are that Alfred is a 38–year–old man who was born in Louisiana, the product of a relationship, his mother and father weren't married. He has 22 siblings. His brothers and sisters that he lived with made fun of him because he never saw his father. His father had a one-night stand with his mother and then left and didn't support him until sometime when he was in high school, when he made contact with him. And his brothers and sisters made fun of him. And his mother singled him out for abuse. So much so that he went to live with Miss Mary, the elderly lady, to get away from his mother. And despite the fact that the Government may have you say he would-may want you to believe that he was doing that for his own convenience, he sacrificed to go and live with Miss Mary to take care of her. And he stayed with her until her death. And then after that, he did not want to go back home. You heard Michelle Armont testify that he didn't want to go back, that he didn't want to go back because of the way that his mother treated him.
>
> (DE 342 at 47).

*3. Trial Counsel Made a Constitutionally Sound Investigation*

With that background in mind, the Court finds that counsel

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

made a probing effort to investigate mitigating evidence. While the defense team delayed part of their investigation somewhat, the Court is more concerned with the results than the timing of their efforts. Bourgeois draws the Court's attention to *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), for the proposition that "[t]he Supreme Court has held that when counsel leave themselves such a truncated period of time to prepare a complex mitigation investigation, they perform deficiently." (DE 649 at 30). The Supreme Court, however, has never set a minimum length of time necessary for an adequate mitigation investigation. In fact, recent Supreme Court cases focus on whether the scope of the investigation was broad enough and the inquiry deep enough, not whether the attorneys met some pre-appointed time line.

Of particular importance, the Supreme Court has found no error where trial counsel began preparing much earlier than the "week before the trial" as in *Williams.* In *Bobby v. Van Hook,* ––– U.S. ––––, ––––, 130 S.Ct. 13, 18, 175 L.Ed.2d 255 (2009), the Supreme Court found it "simply incorrect" to refer to a mitigation investigation started much later than the one in the instant case as "last minute." The defense in *Van Hook* contacted their lay witnesses early and often. They were in touch with their expert witnesses more than a month before trial, and they met with the other for two hours a week before verdict. The *Van Hook* defense tried to enlist a mitigation specialist five weeks before trial. The Supreme Court found that this mitigation investigation did not amount to deficient performance. *See Van Hook,* ––– U.S. at ––––, 130 S.Ct. at 18. The defense team in this case began its probing investigation even earlier than the attorneys in *Van Hook.*

The time line Bourgeois submitted into evidence amply shows that the investigators began interviewing witnesses months ahead of trial. (PX–165). They turned over information to the defense team and to Dr. Cunningham with increased regularity as the trial neared, but certainly well before the beginning of the guilt/innocence phase. The defense sought the assistance of several expert witnesses whose efforts informed their decision making. While some decisions were made as the penalty phase drew nearer, the evidence before the Court shows that the defense team amassed much of the evidence well before trial. With the possible exception of Dr. Weiner's evaluation that the Court will discuss below, Bourgeois simply fails to prove the trial counsel's investigation was not done quickly enough. With that in mind, the Court turns to Bourgeois' allegation that trial counsel failed to adduce sufficient evidence from lay and expert witnesses.

**C. The Unpresented Evidence**

**\*55** Bourgeois faults counsel for not presenting (1) additional information about childhood physical and sexual abuse; (2) testimony that he suffers from borderline personality disorder; (3) evidence that he suffers from brain damage; and (4) evidence that he did not premeditate the killing. In reviewing those allegations, the Court keeps in mind that each category of evidence Bourgeois faults trial counsel for not adducing carries sharp aggravating factors with its mitigating thrust. Such evidence functions as a "two-edged sword." *Penry v. Lynaugh,* 492 U.S. 302, 324, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989); *see also Vasquez v. Thaler,* 389 F. App'x 419, 429 (5th Cir.2010) ("The Supreme Court has held that evidence of mental impairment can be both mitigating and aggravating[.]"). On one hand "it might well have helped the jury understand [the defendant], and his horrendous acts," but on the other "might not have made [him] any more likable to the jury[.]" *Sears v. Upton,* ––– U.S. ––––, 130 S.Ct. 3259, 3264, 177 L.Ed.2d 1025 (2010). Worse, the "double-edged" nature of the evidence may have militated in favor of finding that Bourgeois was a future danger to society. *Cantu v. Thaler,* 632 F.3d 157, 2011 WL 222986 at \*5 (5th Cir.2011); *Woods v. Thaler,* ––– F.3d ––––, 2010 WL4272751 at \*12–13 (5th Cir. Oct. 25, 2010); *Vasquez v. Thaler,* 389 F. App'x 419, 429 (5th Cir.2010); *Martinez v. Quarterman,* 481 F.3d 249, 254 (5th Cir.2007); *Bryan v. Gibson,* 276 F.3d 1163, 1178 (10th Cir.2001); *Motley v. Collins,* 18 F.3d 1223, 1228 (5th Cir.1994). Trial counsel's decisions must be weighed with the recognition that the evidence Bourgeois faults them for not adducing was not exclusively mitigating. Courts defer to counsel's strategic decisions, and especially so when the withholding of beneficial information staves off the disclosure of harmful information.

*1. Lay Witnesses*

Bourgeois has provided declarations from many individuals to support his claim that counsel did not give the jury a full view of his background. The defense team spoke with many of those individuals. Many of those who were not interviewed were distant relations or friends.[FN95] For instance, Bourgeois' section 2255 motion relies on affidavits from three second cousins, the friend of a former girlfriend, and a neighbor from decades past. Also, the trial team never spoke

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**PA-153**

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

with two of Ms. Mary's granddaughters, though the records from the mitigating investigators show they spoke with other members of the Clayton family.

> FN95. The trial team apparently never contacted: his sister-in-law Anita Ferdinand; his second cousin Murray Bourgeois; his maternal uncle Wilmer Bourgeois; a former girlfriend's friend Lawanda Cook; Ms. Mary's granddaughter Beverly Frank (though the investigators spoke with her father); his second cousin Allen Henry; his second cousin Jersey Henry; his second cousin Yvonne Robinson Joseph; his sister-in-law Jevona Jeanette Rixner; a former neighbor Louis Russell, Jr.; and a former girlfriend Ivy Thomas. While their statements say that the defense never contacted them, the Government had subpoenaed his cousin Isaac Bourgeois III and his sister-in-law Anita Ferdinand to testify at trial.

The Court placed no limitation on Bourgeois' ability to call witnesses in the evidentiary hearing to testify about the failure-to-present-mitigating-evidence claim.[FN96] Bourgeois chose only to present testimony from Claudia Williams, Beverly Frank, Brenda Goodman, Carl Henry, Donald Reese, Murray Bourgeois, and Kerry Brown. Most of those witnesses were not unfamiliar to the trial team. The mitigating experts repeatedly interviewed Claudia Williams. Dr. Cunningham himself interviewed her more than once. She and Carl Henry testified at trial. Dr. Cunningham, and possibly other members of the defense team, interviewed both Carl Henry and Kerry Brown. While trial counsel and the mitigation investigators did not include the granddaughters of Ms. Mary (Beverly Frank and Brenda Goodman) in their investigation, they interviewed other members of Ms. Mary's family.

> FN96. In a court date before the evidentiary hearing, counsel for Bourgeois informed the Court that the defense would limit the number of lay witnesses it would call: "We have proffered 23 declarations. I don't think we have to call 23. Perhaps we can pick our best ten and proffer the remaining 13. And we will try to cover different areas so the Court's not seeing the same thing." (Transcript of hearing held on April 20, 2010, DE 496 at 39). The Court provided Bourgeois a full and fair opportunity to substantiate his claim that trial counsel should have called additional witnesses in the penalty phase of trial. (DE

576 at 55–61). Bourgeois has not given the Court any indication that the declarants he did not call as witnesses would have provided some critical, but missing, piece of information. The Court assumes that their testimony would have followed similar themes as the live testimony Bourgeois presented.

**\*56** Bourgeois primarily relies on the witnesses' testimony to show an abused childhood, sexual abuse, and low intelligence. The evidentiary hearing testimony about his abused childhood followed familiar territory, but also introduced some new information. Ms. Williams provided compelling broad outlines that Bourgeois had a difficult childhood, one without nurturing or love on the part of his mother. She remembered severe whippings that left Bourgeois bloody. She explained that her mother beat Bourgeois "constantly." (DE 597 at 14). She also recounted one time that her mother cut off the tip of Bourgeois' finger with a meat cleaver because he would not eat his mother's cooking. (DE597 at 14). She explained: "My mother did Alfred some wrong things, bad things." (DE 597 at 14). Ms. Mary's granddaughter, Beverly Frank, provided credible testimony insofar as she had insight to Bourgeois' home life. She explained why Ms. Mary took Bourgeois in: "she brought Alfred in more or less because Alfred was really mistreated by his mom. We saw a lot of abuse. And my grandmother just took him under her wing to stay with her." (DE 597 at 97). Another of Ms. Mary's granddaughters, Brenda Goodman, described Bourgeois' mother as "overwhelmed, frustrated all time" and neglectful because of her alcohol abuse. (DE 597 at 132–33).

Bourgeois' cousin Carl Henry provided some context for Bourgeois' mothers abuse: "his mother had a resentment from him, due to his father and her [had] a relationship that was a one-night relationship, and it didn't work out." (DE 597 at 322). Without providing specifics, he testified that he had observed abuse. (DE 597 at 322–23). Bourgeois' cousin Murray Bourgeois explained that he "got mistreated, treated different more than the rest of his sisters and brothers." (DE 597 at 396). He was "abused more than the rest" and would "from time to time ... have red whelps on him." (DE 597 at 397).

These witnesses' testimony, however, came with caveats. For example, Ms. Williams was confused, easily led by attorneys' questioning, and not a good historian. On

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

cross-examination she admitted that she had talked to the mitigation investigators several times before trial, but had never conveyed the story about Bourgeois' mother cutting off the tip of his finger or that she whipped him with an electrical cord until he bled. (DE 597 at 51). She explained: "the reason why I didn't say, because it was sad. I was ashamed of my mother." (DE 597 at 51). She said that, because her mother was still alive during the time of trial, family members did not want to talk about the way she treated Bourgeois. (DE 597 at 52). The witnesses had not only seen Bourgeois being abused, but had seen him abuse others. Ms. Williams explained that she knew that Bourgeois himself beat his other wives and children. (DE 597 at 54). She told FBI agents before trial that she was sure Bourgeois was capable of killing Robin and that "Alfred knew the difference between right and wrong, and he made the choice to kill JG1999." (DE 597 at 54–55).

**\*57** With regard to his abused childhood, this is not a case where the defense attorneys "failed to pursue known leads" or "ignored ... useful information[.] *Skinner v. Quarterman,* 576 F.3d 214, 220 (5th Cir.2009). The trial investigators made a wide-ranging investigation that uncovered information about Bourgeois' abusive childhood.[FN97] Each of the four witnesses that trial counsel called in the punishment phase described his abused childhood. Even so, Bourgeois claimed not to have been abused and his family was hesitant to discuss the abuse until his mother died. While mostly ambiguously discussing "whippings," (DE 341 at 135), witnesses still specifically mentioned: (1) that Bourgeois received more abuse than others; (2) this abuse included being "whipped ... with an extension cord"; (3) his mother routinely picked at his nose with her long fingernails; and (4) the abuse was continual. Trial counsel presented the same type of evidence relating to child abuse that Bourgeois has adduced in these proceedings.[FN98]

> FN97. Bourgeois now complains that the Government at trial disputed the accuracy of the accounts that Bourgeois' mother abused him, hoping that additional witnesses would have shored up the jury's confidence in that mitigation theory. The Government questioned the reliability of the testimony concerning abuse because Bourgeois himself lied to Dr. Estrada about his homelife (DE 342 at 59) Dr. Estrada concluded that he had lied about his childhood (DE 341 at 17, 22–23).

> FN98. In many respects, Bourgeois' abuse of JG1999 mirrors that which he claimed to have experienced. Of his children. Bourgeois singled out JG1999, his "outside child" for abuse. Like his mother, he beat her with extension cords, continually picked at open wounds, and otherwise maltreated her. Bourgeois excluded JG1999 from family activities. Bourgeois' childhood abuse came full circle, but manifested itself in cruelty and savagery that culminated in murder. Dr. Estrada's testimony sufficiently blamed Bourgeois' violence as an adult on his childhood abuse. Further discussion would only have emphasized that Bourgeois was like his mother, only much worse.

The Fifth Circuit has refused to find *Strickland* error when trial counsel presented similar mitigating evidence, even if only in outline form, at trial. *See Coble v. Quarterman,* 496 F.3d 430, 437 (5th Cir.2007); *Rodriguez v. Quarterman,* 204 F. App'x 489, 501 (5th Cir.2006); *Alexander v. Quarterman,* 198 F. App'x 354, 359–60 (5th Cir.2006); *Parr v. Quarterman,* 472 F.3d 245, 257–58 (5th Cir.2006). This Court "must be particularly wary of 'arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing.' " *Dowthitt v. Johnson,* 230 F.3d 733, 743 (5th Cir.2000) (quoting *Kitchens v. Johnson,* 190 F.3d 698, 703 (5th Cir.1999)). Here, the defense presented evidence of the same nature as that has developed after trial. To whatever extent the trial testimony lacked the depth exhibited by Bourgeois' post-trial evidence, the breadth of testimony about his abused child hood is nearly identical. The trial evidence largely followed the same themes and allowed for the jury to arrive at the same conclusions as they would if they had before them the entirety of the mitigating evidence developed after trial. With regard to the evidence of Bourgeois' abused childhood, "[i]t must be conceded that the jury was presented a clear, if not fully portrayed, picture of [Bourgeois'] life." *Neal,* 286 F.3d at 243. "[T]hough perhaps not as effectively as it might have been, the jury did hear [the child-abuse] evidence." *Parr,* 472 F.3d at 258.[FN99]

> FN99. Moreover, Bourgeois was forty years old at the time of trial. The jury may have come to the conclusion that as Bourgeois "aged and became more chronologically removed from his difficult childhood

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

and traumatic experiences ... his troubled background would exercise a lesser degree of influence over his actions, thereby rendering him less of a future danger." *Coble v. Quarterman,* 496 F.3d 430, 447 (5th Cir.2007).

Low intelligence and sexual abuse were the main areas in which the evidentiary hearing testimony exceeded the outlines counsel drew at trial. The most troubling allegation Bourgeois makes is that trial counsel failed to investigate whether he was sexually abused by two men, one a son of Ms. Mary and the other the church choirmaster. Testimony from the evidentiary hearing could not credibly validate those allegations. Murray Bourgeois, Ms. Williams, and Mr. Henry had never heard that Bourgeois had been sexually assaulted. (DE 597 at 57, 74–76, 357–68, 414). Mr. Henry expressed skepticism that it happened as Bourgeois now alleges. (DE 597 at 357–58). Only Ms. Goodman could provide any testimony about Bourgeois' claiming to have been sexually abused. She explained: "[M]y uncle raped Alfred. Now, I don't know at what age that happened, but when we discovered my uncle had AIDS, and Alfred told me this when he was older, that Uncle Jake had raped him." (DE 597 at 142). Even then, her testimony is somewhat suspect because it was based solely on what Bourgeois told her; no other witness could corroborate that he had been sexually assaulted. In fact, witnesses expressed surprise and disbelief that Bourgeois had experienced sexual abuse, particularly at the hand of the church choirmaster.

**\*58** Even Ms. Goodman was hesitant to divulge that information until late in the legal process. Although Bourgeois' post-conviction investigators asked Ms. Goodman questions about abuse in Bourgeois' background, she did not report it in her initial statement and had only mentioned it recently. (DE 597 at 167). Her reluctance to tell others about what she described as a "dark thing" that she "couldn't tell [her] family" gives no confidence that she would have relayed the information to counsel. (DE 597 at 143). The Fifth Circuit refused to hold "attorneys responsible for introducing mitigation evidence that their client and other witnesses fail to disclose." *Johnson v. Cockrell,* 306 F.3d 249, 252–53 (5th Cir.2002). Bourgeois has not shown that trial counsel erred in not presenting evidence of sexual abuse.

Bourgeois has extensively relied on lay testimony to bolster his claims of mental retardation. Independent of the psychological testimony, the witnesses uniformly expressed that, at least as a child, Bourgeois was slow.[FN100] Their testimony, however, varied in the extent to which that impacted Bourgeois' life. Some witnesses described how, at least at a young age, Bourgeois had problems with activities such as cooking. Some testimony showed that Bourgeois had complained about being asked to perform "girl's work" such as washing clothes and making food. Other witnesses, however, described such activities as part of his daily routine at Ms. Mary's house.[FN101] Nevertheless, the Court is not convinced that a reasonable attorney would encourage the jury to choose a life sentence based on Bourgeois' intellectual limitations. The jury would have heard his cogent, descriptive testimony that lacked any sign of mental impairment. The jury would have viewed his interaction with counsel and his ability to follow the course of the legal proceedings. The jury would have known that Bourgeois successfully worked for years as a truck driver. The Government would assuredly subject any witness attesting to his low intelligence to the same cross-examination from the evidentiary hearing. The Court finds that a reasonable attorney could weigh the probable benefit against the possible loss of credibility and decide not to focus the defense on Bourgeois' low intelligence.

> FN100. In addition to the information about Bourgeois' intellectual abilities as a child, witnesses talked about his adulthood. Donald Reese, a former co-worker, described problems Bourgeois experienced when they worked as team drivers. Bourgeois had problems with some of the equipment, got lost when driving, only brought a small amount of clothing with him on long trips, and was uncomfortably talkative. Kerry Brown, an attorney Bourgeois previously had retained for legal matters, provided testimony relating to his mental impairments. Mr. Brown described Bourgeois as controlling, continually in debt, a bad money manager, "dealing with a lot of issues" involving his family and business, and under stress. (DE 598 at 237–47). Cross-examination of Mr. Brown would have revealed that Bourgeois "was jealous, overbearing, owed everybody child support, beat up his mother-in-law, and then ... destroyed property[.]" (DE 598 at 249). Mr. Brown's testimony, particularly that revealing that Bourgeois "beat the hell out of his mother-inlaw," would not have helped the defense.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 63

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

(DE 598 at 248).

> FN101. The witnesses did not agree on whether Ms. Mary rescued Bourgeois from an abusive atmosphere or whether his mother sent him to serve as a care giver to the elderly, physically impaired woman.

The Court has reviewed the whole of the unpresented mitigation evidence and concludes that trial counsel did not provide ineffective assistance in the investigation, preparation, or presentation of lay testimony in the punishment phase. The Court, therefore turns to Bourgeois' claim that trial counsel should have amplified the case relating to his mental health.

*2. Expert Testimony*

Bourgeois claims that trial counsel should not have relied only on the cross-examination of Dr. Estrada, but should have called additional expert witnesses in the punishment phase. Bourgeois hopes that expert testimony would have discussed: (1) the effects of his abused childhood on his mental state (as explained by Dr. Cunningham); (2) his borderline personality disorder; (3) how neurological impairment affected his ability to control his impulses and make decisions; and (4) Dr. Holden's conclusion that he did not premeditate the crime. In those post-judgment proceedings, Bourgeois has called seven expert witnesses—Drs. Gelbort, Estrada, Swanson, Weiner, Toomer, Cunningham, and Holden—who testified to a greater or lesser extent about each of those theories. The witnesses described Bourgeois as a man with overlapping and interlacing mental illnesses that made him prone to excessively violent reactions when under stress. The Court will describe their testimony as it relates to each theory he faults trial counsel for not presenting.

**\*59** As an initial matter, however, the Court notes that "[c]ounsel's decision not to hire experts falls within the realm of trial strategy." *Yohey v. Collins,* 985 F.2d 222, 228 (5th Cir.1993); *see also Colburn v. Cockrell,* 37 F. App'x 90 (5th Cir.2002) ("The hiring of expert witnesses and the presentation of their testimony is a matter of trial strategy."). To reiterate, trial counsel secured the assistance of mental health experts before the punishment phase. Trial counsel sought Dr. Holden's assistance to determine if Bourgeois had committed a premeditated filicide. Trial counsel sought testing for competency by Dr. Estrada and later relied on his cross-examination to place mental health information before the

jury. Dr. Cunningham synthesized the mitigating evidence and provided guidance about mental health issues. At Dr. Cunningham's direction, trial counsel had Dr. Weiner perform neurological testing. No doubt exists that trial counsel was amply aware of the results of their testing. The record contains numerous on-the-record discussions about whether trial counsel would use their proposed testimony. Trial counsel decided only to rely on Dr. Estrada. The Court will review whether that decision met constitutional standards.

*a. Dr. Cunningham's testimony*

Bourgeois claims that trial counsel should have put a psychological varnish on the evidence about his abused childhood, showing that it had a " 'profound impact' on [his] behavior." (DE 402 at 37). Trial counsel sought Dr. Cunningham's assistance early in the case for that purpose. While Bourgeois claims that trial counsel was unfamiliar with Dr. Cunningham's conclusions, the record shows otherwise. As previously discussed, trial counsel had sufficient communication with Dr. Cunningham as the trial approached. Trial counsel reviewed Dr. Cunningham's report, spoke with him on the telephone, met with him for several hours, and sat by him at the counsel table during trial. Trial counsel even edited the PowerPoint slides that Dr. Cunningham had prepared to excise any reference to Dr. Weiner's testing.[FN102] This Court's interaction with the trial attorneys and the plain evidence in the record gives no reason to slight counsel's familiarity with Dr. Cunningham's proposed testimony.

> FN102. At some point before trial, Dr. Cunningham prepared a PowerPoint presentation and gave trial counsel a binder with the proposed slides. He provided for two presentations: a mitigating presentation and one showing Bourgeois' future threat. Dr. Cunningham would have testified that various "damaging factors"—an overwhelmed family system, abandonment by his father, "childhood problems putting on the brakes," emotional rejection and abuse, physical abuse, and neuropsychological problems—served as a pressure cooker that exploded when set afire by Robin's infidelity, martial problems, and financial concerns. In his second presentation, Dr. Cunningham would have provided general information about behavior in secure environments, including the Bureau of Prisons, and specific items that would make Bourgeois less likely to be a threat

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

in prison: his age, his "behavior in pre-trial custody," his continuing relationship and contact with family, and stable history in the community. Bourgeois attached a copy of some of the PowerPoint slides to his 2255 motion. (DE 397, Exhibits 5 and 6). Before the sentencing hearing began, the Court talked with Dr. Cunningham about how to best place his intended PowerPoint presentation on the record. (DE 348 at 2–4). After addressing the manner in which to preserve Dr. Cunningham's presentation, the discussion turned to the substance of his testimony. The Government wished to exclude any part of Dr. Cunningham's testimony that discussed the Bureau of Prison's policy and practices, and the related speculation about how offenders in general behave in prison, and focus instead on Bourgeois' own propensity toward violence. (DE 348 at 4–6). The Court refused to limit the scope of Dr. Cunningham's testimony, but allowed the Government to call its own witness to rebut Dr. Cunningham's testimony. (DE 348 at 5–6). The Government announced that it intended to rely on its own expert from the Bureau of Prisons, John Shaw, if the defense called Dr. Cunningham. (DE 348 at 5; 341 at 78).

While Bourgeois complains vigorously that trial counsel failed to get information to Dr. Cunningham about childhood abuse in an expeditious manner, the record does not show any similar concern from Dr. Cunningham as the trial approached. The investigators turned over to Dr. Cunningham the results of their investigation well before the guilt/innocence phase started. Other than an email sent by an employee months before trial, the record contains no contemporaneous complaint from Dr. Cunningham about the timing or completeness of that information. Dr. Cunningham interviewed potential witnesses himself. The record does not contain any indication that Dr. Cunningham's own interviews unveiled a wealth of evidence that still laid uncovered. Trial counsel relied on Dr. Cunningham and he did not signal to them that the mitigation investigation was substandard before trial.

**\*60** In the end, trial counsel said that he decided not to call Dr. Cunningham because his theory of the case conflicted with Bourgeois' chosen defense.[FN103] Trial counsel discussed his abused childhood and history as a sympatheTIc, not explanatory or as a justifying factor. (DE 598 at 210–11). [FN104]

Importantly, Bourgeois agreed with that decision. As Mr. Gilmore explained in the evidentiary hearing:

FN103. Trial counsel also knew that calling Dr. Cunningham would bring along "so many hazards." (DE 347 at 106). The Government informed the Court that, if Dr. Cunningham testified about Bourgeois' future danger, the door would be open to harmful evidence that did not come before the jury. (DE 347 at 106). This information possibly included additional information that Bourgeois claimed to have committed another killing, had told people he wanted to kill Robin, had sexually assaulted AB1994, and was cruel to animals. (DE 347 at 82, 88, 92–94, 105–06). Other aspects of his testimony would offend jurors. In one portion of his proposed testimony, he would have told jurors to excuse Bourgeois' repeated fierceness against women because domestic violence is a common, and in his view, apparently accepted feature in society. Jurors may be expected to react with revulsion to that information. This is not an isolated example. At its core Dr. Cunningham's testimony was detached from the extensive testimony that the jury had already seen about the person Bourgeois was. To the extent that Dr. Cunningham's testimony would deal with Bourgeois' threat of violence when incarcerated, rather than his "pressure cooker" theory, trial counsel adduced the same information through Dr. Estrada. Mr. Gilmore testified: "we elicited that testimony from Dr. Estrada, and I thought Dr. Estrada was effective for us." (DE 598 at 209). Dr. Estrada opined that Bourgeois would only be violent "in a family situation." (DE 341 at 50). Dr. Estrada testified that with "higher ... supervision available" Bourgeois would have a "lesser degree of all kinds of violent incidents[.]" (DE 341 at 52). While probably not as extensively as anticipated by Dr. Cunningham, trial counsel adduced expert testimony to show that Bourgeois would not be violent when in "a cage within a cage within a cage." (DE 342 at 63).

FN104. Mr. Gilmore's closing argument, for example, differentiated between abuse as sympathy and as an excuse:

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

Now, these things are offered to you not as an excuse for committing this crime, but to try to help you understand his mindset, and trying to help you understand where he comes from. *This is—it's not an excuse for him, if you believe he committed this crime, for him doing it. It's something t o show you that he's a human being.* We're all human beings. And we're—we're all capable of doing bad things in the right circumstances, or the wrong circumstances as it may be. At the time that this incident occurred, these factors came into play along with his current situation; the current situation being that he was having economic problems, he and his wife were having problems, they'd had problems since—since she had the affair. And I realize he had affairs, too. But this was what was going on in his mind, the fact that his wife had an affair. (DE 342 at 48) (emphasis added). Trial counsel also explained during Dr. Estrada's cross-examination that he was "not asking these questions to help excuse what Mr. Bourgeois did, but to explain it." (DE 341 at 23–24).

The Government: Okay. And when you showed [a notebook containing a copy of the material in Dr. Cunningham's proposed PowerPoint] to Mr. Bourgeois, did he have any reflection on it? Did he make a statement as to this presentation?

Mr. Gilmore: Well, his position all along was that he did not commit the crime. And so specifically what did he say? I just remember we told him that we didn't think we were going to call Dr. Cunningham, and he did not oppose that. And we told him why, because his theory of the mitigation part of the case didn't jive with our theory of defense.

The Government: Did he make some kind of statement to the effect that, "This means that Dr. Cunningham's saying I'm guilty"

Mr. Gilmore: It's something to that effect. I can't remember exactly what was said. But I, you know, explained to him that That's what those arrows meant that he had all the pressure on him, and that's why he exploded and did this.

The Government: And after you explained that to him, did

he want to present Dr. Cunningham?

Mr. Gilmore: He agreed with our assessment.

(DE 596 at 183).

In the evidentiary hearing, Mr. Gilmore further elaborated on other reasons why they decided not to call Dr. Cunningham as a witness: "We weren't impressed with Dr. Cunningham. We didn't particularly think he was going to impress the jury, and we did not like his presentation." (DE 598 at 211). From this Court's own observations, Dr. Cunningham would not have been a good witness for the defense. When trial counsel told Dr. Cunningham they weren't going to use him, he was "very angry." Mr. Gilmore explained: "If you tell a professional witness that you're not going to use them, you know, he should be professional about it, and he wasn't." (DE 598 at 186). Mr. Gilmore's recollection comports with this Court's own observations. In the evidentiary hearing, Dr. Cunningham's demeanor, even though his speech was generally of a level pitch, was consistently argumentative and condescending in tone and facial expression. Dr. Cunningham openly showed scorn, both in his physical manifestation and his substantive testimony, for the defense's case at trial. He did not appear as an impartial scientific expert, but as someone seeking to advance an agenda. [FN105]

> FN105. Testimony from a hearing at the time of trial showed that counsel was not only familiar with Dr. Cunningham's presentation, but had tried to excise any reference to Dr. Weiner's findings without sacrificing any important part of it. (DE 347 at 19).

Dr. Cunningham's testimony came off as distant from the facts of the case before the jury. For example, Dr. Cunningham vigorously asserted that his academic research proved that Bourgeois was not a violent risk while kept in a highly structured environment. The jury, however, would compare that opinion with Bourgeois' actual behavior before trial. While in custody in the state jail facility, he ordered hits on witnesses. His threats were not toothless; witnesses were murdered before trial. Even when security isolated Bourgeois, he continued to sneak out communications, threaten security personnel, and even tried to attack a United States Marshal.[FN106] Dr. Cunningham's testimony would seem hollow-and even unbelievable-given Bourgeois' vicious nature. His claim that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

Bourgeois would not be violent could offend the jury and lessen trial counsel's credibility with the finder of fact.

> FN106. Bourgeois' brother, Lloyd Ferdinand, made threats against witnesses and intimidated those who would testify against Bourgeois. When Bourgeois tried to hire Longoria to eliminate witnesses, Mr. Ferdinand was the one who would have paid him. (DE 347 at 52–54).

**\*61** His evidentiary hearing testimony was removed from the reality of the defense's efforts before trial. He bore an arrogant demeanor as he broadly faulted defense efforts and lauded his own. He criticized the mitigating investigators for not feeding him enough information, but the record does not show that he responded when counsel asked him whether he or the investigators should provide him with information. He complained about the cursory nature of the information, but never said whether he actually communicated that concern to trial counsel or the investigators. The Court appointed him as an expert eight months before trial, but his records show that he did little, if anything, until the last few weeks before trial. He himself interviewed witnesses, some of whom testified in the evidentiary hearing, and himself could have secured the information he claims went undiscovered. Even then, his presentation consisted of information he had apparently prepared in the numerous cases in which he had previously testified.

Dr. Cunningham's testimony showed that both the mitigation experts and trial attorneys gave him information and were familiar with the basic issues of the case. The Court has viewed not only Dr. Cunningham's testimony in the detached context of the federal evidentiary hearing, but can also plug that testimony into the trial context that it observed. The Court's observation of the trial landscape and the jurors' reaction to evidence provides a vantage point to consider the effect any proposed testimony would have. The jury already had before it evidence that Bourgeois' mother had abused him, and trial counsel concluded that Dr. Cunningham's proposed testimony was not convergent with or helpful to their chosen defense. A reasonable and zealous trial attorney could find that Dr. Cunningham was not a witness whose testimony, both in content and tone, would benefit the defense.[FN107]

> FN107. Once supported by an adequate investigation,

"counsel's selection of a strategy is unchallengeable[.]" *Bower v. Quarterman,* 497 F.3d 459, 467 (5th Cir.2007); *see also Strickland,* 466 U.S. at 690. "A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *United States v. Jones,* 287 F.3d 325, 331 (5th Cir.2002). "*Strickland* requires ... [courts to] defer to counsel's decision ... not to present a certain line of mitigating evidence when that decision is both fully informed and strategic, in the sense that it is expected, on the basis of sound legal reasoning, to yield some benefit or avoid some harm to the defense." *Moore,* 194 F.3d at 615; *see also St. Aubin v. Quarterman,* 470 F.3d 1096, 1102 (5th Cir.2006); *Riley v. Dretke,* 362 F.3d 302, 306 (5th Cir.2004).

b. Borderline personality disorder

Testimony from the evidentiary hearing showed that Bourgeois had some sort of mental disorder, though the testimony varied somewhat as to its etiology, effect, and treatability. Drs. Estrada, Gelbort, Swanson, Toomer, Price, and Moore all examined Bourgeois and agreed that he suffered from borderline personality disorder. Bourgeois claims that trial counsel should have put that information before the jury.

Each expert provided different insight to the nature and effect of borderline personality disorder. Dr. Estrada provided the fullest view into how that disorder effected Bourgeois. Dr. Estrada did not diagnosis Bourgeois with a borderline personality disorder when he initially examined Bourgeois before trial. Dr. Estrada testified in the evidentiary hearing that he had suspected that Bourgeois had a personality defect, but that additional information about his background confirmed it.[FN108] Dr. Estrada defined the psychological condition:

> FN108. Dr. Estrada explained in his deposition:
>
> In this case, I had only suspicions at the time, but then with all the information I have reviewed since, it has become clear that my suspicion regarding this person's background is correct and my suspicions regarding his personality organization were correct; and these are the two elements that, in my opinion,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

resulted in this terrible behavior. Regarding the background, the documentation that I reviewed now is clearly indicating that he suffered not only from rejection and abandonment and physical abuse by his natural mother, but in addition, he suffered from sexual abuse and exploitation by the people that he trusted; and finally, he suffered for many years of teasing, humiliation and discrimination because of his mixed race and his limitations in intellect and physical conditioning. These, in my opinion, resulted in developing a narcistic and borderline personality disorder. The narcistic personality disorder is what is most obvious when one meets this man.

(PX–163 at 22).

Borderline personality disorder is characterized by a chronic habitual and automatic pattern of relationships that is characterized by extremes of love and hate triggered by satisfaction. The person becomes idealized, if is fulfilling the individual needs, to extreme devaluation and rage if the person is frustrating. As a result of this basic problem, the individual has extremely unstable relationships, often leading to breaking up the relationship if the pattern is strong enough to leave or having the battered wife syndrome and family violence syndrome when the wife is-or the spouse is weak and cannot separate, resulting in having episodes of honeymoon, followed by episodes of hate and violence.

**\*62** ... [T]he person suffering from a borderline personality due to this instability of his attitudes about the people they are involved with, [is] extremely vulnerable to stress. And during episodes of stress, they are involved in impulsive behavior, behavior with very poor judgment, bordering in psychotic, irrational behavior. That's why the name borderline. It's a border between the psychosis and the neurosis come from and is often associated with drug and alcohol abuse.

(PX–163 at 28). Dr. Estrada noted two sources of the disorder: a genetic one and a childhood plagued by "rejection, neglect and abandonment[.]" (PX–163 at 25).

Dr. Estrada connected the disorder to Bourgeois' abuse of JG1999:

This is a pattern in which he reacts to frustration in this rage without any concern for consequences; and in my opinion, this is very poor judgment.

Then he's calmed down the following day, and he's able to navigate through the highways in the country without losing track like nothing has happened. This is, in my opinion, very poor judgment and a characteristic of borderline under stress. You do crazy things. You do terribly violent things, and they act the next day like so what, that was yesterday.

(PX–163 at 36). This rage would "impact his executive" function and inhibit his "[j]udgment, planning, decision making, control of impulses, control of affects, managing cause and consequences[.]" (PX–163 at 36). Thus, Bourgeois did not intentionally kill the child but succumbed to the stressors about him. (PX–163 at 39).[FN109]

> FN109. In Dr. Estrada's words:
>
> And my opinion, in summary, is this man under the serious stress that he was facing, finances, marital problems and being dumped with a new child that he didn't expect and fatherhood, care and financial obligations, under this stress, he reacted in a typical borderline fashion caused by his background of trauma, neglect and rejection by losing control of his anger and torturing, tormenting and abusing this child intermittently throughout six weeks with periods in which he was actually caring and nice to the child in typical borderline fashion that ultimately the abuse caused this child's death.
>
> It is my opinion, therefore, that this is not the act of a premeditation, an act where he was looking for some gain, getting rid of the child, getting rid of the wife or blaming the wife or the child. There would be better ways.
>
> (PX–163 at 39). To some extent, this disorder mirrors Dr. Cunningham's "pressure cooker" demonstrative and would present similar concerns for the defense.

Testimony from the other experts, both for Bourgeois and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 68

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

for the Government, also probed his borderline personality disorder, although not as deeply as Dr. Estrada did. Dr. Toomer testified that the borderline disorder "affects all aspects of an individual's functioning" including "instability that manifests itself across a variety of activities, interpersonal relationships, personal identity, mood and emotionality as well as self-image." (DE 594 at 297). Dr. Price agreed that Bourgeois had a "personality disorder that's longstanding and pervasive" and that such mental disorders are "oftentimes associated to childhood abuse." (DE 595 at 204, 232). Dr. Moore confirmed that people with borderline personality disorder most often act out at those with whom they have a close relationship. (DE 599 at 160). None of the experts questioned the diagnosis of borderline personality disorder. All agreed that the disorder caused Bourgeois to be emotionally unstable, impulsive, and to have difficulties in his interpersonal relationships.[FN110]

> FN110. Dr. Cunningham's testimony, however, did not discuss borderline personality disorder but referred to a "history of rage attacks that had been occurring since his childhood or adolescence, with marked changes in his consciousness and demeanor, and with memory deficits that occurred afterwards for the events during that rage." (DE 597 at 234).

Because Bourgeois relies on Dr. Estrada, the expert trial counsel relied on to place Bourgeois' mental state before the jury, the Court must address two questions. First, did trial counsel supply Dr. Estrada with sufficient information to allow him to come to a diagnosis of borderline personality disorder? Second, even with that diagnosis, would a reasonable attorney put that information before a jury? *See Harrington v. Richter,* ___ U.S. ___, 131 S.Ct. 770, 789, 178 L.Ed.2d 624 (2011) (finding no error when counsel failed to uncover evidence because it would "be reasonable to conclude that a competent attorney might elect not to use it"); *Neal,* 239 F.3d at 687 ("We must determine whether there is a gap between what counsel actually did and what a reasonable attorney would have done under the circumstances."). The Court finds that neither of the answers to those two questions supports a finding of *Strickland* deficient performance.

**\*63** Dr. Estrada had significant information, apparently given by both parties, before he examined Bourgeois. He interviewed Bourgeois himself. Dr. Estrada sat in the courtroom and heard the entirety of the punishment-phase evidence. He had enough information to diagnose Bourgeois with the closely related disorder of narcissism. Yet he did not diagnose Bourgeois with borderline personality disorder. Instead, he concluded that narcissism explained much of Bourgeois' behavior.

After Bourgeois' conviction and sentence, and considering new information, Dr. Estrada reached this new psychological conclusion. Possibly because of Bourgeois' tangled mental-health issues, it would be a "difficult assessment" to diagnose him with borderline personality disorder. (DE 594 at 111). That, however, does not mean Dr. Estrada could not have done so with the information before him at trial. Admitting that he has "more information now," Dr. Estrada conceded in his deposition that it is "possible" that he had sufficient information at the time of trial to arrive at a diagnosis of borderline personality disorder. (PX–163 at 60). At the time of trial Dr. Estrada already knew that Bourgeois had suffered neglect, rejection, and physical abuse at the hands of his mother. (PX–163 at 60, 62–63). He admitted that many of the same factors that underscored the diagnosis of narcissism he arrived at before trial contributed to his diagnosis of borderline personality disorder. (PX–163 at 61). Dr. Estrada attributed his new diagnosis to "thinking more about it and reviewing the pattern of relations, particularly the relations to women, and a social border interview of all of his wives, then it became more clear that that was a pattern of borderline personality." (PX–163 at 60).

Bourgeois has not convincingly shown that Dr. Estrada did not have the tools necessary to reach a borderline-personality-disorder diagnosis before trial. Dr. Estrada had interviewed Bourgeois and was aware of his violence toward his wives. (DE 341 at 45). The Government's case at the punishment phase emphasized a life-long unrelenting pattern of aggression. Dr. Estrada sat throughout the punishment phase of trial and listened as Bourgeois' ex-wives explained their turbulent and violent marriage to him. The instability of Bourgeois' relationships was fully before Dr. Estrada, as it was before the jury. He testified that he saw "a pattern of abusive relationships again and again and again." (DE 341 at 50). Still, he conceded that the "key features of his violent actions ... haven't changed from the information [he] ... received since the trial has been over." (PX–163 at 52).[FN111]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

FN111. Dr. Estrada remembered:

> discussions with both the government and the defense regarding Mr. Bourgeois' background and information gathered from wives and other people who knew him and that I have given my opinion to both about the—the—the impact of the background of child abuse and rejections and neglect, the pattern of violence with multiple wives and intimate relationships, and the fact that this made him a potentially dangerous person, because the basic fault, so to speak, was not treated or fixed, and—but I also remember that I was not able or allowed to elaborate in how the background is affecting the current situation.

(PX—163 at 70). Bourgeois argues that Dr. Estrada was told not to base his opinion on Dr. Cunningham or Dr. Weiner's reports. (PX–163 at 70). Dr. Estrada, in fact, used the background information from Dr. Cunningham while testifying. (DE 341 at 25). The Court limited the ability to refer to Dr. Weiner's report, but did not prevent him from relying on the information from Dr. Cunnignham that did not directly implicate that derived from Dr. Weiner. (DE 341 at 33). Dr. Cunningham's report, however, did not address the problems Bourgeois had with his wives any more specifically than the trial testimony did. It is telling that Dr. Cunningham's report did not mention the possibility of a borderline personality disorder, while Bourgeois now finds the condition to be abundantly obvious.

Once given sufficient information, trial counsel has a right to rely on the conclusions of the experts he retains. No constitutional right exists to the effective assistance of expert witnesses. After placing the building blocks for the diagnosis before the expert witnesses, trial counsel complied with their duty to investigate possible mental illness. Trial counsel cannot be held accountable for relying on his experts after providing them sufficient evidence. *See Bell v. Thompson,* 545 U.S. 794, 810, 125 S.Ct. 2825, 162 L.Ed.2d 693 (2005) (endorsing state court finding that because "two experts did not detect brain damage, counsel cannot be faulted for discarding a strategy that could not be supported by a medical opinion"). Trial counsel

relied, as Bourgeois does now, on Dr. Estrada to identify salient mental health concerns. Bourgeois has not shown that trial counsel was to blame because mental-health experts did not diagnose him with borderline personality disorder earlier.

**\*64** Even so, to succeed on this claim Bourgeois must show that a reasonable attorney would have presented evidence of that psychological disorder. While admittedly a more difficult question, the Court finds that a zealous attorney could weigh the value of the borderline-personality-disorder diagnosis against possible harm, and stay his hand. Bourgeois has not sufficiently recognized the aggravating edge of that evidence, the Government's use of similar evidence against him at trial, and the absence of any testimony about rehabilitation.

In many ways, Dr. Estrada's deposition testimony differed little from that adduced at trial by both parties, but particularly by the Government as an aggravating circumstance.[FN112] The Government had elicited testimony from Dr. Estrada that Bourgeois had engaged in "repetitive acts of violence" and was a "rageaholic or impulsive in [his] decisions." (DE 348 at 283). Even if the defense placed the mitigating influence of that diagnosis before the jury, cross-examination would go like it did in the hearing and even at trial. The Government would surely ask: "[E]very time someone's abused as a child, do the-do they act out and abuse children later in life?" (DE 341 at 57). The Government would ask, as it did Dr. Price, why this disorder was "directed at certain things[.]" (DE 595 at 231). The Government would be able to adduce rebuttal evidence similar to Dr. Price's testimony that the commission of the murder more as a function of "antisocial psychopathic traits and features." (DE 595 at 231).[FN113] The jury would respond to the information much in the same way as Dr. Gelbort: "I don't want them for my neighbor." (DE 560 at 75).

> FN112. The experts stated that a narcissistic personality disorder can be found in the same category of disorders as borderline. The Government adduced the evidence that he had a narcisstic personality disorder. (DE 348 at 284). The two disorders are apparently not entirely dissimilar. Dr. Swanson vacillated between I "put[ting] him personality disorder NOS, some put him narcisstic and some people put him borderline. I tend to probably want to go more borderline, but all those are in the same cluster of personality disorders that they

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 70

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

have and there is definitely mood problems there[.]" (DE 594 at 103). Dr. Price also described the two disorders similarly. At trial, Dr. Estrada described the narcissism in a way similar to his description of borderline personality disorder. He described such people as being "lively, likeable, exiciting, interesting, sometimes very persuasive or charismatic" at the start of a relationship bit with time "their personal problems are inevitable and result in friction that may lead to simple break of relationships ... or actual violence." (DE 348 at 285–86).

> FN113. Even Bourgeois' expert Dr. Gelbort had not decided whether he was a sociopath, but "would absolutely agree that many of the behaviors [he had] seen described can be caused by sociopathic etiology." (DE 560 at 73).

One problem trial counsel would face in presenting the evidence of Bourgeois' various mental disorders is that the testimony did not show any hope of diminishing or susceptibility to treatment. Dr. Estrada testified that, while the borderline personality disorder would explain what Bourgeois did, it would not make him less violent in the future. (PX–163 at 67). No evidence suggested that psychologists could control Bourgeois' mental issues or cause them to go into remission. The same evidence that would explain Bourgeois violence toward his child would predict violence toward others. One circuit has noted that sentencers "may not be impressed with the idea that to know the cause of viciousness is to excuse it; they may conclude instead that when violent behavior appears to be outside the defendant's power of control, capital punishment is appropriate to incapacitate." *Foster,* 223 F.3d at 637. Without some indication that treatment or confinement would control the effects of his mental illness, the jury would be left to assume that Bourgeois' violent acts would persist immutably.

As the Fifth Circuit has explained, a juror could "have seen the evidence as only aggravating, because [the defendant's] borderline personality disorder and the difficulty of treating it increase the likelihood that [he] will act out violently again." *Nelson v. Quarterman,* 472 F.3d 287, 307–08 (5th Cir.2006); *see also Cantu v. Thaler,* 632 F.3d 157, 2011 WL 222986 at *5 (5th Cir.2011) (finding no error when the defense chose not to have neuropsychological testing because

"[t]he potentially detrimental results of such an examination could have strengthened the State's position that [the defendant] was a sociopath and thus a future danger, thereby warranting the death penalty."). Without additional evidence, the jury may think that successful treatment of his mental illness would be unlikely.[FN114] The thrust of the evidence that would dull the Government's case would also sharpen the chance for a death sentence. The proposed evidence "would still acknowledge that [Bourgeois] has the same dangerous disposition; [his experts] now simply opine[ ] that [they] can explain why." (DE 443 at 119).

> FN114. The evidence before the Court in this case differs from one in which the parties presented evidence that "although borderline personality disorder is treatable, success is by no means certain and is expressly conditioned on intensive therapy" but "successful treatment is often the exception rather than the rule." *Nelson v. Quarterman,* 472 F.3d 287, 308–09 (5th Cir.2006).

**\*65** Bourgeois' new evidence of mental illness would blame the killing on an apparently intractable mental condition. A reasonable attorney may have viewed the whole of the evidence and face a difficult choice, but could rationally decide not to present evidence of borderline personality disorder.

c. Neurological impairment

As previously discussed, at Dr. Cunningham's suggestion trial counsel retained Dr. Weiner to perform a neuropsychological examination based on head injuries Bourgeois claimed to have received as a child. Dr. Weiner administered the WRAT–III, the Halstead–Reitan Neuropsyhological Test Battery for Adults, and the Test of Memory malingering. Dr. Weiner concluded that Bourgeois' results on some categories of the Halstead–Reitan indicated brain damage. Dr. Weiner's report noted "overall mild impairment with moderate cerebral damage in the posterior portion of the cerebral cortex. In all likelihood, this damage is due to the injuries Mr. Bourgeois sustained in a three-wheeler accident that took place in 1984, resulting in a coma lasting 1–2 months." (DE 397, Exhibit 16).

Trial counsel seriously considered calling Dr. Weiner as a punishment-phase witness. After the guilt/innocence phase, the defense turned his report over to the Government. In a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**PA-164**

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

March 17, 2004, hearing Government stated that Dr. Estrada had reviewed the material and had found serious flaws in his methodology. The Government told the Court that they were bringing in their own neuropsychologist to test Bourgeois. (DE 340 at 25–27). Trial counsel objected to any additional testing. (DE 340 at 27). According to the Government, Dr. Weiner had brain scans done that came back negative for impairment. (DE 340 at 27). The Court ordered a hearing on Dr. Weiner's proposed testimony to find out what testing he performed. (DE 340 at 36, 47–48).

In a hearing on March 19, 2004, the defense informed the Court that had decided not to call Dr. Weiner as a witness. (DE 347 at 14). Trial counsel informed the Court that "Dr. Estrada disagreed with some of Dr. Weiner's findings." (DE 347 at 18). The trial court told the defense that, if they were not going to call Dr. Weiner as a witness, they could not rely on the results from his testing. (DE 347 at 16). Accordingly, Dr. Cunningham and Dr. Estrada could not use Dr. Weiner's report during his potential testimony. (DE 347 at 16–19).

Bourgeois claims that trial counsel's choice not to call Dr. Weiner as a witness violated his constitutional rights. Bourgeois supports this claim with a new report and testimony from Dr. Weiner. Dr. Weiner explained that "as [he] understood the situation, the lawyers were concerned that [his] conclusions were not reliable because they were not sure that Mr. Bourgeois accurately reported the head injury referenced on page three of [his] report." (DE 397, Exhibit 16 at 2). He opined, however, that his "test results and conclusions are valid regardless of how the damage was caused, and regardless of what Mr. Bourgeois told [him] about the damage." (DE 397, Exhibit 16 at 2).

**\*66** Bourgeois also presented testimony in the evidentiary hearing regarding the results of Dr. Weiner's testing. Dr. Weiner affirmed the validity of his testing and explained that the brain dysfunction would impair Bourgeois' cognition so that "he may at times perceive things in a distorted way and act in an inappropriate manner." (DE 594 at 240). The brain impairment would influence his emotions, impulse control, and ability to make judgments. (DE 594 at 240). Dr. Gelbort testified that his testing agreed with Dr. Weiner, though he may have localized the injury in another part of the brain. In addition, Dr. Gelbort did not see the source of the impairment as influential as its effect.

Against that background, trial counsel obviously made a strategic decision not to rely on Dr. Weiner's testing. Mr. Tinker explained in his answers to interrogatories: "I do recall having a neurological exam done, because there was a claim that Mr. Bourgeois had been in a car accident and had been in a coma. I do not recall the exam resulting in any information that would have been helpful at trial. Further, the government informed us that they had evidence that Mr. Bourgeois was never in a coma and that he only sustained broken bones in the accident." (Mr. Tinker Interrogatories at 9). A strategic decision by trial counsel is "virtually unchallengeable." *Strickland,* 466 U.S. at 690. Evidence since trial confirms that trial counsel made a reasonable decision. *See Yarborough v. Gentry,* 540 U.S. 1, 8, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) ("When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect.").

As an initial matter, Dr. Weiner premised his conclusion on Bourgeois' claim that he suffered a coma from a three-wheeler accident. The record plainly shows that Bourgeois lied; he had no coma, no serious head injury, and no neurological impairment from that injury. While Bourgeois now points to other potential episodes that may have resulted in brain trauma, the fact is that Dr. Weiner's testimony would have allowed the Government to label him a manipulator and a liar. With Bourgeois' chosen defense to blame the killing on Robin, and his decision to take the stand, trial counsel would have incentive to shore up his credibility.[FN115] Trial counsel's decision not to call Dr. Weiner on that basis alone is a reasonable one, meant to avoid more harm to the defense.

> FN115. Dr. Price's testimony suggested that Dr. Weiner should have used greater care in relying on Bourgeois' self-reported coma. He testified:
>
> In a forensic evaluation you already go into this as the evaluator with a certain amount of skepticism and with an eye to evaluate the response style of anybody you talk to to evaluate how much weight you give to evidence, and when you find that some of the information that you have been provided by someone isn't accurate, then it would lead us to be even more critical or skeptical of other information. And it could be a sign that they are trying to present

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 72

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

in a way as being more impaired than they actually are, or, in your hypothetical, creating a situation that would likely be interpreted as a traumatic event.

(DE 595 at 198).

Additional factors developed in the evidentiary hearing confirm the wisdom of trial counsel's decision. Bourgeois has repeatedly criticized Dr. Weiner for using an outdated IQ test. Dr. Price testified that he also used outdated methodology. Dr. Price testified that Dr. Weiner's attempt to "localize" the injury in Bourgeois' brain was an out-of-date approach, now jettisoned by current psychological thinking. (DE 595 at 218). More importantly, Dr. Price credibly testified that Dr. Weiner relied on the raw scores from the Halstead–Reitan rather than applying norms-called the Heaton norms-which research confirms as valid. The Heaton norms adjust the raw Halstead–Reitan scores for demographic factors, including race.[FN116] Neither Dr. Gelbort nor Dr. Weiner applied norms to their raw scores. (DE 621, Exhibit 1 at 32). When applying the norms for the general population, Bourgeois has mild mental impairment. However, Bourgeois, though of a mixed-racial background, was "raised in an African American family, in an African American community." (DE 621, Exhibit 1 at 35). Applying the Heaton norms for African–Americans to Weiner's testing places Bourgeois outside of the impaired range. (DE 621, Exhibit 1 at 18, 22).

> FN116. Dr. Price explained:
>
> Well, using the norms most similar to the person, including race, that—what the literature describes race as an adjustment as a proxy for other factors in the person's life, cultural enrichment, educational opportunities, quality of education and a socioeconomic status. It stands as a proxy for that. And to avoid over identifying or—you would get a greater degree of impairment comparing someone to Caucasians as you would to comparing them to African Americans.
>
> (DE 621, Exhibit 1 at 16).

**\*67** While Bourgeois elicited testimony from Dr. Price that "some controversy" exists in psychology over the use of

the Heaton norms, he did not show that their application was not good, or even necessary, psychological practice. (DE 621, Exhibit 1 at 17). With the scores from the Heaton norms finding no impairment, Dr. Price attributed the defects that Dr. Weiner described to a personality disorder, not a brain injury. (DE 595 at 223). Application of the Heaton norms would also "not be consistent with somebody that's mentally retarded." (DE 621, Exhibit 1 at 41–42).

In the end, counsel must approach the decision whether to present evidence of brain damage with careful deliberation. Evidence of mental and neurological conditions is double-edged: while it can create jury sympathy, it can equally bolster the Government's claims of future dangerousness by showing poor ability to control impulses and learn from past mistakes. The Fifth Circuit defers to counsel's strategic decision not to present such double-edged mitigation evidence. With the surety that presenting Dr. Weiner's testimony would reveal Bourgeois' manipulation, the credible testimony that he had applied the wrong norms, and the marginal benefit to the defense, trial counsel's decision not to adduce evidence of neurological impairment is not *Strickland* deficient performance.

d. Premeditation

Finally, Bourgeois claims that trial counsel should have called Dr. Holden in the punishment phase to testify that he did not premeditate his crime. The defense elicited Dr. Holden's help well before trial. After receiving a box of material from the defense, Dr. Holden provided a report that he later supplemented after receiving additional information. Dr. Holden opined that Bourgeois did not commit an intentional or premeditated "filicide": "[i]t is highly unlikely that Mr. Bourgeois had decided to (or thought about) killing [the victim]. Instead, what probably happened was that in a fit of rage over the spilled potty, he lost control of himself and in the course of administering physical discipline fatally injured [her]."

Trial counsel initially wanted to call Dr. Holden as a guilt/innocence phase witness. Dr. Holden wanted to testify that Bourgeois did not intend to murder JG1999, but that "this death resulted in a continuation of harsh punishment." (DE 350 at 37). Dr. Holden would have testified that "Bourgeois had never formed a close bonding, attachment, love relationship with the child.... So, he was stressed financially, emotionally

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 73

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

with the child, fatigued, and then when the child spilled the potty, my interpretation is that he totally lost it and [be]came very punitive trying to teach her never to do that again." (DE 350 at 19–20). Dr. Holden conceded that he based his whole opinion about intent on the theory that Bourgeois was the murderer. (DE 350 at 17). Although the defense had supplied Dr. Holden with a "box of information" with "more than 100 pages" including the results of DNA analysis, CPS records, and the autopsy(DE 350 at 55–57), Dr. Holden seemed unaware of many facts surrounding the killing. After a more complete discussion of the evidence, Dr. Holden weakened his opinion on Bourgeois' guilt. In the end, he weakly stated "it's possible that it was not premeditated." (DE 350 at 65).

**\*68** It was obvious that Dr. Holden's testimony would not benefit the defense in the guilt/innocence phase. (DE 350 at 21). Dr. Holden himself agreed that he would not be much help to the jury on the question of guilt. (DE 350 at 54). The Court held that Rule 704(b) prevented Dr. Holden's testimony in the guilt/innocence phase. (DE 350 at 64, 69). The defense, though, indicated that "intend[ed] to make another offer [at] the punishment phase to have him testify." (DE 350 at 70). Trial counsel ultimately chose not to call Dr. Holden in the punishment phase.

The record does not contain a clear statement of why counsel chose not to call Dr. Holden as a witness. As the questioning before the guilt/innocence phase revealed, Dr. Holden would have premised his testimony on Bourgeois' having committed the murder—a theory incompatible with that chosen by the defense. Dr. Holden's testimony would have conflicted with Bourgeois' own statements before the jury in the punishment phase.

Bourgeois secured a new declaration from Dr. Holden in these proceedings. Unlike his earlier testimony, he now has backed away somewhat from his earlier focus on whether the crime was premeditated. Now, with new information, his focus would be on the "family violence ... that sadly repeats itself through generations," which when combined with "numerous psychological factors that impaired Mr. Bourgeois' ability to control his actions," would have explained the murder as the act of "an abuse-survivor, experiencing high stress, with low functioning, and with consequent impairments in impulse control." (PX–20 at 7).

At any rate, this Court's observation in the two times he has appeared before the Court was that a reasonable attorney would not have called him. His testimony came off as academic, speculative, and untethered to the facts of the crime. After seeing how his opinions fared when subjected to scrutiny, a reasonable and competent attorney might not have chosen for him to testify. In fact, the Government seemed eager to put his testimony before the jury knowing how it would benefit them. (DE 350 at 21). The Court's observations assure that trial counsel did not render deficient performance in not calling Dr. Holden as a punishment phase witness.

**D. Conclusion of Deficient Performance Analysis**

This case differs fundamentally from those in which the Supreme Court has found deficient performance.[FN117] "This is not a case in which the defendants attorneys failed to act while potentially powerful mitigating evidence stared them in the face, or would have been apparent from documents any reasonable attorney would have obtained[.]" *Van Hook,* ——U.S. ——, 130 S.Ct. 13, 19, 175 L.Ed.2d 255 (2009) (citing *Rompilla,* 545 U.S. at 389–93 and *Wiggins,* 539 U.S., at 525). Trial counsel zealously gathered the tools necessary to make a probing investigation into a mitigation defense. Trial counsel used those tools to craft a defense which would remain true to Bourgeois' wishes but still advocate for a sentence less than death. In doing do, trial counsel amassed information not fundamentally different, for the most part, from that Bourgeois relies upon in this proceeding. In reviewing the accumulated defensive material, the Government's case, the credibility of witnesses, the jury's composition, and Bourgeois' wishes, trial counsel made hard choices. *See Richter,* ——U.S. at ——, —— S.Ct. at —— ("There are, however, countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."). This Court will defer to those decisions.

> FN117. *See Sears v. Upton,* —— U.S. ——, 130 S.Ct. 3259, 3264, 177 L.Ed.2d 1025 (2010) (trial counsel essential failed to conduct any mitigation investigation and none of the evidence relied upon was known to trial counsel); *Porter v. McCollum,* —— U.S. ——, 130 S.Ct. 447, 453, 175 L.Ed.2d 398 (2009) (with a month to prepare before sentencing the attorney "had only one short meeting with [the defendant] regarding the penalty phase. He did not obtain any of [his] school, medical, or military service records or interview any members of [his] family.");

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**PA-167**

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

*Rompilla v. Beard,* 545 U.S. 374, 389, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (finding deficient performance when defense lawyers failed to "to look at a file he kn[ew] the prosecution w[ould] cull for aggravating evidence .. when the file [was] sitting in the trial courthouse, open for the asking"); *Wiggins v. Smith,* 539 U.S. 510, 516–19, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (trial counsel wholly failed to prepare a social history and ignored serious issues that required further investigation); *Williams v. Taylor,* 529 U.S. 362, 395, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) ("[T]rial counsel did not begin to prepare for [the punishment] phase of the proceeding until a week before the trial[,] ... failed to conduct an investigation that would have uncovered extensive records graphically describing [the defendant's] nightmarish childhood, ... introduce available evidence that [he] was 'borderline mentally retarded' and otherwise ignored readily available evidence).

**\*69** That is not to say that trial counsel did not make mistakes. No trial is perfect. *See* United *States v. Hasting,* 461 U.S. 499, 508, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983) (noting that "there can be no such thing as an error-free, perfect trial"). But the Supreme Court recently emphasized that "the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." *Van Hook,* ––– U.S. at –––––, 130 S.Ct. at 17 (quoting *Roe v. Flores–Ortega,* 528 U.S. 470, 479, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000)); *see also Gentry,* 540 U.S. at 8 ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."). Hindsight and second-guessing may possibly suggest different courses of action, but with eyes focused on how trial counsel viewed the landscape before them, this Court finds that trial counsel engaged in reasonable decision making bolstered by a reasonable investigation. The Court finds that Bourgeois has failed to show deficient performance under *Strickland.*

### E. Cumulative Effect of Prejudice

Even if Bourgeois could show that trial counsel's performance fell below constitutional expectations, he would still have to show actual prejudice. The Court will consider the entirety of Bourgeois' unpresented evidence conjointly. The Fifth Circuit "ha[s] construed [Supreme Court precedent] to

require that an evaluation of *Strickland* prejudice include consideration of both the quantity and quality of the additional mitigating evidence." *Hood v. Dretke,* 93 F. App'x 665, 669 (5th Cir.2004); *see also Strickland,* 466 U.S. at 695 ("[T]he question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."). Particularly, *"Williams, Wiggins,* and *Rompilla* looked at the quality of the mitigation case put forward by trial counsel as compared to what the petition suggested should have been presented." *Alexander v. Quarterman,* 198 F. App'x 354, 361 (5th Cir.2006).

In addition, the prejudice inquiry looks at all available evidence, not just that favoring the defense. *Strickland,* 466 U.S. at 695 ("In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."). In assessing the relative weight of the new mitigating evidence, a reviewing court compares and contrasts the new evidence with that from the trial. *See Wong v. Belmontes,* ––– U.S. –––––, 130 S.Ct. 383, 390, 175 L.Ed.2d 328 (2009) ("[T]he reviewing court must consider all the evidence-the good and the bad-when evaluating prejudice."). The Fifth Circuit has indicated that a court looks to see if the petitioner's new evidence will "lessen the impact of the other evidence against him[,]" *Conner v. Quarterman, 411* F.3d 287, 294 (5th Cir.2007), because "overwhelming aggravating factors" can outweigh unpresented mitigating evidence. *Sonnier v. Quarterman,* 476 F.3d 349, 360 (5th Cir.2007). For instance, the "horrific facts of the crime," Martinez, 481 F.3d at 259, the "brutal and senseless nature of the crime," *Smith, All* F.3d at 576, or the "cruel manner in which he killed," *Miniel v. Quarterman,* 339 F.3d 331, 347 (5th Cir.2003), may weigh heavily against a finding of *Strickland* prejudice. *See also Strickland,* 466 U.S. at 700; *Knight v. Quarterman,* 186 F. App'x 518, 535 (5th Cir.2006); *Ladd v. Cockrell,* 311 F.3d 349, 360 (5th Cir.2002); *Andrews v. Collins,* 21 F.3d 612, 624 n. 23 (5th Cir.1994); *Russell v. Lynaugh,* 892 F.2d 1205, 1213 (5th Cir.1989). Additionally, if the "evidence of ... future dangerousness was overwhelming ... it is virtually impossible to establish prejudice." *Ladd,* 311 F.3d at 360 (citing *Strickland,* 466 U.S. at 698).

**\*70** Finally, federal courts consider whether or not the new evidence is double-edged or introduces new aggravating circumstances into the calculus of sentencing. A court must

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**PA-168**

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

consider whether the material upon which a petition bases his *Strickland* claim contains unhelpful information. *See Burger v. Kemp,* 483 U.S. 776, 793–95, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987); *Strickland,* 466 U.S. at 700. The Fifth Circuit has refused to find prejudice if the unpresented evidence "also contained evidence that, if disclosed, would have been detrimental to [the defense] case." *Ransom v. Johnson,* 126 F.3d 716, 724 (5th Cir.1997); *see also Dowthitt v. Johnson,* 230 F.3d 733, 745 (5th Cir.2000); *Kitchens v. Johnson,* 190 F.3d 698, 703 (5th Cir.1999); *Cockrum v. Johnson,* 119 F.3d 297, 304 (5th Cir.1997); *West v. Johnson,* 92 F.3d 1385, 1410 (5th Cir.1996), *Woods v. Johnson,* 75 F.3d 1017, 1035 (5th Cir.1996); *Callins v. Collins,* 998 F.2d 269, 278 (5th Cir.1993).

The facts of this case are atrocious. Bourgeois committed a horrible murder. This Court need not to recount again the evidence showing the torture, neglect, and abuse that he inflicted on his helpless victim. He was indifferent to JG1999's injuries, unremitting in his beatings, uncaring about her death, and unremorseful at trial. He bit her, beat her with various objects, and probably sexually assaulted her. The Government presented significant evidence that the rage he reserved for his young daughter resulted from financial concerns, not psychological conditions.

The episode that resulted in JG1999's death was not an isolated incident. Bourgeois had been violent in the past and continued his violence while in custody. He had been cruel to children before, beat his wives, assaulted his mother-in-law, threatened jail guards, and tried to assault a United States Marshal. He threatened that his daughter's death would not be the only one. In fact, he threatened to kill witnesses. The jury saw Bourgeois as a violent man.

Trial counsel adduced some of the evidence upon which Bourgeois now relies. The jury knew that his mother neglected and abandoned him. Psychological testimony from Dr. Estrada put some of the blame on mental health issues. While Bourgeois has now presented more nuanced and detailed defensive theories, the jury would not respond more favorably than to those trial counsel fashioned to conform to Bourgeois' chosen defense. Given the whole of the evidence, the Court finds no reasonable probability of a different result. The Court denies Bourgeois' *Strickland* claim.

## III. Jurisdiction (claim three)

Bourgeois claims that he did not kill JG1999 on federal property. Under 18 U.S.C. § 1111(b), *"[w]ithin the special maritime and territorial jurisdiction of the United States,* [w]hoever is guilty of murder in the first degree shall be punished by death or by imprisonment for life[.]"* (emphasis added). "[C]rimes committed within the confines of federal military reservations [fall] within the special territorial jurisdiction of the United States." *United States v. Bell,* 993 F.2d 427, 429 (5th Cir.1993).[FN118] The Corpus Christi Naval Air Station is within the United States territorial jurisdiction. According to Bourgeois, the Government did not meet its burden of showing, beyond a reasonable doubt, that JG1999 died from injuries inflicted on federal property.

> FN118. Congress has defined this jurisdiction as including "[a]ny lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building." 18 U.S.C. § 7.

**\*71** Federal law decides jurisdiction by the place of the fatal injury, not death. *See* 18 U.S.C. § 3236 ("[T]he offense shall be deemed to have been committed at the place where the injury was inflicted, or the poison administered or other means employed which caused the death, without regard to the place where the death occurs."). Jurisdiction in this case came from Bourgeois beating his daughter's head against the truck window on the naval base. Bourgeois' jurisdictional argument presupposes that earlier injuries, unrelated to the vicious beating, caused the victim's death. In other words, the prior injuries he administered in another jurisdiction killed the toddler, not the beating on federal property. Bourgeois faults trial counsel for not basing the trial defense around a jurisdictional challenge. He also asks the Court to reopen the evidentiary hearing to allow more testimony on this matter.

### A. The Autopsy and Trial Testimony

Dr. Elizabeth Rouse performed the autopsy and noted numerous external scars and wounds on JG1999's head in various stages of healing. The extent and severity of the numerous injuries Bourgeois inflicted over time created a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

complexly tangled patchwork of bruises, scars, wounds, lacerations, and other injuries. The overlapping and all-encompassing nature of the victim's external injuries chronicled weeks of abuse by her father.

The autopsy and Dr. Rouse's subsequent trial testimony provided important information about the victim's external and internal head injuries. Dr. Rouse discussed the "severe head injuries, what I call a closed head injury," including "the injuries that actually resulted in her death. And ... there's a number of different components of those head injuries[.]" (DE 345 at 121). Dr. Rouse described layers of injuries, from the skin, to the undersurface of the scalp, to the brain itself. For example, Dr. Rouse described a "recent bruise" on tissue that "indicate[d] that at that spot on her head, there was an impact right at the hair line on the right forehead and a "fairly complex bruise ... that would indicate actually multiple impacts at that site." (DE 345 at 126–27). She observed a "multitude of smaller [bruises] ... across the back of her scalp, across the back of her head ... where something either hit her head, or her head hit something." (DE 345 at 129–30). Dr. Rouse identified a total of 10 bruises on the undersurface of the scalp. (DE 345 at 123).[FN119] She also described a subgaleal hemorrhage that "indicates an impact to the head, the actual point on the head where force was transmitted." (DE 345 at 146). She explained: "all appear what we would call recent injuries ....within the past few days[.]" (DE 345 at 130–31, 146).

> FN119. JG1999 also had "impact bruises on the front of her scalp, on the right, and then all across the back.... Both sides in the back.... [A] fairly large one behind the right ear." (DE 345 at 144).

Bourgeois correctly observes that these wounds alone are not evidence of a recent life-threatening injury. Dr. Rouse explained that the bruises "did not result in the death. But what they indicate is the mechanism of what ultimately caused the injury to her head. *What she actually died from is the forces that were transmitted on the brain.* That's what resulted in her death." (DE 345 at 131) (emphasis added). The scalp wounds "are just markers for where those impacts occurred, where that force was transmitted to the brain." (DE 345 at 132). The most important part of the autopsy was its description of what that force did to JG1999's brain.

**\*72** As part of the autopsy procedure, Dr. Rouse sent slides of JG1999's brain away for microscopic examination.

The autopsy report incorporates a conclusion prepared by Dr. Kathlenne S. Kagan–Hallet, an associate professor of pathology with the University of Texas Health Science Center at San Antonio. In a report dated September 17, 2002, Dr. Kagan–Hallet noted that the autopsy revealed "subgaleal bruising and subdural hematoma, as well as pattern injuries to the skin." [FN120] In the portion of her report entitled "microscopic findings and comments," Dr. Kagan–Hallet noted older injuries and some "in a stage of early organization." In the section designated "neuropathologic diagnosis," she noted a "history of head trauma," and described "{Right} subdural hematoma, mostly recent, minimal organization (approximately 10 days' duration)" She also noted "Cerebral white matter. Organized contusion infarcts (7+ days' duration), myelin tearing and axonal bodies." (DE 397, Attachment 50).

> FN120. The autopsy report notes "two discrete areas of recent subgaleal hemorrhage in the right frontal scalp" and "[a]cross the occipital scalp ... a total of eight discrete areas of recent subgaleal hemorrhage." She also observed a "semisolid subdural hematoma ... over the right occipital region" and a "patchy subarachnoid hemorrhage over the brain."

Dr. Rouse's trial testimony provided the most important insight into Dr. Kagan–Hallet's observations. In discussing the intercranial findings, Dr. Rouse described several indicators that the victim had experienced significant trauma: (1) a subdural hematoma ("where blood has leaked, and that indicates where tremendous forces have been applied to the brain, resulting in her death"); (2) a subarachnoid hemorrhage ("which is blood over the actual surface of the brain"); (3) swelling of the brain; (4) "feuxsaxonal" injury ("injury to the actual nerves and cells of the brain ... the injury to the brain itself); and (5) fresh hemorrhaging in the victim's retina ("[w]hen there are injuries to the brain, those forces are often commonly transmitted also to the eyes, and you'll also get hemorrhage. The blood doesn't leak from around the brain to the eyes."). (DE 345 at 132, 134, 138, 139). All those factors indicated significant blows to the head that transmitted force to the brain itself. (DE 345) ("[T]o get a hemorrhage within the brain, it certainly indicates significant impact to the head.").

Despite this recent bruising on the underside of her scalp, Dr. Rouse did not discuss the age of the intercranial features, particularly the subdural hematoma. She did, however, give her

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

opinion as to the cause of death. She testified that "the feuxsaxonal (phonetic) injury, injury to the brain itself. *And that's what actually resulted in her death.* The scalp hemorrhages are just markers for where those impacts occurred, where that force was transmitted to her brain." (DE 345 at 132) (emphasis added). Dr. Rouse elaborated:

The actual cause of death—we can go through my, basically the summary is my autopsy findings. The cause of death is what we call *a closed head injury, an impact to the head resulting in a devastating brain injury, which we could see looking at the brain, by the bruising of the scalp, the bleeding over the brain, both under the dura and over the lining of the brain, and then also microscopically, when we looked at the actual brain tissue, we could see injury throughout the brain.* I actually sent those sections to a neuropathologist to confirm that there was extensive injury in the brain which would have resulted in her death. *She has the hemorrhage along the optic nerves, as well as the hemorrhage on the back of the retina on both eyes, which again that's very protected.* You do not see that type of retinal hemorrhage in accidental trauma, specifically not in any sort of trivial accident. Certainly, you could get it with something of the magnitude such as a car accident. That type of injury is required to get retinal hemorrhage.

**\*73** (DE 345 at 170) (emphasis added). Acknowledging that the medical evidence did not allow Dr. Rouse to establish precisely when and where JG1999 died, the Government asked her if the fatal injuries were consistent with the AB1994's version of the events. (DE 345 at 171). Dr. Rouse testified that the beating which AB1994 witnessed "could certainly explain the injuries that were seen on the child." (DE 345 at 171).

**B. Bourgeois' Post–Judgment Arguments and Post–Conviction Testimony**

Bourgeois' claim that he did not kill JG1999 on federal property turns on Dr. Kagan–Hallet's observations from the autopsy report. In his Motion to Vacate, Bourgeois based his jurisdictional argument on the subdural hematoma of "approximately 10 days' duration[.]" Treating the subdural hematoma as an indication of when JG1999 received the fatal blows, Bourgeois argued that he could not have inflicted the killing injury on federal property. As support, Bourgeois first secured an affidavit from Dr. Werner Spitz, a forensic pathologist. Dr. Spitz opined that the fatal injuries were a week

or more old:

The neuropathology report by Dr. Kathleen Kagan–Hallet indicates mild to moderate cerebral edema with hemorrhagic necrosis of cerebellar tonsillar tips, subdural hematoma of approximately 10 days duration and organized contusion infarcts of 7+ days duration as well as, myellin tearing and axonal bodies. The scalp bruises are relatively small and do not conform with one or more falls or forceful impacts. *I disagree with the witness testimony (AB1994) whereby the child's head was struck multiple times on the interior of the vehicle.* I am also surprised to see what appear to be fresh bruises of 1 or 2 days in the scalp, while the subdural bleed and contusion infarcs in the white matter show evidence or organization compatible with a week or longer. The findings place in question causation of the injuries and their timing. The scalp injuries in and of themselves would not have been life threatening and there is no question as to the life threatening nature of the cerebral injuries.

(DE 397, Declaration of Werner Spitz, MD dated May 10, 2007, Attachment 53) (emphasis added).[FN121] Relying on Dr. Spitz's assumption that trial testimony claimed that the oldest part of the subdural hematoma represented the killing injury, Bourgeois claims that the federal government never properly had jurisdiction to try him for capital murder.

> FN121. The courts in this circuit that have considered Dr. Spitz's testimony have found him not useful or credible. For instance, one court in the Western District of Texas labeled his methodology "simplistic and preposterous[.]" *Bittner v. General Motors Corp.,* 2005 WL 5977561, at \*1 (W.D.Tex.2005). In another case, Dr. Spitz formed conclusions based on *"no evidence." Galvan v. City of San Antonio,* 2008 WL 5352945, at \*6 (W.D.Tex.2008) (emphasis in original); *see also Hill v. Carroll County, Miss.,* 2008 WL 2066526, at \*5 (N.D.Miss.2008) (noting that Dr. Spitz relied on a conclusion that was "wholly speculative").

From the outset, Dr. Spitz's affidavits lacks credibility because he dismisses AB1994's testimony without having viewed her in court. His willingness to dispute a well-settled factual account calls his conclusions into question. The Court observed AB1994's trial testimony. AB1994 was a highly credible witness who convincingly described, to the best of her

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**PA-171**

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

ability and beyond expectations for her young age, what her father did to her little sister. Dr. Spitz's disregard for her testimony, as well as the other evidence showing an obvious serious injury on federal property, makes his declaration not credible.

**\*74** When this Court allowed limited factual development of this claim, Bourgeois wisely did not secure any additional testimony from Dr. Spitz. Instead, Bourgeois obtained two reports from Dr. Jan E. Leestma, a consultant in forensic neuropathology. Dr. Leestma examined the evidence, including the autopsy photographs and conceded that "[i]t seems inescapable that this child had been physically assaulted over a considerable period of time before death." (DE 641, Exhibit 2). He did not, however, give a definite answer to the "critical question ... of when the fatal head injuries to the child were caused." Acknowledging that "she had sustained a number of head impacts allegedly due to having been beaten over a period of time," Dr. Leestma's report did not list a cause of death. He suggested that some of the brain injuries-specifically "a coagulopathy which appears to have included sagittal sinus thrombosis and possibly cortical venous infarctions"-may have "resulted in the child's death at any time with or without any new episode of trauma." (DE 641, Exhibit 2). He refused, however, to look at anything other than the medical evidence in ascertaining a cause of death. Where Dr. Spitz had criticized AB1994's testimony, Dr. Leetsma ignored her account and any other evidence that would put JG1999's injuries into context.[FN122]

> FN122. In the end, he explained:

> > Much of the pathology in this child is not acute. The scalp injuries are of variable ages in which the hemorrhages show aging of red cells cellular repair and inflammatory reactions and healing-scarring. The brain lesions range from possibly few days in age to days to weeks old. The child may have had coagulopathy which appears to have included sagittal sinus thrombosis and possibly cortical venous infarctions. These processes could have resulted in the child's death at any time with or without any new episode of trauma.

> > (DE 641, Exhibit 2). Admitting that the "child's condition deteriorated after the reported incident in

the father's truck," Dr. Leestma opined that "there is very little information derived from the autopsy that can accurately pin point what physical injury resulted from this alleged incident or that it directly caused the child's death." (DE 641, Exhibit 2).

The parties deposed Dr. Leetsma on January 10, 2011. (DE 641). In response, the Government called Dr. Rouse as a witness and the parties questioned her by telephone in a hearing on January 13, 2011. The resultant evidentiary record provides a highly technical view of the overlapping and interwoven injuries Bourgeois inflicted on his daughter. While disagreeing on many points, the experts found some areas of consensus. Both Dr. Leetsma and Dr. Rouse found serious brain damage in the victim. Both experts observed both recent ("acute") and older ("chronic") brain injury.[FN123] They both opined that the injuries were complex and hard to separate, age, and gauge. Dr. Rouse explained that "you have a complex constellation of things going on in response to that injury." (DE 646 at 7). Dr. Leetsma agreed that the mixture of acute and chronic injuries made this a difficult case. (DE 641 at 88–89).

> FN123. Dr. Rouse testified: "[C]learly the multitude of injuries makes this a complex picture. We can categorize the injuries into, you know, ones that appear to be six weeks old, you know, five, six weeks old, to some that are, like I said, a week old, some that are days old. You know, days, weeks or months. We can't pinpoint exactly any injury, as far as pinpoint down to the day, this occurred on this date." (DE 646 at 22).

Without question, both experts could place injuries into two time periods-those more than a week old and those less than three days. The victim died around 24 hours after the ambulance took her from the naval base. Neither doctor could medically pinpoint the exact time of the newest injuries, though both agreed they occurred within three days of death. Dr. Leetsma explained:

> I don't know anyone who has a magical formula to break down into smaller increments this two-to three-day acute injury scenario. Red blood cells just don't change over that period of time. It's at the three-day mark and beyond that they begin to undergo some changes. The inflammatory reactions that can occur with an impact to the scalp, or any

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

other place, are so variable between individuals that I know of no reliable reproducible scale that someone can use. That means they may have opinions on this matter, but I don't know of any reliable method that can sharpen our razor, so to speak, or turn up the power of the microscope to answer these kinds of question.

**\*75** (DE 641 at 94–95). Dr. Rouse agreed:

[S]he has many injuries of many, many ages, on different parts of her body. Unfortunately, we cannot, with medical certainty, get down very close on the aging of any of the injuries. We can, however, put them in categories of things that are more chronic, they're healing. The body is clearly healing in response to this injury. And some of those are where there's scarring. You know, that clearly takes weeks for a scar to develop. Other things show more along the time frame of about a week. And when I say, "a week," seven days, ten days. I can't differentiate between those two. But you know, clearly a few days have passed from the time of injury. And then she also has injuries that appear to have been in the last day or two. And you know, one to three days. I don't think you can distinguish between one day and two days, particularly when her last day was very altered.

(DE646 at 17).

In another example of agreement, both experts thought that the subdural hematoma was not a major cause of the victim's death. Dr. Leetsma observed

two components to the subdural hematoma. The chronic component ... aged and dated ten days to two weeks before this incident. The fresh blood or more recent blood cannot be accurately aged and dated within about three days, two days from the time of death. So it is possible that some blood that is in this compound subdural hematoma came during the time period you just discussed, but there is absolutely no way I can tell you if that happened.

(DE 641 at 48). "The estimate of the age of the healing of the subdural hematoma, or the reaction that we're talking about, on the order of ten days to two weeks." (DE 641 at 35). Dr. Leetsma opined that, while still a factor, the subdural hematoma was "a rather minor component because of the relatively small volume estimated of that subdural hematoma." (DE 641 at 25). Dr. Rouse agreed that the subdural hematoma,

" 'space-wise' ... was not a large collection of blood. But there are other injuries to the brain that are all causing, that are—there are other markers of injury to the brain." (DE 646 at 7). In those other injuries was where the experts differed. Some of the matters on which the experts disagreed include:

• Dr. Leetsma considered venous thrombosis ("clotting of cerebral veins ... and the superior sagittal sinus") to have caused the most significant precursor to the intercranial swelling that he thought caused her death. (DE 641 at 26). The clotting of the venous channel under the skull "led to infarctions in the brain and cerebral edema and bleeding." (DE 641 at 26–27). However, he could only date "some aspects" of the venous thrombus. (DE 641 at 32). He thought that the clot "ha[d] been there for some days ... [T]he recent red blood cells could be anywhere two to three days from the time of death. The blood clot itself is probably more than that, several days. And that's about as good as we can do with that particular component." (DE 641 at 32–33). The thrombosis occurred before "the collapse and decompensation of this child that was discovered at the naval base and leading to the hospitalization and then ultimately the child's death 24 hours or so later. The thrombosis antedates that whole business, that whole process by several days most likely." (DE 641 at 50). Dr. Rouse, on the other hand, explained: "As you go to the thrombus, that appears I think all within a few days.... One to three days." (DE 646 at 18). She also testified that the thrombosis was "all a constellation of injury that is acutely going on two to three days, on top of previous injury a week prior." (DE 646 at 20). In short, she testified: "I don't think the thrombus alone is a significant injury to the brain. I think it's in response to the other injuries to the brain." (DE 646 at 10).

**\*76** • Dr. Leestma did not believe that the recent portion of the subdural hematoma was consistent with injuries sustained on the naval base. (DE 641 at 48). Dr. Rouse, however, "would argue that the acute [component] does not conflict with occurring 24 hours prior to her death." (DE 646 at 27).

• The experts also disagreed about the source of the retinal bleeding observed when JG1999 arrived at the hospital. Dr. Leetsma explained that the retinal bleeding was "a consequence of the increased intercranial pressure this child had." (DE 641 at 45). Dr. Rouse, however, thought that "a tremendous transmission of forces" had caused the retinal hemorrhage. (DE 646 at 14). [FN124]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

FN124. Dr. Leetsma opined that

First of all, physical forces generally do not and cannot cause the kind of retinal bleeding we see here. They can certainly lead to it if you have a car crash and a giant subdural or tremendous cerebral edema, that's going to produce intercranial pressure which can produce the retinal hemorrhages. But directly as a result of physical forces, that would not be acceptable or is not scientifically proven.

(DE 641 at 46–47).

• Dr. Rouse noted that Dr. Leetsma omitted any reference to intercranial evidence of trauma. He did not "mention[ ] the tearing of the myelin and the axonal body. That's sheering of the fibers in the brain. These are all traumatic." (DE 646 at 11). Dr. Rouse explained that "[t]he actual neurons and tissue of the brain itself was damaged" and credibly testified "we see microscopically different manifestations, but it's all due to trauma. Trauma explains all of the findings." (DE 646 at 7, 12).

• Dr. Rouse testified "You cannot ignore the scalp hemorrhage, which are impact sites on the head, meaning her head hit either something hit her head or her head hit something." (DE 646 at 40).FN125 Dr. Leetsma, however, would "argue about does that really represent an impact site" and stated that "it's difficult to tell when those [impacts] occurred or how they occurred." (DE 641 at 43).

FN125. Dr. Rouse testified: "The scalp injuries, the bruising, which as we call it subgaleal hemorrhage, that means bruising of the scalp—and contusion is the same as a bruise—those are recent. And I would say within days. There's fresh blood in those bruises of the scalp. And they indicate an impact site." (DE 646 at 18).

• In the end, Dr. Leetsma found one cause of death: "increased intercranial pressure which had its consequences causing her to remain comatose, nonresponsive, nonbreathing, and ultimately destroyed the circulation of the brain[.]" (DE 641 at 24). Dr. Rouse clarified that the "intercranial pressure" was "one of the physiologic responses

that led to her death" but "a complex constellation of things" such as trauma, swelling, the thrombus, and the subdural hematoma contributed to her death. (DE 646 at 8).FN126 If the swelling had been occurring before the incident on the naval base, "[y]ou would have expected a different scenario, where she would have had more symptoms leading up to the death, nausea, vomiting, being somnolent, sleepy, head—you know, older people describe headaches, that she would have been irritable. There would have been signs, as she was incurring increasing intercranial pressure ... rather than a very abrupt change." (DE 646 at 40).

FN126. Dr. Rouse described the difference between Dr. Kagan–Hallet's description of the edema as "mild to moderate" and the CAT scan as "severe" to be "broad terms" in which there is "a subjective assessment of a finding" and "overlap." (DE 646 at 46). "And I would attribute differences to a neuropathologist and a radiologist are looking at different, using different terminology, using different references." (DE 646 at 46).

Most importantly, the experts disagreed about the manner in which an expert must consider the bare medical findings in light of other evidence. Both experts saw evidence of recent injury. Both experts opined that the most recent of JG1999's injuries occurred within a three-day window.FN127 Both also agreed that they could not with any degree of precision place a date and hour on the most recent injuries. However, the most substantive disagreement between the experts was how to factor additional information into their conclusions.

FN127. Dr. Rouse testified that dating the injuries did not take into consideration the time after JG1999 died, "[b]ecause the physiology stopped at the time of death." (DE 646 at 28).

**\*77** The Government criticizes this claim because Bourgeois "seeks to have this Court view evidence narrowly based upon a defense expert's opinion but without reference or reliance upon other contextual evidence." (DE 654 at 5). Dr. Leetsma turned a blind eye to anything other than the autopsy findings. Dr. Leetsma would not take into account any testimony about the circumstances of JG1999's death, such as AB1994's testimony. Accordingly, he could not say whether the victim died from the injuries on the naval base.FN128

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 81

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

FN128. He explained:

First of all, the aging and dating of the acute component of the subdural we have imprecision there, we can't do any better than a couple of days. Meaning if I couldn't tell you whether a red blood cell in that clot came five minutes before the heart stopped in this child or two days before. I can't. I can't do it. So that limits that.

We have other processes that are involved in this child. The older component of the subdural. The cerebral thrombosis clearly predates the arrival of this child at the naval base. The bruising on the scalp and so forth and so on, of which there are a number of them, all of those have both acute and chronic components and the issue is the same. I can't tell you if bleeding that is there of an acute nature or recent nature precisely when it occurred or how it occurred.

(DE 641 at 51). Even to the limited extent he considered the circumstances leading up to JG1999's death, Dr. Leetsma did not have a full understanding of the facts. For instance, he stated that "[t]he child apparently at some point was reported to have drunk her own urine because she was hungry or thirsty." (DE 641 at 79–80). He used that to infer that "this child had been ill in some fashion prior to this incident." (DE 641 at 79–80). Dr. Leedemsa had a misconstrued understanding of the incident in which the victim drank, and was forced to drink, her father's urine.

Unlike Dr. Leetsma, Dr. Rouse testified that professionals use the circumstances surrounding the death to inform their findings: "We use the physical findings in conjunction with the investigative information.... Pull the two together, view each in light of the other." (DE 646 at 43). Dr. Rouse testified that a forensic examiner looks at

all the investigative information. Some we discount, some does not fit, some fits. I mean, but we consider all the information that's available.... And we would, we certainly look at the medical evidence, but that is always looked at in

conjunction with clinical evidence, with eyewitness statements, with medical records, physicians' previous examinations. We would pull that all together to come to our conclusion.

(DE 646 at 26). Dr. Rouse credibly explained that

certainly the circumstances help place how significant the injury is in resulting in the death. For example, this child has evidence of brain injury that is a week old. By all accounts, she was functioning neurologically fairly normally during that week. She was conscious, talking, walking. She has evidence microscopically of recent injury, days. At a point on the 27th, clinically her neurologic status changed abruptly. She lost consciousness, was no longer walking, talking. That fits very well microscopically with the acute injuries. The timing fits well.

(DE 646 at 22).

In this case, Dr. Rouse's testimony indicated that a medical expert cannot ignore the significant amount of recent trauma that would place the killing injury just before JG1999 arrived at the hospital. In essence, Dr. Rouse looked at the information like a jury would have to plugging scientific observations into eyewitness accounts.

## C. Evidence of Recent, Extensive, and Fatal Head Trauma

Given the pervasive and prolonged abuse JG1999 suffered at Bourgeois' hands, the existence of different—aged brain injuries is not surprising. Unquestionably, Bourgeois' whipping, hitting, and beating the victim over time-including his barbarous assaults with a plastic baseball bat—inflicted head injuries. In his Motion to Vacate and related briefing, Bourgeois treated the subdural hematoma and related injuries' age as the only indicator of when JG1999 received the fatal injury. This is a myopic view of the trial testimony and autopsy findings. Trial testimony did not refer to the subdural hematoma as the only, or even a major, cause of death. Rather, trial testimony was consistent with the evidentiary hearing explanation that a complex serious of injuries caused JG1999's death. In sum, she died from trauma to the brain.

**\*78** The Court does not find Dr. Leetsma's testimony persuasive insofar as he contends that intercranial pressure from earlier wounds caused the victim's death. Regardless of the mention of a ten-day-old hematoma, Dr. Rouse's trial

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 82

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

testimony convincingly described how recent injuries killed JG1999. Nothing in the record suggests any major neurological side effects before her arrival on federal property.[FN129]

> FN129. Dr. Rouse emphasized the lack of any report showing impaired functioning before Bourgeois slammed his daughter's head into the truck window. Dr. Rouse credibly explained
>
> > If she died from an injury that the insult that occurred a week prior, again, yes, at some point you would go from conscious to unconscious. But you would anticipate days of symptoms prior, lethargy, not eating, vomiting for several days' duration, you know, that you would anticipate a constellation of symptoms. Typically also it would be, the loss of consciousness would be closer to the insult, not a week later. Typically it may be a day or two, but you would expect it to occur more recently and with symptoms in the intervening period.
> >
> > (DE 646 at 45).

Trial testimony helped place the killing injury on the naval base. Bourgeois asserts: "There was no evidence offered through [AB1994] or any other witness to demonstrate that the fatal blows were inflicted on the grounds of the [Naval] Air Station." (DE 402 at 28). Bourgeois seriously downplays how AB1994's testimony as it fits into the context of other trial testimony. True, she chronicled a weeks-long pattern of abuse toward JB1999 that fashioned the complex constellation of wounds observed by forensic experts. She saw her father spank, hit, bite, whip, and beat the young child. AB1994 recalled more than one head injury her father caused. He told AB1994 that he wanted to kill the child, and certainly acted like he wanted to kill her. Fresh blood was present in the bruises on JG1999's head which corresponded to the internal injuries that caused her death.

But most importantly, AB1994 saw the murder on federal property. Bourgeois takes advantage of AB1994's testimony told through her childhood view to argue that no time line would place his violent act on federal property. He fails to recognize how, even if her trial testimony drifted from event to event without always following chronology, it harmonizes with

the accounts of others who saw Bourgeois on federal property. After entering the naval base, two individuals saw Bourgeois before he arrived at the loading dock. Hal Resides, the Occupational Safety and Health Manager for Corpus Naval Air Station, saw Bourgeois' waving for him to stop just after 10:00 a.m. on July 27, 2002. Bourgeois leaned out of the driver's side window and asked for directions to the warehouse. After he turned the engine off so they could talk, Mr. Resides saw a young girl looking out the window. (DE 355 at 113–116).[FN130] Mr. Resides' description of his encounter with Bourgeois suggested that JG1999 had not yet suffered a life-threatening injury.

> FN130. While Bourgeois asked for directions and shut off his vehicle, he did not describe either of them leaving their vehicles.

By 10:25 a.m. Bourgeois had notified his dispatch that he was on the naval base, but his truck would not start. (DE 337 at 283). Carl Mead Arnoux, an employee at the naval base, saw Bourgeois' truck in front of the compound with the hood up. (DE 355 at 132). He helped Bourgeois jump start his vehicle.[FN131] These witnesses observed no sign of emergency while Bourgeois was on federal property—Bourgeois was "very kind" and not "frustrated" or "upset." (DE 335 at 143–44). The testimony from Mr. Resides and Mr. Armoux suggest that there was no concern about JG1999's welfare before Bourgeois brought her on federal land.

> FN131. AB1994 remembered that her father's truck would not start, but she did not remember helping him start it as he and Mr. Arnoux jumpstarted it. (DE 241 at 36).

At approximately 11:00 a.m., Bourgeois pulled the tractor-trailer parallel to the loading dock at the Navy Exchange warehouse. (DE 335 at 147). AB1994 then described how her father stopped, told her not to get out, and then went to ask for directions. (DE 241 at 36). AB1994 described JG1999 as active and wiggling around when they arrived to unload the truck. (DE 245 at 36–37). When the truck started to back up, JG1999 tipped the potty. (DE 241 at 36).

**\*79** After she spilled the potty, Bourgeois ordered AB 1994 to hand him the infant. Bourgeois took off JG1999's pants and spanked her. AB1994 then described the murder:

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**PA-176**

Page 83

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

AB1994: He took her by the shoulders, and he started hitting her head on the window.

...

Ms. Booth: And could you see her face, AB1994?
AB1994: Yes.

Ms. Booth: What was her face doing?

AB1994: Like making a real, real sad face.

Ms. Booth: Okay. And when she was making this real sad face, did you tell him, "Stop, Daddy, stop"?

AB1994: No.

(DE 245 at 39). Bourgeois hit her head against the window four times, put JG1999's clothes back on, and told AB1994 "to catch her and put her right next to [her] seat." (DE 245 at 39). AB1994 "was awake, and then she just, like, fell asleep." (DE 245 at 40).[FN132] Bourgeois then concocted his story and played it out to the hilt.

> FN132. Bourgeois tries to create inconsistency between AB1994's account and the other trial testimony. AB1994's recollection harmonizes in many respects, other than the murder itself, with what Bourgeois said happened before he dashed the victim's head into the window. (DE 344 at 187). Also, her testimony does not hint that the killing blows happened somewhere other than the naval base they had entered an hour before. Bourgeois' and AB1994's actions in the hour leading up to the murder, as described by those who came into contact with them, do not even suggest the urgency that they showed once it became clear that JG1999 was dying. No basis exists to raise reasonable doubt about the location of the killing.

Dr. Rouse's testimony harmonized with other testimony from other medical experts who examined JG1999 before she died. When she arrived at the hospital she bore signs of recent trauma.[FN133] Dr. Rouse credibly explicated: "She had a multitude of injuries, the relative role of which I don't think you can dissect out. But clearly that last injury pushed it till the brain could no longer compensate and resulted in her death." (DE 646 at 39). Abundant and conclusive evidence showed trauma both consistent with AB1994's testimony and amply sufficient to cause JG1999's death.

> FN133. For instance, Dr. Noorullah Akhtar, the pediatric intensive care physician that first evaluated and treated JG1999, realized when she was first brought to the hospital that the recent head injuries included extensive blood in the brain and edema of the brain. Ms. Carol McLaughlin, a registered nurse with expertise in child abuse, was on duty when JG1999 arrived and observed several pattern injuries on the child. Dr. Ronald R. Kuffel, Jr., a board certified ophthalmologist. who Dr. Akhtar requested examine JG1999 because she had so much blood in her eyes, observed "multiple hemorrhages ... all over the back of the eye." (DE 345 at 87). He testified that trauma to the head could cause such injuries. (DE 345 at 89). He explained that he had previously observed mild hemorrages which "go away within days to a week or so" but JG1999's were "quite extensive" and "not mild at all." (DE 345 at 91). He described how he observed "massive subinterlimiting hemorrhages, a very extensive amount of blood throughout both eyes." (DE 345 at 91). He described that type of hemorrhage as "usually associated with life-threatening injuries." (DE 345 at 91). He credibly testified that the injury was consistent with AB1994's description of Bourgeois beating his young daughter's head against the window of his truck. (DE 345 at 91).

Most importantly, Bourgeois' own words place the killing injury on federal property. He described how, when he arrived on the naval base and his truck broke down "JG1999 came into the front of the truck with him. While he could not start his truck, Bourgeois described interacting with JG1999: "At that time we were playing. Me, her—at this time I was broken down. Me, her, AB 1994, we were singing ABC's." (DE 338 at 50). After a man helped jumpstart his truck, JG1999 went into the sleeper area of the truck. (DE 338 at 51). When they arrived to unload the truck, JG1999 was "sitting on a potty in the sleeper and getting her hair combed." (DE 338 at 49, 52). Bourgeois made similar statements to FBI Agents soon after the incident. (DE 344; 46 R. 185–186). His own words do not

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 84

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

show any hint of critical injury before they stopped to unload at the naval exchange.

Dr. Spitz and Dr. Leetsma's opinions, far removed from trial proceedings and testimony, do not credibly challenge the location of the murder. The Court finds that Bourgeois has not adduced credible evidence to challenge the jurisdictional element of his crime. Bourgeois does not show that trial counsel could have initiated a valid jurisdictional defense. Trial counsel was aware before trial that the forensic evidence could be interpreted in such a manner that "it could have occurred more than two days before." (DE 350 at 80). Had trial counsel tried to argue insufficiency of the evidence showing jurisdiction, he might have lessened his credibility with jurors. The Court denies this claim and will not allow additional factual development on the issue.

**IV. Trial Counsel Provided Ineffective Assistance by Failing to Call an Expert Witness to Rebut Forensic Evidence Indicting Sexual Assault (claim four)**

**\*80** Bourgeois claims that trial counsel provided ineffective assistance in defending against the accusation that he sexually assaulted JG1999. The possibility that Bourgeois sexually assaulted his daughter was an inflammatory, but not essential, part of the Government's case. The evidence about possible sexual assault came from two sources: (1) the examination of autopsy photographs by an expert in the sexual abuse of children and (2) testing done on rectal swabs taken during the autopsy. Bourgeois claims that trial counsel should have sought expert assistance to rebut both types of evidence.
**A. The Trial Evidence**

During the autopsy, Dr. Rouse administered a sexual assault examination on the victim. She took swabs from JG1999's mouth, vagina, and anus. Dr. Rouse made slides from those swabs and turned them over to the FBI for testing. (DE 345 at 172, 176–77). Dr. Rouse however, did not observe any external trauma to JG1999's genital area. In fact, the autopsy report stated: "The external genitalia are those of a normal female child, and there is no evidence of any trauma to the labia or introitus. The hymen is present and appears atraumatic. The back is straight and the anus is unremarkable and atraumatic." (DE 397, Exhibit 52, Autopsy Report of Dr. Elizabeth Rouse, PA, p. 3). Nevertheless, the Government used the autopsy photographs and the results from testing the swabs to argue that Bourgeois sexually assaulted his daughter.

The Government's opening argument promised to show that "there was seminal fluid in the rectum of that baby." (DE 335 at 42). Testimony about Bourgeois' sexual assault on his young daughter began after AB1994 testified on the fourth day of trial. Previously, the parties had carefully avoided asking about any sexual abuse Bourgeois inflicted on his daughters. The forensic evidence allowed the Government to prove that the murder was only the culminating event in a barrage of abuse that also contained a sexual component.

The Government first called Dr. Scott Anthony Benton, the Medical Director of the Children–at–Risk Evaluation Center and a Clinical Associate Professor with Louisiana State University and Tulane Schools of Medicine. Dr. Benton testified that he examined JG1999 on May 21, 2002, after Child Protective Services in Louisiana had received a complaint that JG1999 had vaginal bleeding. (DE 346 at 23–24). At that point, Bourgeois only had possession of the child for a few days. (DE 346 at 28). In his head-to-toe examination of her, Dr. Benton did not observe signs of abuse. Specifically, he found nothing in the vaginal or rectal area that would indicate bleeding or sexual trauma. (DE 346 at 31–32).[FN134]

> FN134. He noticed inflamation around her urethra, but did not see any evidence of trauma. (DE 346 at 45).

Dr. Benton, however, found a much different picture when he reviewed the autopsy photographs. At trial, Dr. Benton briefly contrasted the appearance of the victim's genital area in his initial examination with what he saw later:

> [T]he autopsy photograph is specific that it is blood outside of a vessel. Okay? And the reason I can say that is because all of the other parts of her vagina are white. When you drain blood from a mucus membrane, it turns white. But that area doesn't. It stays—it's a black red. And that tells me that that's blood outside of a blood vessel. So ... this could have been trauma [.] ... This one is blood outside and most likely is trauma[.]

**\*81** (DE 346 at 46). The bulk of Benton's testimony about sexual assault did not focus on external observations, but on the possibility that the FBI had detected semen in her rectum.

Dr. Benton did not perform any testing on substances

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 85

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

taken from JG1999's corpse. However, the Government laid a foundation for later testimony by asking Dr. Benton about how forensic testing can indicate sexual abuse. Dr. Benton testified that three tests could confirm the presence of semen: (1) a test for acid phospatase, which is a substance predominantly produced in the male prostrate and deposited in ejaculation or pre-ejaculation; (2) testing for the presence of the prostatic specific antigen, also known called by the terms "P30" or "PSA"; and (3) the "more confirmatory" observation of sperm cells. (DE 346 at 22–23). The Government asked what it would mean if testing found indications of semen, but no sperm could be observed. (DE 346 at 49). Dr. Benton explained that sexual abuse may still have occurred under some circumstances, such as if the man has had a vasectomy,[FN135] if he only deposits only pre-ejaculate fluid, or he has been ill. (DE 346 at 50–52). Finally, the Government asked Dr. Benton specifically about what substances contain the PSA protein, thus allowing for a positive result on the P30 test. Dr. Benton testified that the P30 could only be found in secretions from the prostate and in breast milk. (DE 346 at 53).

> FN135. Before trial, trial counsel told the Court that Dr. Johnson "asked [him], as a matter of fact, ....whether or not [their] client had a vasectomy, and [they] discovered he has not." (DE 388 at 33).

Cross-examination did not challenge Dr. Benton's observation of possible vaginal trauma. Instead, trial counsel focused on the reliability of P30 testing. Dr. Benton explained that, although "very low levels of false positives" are associated with the P30 test, "there is no such thing as 100 percent accuracy." (DE 346 at 55). He testified there are "multiple ways to test for the P30, just to confirm that it really is there." (DE 346 at 55). He conceded, however, that the P30 test still had a chance of being erroneous. (DE 346 at 55).

The Government next called Caroline Zervos, a forensic serology examiner with the DNA Analysis Unit for the FBI laboratory in Quantico, Virginia. Ms. Zervos testified about the Government's testing of postmortem swabs, labeled Q5 through Q7, taken from JG1999's rectum. Ms. Zervos described how the forensic laboratory generally uses two tests, the presumptive acid phospatase and the confirmatory PSA, to determine the presence of semen. (DE 346 at 63–64). Here, the laboratory only performed a confirmatory P30 test in order to avoid a false positive. (DE 346 at 87). The test was positive for

samples Q5 and Q7. (DE 346 at 85). Throughout Ms. Zervos' testimony, she equated a positive score on the P30 testings with a positive finding of semen.

Cross-examination probed whether anything other than prostate proteins could result in a positive P30 test. Ms. Zervos testified that low levels of P30 could be in "peripheral male blood, as well as male urine" but at "very low concentrations." (DE 346 at 104). She did not believe that the protein could be found in female fluids. (DE 346 at 105–06). Also, she did not know if anything could be injected that would have the same reaction. (DE 346 at 106). In a discussion with the Court, Mr. Tinker expressed that he "got more than he wanted" from Ms. Zervos because she "didn't know whether things in food might cause" a false positive. (DE 346 at 107).

**\*82** Anthony Onorato, a forensic DNA examiner with the FBI, testified that the only DNA present on the rectal swabs, Q5–Q7, came from JG–1999. (DE 346 at 118). He explained, however, that it was not uncommon to have a sample where semen, but not male DNA, is detected. (DE 346 at 127–28). On cross-examination, Mr. Onorato testified that the only place outside of male semen where the P30 protein can be found is the blood of a male with prostate cancer. (DE 346 at 128–29). Also, Mr. Tinker emphasized that the FBI testing was negative for sperm and for male DNA. (DE 346 at 130).

During guilt/innocence closing, the Government argued:

The DNA, our DNA, expert testified that the swabs that were taken from JG–1999's little bottom had semen on them. There was semen in that baby's bottom. But the swabs were taken at the autopsy and the autopsy was done on June 29th. The baby was thrown on the side of the truck on June 27th and died on the 28th, two days. Dr. Benton testified, the DNA specialist testified that the sperm is very delicate, that it degrades quickly. But when you get a confirmatory test for semen, you've got semen. It's an ejaculate from a man, not from a woman, from a man from sexual arousal. And that's what we know.

The other thing that Dr. Benton told us, as many of the other physicians, is that there can be things happen and not show. You know, I thought it was real interesting yesterday when Mr. Bourgeois was testifying because I said, what was that around her eyes? I said, wt[*sic* ] that Vaseline? No, we don't

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

have Vaseline in the truck.

What is so bad about having Vaseline? I thought that was interesting. It's a lubricant. Why would you have to deny that?

(DE 339 at 20).

The defense's closing argument responded by pointing out weaknesses in the evidence of sexual assault: "They say sexually abused. And they don't talk about the fact that they found no evidence of trauma to the rectum or the genitalia when they examined this child at the hospital." (DE 339 at 24). In addition to calling the post-mortem observations into question, trial counsel pointed out forensic weaknesses in the Government's testing. Trial counsel asserted that the testing should have "no reliability as far your decision making in this case" since the Government's case rested on "nothing but insinuations since that test for the semen, the advanced test, I don't know what it's call[ed], was negative. There's no evidence of semen, I suggest to you, being found on this child." (DE 339 at 41–42).

The Government did not adduce any additional evidence of sexual assault in the punishment phase. In the punishment closing arguments, the Government chronicled the extensive physical injuries Bourgeois inflicted on the victim. Pages and pages of transcript recount his unrelenting torture. In that closing, the Government twice briefly mentioned that Bourgeois' semen had been found in the victim. First, when discussing how Bourgeois had laughed in videotapes while subjecting children to abuse and traumatic episodes, Ms. Booth asked: "Was he laughing when he beat JG–1999 to death? Was he laughing when he bit her, or he burns her, or *he put his filthy semen in her little body?"* (DE 342 at 70) (emphasis added). Second, the Government argued that Bourgeois had not shown remorse:

**\*83** Let's talk about lack of remorse. The Defendant spoke to you. Was there remorse in his voice? Did he ever admit to you that he lost it and accidentally killed the baby, and that it was his background that did it to him? No, he didn't. Not ever. He murdered this baby. His signature with his teeth marks *and his semen is all in that baby.*

(DE 342 at 75–76) (emphasis added).

Bourgeois argues that trial counsel should have presented expert testimony to undercut Dr. Benton's observation of sexual abuse and to blunt the forensic evidence. The Court observes, however, that to succeed on this claim Bourgeois must prove both that the Dr. Benton was incorrect in his physical observations and that the positive P30 did not necessarily equate to a positive result for semen. Absent evidence that would likely eviscerate the effect of either prong, the other would give the jury a sufficient basis to find that Bourgeois sexually assaulted his daughter.

**B. Dr. Benton's Observation of Sexual Trauma**

Bourgeois argues that Dr. Benton had no reliable basis for his testimony about sexual trauma. Bourgeois premises his argument on (1) Dr. Rouse's autopsy report that did not find evidence of sexual trauma and (2) an affidavit from Dr. Spitz in which he criticizes Dr. Benton's testimony. Dr. Spitz has opined that:

As a forensic pathologist, being aware of the type of exposure of the body available to a pathologist performing an autopsy and directly viewing the body, I take exception with Dr. Benton's observations and consider them questionable. Dr. Rouse was in a much better position to determine if a bruise was present. She examined the entire area, described it, and determined it was normal.

(DE 397, Exhibit 53, Declaration of Werner U. Spitz, M.D., PA document at ¶ 15).[FN136] Bourgeois faults trial counsel for not questioning Dr. Rouse about her autopsy findings or otherwise verifying that JG1999 did not suffer sexual abuse.

> FN136. From the onset, Dr. Spitz's testimony on this issue is suspect. As previously noted, Dr. Spitz is not a credible expert.

Bourgeois did not call any witness in the evidentiary hearing to criticize Dr. Benton's observations. Bourgeois did not question Dr. Rouse during her post-conviction testimony about her sexual-assault examination. Bourgeois relies entirely on Dr. Spitz affidavit that does not necessarily eviscerate Dr. Benton's interpretation of the evidence, it only opines that the person performing the autopsy would be in a "better position to determine if a bruise was present."

Bourgeois has not presented any evidence showing that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

Dr. Rouse's initial observation of no trauma was more valid than Dr. Benton's trial testimony. In particular, he has not shown that Dr. Benton's specialized knowledge about childhood sexual abuse and prior treatment of JG1999 did not provide sufficient support for his expert opinion. Unlike Dr. Rouse, Dr. Benton could comment on the condition of JG1999's genital area over time; he could compare her autopsy photographs with those taken a month before her death. Bourgeois' ineffective-assistance claim relies on the unproven speculation that Dr. Rouse would not defer to Dr. Benton's observations. Bourgeois has not shown that trial counsel should have relied on an expert witness such as Dr. Spitz, who can only say that it is better to defer to the autopsy doctor's observations. At best, Bourgeois has shown that experts can disagree on how to interpret the evidence collected during the autopsy.

**\*84** Even without calling additional witnesses, trial counsel exploited weaknesses in the evidence of sexual trauma. For example, during the cross-examination of Carol Ann McLaughlin, the registered nurse who examined JG1999 the day after her death, trial counsel stressed that she saw no evidence of sexual trauma to her genitalia. (DE 595 at 65). Trial counsel also brought out that Ms. McLaughlin observed no trauma in her pelvic examination. (DE 595 at 69–70). During closing arguments, the first thing Mr. Tinker stressed was that "they found no evidence of trauma to the rectum or genitalia when they examined this child at the hospital." (DE 339 at 24). On postconviction review, Bourgeois has not adduced any evidence or testimony that would put a stronger case against the evidence of sexual trauma than the essence of that brought out by trial counsel. Bourgeois has not shown that trial counsel performed deficiently in addressing Dr. Benton's testimony.

**C. Forensic Evidence of Semen**

Before trial, Bourgeois' attorneys sought expert help in performing their own testing on the rectal swabs. The Court appointed Dr. Elizabeth Johnson as a DNA expert pursuant to trial counsel's *ex parte* request well before trial. (DE 122; DE 351 at 18–19). Trial counsel had confidence in Dr. Johnson's abilities after seeing her presentations at a seminar. Trial counsel communicated with her repeatedly. (DE 388 at 14, 33, 35). Dr. Johnson identified sufficient biological material for further serological and DNA testing. Trial counsel made sure

that the Government sent the remaining samples to Dr. Johnson in January 2004. (DE 388 at 32–34).[FN137] To that point, Dr. Johnson had been "good about talking to [the defense] about issues." (DE388 at 35).

> FN137. Bourgeois has raised a related *Brady* claim which asserts that the Government did not turn over a report relating to its testing. (DE 614). Specifically, Bourgeois notes the existence of a document now labeled PX–179 entitled "P30 Test Results"that "indicates that on the three swabs, Q5–Q7, that were subjected to p30 testing by the FBI, the results were 'very weak, very weak and weak,' respectively." (DE 611 at 6). The basis for this *Brady* claim is that this report, while contained in additional collections of trial material, was not in the documents trial counsel submitted to Bourgeois' current attorneys. According to Bourgeois, PX–179 was also not in the material trial counsel turned over to Dr. Johnson and trial counsel apparently did not rely on that information in cross-examination. Bourgeois asserts that his attorneys only became aware of PX–179 during the evidentiary hearing. A *Brady* claim requires the defendant to show that (1) the Government intentionally or inadvertently suppressed (2) material favorable to the defense which (3) was materially prejudicial. *See Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *Brady v. Maryland,* 373 U.S. 83, 89, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Bourgeois has not shown by a preponderance of the evidence that the Government, whether intentionally or by accident, withheld PX–179. The Government called a witness to explain how in late 2003, the Goverment received 358 pages of material from the FBI lab, including PX–179, and then soon thereafter sent the defense 358 pages of material. (DE 655 at 54–57). Also, the records trial counsel turned over to Bourgeois' current attorneys did not contain other documents the Government disclosed before trial. (DE 655 at 63–64). While PX–179 was not found in trial counsel's files, the preponderance of the evidence certainly indicates that the Government fulfilled its *Brady* obligation. At any rate, as the Court will discuss with respect to his *Strickland* claim, a notation of weak results on the P30 test does not indicate an absence of seminal fluid, but triggers a confirmatory search for sperm. The

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

"weak" or "very weak' results from PX–179 signal a small amount, not an absence, of seminal fluid. At any rate, Dr. Johnson's own testing, fully available to the defense, came to the same conclusion.

Dr. Johnson first ordered an acid phosphatase test, which detects an enzyme present in several body fluids, but in a particularly high concentration in seminal fluid, that came back negative. (DE 575 at 7–8). Next, she ordered her own P30 test which came back as a "weak positive." (DE 575 at 18).[FN138] The negative results from her microscopic sperm search, which was even more sensitive than that done by the FBI, made her question the accuracy of the P30 results. In light of the absence of sperm cells, Dr. Johnson interpreted the weak positive P30 test as a "false positive" that could be "due to bacterial proteins found in the rectal swab. If there was actually sperm on the swab, they should be observed." (DE 575 at 23). To that end, she formed the following opinion: "Taking all of the test results, some of which were negative, negative for sperm, negative for acid phosphatase, negative for DNA, even on the Y chromosome testing, that it was not reasonable to conclude that there was semen present on the swabs." (DE 575 at 19).

> FN138. Dr. Johnson explained that "P30 is a protein that is found in abundance in human seminal fluid, and it is found in lesser concentrations in some other fluids.... Amniotic fluid has been reported, breast milk, urine from men, some serum from men, and some female serum, and some female urine." (DE 575 at 13).

By the time Dr. Johnson finished her testing, trial loomed near. Trial counsel faced an oncoming deadline for the disclosure of all expert reports. As the parties were tardy in disclosure, on February 25, 2004, the Court ordered that all experts whose reports were not produced within two days would be excluded from testifying. (DE 196). Trial counsel stepped up efforts to secure a report from Dr. Johnson.[FN139]

> FN139. She later testified that she did not previously known that there was any urgency to the preparation of her report. (DE 575 at 27).

**\*85** On March 1, 2004—immediately before the guilt/innocence phase—Dr. Johnson provided trial counsel with a two-page summary of her proposed the testimony. In a handwritten report that she obviously prepared hastily, [FN140] Dr. Johnson summarized the results of her testing. She reported that her AP test and microscopic sperm search came out negative, but her P30 test yielded a weak positive. Dr. Johnson did not see the weak positive, however, as dispositive particularly because her microscopic search showed no sperm. She told counsel that the P30 result could be a false positive due to bacterial from the rectal swab or from other substances where prostatic specific antigen (PSA) has been detected, such as amniotic fluid, breast milk, saliva, female urine and female serum.

> FN140. Dr. Johnson explained in the evidentiary hearing that she provided him "a handwritten document, because I was in Colorado on another case and didn't have my file, and he kind of caught me off guard needing something. So I put together a handwritten document for him, to assist him in cross-examination." (DE 575 at 21).

Trial counsel did not call Dr. Johnson as a witness. In his post-conviction answer to interrogatories, Mr. Tinker explained:

I had met Dr. Johnson at a seminar and was very impressed with her presentation. I spoke with her afterward about helping us with Mr. Bourgeois' case. I had a great deal of problems getting her to return my phone calls. I learned, during my dealings with her that she did not have her own lab. She did not do the testing I requested in a timely fashion and, therefore, we did not utilize her services.

(PX–82 at 14).

In his Motion to Vacate, Bourgeois faults counsel for not calling an expert such as Dr. Johnson to challenge the forensic evidence of sexual assault. Bourgeois' attack to trial counsel's efforts emphasizes three themes: (1) the P30 result was only a "weak positive," which he argues raises the accompanying possibility that it was a "false positive"; (2) substances other than semen could have provided the P30 antigen that gave the weak positive result; and (3) no observation of sperm cells confirmed the presence of semen. Bourgeois' challenge, however, cannot stand independent of what his attorneys did at trial. In fact, Respondent persuasively argues that, although trial counsel did not call Dr. Johnson as a witness, the flow of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 89

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

his questioning suggests that he used her report to prepare for cross-examination.

Trial counsel did not leave forensic testimony about sexual assault unrebutted. For instance, trial counsel's cross-examination of Dr. Benton centered on whether the P30 test was susceptible to false-positive results. (DE 346 at 53–55). Trial counsel asked both Ms. Zervos and Mr. Onorato whether substances other than semen could give a positive result on the P30 test. (DE 346 at 102–06, 128–29). Trial counsel even elicited from Ms. Zervos that she did not know if digested food could contain the P30 antigen—a factor which Dr. Johnson's testimony would have refuted. (DE 346 at 106). Trial counsel's questioning and argument also highlighted that the Government's experts observed no sperm cells. (DE 346 at 130). In fact, trial counsel's questioning showed that the absence of sperm made the Government experts recommend DNA testing. (DE 346 at 130).

**\*86** Without calling an expert witness, trial counsel's cross-examination touched on the issues raised in Bourgeois' Motion to Vacate. "*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Richter,* ––– U.S. at ––––, 131 S.Ct. at 791. "In many instances cross-examination will be sufficient to expose defects in an expert's presentation." *Id.* (noting also that "[w]hen defense counsel does not have a solid case, the best strategy can be to say that there is too much doubt about the State's theory for a jury to convict"). If based on an adequate investigation and understanding of the issues, an attorney's decision to attack the Government's expert witnesses on cross-examination rather than calling additional experts can be reasonable performance. *See Bower v. Quarterman,* 497 F.3d 459, 467 (5th Cir.2007). Trial counsel's questioning manifested a familiarity with the issues presented in Dr. Johnson's report and, in fact, introduced doubts that could not have been raised by expert testimony, such as that digested food could contribute to the positive P30 results.

Validating trial counsel's cross-examination through expert testimony certainly could have provided some benefit to the defense. Bourgeois has made much of Dr. Johnson's opinion that the P30 testing resulted in a "weak positive," hoping that it would discount the possibility of sexual assault. In the hearing, Dr. Johnson's explanation of her testing tracked the

pre-trial report she gave counsel, but she explicitly drew a distinction between her test results and that from the FBI testing on the P30 assay: they reported a "positive" and she reported a "weak positive" because the test line on the P30 test card "was barely visible ... It's actually very difficult to see on a photograph even." (DE 575 at 72).[FN141] Bourgeois particularly hopes that her qualification of the P30 results as a "weak positive" would have undermined the certainty of the Government testing about semen. The value in Dr. Johnson's testimony, therefore, would have been in showing that the evidence should have compelled the Government to perform the more-confirmatory sperm search.

> FN141. Dr. Johnson explained that in 2004 she tested rectal swabs for the presence of seminal fluid and spermatozoa. (DE 575 at 6). The swabs were tested using the acid phospatase test, which came up negative. (DE 575 at 6, 8). A microscopic search for spermatozoa was negative. (DE 575 at 9–10). She also performed a P30 test. She explained that the P30 protein had been found in "[a]mniotic fluid ..., breast milk, urine from men, some serum from men, and some female serum, and some female urine." (DE 575 at 13). She did not know if studies identifying the P30 protein had included two-and-a-half year old children. (DE 575 at 17, 100, 105). She explained that: "Taking all of the test results, some of which were negative, negative for sperm, negative for acid phosphatase, negative for DNA, even on the Y chromosome testing, that it was not reasonable to conclude that there was semen present on the swabs." (DE 575 at 19).

Dr. Johnson's testing, however, did not completely discount the possibility that Bourgeois sexually assaulted his daughter. On cross-examination, Dr. Johnson admitted that a finding of "weak positive" indicated that the test had only detected a lesser amount of PSA, not that it did not find any semen. (DE 575 at 74–75, 87–88). She elaborated: "the test is designed to detect p30. But whether or not-you can make some double-checks and checks and balances based on the intensity of the color reaction, which gives you an idea of concentration or the amount of material you're dealing with." (DE 575 at 87). In other words, a weak positive indicates the amount, not the presence of, PSA. Testimony in the evidentiary from Jerrilyn Conway, an FBI forensic examiner, confirmed that "[t]he weak

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

positive result means that there is a limited amount of PSA present, which means that there is a limited amount of semen present." (DE 576 at 13).

**\*87** In that regard, Dr. Johnson's proposed trial testimony would only have reconfirmed that a substance with PSA was contained in the victim's rectum. Dr. Johnson's testimony would most benefit the defense if she could identify a substance high enough in PSA content to react with the P30 test. The testimony at trial and on post-conviction review was not completely in agreement about what materials contain PSA. Ms. Zervos did not know if substances from female could contain PSA/P30. The trial testimony allowed for it to exist in females from lactation. The postconviction record shows that the P30 antigen exists in different substances produced by both males and females. Dr. Johnson explained that it had been found in "[a]mniotic fluid ..., breast milk, urine from men, some serum from men, and some female serum, and some female urine. (DE 575 at 13). Because the blood on JG1999's underwear tested negative for PSA/P30, and Dr. Johnson agreed that her blood could not have been the source of the substance in her rectum (DE 575 at 106–08), the substance was likely foreign to the victim's body. Not even Bourgeois' other expert, Charles Alan Keel, however, could conclusively identify a substance naturally occurring in a two-year-old infant that would contain the P30 protein. (DE 575 at 13).[FN142]

> FN142. Mr. Keel did not know if a toddler can produce the P30 antigen. (DE 575 at 129). He also opined that "there's really no such thing ... as a false positive.... It's whether or not the result is coming from P30 or not." (DE 575 at 130). Mr. Keel viewed the P30 test as "a screening tool, in the same way that we use acid phosphatase ... it's only a presumptive test." (DE 575 at 135).

Problematically for Bourgeois, Dr. Johnson did not discuss the level at which PSA occurs in substances other than semen. Ms. Conway, however, explained that the P30 test was designed not to react to substances with a lower concentration of PSA than semen. (DE 576 at 10, 20–21). According to Ms. Conway, research had shown that substances such as female urine or female serum, both of which Dr. Johnson identified as a source of PSA, would not trigger a positive reaction on the P30 test. (DE 576 at 20–21). Studies have shown that PSA levels in pre-pubescent girls were not high enough to account

for a "false positive." (DE 576 at 26). The only substance containing PSA at a level near that which could trigger a positive reaction was breast milk. (DE 576 at 22). Especially where the circumstances of this case do not present a circumstance where breast milk would be present in JG1999's rectum, Ms. Conway credibly explained that "if the PSA test was positive, they can be assured that that came from semen." (DE 576 at 20). With that understanding, Dr. Johnson's post-conviction testimony still allows for the P30 reaction coming from a substance external to the victim, which still carries with it the possibility of sexual assault.[FN143]

> FN143. Bourgeois hopes that Dr. Johnson's testimony would have discounted Dr. Benton's testimony treating sperm as easily degradable. Dr. Johnson criticized Dr. Benton's testimony that the sperm could have degraded over time as "totally erroneous" because "[s]perm are very durable. They can be found in decomposing bodies 30 days after" death. (DE575at 15, 101–02).Dr. Johnson explained that, according to their own guidelines, the FBI testing should not have allowed a conformation of sexual assault because FBI protocol only allowed identification of sperm when it was "intact, with a tail attached[.]" (DE 575 at 103). Additional experts in the hearing bolstered Dr. Johnson's testimony. Charles Alan Keel, a forensic scientist with Forensic Science Associates who "specialize [s] in the identification and genetic characterization of human body" testified that "there's no proof of semen being detected ... in the evidence that was presented at trial." (DE 575 at 123, 127). His testimony, in essence, was that a positive P30 could not reliably predict the presence of seminal fluid without the presence of sperm. Ms. Conway, however, disagreed and stated that sperm cells will break down quickly, likely only susceptible to identification for a day. (DE 576 at 25). She expected, though, the sperm cells to survive as long as the PSA would. (DE 576 at 47).

Taken in the context of the trial and post-conviction record, the testimony from Dr. Johnson and Mr. Keel does not show that trial counsel provided ineffective deficient in relying on cross-examination to poke holes in the Government's forensic evidence. Here, the forensic evidence of sexual assault was not of the strongest sort, but was not inconsequential

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

either. Given the complex scientific issues at play, and the fact that his experts could question but not conclusively eliminate the possibility of sexual assault, Bourgeois has not shown that using experts to highlight that information would have swayed the jury. In particular, the Court's observation of Mr. Keel and Dr. Johnson showed that they would not be persuasive witnesses before the jury. They identified the same errors in the testing that trial counsel had, yet bogged down their testimony with fine distinctions which did not completely discount the possibility of sexual assault. A reasonable trial attorney could certainly be concerned that a prolonged attack without a clear-cut resolution could make a minor, but highly inflammatory, issue a much more prominent feature in the jury's deliberation.

**\*88** For the reasons outlined above, Bourgeois has not shown that trial counsel provided ineffective assistance by not calling expert witnesses such as Dr. Johnson or Mr. Keel at trial.

### D. Prejudice From Trial Counsel's Defense Against Allegations of Sexual Assault

To succeed, Bourgeois must also show a reasonable probability of a different result had trial counsel vigorously attacked the evidence of sexual assault. In doing so, Bourgeois would both have to (1) discount the presence of semen through a false positive on the two rectal swabs and (2) conclusively show through Dr. Johnson's testimony that Dr. Benton incorrectly identified vaginal trauma.[FN144] Even if he could rebut that evidence, testimony hinted that Bourgeois committed improprieties on his daughters when he spent nights locked in a bedroom alone with them. The testimony of bruising and semen only confirmed that Bourgeois sexually assaulted JG1999.

> FN144. Because *Brady's* materiality standard is "identical to" the standard for prejudice under *Strickland, Johnson v. Scott,* 68 F.3d 106, 109–10 (5th Cir.1995), the discussion that follows above also shows why Bourgeois cannot succeed on his related claim that the Government withheld information about its DNA testing.

To some extent, an aggressive challenge to the sexual-assault evidence could have opened the door to additional prejudicial information. Trial counsel had acted to prevent the Government from adducing "[a]ny evidence that the defendant may have or did sexually abuse his daughter, [AB1994]." (DE 160 at 3). The Court refused to allow the Government to adduce evidence in its case-in-chief that witnesses "saw [him] french kiss AB 1994," have her sit on his lap inappropriately, and treat her like a mature adult. (DE 347 at 92, 94–95). In fact, the Court commented without rejoinder from trial counsel that "everybody in the room knows what was going on with Mr. Bourgeois and AB1994." (DE 347 at 94). An additional and aggressive challenge to the allegation that he sexually assaulted JG1999 may have allowed the Government to discuss what he had done to his other daughter.

Regardless, the evidence of sexual abuse was an inflammatory, but not decisive, factor in both phases of trial. Without much question, Bourgeois' sexual abuse of his daughter did not substantially impact the factors the jury had to consider reaching a verdict as to his guilt. Bourgeois expresses the most concern about the Government's reliance on sexual assault at the punishment phase. The Court's review of the trial and the evidentiary hearing testimony indicates that he has not shown a reasonable probability of a different result had trial counsel's efforts disputed the sexual-assault evidence.

As discussed above, the post-conviction evidence questioned, but did not completely eliminate, the possibility that Bourgeois sexually assaulted his daughter. Even so, that evidence was not a pronounced feature of the trial. Even if trial counsel had conclusively rebutted the testimony from both Dr. Benton and from the other forensic experts, the jury still had already heard vivid testimony about how Bourgeois viciously abused his daughter in numerous other ways. While the evidence of sexual abuse made Bourgeois seem more selfish, uncaring, and inhuman, the jury still had before it a graphic understanding of the unrelenting abuse he heaped upon the young child. The Government's brief mention of sexual assault in the punishment phase closing argument was only another reminder that JG1999 bore the signs of her father's abuse throughout the rest of her body. While certainly similar information could unduly inflame a jury in other circumstances, Bourgeois' abusive and violent tendencies prevent any reasonable likelihood that jurors would have reacted differently in the punishment-phase had they not known that Bourgeois had raped his daughter.

**\*89** In sum, Bourgeois has not shown that, had trial counsel challenged the evidence of sexual abuse in the manner

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

he proposed, there would have been a reasonable probability of a different result. The Court will deny Bourgeois' ineffective-assistance claim based on those allegations.

**V. Trial Counsel Provided Ineffective Assistance by Not Litigating a *Daubert* Challenge to Three of the Government's Expert Witnesses (claims five and six)**

As discussed at length above, the autopsy revealed that JG1999's body bore numerous and varied wounds suggesting a long, tormented series of physical assaults. The Government sought expert assistance to describe those injuries to the jury. Those expert witnesses used the autopsy photographs to chronicle the dozens of bruises, lacerations, and other wounds throughout the young victim's body. For example, forensic odontologists Dr. Senn and Dr. Chrz's testimony linked Bourgeois to bite marks on JG1999's arm and lower back. As a demonstrative device, expert witnesses relied on digitally enhancements made to the autopsy photographs by Dr. Oliver.

Bourgeois faults trial counsel for not challenging the scientific and technical reliability of (1) Dr. Oliver's use of digitally enhanced autopsy photographs (claim five) and (2) Dr. Senn and Dr. Chrz's opinion about bite mark evidence (claim six). Bourgeois asserts that, had counsel asked the Court to subject the experts' opinions to the rigors of *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), their testimony would not have come before the jury. The Court finds that Bourgeois has not met his burden under *Strickland* with regard to these claims.

**A. Dr. Oliver's Reliance on the Digitally Enhanced Autopsy Photographs (claim six)**

The Government sought the assistance of Dr. William Oliver to ascertain the extent of external injuries on the victim. Dr. Oliver, a medical doctor board certified in anatomical, clinical, and forensic pathology who also possesses a master's degree in computer science, received copies of the autopsy photographs which had been taken with a 35mm camera. Dr. Oliver digitally enhanced the autopsy photographs using a method called Contrast–Limited Adaptive Histogram Equalization ("CLAHE") which redistributed colors to accentuate certain features. For his trial testimony, Dr. Oliver created a PowerPoint presentation with three representations of many autopsy photographs: the original, a digital enhancement of the original image, and the enhanced photograph with markings indicating the external injuries. Other experts relied

on Dr. Oliver's enhancements.

During a pre-trial hearing trial counsel raised concerns about the use of the enhanced images, but did not lodge a *Daubert* challenge. (DE 350 at 103; DE 345 at 14). Mr. Tinker informed the Court that his particular concern was that the photographs were more prejudicial than probative, not that Dr. Oliver's testimony lacked reliability. (DE 345 at 30). The Court told the parties that it would like to hear about Dr. Oliver's methodology before his enhanced photographs came before the jury. (DE 350 at 103–04).

**\*90** Before Dr. Rouse began her testimony in the guilt/innocence phase that would use the enhanced photographs, the Court again said it wanted to hear about "whatever [Dr. Oliver's] expertise is on this enhanced picture taking." (DE 346 at 174). Dr. Oliver testified outside of the jury's presence about the enhancement of the photographs. (DE 345 at 7–9). As Dr. Oliver began discussing the digital enhancements, the Court asked if his imaging technique had been peer reviewed, which he said it had. (DE 345 at 14). Dr. Oliver outlined the process he used to accentuate the external injuries. He explained that his method of image processing changed the relative value or prominence of features already visible in the image. (DE 345 at 17). Mr. Tinker asked if "this is something that you do, or are there other people in the country that do this kind of thing?" (DE 595 at 29). Dr. Oliver described a "long history of all this" and referred to "contrast enhancement in the 1960s for bite mark analysis. So the general practice of doing image processing to evaluate imagery is actually fairly old." (DE 595 at 29). The specific technique he used "has been in use since the mid 1980s." (DE 595 at 30).

Nevertheless, Dr. Oliver stressed that his forensic conclusions came from the original photographs, not the enhancements. He stated that his "conclusions are based on going back to the original image" and that the CLAHE technique only served to "make features in an image more obvious." (DE 345 at 13). When he later testified before the jury, he reiterated that "you don't want to draw conclusions from" the enhanced images but you must "go back to the previous image." (DE 345 at 26). The trial court allowed the admission of the enhancements "as an aid to the jury." (DE 345 at 30). Other witnesses, most notably Dr. Senn and Dr. Chrz, used Dr. Oliver's enhanced images to accentuate the injuries they identified. Only the unenhanced autopsy photographs went with the jury into deliberations. (DE 345 at 33).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 93

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

Bourgeois claims that Dr. Oliver's method of enhancing the autopsy photographs is not reliable or scientifically endorsed. The Federal Rules of Evidence and the Supreme Court's *Daubert* jurisprudence govern the admission of expert testimony. Both essentially require that expert testimony be reliable and relevant. Bourgeois' attack on Dr. Oliver's testimony does not allege that all digital enhancement of photographic evidence violates scientific principles. Instead, Bourgeois claims that the specific CLAHE technique Dr. Oliver utilized has not been peer reviewed, distorts the original image, and otherwise insert a degree of unreliability into the expert's analysis. Bourgeois also contends that trial counsel should have sought expert assistance to dispute the Government's reliance on the enhanced images. To that end, Bourgeois has adduced significant technical evidence criticizing Dr. Oliver's methodology.

However, this Court's analysis cannot stray far from *Strickland'*s inquiry into what trial counsel should have done and how it would have made a difference at trial. The ultimate inquiry is not an expert's strict compliance with scientific principles or paradigms, but *Strickland* performance and prejudice.[FN145] With that in mind, the Court only needs to summarize the highly detailed evidence in order to conclude that Bourgeois has not met *Strickland'*s deficient performance or actual prejudice prong on these claims.

> FN145. In his answers to the interrogatories, Mr. Tinker stated: "I reviewed the government's evidence and reports; and personally met and interviewed the government's experts. I believe I had an expert review the evidence, but at this time, I do not recall who that person was."

**\*91** Bourgeois primarily relies on three sources to challenge Dr. Oliver's CLAHE technique. First, Bourgeois put forward C. Michael Bowers, a forensic odontologist and dentist, as an expert in photo imaging and enhancement. Dr. Bowers prepared a report that coupled his review of the CLAHE method with his own examination of the *Daubert* analysis. In the hearing, however, Dr. Bowers revealed that his expertise with digital enhancement came from "weekend courses in [his] town ... put on by ... the junior college." (DE 598 at 40). His scientific works on the subject consisted of a book he self-published. Dr. Bowers is not expert in image

enhancement.[FN146] As the Court will discuss with respect to his testimony about the bite mark evidence, Dr. Bowers was also not a credible witness.

> FN146. To the extent that he testified from his use of digital enhancements, he explained "Digital enhancement standards at this point are actually quite lax, even with the study working groups that they've established." (DE 598 at 81).

Second, in the hearing Bourgeois called United States Army Colonel J. Curtis Dailey, DDS, who the Government had initially consulted as a witness in this case, to testify about the use of the enhancements for identifying bite marks. Dr. Dailey opined that he had never seen Dr. Oliver's CLAHE procedure used before. (DE 597 at 425). Dr. Dailey, however, is not an expert in digital enhancement. As the Court will discuss at greater length below, Dr. Dailey's self-interest clouds his credibility in this case.

Finally, in a report bearing the names of Michael Cherry and Manfred Schenk, Bourgeois also included a report from CherryBiometrics criticizing Dr. Oliver's enhancement of the photographs. The report states that Dr. Oliver's use of CLAHE

disort[ed] almost everything in the newly created image. There is no way to know whether his enhancements distorted the areas he claims he improved. Therefore his enhanced images cannot be used as a fair and accurate building block to analyze bite marks or 'injuries' that were not visibly present in the original autopsy photographs.

The report noted problems with Dr. Oliver's approach, including that he used a substandard scan of the original photograph, changed the image into inaccurate shapes and colors, lost information in the file structure of the images, and further distorted the images when converting them into a PowerPoint program. (DE 397, Exhibit 43 at 3). Bourgeois also presented testimony from Manfred Schenk, one of the co-authors of the report from Cherry Biometrics through a videotaped deposition. The Government objected to his qualification as an expert in digital imaging. (DE 609, Deposition of Manfred Schenk, at 18). Mr. Schenk complained that a loss of detail and accuracy could accompany Dr. Oliver's techniques.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 94

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

As a counterbalance to Bourgeois' evidence, the parties also deposed Dr. Oliver, who defended his technique and explained his demonstrative use of the photographs.

The Court's summary only captures the briefest outline of the sizeable evidence Bourgeois has amassed to denigrate Dr. Oliver's enhancement technique. The wide-ranging development of this claim, however, threatens to side-rail the focus from what happened at trial. The knowledge that Dr. Oliver's digital enhancement technique somewhat distorts the resultant image is not new. At trial, Dr. Oliver explained how his process left "artifacts" or otherwise compromised portions of the image in order to enhance others. (DE 345 at 203). Alterations in the enhanced images were apparent to the Court and the jury through Dr. Oliver's three-part presentation in which the jury saw the original image, the enhancement, and the enhancement with the injuries marked. Even without the layers of expert testimony from post-conviction review, Dr. Oliver has never denied that his CLAHE method alters the original image.

**\*92** The question is how the enhancements affected the data upon which Dr. Oliver based his expert opinion, that is, the identification of the injuries Bourgeois inflicted. Dr. Oliver's use of the images has caused the parties to see the nature of his testimony differently. The Government considers the heart of Dr. Oliver's opinion to rest on his observations and conclusions drawn from the original photographs, with the digital enhancements serving as a demonstrative aid whose formation does not fall under *Daubert'*s strictures. Bourgeois instead views the enhancements as the foundational basis for Dr. Oliver's expert opinion, subjecting their creation to the rigors of *Daubert.*

It is obvious from the trial transcript and post-conviction hearing record that Dr. Oliver's trial opinions rested on observations he made from the original autopsy photographs. At trial, Dr. Oliver emphatically told the jury that if

you notice a feature in one of these images, go back and look at the original. If you don't see it in the original image, it doesn't matter who says it's there, if I say it's there or anybody else says it['s] there. If you don't see it in the original image, don't believe them. It's that simple. This isn't rocket science.

(DE 345 at 204). In his deposition Dr. Oliver reiterated that he only counted injuries observable on the original autopsy photographs. (DE 609 at 31). Simply, the original photographs, not the challenged enhancements, formed the basis for his expert assessment. As Bourgeois has not seriously challenged Dr. Oliver's expertise to identify external injuries from autopsy photographs, he has not raised any concern that would have prevented Dr. Oliver from testifying.

Moreover, Dr. Oliver's digital enhancements were not the genesis for the claim that Bourgeois physically assaulted JG1999. The enhanced digital images were not by far the only evidence that Bourgeois tormented his young daughter with extensive abuse. Dr. Oliver's testimony only served to reconfirm observations made by medical personnel when JG1999 arrived at the hospital. Ms. McLaughlin, the registered nurse who could not perform a typical head-to-toe examination because of her serious condition, observed numerous pattern injuries and bruising throughout JG1999's body. The original autopsy photographs themselves undeniably confirmed the graphic testimony recounting Bourgeois' abuse. Dr. Rouse's autopsy report included a section listing "injuries indicative of chronic abuse" with included a litany of severe trauma throughout the victim's body. In addition, Dr. Rouse observed deep tissue bruising when she cut into JG1999's body. Dr. Benton described the numerous wounds he observed in the unaltered autopsy photographs. An FBI agent describing visiting JG1999 in the hospital and observe bruising, whip marks, burn marks, and other extreme injuries. (DE344 at 176). Importantly, AB1994 provided a detailed account of Bourgeois' savage abuse that meshed seamlessly with the injuries highlighted in the digital enhancements. Removing the digital enhancements from the evidentiary equation would not have measurably changed the case before the jury.

**\*93** Bourgeois' highly technical challenge to Dr. Oliver's digital enhancement obfuscates the sources, nature, and pervasiveness of the evidence showing that Bourgeois viciously abused his daughter. Given the fact that Dr. Oliver based his conclusions on the original autopsy photographs and in light of the mountain of additional evidence showing harsh physical abuse, Bourgeois has not shown *Strickland* deficient performance or prejudice respect to counsel's failure to raise a *Daubert* challenge to Dr. Oliver's digital enhancements. Any alleged error by trial counsel by not litigating a *Daubert* challenge did not call into question the fundamental fairness of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**PA-188**

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

either phase of trial.

**B. Testimony from Dr. Senn and Dr. Chrz Concerning Bite–Mark Evidence (claim five)**

Bourgeois claims that trial counsel should have raised a *Daubert* challenge to the two experts—Dr. Senn and Dr. Chrz—who linked Bourgeois to bite marks found on JG1999's right arm and on her back just above the waist. As discussed below, strong evidence showed that Bourgeois was the one who bit his young daughter. Bourgeois has not presented any credible evidence that would undercut the trial testimony.

Dr. Rouse had testified that she observed multiple bite marks on the victim. (DE 345 at 156). In particular, Dr. Rouse described two "arched contusions, contusions that are, you know, this type of shape, that have discrete areas that are consistent with a bite mark ... on the right forearm, and then one on her left flank ... [j]ust kind of the side between her belly and her back, lower." (DE 345 at 174). Dr. Rouse testified that she took pictures of the bite marks. (DE 345 at 175–76).

Before trial, the Government had sought the assistance of United States Army Colonel J. Curtis Dailey, a consultant for the Armed Forced Institute of Pathology, to analyze the bite-mark evidence, but did not call him as a witness. Using only a portion of the available photographic evidence, Dr. Dailey compared dental casts taken from Bourgeois, Robin and AB1994 to the bite marks. Dr. Dailey could not "rule in, or rule out" Bourgeois, Robin, AB1994 "as the possible biter." [FN147] (DE 397, Exhibit 45). Dr. Dailey did not testify at trial. He did, however, try to bill the Government for his work on this case. He also apparently tried to secure an appointment as an expert witness once his commission ended.

> FN147. Dr. Dailey explained that he could not include or exclude any of the three because the bite marks had diffuse presentation in the photographs, the bite marks were in distorted positions, the ruler in the photographs was in a different spatial plane than the marks, and the three individuals' dentition had similar metric and spatial pattern relationships. (PX–140 at 1). Bourgeois provided an affidavit from Dr. Dailey with his section 2255 motion. Dr. Dailey stated that, when he told the Government the results of his analysis, Assistant United States Attorney Booth was "irate" and told him that Bourgeois "was a really bad man." When he told her that information was

irrelevant to his analysis, "she then told [him] that if [he] could not help her she would go out and find an expert who could help her." (DE 397, Exhibit 45; DE 597 at 426–27).

The Government sought the opinion of additional forensic odontologists, Dr. Senn and Dr. Chrz. Dr. Senn's role was twofold: (1) determine whether the injuries were indeed bite marks and, if so, (2) determine which of the individuals with access to JG1999 he could exclude as a possible biter. (DE 345 at 254–56). Dr. Senn testified that the injuries on her arm and back were consistent with bite marks. (DE 345 a 250, 252). Comparing models taken from the three potential biters, Dr. Senn could not exclude or include any of them from biting JG1999 on the arm. (DE 345 at 274). He could, however, exclude Robin and AB1994 from biting her on the back. (DE 345 at 279).

**\*94** The American Board of Forensic Odontology Guidelines for Bite Mark Analysis require a second opinion. (DE 345 at 283–84; DE 388 at 28). Dr. Senn sent the photographs and dental models to Dr. Chrz, who is also a dentist and an expert in forensic odontology. Dr. Chrz conducted a similar bite mark analysis but utilized a technique called grey scale shading that allowed identification with greater detail. (DE 345 at 297–312). Dr. Chrz also identified the injury on JG1999's arm as a probable bite mark and excluded Robin and AB1994 as the one who left the bite on JG1999's back. (DE 345 at 311). Because this was a "closed situation" where only the three people in the truck could have bitten JG1999, Dr. Chrz explained that only left Bourgeois "as a suspect capable of causing the pattern injury that is seen on her back." (DE 345 at 311).

Well before trial counsel Mr. Tinker met with Dr. Senn and questioned him about his findings. (DE 388 at 28). Mr. Tinker was not unfamiliar with forensic odontology. During a hearing Ms. Booth told the Court that Mr. Tinker's pre-trial questioning of Dr. Senn was "brilliant" and that he had been "the very first Prosecutor in the State of Texas to get a conviction with bite mark evidence[.]" (DE 388 at 36). Trial counsel considered whether to challenge Dr. Senn's and the other experts' qualifications through *Daubert,* but informed the Court that they had instead chosen to just attack the substance of their opinions. (DE 388 at 38–42). Trial counsel filed a motion in limine asking that Dr. Senn only be allowed to testify

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

"to a medical certainty," not that they "might be or could be or probably are teeth marks." (DE 160 at 3).

Bourgeois launches two attacks on the bite-mark evidence. First, Bourgeois claims trial counsel should have objected to Dr. Senn and Dr. Chrz's testimony because the science of forensic odontology is not sufficiently reliable under *Daubert.* Second, assuming that a court can consider bite-mark evidence, Bourgeois asserts that the science would not have pointed to him as the one who bit the infant girl. The Court will only discuss Bourgeois' claim briefly because, in the context of the testimony he adduced in the hearing and the trial record, he has not made a colorable showing of possible merit.

Bourgeois supported his Motion to Vacate with a report in which Dr. Bowers assumed expertise in digital imagery, made legal conclusions about *Daubert'* s application, and denigrated the relevance of his profession in court. He wrote:

[B]oth experts otherwise adhere to the general rules and methods of their forensic board, the ABFO. The acceptability of methods does not impact, however, on analytical judgment and interpretation of the evidence. In my opinion, the limits of the bitemark evidence in *Bourgeois* have been ignored by both of my colleagues. The methods they used are inappropriate and not relevant to the injuries on the child's body.

(DE 397, Exhibit 52 at 3). Dr. Bowers was not a credible witness. Aside from his claim to be an expert in an area for which he had no expertise, he also assumed too much when he presumed as a forensic odontologist that he could inform the Court whether the Government's testimony should have been excluded under *Daubert.* His decision to educate the Court on legal conclusions reflects his testimony in the evidentiary hearing. His testimony was condescending and argumentative. His testimony was slippery; he evaded giving answers that would not benefit Bourgeois.[FN148] Most troubling, the essence of Dr. Bowers' testimony was that forensic odontology's only role in criminal cases was to identify something as a bite mark, without attempting to identify who may have or may not have been the biter. (DE 598 at 109). On cross-examination, Dr. Bowers admitted that he did not know of any other forensic odontologist in the nation who was testifying in court that bite mark evidence is not reliable. (DE 598 at 85–86). To his knowledge, bite mark evidence has never been excluded in a case. (DE 598 at 86).[FN149] Dr. Bowers' testimony—both in general and relating to the specific factors a competent odontologist would consider in this case—was not credible or even useful to the Court. His testimony would not have resulted in the exclusion of Dr. Senn or Dr. Chrz under *Daubert.*

FN148. For instance, Dr. Bowers agreed that bite mark evidence is generally reliable for the purposes of excluding individuals as the biter, (DE 598 at 87), but refused to do so in this case. He carefully selected problems Dr. Senn had noted with forensic odontology without giving voice to guiding themes such as: "Bite mark analysis is too important and valuable to the investigation and adjudication of certain crimes to be discounted or overlooked" and "The use of bite mark analysis to exclude suspects is powerful and important." (DE 598 at 94–95). Aside from his conclusion about the evidence in this case, cross-examination showed that Dr. Bowers' testimony in another case shifted after one party agreed to pay him. (DE 598 at 109–13). In that case, Dr. Bowers apparently initially refused to exclude as a biter a man who had no teeth. (DE 598 at 110). He admitted that he gave "incorrect" testimony under oath in that case. (DE 598 at 112–13).

FN149. At the same time he criticized the foundational aspects of Dr. Senn's testimony, Dr. Bowers asserted that he had no reason to question Dr. Senn's integrity and his reasons for coming to his conclusions in this case. (DE 598 at 118).

**\*95** Bourgeois has not raised a credible attack on Dr. Senn or Dr. Chrz's conclusions. Aside from Dr. Bowers, Bourgeois relies on Dr. Dailey's testimony not to exclude Robin or AB1994 as possible biters. From the trial record and the evidentiary hearing, it was apparent that Dr. Dailey had not considered the whole of the evidence in this case. He based his conclusions on a limited amount of information. Worse, his request for reimbursement for his services while a government employee taints his testimony with self-interest. Even in his live testimony, Dr. Oliver did not appear credible. Neither of Bourgeois' post-conviction witnesses would have been persuasive in any way to the jury.

Even if trial counsel should have made the challenge to the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**PA-190**

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

bite-mark evidence that Bourgeois proposes, he has not shown a reasonable probability of a different result. Again, prolonged discussion of highly technical scientific factors cannot brush aside the heart-wrenching testimony the jury heard. Bourgeois brashly, and incorrectly, argues that "[t]he bite marks found on the victim cannot be traced to [him] with certainty any greater than guess work." (DE 459 at 2). AB 1994's trial testimony is conspicuously absent from Bourgeois' discussion of prejudice on these claims. AB1994 provided vivid testimony showing that Bourgeois often bit JG1999.

AB 1994 described how she saw her father bite JG1999's feet "[m]any times" until she would cry. (DE245 at 14). Bourgeois never bit any of his other daughters, but he bit JG1999's hands until they got "ugly." (DE 245 at 15). AB 1994 recalled that her father even bit JG1999 on the head: "He just opened his mouth wide, and he just started biting her right there." (DE 245 at 23). AB1994 testified that JG1999 wore socks "[b]ecause she was bitten all up, and her feet looked bad." (DE 346 at 3). She elaborated:

The Government: Okay. Did you ever see your dad hit her while she was sitting on the potty? Or do you remember?

AB1994: I don't remember.

The Government: Okay. Did you ever see her bleeding after your dad hit her?

AB1994: When he bit her.

The Government: Okay. And when he bit her, what do you mean? Where did he bite her?

AB1994: Right on the forehead.

The Government: How about her hands? Did you see her bleed when he bit her on the hands?

AB1994: A little.

The Government: How about her feet? Did you see her bleed when he bit her on the feet?

AB1994: Yes.

(DE 346 at 5). Even if trial counsel could have prevented Drs. Senn and Chrz from testifying, AB1994 had already provided emotionally wrenching testimony that Bourgeois repeatedly bit JG1999's feet and hands making her cry out in pain. The fact that AB 1994 did not mention that Bourgeois bit JG1999 on the arm and back would aid the defense little in light of the unimpeached testimony of his ruthless biting elsewhere on the infant. The Court finds that Bourgeois has wholly failed to prove deficient performance or prejudice with respect to this claim.

**VI. The Government Violated its Duty under _Brady v. Maryland,_ 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by Failing to Disclose That the Government Promised Inmates Some Benefit for Testifying Against Bourgeois (claim seven)**

**\*96** Bourgeois' seventh claim alleges that the Government breached its duty under _Brady v. Maryland,_ 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to provide exculpatory evidence to the defense. "[T]he special role played by the American prosecutor in the search for truth in criminal trials" encourages the full disclosure to the defense of all exculpatory or impeachment evidence. _Strickler v. Greene,_ 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). "Courts, litigants, and juries properly anticipate that 'obligations [to refrain from improper methods to secure a conviction] ... plainly rest[ing] upon the prosecuting attorney, will be faithfully observed.' " _Banks v. Dretke,_ 540 U.S. 668, 697, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (quoting _Berger v. United States,_ 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)). Bourgeois asserts that the Government breached its duty to reveal deals it allegedly made with inmate witnesses.

The Government relied on inmates to relate incriminating statements Bourgeois made while incarcerated before trial. In his Motion to Vacate, Bourgeois argued that the Government secured the testimony of four inmates—Adam Longoria, Orlando Campos, Wiley Taylor, and Darick Moore [FN150]—by making them promises that they did not divulge to the defense. At the time of trial, Longoria faced state drug charges and Campos was serving a 12–year state sentence. Taylor and Moore had not yet been sentenced on federal drug charges. [FN151] The inmates' collective testimony showed that Bourgeois said he killed his daughter and was going to make it look like an accident, admitted to beating his wife and the victim, had alleged drug trafficking connections, and had ordered hits from prison. The Government verified Bourgeois' ordering of hits

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

from his prison cell through notes he passed to Longoria. (DE 348 at 159).

> FN150. The pleadings, transcripts, and record provide various spellings for Moore's first name.

> FN151. At the time of trial, Moore had pleaded guilty to a federal charge of possessing with intent to distribute cocaine base but he had not yet been sentenced. (DE 344 at 200). Taylor had pleaded guilty to a charge of conspiracy with intent to distribute more than 50 grams of methamphetamine, but had not yet been sentenced. (DE 344 at 228)

The parties questioned each of the inmates about what benefit they expected to receive for their assistance. Longoria and Campos testified that the Federal Government could not help with their state court cases. (DE 344 at 216; DE 348 at 167, 184–86). Longoria, in fact, explicitly stated that he did not expect the United States Government to "come in and testify on [his] behalf that [he] cooperated[.]" (DE 348 at 186). Campos agreed that the Government "told [him] clearly" that they "can't reduce [his] time," but he still "hop[ed] that [the Government] will relay to authorities that [he] came in and testified in a murder case[.]" (DE 344 at 216, 223–26). Moore and Taylor explained that they hoped the Government would ask for a downward departure of their sentences because they cooperated against Bourgeois. (DE 344 at 202–03, 209, 231). Bourgeois now argues that he can prove that the Government promised to help each of the men in exchange for their testimony.

Three essential elements compose a valid *Brady* claim: " 'The evidence must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' " *Banks,* 540 U.S. at 691 (quoting *Strickler,* 527 U.S. at 281–282). Here, Bourgeois claims that the alleged Government deals would have impeached the inmates' testimony. Without question, impeachment evidence "falls within the *Brady* rule [.]" *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *see also Giglio v. United States,* 405 U.S. 150, 155, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) ("[E]vidence of any understanding or agreement as to a future prosecution would be relevant to [a witness'] credibility and the jury [is]

entitled to know of it.").[FN152]

> FN152. For the first time in his Memorandum of Law in Support of Motion for Relief Pursuant to 28 U.S.C. Section 2255, Bourgeois argues that the Government's failure to disclose deals with its witnesses violated its affirmative burden to correct testimony which it knows to be false under *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The Supreme Court has not yet decided whether a *Brady* claim is distinct from a false-evidence claim. *See Banks v. Dretke,* 540 U.S. 668, 690 n. 11, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004). Courts generally assume that a *Napue/Giglio* claim has three components: "(1) the testimony in question was actually false; (2) the testimony was material; and (3) the prosecution had knowledge that the testimony was false." *United States v. Webster,* 392 F.3d 787, 801 (5th Cir.2004). For the same reasons discussed above, Bourgeois has not shown that the witnesses gave false testimony or that their testimony was constitutionally material.

**A. No Evidence of Concealed Deals with Government Witnesses**

**\*97** Bourgeois did not call any of the inmates in the federal evidentiary hearing.[FN153] Without direct testimony from the inmates, Bourgeois' *Brady* claim rests on an uncertain foundation. Bourgeois largely supports his *Brady* claim on hearsay statements from others and inferences. "[S]peculation about the suppression of exculpatory evidence is an insufficient basis to support a *Brady* claim." *Medellin v. Dretke,* 371 F.3d 270, 281 (5th Cir.2004); *see also Wood v. Bartholomew,* 516 U.S. 1, 6, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995) (denying a *Brady* claim based on "mere speculation"); *Hughes v. Johnson,* 191 F.3d 607, 630 (5th Cir.1999) ("[S]peculation does not support a *Brady* claim.").

> FN153. Bourgeois, knowing that he was in custody in Kansas, sought a subpoena for Longoria to appear. Bourgeois did not request that the Court issue a writ requiring the officials in Kansas to release Longoria to federal custody for his testimony. (DE 598 at 23, 30–33). The United States Marshals tried to serve subpoenas on Campos and Moore, but Bourgeois had not provided them with an accurate address. (DE 598

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 99

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

at 77). Bourgeois forfeited his opportunity to have those individuals testify.

Bourgeois did not adduce any evidence in the hearings suggesting that the Government concealed any agreement with Moore, Taylor, and Campos. The evidence does not hint that the Government made undisclosed deals with those inmates. Bourgeois claims that the two federal inmates—Taylor and Moore—more than hoped for a downward departure; the Government had promised to ask for a reduced sentence. Bourgeois has apparently abandoned his allegations regarding Taylor.[FN154] Bourgeois did not call Moore in the evidentiary hearing, but rests on a declaration in which Moore claimed that: "[Ms. Booth] told me if I testified against Bourgeois she would contact my prosecutor, Lance Duke, and make sure that my sentence was reduced." (DE 402, Affidavit/Declaration of Darrick Moore dated September 18, 2007, Exhibit 67). The facts reveal that he received a lighter sentence partially because of his assistance in this and another case.[FN155] Yet Bourgeois has not shown that a plea agreement or other formal understanding existed between Moore and the Government. The defense and the jury knew that Moore expected to receive something for his testimony. Bourgeois has not shown that the Government substantially withheld any additional promise that induced his testimony.

> FN154. In his Motion to Vacate, Bourgeois claimed that the Government entered into an undisclosed deal with Wiley Taylor. (DE 396 at 107–09). His Memorandum of Law in Support of his Motion for Relief does not mention Taylor. Bourgeois has not adduced any evidence showing that the Government engaged in a deal with Taylor. Bourgeois seems to have abandoned his claim with respect to Taylor.

> FN155. Moore was sentenced on April 25, 2004. Assistant United States Attorney Lance Duke recommended that Moore receive 75 months where the original guidelines range was 151 to 188 months because of Bourgeois' assistance in this and another case. Also, the Government noted that Moore had experienced "a great deal of coercion and harassment by his fellow inmates for testifying on behalf of the Government." (*United States v. Moore,* C–03–CR–75 [S.D. Tex.], DE 41 at 6). Recognizing Moore's assistance in the instant case, this Court sentenced

Moore to 65 months. AUSA Duke later filed a Motion to Reduce Sentence Pursuant to Rule 35(b) based on Moore's substantial assistance in another case.

With respect to Campos who was serving a 12–year sentence for a drug charge in state court, Bourgeois claims that either Ms. Booth or an FBI agent promised Campos they would help him get a reduced sentence if he testified. According to Bourgeois, Campos was paroled after only serving three years of that sentence. Yet he has not provided a declaration, affidavit, or other competent statement from Campos detailing any promise from the Government that resulted in his testimony or his early release from State custody.[FN156] Bourgeois instead relies on an affidavit from an investigator who purports to relate what Campos told her. (DE 397, Declaration of Kathleen Kaib dated May 14, 2007, Attachment 30). Bourgeois has not shown how her hearsay account could be admissible. He has not otherwise verified what the investigator alleges Campos said. Bourgeois bases his claim relating to Moore entirely on speculation.

> FN156. Ms. Booth did, however, communicate to Campos that: "The best thing I could do for you would be to tell the authorities that you cooperated here." (DE 646 at 198). Nevertheless, at trial she thought that nothing could be done to reduce Campos' sentence. (DE 340 at 56–57). In the end, she assured: "I promised him nothing." (DE 340 at 57).

Bourgeois has provided the most evidentiary support for his claims relating to Longoria. Longoria has provided a declaration in which he claims that AUSA Patti Booth said "she could not provide me anything now but after I testified she would be happy to help me in the future with my case or parole." Longoria claims that the state prosecutor in his case, James Sales, and his trial attorney, William May, each knew about the deal he made with the Government. Bourgeois claims that a letter Ms. Booth later wrote to the Texas Board of Pardons and Paroles confirms that she entered into a deal with him.

*98 Bourgeois, however, has not verified Longoria's story. Bourgeois subpoenaed Longoria as a witness in the evidentiary hearing. Longoria did not appear, which is unsurprising as he currently faces state capital murder charges in Kansas.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

Bourgeois called other witnesses in an attempt to confirm Longoria's story, but their testimony did not show that the Government concealed a deal with him. For example, Bourgeois called Longoria's former girlfriend as a witness to provide hearsay recitations about what he allegedly said contemporaneous with trial.[FN157] She testified that Longoria told her several times that "he was planning on trying to make a deal [with prosecutors] so he can get out early to be with [her] and [their] baby." (DE 598 at 26–27). However, she had no personal knowledge if Longoria actually made a deal. She did not have any direct knowledge about any agreement; she only knew what Longoria told her. (DE 598 at 28). Her recitation of hearsay statements carries little weight, especially after she testified that Longoria was a liar. (DE 598 at 28, 30). She did not know if Longoria was being truthful when he claimed that he was going to cut a deal with prosecutors. (DE 598 at 30).

> FN157. Bourgeois also wanted another inmate to provide hearsay testimony about what he heard Moore say. (DE 598 at 255–56). The Court disallowed the presentation of hearsay testimony.

Longoria's former attorney Mr. May appeared in the evidentiary hearing by video.[FN158] Mr. May's testimony credibly established that the Government never promised to do anything on Longoria's behalf. (DE 655 at 14). Mr. James Sales, the prosecutor who handled Longoria's state case, testified that he did not remember having any communication with the Government prior to Longoria's sentencing. (DE 655 at 29). He explained that the State's plea agreement with Longoria had nothing to do with Bourgeois' case. (DE 655 at 32). Ms. Booth never told Mr. Sales that she made a deal with Longoria. (DE 655 at 39).

> FN158. Mr. May testified that AUSA Booth contacted him and asked for permission to speak with Longoria. (DE 655 at 7). Longoria told Mr. May that he was "going to be a witness and that he hoped that Ms. Booth would eventually give him some benefit from that." Mr. May responded that, in his experience, "generally you would get some benefit from that, but what it would be, I had no way of knowing and we'd just have to wait and see, since she was not a state court prosecutor." (DE 655 at 9). Mr. May then filed a continuance in Longoria's criminal

case, hoping that, with all of the evidence against Longoria, holding off trial until after the Bourgeois trial would allow him to seek some benefit from the state court. (DE 655 at 10). Mr. May explained what then happened:

> When I went into court, I approached the state court prosecutor, James Sales. I asked him if he had had a chance to talk to Patti Booth about the case. He said that he had. I asked him what he was going to recommend. He told me seven years on each case, concurrent with one another, and that he would be willing to drop it down to five years if Mr. Longoria testified against a different Defendant in a potential state court case. I can't recall who that target was. And I conveyed that to Mr. Longoria, and he accepted the offer.

> (DE 655 at 11). On cross-examination Mr. May explained that Longoria only hoped to receive some benefit; the Government had not promised a quid pro quo deal. (DE 655 at 13–14).

Importantly, Ms. Booth explained on the record that she did not offer Longoria any benefit for his testimony. (DE 655 at 79). At one point before his testimony Longoria hinted that he wanted help with his state case, but Ms. Booth clearly told him that she would promise him nothing. (DE 655 at 85–86, 100). She did not tell Mr. May that she would do anything to help his client. (DE 655 at 99). Years later, another attorney requested that she write a letter on Longoria's behalf to the Parole Board, which she did. (DE 655 at 83). She had never promised to do that and her actions after trial did not retrospectively trigger *Brady.*

In all, Bourgeois has not brought forth any credible evidence that would show that the Government promised to help Longoria in return for his testimony. Mr. May, Mr. Sales, and Ms. Booth's testimony credibly proved that the Government did not make a deal with Longoria. There is absolutely no factual basis for the *Brady* claim based on the four inmates' testimony.

**B. Materiality**

Notwithstanding Bourgeois' failure to meet the first two prongs of the *Brady* analysis, the Court likewise finds that he

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**PA-194**

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

has not shown that any alleged suppression of information was material. The *Brady* materiality standard requires a defendant to show a "reasonable probability of a different result." *Kyles,* 514 U.S. at 434; *see also Bagley,* 473 U.S. at 682 ("The evidence is material only of there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different."). A court must ask whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley,* 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).[FN159] The Court considers all alleged *Brady* violations collectively. *See id.* at 421–22; *United States v. Hughes,* 230 F.3d 815, 819 (5th Cir.2000).

> FN159. This standard corresponds to *Strickland'* s requirement that "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland,* 466 U.S. at 694.

**\*99** "[M]ateriality is a fact-intensive examination done on a careful, case-by-case basis." *Banks v. Thaler,* 583 F.3d 295, 322 (5th Cir.2009). In the guilt/innocence phase, the Government called the inmates to provide testimony on main two points: (1) Bourgeois had caused his daughter's death and (2) he told Robin Bourgeois to lie about the source of the toddler's injuries. [FN160] The inmate witnesses were far from the centerpiece of the Government's case. *See United States v. Sipe,* 388 F.3d 471, 478 (5th Cir.2004) ("The materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state."). Other testimony strongly confirmed that Bourgeois, despite his attempts to pin the murder on Robin, killed JG1999. In addition to forensic evidence and circumstantial factors substantiating the case against Bourgeois, AB1994 convincingly told the jury that her father beat JG1999 against the truck window. Both Robin Bourgeois and AB1994 testified persuasively that Bourgeois had ordered them to fabricate an explanation for the toddler's death. The additional evidence more that corroborated the inmates' testimony, it eclipsed their brief statements and provided a strong independent basis for Bourgeois' conviction. Bourgeois has not shown that the alleged *Brady* errors were material to his conviction.

> FN160. Moore explained that, while Bourgeois

initially claimed that JG1999's death was an accident, he later claimed that she was a "bad child" who would shake her butt all the time." (DE 344 at 205–06). Bourgeois told Moore he whipped JG1999 with an extension cord and otherwise abused her. (DE 344 at 206). Bourgeois told Taylor that he killed the victim, Robin did not keep to their agreed-upon story, and he previously beat his wife. (DE 344 at 230). He called JG1999 "that fucking baby." (DE 344 at 231). Campos testified that, after telling one story, Bourgeois said that he "hit his little girl and that him and his wife ... had a plan to go by and make it look like she had fell out of his 18–wheeler." (DE 344 at 219). Campos also testified that Bourgeois admitted to beating his wife. (DE 344 at 220).

In addition to emphasizing guilt/innocence testimony about Bourgeois' callous boasting about the murder, *see Cone v. Bell,* ––– U.S. ––––, 129 S.Ct. 1769, 1784, 173 L.Ed.2d 701 (2009) ("Evidence that is material to guilt will often be material for sentencing purposes as well[.]"), the Government called the inmates in the penalty phase to emphasize Bourgeois' lawlessness and propensity toward violence. Some of the other testimony in the penalty phase covered the same ground as that provided by the inmates. For instance, the inmates' testimony established that Bourgeois had physically abused his wife. Other witnesses, including Bourgeois' former wives, more vividly and dramatically expounded on Bourgeois' habitual violence against women. Robin's own mother provided detailed testimony about how Bourgeois abused her daughter. Also, other witnesses, including Robin, confirmed that he had issued violent threats from his prison cell. Also, Bourgeois' calloused statements about his young victim only echoed the indifferent attitude he repeatedly showed to her passing. The inmates' testimony largely repeated themes more vividly developed elsewhere in the Government's case. The inmates' testimony only showed that Bourgeois made efforts to actualize the threats he had already made. "[W]hen the undisclosed evidence is merely cumulative of other evidence [in the record], no *Brady* violation occurs." *Spence v. Johnson,* 80 F.3d 989, 995 (5th Cir.1996).

To the extent that the inmates' testimony provided the only information about some issues, Bourgeois has not shown that any alleged *Brady* error impinged on the fairness of his trial. For instance, no other witnesses testified that Bourgeois had

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

drug connections. In the entire context of the penalty phase, however, Bourgeois' drug running was only one piece of a detailed picture of his criminality. The jury had to consider more relevant acts of violence, such as his repeated and heartless aggression toward women and children. In the entire context of the highly incriminating case for a death sentence, the inmates' testimony only played a minor theme.

**\*100** Even then, the inmates did not come before the jury unblemished. Trial counsel's opening argument accused the inmates of "look[ing] around [to] find somebody else to serve their time." (DE 216 at 5). Trial counsel extensively questioned each inmate about their lengthy criminal records. (DE 344 at 209–10, 232–33, 271–72; DE 348 at 167–68, 177–79). Trial counsel probed the inmates' incentive to testify for the Government. (DE 344 at 235). Trial counsel's closing argument hammered that the inmates were men who had committed crimes, were not trustworthy, and "were paid or hoped to be paid" for their testimony. (DE 339 at 30–31). Trial counsel argued that they "are liars" who, when arrested, "try to find "someone else to serve their time." (DE 339 at 30). Whatever impeachment may have resulted from confirming the alleged deals only would have added one more layer of concern to what trial counsel already put before the jury.

Given the whole evidentiary landscape against Bourgeois, the corroborating evidence that verified the inmates' testimony, and the minor effect of the evidence unique to their testimony, the Court find that Bourgeois has not shown that, "had the evidence [of an alleged deal] been disclosed to the defense, the result of the proceedings would have been different." *Bagley, 473 U.S. at 682*. The Court will deny Bourgeois' *Brady* claim.

**VII. Trial Counsel Labored under a Conflict of Interest Because of His Representation of Clients Associated with this Case (claim eight)**

Apart from his other arguments about trial counsel's representation, Bourgeois also claims that conflicting interests prejudiced his attorneys' ability to defend him zealously. This is not a case where trial counsel actively represented multiple defendants with competing interests. Nor did trial counsel's current or former clients testify against Bourgeois. Instead, Bourgeois' conflict-of-interest claim arises out of three circumstances involving his attorney, Mr. Gilmore:

• Mr. Gilmore had previously represented Ross Griffin in a federal criminal action. Bourgeois alleges that Griffin acted

as a jailhouse informant for the Government. Bourgeois states that Griffin "had been offered favorable treatment to cooperate against [him]." (DE 396 at 110). Griffin never testified against Bourgeois.

• Mr. Gilmore had called Adam Longoria as a witness in the trial of another criminal defendant.[FN161]

> **FN161.** In that case, Longoria apparently related conversations he heard while residing on the same cell block as Bourgeois, though Bourgeois does not allege that the testimony in that case concerned him directly. Mr. Gilmore's cross-examination of Longoria in this case discussed how he had called him as a witness in the earlier case. (DE 348 at 179–80).

• Mr. Gilmore had represented Roel Contreras who was a co-defendant of Orlando Campos. Campos initially testified against Contreras in exchange for a reduced sentence, but at some point tried to disavow his prior testimony against Mr. Gilmore's client.

Bourgeois summarily asserts that these three circumstances created a conflict of interest that fenced in trial counsel's efforts to defend him.

With its guarantee of effective legal representation, the Constitution promises a criminal defendant conflict-free counsel. "A conflict will exist only 'when defense counsel is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client.' " *United States v. Garcia–Jasso,* 472 F.3d 239, 243 (5th Cir.2006) (quoting *Perillo v. Johnson,* 205 F.3d 775, 781 (5th Cir.2000)); *see also United States v. Culverhouse,* 507 F.3d 888, 893 (5th Cir.2007) (stating that an actual conflict exists "when the attorney knows that his clients' interests diverge and must then choose between the interests of multiple clients, or be compelled to compromise his duty of loyalty"). To succeed on a conflict-of-interest claim, however, an inmate must show more than a "mere possibility of a conflict of interest." *See Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). The Supreme Court has explained that " 'an actual conflict of interest' mean[s] precisely a conflict that affected counsel's performance—as opposed to a mere theoretical division of loyalties." *Mickens v. Taylor,* 535 U.S.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

162, 164, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002). Accordingly, "[t]o establish a Sixth Amendment violation on the basis of a conflict of interest the defendant must demonstrate: (1) that his counsel acted under the influence of an actual conflict; and (2) that the conflict adversely affected his performance at trial." Culverhouse, 507 F.3d at 892; see also Cuyler, 446 U.S. at 348–50.

**\*101** Bourgeois has not shown "more than a speculative or potential conflict." Culverhouse, 507 F.3d at 892. Mr. Gilmore's relationship with criminal defendants tenuously connected to this case did not conflict with his advocacy for Bourgeois. Bourgeois, in fact, exaggerates and misrepresents the nexus between the three circumstances listed above and his own case. For example, Bourgeois alleges that "[p]rior to and during [his] trial, Mr. Gilmore represented ... Ross Griffin ... [who] was under indictment in the United States District Court for the Southern District of Texas for the distribution and sale of marijuana." (DE 396 at 110). Griffin was actually sentenced on June 17, 2003, before the Government even designated this a capital case. (United States v. Griffin, 2:02–CR–309–2 (S.D.Tex.)). Griffin did not appeal and it appears that Mr. Gilmore's representation of Griffin ended when judgment issued. Bourgeois also labels Griffin a "government witness" against him. (DE 402 at 107).[FN162] The Government never called Griffin as a witness in the case. In fact, Bourgeois has not shown that the Government made any attempt to act on the information Griffin provided, particularly because Griffin's account was inconsistent with known evidence. Moreover, Bourgeois has never substantiated his claim that Griffin, after he had already been sentenced for his crime, "had been offered favorable treatment to cooperate against [Bourgeois]." (DE 402 at 107). Nothing suggests that Griffin's action in making statements to a government agent after sentencing divided Mr. Gilmore's loyalties.

> FN162. An FBI agent did not interview Griffin until June 30, 2003. (DE 396, Exhibit 60). Bourgeois emphasizes that "Griffin was housed with [Bourgeois] in the Nueces County Jail along with Mr. Adam Longoria and Mr. Darrick Moore," both of whom testified against Bourgeois at trial. (DE 396 at 110). The record Bourgeois relies upon, however, does not arise out of conversations in the county jail facility, but in a federal court holding cell during earlier hearings.

In the two other circumstances, Bourgeois likewise summarily speculates that the entangled web of information given by snitches in the Nueces County jail hindered Mr. Gilmore's ability to cross-examine witnesses in his case. Bourgeois, however, does not show that anything limited Mr. Gilmore's ability to probe the truth. Speculation about tenuous relationships between criminal cases does not equate to an actual conflict of interest.

Bourgeois has simply failed to show that an actual conflict impaired Mr. Gilmore's ability to advocate ardently on his behalf. The Court denies Bourgeois' speculative claim that Mr. Gilmore operated under a conflict of interest.

## VIII. The Government Engaged in Misconduct by Making Improper Argumentative Statements in the Guilt/Innocence and Penalty Phases (claim nine)

Given the horrific facts of this case and the emotionally charged trial atmosphere, both parties' closing arguments passionately championed their cause. The Government's attorneys in particular used strong language and forceful argument. Bourgeois claims that the Government crossed the line into constitutionally prohibited misconduct with certain comments made during the closing arguments in both phases of trial. Bourgeois complains that the Government improperly (a) disparaged Bourgeois and his attorneys; (b) appealed to the jury's civic responsibility and to religious sentiments; (c) knowingly made false arguments; (d) interjected personal information; and (d) diluted the jury's consideration of mitigating evidence. The Court finds that the Government's statements did not amount to prosecutorial misconduct.

**\*102** In its zealous advocacy, the Government may strike hard, but not foul, blows. See Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). A criminal conviction "is not to be lightly overturned on the basis of a prosecutor's comments standing alone," United States v. Bernard, 299 F.3d 467, 488 (5th Cir.2002), which require relief only "in only the most egregious cases." Ortega v. McCotter, 808 F.2d 406, 408 (5th Cir.1987). A two-step process governs claims of prosecutorial misconduct. "First, we ... initially decide whether or not the prosecutor made an improper remark." United States v. Gallardo–Trapero, 185 F.3d 307, 320 (5th Cir.1999). Second, "[i]f an improper remark was made, we must then evaluate whether the remark affected the substantial rights of the defendant." Id. "The determinative

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict.' " *Bernard,* 299 F.3d at 488 (quoting *United States v. Iredia,* 866 F.2d 114, 117 (5th Cir.1989)) Under that framework, the Court will evaluate Bourgeois' prosecutorial-misconduct claim.

With respect to each prosecutorial statement, the Government correctly responds that "[m]ost of the comments were nothing more than a fair comment upon the evidence" and some "were analogies that are commonly permissible during argument" while other "challenges are flatly incorrect." (DE 443 at 96). With a firm recollection of the atmosphere in the closing arguments, and having reviewed the record with respect to each allegation, the Court finds no merit to Bourgeois' prosecutorial-misconduct claim. In each instance, the Government's statements were strong, but not constitutionally improper.

For instance, Bourgeois asserts that the Government urged the jury to base its decision on religion. "Courts universally condemn" injecting religion into legal proceedings. *Hicks v. Collins,* 384 F.3d 204, 223 (6th Cir.2004). However, the context of the questioning shows that the Government did not tell the jury to jettison legal standards or to let religion guide their deliberations. The Government twice mentioned that "pride comes before the fall," (DE 339 at 11, 46), a phrase which has a biblical origin but has also entered the common parlance.[FN163] The Government did so rhetorically, not as an encouragement to convict him based on religious views. *See United States v. Bailey,* 123 F.3d 1381, 1401–02 (11th Cir.1997) (finding no error when "[t]he prosecutor did not suggest that [the defendant] should be adjudicated under Biblical law, and he did not ask the jury to decide the case on a religious or emotional basis."). Bourgeois has not pointed to any case expunging similar comments from the courtroom setting.[FN164]

> FN163. Bourgeois also objects to when the Government stated: "He called it 'it'. The kid that died. The fucking kid and those words are *sacrilegious when you speak about this lamb* because he didn't see it as human." (DE 339 at 17) (emphasis added). Bourgeois does not identify what Biblical passage the Government invoked by using the words "sacrilegious" or "lamb." While perhaps harkening to religious imagery, that statement does not directly

refer to commonly known elements of religious belief, much less encourage the jury to let religious persuasion influence its decision.

> FN164. Even in cases where the Government has made the extremely troubling argument that a jury should return a sentence of death because the Bible required it, courts have found no error when the comments are isolated and the facts of the crime egregious. *See Middlebrooks v. Bell,* 619 F.3d 526, 543 (6th Cir.2010); *Coe v. Bell,* 161 F.3d 320, 351 (6th Cir.1998); *but see Romine v. Head,* 253 F.3d 1349, 1370–71 (11th Cir.2001) (finding error under the circumstances of that case)

The phrase in which Bourgeois alleges that the Government told the jury it had a civic duty to convict him merely commented on its own duty to investigate and prosecute criminal acts:

**\*103** The Defendant never dreamed in his arrogance that the CPS would care about that baby, that FBI would be called, that FBI would care about that baby, that the United States would care about that baby because he saw it as thing for his pleasure. Shocked that he couldn't drive away. Shocked that he couldn't have his truck back and leave. The arrogance of his cruelty. *The arrogance to think that the United States would not care about one of its citizens even if it was a little citizen.* The arrogance of his cruelty.

(DE 339 at 17–18). This statement did not encourage the jury to protect society by convicting him; it inferred that Bourgeois did not think that the Government would act to prosecute. The Government did not ask the jury to apply extra-judicial standards in considering the evidence.

Bourgeois invited some of the challenged prosecutorial comments. For example, he says that the Government interjected personal information into the penalty-phase closing by conveying that it was difficult to try this capital case.[FN165] The Government, however, only responded to the final portion of Mr. Tinker's argument where he stated that "it's easy for Ms. Booth to say let's kill him, because she is not the one that does it." (DE 342 at 64). Ms. Booth, who argued next, responded that seeking a death sentence was the most difficult thing she had done. (DE 324 at 66–67). A prosecutor may validly

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 105

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

respond to the defense argument without committing misconduct. *See United States v. Mendoza,* 522 F.3d 482, 492 (5th Cir.2008) (holding that a reviewing court does "not view the prosecutor's remarks in isolation but consider the effect of those remarks in the context of the entire trial."); *United States v. Saenz,* 747 F.2d 930, 939 (5th Cir.1984) ("Allegedly improper prosecutorial comments must be considered in context when determining their propriety.").

> FN165. Bourgeois refers to the following colloquy in the penalty phase:
>
> Ms. Booth: Now, Mr. Tinker told you this was going to be very easy for me to ask for someone's death. And he's very wrong. I've raised five children, I've buried family—
>
> Mr. Tinker: She's outside the record here, your Honor, and I just—
>
> Ms. Booth: Judge I'm responding to—he opened the door.
>
> Mr. Tinker: About how many kids she's got doesn't have anything to do with the trial in this case.
>
> The Court: Go ahead, Ms. Booth
>
> Ms. Booth: My baby brother is in Iraq serving his country. Things are hard, and this is the hardest thing that I have ever done in my life.
>
> (DE 324 at 66–67).

Other challenged statements were permissible summaries of the evidence. For example, Bourgeois alleges that the Government falsely argued that Orlando Campos testified "not because he hoped to get lesser time but because he had a child, a six year old, and he believed that this man should be held accountable." (DE 339 at 58). Bourgeois complains that this was a false statement because "Orlando Campos more than 'hoped' he would be getting a sentence reduction for his cooperation with the Government, he *knew* he would be getting a deal." (DE 402 at 129). The Court has already found that Campos did not have a deal with the Government. The Government's statement accurately comports with the evidence:

the federal government had no power to change Campos' state-court sentence and the prosecutor's comments accurately recalled Campos' testimony about why he testified.

In another instance, Bourgeois complains that the Government claimed that, by securing Dr. Senn's assistance after Dr. Dailey could not help them, they were not "expert shopping." (DE 339 at 19–20).[FN166] Bourgeois seems to believe that Dr. Dailey "was unable to provide them with favorable bite mark evidence," meaning that the Government shopped for experts until they found one who would testify in their favor. (DE 402 at 116). In reality, Dr. Dailey "could not rule in or out any of the three individuals as the possible biter." (DE 387, Attachment 45). Bourgeois has not shown that the Government "expert shopped" by seeking out someone who could answer the question asked of them, and thus the closing argument was not "false argument." In addition, as discussed above, forensic odontology requires a second opinion in similar cases. (DE 339 at 43).

> FN166. During the guilt/innocence phase closing, the prosecutor stated:
>
> Now the defense told you in their opening, first of all, that there was going to be testimony that a child could have made those marks. You didn't hear that. The only child whose bite was analyzed was excluded. He told you that there was forum shopping by the United States on our experts and what did you hear? We sent our teeth to Dr. Senn. Dr. Senn made his analysis and sent it for a second opinion. In serious and solemn matters of our health, like to get surgery or to do some kind of other procedure on us, many times we'll get a second opinion. Is that expert shopping or is that just making sure?
>
> 3/16/04 at 19–20. Bourgeois argues that "the Government *had* engaged in forum shopping for favorable bite mark evidence" by first consulting with United States Army Colonel J. Curtis Dailey, M.D. Dr. Dailey could not conclusively identify Borugeois as the biter.

**\*104** Bourgeois also argues that the Government told the jury to abandon its duty to consider his mitigating evidence. In

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 106

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

closing, the prosecutor stated:

> The mitigation that the Defense wants you to look at and decide that that overpowers the aggravating factors that he's alleged to, and they are that he was under substantial duress, that he was—that he was driving in an 18–wheeler with three children, that he had family and economic pressures. You know and I thought, "Oh, well, that's just life, that's not mitigation."

(DE 342 at 74). Bourgeois argues that "[w]hile the jury in this case was certainly free to decide that the mitigation proffered on behalf of Mr. Bourgeois did not outweigh the aggravating circumstances, the prosecutor's argument that Mr. Bourgeois' evidence 'was not mitigation,' improperly prevented the jury from considering the mitigating evidence." (DE 402 at 121). Nevertheless, if the jury instructions properly outline the use of mitigating evidence, the Government can freely comment on the weight the jury should accord it. *See Bland v. Sirmons,* 459 F.3d 999, 1026 (10th Cir.2006). The Government did not tell the jury to ignore mitigating evidence, they only disputed the weight of that evidence.

Bourgeois also complains that the Government called him names. In the guilt/innocence phase argument, the Government stated that its bite-mark experts "did the best they could to determine—to exclude, their goal was to see who they could exclude. And they excluded Robin. But who did they not exclude? They didn't exclude *this man, that thing that's sitting right there.* (DE 339 at 48–49) (emphasis added). The Government contends that was a reasonable response to Bourgeois' own use of "dehumanizing terms" for the victim. (DE 443 at 97). "The use of colorful pejoratives is not improper." *United States v. Fields,* 483 F.3d 313, 360 (5th Cir.2007) (quoting *United States v. Shoff,* 151 F.3d 889, 893 (8th Cir.1998)); *see also United States v. Malatesta,* 583 F.2d 748, 759 (5th Cir.1978) ("Unflattering characterizations of a defendant do not require a new trial when such descriptions are supported by the evidence."). As with the rest of the challenged comments, the Government's reference to Bourgeois as a "thing" was isolated and not a pervasive feature of the trial. The Court has reviewed all of the comments Bourgeois challenges in the context of the whole trial and finds no prosecutorial misconduct.

Even assuming, *arguendo,* the Government's comments

were improper, Bourgeois fails to show the requisite prejudice.[FN167] As an initial matter, the Court instructed the jury that the parties' arguments were not evidence. (DE 339 at 61); *see United States v. Pittman,* 401 F. App'x 895, 900 (5th Cir.2010) (finding that a similar instruction "[a]meliorat[ed] the government's [allegedly] improper argument and cross-examination and their resultant prejudice"); *United States v. Tomblin,* 46 F.3d 1369, 1390 (5th Cir.1995) (presuming a similar instruction sufficient "unless there is an overwhelming probability that the jury will be unable to follow the instruction and there is a strong probability that the effect [of the prosecutorial misconduct] is devastating."). Had this been a close case, perhaps the jury instruction itself may not have been enough to dispel the taint of the alleged prosecutorial misconduct. However, the evidence of Bourgeois' guilt was overwhelming and the case for a death sentence especially strong. The allegedly prejudicial comments were not the centerpieces of the Government's argument, but isolated rhetorical flourishes and intermittent themes. Where, as here, "numerous witnesses, pieces of evidence, and issues [are] placed before the jury," it is highly unlikely that "the prosecutor's statements overshadowed what had come before and unduly prejudiced the [defendant's] case. *See Gallardo–Trapero,* 185 F.3d at 320–21. The overwhelming evidence against Bourgeois and the detailed jury instructions prove that the comments did not prejudice Bourgeois. The allegedly improper comments were not of a sufficient magnitude to cast serious doubt on the jury's verdict. The Court denies Bourgeois' claims of prosecutorial misconduct.

> FN167. The prejudice step "sets a high bar ... The determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict." *United States v. Fields,* 483 F.3d, 313, 358 (5th Cir.2007); *see also Lowenberg,* 853 F.2d at 301 ("The ultimate question before us, however, is not the impropriety of the prosecutor's remarks but whether these remarks were so inflammatory that they entitle the defendant to a new trial."). Courts reviewing the prejudice from the prosecution's unfair arguments focus on three factors: (1) the magnitude of the prejudicial effect of the prosecutor's remarks; (2) the efficacy of any cautionary instruction by the judge; and (3) the strength of the evidence supporting the conviction. *See United States v. McCann,* 613 F.3f 486, 496 (5th Cir.2010); *United States v.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

*Gallardo–Trapero,* 185 F.3d 307, 321 (5th Cir.1999); *United States v. Diaz–Carreon,* 915 F.2d 951, 956 (5th Cir.1990); *United States v. Lowenberg,* 853 F.2d 295, 302 (5th Cir.1988).

**IX. Trial Counsel Provided Ineffective by Not Rebutting Evidence of Bourgeois' Indifferent Demeanor (claim ten)**

**\*105** The Government portrayed Bourgeois as a heartless man who, while his infant daughter lay dying, only worried about his own interests. Multiple government witnesses related their surprise at Bourgeois' lack of emotion and inaction. Indifference marked what little attention Bourgeois paid to his dying daughter. One witness summed up the testimony about Bourgeois' demeanor as "just kind of heartless." (DE 335 at 289). Bourgeois faults his trial attorneys for not calling expert witnesses to explain that mental illness caused his apathy.

Testimony from the evidentiary hearing only inferentially addressed this claim. As previously discussed, experts have diagnosed Bourgeois with various interlocking psychological conditions. Bourgeois argues that his demeanor on the day he killed his daughter was not one of a deeply flawed character, but a deeply disturbed man. Bourgeois claims that his alleged mental retardation—or at least his impaired intelligence—inhibited his ability to process new information, making him unable to understand fully the events he caused. Overlapping mental conditions, such as borderline personality disorder, "which can cause individuals to dissociate, or separate themselves both emotionally and mentally, in times of stress" allegedly caused him to " 'spac [e] out' " while his daughter was dying. (DE 402 at 127). Bourgeois claims that trial counsel should have presented the mental-health evidence in the guilt innocence phase to "humanize him in the eyes of the jury." (DE402 at 127). He also claims that the information in the penalty phase would have mitigated against a death sentence.

With regard to the guilt/innocence phase, Bourgeois does not claim that his attorneys should have presented an insanity, diminished capacity, or other defense by which his mental state would exculpate him. Instead, Bourgeois hopes that a psychologist could have "humanized" him so that the jury would not see him as a calloused killer.[FN168] The proposed testimony was not relevant. [FN169] Bourgeois' theory addresses his apathetic attitude after the killing, but mental disorders do not explain his intent as he killed. As trial counsel recognized in the closing argument, the jury "had to decide one of three

things. One, is it murder with malice and premeditation. Is it murder with malice not premeditated. Is it not murder at all." (DE 339 at 25). The lay depictions of the circumstances surrounding the crime were unquestionably properly before the jury; Bourgeois' still-unproven explanation for his demeanor would not have been.

> FN168. In recognizing that "there are countless ways to provide effective assistance in any given case," the Supreme Court recently cited with approval a case stating that "[t]he current infatuation with 'humanizing' the defendant as the be-all and end-all of mitigation disregards the possibility that this may be the wrong tactic in some cases because experienced lawyers conclude that the jury simply won't buy it." *Cullen v. Pinholster,* ––– U.S. ––––, ––– S.Ct. ––––, ––– L.Ed.2d – – – – , 2011 WL 1225705, at \*17 (2011) (citing *Pinholster v. Ayers,* 590 F.3d 651, 692 (9th Cir.2009) (Kozinski, C.J., dissenting)).

> FN169. The federal rules do not commonly permit Bourgeois' proposed guilt/innocence defense. Under Federal Rule of Evidence 704(b),

> > No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

> > FED.R.EVID. 704(b).

With respect to the punishment phase, Dr. Estrada examined Bourgeois but apparently did not come to the conclusion that mental illness made him grossly indifferent. Nevertheless, trial counsel elicited from Dr. Estrada that his disinterested demeanor toward his daughter's dying was common to those who, because they had been abused, became abusers themselves. (DE 341 at 36–38). Trial counsel secured expert assistance before trial and used Bourgeois indifference to benefit the defense, though for a different way than he proposes now. *See Strickland,* 466 U.S. at 689 ("There are

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

countless ways to provide effective assistance in any given case.").

**\*106** A reasonable attorney would not necessarily put forth mental illness as an excuse for Bourgeois' indifferent attitude. As previously noted, Bourgeois' claim of mental retardation is not strong and is inconsistent with a holistic view of his life. Placing evidence that mental disorders blunted Bourgeois' response after the killing would not seriously persuade the jury's consideration of his intent during the killing or his reaction to the murder. [FN170] The jury would have to place the mental-health evidence into the broader context of Bourgeois' relationship with his daughter. Bourgeois heartlessly mistreated her, callously cursed her, viciously abused her, and vocally wished her dead. Psychological testimony about his indifferent demeanor as she died did not explain his inhumane treatment of her over time. Emphasizing this aspect of Bourgeois' personality also would only have reinforced the Government's emphasis on his "decrease in the capacity for empathy or decrease in the regard for others" as a feature of his future danger to society. (DE 348 at 283). The Court finds that the proposed mental-health testimony does not show deficient performance by trial counsel or create a reasonable probability of a different result.

> FN170. The evidence as it was allowed trial counsel to argue that Bourgeois' actions did not show callous disregard, but a desire hurry on to the hospital. (DE 339 at 28)

### X. A Witness Improperly Relied on Bourgeois' Interactions with Counsel as a Basis to Formulate an Adverse Opinion about Him (claim eleven)

Bourgeois argues that the Government's questioning of Dr. Estrada violated his constitutional rights. Dr. Estrada's direct testimony revealed that Bourgeois would be a future societal danger, manipulated others, and was narcissistic. Dr. Estrada based his opinion, in part, on his in-trial observations of Bourgeois, particularly those relating to his interaction with counsel:

I would say that in my opinion, Mr. Bourgeois' attitude throughout these proceedings has been one of a member of the defense team, and rather than the Defendant or the father of the victim. He has been very attentive, has made profuse notes and has been able to discuss and provide assistance to his defense team as needed.

In addition, he also, to me, portrayed the impression of feeling often disgusted with the presentation and answers of the witnesses and having a sense that whatever the witnesses may be saying was not going to shake him or affect him. And I think that these two characteristics that I mention are very consistent with a diagnosis of a narcissistic personality disorder.

(DE 348 at 286). Bourgeois claims that the Government used his constitutional rights against him through this statement. In essence, he argues that "[t]he Government's reliance on a mental health opinion that was based upon Petitioner's participation as 'part of the defense team' violated Petitioner's right to participate in his trial and to assist counsel. In effect, Petitioner was penalized by invoking and exercising these fundamental rights." (DE 396 at 129).

Bourgeois does not point to any case law limiting an expert witness' in-court observations only to issues unrelated to the exercise of constitutional rights. Instead, Bourgeois draws comparison to Supreme Court authority preventing the Government from commenting on a defendant's post-arrest silence. *See Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *Griffin v. California,* 380 U.S. 609, 614, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). However, Bourgeois' argument is similar to one rejected by the Supreme Court in *Portunondo v. Agard,* 529 U.S. 61, 120 S.Ct. 1119, 146 L.Ed.2d 47 (2000). In *Agard,* the prosecutor's closing argument mentioned that, because he was the last witness called by the defense, the defendant had the benefit of listening to all prior accounts before testifying. Drawing a comparison to *Doyle* and *Griffin,* the *Agard* defendant argued that the prosecutor's comments stifled his right to be present at trial, confront witnesses, and testify. The Supreme Court refused to extend *Doyle* and *Griffin* because a jury making observations about the courtroom events *"is* natural and irresistible" and "what the jury is perfectly entitled to do." *Agard,* 529 U.S. at 67–68. Also, the Supreme Court said that commenting on a defendant's credibility and other related issues fundamentally differs from commenting on his guilt. *See id.* at 69.

**\*107** Here, the Government did not mention Bourgeois' failure to testify, nor could Dr. Estrada's testimony reasonably be construed to encroach on his right to silence. Dr. Estrada's testimony did not directly address Bourgeois' right to appear at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**PA-202**

Page 109

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

trial or right to consult with his attorneys. The challenged comments related to Bourgeois' demeanor and actions before the jury. Courts have held that prosecutorial discussion of a defendant's trial demeanor does not violate his constitutional rights. *See Bates v. Lee,* 308 F.3d 411, 421 (4th Cir.2002) ("[P]rosecutorial comments about the lack of remorse demonstrated by a defendant's demeanor during trial do not violate a defendant's Fifth Amendment right not to testify."); *Hall v. Wainwright,* 733 F.2d 766, 773 (11th Cir.1984) (holding that the jury would not interpret a comment simply related to a defendant's demeanor during the trial as a comment on the defendant's failure to testify); *Cunningham v. Perini,* 655 F.2d 98, 100 (6th Cir.1981) (holding that comments related to the defendant's demeanor in court did not run afoul of the Fifth Amendment). Bourgeois has not shown that the Constitution prevents witnesses for the Government from testifying about matters that inferentially touch upon a defendant's constitutional rights. *See Bates,* 308 F.3d at 422 (finding no error in the prosecutor comments on the defendant's demeanor at trial); *Williams v. Chrans,* 945 F.2d 926, 953–54 (7th Cir.1991) (finding that comments related to lack of remorse did not violate *Griffin* because jury could consider remorse in light of defendant's demeanor and testimony);

Even when the Government improperly discusses a defendant's valid exercise of constitutional rights, a reviewing court must still decide if, beyond a reasonable doubt, the jury would have found against the defendant absent the prosecutor's improper statements. *See United States v. Martinez–Larraga,* 517 F.3d 258, 269 (5th Cir.2008) (citing the harmless doubt standard from *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)). Dr. Estrada's remarks focused on his opinion that Bourgeois had a narcissistic personality. Before commenting on his trial observation, Dr. Estrada made that same diagnosis based on "all the information that [he] ha[d]," without mentioning anything that would implicate Bourgeois' constitutional rights. (DE 348 at 285). Dr. Estrada's testimony along this vein was brief and was not a decisive issue throughout the remainder of the sentencing proceedings. Even if the Government's witness improperly commented on the exercise of Bourgeois' constitutional rights, any error was harmless. This is particularly the case because the Court and the jury could make the same lay assessment of Bourgeois' courtroom behavior. In fact, the jury was in the best position to view and assess how Bourgeois interacted with his attorneys. For those reasons, the Court will deny this claim.

## XI. Ineffective Assistance of Appellate Counsel (claim twelve)

**\*108** Mr. Gilmore and Mr. Tinker represented Bourgeois on appeal. They raised four issues on appeal that required a probing review by the Court of Appeals for the Fifth Circuit. Bourgeois' criticism of their representation extends to their appellate efforts. In three tersely briefed claims, Bourgeois argues that appellate counsel should have argued that:

• the Court improperly admitted into evidence inflammatory and prejudicial photographs of the victim.

• Dr. Estrada's testimony comparing his background to others sentence to death violated his Eighth Amendment rights, and trial counsel should have lodged an objection on that basis.

• "failing to raise all of the record-based claims discussed herein, which were not properly raised or objected to at trial." (DE 396 at 127).

"[I]neffective assistance of appellate counsel claims are governed by the test set forth in *StricMand* [.]" *Amador v. Quarterman,* 458 F.3d 397, 410 (5th Cir.2006). An inmate challenging his appellate counsel's selection of claims must show both deficient performance and that "the outcome of the appeal would have been different." *Id.; Pitts v. Anderson,* 122 F.3d 275, 279 (5th Cir.1997); *Sharp v. Johnson,* 107 F.3d 282, 286 n. 9 (5th Cir.1997). The Court finds that Bourgeois has not met *Strickland'* s demanding burden with respect to his ineffective-assistance-of-appellate-counsel claims.

Appellate counsel did not provide constitutionally deficit representation by not advancing a challenge to the admission of photographic evidence at trial. The Government carefully selected only photographs that were necessary for the trial testimony. Trial counsel reviewed the autopsy photographs and then strongly and repeatedly challenged their prejudicial nature. (DE 350 at 102; DE 345 at 1–8, 92–111). The Court carefully considered trial counsel's objections, studied the relative importance of each photograph, and weighed the impact it could have on the jury. The Court admitted into evidence only those photographs that would not be unduly prejudicial. With that background, the Court finds that a reasonable appellate attorney would not raise a claim based on the autopsy photographs and that the outcome of the appeal could not have been different had appellate counsel done so.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

See *Ries v. Quarterman,* 522 F.3d 517, 531–32 (5th Cir.2008) ("Counsel need not raise every nonfrivolous ground of appeal, but should instead present solid, meritorious arguments based on directly controlling precedent.").

Similarly, appellate counsel would not be ineffective for not challenging Dr. Estrada's testimony. During the Government's direct questioning of Dr. Estrada, it tried to extract information about how common it was for death row inmates to have been abused:

The Government: Do you know much about the background of people that have actually murdered somebody and been given the death penalty? Do you know much about any of that?

**\*109** Dr. Estrada: Unfortunately I have been involved in a number of those cases.

The Government: And there are—are there people that have been abused as children that were ultimately sentenced to death because of their actions?

Dr. Estrada: Not the majority.

The Government: Okay. But some have been?

Dr. Estrada: Yes.

(DE 341 at 57). After Dr. Estrada's testimony, trial counsel objected that he had violated Bourgeois' right to individualized sentencing. (DE 341 at 74–78). Bourgeois now claims that appellate counsel should have argued that Dr. Estrada's testimony denied him sentencing as a "uniquely individual human being," because it compared him to others. *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).[FN171]

> FN171. In *Woodson,* the Court struck down a statute that mandated an automatic death sentence for those convicted of first-degree murder because the statute failed to require a consideration of the defendant's character, record, or circumstances of his crime.

Appellate counsel did not provide ineffective representation by not raising Bourgeois' variant on a *Woodson*

claim. Bourgeois has not cited any case where the Supreme Court has reversed a death sentence because a witness discussed the outcome of mitigating circumstances in other cases. Nevertheless, Dr. Estrada's isolated comment by no means played a major part in the jury's consideration of mitigating evidence. To the extent that it had any effect, the testimony helped Bourgeois more than it harmed him. The jury heard that childhood abuse could be a sufficient basis to impose a life sentence. Dr. Estrada's comment likely helped the defense because he told the jury that the "majority" of those who had been abused as children did not receive a death sentence. (DE 341 at 58).[FN172] That information would only help the jury facing a mountain of reasons to sentence Bourgeois to death. Bourgeois has not shown that appellate counsel violated his constitutional rights by not advancing a *Woodson* claim.

> FN172. Interesting, Dr. Estrada's testimony bears strong similarities to Dr. Cunningham's comparison of Bourgeois's future risk for violence to that of other offenders. Bourgeois faults trial counsel for not calling Dr. Cunningham to compare him to other inmates.

Insofar as Bourgeois raises a generalized complaint that appellate counsel should have raised each record-based claim that he advances in his Motion to Vacate, the Court has already extensively discussed each and finds them without merit. As the Court has found no error or prejudice flowing from the underlying claims, Bourgeois cannot meet the *Strickland* standard. *See Mayabb v. Johnson,* 168 F.3d 863, 869 (5th Cir.1999) (applying *Strickland* to an ineffective assistance of appellate counsel claim and noting that "[w]hen we do not find prejudice from the trial error, by extension, we cannot find prejudice from an appellate error predicated on the same issue").

In the end, an appellate attorney cannot be faulted for not raising meritless claims. *See United States v. Kinder,* 167 F.3d 889, 893 (5th Cir.1999) ("An attorney's failure to raise a meritless argument thus cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue."); *Williams v. Collins,* 16 F.3d 626, 634 (5th Cir.1994). "Failure to raise meritless objections is not ineffective lawyering; it is the very opposite." *Clark v.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 111

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

*Collins,* 19 F.3d 959, 966 (5th Cir.1994); *see also Green v. Johnson,* 160 F.3d 1029, 1037 (5th Cir.1998) ("[F]ailure to make a frivolous objection does not cause counsel's performance to fall below an objective level of reasonableness...."). The Court denies Bourgeois' ineffective-assistance-of-appellate-counsel claim.

### XII. Cumulative Error (claim thirteen)

**\*110** Bourgeois claims that, even if each claim raised by his Motion to Vacate alone does not require relief, accumulating the effect of them all does. He argues: "Each of the above-described claims of constitutional error stand on their own and independently require relief. However, should this Court find error, but believe that individually they do not merit relief, the Court should consider the cumulative impact of the constitutional violations." (DE 396 at 134). This Court sat at trial, has held numerous hearings, and has considered voluminous evidence. With complete surety, the Court concludes that Bourgeois received all the Constitution affords him, and then some. Whether taken singly or as a whole, the issues Bourgeois raises in his 2255 motion do not show a flawed trial laden with unfairness. *See Westley v. Johnson,* 83 F.3d 714, 726 (5th Cir.1996) ("Meritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised."); *Mullen v. Blackburn,* 808 F.2d 1143, 1147 (5th Cir.1987) ("Twenty times zero equals zero."). Bourgeois was lawfully convicted and sentenced to death. The Court finds no merit to his cumulative-error claim.

### XIII. Lethal Injection (claim fourteen)

As his final claim, Bourgeois argues that the United States of America employs an unconstitutional method of execution. Bourgeois summarily argues that "unnecessary pain and suffering in violation of the Eighth Amendment" will result when the Government carries out his death sentence because of "the combination of drugs to be used, the protocol governing the execution, the use of untrained non-medical and unqualified personnel and the physical space in which the execution would be carried out." (DE 396 at 128). Nevertheless, Bourgeois provides two reasons that make the instant action an improper vehicle to address his claims. First, because Bourgeois' execution "is far from imminent, the question is not yet ripe." (DE 396 at 128). Second, "a challenge to lethal injection is properly brought in a separate civil rights action under 42 U.S.C. § 1983." (DE 396 at 128). Nevertheless, Bourgeois states that he "will be happy to litigate this Eighth Amendment

challenge in whatever forum is deemed appropriate." (DE 396 at 128). In addition to those two reasons for dismissing Bourgeois' lethal-injection challenge, the Government observes that the Supreme Court in *Baze v. Rees,* 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008), recently upheld the constitutionality of a State's execution protocol which is similar to that used by the federal government. [FN173]

> FN173. 18 U.S.C. § 3596(a) provides that federal death sentences shall be implemented "in the manner prescribed by the law of the State in which the sentence is imposed."

Both parties agree that this issue is not now properly before the Court. A motion pursuant to § 2255, by its own terms, challenges the constitutionality of a movant's conviction and sentence of death, not the means of carrying out that sentence. The Court will dismiss this premature and noncognizable claim.

### CERTIFICATE OF APPEALABILITY

The AEDPA bars appellate review of a 2255 motion unless a district or circuit court certifies specific issues for appeal. *See* 28 U.S.C. § 2253(c); FED.R.APP.P. Rule 22(b). Bourgeois has not sought a Certificate of Appealability ("COA"), though this Court can consider the issue *sua sponte. See Alexander v. Johnson,* 211 F.3d 895, 898 (5th Cir.2000). The Court must address whether the circumstances justify an appeal before issuing a final judgment. *See* Rule 11, RULES GOVERNING SECTION 2255 CASES IN THE UNITED STATES DISTRICT COURTS.

**\*111** A COA may issue when an inmate "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). Settled precedent forecloses relief on Bourgeois' claims. Under the appropriate standard, Bourgeois has not shown that this Court should authorize any issue for appellate review. This Court will not certify any issue for consideration by the Fifth Circuit.

### CONCLUSION

The Court has fully considered the pleadings, the record, and the applicable law. Bourgeois has raised many issues requiring serious judicial consideration. The Court commends Bourgeois' current attorneys for their tireless efforts to defend him. They have zealously probed the legal and factual

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 112

Slip Copy, 2011 WL 1930684 (S.D.Tex.)

(Cite as: 2011 WL 1930684 (S.D.Tex.))

background of this case looking for issues meriting judicial review. In their briefing and argument, they have proven themselves competent and fervid defenders of their client's rights. Nonetheless, this Court finds no error invalidating Bourgeois' capital conviction or death sentence. As Bourgeois has failed to show that his sentence was imposed in violation of the Constitution or laws of the United States, was in excess of the maximum authorized by law, or is otherwise subject to collateral attack; his claims do not merit section 2255 relief.

Accordingly, the Court **DENIES** Bourgeois Motion to Vacate, **DENIES WITHOUT PREJUDICE** any outstanding motions, and **DISMISSES** this case. The Court will not certify any issue for consideration by the appellate court.

S.D.Tex.,2011.

U.S. v. Bourgeois
Slip Copy, 2011 WL 1930684 (S.D.Tex.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**PA-206**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

————————

No. 18-40270

————————

In re: ALFRED BOURGEOIS,

     Movant

United States Court of Appeals
Fifth Circuit

**FILED**

August 23, 2018

Lyle W. Cayce
Clerk

————————————

Motion for an order authorizing
the United States District Court for the
Southern District of Texas, Corpus Christi, to consider
a successive 28 U.S.C. § 2255 motion

————————————

Before KING, DENNIS, and HIGGINSON, Circuit Judges.

KING, Circuit Judge:

     Alfred Bourgeois, a federal death-row inmate, asks us to authorize consideration of a successive motion to vacate his death sentence. *See* 28 U.S.C. § 2255(h). In his successive motion, Bourgeois claims that he is constitutionally ineligible for the death penalty because he is intellectually disabled. *See Atkins v. Virginia*, 536 U.S. 304 (2002). While Bourgeois's original motion unsuccessfully raised an *Atkins* claim, he contends that the Supreme Court's decision in *Moore v. Texas*, 137 S. Ct. 1039 (2017), now makes his claim viable.

     Bourgeois is barred from relitigating his *Atkins* claim. Under 28 U.S.C. § 2244(b)(1), "[a] claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall

PA-207

No. 18-40270

be dismissed."[1] By its terms, the provision applies to "second or successive habeas corpus application[s] under section 2254"—the section governing state prisoner habeas applications. But § 2244(b)(1)'s strict relitigation bar is incorporated by 28 U.S.C. § 2255(h), the provision governing federal prisoner's successive § 2255 motions. Section 2255(h) states: "A second or successive motion *must be certified as provided in section 2244* by a panel of the appropriate court of appeals to contain" either newly discovered evidence or a new rule of constitutional law. *Id.* § 2255(h) (emphasis added). We have held, in a pair of unpublished decisions, that this cross-reference incorporates § 2244(b)(1)'s strict relitigation bar into § 2255(h)'s scheme. *See In re Hartzog*, 444 F. App'x 63, 64 (5th Cir. 2011) (per curiam); *Montalvo v. Casterline*, 48 F. App'x 480, 2002 WL 31049451, at *1 (5th Cir. Aug. 29, 2002) (per curiam).[2] Every other circuit to take up the question agrees. *See In re Bradford*, 830 F.3d 1273, 1275 (11th Cir. 2016) (per curiam); *Dawkins v. United States*, 829 F.3d 549, 550 (7th Cir. 2016) (per curiam); *United States v. Lee*, 792 F.3d 1021, 1023 (8th Cir. 2015); *In re Liddell*, 722 F.3d 737, 738 (6th Cir. 2013) (per curiam); *United States v. Card*, 220 F. App'x 847, 851 (10th Cir. 2007); *Green v. United States*, 397 F.3d 101, 102 n.1 (2d Cir. 2005) (per curiam).

Bourgeois's only rejoinder is unpersuasive. He argues that Congress's express limitation of § 2244(b)(1)'s scope to habeas applications brought "under section 2254" shows that Congress intended for that section to apply only to claims brought by state prisoners. He invokes the canon of *expressio unius est exclusio alterius* ("the expression of one thing implies the exclusion of another")

---

[1] Bourgeois does not contest that his § 2255 motion is second or successive. Nor does he contest that the *Atkins* claim he currently raises was "presented in a prior application." *See* 28 U.S.C. § 2244(b)(1).

[2] As *Hartzog* and *Montalvo* are unpublished, they are non-precedential but "may be considered persuasive authority." *See United States v. Torres-Jaime*, 821 F.3d 577, 582 (5th Cir. 2016).

2

No. 18-40270

as support. *See Tex. Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 443 & n.96 (5th Cir. 1999); *see also POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228, 2238 (2014) (applying the doctrine).

But the *expression unius* canon is not meant to be mechanically applied. Express provision of one thing only "*implies*" the exclusion of another. *See Tex. Office of Public Util.*, 183 F.3d at 443 & n.96 (emphasis added). Context may indicate that Congress did not wish for an express provision of one thing to work towards the exclusion of another. *See Christensen v. Harris County*, 529 U.S. 576, 583 (2000); *Springer v. Gov't of Phil. Islands*, 277 U.S. 189, 206 (1928) ("Like other canons of statutory construction," *expression unius* "is only an aid in the ascertainment of the meaning of the law, and must yield whenever a contrary intention on the part of the lawmaker is apparent.").

Here, the larger statutory context favors applying § 2244(b)(1)'s strict relitigation bar to federal prisoners. Section 2255(h) does not supply its own procedures for processing successive § 2255 motions. Instead, it cross-references the procedures set forth in § 2244. What is more, "the legislative history does not distinguish between second or successive motions by federal and by state prisoners." *Bennett v. United States*, 119 F.3d 468, 469 (7th Cir. 1997), *cited with approval in Reyes-Requena v. United States*, 243 F.3d 893, 898 (5th Cir. 2001). And "it would be odd indeed if Congress had intended to allow federal prisoners to refile precisely the same non-meritorious motions over and over again while denying that right to state prisoners." *In re Baptiste*, 828 F.3d 1337, 1339 (11th Cir. 2016) (per curiam); *see White v. United States*, 371 F.3d 900, 901 (7th Cir. 2004) (invoking a similar sentiment).

As Bourgeois's successive § 2255 motion presents only a single claim that was already presented in his original motion, his request for authorization is DENIED.

3

PA-209

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

| | | |
|---|---|---|
| ALFRED BOURGEOIS, | § | |
| Petitioner, | § | |
| v. | § | No. 2:19-cv-00392-JMS-DLP |
| | § | |
| SUPERINTENDENT, | § | |
| USP—Terre Haute, | § | |
| UNITED STATES OF AMERICA, | § | |
| Respondents. | | |

_____

**RETURN TO ORDER TO SHOW CAUSE**

_____

JOSH J. MINKLER
United States Attorney

By: s/ Paula C. Offenhauser
PAULA C. OFFENHAUSER
Special Assistant United States Attorney
1000 Louisiana, Suite 2300
Houston, Texas 77002
Telephone: (713) 567-9102
E-mail: Paula.Offenhauser@usdog.gov

By: s/ Brian Reitz
BRIAN REITZ
Assistant United States Attorney
Office of the United States Attorney
10 W. Market St., Suite 2100
Indianapolis, Indiana 46204-3048
Telephone: (317) 226-6333
E-mail: Brian.Reitz@usdoj.gov

*Attorneys for Respondent*

**PA-210**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................v

INTRODUCTION ......................................................................................... 1

BACKGROUND .......................................................................................... 9

    A.    Facts: Bourgeois brutally murdered his 2-year daughter at the Corpus Christi Naval Air Station on June 27, 2002. ................................................................................... 9

    B.    Procedural History. .......................................................... 17

        1.    Trial, Sentencing, and Direct Appeal, *United States v. Bourgeois,* No. 2:02-cr-216 (S.D.Tex. 2004), 423 F.3d 501 (5th Cir. 2005), *cert. denied,* 547 U.S. 1132 (2006) ................................................... 17

        2.    28 U.S.C. § 2255, Motion to Vacate, *United States v. Bourgeois*, Nos. 2:02-cr-216, 2:07-cv-223, 2011 WL 1930684 (S.D.TX, May 19, 2011) .......................... 21

        3.    *United States v. Bourgeois,* 537 F. App'x 604 (5th Cir. 2013) (per curiam), *cert. denied,* 135 S. Ct. 46 (2014) ....................................................................... 28

        4.    *In re Bourgeois*, 902 F.3d 446 (5th Cir. 2018) ............. 30

ARGUMENT ............................................................................................ 34

    A.    BECAUSE BOURGEOIS CANNOT SHOW THAT 28 U.S.C. § 2255 IS "INADEQUATE OR INEFFECTIVE" TO TEST THE LEGALITY OF HIS DETENTION, THIS COURT SHOULD DISMISS THE ATKINS CLAIM HE PRESENTED UNDER 28 U.S.C. § 2241 ............................. 34

ii

## TABLE OF CONTENTS, cont'd

**Page**

1. Section 2255 provides the exclusive means for a federal prisoner to collaterally attack his conviction or sentence ................................................. 37

2. The remedy afforded by § 2255 functions as an effective substitute for § 2241, not as an "in addition to." .............................................................. 40

3. Section 2241 does not permit Bourgeois to circumvent § 2255's limits on second or successive motions ...................................................................... 44

4. Bourgeois' *Atkins* claim does not meet the requirements of § 2255(h) for a successive motion ...... 46

5. Bourgeois cannot show § 2255 is "inadequate or ineffective" and that should have access to § 2241 ..... 48

6. To proceed under § 2241 requires a structural problem with § 2255 that forecloses even one round of effective collateral rule ................................ 51

7. The Seventh Circuit's decisions do not permit Bourgeois to relitigate his *Atkins* claim under § 2241 ................................................................... 56

8. The Seventh Circuit's *Davenport* standard does not allow Bourgeois' *Atkins* claim to proceed under § 2241 ................................................................... 58

9. The *Webster* standard does not allow Bourgeois' *Atkins* claim to proceed under § 2241 .......................... 64

PA-212

# TABLE OF CONTENTS, cont'd

**Page**

10. Bourgeois' § 2241 motion is an abuse of the writ and premised on a theory at odds with *Teague* ........... 66

11. Bourgeois cannot relitigate his Atkins claim under 28 U.S.C. § 2241 by making his 28 U.S.C. § 2255 remedy inadequate ....................................................... 72

B. THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS APPLIED THE AAIDD'S AND APA'S DEFINITION OF INTELLECTUAL DISABILITY IN THE AAIDD 11TH EDITION AND DSM-IV-TR, THE DIAGNOSTIC GUIDES CURRENT AT THE TIME OF BOURGEOIS' § 2255 PROCEEDING ....................................................... 76

UNITED STATES' OPPOSITION TO MOTION FOR STAY OF EXECUTION ................................................................... 93

CONCLUSION ................................................................... 96

CERTIFICATE OF SERVICE ............................................. 97

iv

PA-213

# TABLE OF AUTHORITIES

**Cases**                                                        **Page(s)**

*Anderson v. City of Bessemer City*, 470 U.S. 564 (1985)..........................74

*Atkins v. Virginia*, 536 U.S. 304 (2002) ............................................ *passim*

*Beason v. Marske*, 926 F.3d 932 (7th Cir. 2019)............................. *passim*

*Bennett v. United States*, 119 F.3d 468 (7th Cir. 1997)................. 4, 33, 45

*Bobby v. Bies*, 556 U.S. 825 (2009)..........................................................78

*Bourgeois v. United States*, 547 U.S. 1132 (2006) ..................................20

*Bourgeois v. United States*, --- U.S. ---, 135 S. Ct. 46 (2014) ..................30

*Brady v. Maryland*, 373 U.S. 83 (1963) ..................................................22

*Brown v. Caraway*, 719 F.3d 583 (7th Cir. 2013) ........................ 40, 56, 59

*Brumfield v. Cain*, --- U.S. ---, 135 S. Ct. 2269 (2015)............................72

*Cain v. Chappell*, 870 F.3d 1003 (9th Cir. 2017), *cert. denied,*
    139 S. Ct. 455 (2018) ......................................................................62

*Camacho v. English*, 872 F.3d 811 (7th Cir. 2017), *cert. denied,*
    138 S. Ct. 1028 (2018) ....................................................................51

*Chazen v. Marske*, --- F.3d ---, 2019 WL 4254295
    (7th Cir. Sept. 9, 2019) ...................................................................37

*Cooper v. United States*, 199 F.3d 898 (7th Cir. 1999) ............................41

*Cullen v. Pinholster*, 563 U.S. 170 (2011) ...............................................39

*Davis v. United States*, 417 U.S. 333 (1974) ......................................38, 40

v

**PA-214**

# TABLE OF AUTHORITIES, cont'd

**Cases**                                                            **Page(s)**

*Elmore v. Shoop,* 1:07-CV-776, 2019 WL 3423200
(S.D. Ohio July 30, 2019) ........................................................ 37, 47

*Ex Parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004) ......................... 88

*Fulks v. Krueger,* --- F.Supp.3d ---, No. 2:15-cv-33-JRS-MJD,
2019 WL 4600210 (S.D. Ind. Sept. 20, 2019) ......................... *passim*

*Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001) .............................. *passim*

*Gideon v. Wainwright*, 372 U.S. 335 (1963) ............................................ 71

*Gomez v. U.S. Dist. Court for N. Dist. of California,*
503 U.S. 653 (1992) .................................................................. 9, 95

*Goodwin v. Steele*, 814 F.3d 901 (8th Cir. 2014)
(per curiam) ................................................................................. 47

*Hall v. Florida*, 572 U.S. 701 (2014) ............................................... *passim*

*Hare v. United States*, 688 F.3d 878 (7th Cir. 2012) ............................ 46

*Hernandez v. Fed. Corr. Inst.*, No. 08-C-499, 2008 WL 2397546
(E.D. Wis. June 10, 2008) ............................................................ 75

*Hill v. McDonough*, 547 U.S. 573 (2006) ............................................ 8, 94

*Hill v. Werlinger*, 695 F.3d 644 (7th Cir. 2012) .............................. 38, 57

*Hope v. United States*, 108 F.3d 119 (7th Cir. 1997) ............................ 46

*Horn v. Banks*, 536 U.S. 266 (2002) ...................................................... 68

*In re  Payne*, 722 F. App'x 534 (6th Cir. 2018) ........................... 32, 47, 68

# TABLE OF AUTHORITIES, cont'd

**Cases**                                                          **Page(s)**

*In re Bourgeois*, 902 F.3d 446 (5th Cir. 2018).................................*passim*

*In re Bowles*, 935 F.3d 1210 (11th Cir. 2019) .................................. 47, 62

*In re Davenport*, 147 F.3d 605 (7th Cir. 1998)................................*passim*

*In re Henry*, 757 F.3d 1151 (11th Cir. 2014)....................................47

*In re Jones*, 830 F.3d 1295 (11th Cir. 2016)................................... 44, 63

*In re Page*, 179 F.3d 1024 (7th Cir. 1999)..............................................68

*Kilgore v. Sec'y, Fla. Dep't of Corr.*, 805 F.3d 1301 (11th Cir. 2015) .....48

*Kramer v. Olson*, 347 F.3d 214 (7th Cir. 2013)........................... 37, 58, 59

*Light v. Caraway*, 761 F.3d 809 (7th Cir. 2014) ....................................53

*McCarthan v. Director,* 851 F.3d 1076 (11th Cir. 2017) (en banc),
    *cert. denied,* 138 S. Ct. 502 (2017)..................................................56

*McManus v. Neal*, 779 F.3d 634 (7th Cir. 2015)....................................78

*Montana v. Cross*, 829 F.3d 775 (7th Cir. 2016).............................. 57, 58

*Montgomery v. Louisiana*, --- U.S. ---, 136 S. Ct. 718 (2016).................70

*Moore v. Texas*, --- U.S. ---, 137 S. Ct. 1039 (2017) ........................*passim*

*Moore v. Texas*, --- U.S. ---, 139 S. Ct. 666 (2019) ..........................*passim*

*Morales v. Bezy*, 499 F.3d 668 (7th Cir. 2007) ......................................75

*Penry v. Lynaugh*, 492 U.S. 302 (1989)................................................70

## TABLE OF AUTHORITIES, cont'd

**Cases**                                                                                        **Page(s)**

*Peoples v. United States*, 403 F.3d 844 (7th Cir. 2005) ......................... 42

*Poe v. LaRiva*, 834 F.3d 770 (7th Cir. 2016) .................................... *passim*

*Prost v. Anderson*, 636 F.3d 578 (10th Cir. 2011) .................................. 56

*Rice v. Collins*, 546 U.S. 333 (2006) ...................................................... 73

*Roundtree v. Krueger*, 910 F.3d 312 (7th Cir. 2018) ............. 56, 57, 67, 68

*Salinger v. Loisel*, 265 U.S. 224 (1924) ................................................. 67

*Sanders v. United States*, 373 U.S. 1 (1963) .................................. *passim*

*Shepherd v. Krueger*, 911 F.3d 861 (7th Cir. 2018), *cert. denied,*
  139 S. Ct. 1582 (2019) ...................................................... 43, 48, 49

*Shoop v. Hill*, 139 S. Ct. 504 (2019) .................................... 61, 62, 63, 77

*Smith v. Comm'r, Ala. Dep't of Corr.*, 924 F.3d 1330
  (11th Cir. 2019) .............................................................. 47, 68, 71

*Smith v. Dunn*, 2:13-CV-00557-RDP, 2017 WL 3116937
  (N.D. Ala. July 21, 2017) ............................................................. 47

*Smith v. Sharp*, 935 F.3d 1064 (10th Cir. 2019) ....................... 37, 62, 63

*Smith v. Warden, FCC Coleman – Low,* 503 F. App'x 763
  (11th Cir. 2013) ............................................................................. 52

*Stewart v. United States*, 646 F.3d 856 (11th Cir. 2011) ....................... 42

*Susi nka v. United States*, 855 F.3d 728 (7th Cir. 2017) ....................... 47

**PA-217**

# TABLE OF AUTHORITIES, cont'd

**Cases**                                                                          **Page(s)**

*Taylor v. Gilkey*, 314 F.3d 832 (7th Cir. 2002) .............................. *passim*

*Teague v. Lane*, 489 U.S. 288 (1989)....................................... 7, 68, 69, 70

*Tyler v. Cain*, 533 U.S. 656 (2001) ....................................... 42, 43, 45, 71

*United States v Alfred Bourgeois*, 423 F.3d 501 (5th Cir. 2005),
    *cert. denied,* 547 U.S. 1132 (2006).............................. 10, 17, 20, 21

*United States v Alfred Bourgeois,* No. 2:02-cr-216, No. 2:07-cv-223,
    2011 WL 1930684 (S.D.Tex. May 19, 2011), *COA denied,*
    No. 11-70024, 537 F. App'x 604 (5th Cir. Aug. 5, 2013),
    *cert. denied,* 135 S. Ct. 46 (2014) .......................................... *passim*

*United States v. Bourgeois,* 537 F. App'x 604 (5th Cir. 2013)
    (per curiam), *cert. denied,* 135 S. Ct. 46 (2014) .............................29

*United States v. Hayman*, 342 U.S. 205 (1952) .....................................38

*United States v. Prevatte*, 300 F.3d 792 (7th Cir. 2002)............. 40, 41, 53

*Van Daalwyk v. United States*, 21 F.3d 179 (7th Cir. 1994) ..................68

*Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015)
    (en banc) ............................................................................. *passim*

*White v. United States*, 371 F.3d 900 (7th Cir. 2004)................... 4, 33, 45

*Williams v. Kelley*, 858 F.3d 464 (8th Cir. 2017) ............................ 32, 47

*Wong Doo v. United States*, 265 U.S. 239 (1924) ...................................67

*Wood v. Allen,* 558 U.S. 290 (2010) .......................................................73

# TABLE OF AUTHORITIES, cont'd

**Statutes and Rules**                                                    **Page(s)**

8 U.S.C. § 3592(c)(6) ....................................................................... 18

8 U.S.C. § 3592(c)(9) ....................................................................... 18

8 U.S.C. § 3592(c)(11) ..................................................................... 18

18 U.S.C. § 7 .................................................................................... 17

18 U.S.C. § 13 .................................................................................. 17

18 U.S.C. § 1111 .............................................................................. 17

18 U.S.C. § 3591(a)(2) ..................................................................... 18

18 U.S.C. § 3591(a)(2)(D) ............................................................... 20

28 U.S.C. § 1651 .............................................................................. 40

28 U.S.C. § 2241 ......................................................................... *passim*

28 U.S.C. § 2241(b)(1) ........................................................ 4, 33, 44, 45

28 U.S.C. § 2244(a) ........................................................................... 3

28 U.S.C. § 2244(b)(1) ........................................................... 4, 42, 94

28 U.S.C. § 2244(b)(2) ......................................................... 3, 7, 32, 94

28 U.S.C. § 2244(b)(2)(A) .......................................................... 43, 45

28 U.S.C. § 2244(b)(2)(B)(i)-(ii) ..................................................... 43

28 U.S.C. § 2244(b)(3)(A) ....................................................... 3, 30, 42

x

PA-219

## TABLE OF AUTHORITIES, cont'd

**Statutes and Rules**                                                                    **Page(s)**

28 U.S.C. § 2244(b)(3)(B)..............................................................................31

28 U.S.C. § 2244(b)(3)(C)................................................................................3

28 U.S.C. § 2253(c) .....................................................................................10

28 U.S.C. § 2254 ........................................................................................39

28 U.S.C. § 2255 ..................................................................................*passim*

28 U.S.C. § 2255(a) ...............................................................................23, 39

28 U.S.C. § 2255(b)(2)..................................................................................63

28 U.S.C. § 2255(e) ................................................................................*passim*

28 U.S.C. § 2255(h)....................................................................... 7, 43, 45

28 U.S.C. § 2255(h)(1) .................................................................................47

28 U.S.C. § 2255(h)(2) ..................................................... 3, 32, 44, 47, 63

Tex. Pen. Code § 22.04(a)(1)...........................................................................17

PA-220

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

| | | |
|---|---|---|
| ALFRED BOURGEOIS, | § | |
|     Petitioner, | § | |
| v. | § | No. 2:19-cv-00392-JMS-DLP |
| | § | |
| SUPERINTENDENT, | § | |
|     USP—Terre Haute, | § | |
| UNITED STATES OF AMERICA, | § | |
|     Respondents. | § | |

—————————————————————————

**RETURN TO ORDER TO SHOW CAUSE**
—————————————————————————

For their return to the Order to Show Cause and in response to Petitioner Albert Bourgeois' (Bourgeois) petition for writ of habeas corpus, filed pursuant to 28 U.S.C. § 2241, the Respondents advise the Court as follows:

**INTRODUCTION**

Bourgeois is a federal inmate currently housed on death row at the United States Penitentiary at Terre-Haute (USP-Terre Haute), scheduled for execution on January 13, 2020, for the 2002 brutal and horrifying murder of his two-year-old daughter (JG) while making a delivery at a United States Naval base. Bourgeois savagely beat and tortured JG during the last six weeks of her life while having custody

**PA-221**

over her—that is, biting her all over her body, burning her, whipping her with belts, extension cords and his hands, beating her with a baseball bat, shoes and other objects, duct-taping her mouth shut, and forcing her to drink his urine from a jug that the kept in his truck.  He murdered his daughter by forcibly slamming her head into the window of his truck until JG's face became "real, real sad," as witnessed by his then other 7-year old daughter, who testified at trial.

Based on well-established Seventh Circuit precedent applied to the facts of this case, Bourgeois' *Atkins* claim began under 28 U.S.C. § 2255 in the Southern District of Texas and ends there.  Bourgeois timely moved under 28 U.S.C. § 2255 to vacate his sentence on the ground that he is intellectually disabled and therefore ineligible for execution under *Atkins v. Virginia,* 536 U.S. 304 (2002).  The United States District Court for the Southern District of Texas decided Bourgeois' *Atkins* claim on the merits after affording him the opportunity to fully litigate that claim without imposing any limitation. United States District Court Judge Janice Graham Jack, who presided over the guilt and punishment phases of his trial and the entire 2007-2011 § 2255 proceeding, determined that Bourgeois is not intellectually disabled under the *Atkins* criterion. She

2

did so after holding a complete and extensive evidentiary hearing and denied his request for *Atkins* relief in a careful and comprehensive order and opinion filed on May 19, 2011. *United States v Alfred Bourgeois,* No. 2:02-cr-216, No. 2:07-cv-223, 2011 WL 1930684, *1 (S.D.Tex. May 19, 2011), c*ertificate of appealability denied,* No. 11-70024, 537 F. App'x 604 (5th Cir. Aug. 5, 2013), *cert. denied,* 135 S. Ct. 46 (2014). The decision of the Southern District of Texas is final under 28 U.S.C. § 2244(a), (b)(1), and (b)(2).

Years later on March 28, 2018, Bourgeois requested Fifth Circuit authorization to proceed on a successive 28 U.S.C. § 2255 motion under § 2255(h)(2), pursuant to 28 U.S.C. § 2244(b)(3)(A). Bourgeois argued that, based on the Supreme Court's decision in *Moore v. Texas (Moore I),* --- U.S. ---, 137 S. Ct. 1039 (2017), he satisfied the requirements of § 2255(h)(2) because *Atkins* created a new rule of constitutional law made by the Supreme Court retroactively applicable to cases on collateral review. The United States' position before the Fifth Circuit in opposition to Bourgeois' request was then, and is now, that Bourgeois failed to satisfy the gatekeeping requirements of 28 U.S.C. § 2255(h)(2) and § 2244(b)(3)(C); that Bourgeois' *Atkins* claim presented in his second or

3

PA-223

successive § 2255 motion and the evidence he attached in support duplicated the *Atkins* claim and evidence that he presented to the district court in his first § 2255 motion, and that the Supreme Court did not declare *Moore (I)* or its predecessor, *Hall v. Florida,* 572 U.S. 701 (2014), a new rule of constitutional law retroactively applicable to cases on collateral review.   The Fifth Circuit agreed, holding that Bourgeois' "successive § 2255 motion present[ed] only a single claim that was already presented in his original motion."   *In re Bourgeois,* 902 F.3d 446, 448 (5th Cir. 2018).   Joining the other circuits having addressed the issue, including the Seventh Circuit in *Bennett v. United States*, 119 F.3d 468, 469 (7th Cir. 1997), and *White v. United States,* 371 F.3d 900, 901 (7th Cir. 2004), the Fifth Circuit held that the strict litigation bar in 28 U.S.C. § 2244(b)(1) applies equally to federal prisoners and barred Bourgeois from relitigating his *Atkins* claim.   Accordingly, the Fifth Circuit denied Bourgeois' request for authorization to proceed on a successive § 2255 pursuant to § 2241(b)(1).

Bourgeois filed this Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241 (Dkt. 1), asserting this Court's jurisdiction via the "savings clause" in 28 U.S.C. § 2255(e) and claiming that he is categorically

4

exempt from execution under *Atkins* under *Moore (I)* and the Supreme Court's recent decision in *Texas v. Moore (Moore II),* --- U.S. ---, 139 S. Ct. 666 (2019). The declarations, affidavits, and reports of mental health professionals, the declaration of lay witnesses, and other investigatory records that Bourgeois attaches as appendices to his § 2241 petition and as supporting his claim of intellectual disability, Dkt. 1-1, is evidence that was available to him at the time of his first § 2255 proceeding and is in fact the *same* evidence that he presented to the United States District Court for the Southern District of Texas at that evidentiary hearing in September 2010 through January 2011.

The "savings clause" under § 2255(e) does not allow Bourgeois' *Atkins* claim to proceed under § 2241 because Bourgeois cannot meet his burden of showing that § 2255 is "inadequate or ineffective." The Seventh Circuit holds that, to pass through the savings clause and proceed under § 2241, there must be a structural problem with § 2255 that prevents an opportunity to address claims on collateral review. Bourgeois agrees, and the record establishes, that he fully adjudicated his *Atkins* claim at his first § 2255 proceeding. The mere fact that Bourgeois' petition is barred as a successive petition under § 2255 does

5

not bring Bourgeois' petition under the savings clause's protection. To hold otherwise would denigrate the careful structure Congress has created to avoid repetitive filings to meaning little or nothing, as the Seventh Circuit pointedly holds in *Garza v. Lappin,* 253 F.3d 918, 921 (7th Cir. 2001).

As important, Bourgeois does not satisfy the Seventh Circuit's tests under *In re Davenport,* 147 F.3d 605 (7th Cir. 1998), and *Webster v. Daniels,* 784 F.3d 1123 (7th Cir. 2015) (en banc), to proceed under § 2241. *Davenport* precludes the use of § 2241 for claims based on a constitutional case. *Atkins* and its progeny, *Hall, Moore I,* and *Moore II,* are all grounded in the Eighth Amendment and are not statutory interpretation cases. Neither *Moore I* nor *Moore II* establish new "legal and factual bases" beyond *Atkins.* The Supreme Court has not declared *Moore* a new rule of constitutional law retroactively applied to Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) cases. The development of new diagnostic standards does not constitute newly discovered evidence retroactively applicable to Bourgeois. The Supreme Court pronounced in *Atkins* the three criteria required for determining intellectual disability and ineligibility for execution under the Eighth Amendment. Bourgeois

6

shows no structural problem with § 2255 prevented him from having a reasonable opportunity for a reliable judicial determination of the merits of his *Atkins* claim in his first § 2255 proceeding.

Bourgeois' attempt to circumvent § 2255(h) and the strict litigation bar under § 2244(b)(2) by proceeding under § 2241 to relitigate his *Atkins* claim amounts to an invitation to abuse the writ under pre-AEDPA law. Furthermore, in addition to performing any analysis required by AEDPA, this Court must conduct a threshold *Teague v. Lane*, 489 U.S. 288 (1989) analysis. *Moore* does not announce a new substantive rule that could retroactively apply under *Teague*, and Bourgeois' *Atkins* claim does not fall within a *Teague* exception.

Finally, Bourgeois seeks to proceed in this § 2241 habeas petition to relitigate the same *Atkins* claim that he fully adjudicated in the United States District Court for the Southern District of Texas in his first § 2255 proceeding and which that court finally denied on the merits in a comprehensive decision. The relief that Bourgeois requests of this Court is to stay his execution pending a final disposition of his *Atkins* claim in the Southern District of Indiana, a request to amend his claim if necessary, and for an evidentiary hearing conducted on the merits of his

7

*Atkins* claim.  Bourgeois' *Atkins* claim is barred by the savings clause at § 2255(e).  Bourgeois' claim should be dismissed with prejudice and his motion for stay of execution denied.

Bourgeois' execution is scheduled for January 13, 2020.  "[A] stay of execution is an equitable remedy. It is not available as a matter of right, and equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Hill v. McDonough*, 547 U.S. 573, 584 (2006).  Bourgeois does not demonstrate a significant possibility of success on the merits of his *Atkins* claim.  The United States District Court for the Southern District of Texas made the *Atkins* intellectual-disability determination that Bourgeois is not exempt from execution under the Eighth Amendment based on and applying the clinical definition of intellectual disability by the American Association on Intellectual and Developmental Disabilities (AAIDD) and American Psychiatric Association (APA), as *Atkins* directs.

The United States has a strong interest in enforcing Bourgeois' death sentence imposed by the jury on March 25, 2004, for the savage and horrific premediated murder of his two-year daughter.  "Equity must take into consideration the [United] State's strong interest in proceeding

8

**PA-228**

with its judgment." *Gomez v. U.S. Dist. Court for N. Dist. of California*, 503 U.S. 653, 654 (1992).  The public interest mandates that Bourgeois' scheduled execution on January 13, 2020, be enforced by the United States.  This Court should deny Bourgeois' motion for stay of execution: there is no public interest or constitutional basis to grant it.

## I.

## BACKGROUND

A.    Facts:  Bourgeois brutally murdered his 2-year daughter at the Corpus Christi Naval Air Station on June 27, 2002.

These facts and the aggravating and mitigating evidence the parties presented to the jury at the punishment phase of Bourgeois' trial and at the evidentiary hearing held at his first 28 U.S.C. § 2255 proceeding in September 2010 through January 1, 2011, are set forth in comprehensive detail in the opinion of the United States Court of Appeals for the Fifth Circuit (Fifth Circuit) affirming his conviction and sentence on August 25, 2005, the opinion of the United States District Court for the Southern District of Texas, U.S. District Court Judge Janice Graham Jack (Judge Jack), denying his request for post-conviction relief under 28 U.S.C. § 2255 on May 19, 2011,  and the Fifth Circuit opinion denying his request for a certificate of appealability (COA) on August 5, 2013,

9

pursuant to 28 U.S.C. § 2253(c). *See United States v Alfred Bourgeois,* 423 F.3d 501 (5th Cir. 2005), *cert. denied,* 547 U.S. 1132 (2006); *United States v Alfred Bourgeois,* No. 2:02-cr-216, No. 2:07-cv-223, 2011 WL 1930684, *1 (S.D.Tex. May 19, 2011), *certificate of appealability (COA) denied,* 537 F. App'x 604 (5th Cir. Aug. 5, 2013), *cert. denied,* 135 S. Ct. 46 (2014).

Bourgeois brutally and savagely murdered his two-year-old daughter (JG) on the grounds of the Corpus Christi Naval Air Station, where he was making a delivery. Bourgeois systematically and savagely tortured JG during the last six weeks of her life while she was in his custody. He bit her all over her body, burned her, whipped her with belts and extension cords, beat her with his hands, a baseball bat, shoes, and other objects, duct-taped her mouth shut, and forced her to drink his urine from a jug that the kept in his truck. Bourgeois murdered his daughter by slamming her head into the window frame and dashboard of his truck. JG's murder was witnessed by AB1994 (AB), Bourgeois' other 7-year old daughter who was in the truck. AB testified that Bourgeois slammed JG's head until JG's face became "real, real sad."

10

JG was Bourgeois' two-year old biological daughter. At the time of JG's murder, Bourgeois was married to a woman (Robin) who was not JG's biological mother. Bourgeois and Robin had two biological daughters, then 7-year old AB and AB2001, who was one year old. After a court ordered Bourgeois to pay child support for JG, Bourgeois demanded visitation rights for the summer of 2002. Medical evidence established that JG was a very healthy baby with no substantial injuries when Bourgeois took physical control of her.

The trial established that Bourgeois developed a scheme to systematically torture JG and did so from the time he obtained possession of JG until he murdered her while on the federal Naval base on June 27, 2002. Circumstantial evidence, together with AB's testimony and subsequent medical evidence, established that Bourgeois murdered JG by slamming her head four times against the window inside of his tractor-trailer while seated in the driver's seat. AB, who testified at trial, described how Bourgeois held JG by the shoulders and slammed her head into the window frame and dashboard of his truck cab. The medical examiner found the ultimate cause of death to have been an impact to the head resulting in a devastating brain injury.

11

The evidence established that Bourgeois entered into a pattern of conduct aimed at controlling or killing JG, who Bourgeois referred to as a "trifling little bitch like her mother [Katrina]" and "a mother f***er." A few days after JG came to live at Bourgeois' home, and with Bourgeois proclaiming he would teach JG to swim, a 30-minute videotape captured Bourgeois tossing her in the air and letting her fall into the swimming pool where she sank until he pulled her out, coughing and gasping for breath, and to the brink of downing before he let her go. He did this again on a trip to the beach when he repeatedly held her under the waves.

Bourgeois also brutally and systematically beat JG, often with electrical cords, resulting in looped injuries, and other objects. AB witnessed Bourgeois beating JG with a belt so hard that it broke. Bourgeois beat JG with electrical cords, shoes, and a toy baseball bat until her head swelled "like a football." Bourgeois told an inmate with whom he was incarcerated prior to trial about how JG fell about ten feet at a dinosaur park, and he laughed as he said "that f***ing baby's head got as big as a watermelon." Bourgeois hit JG with all his strength in the eyes until she had to wear sunglasses to mask the injuries. AB testified that JG had black eyes from being hit by her father. AB witnessed

12

Bourgeois beat JG until she lost consciousness. Foreshadowing her murder, Bourgeois knocked JG unconscious by striking her head against the truck's steering wheel because she referred to herself by her mother's, not his, surname.

The medical evidence established that JG had over 300 injuries, including a multitude of pattern injuries which appeared to be whip marks, human bite marks, a burn mark on her foot, extensive trauma and hemorrhaging in her eyes, 110 to 140 nonspecific and pattern contusions, abrasions or excoriations, and approximately 10 separate head contusions. AB testified that she repeatedly saw Bourgeois bite JG "all over" on her hands, feet, head, and back until JG bled; that JG's hands and feet were pretty when she came to them, but got ugly from Bourgeois biting them; that JG wore socks because "she was all bitten up, and her feet looked real bad." JG's sores on her feet would not heal because Bourgeois kept pressing his thumbs into the wounds. The forensic experts found bite marks on JG's hands and back matched to Bourgeois. Bourgeois taped JG's mouth shut and burned holes in her foot the size of a cigarette lighter. Once while stopped for refueling, two-year old JG reached for a plastic Hawaiian Punch plastic bottle containing

13

urine and tried to drink it. Robin returned from the restroom and took the jug of urine away from JG, but when Bourgeois heard what happened, he poured some urine in a cup and forced JG to drink it.

Bourgeois, who at that point no longer shared a bed with Robin, would lock himself in the bedroom with JG, AB, and his other one-year old daughter. JG would spend the night tied to her potty chair under a window. Robin testified that some nights she could hear pounding in the bedroom accompanied by crying. A bloodstain found by law enforcement confirmed that one loud thump Robin heard was Bourgeois throwing JG against a wall. At some point blood was found in JG's diapers. There was some evidence of vaginal trauma, and rectal swabs after JG's death indicated the presence of semen. Bourgeois said to one of the inmates who testified at trial that JG was a "bad child" who "used to shake her butt all the time."[1]

Bourgeois' callous and cavalier attitude towards JG continued when she was dying. After having delivered the killing blows to JG at the federal Naval base, Bourgeois handed JG back to AB and left the

---

[1] *Bourgeois,* 537 F. App'x at 608 & n.15.

14

truck.  Robin, who was asleep when this happened, woke up, saw JG's motionless and limp body, unsuccessfully attempted to revive JG, and honked the horn.  Bourgeois came back, took JG out of the truck, laid her on the ground, and crafted the story: "AB forgot to close the cab door" and "JG fell from the truck."  Robin attempted CPR and paramedics then took over when they arrived.  While this was happening, Bourgeois was on the phone trying to see about his next load to Kingsville.

Robin testified that Bourgeois said he wanted to kill JG; that once he killed JG, he planned on leaving her body in the woods or in a swamp and have Robin report her as kidnapped. After Bourgeois was arrested and confined in jail, he wrote a large number of letters to his wife discussing how she poorly handled the police.  Bourgeois also made multiple telephone calls to relatives and friends making incriminating statements.  Another inmate testified that Bourgeois told him that he killed JG and was going to make it look like an accident.  Bourgeois attempted to explain away all of JG's injuries on cross examination at trial and to lay blame on Robin for many of those injuries.  While confined prior to trial Bourgeois threatened to have witnesses killed.  As the

15

district court found, Bourgeois' "threats were not toothless; witnesses, including JG[ ]'s mother, were murdered before trial."[2] (DE 24).

Bourgeois' testimony at trial was that JG was alive when he drove onto the U.S. Naval base and that he did not fatally injure her. The jury did not believe him and found him guilty of first degree premeditated murder with malice aforethought. Bourgeois addressed the jury a second time at punishment, saying:

> My sympathy goes out to the soul of JG1999, my baby, her family, my family, relatives and friends, and I'm very sorry for the death of my child. It's a hurting pain and a sorrowful thing that happened. And I feel or believe that I have been wrongfully accused of this crime that I've been convicted for....
>
> So I feel like you all have been misled and I've been wrongfully convicted, and I'm just sorry for the pain and suffering, that I've been wrongfully accused for the death of my baby, and I did not kill my baby.
>
> I just want to close with that I loved JG1999, she's an infant that didn't actually come in this world and I think the real murderer got off with this crime. I just think you all should know that I have been wrongfully convicted. I feel my wife had a lot to do with this and she walked away free, and I just had to say this. If I never get an opportunity to say this to nobody else, my family, Katrina's family, JG1999 came from a lovely family. When I picked her up, when she got in my custody I had no problems with JG1999. She was a lovely kid, very lovely. I realize some of the pictures that you all seen in the swimming pool, I will say I was a little rough like that, I'm

---

[2] *Bourgeois,* 2011 WL 1930684, at *9.

16

like that with all my children. And I just feel you all have been
wrongfully misled.

I just think I want to close with that, saying that I love my
baby, I love her family, I love my family. And I thank each and
every one of you for participating, the lawyers for the job they
did, and for everybody that communicated. And God bless all
of you all. Thank you.

*Bourgeois,* 537 F. App'x at 641.   The jury was not persuaded and

sentenced Bourgeois to death.

B.   Procedural History.

    1.   Trial, Sentencing, and Direct Appeal, *United States v.*
        *Bourgeois,* No. 2:02-cr-216 (S.D.Tex. 2004), 423 F.3d 501
        (5th Cir. 2005), *cert. denied,* 547 U.S. 1132 (2006).

On July 25, 2002, the Grand Jury for the United States District

Court for the Southern District of Texas, returned a two-count

indictment, Criminal No. 2:02-cr-216, charging Bourgeois with murder

(unlawful killing with malice aforethought) in violation of 18 U.S.C. §§ 7

and 1111, and injury to a child in violation of 18 U.S.C. § 13 and Texas

Penal Code, Section 22.04(a)(1). (Crim. Dkt. 1, 5).[3] The grand jury

returned a two-count superseding indictment on April 9, 2003, alleging

---

[3] "Crim. Dkt." refers to docket entries in *United States v. Bourgeois,* No. 2:02-cr-216
(S.D. Texas).  The Clerk of the District Court for the Southern District of Texas
ordered that all post-conviction collateral attack pleading filed under 2:07-cv-223 be
docketed under the criminal number.

17

premeditated murder with malice aforethought and injury to a child, to which Bourgeois pleaded not guilty. (Crim. Dkt 43).

At the status conference on July 16, 2003, the United States announced that the United States Attorney General had authorized seeking the death penalty. (Crim. Dkt. 74, 111). The grand jury returned a second superseding indictment on July 22, 2003, alleging a single count of premeditated murder with malice aforethought and alleging special findings, including all four of the statutory intent elements and three statutory aggravating factors. On July 23, 2003, the United States filed the Notice of Intent to Seek the Death Penalty ("Death Notice"), in which it added two non-statutory aggravating factors.[4]

---

[4] The indictment alleged the following statutory intent elements: Bourgeois (A) intentionally killed the victim, (B) intentionally inflicted serious bodily injury that resulted in the death of the victim, (C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, [other than one of the participants in the offense], who died as a direct result of the act; and (D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, [other than one of the participants in the offense], and constituted a reckless disregard for human life and the victim died as a direct result of the act.  Crim. Dkt. 78; *see* 18 U.S.C. § 3591(a)(2).

The three alleged statutory aggravating factors were that Bourgeois: (1) committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim; (2) committed the offense after substantial planning and premeditation to cause the death of a person; and (3) that the victim was particularly vulnerable due to youth or infirmity. Crim. Dkt 78; *See* 8 U.S.C. § 3592(c)(6), (c)(9) and (c)(11).

18

Bourgeois pleaded not guilty to the second superseding indictment on July 25, 2003. The guilt/innocence phase of Bourgeois' capital trial began on March 2, 2004, and ended on March 16, 2004, with a guilty verdict for first degree premeditated murder with malice aforethought. The capital trial resumed with the punishment phase on March 22, 2004, and ended on March 24, 2004, with a unanimous jury verdict that Bourgeois be sentenced to death.  The jury found that the government had proven all of the statutory and non-statutory factors and that Bourgeois had shown two mitigating factors:  six jurors found that he was under stress, and all found that he was driving across the country in a truck with three children and another adult in the cab of an 18-wheeler truck.   The jury unanimously found that the aggravating factors outweighed the mitigating factors and recommended a death sentence. The district court entered the judgment and order implementing the judgment on March 25, 2004, sentencing Bourgeois to death. *See Bourgeois,* 537 F. App'x at 606-09.

---

The two alleged non-statutory aggravating factors were: (1) future dangerousness of the defendant, and (2) victim impact evidence. Crim. Dkt. 79.

19

Bourgeois appealed his conviction and sentence to the Fifth Circuit, raising four issues:

(1) a Fifth Amendment claim that the United States failed to allege the required statutory intent elements and aggravating factors in the indictment, *id.* at 506-08;

(2) an Eighth Amendment claim challenging the application of the intent element under 18 U.S.C. § 3591(a)(2)(D), *id.* at 508-09;

(3) a due process claim regarding this Court's delegation of ministerial powers in how and where the sentence of death will be carried out, *id.* at 509-10; and

(4) a claim that the aggravating factors alleged in his case were vague and ambiguous and violated the Eighth Amendment, *id.* at 511-12.

The Fifth Circuit affirmed his conviction and sentence in all respects on August 25, 2005, concluding that "[t]his is not a close case," and that "Bourgeois fail[ed] to prove there was any error, much less plain error, in any aspect of his trial." *Bourgeois*, 423 F.3d at 512.  The Supreme Court denied certiorari review on May 15, 2006.  *Bourgeois v. United States,* 547 U.S. 1132 (2006).

20

2.     28 U.S.C. § 2255, Motion to Vacate, *United States v. Bourgeois*, Nos. 2:02-cr-216, 2:07-cv-223, 2011 WL 1930684 (S.D.TX, May 19, 2011).

The district court appointed Mr. Victor J. Abreu, Bourgeois' present counsel of record, and Mr. Michael Wiseman, both with the Federal Community Defender Office for the Eastern District of Pennsylvania, Capital Habeas Corpus Unit.  ROA-5th.138.  On May 14, 2007, Bourgeois filed "Petitioner's Motion for Relief Pursuant to 28 U.S.C. § 2255 or in the Alternative Pursuant to 28 U.S.C. § 2241" with appendices, 5thCir.[5]338-474, 477-915, and a supplemental motion with appendices on October 5, 2007, *see* 5thCir.928-1077, 1079-1165.   The United States filed its answer and response on October 15, 2008.   (Crim. Dkt. 442-443).  Bourgeois filed his reply with appendices to the United States' answer on June 26, 2009, which are contained in the record at 5thCir.1356-474, 1476-755.[6]

---

[5] A complete copy of the Fifth Circuit's record on appeal from Bourgeois' first 28 U.S.C. § 2255 proceeding is contained in *United States v. Bourgeois,* No. 11-70024 (5th Cir. 2013).  Because the record is voluminous, the United States files that record on appeal as appendices to this opposition for purpose of record completeness.  This record is cited as "5thCir." followed by the posted number at the bottom right-hand corner of each page.

[6] Bourgeois filed additional supplemental and amended motions relating to claims of ineffective assistance and remaining issues.  *See*, *e.g.,* 5thCir.4436-512, 4723-792, 5960-6061.

21

Bourgeois raised fourteen claims.[7]  On May 19, 2011, the district court entered its Memorandum, Order, and Final Judgment, deciding Bourgeois issues on the merits and denying him relief under 28 U.S.C. §

---

[7]    (1) Bourgeois is mentally retarded, making him ineligible for execution under *Atkins*, *Bourgeois,* 2011 WL 1930684 at \*22-46.

(2) Trial counsel provided ineffective assistance of counsel at the punishment phase of trial by failing to present available mitigating evidence, including that of his alleged mental retardation. *Id.* at \*46-70.

(3) Bourgeois' conviction violates due process because the fatal injury occurred outside the territorial jurisdiction of the United States. Trial counsel should have disputed the location of the crime.  *Id.* at \*70-79;

(4) Trial counsel provided ineffective assistance by failing to present available expert testimony that would have shown that Bourgeois did not sexually assault the victim.  *Id.* at \*80-89.

(5) Trial counsel provided ineffective assistance by not litigating a *Daubert* challenge to testimony from Dr. Senn and Dr. Chrz concerning bite-mark evidence. *Id,* at 93-95.

(6) Trial counsel provided ineffective assistance by not litigating a *Daubert* challenge to testimony from Dr. Oliver concerning digitally enhanced autopsy photographs.  *Id.* at \*89-93.

(7) The Government *violated Brady v. Maryland*, 373 U.S. 83 [ ] (1963), by failing to disclose that four inmates were promised some benefit for testifying against Bourgeois.  *Id.* at \*96-100.

(8) Trial counsel labored under a conflict of interest because of representation of clients associated with this case.  *Id.* at \*100-101.

(9) The Government engaged in misconduct by making improper argumentative statements in the guilt/innocence and penalty phases. *Id.,* at \*101-04.

(10) Trial counsel provided ineffective assistance by not rebutting evidence of Bourgeois' indifferent demeanor at trial. *Id.* at \*105-06.

(11) A witness improperly relied on Bourgeois' interactions with counsel as a basis to formulate an adverse opinion about him   *Id.* at 106-107.

(11) Appellate counsel ineffectively failed to advance several claims.  *Id.* at \*108-09.

(13) The cumulative effect of the claimed errors resulted in a constitutional violation.  *Id.* at \*110.

(14) The method by which the government would carry out Bourgeois' execution violates the Constitution.  *Id.* at \*110.

22

2255(a). *Bourgeois,* 2011 WL 1930684, at *1-111. The district court's opinion details defense counsel's pretrial preparation and investigation, *id.* at *6-9, the guilt and innocence phase of trial, *id.* at *9-18, and a summary of the § 2255 proceeding and evidentiary hearing, *id.* at *19-22.

The court carefully and comprehensively analyzed Bourgeois' *Atkins* claim of intellectual disability and ineligibility for execution, *id.* at *22-46, and his claim of ineffective assistance of counsel, *id.* at *46-71, including trial counsels' failure to develop evidence of mental retardation as mitigating punishment evidence, *id.* at *44-45. Regarding the ineffective assistance of counsel claims, the court's analysis includes detailed accounts of defense counsel's investigation and preparation of mitigating evidence, *id.* at *49-51, trial counsel's preparations before the guilt/innocence phase of trial and defense strategies, *id.* at 51-54, the "unpresented evidence" of childhood abuse by lay witnesses, *id.* at *55-58, and expert testimony, *id.* at *58-69.

At the § 2255 evidentiary proceeding, the district court allowed Bourgeois to present testimony and evidence supporting nearly all of his § 2255 claims without imposing any limitation. *Id.* at *20. In that regard, the court "liberally allowed Bourgeois to prepare the factual basis for his

23

post-judgment claims through expert and investigative assistance." *Id.*

The court held a week-long evidentiary hearing for the parties to present

evidence and placed no limitation on Bourgeois' ability to call witnesses.

*Id.* at \*20, 55.  "Testimony during that week often extended long afDter

normal hours.  Aside from the witnesses called during that hearing, the

[court] heard testimony at different dates and allowed the taking of video

depositions of other witnesses."  *Id.* at \*20.  The court found that the

parties "developed a rich factual record through the submission of written

interrogatories, declarations, and record documents."  *Id.* The parties

presented  extensive  in-court  testimony  of  medical  experts  and  lay

witnesses,  video  taped  depositions,  interrogatories,  affidavits,  and

documentary reports related to Bourgeois' *Atkins* claim and ineffective

assistance  of  counsel  claim  for  failing  to  present  his  alleged  mental

retardation as mitigating evidence at punishment. [8]  The court informed

---

[8] The Fifth Circuit record on appeal in No. 11-70025, includes attachments:

- 5thCir.6151-75 (telephone conference on December 14, 2009);
- 5thCir.1904-71 (hearing on April 20, 2010);
- 5thCir.1976-95 (telephone conference on May 6, 2010);
- 5thCir.2061-85 (telephone conference on June 7, 2010);
- 5thCir.2087-135 (telephone conference on June 9, 2010)

24

- 5thCir. 2201-348 (evidentiary hearing on September 10, 2010, including testimony of Dr. Glebort at 2210-82, 2294-348);

- 5thCir.2698-3104 (evidentiary hearing on September 20, 2010, including testimony of: Dr. Swanson at 2704-895; Dr. Weiner at 2895-966; Dr. Toomer at 2697-3075; Kathleen Kaib at 3075-93);

- 5thCir.3403-48 (evidentiary hearing on September 21, 2010, including testimony of: Claudia Williams at 3405-93; Beverly Clayton Frank at 3494-531; Brenda Clayton Goodman at 3532-82; Dr. Mark Douglas Cunningham at 3582-723; Carl Kevin Henry at 3723-64; Donald Reese at 3765-95; Murray Bourgeois at 3796-819; Jon Curtis Daily at 3820-46);

- 5thCir.2395-568, 3849-4170 (evidentiary hearing on September 22, 2010, including testimony of: Elizabeth Ann Johnson at 2395-568; Dr George Walker Holden at 3856-68; Jennifer Valdez at 3872-79; Charles Michael Bowers at 3881-972; attorney John Gilmore at 3794-4076; Kerry Dion Brown at 4078-99; Timothy Lynn Allen at 4100-04; AFD Gerald Bierbaum at 4105-55);

- 5thCir.3106-3401 (evidentiary hearing on September 23, 2010, including testimony of: Danny Lee Clark at 3109-44; Robert Patterson at 3158-76; William D. Shotts at 3177-306; Carlin Christopher Key at 3208-45; Rhonda Michelle Davis at 3246-92; Dr. Jack Randall Price at 3292-339);

- 5thCir.2569-662, 4171-4413 (evidentiary hearing on September 24, 2010, including testimony of: Jerrilyn Conway at 2571-661; Dr. Jack Randall Prices at 4192-225; Dr. Roger Byron Moore, Jr. at 4236-4412);

- 5thCir.4516-661 (transcript of videotaped deposition of Dr. William Russell Oliver on October 28, 2010);

- 5thCir.4661-705 (transcript of videotaped deposition of Manfred Schenk) on October 28, 2010;

- 5thCir.4869-935 (transcript of videotaped deposition of Dr. Randall Price on November 10, 2010);

- 5thCir.4982-5018 (telephone conference on December 1, 2010);

- 5thCir.6176-82 (telephone conference on December 6, 2010);

- 5thCir.5047-221 (transcript of video-teleconference of Dr. Jan Edward Leestman on January 10, 2011);

25

PA-245

that it "spent many hours reviewing the testimony of the out-of-court witnesses" and "afforded Bourgeois a full and fair opportunity to develop his arguments." *Id.*

The district court's order and opinion on May 19, 2011, established that the court properly applied *Atkins'* criterion for intellectual disability (mental retardation) as defined by the AAIDD and the APA in AAIDD-11 (11th edition, 2010) and the DSM-IV-TR (2010): (1) significantly subaverage intellectual functioning, (2) existing concurrently/ accompanied by related significant limitations in adaptive functioning in at least two adaptive skills, (3) the onset of which occurs prior to the age of 18. *Bourgeois*, 2011 WL 1930684 at 23 (citing *Atkins*, 536 U.S. at 309 n.3). Summarized, the district court scrupulously adhered to the AAIDD and APA clinical definitions in determining Bourgeois' *Atkins* intellectual functioning and adaptive functioning. The court determined, based on a comprehensive analysis of the medical experts' clinical assessment and judgment, that Bourgeois did not show by a preponderance of the

---

- 5thCir.5226-445, 5579-694 (miscellaneous hearing on January 13, 2011, including testimony of Dr. Rouse at 5228-79; arguments of counsel at 5282-443, including the *Atkins* standard at 5282-5346; testimony of William Edward May, Jr. at 5582-95; James Sales at 5593-620; Debra Hohle at 5621-57; AUSA Booth at 5662-86).

26

evidence that he is intellectually disabled and categorically exempted from execution under the Eighth Amendment. *Id.* at 22-46 ("Bourgeois' Alleged Mental Retardation Claim" (*22); "Background of Bourgeois' Atkins Claim" (*23-26); "Intellectual Functioning" (*25); "Bourgeois' IQ Score " (*25-26); "Legal Evaluation of Intelligence in *Atkins* cases" (*26-27); "Bourgeois' IQ Does Not Persuasively Fall at the Lower End of the Confidence Interval" (*27-31); "Significant Limitations in Adaptive Skill Areas" (*31-33); "Assessment by Testing Instruments" (*33-37); "Lay Accounts of Bourgeois' Functioning" (*37-39); "Bourgeois' Adaptive Abilities (*40); "Conceptual Domain-Functional Academics" (*40-42), "Practical Domain—Health and safety" (*42-43); "Social Domain—Social /interpersonal skills" (*43-44); "Manifestation of Limitation Before Age 18" (*44); "Trial Counsel's Failure to Develop Evidence of Mental Retardation" 44-46). In conjunction with Bourgeois' *Atkins* claim, the district court decided the merits of Bourgeois' claim of ineffective assistance of counsel for failing to develop evidence of his mental retardation at the time of sentencing. *Id.* at *44-46, 46-71.

Finding that it had "afforded Bourgeois a full and fair opportunity to show whether mental retardation precludes his execution," and

27

**PA-247**

referring directly to *Atkins,* the court found that, "Bourgeois' intellectual and adaptive functioning, while possibly low, does not bear the characteristics that would render his sentence a cruel and unusual punishment." *Id.* at *46.

For Bourgeois' *Atkins* claim and each of the other claims he presented in his first § 2255 motion, the district court found "no error invalidating Bourgeois' capital conviction or death sentence." *Id.* at *111. The court found that Bourgeois "failed to show that his sentence was imposed in violation of the laws of the United States, was in excess of the maximum authorized by law, or is otherwise subject to collateral attack[;]" and that "his claims do not merit section 2255 relief." *Id..*  The court additionally found that Bourgeois had "not shown that [the Court of Appeals for the Fifth Circuit] should authorize any issue for appellate review" and denied a COA of any issue for consideration by the Fifth Circuit. *Id.* at *111.

    3.    *United States v. Bourgeois,* 537 F. App'x 604 (5th Cir. 2013) (per curiam), *cert. denied,* 135 S. Ct. 46 (2014).

Bourgeois requested the Fifth Circuit grant a COA limited to the following three issues presented in his § 2255 petition:

28

**PA-248**

1)      The district court erred in dismissing, without an evidentiary hearing, his claim that trial counsel were ineffective for failing to challenge jurisdiction.

2)      Trial counsel were ineffective at both phases of trial for failing to present available expert testimony to rebut the government's assertion that JG was sexually assaulted.

3)      Trial counsel provided ineffective assistance during the punishment phase by failing to pursue and present mitigating evidence of his life history of abuse, neglect and abandonment, personality disorder, cognitive deficits, and the combined impact of his mental-health problems.

*Bourgeois,* 537 F. App'x at 610.

The Fifth Circuit denied Bourgeois' request for COA on August 5, 2013; it made extensive factual and legal findings with respect to each of those issues and resolved each on the merits. *See id.* at 611-17 (Issue 1), 617-31 (Issue 2), and 631-65 (Issue 3); *see also United States v. Bourgeois,* No. 11-70024, 2012 WL 2884266 (July 9, 2012) (5th Cir. Brief of the United States).  So doing, the Fifth Circuit concluded that Bourgeois "ha[d] not made a substantial showing of the denial of a constitutional right, [that] the issues he presents were inadequate to deserve encouragement to proceed further, and [that] no reasonable jurist could debate the district court's assessment of his claims." *Id.* at 665.  The Supreme Court denied Bourgeois' petition for writ of certiorari (No. 13-

29

8397) on October 6, 2014. *Bourgeois v. United States,* --- U.S. ---, 135 S. Ct. 46 (2014).

Pertinent to this 28 U.S.C. § 2241 habeas petition, the Fifth Circuit expressly found that "Bourgeois did not request a COA of the remaining claims his raised in his § 2255 petition." *Bourgeois,* 537 F. App'x at 610 n. 7. This included Bourgeois' claim that he is ineligible for execution under *Atkins.* Accordingly, Bourgeois waived appellate review of his *Atkins* claim, including whether he was afforded a full and fair opportunity to adjudicate his intellectual-disability *Atkins* claim and ineligibility for execution, and whether the district court's *Atkins* determination was unreasonable and violated the Eighth amendment.

4. *In re Bourgeois*, 902 F.3d 446 (5th Cir. 2018).

Well over four years later, on March 27, 2018, Bourgeois filed in the United States District Court for the Southern District of Texas a "Second Motion to Vacate Sentence Pursuant to 28 U.S.C. § 2255," pursuant to 28 U.S.C. § 2244(b)(3)(A), for purposes of relitigating his *Atkins* claim. *See In re Alfred Bourgeois,* U.S. App. Lexis, No. 18-40270, Doc. 00514404925, ("Second Motion to Vacate Sentence Pursuant to 28 U.S.C. § 2255" (filed

30

March 28, 2019)).[9]   On March 28, 2018, pursuant to 28 U.S.C. § 2244(b)(3)(B), Bourgeois moved the Fifth Circuit for an "Order Authorizing the Southern District of Texas to Consider a Successive Petition under 28 U.S.C. § 2255." *See In re Alfred Bourgeois,* U.S. App. Lexis, Doc. Doc. 00514404917 ("Motion for Order Authorizing the Southern District of Texas to Consider a Successive Petition Under 28 U.S.C. § 2255" (filed March 28, 2019)).

In that motion, Bourgeois acknowledged that he had previously raised his *Atkins* claim asserting he is intellectually disabled and his death sentence is unconstitutional, and that the district court denied his *Atkins* claim on the merits. *Id.* at 7-8.   Bourgeois also acknowledged that he did not seek a COA on his *Atkins* claim based on Fifth Circuit precedent that he alleged the district had relied on to resolve his claim. *Id.* at 8.   He argued generally that the Supreme Court's decision in *Moore v. Texas (Moore I),* 137 S. Ct. 1039 (2017), invalidated the Fifth Circuit's approach to determining eligibility for *Atkins* relief, thereby making the

---

[9] These documents are electronically available via PACER and through Lexis-Nexis. However, they were unavailable to the undersigned through Westlaw.

rule articulated in *Atkins* available to him for the first time and his claim viable under 28 U.S.C. § 2255(h)(2).   *Id.* at 8.

The United States disagreed, on grounds that the Supreme Court had not made *Moore* retroactively applicable to cases on collateral review (citing to *In re Payne,* 722 F. App'x 534 (6th Cir. 2018), *Williams v. Kelley,* 858 F.3d 464, 474 (8th Cir. 2017), and other cases), and that this was the issue underlying his motion to certify a successive § 2255 motion.   The United States' position was, and is, that Bourgeois failed to make a prima facie showing that his claim has not previously been presented in a prior § 2255 application, and that he did not satisfy the 28 U.S.C. §  2244(b)(2) exceptions to certify a successive *Atkins* claim in a second § 2255 motion. The United States' position was, and is, that Bourgeois failed to demonstrate he did not present his *Atkins* claim in his prior § 2255 motion, that the record unequivocally showed that he in fact had raised his *Atkins* claim in his first § 2255 motion and the district court denied that claim on the merits, and that the strict litigation bar in § 2244(b)(1) required his successive motion be dismissed.   *See In re Bourgeois,* U.S. App. Lexis, No. 18-40270, Doc. 00514529907 (United States' Opposition for Leave to File Successive 28 U.S.C. § Petition (filed June 26, 2018));

*see also* 28 U.S.C. § 2241(b)(1) ("A claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed.").

On August 23, 2018, the Fifth Circuit found that Bourgeois' "successive § 2255 motion present[ed] only a single claim that was already presented in his original motion." *In re Bourgeois,* 902 F.3d at 446 (published September 24, 2018). Finding that "[e]very other circuit to take up the question agrees," and adopting the Seventh Circuit's decisions in *Bennett,* 119 F.3d at 469, and *White,* 371 F.3d at 901, the Fifth Circuit held that "the larger statutory context favors applying § 2244(b)(1)'s strict litigation bar to federal prisoners." *In re Bourgeois,* 902 F.3d at 448. The Fifth Circuit held that Bourgeois was barred from relitigating his *Atkins* claim under § 2241 and denied Bourgeois' request for authorization to proceed on a successive § 2255 motion on that ground. *Id.*

On August 27, 2019, the district court entered its "Memorandum and Order" finding that "the Court held an evidentiary hearing in which expert and lay witnesses gave testimony relating to [Bourgeois'] *Atkins* claim," that the "Court denied Bourgeois' 2255 in a lengthy Memorandum

33

and Order which included substantial discussion of the *Atkins* issue," and that "Bourgeois did not seek appellate review of the denial of his *Atkins* claim." *Bourgeois,* No. 2:07-cr-223 (S.D.Tex Aug. 28, 2019).  Finding that the Fifth Circuit denied Bourgeois' motion to proceed in a successive § 2255 motion and did not authorize a successive motion, the district court dismissed Bourgeois' second § 2255 motion without prejudice.  *Id.*

## II.

## ARGUMENT

**A.    BECAUSE BOURGEOIS CANNOT SHOW THAT 28 U.S.C. § 2255 IS "INADEQUATE OR INEFFECTIVE" TO TEST THE LEGALITY OF HIS DETENTION, THIS COURT SHOULD DISMISS THE ATKINS CLAIM HE PRESENTED UNDER 28 U.S.C. § 2241.**

In his petition for writ of habeas corpus, Bourgeois argues he is intellectually disabled and therefore ineligible for the death penalty under *Atkins* and its progeny.  Because Bourgeois could have, and did, fully explore this claim during extensive proceedings under 28 U.S.C. § 2255, this Court should deny and dismiss the current petition.

In *Atkins,* the Supreme Court held that executing an offender who has mental retardation (now intellectual disability) violates the Eighth Amendment ban on excessive punishments.  *Atkins*, 536 U.S. at 321.

34

*Atkins* adopted the clinical definition of intellectual disability: significantly subaverage intellectual functioning, deficits in adaptive functioning, and onset of these deficits before the age of 18.   *Id.* at 318. Since *Akins,* the Supreme Court has consistently confirmed *Atkin's* three-prong criterion as the basis for determining whether a defendant is intellectually disabled and therefore death penalty-ineligible.

The Supreme Court has, on several occasions, evaluated the appropriate clinical standards to use in determining whether an inmate suffers from subaverage intellectual functioning or deficits in adaptive functioning.  Each time, the Court's opinion has served to underscore the validity of *Atkins* and not a new rule of constitutional law.  In *Hall v. Florida,* 572 U.S. 701, 704, 710 (2014), the Supreme Court, holding that intellectual disability "is a condition, not a number," embraced *Atkins'* definition of intellectually disabled, but rejected as unconstitutional a Florida law that categorically restricted *Atkins* claims to defendants with an IQ score of 70 or less. The Supreme Court concluded in *Hall* that, "when a defendant's IQ score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony

35

regarding adaptive deficits." *Id.* at 723. The ruling did not alter any Eighth Amendment threshold, it simply recognized that the Court does not author medical standards.

Likewise in *Moore v. Texas (Moore I),* the Supreme Court instructed that adjudications of intellectual disability should be "informed by views of medical experts." 137 S. Ct. 1039, 1044 (2017) (citing *Hall,* 572 U.S. at 722). The Supreme Court affirmed *Atkins'* criterion, finding the Texas Court of Criminal Appeals' (CCA) conclusion that Moore's IQ score established he was not intellectually disabled was irreconcilable with *Hall. Id.* at 1050. The Supreme Court held that it "do[es] not end the intellectual-disability inquiry, one way or the other, based on Moore's IQ score." *Id.* "Rather, in line with *Hall,* [the Court] require[s] that courts continue the inquiry and consider other evidence of intellectual disability where an individual's IQ score, adjusted for the test's standard error, falls within the clinically established range for intellectual-functioning deficits." *Moore I,* 137 S. Ct. at 1050.

The Supreme Court reaffirmed *Atkins'* criterion in *Moore v. Texas (Moore II),* --- U.S. ---, 139 S. Ct. 666 (2019), holding that the CCA's decision on remand was "inconsistent with our opinion in [*Moore I*]." 139

36

S. Ct. at 670. "*Moore II* in effect applies *Moore I* to the record before the Texas Court of Criminal Appeals" and is "properly seen as an enforcement of the mandate rule." *Elmore v. Shoop*, 1:07-CV-776, 2019 WL 3423200, at \*5 (S.D. Ohio July 30, 2019). Like *Hall* and *Moore I, Moore II* "does not create a new substantive constitutional right which is retroactively applicable on collateral review." *Id.; see Smith v. Sharp*, 935 F.3d 1064, 1084 (10th Cir. 2019) ("[T]he Supreme Court's post-*Atkins* jurisprudence has expressly confirmed that its reliance on the clinical standards endorsed in *Atkins* constitutes a mere application of that case."). In sum, *Atkins* remains the standard for evaluating claims of mental retardation and/or intellectual disability.

    1.    Section 2255 provides the exclusive means for a federal prisoner to collaterally attack his conviction or sentence.

"As a general matter, § 2255 provides the exclusive means for a federal prisoner to collaterally attack his conviction or sentence." *Beason v. Marske*, 926 F.3d 932, 935 (7th Cir. 2019); *see Chazen v. Marske,* --- F.3d --- 2019 WL 4254295 (7th Cir. Sept. 9, 2019) ("[A] federal prisoner wishing to collaterally attack his conviction must do so under § 2255 in the district of conviction."); *Kramer v. Olson,* 347 F.3d 214, 217 (7th Cir. 2013) ("A Section 2255 motion is ordinarily the 'exclusive means for a

37

federal prisoner to attack his conviction."); *Hill v. Werlinger,* 695 F.3d 644, 647-48 (7th Cir. 2012) (same); *see also Garza v. Lappin,* 253 F.3d 918, 920-23 (7th Cir. 2001) (examining the interplay between 28 U.S.C. § 2255 and 28 U.S.C. § 2241).

The interplay between § 2255 and § 2241, the traditional writ of habeas corpus, was recently explained in *Fulks v. Krueger,* --- F.Supp.3d ---, No. 2:15-cv-33-JRS-MJD, 2019 WL 4600210, at *2 (S.D. Ind. Sept. 20, 2019).  There, the court observed, "Prior to the enactment of 28 U.S.C. § 2255 in 1948, federal prisoners wishing to file a collateral attack on their convictions or sentences were required to petition for a writ of habeas corpus—codified at 28 U.S.C. § 2241—in the federal district court in which they were incarcerated.'"  *Id.* (quoting *In re Davenport,* 147 F.3d 605, 608 (7th Cir. 1998)).  In enacting § 2255, Congress crafted a new procedure that diverted federal prisoner habeas attacks from the district of confinement into the "'more convenient' jurisdiction of the sentencing court," *United States v. Hayman,* 342 U.S. 205, 219 (1952), while still "afford[ing] federal prisoners a remedy identical in scope to federal habeas corpus," *Davis v. United States*, 417 U.S. 333, 343 (1974).  To that end, § 2255(a) provides that "[a] prisoner in custody  … claiming the right

to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States ... may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a).

In this case, the record establishes that Bourgeois raised his *Atkins* claim in his first § 2255 proceeding his *Atkins* claim and his contention that his trial attorney ineffectively failed to present evidence of mental retardation at the punishment phase of trial.  In 2010, the district court afforded Bourgeois a week-long evidentiary hearing to present evidence and argument supporting his *Atkins* claim and ineffective assistance of counsel claim, without imposing any limitation on the evidence he presented or the arguments he made.  Following the hearing and other evidentiary proceedings, the court issued an opinion and final judgment denying Bourgeois' *Atkins* and ineffective assistance of counsel claims.

The district court's opinion is comprehensive and directly on point on both issues. *Bourgeois,* 2011 WL 1930684, at *2-70.   Just as 28 U.S.C. § 2254 sets limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner, *see Cullen v.*

39

*Pinholster,* 563 U.S. 170, 181-87 (2011), so does § 2255 limit the power of a federal court to grant successive habeas relief to a federal prisoner.

2.   The remedy afforded by § 2255 functions as an effective substitute for § 2241, not as an "in addition to."

"The history makes clear that § 2255 was intended to afford federal prisoners a remedy identical in scope to federal habeas corpus." *Davis,* 417 U.S. at 343.   "In general, federal prisoners who wish to attack the validity of their convictions or sentences are required to proceed under § 2255." *United States v. Prevatte,* 300 F.3d 792, 799 (7th Cir. 2002) (quoting *Garza,* 253 F.3d at 921).   "As a rule, the remedy afforded by section § 2255 functions as an effective substitute for the writ of habeas corpus, [28 U.S.C. § 2241], that it largely replaced.'" *Fulks,* 2019 WL 4600210, at *2 (quoting *Webster v. Daniels,* 784 F.3d 1123, 1124 (7th Cir. 2015) (en banc)); *Brown v. Caraway,* 719 F.3d 583, 586 (7th Cir. 2013) ("Federal prisoners who seek to bring collateral attacks on their conviction or sentences must ordinarily bring an action under 28 U.S.C. § 2255, 'the federal prisoner's substitute for habeas corpus.'") (internal citation omitted).   It does not follow, however, that habeas corpus relief under 28 U.S.C. § 2241, or 28 U.S.C. § 1651, is a substitute for § 2255.

40

Congress' original intent in codifying § 2255 was that this new motion be used instead of, not in addition to, the traditional habeas corpus remedy.

The fact "that one has lost the right to relief under § 2255 does not automatically mean that one gets relief under § 2241." *Cooper v. United States*, 199 F.3d 898, 901 (7th Cir. 1999). "It is only when a fundamental defect exists in the criminal conviction—a defect which cannot be corrected under § 2255—that we turn to § 2241." *Id.* "[I]n the overwhelming majority of cases § 2255 specifically prohibits prisoners from circumventing § 2255 and challenging their convictions or sentences through a habeas petition under § 2241." *Prevatte*, 300 F.3d at 799 (quoting *Garza*, 253 F.3d at 921)).

As enacted in 1948, and as it appears today in subsection (e), § 2255 contains an exclusivity provision, referred to as the "savings clause," stating that the district court "shall not" entertain a federal habeas prisoner's application for a writ of habeas corpus "unless it also appears that the remedy by motion [under § 2255] is inadequate or ineffective to test the legality of his detention." 28 U.S.C. § 2255(e). The savings clause was dormant for the first half-century after its enactment. During that time § 2255's adequacy was never seriously questioned because there

41

were no categorical restrictions on the filing of repetitive § 2255 motions. Although successive motions could be dismissed under modified res judicata principles like "abuse of the writ," courts could entertain them on the merits when the "ends of justice" so required. *See Sanders v. United States*, 373 U.S. 1, 12 (1963); see also *Peoples v. United States*, 403 F.3d 844, 847 (7th Cir. 2005).

The enactment of the AEDPA in 1996 altered this landscape, indirectly causing the savings clause to take on new-found importance. The AEDPA sought to enhance the finality of criminal judgments by "dramatically limit[ing] successive attempts at [postconviction] relief." *Stewart v. United States*, 646 F.3d 856, 859 (11th Cir. 2011); *see also Tyler v. Cain*, 533 U.S. 656, 661 (2001). To that end, the law prohibits a defendant from filing a "second or successive" collateral attack unless he first applies to the court of appeals "for an order authorizing the district court to consider the application." 28 U.S.C. § 2244(b)(3)(A).  Pursuant to § 2244(b)(1), a "claim presented in second or successive application under section [2255] that was presented in a prior application shall be dismissed."  *See Taylor v. Gilkey,* 314 F.3d 832, 836 (7th Cir. 2002); 28 U.S.C. § 2244(b)(1).

A claim presented in a second or successive § 2255 that was not presented in a prior § 2255 shall also be dismissed unless "the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable," 28 U.S.C. § 2244(b)(2)(A), or "the factual predicate for the claim could not have been discovered through the exercise of due diligence," and "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convicting evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense," 28 U.S.C. § 2244(b)(2)(B)(i)-(ii).  The exception under § 2244(b)(2)(A) may be satisfied only if the Supreme Court has held that the new rule of constitutional law is retroactively applicable to cases on collateral review.  *Tyler v. Cain,* 533 U.S. at 661.

In conformity with § 2244(b), § 2255(h) "sharply limits the ability of a prisoner to bring a second or successive motion under that section." *Shepherd v. Krueger,* 911 F.3d 861, 862 (7th Cir. 2018), *cert. denied,* 139 S. Ct. 1582 (2019).  A prospective second or successive movant must show either (1) newly discovered evidence that by clear and convincing

43

evidence shows that no reasonable factfinder would have found the movant guilty of the offense, 28 U.S.C. § 2255(h)(1), or (2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable, 28 U.S.C. § 2255(h)(2). "[A] prisoner may not file 'what amounts to a motion for reconsideration under the guise of a separate and purportedly 'new' application when the new application raises the same claim that was raised and rejected in the prior application." *In re Jones,* 830 F.3d 1295, 1297 (11th Cir. 2016) (internal citations and marks omitted).

3.   Section 2241 does not permit Bourgeois to circumvent § 2255's limits on second or successive motions.

The record establishes that Bourgeois unsuccessfully raised his *Atkins* claim in his first § 2255 proceeding, *see Bourgeois*, 2011 WL 1930684 at *22-44, and he requested authorization for a second or successive § 2255 proceeding.  *See In re Bourgeois,* U.S. App. Lexis, No. 18-40270, Doc. 00514529907 (United States' Opposition for Leave to File Successive 28 U.S.C. § 2255 Petition (June 26, 2018)).  The Fifth Circuit determined "Bourgeois' successive § 2255 motion presents only a single claim that was already presented in his original motion" and denied his request for authorization under § 2241(b)(1).  *United States v Bourgeois,*

44

902 F.3d 446, 447-48 (5th Cir. 2018).   In so doing, the Fifth Circuit joined the Seventh Circuit in holding that "§ 2244(b)(1)'s strict litigation bar is incorporated by 28 U.S.C. § 2255(h), the provision governing a federal prisoner's successive motion," *id.* (citing *Bennett v. United States,* 119 F.3d 468, 469 (7th Cir. 1997), and that Bourgeois was barred from relititgating his *Atkins* claim.  *See Taylor,* 314 F.3d at 836 (analogizing § 2255 to § 2254 cases for purpose of limitations under 2244) (citing *Bennett,* 119 F.3d at 468); *see also White v. United States,* 371 F.3d 900, 901 (7th Cir. 2004) (rejecting the argument that § 2241(b)(1) applies only to 28 U.S.C. § 2254 cases on the ground that § 2255 contains no provision directly corresponding to § 2244(b)(1)).

"If the prisoner asserts a claim that he has already presented in a previous federal habeas petition, the claim must be dismissed in all cases." *Tyler v. Cain,* 533 U.S. at 661 (citing to 28 U.S.C. § 2244(b)(1)). As the Supreme Court holds, "if the prisoner asserts *a claim that was not presented in a previous petition, the claim must be dismissed unless it falls within one of two narrow exceptions,*" one of which is for claims relying on new rules of constitutional law. *Id.* (citing 28 U.S.C. § 2244(b)(2)(A)) (emphasis added)).

45

4.    Bourgeois' *Atkins* claim does not meet the requirements of § 2255(h) for a successive motion.

As indicated, § 2255 contains two provisions applicable to Bourgeois:  a second or successive § 2255 petitions under subsection (h) and the "savings clause" under subsection (e).  The first, § 2255(h), bars Bourgeois from filing second or successive § 2255 petitions except in two narrow circumstances: (1) persuasive new evidence of his innocence of the crime; or (2) a new rule of constitutional law made retroactive by the Supreme Court to cases on collateral review. *Garza*, 253 F.3d at 921.

Regarding the first exception, § 2255(h)(1), Bourgeois raised no claim of newly discovered evidence in the request to proceed on a successive § 2255 that he filed in the Southern District of Texas and the Fifth Circuit, and he presented no new evidence supporting a claim of actual innocence.  *See Hare v. United States,* 688 F.3d 878, 880 n.2 (7th Cir. 2012) (holding that the "newly discovered evidence" exception in § 2255(h)(1) applies to evidence that concerns guilt; that "there is no "actually innocent of the sentence" exception in § 2255(h)" (citing *Taylor,* 314 F.3d at 835-86).  "As explained in *Hope v. United States*, 108 F.3d 119, 120 (7th Cir. 1997), 'a successive motion under 28 U.S.C. § 2255 ... may not be filed on the basis of newly discovered evidence unless the

46

motion challenges the conviction and not merely the sentence.' That is an unavoidably correct reading of 28 U.S.C. § 2255(h)(1), whether we like it or not." S*usi nka v. United States*, 855 F.3d 728, 729 (7th Cir. 2017). Bourgeois does not claim any new evidence of his intellectual disability that had not been discovered before his first § 2255 proceeding.

Regarding the second exception, § 2255(h)(2), to make a prima facie showing to proceed with a second or successive § 2255 application, Bourgeois must identify a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.  28 U.S.C. § 2255(h)(2).  Bourgeois cites *Hall* and *Moore* but neither is a new rule of constitutional law made retroactively applicable to collateral cases by the Supreme Court.[10]

---

[10] *See In re Bowles*, 935 F.3d 1210, 1220 (11th Cir. 2019) (holding *Moore I* cannot be applied retroactively) (citing *Smith v. Comm'r, Ala. Dep't of Corr.*, 924 F.3d 1330, 1338–39 (11th Cir. 2019)); *In re Payne,* 722 F. App'x 534, 537-39 (6th Cir. 2018) (holding that *Moore I* and *Hall*  "merely created new procedural requirements that do not amount to 'watershed rules of criminal procedure"); *Elmore v. Shoop*, 1:07-CV-776, 2019 WL 3423200, at *5 (S.D. Ohio July 30, 2019) (holding *Hall* and the *Moore* opinions did not create new substantive and retroactively applicable constitutional rights); *Smith v. Dunn*, 2:13-CV-00557-RDP, 2017 WL 3116937, at *5 (N.D. Ala. July 21, 2017) (*Moore* "dealt with the 'procedural requirement[s]' associated with . . . determination of a petitioner's disability."); *see also  Williams v. Kelley*, 858 F.3d 464, 473-474 (8th Cir. 2017) (rejecting a claim that *Moore 1* announced a new rule of constitutional procedure that must be given retroactive effect); *Goodwin v. Steele*, 814 F.3d 901, 904 (8th Cir. 2014) (per curiam) (holding "*Hall* 'created a procedural requirement that those with IQ test scores within the test's standard of error would have the opportunity to otherwise show intellectual disability.' ") (*quoting In re*

47

5.   Bourgeois cannot show § 2255 is "inadequate or ineffective" and that should have access to § 2241.

The critical issue in this case is whether Bourgeois can pass through the "Savings Clause" under § 2255(e)[11] and proceed under § 2241.  *See Fulks,* 2010 WL 4600201, at \*2.  Congress created § 2255(e) to serve as a safety hatch to "preserve and authorize access to the traditional habeas corpus relief under 28 U.S.C. § 2241 if the remedy available under § 2255 was 'inadequate or ineffective to test the legality of his detention." *Beason,* 926 F.3d at 935; *Shepherd v. Krueger,* 911 F.3d 861, 862 (7th Cir. 2018), *cert. denied,* 138 S. Ct. 1582 (2019).  As codified, § 2255(e) is not available to Bourgeois "if it appears that [he] has failed to apply for relief, by motion, to the court which sentenced him," or simply because "such court has denied him relief."  Bourgeois must show "that

---

*Henry,* 757 F.3d 1151, 1161 (11th Cir. 2014)); *Kilgore v. Sec'y, Fla. Dep't of Corr.,* 805 F.3d 1301, 1314 (11th Cir. 2015) (holding *Hall* not retroactive).

[11] 28 U.S.C. § 2255(e):

An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention.

48

the *remedy* by motion be inadequate or ineffective to *test* the *legality* of his detention." *Id.* (emphasis added).

As such, the Seventh Circuit hold that pass through the saving clause and proceed under § 2241, there must be a structural problem with § 2255 that prevents an opportunity to address claims on collateral review. *See, e.g., Webster v Daniels,* 784 F.3d 1123, 1136 (7th Cir. 2015) (en banc) (observing "there must be some kind of structural problem with section 2255 before section 2241 becomes available.")  Whether the § 2255 remedy was inadequate or ineffective "depends on whether a proceeding under that section afforded the petitioner 'a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence." *Beason,* 926 F.3d at 935 (quoting *In re Davenport,* 147 F.3d 605, 609 (7th Cir. 1998) (citing *Webster,* 784 F.3d at 1136, "as reinforcing *Davenport* as the law of the circuit.")).

Section 2255 is not inadequate or ineffective simply because Bourgeois may be barred from filing a second § 2255 motion, a point the Seventh Circuit has made abundantly clear.  "To hold otherwise ... would be to nullify the limitations on successive petitions." *Garza v. Lappin,* 253 F.3d 918, 921 (7th Cir. 2001) (citing *In re Davenport,* 147 F.3d at

608). "The mere fact that Garza's petition would be barred as a successive petition under § 2255, however, is not enough to bring the petition under § 2255's savings clause; otherwise, the careful structure Congress has created to avoid repetitive filings would mean little or nothing." *Id.*

Section 2255(e) focuses on procedure rather than outcomes. *Taylor,* 314 F.3d at 835. The Seventh Circuit in *Taylor* rejected the argument that whenever § 2255(h) closes the door to a renewed challenge under § 2255, the savings clause must open the door to a challenge under § 2241. *Id.* at 833-36. Taylor wanted to argue that the district court erred in denying his first § 2255 motion based on a new intervening Supreme Court decision. The intervening decision did not, however, create a new and retroactive rule of constitutional law: at most it showed the district court had erred in applying an old rule to his situation, an error insufficient to justify a second collateral attack. *Id.* at 836. The Seventh Circuit rejected Taylor's claim to proceed under § 2241, concluding that this would make § 2255(h) self-defeating. *See id.* Congress intended through the AEDPA to define limited circumstances

50

that permit successive collateral attacks; "[t]he escape hatch in [§ 2255(e)] must be applied in light of that history." *Id.*

6. To proceed under § 2241 requires a structural problem with § 2255 that forecloses even one round of effective collateral rule.

"A procedure for postconviction relief can fairly be termed inadequate when it is so configured as to deny a convicted defendant any opportunity for judicial rectification of so fundamental a defect in his conviction as having been imprisoned for a nonexistent offense." *In re Davenport,* 147 F.3d at 611. "[S]omething more than a lack of success with a section 2255 motion must exist before the savings clause is satisfied." *Webster,* 784 F.3d at 1136. To pass through § 2255(e) to § 2241 "requires a structural problem in § 2255 that forecloses even one round of effective collateral review, unrelated to the petitioner's own mistakes." *Camacho v. English,* 872 F.3d 811, 813 (7th Cir. 2017) (citing *Poe v. LaRiva,* 834 F.3d 770, 772 (7th Cir. 2016)) (quoting *Taylor,* 314 F.3d at 835)), *cert. denied,* 138 S. Ct. 1028 (2018). Bourgeois therefore "bears the burden of coming forward with evidence affirmatively showing the inadequacy or ineffectiveness of the § 2255 remedy" in the first

51

instance. *Smith v. Warden, FCC Coleman – Low,* 503 F. App'x 763, 765 (11th Cir. 2013) (citation omitted). He has not met that burden.

As *Fulks* held, the Seventh Circuit has found § 2255 "inadequate or ineffective" in only limited circumstances and infrequently has found the savings clause satisfied in circumstances beyond those articulated in *Davenport.* 2019 WL 4600210, at *3. In *Davenport* and *Webster,* the Seventh Circuit established narrow pathways through the savings clause to relief under § 2241. In both cases, the Seventh Circuit identified a structural problem in § 2255 that wholly foreclosed collateral review of a claim and justified permitting a federal prisoner to file a habeas petition under § 2241. *See Poe,* 834 F.3d at 773-74.

In *Davenport,* the Seventh Circuit held that Appellant Davenport could not meet the savings clause requirement because he could have raised his challenge during his direct appeal and initial § 2255 but choose not to. "Davenport thus could not meet the Savings Clause because [n]othing in 2255 made the remedy provided by that section inadequate to enable Davenport to test the legality of his imprisonment. He had an unobstructed procedural shot at getting his sentence vacated.'" *Fulks,* 2019 WL 4600210, at *3 (quoting *In re Davenport,* 147 F.3d at 609).

52

Section 2241 review was, however, appropriate for Appellant Nichols when the law of the circuit was so firmly against" his claim that it would have been futile to raise it at the time of his first petition, but the Supreme Court subsequently overruled the Seventh Circuit's interpretation of that relevant statue and made that ruling retroactive on collateral review. Given the retroactive application of the decision overruling the prior rule, the Seventh Circuit concluded that § 2255 was "inadequate or ineffective" to test Nichols' claim that he was imprisoned for a non-existent crime. *In re Davenport,* 147 F.3d at 610. Section 2241 provided an appropriate vehicle because the defendant could not have raised his claim in an initial § 2255 motion and could not obtain permission to file a successive § 2255 motion because his claim did not rely on new evidence or a new rule of constitutional law. *Id.* at 610. In short, *Davenport* recognized a structural problem in the failure of § 2255(h) to permit a successive petition for new rules of statutory law made retroactive by the Supreme Court. *See Poe,* 834 F.3d at 773; *Light v. Caraway,* 761 F.3d 809, 812 (7th Cir. 2014) (holding § 2255 "is silent on how a prisoner can challenge his sentence based on a new and retroactive *statutory* decision") (emphasis in original); *Prevatte,* 300 F.3d

53

at 799-802 (holding Prevatte had not had an opportunity to obtain judicial correction of a potential defect in his conviction based on retroactive rules of statutory interpretation).

The Seventh Circuit followed *Davenport* in *Garza v. Lappin,* 253 F.3d at 918, holding that a § 2241 petition was properly cognizable via § 2255(e)'s savings clause and analyzed the unique facts and claim presented.  As recently explained in *Fulks,* the Seventh Circuit reasoned that it was "literally impossible" for Garza to have raised his claim in his first proceeding:

> In *Garza*, after Garza's direct appeal and § 2255 proceedings were complete, the Inter-American Commission on Human Rights (the "Commission") determined that Garza's rights were violated during the penalty phase of his proceedings. *Garza,* 253 F.3d at 919. Garza sought to use this favorable decision to argue that he was entitled to habeas relief. *Id.* Looking to *Davenport*, the Seventh Circuit reasoned that because Garza could not meet either avenue set forth in § 2255(h) to file a second or successive § 2255 motion, and because it was "literally impossible" for Garza to have raised the Commission's favorable decision in his first § 2255 proceeding because the Commission had not yet issued its decision, § 2255 did not then nor had it ever "provided an adequate avenue for testing Garza's present challenge to the legality of his sentence." *Id.* at 922-23.

*Fulks,* 2019 WL 4600210, at *4.

54

In *Webster*, like *Davenport*, the Seventh Circuit determined that a structural problem existed that entirely foreclosed effective collateral review under § 2255. *See Poe*, 834 F.3d at 774. The Federal Defender in *Webster* filed an *Atkins* claim under § 2241, seeking to present evidence they discovered after Webster's initial § 2255 motion was denied; that evidence revealed that Webster had been diagnosed as mentally retarded a year before the commission of the crime for which he was sentenced to death. *Webster,* 784 F.3d at 1133-35. The Seventh Circuit determined Webster could not have used § 2255 at the time *Atkins* was decided because, despite due diligence, the new evidence was not available to him. Likewise, he could not file a successive § 2255 motion after discovering the new evidence because the Fifth Circuit required that the evidence show he could not be found guilty of the offense, rather than the penalty. *Id.* at 1134. Accordingly, the Seventh Circuit determined Webster's challenge to his sentence could not, "as a structural matter," be entertained by the use of a § 2255 motion and that he could therefore proceed under § 2241. *Webster,* 784 F.3d at 1139.

As the Seventh Circuit held in *Poe,* "the *Webster* court took great care to assure that its holding was narrow in scope." 834 F.3d at 777.

55

"There is nothing in *Webster* to suggest that its holding applies outside the context of new evidence." *Id.*

 7.    The Seventh Circuit's decisions do not permit Bourgeois
       to relitigate his *Atkins* claim under § 2241.

Bourgeois contends that cognizable claims under § 2241 "include those that rely on a new legal or factual basis not available at the time of the petitioner's trial proceedings or his § 2255 proceedings." (Bourgeois Petition, 2).   While true in the abstract, Bourgeois cannot, however, marshal any authority for this proposition, which in its application expands the § 2255 saving clause beyond recognition.

 Recognizing other circuits disagree, *see McCarthan v. Director,* 851 F.3d 1076 (11th Cir. 2017) (en banc), *cert. denied,* 138 S. Ct. 502 (2017); *Prost v. Anderson,* 636 F.3d 578 (10th Cir. 2011) (Gorsuch, J.), the Seventh Circuit held in *Roundtree v. Krueger*, 910 F.3d 312 (7th Cir. 2018), "that § 2255 is 'inadequate or ineffective' when 'it cannot be used to address novel developments either statutory or constitutional law, whether those developments concern the conviction or the sentence." *Id.* at 313 (citing *In re Davenport,* 147 F.3d at 605; *Brown v. Caraway,* 719 F.3d 583 (7th Cir. 2013); *Webster,* 784 F.3d at 1123).   But *Roundtree* qualified this, holding that "none of this circuit's decisions—and none in

56

the circuits that agree with *Davenport, Brown,* and *Webster*—permits relitigation under § 2241 of a contention that was actually resolved in a proceeding under § 2255, unless the law changed after the initial collateral review." 910 F.3d at 313. Stated differently in *Prevatte v. Merlak,* "the 'savings clause of § 2255 ... will permit a federal prisoner 'to seek habeas corpus *only* if he had *no reasonable opportunity* to obtain earlier judicial correction of a fundamental defect in his conviction or sentence *because the law changed after his first 2255 motion.*'" 865 F.3d 894, 897 (7th Cir. 2017) (emphasis added) (quoting *Montana v. Cross,* 829 F.3d 775, 783 (7th Cir. 2016) (quoting *In re Davenport,* 147 F.3d at 611)).

The Seventh Circuit reiterated in *Hill v. Werlinger* that "[i]nadequate or ineffective' means that 'a legal theory that could not have been presented under [Section] 2255 establishes the petitioner's actual innocence.'" 695 F.3d 644, 647-48 (7th Cir. 2012) (citing *Taylor,* 314 F.3d at 835); *In re Davenport,* 147 F.3d at 608. Accordingly, Bourgeois "must show that the legal theory he advances relies on a change in law that postdates his first § 2255 motion (for failure to raise a claim the first time around does not render § 2255 'inadequate') *and* 'eludes the permission in section 2255 for successive motions,'" *and*

57

"supports a non-frivolous claim of actual innocence." *Kramer,* 347 F.3d at 217 (emphasis added).

> 8.    The Seventh Circuit's *Davenport* standard does not allow Bourgeois' *Atkins* claim to proceed under § 2241.

The savings clause of § 2255(e) does not give Bourgeois a further bite at the post-conviction relief apple.  Instead, *Davenport* developed a three-part test to establish that § 2255 was inadequate:

> (1) that [Bourgeois] relies on not a constitutional case, but a statutory-interpretation case, so [that he] could not have invoked it by means of a second or successive 2255 motion; (2) that the new rule applies retroactively to cases on collateral review and could not have been invoked in his earlier proceeding, and (3) that the error is "grave enough ... to be deemed a miscarriage of justice corrigible thereof in a habeas proceeding," such as one resulting in "a conviction for a crime for which he was innocent."

*Beason,* 926 F.3d at 35 (quoting *Cross,* 829 F.3d at 783) (citation and quotation marks omitted). In *Taylor*, the Seventh Circuit made explicit what *Davenport* strongly implied:  "[A] claim of error in addressing the sort of constitutional theory that has long been appropriate for collateral review does not render § 2255 'inadequate or ineffective.' ... Every court that has addressed the matter has held that § 2255 is 'inadequate or ineffective' only when a structural problem in § 2255 forecloses even one round of effective collateral review—and then only when as in *Davenport*

the claim being foreclosed is one of actual innocence." 314 F.3d at 835; *Kramer,* 347 F.3d at 217 ("We have explained that § 2255 is 'inadequate' when its provisions limiting multiple § 2255 motions prevent a prisoner from obtaining review of a legal theory that 'establishes the petitioner's actual innocence.'") (citing *Taylor* 314 F.3d at 835).

As stated, nothing in *Webster* suggests that its holding applies outside the context of new evidence. *Poe*, 834 F.3d at 774. Arguments that would have abused the writ of habeas corpus before the 1996 AEDPA cannot be raised after the amendments.

To meet the first prong of the *Davenport* test, Bourgeois "must show that he relies on a 'statutory-interpretation case,' rather than a 'constitutional case.'" *Brown,* 719 F.3d at 586. The Supreme Court in *Atkins* held that the Eighth Amendment forbids execution of an individual who has an intellectual disability. 536 U.S. at 321; *Hall,* 572 U.S. at 704. Unquestionably *Atkins* and its progeny, *Hall, Moore I,* and *Moore II,* are all grounded in the Eighth Amendment and are not statutory interpretation cases. "Simply put, [Bourgeois] asks 'th[is] court to set aside his sentence' as violative of the Eighth Amendment," a claim falling squarely within § 2255(a). *Fulks,* 2019 WL 4600210, at * 9.

Moreover, *Davenport* precludes the use of § 2241 for claims based on a constitutional case. *Poe,* 834 F.3d at 773 ("*Poe* contends that [*Brown v.*] *Caraway* misreads *Davenport*, asserting that *Davenport* does not actually preclude use of § 2241 for a constitutional case. This contention is meritless."); *Fulks,* 2019 WL 4600210, at \*10 ("Constitutional claims, unlike statutory claims, do not reveal 'some kind of structural problem with § 2255' that forecloses a single round of judicial review.") (quoting *Webster,* 784 F.3d at 1136).[12]  A claim based on a new constitutional rule does not fall within the savings clause because § 2255(h) already provides a remedy where such a claim arises after a direct appeal and first § 2255 motion. *Poe*, 834 F.3d at 773; 28 U.S.C. § 2255 (h)(2)).  The savings clause therefore allows a claim to proceed under § 2241 only when it is based on a new rule of statutory law.  *Fulks*, 2019 WL 4600210, at \*10 ("Fulks cannot meet this factor, as he relies on *Hall* and *Moore* (which applies *Atkins* and *Madison (*which applies *Ford*).  All of these cases involve Eighth Amendment claims, not statutory ones.").

---

[12] As this District observed in *Fulks, Hall*—on which *Moore I* is based—was decided before *Webster*. If reliance on *Hall* was all that was required to meet the savings clause, the Seventh Circuit could have said so, but it did not.  *Fulks,* 2019 WL 4600210, at \*11.  "It cannot be," as Bourgeois contends, "that one need only invoke [*Moore I* and *Moore II*] to proceed under § 2241."  *Id.*

60

PA-280

Nor does Bourgeois meet *Davenport*'s second prong, which requires that his claim rely on a "new rule [that] applies retroactively to cases on collateral review and could not have been invoked in his earlier proceeding." *Beason,* 926 F.3d at 35. First, *Atkins* was decided at the time Bourgeois was convicted, and Bourgeois made his *Atkins* claim at his first § 2255 proceeding. Second, *Moore* did not establish a new rule or break any new ground beyond *Atkins'* holding that "[c]linical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills" and that State standards conform to clinical definitions of intellectual disability. 536 U.S. at 318; *see Hall,* 572 U.S. at 719-20. The Supreme Court reaffirmed in *Hall* and *Moore* that borderline intellectual testing cases require consideration of the adaptive functioning criteria, *Atkins'* second criteria. *Moore II,* 139 S. Ct. at 668 (citing *Moore I,* 581 U.S. at ---, 137 S. Ct. at 1048-50). Third, the Supreme Court did not and has not declared *Moore* as a new rule applied retroactively to AEDPA cases. *See Shoop v. Hill,* 139 S. Ct. 504, 507-08 (2019) (holding that, under AEDPA, the Supreme Court's opinion in *Moore I* was not clearly established federal law when an Ohio state court rejected Hill's *Atkins* claim in 2009); *see*

61

*Cain v. Chappell,* 870 F.3d 1003, 1024 n.9 (9th Cir. 2017) ("*Moore* itself cannot serve as 'clearly established' law at the time the state court decided Cain's claim."), *cert. denied,* 139 S. Ct. 455 (2018).

Bourgeois claims that he raises a new *Atkins* claim that was previously unavailable at the time of his first § 2255 motion because *Moore I* and *Moore II* establish new "legal and factual bases." *Moore I* and *Moore II* were derived directly from *Atkins*; the Supreme Court merely "expounded on the definition of intellectual disability" in *Hall* and *Moore. Hill,* 139 S. Ct. at 507. *"Moore* cannot apply retroactively." *In re Bowles,* 935 F.3d 1210, 1220 (11th Cir. 2019), *application for stay of execution and petition for writ of habeas corpus denied,* No. 1956-82, 2019 WL 3976202 (Aug. 22, 2019). In *Atkins,* the Supreme Court "declared 'a rule of general application ... designed for the specific purpose of evaluating a myriad of factual contexts.'" *Smith v. Sharp,* 935 F.3d 1064, 1084-85 (10th Cir. 2019) (quoting *Chaidez v. United States,* 568 U.S. [342,] 348 [(2013)]." "The application of this general rule to *Hall,* [ ] *Moore I* [ ], and *Moore II* cannot be understood to 'yield[ ] a result so novel that it forges a new rule, one not dictated by precedent', [given] the Court's proclamation in *Hall* that '*Atkins* ... provide[s] substantial guidance on

62

the definition of intellectual disability.'" *Smith,* 935 F.3d at 1084 (internal citation omitted).

Bourgeois may not proceed under § 2241 by filing a previously adjudicated *Atkins* claim under the guise of purportedly "new legal bases" forged by *Moore I* and *Moore II* and "new factual bases" from published updates to AAIDD-11 (11th ed. 2010) in AAIDD-2012 and AAIDD-2015, and to DSM-5.[13] *See In re Jones*, 830 F.3d at 1297.   Again, while Bourgeois asserts *Moore I* and *Moore II* as new legal bases for his intellectual disability claim, the Supreme Court merely "expounded on the definition of intellectual disability" in *Hall* and *Moore.  Hill,* 139 S. Ct. at 507; *see Atkins*, 536 U.S. at 308 n.3; *Hall,* 572 U.S. at 710; *Moore I,* 137 S. Ct. at 1045; *Moore II,* 149 at 668.  Bourgeois does not rely on a new rule that could not have been invoked in his first § 2255 motion.[14]

---

[13] The "American Association on Intellectual and Developmental Disabilities," AAIDD, published the 11th edition of its diagnostic manual, "Intellectual Disability: Definition, Classification, and Supports," in 2010.   The American Psychiatric Association published DSM-5, "Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition," on May 18, 2013.

[14] Should the Supreme Court declare *Hall* and *Moore* to announce new, retroactive rules of constitutional law, Bourgeois could raise his claim in a second and subsequent motion under § 2255.  See 28 U.S.C. § 2255(h)(2).  In the absence of such declaration by the Supreme Court, the Fifth Circuit denied Bourgeois' request for a successive § 2255 motion based on § 2244(b)(1) and not § 2255(b)(2). *Bourgeois,* 902 F.3d at 447-48.

Simply because Bourgeois may be barred from filing a second § 2255(a) motion does not render § 2255 inadequate or ineffective to test the fundamental legality of his sentence.  "'To hold otherwise ... would be to nullify the limitations on successive petitions." *Garza,* 253 F.3d at 921; *In re Davenport*, 147 F.3d at 608 (rejecting the argument that "when the new limitations [on second or successive motions] prevent the prisoner from obtaining relief under 2255, his remedy under that section is inadequate and he may turn to 2241," with this explanation).  Section 2255 provides a remedy for new retroactive constitutional rules; as such, those types of cases do not and would not fall under § 2255(e)'s savings clause.  *See Fulks,* 2019 WL 4600210, at *8-17.

9.   The *Webster* standard does not allow Bourgeois' *Atkins* claim to proceed under § 2241.

In *Webster,* Seventh Circuit announced a three-part test for determining whether a claim of newly discovered evidence can satisfy the savings clause:  "First, the evidence sought to be presented must have existed at the time of the original proceedings." 784 F.3d at 1140 n.9.  "Second, the evidence must have been unavailable at the time of trial despite diligent efforts to obtain it.  Third, and most importantly, the

64

PA-284

evidence must show that the petitioner is constitutionally ineligible for the penalty he received." *Id.*

Bourgeois does not meet *Webster*'s three-part test.  Bourgeois' claim of "new factual bases" is based on new AAIDD and APA diagnostic standards, not newly discovered, previously existing evidence that his counsel did not uncover before trial despite diligent efforts.  "These updated standards are not newly *discovered* evidence that [Bourgeois] specifically is intellectually disabled." *Fulks,* 2019 WL 4600210, at *13. "[T]hey are instead newly *created* standards used to assess whether anyone is intellectually disabled[,]" not newly discovered evidence that existed before Bourgeois' trial or at the time of his  first § 2255 proceeding. *Id.* Second, *Webster* requires that the newly discovered evidence must have existed, but been unavailable, at the time of the original proceedings.  *Webster,* 784 F.3d at 1140 n.9.  The AAIDD 11th Edition was published in 2010 and consulted by Judge Jack in the § 2255 order rejecting Bourgeois' *Atkins* claim. *Bourgeois,* 2011 WL 1930684, at *22-23 n.27.  The 2012 and 2015 updates to AAIDD 11th Edition and the DSM-5 manual (published on May 18, 2013) were not created until after Bourgeois' 2007-2011 § 2255(a) proceeding. *Fulks,* 2011 WL 1930684, at

65

*13.   Assuming these publications could constitute newly discovered evidence—and they do not—, the Seventh Circuit made clear in *Webster* "that later developed evidence is insufficient" because otherwise there would never be any finality.   *Fulks,* 2011 WL 1930684, at *14 (*commenting on Webster,* 784 F.3d at 1140).   To accept Bourgeois' approach would permit him to "refile his claims with each revision of the medical standards governing the diagnosis of intellectual disability" forever forestalling a final decision in this case, precisely the tactic rejected in *Fulks.*  2011 WL 1930684, at *14.

10.   Bourgeois' § 2241 motion is an abuse of the writ and premised on a theory at odds with *Teague*.

Bourgeois does not claim that his sentence violated *Atkins* at the time it was imposed. (Petition, p. 72 ¶156).   He agrees that he fully adjudicated his *Atkins* claim at his first § 2255 proceeding.   He claims instead that he is intellectually disabled under current diagnostic standards and precluding him from raising his "revised" *Atkins* claim leads to an intolerable result—the execution of a categorically exempted individual.

As discussed above, Bourgeois does not present any new rule of law or newly discovered evidence that renders the remedy under § 2255

66

inadequate or ineffective test the fundamental legality of his death sentence. The Supreme Court has not declared *Moore* a new rule of constitutional law retroactively applied to AEDPA cases. And the development of new diagnostic standards does not constitute newly discovered evidence.

Based on Seventh Circuit precedent applied to the facts of this case, Bourgeois' *Atkins* claim, which failed under § 2255, cannot merit consideration or relief in this Court. Bourgeois' attempt to circumvent § 2255(h) amounts to an invitation to abuse the writ under pre-AEDPA law. *See Roundtree,* 910 F.3d at 313-14 ("An attempt to relitigate a theory, in the absence of an intervening change of law, was taken as a paradigm abuse of the writ.").[15] "[I]n addition to performing any analysis

---

[15] "Until 1996, when the Antiterrorism and Effective Death Penalty Act (AEDPA) amended § 2255, a petition could be filed in the sentencing court at any time—and multiple petitions could be filed, provided they did not abuse the writ. The 1996 Act added § 2255(f), which set a one-year time limit on petitions but also restarts the time if the Supreme Court changes the law with retroactive effect (§ 2255(f)(3)). The 1996 Act also added § 2255(h), which limits second or subsequent petitions. Neither of these changes affected Roundtree, who was able to use extra time under § 2255(f)(3) to file his initial § 2255 motion in Iowa. What he now wants is to use § 2241 in circumstances that would have been called an abuse of the writ before the 1996 Act replaced that common-law doctrine with § 2255(f) and (h). An attempt to relitigate a theory, in the absence of an intervening change of law, was taken as a paradigm abuse of the writ. See, e.g., *Salinger v. Loisel*, 265 U.S. 224, 44 S.Ct. 519, 68 L.Ed. 989 (1924); *Wong Doo v. United States*, 265 U.S. 239, 44 S.Ct. 524,

required by AEDPA, a federal court considering a habeas petition must conduct a threshold *Teague* [*v. Lane,* 489 U.S. 288 (1989)] analysis when the issue is properly raised by the state." *Horn v. Banks,* 536 U.S. 266, 272 (2002); *Van Daalwyk v. United States,* 21 F.3d 179, 180 (7th Cir. 1994) (holding retroactively principles articulated in *Teague* apply to collateral challenges to federal convictions).

In any event, *Teague* bars Bourgeois' reliance on *Moore* to revitalize his *Atkins* claim. *Moore* did not announce a new rule that could apply retroactively under *Teague. Smith v. Ala. Dep't of Corr.*, 924 F.3d at 1337-39. In *Atkins,* the Supreme Court left the task of defining intellectual disability to individual states and legislatures. *Id.,* 536 at 317; *Smith,* 924 F.3d at 1337. In *Hall,* the Court clarified that state court's intellectual disability determination should be "informed by the medical community's diagnostic framework." 572 U.S. at 721. "This

---

68 L.Ed. 999 (1924); *Sanders v. United States*, 373 U.S. 1, 17–18, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963). The 1996 changes were designed to curtail relitigation of collateral attacks, yet Roundtree wants something that would have been unavailable even before 1996.—That's not permissible. See *In re Page*, 179 F.3d 1024 (7th Cir. 1999), which says that arguments that would have abused the writ before 1996 also cannot be raised after the amendments.

*Roundtree,* 910 F.3d at 313-14.

68

meant . . . that courts must consider the standard error inherent in IQ tests," and that "defendants be allowed to present additional evidence of intellectual disability, including testimony on adaptive deficits." *Smith,* 924 F.3d at 1337 (citing *Hall,* 572 U.S. at 723; *Moore I,* 137 F.3d at 105). The Court expanded on *Hall* in *Moore,* "reiterating that state courts do not have 'unfettered discretion'" in assessing intellectual disability and "cannot disregard current clinical and medical standards." *Id.* at 1337 (citing *Moore I,* at 1050-51). In *Moore I,* the Court "clarified ... the focus of the adaptive functioning inquiry should be an individual's adaptive deficits—not adaptive strengths," *Moore I,* 137 U.S. at 1050–51, a point reemphasized in *Moore II,* 139 U.S. at 668-69.

"New constitutional rules are generally not retroactive for cases on federal habeas review." *Smith,* 924 F.3d 1337 (citing *Teague,* 489 U.S. at 288). "To determine whether a rule is retroactive, [this Court] first decide[s] if it is a new rule," that is, "breaks new ground or imposes a new obligation on the States or the Federal Government," or when "the result was not dictated by [prior] precedent." *Id.* (quoting *Teague,* 489 U.S. at 301). If the rule is indeed new, then the question is "whether it falls into one of *Teague*'s two exceptions to the general bar on retroactivity:" (1)

"substantive rules of constitutional law that place an entire category of primary conduct beyond the reach of the criminal law, including 'rules prohibiting a certain category of punishment for a class of defendants because of their status or offense,'" *id.* (citing *Penry v. Lynaugh*, 492 U.S. 302, 330 (1989)), or (2) "'watershed rules of criminal procedure'" that are necessary to the fundamental fairness of criminal proceedings," *id.* (citing *Teague,* 489 U.S. at 311–12.

Bourgeois' claim does not fall under either of *Teague's* exceptions. To the extent he argues that *Moore* effectively expands the class of persons who are ineligible for execution by requiring consideration of the medical community's current clinical standards, this decision is procedural, not substantive:

> Substantive rules "set forth categorical constitutional guarantees that place certain criminal laws and punishments altogether beyond the State's power to impose," while procedural rules "are designed to enhance the accuracy of a conviction or sentence by regulating the manner of determining the defendant's culpability." *Montgomery v. Louisiana*, --- U.S. ---, 136 S. Ct. 718, 729–30 [ ] (2016) (internal quotation marks omitted). . . .
>
> . . . While *Moore* may have the effect of expanding the class of people ineligible for the death penalty, it merely defined the appropriate manner for determining who belongs to that class of defendants ineligible for the death penalty. *Moore* thus announced a new rule, but it is procedural, not substantive."

70

924 F.3d at 139.

To fall within *Teague's* procedural exception, "a new rule must meet two requirements: Infringement of the rule must seriously diminish the likelihood of obtaining an accurate conviction [or sentence], and the rule must alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding.'" *Smith,* 924 F.3d at 1339 (quoting *Tyler*, 533 U.S. at 665). As the Eleventh Circuit holds, "[o]nly *Gideon v. Wainwright*, 372 U.S. 335 [ ] (1963), which extended the right to counsel to criminal defendants, has been declared the kind of procedural rule that altered the 'bedrock procedural elements' essential to the fairness of a proceeding." 924 F.3d at 1339-40 (listing Supreme Court cases rejecting retroactivity under *Teague'*s second exception that do not have the "primacy" or "centrality" of *Gideon*). *Moore* provides guidance for complying with *Atkins,* but it "cannot [be said] that *Moore* altered the bedrock procedural elements essential to the fairness of a criminal proceeding in the way that the *Gideon* rule did." *Smith,* 924 F.3d at 1339-40. As such, Bourgeois cannot meet the requirements of *Teague*'s second exception for *Moore* to be applied retroactively.

71

11.   Bourgeois cannot relitigate his *Atkins* claim under 28 U.S.C. § 2241 by making his 28 U.S.C. § 2255 remedy inadequate.

The relief Bourgeois requests is (i) a stay of execution pending a final disposition of his *Atkins* claim in district court, (ii) amendment of his claim if necessary, and (iii) an evidentiary hearing to be conducted on the merits of his *Atkins* claim.  As discussed, though Bourgeois seeks to characterize his *Atkins* claim as new (or at least revised), in reality he seeks to relitigate his same 2010 *Atkins* claim in this § 2241 habeas petition.  But Bourgeois does not allege or provide any newly discovered evidence related to his *Atkins* claim that was not already presented to and considered by the district court at his first § 2255 proceeding.  In substance, what Bourgeois requests is that this Court re-evaluate and reweigh *all* of the evidence considered by the district court in determining on the merit that he is not *Atkins* intellectually-disabled and constitutionally exempt from execution.

Moreover, the Southern District of Texas judge's legal and factual *Atkins* determinations are not unreasonable merely because the Supreme Court, a circuit court, or this Court "would have reached a different conclusion in the first instance." *Brumfield v. Cain,* --- U.S. ---, 135 S. Ct.

72

PA-292

2269, 2277 (2015). "If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's ... determination." *Wood v. Allen,* 558 U.S. 290, 301 (2010) (quoting *Rice v. Collins,* 546 U.S. 333, 341-42 (2006) (internal marks omitted)).

This Court, like the Supreme Court on review of the State's factual determination in *Brumfield,* cannot second guess factual and legal findings and conclusions made by the district court, who presided over and considered all evidence at Bourgeois' capital murder trial and collateral proceedings, made veracity and credibility determinations based on expert and lay witness testimony, and determined Bourgeois' *Atkins* claim on the merits. *Bourgeois,* 2011 WL 1930684, at * 1-46. The district court afforded Bourgeois the opportunity to present evidence and argue his position without imposing any limitation. The court conducted a full-scale comprehensive week-long evidentiary hearing addressing his *Atkins* claim. The court "liberally allowed Bourgeois to develop the factual basis for his post-conviction claims, including through the presentation of testimony and evidence in several hearings." *See Bourgeois,* 2011 WL 1930684, at *1. This Court cannot second-guess the

73

decision of the United States District Court for the Southern District of Texas to believe one witness' testimony over another's, nor can it discount a witness's testimony that supports the court's *Atkins* factual findings and final intellectual disability determination.

This Court should also be reluctant to set aside factual findings that are based upon the district court's determination of the credibility of witnesses. "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeal may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City,* 470 U.S. 564, 573-74 (1985). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574.

Bourgeois, who is represented by the same Federal Defender who represented him on his first § 2255 motion in the Southern District of Texas, on appeal from the denial of § 2255 relief to the Fifth Circuit, and on petition for certiorari review, could have but did not appeal the district court's *Atkins* determination on any ground. Habeas is an extraordinary remedy. *Webster* holds that, as a rule, the remedy afforded by § 2255

74

largely replaced § 2241; that it "functions as an effective substitute for the writ of habeas corpus" and not an "in addition to." *Webster,* 784 F.3d at 1124. Bourgeois "cannot be permitted to lever his way into section 2241 by making his section 2255 remedy inadequate, here by failing to appeal from the denial of his section 2255 motion." *Morales v. Bezy,* 499 F.3d 668, 672 (7th Cir. 2007); *see Hernandez v. Fed. Corr. Inst.,* No. 08-C-499, 2008 WL 2397546, at *1 (E.D. Wis. June 10, 2008) ("Because he did not even litigate his § 2255 motion through the appellate stage, he is hard-pressed to suggest that the relief available under § 2255 was somehow inadequate."). Nothing prevented Bourgeois from challenging on appeal the district court's factual and legal determinations as an unreasonable application of *Atkins,* or from challenging the underlying factual evidence and credibility determinations supporting the court's findings as clear and convincing error. And neither *Hall* nor *Moore* can be understood to yield a result so novel that it Bourgeois could not have advanced his legal theories earlier on appeal from the district court's denial of his *Atkins* claim.

75

**B.   THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS APPLIED THE AAIDD'S AND APA'S DEFINITION OF INTELLECTUAL DISABILITY IN THE AAIDD 11TH EDITION AND DSM-IV-TR, THE DIAGNOSTIC GUIDES CURRENT AT THE TIME OF BOURGEOIS' § 2255 PROCEEDING.**

The Supreme Court in *Atkins* held that the Eighth Amendment forbids execution of an individual who has intellectual disability.  536 U.S. at 321.  *Atkins,* however, left the task of developing appropriate ways to enforce this constitutional restriction upon execution of sentences to the states.  536 U.S. at 317.  Twelve years later in *Hall,* the Supreme Court addressed "how intellectual disability must be defined in order to implement ... the holding of *Atkins." Hall,* 572 U.S. at 709. On specifics, the Court in *Hall* confirmed that "[t]he legal determination of intellectual disability is distinct from a medical diagnosis, but informed by the medical community's diagnostic framework"—that is, by analyzing the criteria set by *Atkins.  Hall,* 572 U.S. at 709-10; *Moore I,* 137 S. Ct. at 1039 (setting forth the same three criteria); *Fulks,* 2019 WL 4600210, at *6.  The Court in *Hall* held that Florida's rule restricting *Atkins* to defendant's with an "IQ test score of 70 or less" "violated the Eighth Amendment because it treated an IQ score higher than 70 as conclusively

76

disqualifying and thus prevented consideration of other evidence of intellectual disability, such as evidence of 'deficits in adaptive functioning over [the defendant's] lifetime." *Shoop,* 139 S. Ct. at 507 (quoting *Hall,* 572 U.S. at 704, 724).

Three years later in *Moore,* the Court applied *Hall,* again instructing that adjudications of intellectual disability should be "informed by views of medical experts," and that courts continue the inquiry and consider other evidence of intellectual disability where an individual's IQ score, adjusted for the test's standard error, falls within the clinically established range for intellectual-functioning deficits." *Moore I*, 137 S. Ct. at 1050. The Court made clear in *Moore I* that courts should not disregard the medical community's current standards in favor of applying a judicially-created standard based on outdated standards, as the Texas Court of Criminal Appeals did in Moore's case. *Moore I,* 137 S. Ct. at 1052-53; *see Fulks*, 2019 WL 4600210, at *6. In *Moore II,* as it did in *Hall* and *Moore I,* the Court directed courts to the AAIDD 11th edition and DSM-5 for consultation and guidance.

In line with *Atkins* and *Hall,* the United States District Court for the Southern District of Texas properly concluded in Bourgeois' § 2255

77

litigation that *Atkins* "did not provide definitive procedural or substantive guides for determining when a person who claims mental retardation will be so impaired as to fall within the *Atkins* compass." *Bourgeois*, 2011 WL 1930684, at \*23 (citing *Bobby v. Bies,* 556 U.S. 825, 830 (2009)); *Hall,* 572 U.S. at 718; *Fulks,* 2019 WL 4600210, at \*6 ("'*Atkins* largely left to the [sovereign] the job of developing criteria to determine' which prisoners have an intellectual disability and thus cannot receive a death penalty.") (citing *McManus v. Neal,* 779 F.3d 634, 650 (7th Cir. 2015)). Observing a "welter of uncertainty follow[ed] *Atkins,"* the district court confirmed what the Supreme Court held in *Atkins* and later made more certain in *Moore*: the "psychological profession generally agrees as to what standards govern a diagnosis of mental retardation." *Bourgeois*, 2011 WL 1930684, at \*23, 24 n.29.

The district court correctly held that *Atkins* did not delegate to the psychologists the determination of whether an inmate was categorically exempt from execution, but left "the contours of the constitutional protection to the courts." *Id.* at \* 24. Conforming with the Supreme Court's later decisions in *Hall* and *Moore,* the district court consulted, relied on, and adhered to the AAIDD and APA's clinical definition of

78

intellectual disability/mental retardation contained in AAIDD-11 (2010) and DSM-IV-TR (2000) in making its *Atkins* determination on Bourgeois' intellectual-disability claim.  The court recognized that the AAIDD and APA provided equally valid definitions of intellectual disability/mental retardation shown by *Atkins* and then confirmed by *Hall* and *Moore*.  *Id.* The two leading medical experts who testified at the § 2255 hearing on Bourgeois' intellectual-disability claim did not describe any meaningful distinction between the various editions as to the substance of what constitutes mental retardation/intellectual disability.  Dr. Swanson, Bourgeois' expert, relied on the AAIDD-11 definition.  *Id.* at *23 n.27.  Dr. Price, the government's expert, relied on the DSM-IV definitions; he explained the AAIDD-11 is "a restatement of the same thing' without 'significant differences.'"  *Id.*  Judge Jack "refer[red] to the 11th edition when referring to the evidence in this case."  *Id.*  She used the term "mental retardation" throughout her opinion because the APA had not yet adopted the term "intellectual disability."  *Id.* at 23 n.27, 24 n.28.

Whether through prescience or thorough research of substantive *Atkins* and/or *Atkins*-related procedural issues developing in federal and state courts at that time, the district court analyzed intellectual

79

disability under *Atkins* according to the APA's definition of intellectual functioning deficits in the DSM-5, prior to the Supreme Court's decisions in *Hall* and *Moore I*.  The first *Atkins* criteria of intellectual disability defined by the medical community is "*significantly* subaverage intellectual functioning."  *Fulks,* 2019 WL 4600210, at *6 (citing *Hall,* 572 U.S. at 710).  Justice Alito explained in his dissent in *Hall* that the intellectual functioning and adaptive deficits prong of *Atkins* "are meant to show distinct components of intellectual disability": "intellectual functions" include "reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience." *Hall,* 572 U.S. at 737 (J. Alito dissenting, with the Chief Justice, J. Scalia, and J. Thomas concurring) (citing to DSM-5, at 33) ("Deficits in intellectual functions, such as reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience, confirmed by both clinical assessment and individualized, standard testing.") The district court comprehensively analyzed and evaluated that criteria as defined by the medical community.  *Bourgeois*, 2011 WL 1930684, at *25-31.

80

The district court found the medical experts scored Bourgeois' Full Scale IQ range at 70 to 75, the presumptive range accepted by the medical community as a qualifying score for a diagnosis of mental retardation. The court accepted testimony that Bourgeois' base IQ could be five points higher or lower using the medical community's standard error of measurement. *Id.* at 25 & n.31-34. The court did *not* interpret *Atkins* more narrowly than the Supreme Court intended by holding that an individual with a test score above 70 to 75, including a score within the margin of error, does not have an intellectual disability and is barred from presenting other evidence that would show his faculties are limited. *Bourgeois,* 2011 WL 1930684, at 26. Instead, the court expressly observed that *Atkins* did not establish a cut-off score that exempts a person from execution or categorically qualifies him for execution. *Id.* at *26 ("Federal law does not require a court to find [an inmate] to be mentally retarded because the low end of [his] confidence level was below 70, just as it would not be required to find that [he] could be executed on the basis that the high end of this band fell above 70.") (internal citation and marks omitted); *see Hall,* 572 U.S. at 717-18.

Bourgeois' claim that the district court violated *Moore I* and current diagnostic standards because it refused to apply the "Flynn Effect" is incorrect. (Petition, p. 60 ¶134).  The court expressly cited the AAIDD 11th edition as informing that "'best practices require *recognition* of a potential Flynn Effect when older editions of intelligence tests (with corresponding older norms) are used in the assessment of an IQ score." *Bourgeois*, 2011 WL 1930684, at *26 n.37 (emphasis in original) (citing AAIDD 11th, at 37).  The court found, based on Dr. Swanson's and Dr. Moore's testimony, that the evidence in Bourgeois' case did not show "a consensus among psychologists that would require the adoption of the Flynn Effect as a legal method to lower an inmate's Full Scale IQ score." *Id.*   Dr. Swanson, Bourgeois' expert, agreed the "Flynn Effect" was primarily a term used in the courtroom. *Id.*  Dr. Swanson testified the Flynn Effect would place Bourgeois' IQ score to a "'true score ... somewhere between 68 and 70," but qualified that the Flynn Effect was "not relevant" because Bourgeois' scores satisfied *Atkins* in and of themselves. *Id.*

The district court correctly determined that whether Bourgeois had significantly subaverage intellectual functioning is a question of fact that

82

the district court decides.   *Bourgeois*, 2011 WL 1930684, at *26. Bourgeois' attorneys in fact conceded the district court must look at the IQ scores "but then reach its own determination of whether he has significantly subaverage intelligence."   *Id.*   Contrary to Bourgeois' present claim, the district court did not disregard Bourgeois' Full Scale IQ test scores, rely on various unscientific stereotypes, or rely on its own "armchair assessment" in applying *Atkins*.

Instead, the court credited Dr. Price and Dr. Moore's assessment of Bourgeois' intellectual functions based on IQ scores evaluated in conjunction with considerations listed in the DSM-5: "reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience, confirmed by both clinical assessment and individualized, standard testing." DSM-5, p. 33. Dr. Price testified that he did not trust that the IQ testing adequately measured Bourgeois' "true level" of intellectual functioning based on a variety of factors that may compromise the validity of his test scores and/or caused the testing to underestimate his intellectual level—such as Bourgeois' poor testing performance, idiosyncratic abilities, lackluster effort and carelessness in testing, cultural deprivation, and others.   *Id.* at 27-29.   Dr. Price testified

83

PA-303

it was "'very unusual' that the results of Bourgeois' academic achievement scores administered by Bourgeois' experts (Dr. Gelbort, Dr. Weiner, and Dr. Swanson) showed high-school age proficiency higher than his IQ scores." *Id.* at 29.

Importantly, Dr. Price concluded, based on his clinical assessment, individualized testing, and review of the expert medical reports, that Bourgeois' "cognitive abilities exceeded his measured cognitive intelligence." *Id.* at 27. The district court credited Dr. Price's and Dr. Moore's judgment based on the evidence viewed in proper context. For instance, Dr. Price and Dr. Moore found that Bourgeois was able "to concentrate for a length of time," *id.*; "to read and understand and conceptualize some of the things that he was able to talk about," *id;* write in a very detailed and communicative manner, expressing himself in complete thoughts ("his sentence structure, his syntax ... he can communicate when he writes;" he "can express himself in complete thoughts, and very detailed complete thoughts"; his "vocabulary is good," his "ideas are complex[,] the sentences are often compound, [h]e's able to follow a flow of thoughts, communicated his ideas effectively," he's

84

"certainly seems to be a vigilant record keeper, well aware of dates and perhaps locations.") *Id.*

Dr. Price further assessed that Bourgeois "had graduated from high school [a childhood friend told Dr. Moore that he had attended college classes], had worked for years as an over-land trucker, bought a house, managed his own finances, wrote intricate and detailed letters, communicated without difficulty, participated actively in his own defense, and otherwise carried himself without any signs of intellectual impairment." *Id.* at 29. Referring directly to AAIDD-11 in conjunction with Dr. Price's and Dr. Moore's assessment of Bourgeois' intellectual functioning, the court rejected Bourgeois' experts' conclusion that he only performed his job with a system of supports in place. *Id.* & n.44. "Dr. Price credibly explained that 'it's highly inconsistent for him to have had a job as a cross-country truck driver and perform as he did, just totally inconsistent with mental retardation.'" *Id.* at 29.

Dr. Price's and Dr. Moore's clinical assessment, individualized testing, and professional judgment was that: "Bourgeois' writings show an ability to observe the world around him, process relevant information, form strategy, and communicate his thoughts to others. His letter

85

exceeds the complexity and sophistication of someone operating at a grade-school level. Bourgeois' own writings discount the possibility that he is mentally retarded."[16] *Id.* at *30. The district court's findings regarding Bourgeois' personal interaction with the bench were not just "lay assessments" Bourgeois' "true" intellectual abilities, as the defendant now suggests. The findings gave credence to Dr. Price's and Dr. Moore's "clinical judgment" that Bourgeois was not significantly subaverage in intellectual functioning based on their professional and individualized standard assessment testing and interviews. *Id.* at *30-31. The court rejected as incredible Dr. Swanson's assessment that Bourgeois "functions in about the 'lowest two percent of the population'" (i.e., "operates as a child") in view of conflicting evidence and competing

---

[16] The district court gave representative examples of Bourgeois' personal writings to his attorneys early in this case:

> I, Alfred Bourgeois, have every intention of winning my case. I have been falsely arrested, and please take your time and read this letter real well. This will explain how we can win this case in the death of my child, [JG1999]." (DE 598 at 148). In another letter he asked: Dear Mr. Gilmore, I want a copy of your strategy on my case. I want to know how you plan to attack my case and what you think the outcome will be. I would appreciate if you could put together a brief memorandum in support of me, Alfred Bourgeois, your Defendant, and position regarding my trial." (DE 598 at 151).

*Bourgeois*, 2011 WL 1930684, at *30 n.45.

86

clinical judgments made by the other experts.  *Bourgeois,* 2011 WL 1930684, at \*30-31.   Moreover, the district court's observations that Bourgeois actively participated in his defense and understood the proceedings, intelligently assessed the circumstances he faced and formulated strategy,[17] *is relevant* as supported by factual evidence. *Compare Moore II,* 139 S. Ct. at 671 ("[T]he [CCA] emphasized Moore's capacity to communicate, read, and write based in part on *pro se* papers Moore filed in the court. [*T*]*hat evidence is relevant,* but it lacks convincing strength without a determination about whether Moore wrote the papers on his own...") (emphasis added).

In making the *Atkins* determination the district court did precisely the two things that *Hall* and *Moore* direct:   afforded Bourgeois the opportunity to present his evidence and argument on *Atkins'* three-part

---

[17] "During trial, Bourgeois communicated with the Court on several occasions.  The Court viewed his testimony before the jury in both phases of trial.  The Court had sufficient interaction with Bourgeois to make a lay assessment of whether he functions at the low level described by his expert witnesses.  Bourgeois never gave the Court any impression that he functioned at an intellectual level equal to that of a child.  He completely understood the proceedings against him, intelligently assessed the circumstances he faced, actively participated in his defense, formulated strategy, intelligently communicated his versions of events, cogently answered questions put to him, and otherwise appeared to have an adequate level of intelligence.  Based on this Court's own observations, the testimony that Bourgeois has significant intellectual limitations is not credible or persuasive." *Bourgeois,* 2011 WL 1930684, at \*30.

87

criterion without limitation.  And, after finding that Bourgeois' IQ test score fell within a presumptive range accepted by the medical community as a qualifying score for a diagnosis of mental retardation (but that a fuller view of his abilities does not correspond to a finding of significant intellectual limitations), the court continued its inquiry into *Atkins'* adaptive deficits criteria.  *Bourgeois,* 2011 WL 1930684, at *31.

Moreover, the district court did not rely on judicially-created *Briseno*[18] factors that formed the basis of the error explored in Moore *I* and *Moore II.*  Nor did it employ any facsimile of the *Briseno*-test applied by the CCA in *Moore.*  As it did with *Atkins'* intellectual functioning criteria, it scrupulously applied the AAIDD's and APA's definition of intellectual disability in the AAIDD-11 and DSM-IV-TR editions to *Atkins'* second criteria: adaptive deficits, "the inability to learn basic skills and adjust behavior to changing circumstances," *Hall,* 572 U.S. at 710, "assessed using both clinical and individualized ... measures," *Moore II,* 139 S. Ct. at 668; *see Bourgeois,* 2011 WL 1930684, at *31 & n.48. [19]

---

[18] *Ex Parte Briseno,* 135 S.W.3d 1 (Tex. Crim. App. 2004).

[19] *See Bourgeois,* 2011 WL 1930684, at *31 & n.48:

> "The AAIDD and APA definitions for mental retardation both break the adaptive-limitations inquiry into subcategories of deficiencies. The

88

The record does not support Bourgeois' global claim that the district court counteracted his adaptive deficits by overemphasizing adaptive strengths and unscientific stereotypes of intellectually disabled individuals.  The court carefully examined the experts' clinical reports pertaining to Bourgeois' adaptive skills and adaptive deficits within the medical community's diagnostic framework.  The Court determined Dr. Swanson and Dr. Moore came to diametrically opposed conclusions about Bourgeois' adaptive skills.  *Id.* at *33.  The court credited Dr. Moore's assessment and judgment that Bourgeois did not qualify as mentally

---

AAIDD evaluates "significant limitations ... in adaptive behavior as expressed in conceptual, social, and practical adaptive skills." AAMR 11th at 1.[48]  The APA looks for 'significant limitations in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.' DSM–IV–TR at 41. While collapsing the adaptive deficits into distinct subgroups, the APA and AAIDD approaches apparently capture the same range of functional aptitude."

[48]The AAIDD 11th gives examples of multidimensional representative skills within the three categories: (1) conceptual skills involve "language; reading and writing; and money, time, and number concepts"; (2) social skills mean "interpersonal skills, social responsibility, self-esteem, gullibility, naivete (i.e., wariness), follows rules/obeys laws, avoid being victimized, and social problem solving"; and (3) practical skills include "activities of daily living (personal care), occupational skills, use of money, safety, health care, travel/transportation, schedules/routines, and use of the telephone." AAIDD 11th at 44.

89

retarded within the diagnostic framework. The court reasonably viewed the inquiry as requiring it to probe more deeply "into the accuracy of reported deficiencies" and verify the reliability of data underlying the experts' findings of adaptive deficits. *Id.* at \*33. In this regard, the court conducted a *very* extensive and comprehensive review of both doctor's reports and testimony, and examined the veracity and reliability of clinical data underlying them. *Id.* at \*33-44; *see id.* at \*33-37 ("Assessment by Testing Instruments"), \*37-39 ("Lay Accounts of Bourgeois' Functioning"), \*40-44 ("Bourgeois' Adaptive Abilities"), \*44-46 "Manifestations of Limitation Before Age 18"). The court referred two focal points in the AAIDD 11th when assessing the credibility and reliability of Dr. Swanson's and Dr. Moore's adaptive skill reports:  that the AAIDD "adopts an underlying 'assumption' in the definition of mental retardation that 'within an individual, limitations often coexist with strengths," *id.* at \*32 (citing AAIDD 11th at 1), and, to that end, the AAIDD instructs "for clinicians to assess the reliability of any respondent providing adaptive behavior information," *id.* at \*34 (citing AAIDD 11th at \*47).

90

PA-310

The court did not find that Bourgeois perceived adaptive strengths counteracted the evidence of his adaptive deficits, as Bourgeois argues in his habeas petition. The court critically analyzed the diametrically opposed conclusions by the medical experts, assessed the credibility and accuracy of their assessments and reports based on the evidence, and examined the veracity of the evidence underlying their professional judgment. In that context, the court found the "record show[ed] strengths that more than coexist with weaknesses, they call into question the depth and accuracy of reports of those weaknesses." *Id.* at *44. The court found that Dr. Swanson for failed to assess the validity and credibility of lay witnesses, *id.* *40, and rejected her clinical assessment based on failure "to make a full review of available evidence relating to Bourgeois' adaptive abilities," *id.,* at *44. The court considered Dr. Swanson's failure to administer Vineland/ ABAS-II testing to multiple respondents and basing her assessments on someone who had observed Bourgeois for only a short period of time at the age of 7, and not when he was closer to age 18, and who gave conflicting test answers. Dr. Moore ascertained that the conflicting answers Ms. Franks gave undermined the reliability of her testing. *Id.* at *35-36.

91

PA-311

The court credited Dr. Moore's administering the test to multiple respondents who observed Bourgeois closer to age 18 and older, verifying the accuracy of the supporting data, discounting questionable testing, and basing his assessment only on verified testing.  The court found that this "more credibly measured Bourgeois' functioning."     *Id.* at \*35-37.  The court credited Dr. Moore's testimony, "while [Bourgeois]' functioning may have been relatively impaired in his early childhood, he appears to have developed greater independence of functioning by the time he finished high school."  *Id.* at \*44.  The court found that "[n]one of the responses in Dr. Moore's testing suggested a significant impairment." *Id.* at \*37.

Consistent with AAIDD guides, the court reasonably assessed and weighed the reliability of competing lay testimony.  For example, defense witnesses testified that Bourgeois, could not tie his shoes or button his clothes as a child, had trouble learning to drive a truck, and had accidents.  Government sponsored witnesses testified that Bourgeois had a "very professional appearance," was a competent to above-average truck driver, and navigated throughout the country without difficulty. *Id.* at \*37-39.    Accordingly, the court found that Bourgeois' academic

92

PA-312

test score, his meticulous financial tracking, his fastidious record keeping, his cogent letter writing, and his competent spelling did not persuasively reflect adaptive deficits. *Id.* at 41-44. Bourgeois' employment as a commercial truck driver, entailing cross-country routes, for decades without accident, was inconsistent with mental retardation. *Id.* at \*41-44.

Based on Dr. Price's and Dr. Moore's testimony, diagnostic assessment, and professional judgment, the court reasonably found the evidence "failed to point to any pronounced intellectual impairment before Bourgeois' eighteenth birthday;" that "Bourgeois has not shown that he is now, was at the time of the crime, or was during the developmental period, mentally retarded." *Id.* at \*44. Based on the evidence presented, Bourgeois did not make "a convincing showing that he suffers from significant adaptive deficits that would serve as a predicate for mental retardation." *Id.*

## III.

## UNITED STATES' OPPOSITION TO
## MOTION FOR STAY OF EXECUTION

Bourgeois' execution is scheduled for January 13, 2020. Bourgeois moves to stay his execution pending this Court's final disposition of his

93

*Atkins* claim.  The uncontroverted facts are that Bourgeois adjudicated his *Atkins* claim in his first § 2255 proceeding and the district court denied his claim on the merits.  *United States v Alfred Bourgeois,* No. 2:02-cr-216, No. 2:07-cv-223, 2011 WL 1930684, *1 (S.D.Tex. May 19, 2011), *COA denied,* No. 11-70024, 537 F. App'x 604 (5th Cir. Aug. 5, 2013), *cert. denied,* 135 S. Ct. 46 (2014).  The decision of the Southern District of Texas is final under 28 U.S.C. § 2244(a), (b)(1), and (b)(2).  As briefed, on the facts of this case 28 U.S.C. § 2241 does not provide Bourgeois a viable avenue for habeas relief in the Southern District of Indiana on the successive *Atkins* claim that he raises in this habeas petition.

"[A] stay of execution is an equitable remedy. It is not available as a matter of right, and equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Hill v. McDonough*, 547 U.S. 573, 584 (2006).  Bourgeois does not demonstrate a significant possibility of success on the merits of his *Atkins* claim.  The Supreme Court has not declared *Moore I* and *Moore II* a new rule retroactively applicable under the AEDPA, and he does not meet the statutory requirements under 28 U.S.C. § 2255(e)

94

to proceed under 28 U.S.C. § 2241.  Bourgeois does not meet the Seventh Circuit's tests under *Davenport* and *Webster* to proceed under § 2241 in this habeas petition.  Nor does his claim fall within any *Teague* exception for purposes of § 2241.  There is no reasonable probability that four Justices will consider his *Atkins* claim sufficiently meritorious to grant certiorari.  This is not a close case that the equities favor the granting of relief.  As stated, Bourgeois was afforded full adjudication of the merits of his *Atkins* claim at his first § 2255(a) proceeding, and the order of the United States District Court for the Southern District of Texas denying Bourgeois habeas relief is final.

The United States has a strong interest in enforcing Bourgeois' death sentence imposed by the jury on March 25, 2004, for the savage and horrific premediated murder of his two-year old daughter.  Bourgeois does not claim that his sentence violated *Atkins* at the time the jury unanimously imposed it, Dkt. 1, p. 71 ¶156; he does not fall within a class of persons the Eighth Amendment categorically exempts from execution. "Equity must take into consideration the [United] States' strong interest in proceeding with its judgment." *Gomez v. U.S. Dist. Court for N. Dist. of California*, 503 U.S. 653, 654 (1992).  The public interest mandates

95

that Bourgeois' scheduled execution on January 13, 2020, be enforced by the United States. This Court should deny Bourgeois' motion for stay of execution on grounds that there is no public interest or constitutional basis to grant it.

## CONCLUSION

For the foregoing reasons, Bourgeois' petition for writ of habeas corpus and motion to stay execution should be denied with prejudice.

Respectfully submitted,

JOSH J. MINKLER
United States Attorney

By:   s/ Paula C. Offenhauser
PAULA C. OFFENHAUSER
Special Assistant United States Attorney
1000 Louisiana, Suite 2300
Houston, Texas 77002
Telephone: (713) 567-9102
E-mail: Paula.Offenhauser@usdog.gov

By:   s/ Brian Reitz
BRIAN REITZ
Assistant United States Attorney
Office of the United States Attorney
10 W. Market St., Suite 2100
Indianapolis, Indiana 46204-3048
Telephone: (317) 226-6333
E-mail: Brian.Reitz@usdoj.gov

*Attorneys for Respondent*

PA-316

## CERTIFICATE OF SERVICE

I certify that on October 18, 2019, a copy of the foregoing Return to Order to Show Cause was filed electronically.  Notice of this will be sentence to the following parties by operation of the Court's electronic filing system:

Victor J. Abreu
Federal Community Defender Office
For the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Victor_Abreu@fd.org

Katherine Thompson
Federal Community Defender Office
For the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Katherine_Thomson@fd.org

Peter Williams
Federal Community Defender Office
For the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Pete_Williams@fd.or

By:   s/ Paula C. Offenhauser
   PAULA C. OFFENHAUSER
   Special Assistant United States Attorney
   E-mail:  Paula.Offenhauser@usdog.gov

PA-317

# CERTIFICATE OF SERVICE

I, Peter Williams, hereby certify that on 16th day of July, 2020, I electronically filed the foregoing appendix with the Clerk of Court for the Seventh Circuit by using the appellate CM/ECF system. I further certify that I will cause 10 paper copies of this appendix to be received by the Clerk within seven days of the Notice of Docket Activity generated upon acceptance of this document.

Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ *Peter Williams*
Peter Williams