No. 20–1891
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

ALFRED BOURGEOIS,
*PETITIONER-APPELLEE,*

v.

SUPERINTENDENT,
USP—TERRE HAUTE,
UNITED STATES OF AMERICA,
*RESPONDENTS-APPELLANTS.*

_____

On Appeal from the United States District Court
for the Southern District of Indiana
No. 2:19–cv–00392, Hon. Jane Magnus-Stinson, Chief J.

**APPENDIX TO BRIEF OF APPELLEE
VOLUME II : (PAGES PA-318 TO PA-527)**

**THIS IS A DEATH PENALTY CASE**

Peter Williams
 *Counsel of Record*
Victor J. Abreu
Katherine Thompson
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215–928–0520

*Counsel for Petitioner-Appellee Alfred
Bourgeois*

Dated: July 16, 2020

# TABLE OF CONTENTS

<u>**VOLUME I**</u>

<u>**Pleadings in 28 U.S.C. § 2241 Proceedings**</u>

Petition for Writ of Habeas Corpus, *Alfred Bourgeois v. Superintendent, USP—Terre Haute, United States of America*, 2:19–cv–992–JMS–DLP (S.D. Ind. Aug. 15, 2019) ..................................................................................... PA–001

Motion for Stay of Execution, *Alfred Bourgeois v. Superintendent, USP—Terre Haute, United States of America*, 2:19–cv–992–JMS–DLP (S.D. Ind. Aug. 15, 2019) ..................................................................................... PA–079

Return to Order to Show Cause, *Alfred Bourgeois v. Superintendent, USP—Terre Haute, United States of America*, 2:19–cv–992–JMS–DLP (S.D. Ind. Oct. 18, 2019)..................................................................................... PA–210

<u>**VOLUME II**</u>

<u>**Pleadings in 28 U.S.C. § 2241 Proceedings (cont.)**</u>

Reply in Support of Petition for Writ of Habeas Corpus and Motion for Stay of Execution, *Alfred Bourgeois v. Superintendent, USP—Terre Haute, United States of America*, 2:19–cv–992–JMS–DLP (S.D. Ind. Nov. 15, 2019).................. PA–318

Motion to Reconsider Order Staying Execution of Alfred Bourgeois, *Alfred Bourgeois v. Superintendent, USP—Terre Haute, United States of America*, 2:19–cv–992–JMS–DLP (S.D. Ind. March 23, 2020) .................................... PA–369

Motion for Leave to File Surreply to Petitioner's Reply, *Alfred Bourgeois v. Superintendent, USP—Terre Haute, United States of America*, 2:19–cv–992–JMS–DLP (S.D. Ind. March 23, 2020) ......................................................... PA–375

Surreply to Petitioner's Reply Brief, *Alfred Bourgeois v. Superintendent, USP—Terre Haute, United States of America*, 2:19–cv–992–JMS–DLP (S.D. Ind. March 23, 2020)..................................................................................... PA–389

## Excerpts from Diagnostic Manuals

Excerpt from Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition—("DSM–5") ................................................................................... PA–409

Excerpt from *Intellectual Disability—Definition, Classification, and Systems of Supports—11th Edition*, American Association on Intellectual and Developmental Disabilities (2010) ("AAIDD–10") ............................... PA–432

Excerpt from *User's Guide to Intellectual Disability—Definition, Classification, and Systems of Supports—11th Edition*, American Association on Intellectual and Developmental Disabilities (2012) ("AAIDD–12") ............................... PA–475

Excerpt from *The Death Penalty and Intellectual Disability*, American Association on Intellectual and Developmental Disabilities (2015) ("AAIDD–15"), Chapter 8: Intelligence Testing, by Dale G. Watson, Ph.D ......................................... PA–483

Excerpt from *The Death Penalty and Intellectual Disability*, American Association on Intellectual and Developmental Disabilities (2015) ("AAIDD–15"), Chapter 10: Norm Obsolescence: The Flynn Effect, by Kevin S. McGrew, Ph.D ............................................................................................................... PA–512

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA**

_____

|  |  |  |
|---|---|---|
| ALFRED BOURGEOIS, | : | CIVIL ACTION<br>(Capital Habeas Corpus) |
|  | : |  |
| Petitioner, | : |  |
|  | : | Case No. 2:19–cv–00392–JMS–DLP |
| V. | : |  |
|  | : | **CAPITAL CASE** |
| SUPERINTENDENT, USP-Terre Haute, | : | **EXECUTION SCHEDULED FOR** |
| UNITED STATES OF AMERICA, | : | **JANUARY 13, 2020** |
|  | : |  |
| Respondents. | : |  |

_____

_____

**REPLY IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS AND
MOTION FOR STAY OF EXECUTION**

_____

Victor J. Abreu
Katherine Thompson
Peter Williams
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West—The Curtis Center
Philadelphia, PA 19106
215-928-0520
Victor_Abreu@fd.org
Katherine_Thompson@fd.org
Pete_Williams@fd.org

Counsel for Petitioner

Dated: November 15, 2019

**PA-318**

## PRELIMINARY STATEMENT

Petitioner Alfred Bourgeois shall be referred to as Petitioner or Mr. Bourgeois. Respondents shall be referred to as the Government. Mr. Bourgeois's August 15, 2019, Petition for Writ of Habeas Corpus Pursuant ("Petition") shall be cited as "Pet." followed by the relevant page or paragraph number(s). The Government's October 15, 2019, Response shall be cited as "GR" followed by the relevant page number(s).

With this Reply Brief, Petitioner is filing a supplement to Appendix A, which was filed with the Petition on August 15, 2019. The supplemental appendix is entitled "Appendix A, Vol. II," and the page numbers continue sequentially from the last page of the initial volume. Cites to both volumes of Appendix A shall be referred to by the initial "A" and relevant page number. Relevant transcripts from Petitioner's § 2255 level proceedings are provided in Appendix B, filed with the Petition, and cites to pages from the transcript shall be referred to as "Tr.," followed by the relevant date and page number.

All other citations are either self-explanatory or will be explained.

All emphasis in this Petition is supplied unless otherwise indicated.

**PA-319**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................... i

TABLE OF CONTENTS.......................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

I.    MR. BOURGEOIS IS ENTITLED TO REVIEW UNDER 28 U.S.C. § 2241
BECAUSE HE SATISFIES THE 28 U.S.C. § 2255(E) SAVINGS CLAUSE .................. 5

    A.    Section 2255 Is "Inadequate or Ineffective" to Test Mr. Bourgeois's
Claim of Categorical Ineligibility for Execution. ................................................... 6

        1.    Mr. Bourgeois's claim need not fit within the facts of *Davenport* or
*Webster* to be cognizable under § 2241. .......................................... 7

        2.    Mr. Bourgeois may proceed under § 2241 because he presents a
structural error with § 2255.............................................................. 9

    B.    Mr. Bourgeois Has Never Received Judicial Review of His *Atkins*
Claim Under Constitutionally-Mandated Diagnostic Standards........................... 11

        1.    The § 2255 District Court's opinion cannot be considered a "reliable
judicial determination" of Mr. Bourgeois's claim in the wake
of *Moore-I*. ................................................................................... 12

        2.    Mr. Bourgeois's current *Atkins* claim relies on the application of the
medical community's diagnostic standards, which was not available
to him at the time of his initial § 2255 proceedings....................... 27

    C.    Mr. Bourgeois's Petition Is Neither an Abuse of the Writ Nor Barred
by *Teague*............................................................................................... 36

        1.    Mr. Bourgeois's petition is not an abuse of the writ....................... 36

        2.    *Teague* is not relevant to either of Mr. Bourgeois's jurisdictional
arguments.................................................................................... 37

        3.    *Teague* cannot preclude review of Mr. Bourgeois's claim that he is
categorically ineligible for execution under the Constitution......................... 41

**PA-320**

II.     THE GOVERNMENT HAS NOT CHALLENGED THAT MR. BOURGEOIS MAY PROCEED UNDER § 2241 BECAUSE HE CHALLENGES THE EXECUTION, AS WELL AS THE IMPOSITION, OF HIS SENTENCE. .................... 42

III.    MR. BOURGEOIS IS ENTITLED TO A STAY OF EXECUTION. .............................. 43

REQUEST FOR ORAL ARGUMENT ........................................................................................ 45

**PA-321**

### INTRODUCTION

In his Petition, Mr. Bourgeois establishes that he is intellectually disabled ("ID") under the medical community's diagnostic standards and thus his execution is barred by *Atkins v. Virginia*, 536 U.S. 304 (2002), and its progeny. Mr. Bourgeois also establishes that he is entitled to review of his *Atkins* claim under these standards prior to his scheduled execution on January 13, 2020, as the plain language of the Federal Death Penalty Act ("FDPA") and numerous Supreme Court decisions categorically ban *the carrying out of an execution* on an intellectually disabled person. The Government does not dispute that an ID person is entitled to prove he is categorically ineligible for death at the time of his execution. It only challenges Mr. Bourgeois's ability to bring his *Atkins* claim under 28 U.S.C. § 2241, relying on various unconvincing arguments.

First, the Government contends that § 2241 is not available to Mr. Bourgeois because the facts underlying his jurisdictional claim do not precisely align with the facts presented in either *In re Davenport*, 147 F.3d 605 (7th Cir. 1998), or *Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015). Yet the Seventh Circuit has never held, or even suggested, that these two cases represent the only circumstances under which the 28 U.S.C. § 2255(e) Savings Clause is available; a petitioner need only show that § 2255 is "inadequate or ineffective" to challenge his conviction or sentence. And, just as the *Davenport* court found § 2255 to be inadequate where it denies the defendant the ability to challenge his imprisonment for a "nonexistent offense," *Davenport*, 147 F.3d at 611, and the *Webster* court found § 2255 to be inadequate as it prevented Mr. Webster from challenging his constitutionally prohibited sentence, § 2255 is inadequate here:

- *Atkins* was unavailable to Mr. Bourgeois at the time of his initial § 2255 proceedings because then-binding Fifth Circuit jurisprudence rejected the medical community's approach to ID in favor of a "legal" approach that employed the same unscientific standards and practices invalidated in *Moore v. Texas*, 137 S. Ct. 1039 (2017) ("*Moore–I*").

1

- Indeed, unlike the *Atkins* claim at issue in this Court's recent § 2241 decision in *Fulks v. Krueger*, there is *no doubt* that the district court that reviewed Mr. Bourgeois's initial *Atkins* claim ("District Court" or "§ 2255 Court") did so using "factors that the Supreme Court subsequently deemed inappropriate in *Moore*."[1]

- Mr. Bourgeois has established that, when his *Atkins* claim is analyzed under the medical community's diagnostic standards as now required by *Moore–I*, he is indisputably ID. *See* Pet. § III.

- Nevertheless, Mr. Bourgeois is now precluded from bringing a second § 2255 motion to obtain review of his sentence under constitutionally-mandated standards due to the procedural language of AEDPA's strict relitigation bar.

Accordingly, Mr. Bourgeois has established that he is intellectually disabled and constitutionally exempt from execution, but without an avenue under § 2255 to vindicate his claim for relief. Just as it did in *Webster*, this constitutes a structural defect that allows him to pass through the Savings Clause.

The Government attempts to distinguish *Webster*, in part, by stating that unlike Mr. Bourgeois who previously raised an *Atkins* claim, Mr. Webster could not have raised his *Atkins* claim in his initial § 2255. In fact, however, Mr. Webster not only raised an *Atkins* claim in his initial § 2255 proceedings, he, like Mr. Bourgeois, also unsuccessfully sought authorization to re-raise that claim in a successor petition. And—just as it does here—the Government argued in *Webster* that the petitioner's prior *Atkins* litigation precluded him from proceeding under § 2241. The Seventh Circuit rejected that argument, allowing Mr. Webster to use § 2241 to bring—and ultimately prevail on—his successive *Atkins* claim. The Government also attempts to distinguish

---

[1] No. 2:15–cv–33–JRS–MJD, 2019 WL 4600210, *16 n.9 (S.D. Ind. Sept. 20, 2019). In *Fulks*, the petitioner sought to bring an *Atkins* claim for the first time under § 2241, explaining that his claim was not viable under the legal and diagnostic regime in effect at the time of his initial § 2255 motion. Yet the Court found this premise to be too speculative, as it "would require the Court to assess the evidence supporting Mr. Fulks' *Atkins* claim, *then speculate how another federal court would have treated that evidence*." *Id.* at *16. Here, the Court need not engage in any such speculation:  it was not until *Moore–I* invalidated the Fifth Circuit's unscientific approach to ID that *Atkins* became available to Mr. Bourgeois.

2

*Webster* on the ground that it involved newly discovered evidence. But, as nothing in *Webster* limits § 2241 relief to *Atkins* claims that are procedurally and factually identical to Mr. Webster's, the Government's distinction is meaningless. In *Webster*, the Seventh Circuit rejected the proposition that the language of § 2255(h)(1) could render an *Atkins* claim "beyond the scope of the savings clause" and "create the possibility of an unconstitutional punishment." *Webster*, 784 F.3d at 1139. The same reasoning applies here, as the procedural barrier created by the § 2255(h) relitigation bar is all that prevents Mr. Bourgeois from challenging the constitutionality of his upcoming execution under clinical diagnostic standards. As the *Webster* court explained, Mr. Webster could proceed under § 2241 because the wording of § 2255(h) foreclosed his ability to challenge "a particular sentence [that] was *constitutionally forbidden*." *Id.* at 1138. Mr. Bourgeois should be allowed to do the same.

The Government also argues that Mr. Bourgeois is precluded from proceeding under § 2241 because he purportedly received a reliable judicial determination when he litigated his *Atkins* claim in his initial § 2255 proceedings. The success of this argument depends on the Government establishing—as it attempts to do in Section B of the Response—that the § 2255 District Court's adjudication of Mr. Bourgeois's claim is consistent with *Moore–I*'s requirement that *Atkins* be assessed according to diagnostic standards. But again, applying then-binding Fifth Circuit jurisprudence, the District Court repeatedly and expressly eschewed the medical standards for ID in favor of an unscientific "legal" approach when it reviewed Mr. Bourgeois's *Atkins* claim. The Government's attempts to argue otherwise are unconvincing.

In light of the difficulty of showing that the District Court complied with diagnostic standards, the Government also challenges Mr. Bourgeois's right to rely on *Moore–I* and *Moore*

3

*v. Texas*, 139 S. Ct. 666 (2019) ("*Moore–II*"), and the diagnostic standards they require, in his

§ 2241 petition. But, contrary to the Government's arguments:

- Mr. Bourgeois cannot be barred from obtaining judicial review of his *Atkins* claim under medical standards, as the execution of an ID person is constitutionally prohibited, meaning that procedural barriers to relief that would normally be permissible are themselves constitutionally invalid;

- Mr. Bourgeois could not have relied on the principles enunciated in *Moore–I* and *Moore–II* in his first § 2255 motion because, prior to *Moore–I* holding that courts are *required* to apply current medical standards in the evaluation of *Atkins* claims, Mr. Bourgeois had no authority to challenge settled Fifth Circuit that supported the use of non-scientific factors in the disposition of an such claims;

- Mr. Bourgeois can rely on constitutional cases in support of his § 2241 petition, as he need only show § 2255 is inadequate or ineffective; and

- Allowing Mr. Bourgeois to rely on new diagnostic standards would not forever forestall a final decision in this case, or open the floodgates to endless *Atkins* litigation from other capital petitioners. Mr. Bourgeois is perhaps the only § 2255 litigant who raised a timely and meritorious *Atkins* claim, but was denied relief on the basis of circuit jurisprudence subsequently invalidated by *Moore–I*. This is not a claim like the one presented in *Fulks*, in which the petitioner conceded that he would not have been ID under diagnostic standards in effect at the time of his § 2255 proceedings. Here, Mr. Bourgeois has established that, if his claim is assessed under the medical community's diagnostic standards—as of 2011 or as of today—he is undeniably ID. This is a rare case indeed.

Nor is the Government able to persuasively argue that Mr. Bourgeois's Petition is an

abuse of the writ or that it is barred by *Teague v. Lane*, 489 U.S. 288 (1989), as nothing in the

jurisprudence relied upon by the Government actually supports either of these claims. Mr.

Bourgeois's Petition is not an abuse of the writ because it relies on a change in the law that

occurred after his initial § 2255 proceedings. And *Teague* is irrelevant to each of Mr.

Bourgeois's two bases for § 2241 jurisdiction. In any event, regardless of the jurisdictional basis

for Mr. Bourgeois's Petition, *Teague* is a judge-made, prudential doctrine that was announced

well before the decision in *Atkins* and as such it cannot be applied to bar review of his claim that

he is categorically exempt from execution.

4

Finally, the Government completely fails to challenge Mr. Bourgeois's claim that he is entitled to § 2241 review because he challenges the execution of his sentence, as well as its imposition. In addition to the prohibition on the carrying out of an execution of the intellectually disabled set forth by *Atkins* and its progeny, Mr. Bourgeois was sentenced under the FDPA, which expressly mandates that a "sentence of death shall not be *carried out* upon a person who *is* mentally retarded." 28 U.S.C. § 3596(c). This language calls for an inquiry necessarily governed by the present, including the prisoner's present-day functioning as measured by present-day diagnostic standards, rather than standards applicable at the time the sentence was imposed. And, as the Seventh Circuit has recognized, § 2241 confers habeas jurisdiction where a federal prisoner is challenging not the validity but the execution of his sentence.

Hence, whether because he satisfies the § 2255(e) Savings Clause, or because he is challenging the execution of his sentence, Mr. Bourgeois is entitled to litigate the merits of his *Atkins* claim and establish that he is intellectually disabled and cannot constitutionally be executed on January 13, 2020.

## I.       MR. BOURGEOIS IS ENTITLED TO REVIEW UNDER 28 U.S.C. § 2241 BECAUSE HE SATISFIES THE 28 U.S.C. § 2255(E) SAVINGS CLAUSE.

The Government acknowledges that a federal prisoner is entitled to § 2241 review under the Savings Clause when the remedy under § 2255 is "inadequate or ineffective to test the legality of his" sentence. GR at 41 (citing § 2255(e)). Yet the Government contends that Mr. Bourgeois is precluded from proceeding under § 2241 because: (i) his claim does not precisely fit within the facts of prior cases in which the Seventh Circuit has found the savings clause applicable; and (ii) he "fully adjudicated" the same *Atkins* claim he now presents and received a "reliable judicial determination" of that claim in his initial § 2255 proceedings. *See* GR at 5–8. The Government errs on both counts.

5

**A.      Section 2255 Is "Inadequate or Ineffective" to Test Mr. Bourgeois's Claim of Categorical Ineligibility for Execution.**

As set forth in his Petition, Mr. Bourgeois's initial § 2255 *Atkins* claim was denied in 2011 under an approach to *Atkins* found to be unconstitutional in *Moore–I*.  Following the *Moore–I* decision, Mr. Bourgeois sought authorization from the Fifth Circuit to file a second petition under § 2255(h)(2). *See* Pet. ¶¶ 9–11. The circuit panel did not deny that Mr. Bourgeois qualifies as ID under the diagnostic standards required under *Moore–I*. Nor did it dispute that *Atkins* could be "newly available" to a petitioner who had been unable to successfully raise an ID claim earlier due to Fifth Circuit jurisprudence that has since been overruled. To the contrary, the Fifth Circuit subsequently reaffirmed that "it is correct to equate legal availability" under § 2255(h)(2) with changes in the standards by which an *Atkins* claim is assessed. *In re Johnson*, No. 19–20552, 19–70013, 2019 WL 3814384, at *5–6 (5th Cir. Aug. 14, 2019). Nevertheless, the panel denied Mr. Bourgeois's application on the ground that he was procedurally barred from re-litigating his *Atkins* claim under 28 U.S.C. § 2244(b)(1). *In re Bourgeois*, 902 F.3d 446 (5th Cir. 2018).[2] Mr. Bourgeois then filed his § 2241 Petition with this Court, arguing that the Fifth Circuit's interpretation of § 2255(h)[3] precludes review of his death sentence under current constitutional standards, despite that same opportunity having been given to other, *less diligent* prisoners, and despite the categorical bar against executing an intellectually disabled person.

---

[2] 28 U.S.C. § 2244(b)(1) provides: "A claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed."

[3] Section 2255(h) states that "[a] second or successive motion must be certified as provided in section 2244." As explained in the Petition, Mr. Bourgeois argued in his application that the § 2244(b)(1) re-litigation bar is expressly limited to petitions brought by state prisoners under § 2254, but the Fifth Circuit rejected this argument. *See* Pet. ¶ 10.

6

### 1. Mr. Bourgeois's claim need not fit within the facts of *Davenport* or *Webster* to be cognizable under § 2241.

The Government recognizes that the Seventh Circuit has found § 2241 review appropriate in a number of different settings. *See* GR 51–56. Nevertheless, the Government argues that Mr. Bourgeois's *Atkins* claim is barred because it "does not fall within either of the narrow paths for § 2241 relief set forth by the Seventh Circuit in *Davenport* and *Webster*." GR at 6. But as this Court recently acknowledged, "[t]he Seventh Circuit has never held that the Savings Clause is only met in the specific circumstances in which it has so found." *Fulks*, 2019 WL 4600210, at *14. To the contrary, *Webster* made clear that the only requirement for establishing § 2241 jurisdiction through the savings clause is that there be "some kind of structural problem with section 2255." *Webster*, 784 F.3d at 1136.

Notably, the Government defeats its own "*Davenport*-or-*Webster*" argument in acknowledging that § 2241 was available to the petitioner in *Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001), a case that involves no factual overlap with either *Davenport* or *Webster*. In *Garza*, the petitioner sought to raise a claim under § 2241 based on the ruling of an international treaty body issued after his § 2255 proceedings concluded. In analyzing the jurisdictional issue, the *Garza* court recognized generally that there are "circumstances" in which "the operation of the successive petition rules absolutely prevent[] the petitioner from ever having an opportunity to raise a challenge to the legality of his sentence." *Id.* at 922. One such circumstance was *Davenport*, which involved a retroactive change in statutory law, and another was Mr. Garza's case. *Id.*; *see also Webster*, 784 F.3d at 1137 (describing *Garza* as "*one illustration* of a situation in which petitioner was entitled under the savings clause to use section 2241 to attack a sentence"); *Poe v. Lariva*, 834 F.3d 770, 772 (7th Cir. 2016) (referring to a new retroactive

statutory rule as just "*[o]ne circumstance* under which this court has permitted resort to § 2241").

Citing *Fulks*, the Government attempts to distinguish Mr. Bourgeois's § 2241 *Atkins* claim from *Garza*, stressing that it was "literally impossible" for Mr. Garza to have raised his claim earlier as the factual predicate did not yet exist. GR at 54 (citing *Fulks*, 2019 WL 4600210, at \*4). But *Fulks* is distinguishable. There, the petitioner sought to bring an *Atkins* claim for the first time under § 2241, explaining that his claim was not viable under the legal and diagnostic regime in effect at the time of his initial § 2255 motion. Yet the Court found this premise to be too speculative, as it "would require the Court to assess the evidence supporting Mr. Fulks' *Atkins* claim, *then speculate how another federal court would have treated that evidence.*" *Id.* at \*16. The Court went on to stress that "this speculative analysis would not be required had Mr. Fulks raised an *Atkins* claim in his § 2255 when he had the opportunity to do so," in which case the Court "would not have to speculate how another court would have treated a wide-range of evidence regarding Mr. Fulks' alleged intellectual disability." *Id.* at \*16, n.9. Here, by contrast, the District Court that denied Mr. Bourgeois's prior *Atkins* claim did so under Fifth Circuit precedent that made it "literally impossible" for his claim to succeed.  It was not until *Moore–I* invalidated that jurisprudence that Mr. Bourgeois could raise his current claim.

In short, in *Davenport*, *Webster*, and *Garza*, the Seventh Circuit allowed claims to proceed under § 2241 because the petitioner identified a structural problem that rendered § 2255 "inadequate or ineffective" to test the petitioner's claim. In none of these cases did the petitioner present the same factual scenario as any other case in which the court found jurisdiction under § 2241. Here, Mr. Bourgeois has established that developments occurring after his trial and § 2255 proceedings show that he is categorically ineligible for execution. Yet because § 2255(h)

8

does not account for claims of categorical ineligibility from execution, "as a structural matter," Mr. Fulks's challenge to his sentence "cannot be entertained by use of the 2255 motion." *Webster*, 784 F.3d at 1139. Just as in Mr. Webster's case, "[t]o hold otherwise would lead . . . to the intolerable result of condoning an execution that violates the Eighth Amendment." *Id.*

### 2. Mr. Bourgeois may proceed under § 2241 because he presents a structural error with § 2255.

The Government also argues that § 2255 is not inadequate or ineffective "simply because Bourgeois may be barred from filing a second § 2255 motion." GR at 49–50. Yet Mr. Bourgeois's claim is not premised on the mere fact that his successor application was denied. Rather, just like the petitioner in *Webster*, Mr. Bourgeois argues that § 2255, as interpreted by the Fifth Circuit, is inadequate or ineffective because a "glitch" in the wording of § 2255(h) precludes him from challenging the fundamental legality of his death sentence. *See Webster v. Lockett*, Case 2:12–cv–00086–JPH–MJD, ECF Doc. 1 at 30 (filed Apr. 6, 2012).

The Government attempts to distinguish *Webster*, in part, by stating that Mr. Webster "could not have used" *Atkins* in his first § 2255. GR at 55. In fact, Mr. Webster not only raised an *Atkins* claim in his initial § 2255 proceedings, he also unsuccessfully sought authorization to re-raise that claim in a successor petition. And—just as it does here—the Government argued in *Webster* that the petitioner's prior *Atkins* litigation precluded him from proceeding under § 2241. *See Webster v. Lockett*, Case 2:12–cv–00086–JPH–MJD, ECF Doc. 17 at 12 (filed Aug. 7, 2012) ("The remedy provided in section 2241 does not become available to Webster simply because he cannot meet the requirements for filing a successive section 2255 motion."). Of course, the

**PA-330**

Seventh Circuit rejected that argument, allowing Mr. Webster to use § 2241 to bring—and ultimately prevail on[4]—his successive *Atkins* claim. *See Webster*, 784 F.3d at 1138–39.

The Government also attempts to distinguish *Webster* on the ground that it involved newly discovered evidence. *See* GR at 31–32. But again, nothing in *Webster* limits § 2241 relief to *Atkins* claims that are procedurally identical to Mr. Webster's, i.e., those that involve new facts that the claimant could not have reasonably discovered earlier. As with the previous § 2241 cases on which *Webster* relied, *Webster* itself is "best underst[ood] . . . as [an] appropriate application[] of the law to the facts before the court." 784 F.3d at 1137.

Looking to the reasoning (as opposed to the facts) behind *Webster*, the Government's distinction between Mr. Webster's case and that presented by Mr. Bourgeois is meaningless. In *Webster*, the petitioner filed a § 2241 petition raising an *Atkins* claim based on newly discovered evidence establishing his intellectual disability. He argued that § 2255 was ineffective to prove he was categorically ineligible for execution because the language of § 2255(h)(2) limits successors based on new evidence to those establishing innocence of *the offense*. The Seventh Circuit agreed, explaining there is a "lacuna in the statute" for the "narrow set of cases" involving claims of categorical ineligibility for execution. *Webster*, 784 F.3d at 1138. The *Webster* court went on to reject the proposition that the procedural language of § 2255 could render an *Atkins* claim "beyond the scope of the savings clause" and "create the possibility of an unconstitutional punishment." *Id.* at 1139.

The same reasoning applies here. The relitigation bar in § 2244(b)(1) was enacted as part of AEDPA, i.e., before any categorical exclusion against execution of the intellectually disabled existed. Thus, Congress could not have contemplated the situation in which Mr. Bourgeois now

---

[4] *See Webster*, 2019 WL 2514833, at *1 (granting relief on remand).

finds himself: categorically exempt from a death sentence, but without recourse under § 2255 to prevent his unconstitutional execution. The particular provision of AEDPA that placed him in this position is irrelevant. As the *Webster* court explained, Mr. Webster could proceed under § 2241 because the wording of § 2255(h) foreclosed his ability to challenge "a particular sentence [that] was *constitutionally forbidden*." *Id.* at 1138. Mr. Bourgeois should be allowed to do the same.

**B.     Mr. Bourgeois Has Never Received Judicial Review of His *Atkins* Claim Under Constitutionally-Mandated Diagnostic Standards.**

In addition to challenging that Mr. Bourgeois has established a structural defect with § 2255 within the meaning of prior Seventh Circuit jurisprudence, the Government argues that Petitioner is unable to make use of the Savings Clause because "he fully adjudicated" his *Atkins* claim in first § 2255 proceeding. GR at 5. But as explained in Mr. Bourgeois's Petition and below, his claim is that he is intellectually disabled under the medical community's diagnostic standards, which then-binding Fifth Circuit jurisprudence precluded the District Court from considering at the time of its 2011 decision denying *Atkins* relief.

The Government tries to argue otherwise, even claiming that the court "prescien[tly]" applied diagnostic criteria that were not published until two years *after* the court penned its decision. *See* GR at 79 (referring to the standards set forth in the DSM–5).[5] It is absurd to state

---

[5] As explained in the Petition, the American Association on Intellectual and Developmental Disabilities ("AAIDD") and the American Psychiatric Association ("APA") are the leading diagnostic authorities in the field of intellectual disability. *See* Pet. ¶ 5; *see also Moore–I*, 137 S. Ct. at 1053 (citing the current manuals from the APA and the AAIDD as offering the best available description of how mental disorders are expressed and can be recognized by trained clinicians."). The AAIDD published the most recent edition of its manual entitled *Intellectual Disability: Definition, Classification, and Systems of Supports Definition Manual*, in 2010 ("AAIDD–10"). The AAIDD is also publisher of the *User's Guide: Intellectual Disability, Definition, Classification, and Systems of Supports*, the most recent edition of which was issued in 2012; and *The Death Penalty and Intellectual Disability*, issued in 2015. The most

11

that the District Court followed diagnostic criteria that did not exist at the time of Mr.

Bourgeois's § 2255 proceedings. But the court did not even apply the diagnostic standards that

were current as of 2011; to the contrary, it deliberately rejected them. Hence, the review that Mr.

Bourgeois now seeks in this Court is not simply an attempt to relitigate or appeal the § 2255

Court's denial of relief. It is a request to receive review of his *Atkins* claim—for the first time—

under the medical community's standards for diagnosing ID, as required by Supreme Court

jurisprudence, before he is unconstitutionally executed on January 13, 2020.

### 1. The § 2255 District Court's opinion cannot be considered a "reliable judicial determination" of Mr. Bourgeois's claim in the wake of *Moore–I*.

According to the Government, Mr. Bourgeois's *Atkins* claim "began . . . in the Southern

District of Texas and ends there," GR at 2, as the § 2255 Court has already reliably adjudicated

the claim. The success of this argument depends on the Government establishing—as it attempts

to do in Section B of the Response—that the § 2255 Court's adjudication of Mr. Bourgeois's

claim is consistent with *Moore–I*'s requirement that *Atkins* be assessed according to diagnostic

standards. But, unlike in *Fulks*, there is *no doubt* in this case that the § 2255 Court "applied

factors that the Supreme Court subsequently deemed inappropriate in *Moore*." *Fulks*, 2019 WL

4600210, *16 n.9. Indeed, the District Court repeatedly and expressly eschewed the medical

standards for ID in favor of a "legal" approach grounded in erroneous stereotypes of the

intellectually disabled. The Government's attempts to establish otherwise are unconvincing.

First, the Government contends that the District Court complied with the principles

announced in *Moore–I*, and even complied with diagnostic standards that had not yet been

published, simply because the court recognized that ID is assessed under three prongs (i.e.,

---

recent edition of the APA's guidelines is found in the Diagnostic and Statistical Manual of
Mental Disorders—5th Edition ("DSM–5").

subaverage intellectual functioning, adaptive deficits, and onset before age eighteen). *See, e.g.*, GR at 79–80 ("Conforming with the Supreme Court's later decisions in *Hall* [*v. Florida*, 572 U.S. 701 (2014)] and *Moore*, the district court consulted, relied on, and adhered to the AAIDD and APA's clinical definition of intellectual disability/mental retardation contained in AAIDD–11 (2010) and DSM–IV–TR (2000)[6] in making its *Atkins* determination."); *id.* at 79 ("Whether through prescience or thorough research of substantive *Atkins* and/or *Atkins*-related procedural issues developing in federal and state courts at that time, the district court analyzed intellectual disability under *Atkins* according to the APA's definition of intellectual functioning deficits in the DSM–5."). But *Moore–I* and *Moore–II*, make clear that applying the clinical definition of intellectual disability is much more than simply reaching opinions on the three prongs of the diagnosis. Indeed, for both rounds of review in Bobby Moore's case, the CCA made findings on all three prongs of ID.  However, because the CCA assessed those three prongs with reference to standards that violated the "medical community's diagnostic framework," the Supreme Court held that Texas's approach to the *Atkins* analysis "creat[ed] an unacceptable risk that persons with intellectual disability will be executed." *Moore–I*, 137 S. Ct. at 1048, 1053. The same is true here.

Second, the Government denies that the District Court "disregard[ed] Bourgeois' Full Scale IQ test scores, rel[ied] on various unscientific stereotypes, or rel[ied] on its own 'armchair assessment'" in assessing whether Petitioner satisfies prong one. GR at 83. Unfortunately for the Government, the plain language of the District Court's opinion repeatedly and unambiguously proves otherwise, as summarized in the following chart:

---

[6] The DSM–IV–TR is the fourth edition of the APA's Diagnostic and Statistical Manual, published in 2000, and was the current version of the DSM at the time of Mr. Bourgeois's § 2255 proceedings.

13

| Government Response | District Court Opinion |
|---|---|
| The court did not "disregard Bourgeois' Full Scale IQ test scores." | "The psychological profession allows any score falling along that range [of 70–75] to qualify for a diagnosis of mental retardation. . . . Courts, however, endeavor to determine whether a borderline score represents an intelligence capacity above or below the mental-retardation threshold. In the legal context, whether an inmate had significantly subaverage intellectual functioning is a question of fact that the Court decides." *See, e.g.*, *Bourgeois*, 2011 WL 1930684, at *26. <br><br> "[A]ll cases in which the Fifth Circuit has found that an inmate warrants *Atkins* relief have involved at least one base score below 70 without adjustment." *Id.* |
| The court did not "rely on various unscientific stereotypes." | "Bourgeois' behavior and characteristics are inconsistent with an IQ that would fall below 70" because, inter alia: <br><br> • he "lived a life which, in broad outlines, did not manifest gross intellectual deficiencies," *id.* at *22; <br><br> • he "worked for many years as a long haul truck driver . . . bought a house, purchased cars, and handled his own finances," *id.* at *29; and <br><br> • "otherwise carried himself without any sign of intellectual impairment," *id.* |
| The court did not "rely on its own 'armchair assessment.'" | "Notably, this Court's interactions with Bourgeois have provided an important point of observation. During trial, Bourgeois communicated with the Court on several occasions. The Court viewed his testimony before the jury in both phases of trial. The Court had sufficient interaction with Bourgeois to make a lay assessment of whether he functions at the low level described by his expert witnesses." *Id.* at *30. <br><br> "Based on this Court's own observations, the testimony that Bourgeois has significant intellectual limitations is not credible or persuasive." *Id.* <br><br> "The Court has viewed many hours of video from the examination by Dr. Price and Dr. Moore. Bourgeois answers the questions asked of him, engages in conversation, has logical thoughts, and does not otherwise give any impression of mental retardation." *Id.* at *28. |

14

The Government attempts to explain away the plain language quoted above by casting the District Court's prong-one conclusion as merely the product of its crediting the Government's experts (Drs. Price and Moore) over those presented by petitioner (Drs. Gelbort, Weiner, and Swanson). *See, e.g.*, GR at 83 (court did not rely on stereotypes, but rather "credited Dr. Price and Dr. Moore's assessment of Bourgeois'[s] intellectual functions based on IQ scores evaluated in conjunction with considerations listed in the DSM–5"); GR at 91 (court "critically analyzed the diametrically opposed conclusions by the medical experts, assessed the credibility and accuracy of their assessments and reports based on the evidence, and examined the veracity of the evidence underlying their professional judgment").

This argument ignores that the District Court relied on its own lay assessment of Mr. Bourgeois's functioning. *See supra.* Yet even assuming the Court's conclusions were presented only as credibility determinations, *Moore–II* makes clear that a court cannot circumvent the application of medical criteria by couching its decision in terms of "credibility." *See Moore–II*, 139 S. Ct. at 670 (recognizing that CCA purported to abandon *Briseño* factors and base its post-*Moore–I* denial of relief on finding that the state's expert was more credible, but finding the CCA nevertheless repeated same practices invalidated in *Moore–I*). That is precisely what the District Court did here, as each of the credibility determinations cited by the Government is either founded on a misrepresentation of the record and/or itself involves a violation of diagnostic criteria.

For instance, as already discussed in Mr. Bourgeois's Petition, the court supported its decision to ignore Petitioner's presumptively-qualifying IQ scores based, in part, on Dr. Price's contra-diagnostic testimony concerning Mr. Bourgeois's lack of education and his "cultural deprivation." *See, e.g.*, Pet. ¶ 133 (explaining that, per *Moore–I* and diagnostic guidelines, Mr.

15

Bourgeois's limited education and lack of stimulation are factors that make intellectual disability more, not less, likely). Additionally, as the Government highlights, the District Court cites to Dr. Price's testimony that "it was 'very unusual' that the results of Bourgeois's academic achievement scores . . . showed high-school age proficiency higher than his IQ scores." GR at 83–84 (citing *Bourgeois* at * 29). In fact, twelve of Mr. Bourgeois's thirteen scores on the Woodcock–Johnson III ("WJ–III") were in the impaired range.[7] As set forth in the Petition:

> Petitioner's individual achievement test scores on the WJ–III include: story recall at a kindergarten level; applied problem solving at a second grade level; oral comprehension and passage comprehension at a third grade level; writing samples and understanding directions at a fourth grade level; calculation, reading fluency, and writing fluency at a fifth grade level; and math fluency at a sixth grade level. *See* A0240. The only tests on which he scored above a sixth grade level—letter-word identification (eighth grade) and spelling (thirteenth grade)—are tests that implicate mere rote learning, as opposed to any problem solving, analysis, or higher-level thinking.

*See* Pet. ¶ 50. Hence, the only "high school range" score Mr. Bourgeois received was for spelling. Although Dr. Moore testified otherwise, he was discussing the "scaled score" column of the test results, rather than the "age and grade equivalent" column, despite acknowledging that the then-current version of the DSM described the level of functional academics achievable by a person with ID in terms of grade level, not standard score. Tr. 9/24/10 at 180–85; *see also* DSM–IV–TR at 43 ("[B]y their late teens," individuals with mild intellectual disability could "acquire academic skills up to approximately the sixth-grade level.").[8] And even looking to the "scaled

---

[7] Both the Government and defense experts agreed that the WJ–III was the most comprehensive of the achievement tests administered. *See* Tr. 9/23/10 at 265 (Price); Tr. 9/10/10 (p.m.) at 46–47 (Gelbort); Tr. 9/20/10 at 44 (Swanson).

[8] As discussed in the Petition, the DSM–5 does away with any specific grade cut-off, describing the level of functioning necessary for significant impairments in the conceptual domain as follows: "For school-age children and adults, there are difficulties in learning academic skills involving reading, writing, arithmetic, time, or money, with support needed in one or more areas to meet age-related expectations. In adults, abstract thinking, executive

16

score" column, Dr. Moore conceded on cross that Mr. Bourgeois had five scores that are "two standards deviations below the mean," including broad Math, Brief Math, Story Recall, Applied Problems, and Story Recall Delay—all of which implicate higher-level thinking as opposed to rote memorization. *Id.* at 181–82. Under diagnostic standards—then and now—this constituted evidence of impairment and was consistent with ID. Accordingly, the District Court had no basis for crediting Dr. Price's testimony that Mr. Bourgeois's IQ scores were inconsistent with his achievement testing.

More generally, the Government claims that the District Court "credited Dr. Price's and Dr. Moore's judgment" of Mr. Bourgeois's intellectual functioning "based on the evidence viewed in proper context." GR at 84. However, the Government immediately goes on to cite many of the erroneous stereotypes that these experts used to support their opinions, including Mr. Bourgeois's ability to "read and understand and conceptualize *some* of the things that he was able to talk about," that he "express[ed] himself in complete thoughts," "often" wrote "compound sentences," "communicated his ideas effectively," and worked as a truck driver. GR at 84–85. None of these "skills" is inconsistent with a diagnosis of ID, and all reflect the types of erroneous stereotypes of ID condemned in *Moore–I* and diagnostic guidelines. *See* Pet. ¶¶ 41, 129–31.[9]

---

function . . ., and short-term memory, as well as functional use of academic skills (e.g., reading, money management) are impaired." A0076 (DSM–5 at 34).

[9] That the Government quotes these purported "strengths" in its briefing to support the argument that the District Court applied clinical standards demonstrates a profound lack of understanding on the part of the Government regarding the diagnostic criteria and the Court's holdings in *Moore–I* and *Moore–II*. The same is true regarding the Government's favorable citation to Dr. Price's opinion that Mr. Bourgeois's low IQ scores could be explained by his limited education and "cultural deprivation." GR at 83.

17

By contrast, Mr. Bourgeois's prong-one experts, Drs. Wiener and Gelbort, supported their conclusions as to the validity of Petitioner's IQ scores, in part, with reference to the consistency between the full-scale scores he received on each test, as well as the consistency in the overall pattern of correct and incorrect answers on each test. *See, e.g.*, Tr. 9/10/10 at 32 (Dr. Gelbort explaining it would be very difficult for an individual to "feign bad" in the same way on two tests administered three years apart); Tr. 9/20/10 at 223–25, 229 (Dr. Weiner testifying similarly); *see also Webster v. Lockett*, No. 2:12–v–86–WTL–MJD, 2019 WL 2514833, *7 (S.D. Ind. June 18, 2019) (citing, in support of finding petitioner's IQ tests scores valid, expert testimony that "it would be 'extremely difficult' to consistently fake IQ scores" across multiple tests). And, contrary to the District Court's assertion that Dr. Gelbort relied on the "naked IQ scores" for his opinion of Mr. Bourgeois's functioning, *Bourgeois*, 2011 WL 1930684, at *25, Dr. Gelbort in fact testified that he also considered the neuropsychological and achievement testing administered to Mr. Bourgeois, as well as historical records and the manner in which he presented in his evaluations by Dr. Gelbort and Government experts, *see* Tr. 9/10/10 at 26, 28–30, 38–39. The court's only reason for discrediting Dr. Gelbort's testimony rests on a mischaracterization of the record and a disregard of diagnostic standards. *See Bourgeois*, at *26 (misrepresenting Dr. Gelbort's testimony as to whether he was willing to consider Mr. Bourgeois's "courtroom behavior" in his assessment and ignoring that diagnostic standards preclude reliance on verbal behavior and prison functioning in the diagnosis of ID).

In light of the foregoing, there is no support for the Government's claim that the § 2255 Court's prong-one determination is based on a proper credibility finding that is consistent with diagnostic standards.

18

Third, even given the District Court's express rejection of diagnostic standards and extensive reliance on non-clinical factors in the evaluation of prong one, the Government ultimately claims that the court "did precisely the two things that *Hall* and *Moore* direct" a court to do in assessing intellectual functioning:

> [The Court] afforded Bourgeois the opportunity to present his evidence and argument on *Atkins*' three-part criterion without limitation. And, after finding that Bourgeois' IQ test score fell within a presumptive range accepted by the medical community as a qualifying score for a diagnosis of mental retardation (but that a fuller view of his abilities does not correspond to a finding of significant intellectual limitations), the court continued its inquiry into *Atkins*' adaptive deficits criteria.

GR at 87–88.

Yet *Moore–I* does not merely require the presentation of evidence and argument on "*Atkins*' three-part criterion without limitation." Rather, *Moore–I* "made clear . . . that courts should not disregard the medical community's current standards in favor of applying a judicially-created standard." GR at 77. And, with respect to prong-one specifically, *Moore–I* rejected the argument that a court could "properly consider[] factors unique" to the petitioner in order to disregard "the lower end of the standard-error range" for his IQ scores, *Moore–I*, 137 S. Ct. at 1049, which is precisely what the District Court did in Mr. Bourgeois's case. Rather, *Moore–I* held that "the presence of other sources of imprecision in administering the test to a particular individual, cannot *narrow* the test-specific standard-error range." *Id.* (internal citations omitted) (emphasis in original).

Furthermore, *Moore–I* held that, where a petitioner's IQ score falls within the presumptive range for ID, the court cannot "end the intellectual-disability inquiry" based on that score, but instead that the reviewing court was required to find prong one to be established and move on to prong two. *Moore–I*, 137 S. Ct. at 1050; *see also id.* at 1049 ("Because the lower end of Moore's score range falls at or below 70, the CCA had to move on to consider Moore's

19

adaptive functioning."). Like the CCA in *Moore*, the District Court here expressly found that Mr. Bourgeois had failed to meet prong one, and it also held that *this finding alone "doom[ed]"* his *Atkins* claim. *Bourgeois*, 2011 WL 1930684, at *31. This violated *Moore–I*[10] and diagnostic standards, which *require* that courts find prong one satisfied and proceed to prong two "where an individual's IQ score, adjusted for the test's standard error, falls within the clinically established range for intellectual-functioning deficits." *Moore–I*, 137 S. Ct. at 1049–50. The mere fact that the court conducted a prong-two assessment "in the interests of justice," *Bourgeois*, 2011 WL 1930684, at *31, does not render the court's approach compliant with *Moore–I*.

Fourth, the Government denies that the District Court relied on the "judicially-created *Briseño* factors that formed the basis of the error explored in *Moore I* and *Moore II*" or "any facsimile of the *Briseño*-test applied by the CCA in *Moore*." GR at 88 (referring to the standards first set forth in *Ex parte Briseño*, 135 S.W.3d 1 (Tex. Crim. App. 2004), *abrogated by Moore–I*, 137 S. Ct. 1039). The Government's position is contradicted by the fact that many of the examples of behavior the District Court found inconsistent with a diagnosis of ID directly implicate at least one of the invalidated *Briseño* factors. *See* Pet. ¶ 142. It is also contradicted by the District Court's conclusions that Mr. Bourgeois "never gave the Court any impression that he functioned at an intellectual level *equal to that of a child*," and that ID-range functioning "*should be obvious*." *Id.* at *31, n.42. Such comments demonstrate a view of intellectually disabled persons directly on par with the view that led to creation of the *Briseño* factors in the first place. As explained in the Petition, the CCA in *Briseño* explicitly stated that its goal was to "define that level and degree of mental retardation at which a consensus of Texas citizens would agree that a

---

[10] The *Moore–II* Court did not address prong one, as the CCA focused only on prong two in re-evaluating Mr. Moore's claim on remand following *Moore–I. See Moore–II*, 139 S. Ct. at 670.

20

person should be exempted from the death penalty," *Briseño*, 13 S.W.3d at 6, and pointed to the fictional character "Lennie" from John Steinbeck's *Of Mice and Men* as someone who "might" be considered by Texans to be entitled to *Atkins* relief. *Id.* The CCA then went on to invent the *Briseño* factors as a way for courts to determine if a particular defendant's functioning was sufficiently close to that of Lennie, in which case the defendant would be entitled to *Atkins* relief.

Here, the mere fact that the District Court did not directly cite to the now-overruled *Briseño* decision does not mean that its adaptive-behavior assessment was any less rooted in the "lay stereotypes of the intellectually disabled" that caused the Supreme Court to reverse the CCA's decisions in *Moore–I* and *Moore–II*. *Moore–I*, 137 S. Ct. at 1052.[11] Indeed, in *Moore–II*, the Supreme Court found that the CCA had continued to effectively employ certain *Briseño* factors, despite expressly claiming that it had abandoned reliance on them when assessing Mr. Moore's *Atkins* claim on remand. *See Moore–II*, 139 S. Ct. at 670–72.

Fifth, the Government denies "Bourgeois' global claim that the district court counteracted his adaptive deficits by overemphasizing adaptive strengths and unscientific stereotypes of intellectually disabled individuals." GR at 89. It supports this position, in part, by noting that the court "referred" to the fact that "the AAIDD–2010 adopts an underlying 'assumption' in the definition of mental retardation that 'within an individual, limitations often coexist with strengths." GR at 90 (citing *Bourgeois* at *32). Incredibly, however, the Government fails to mention that the court *immediately thereafter* stated:

> The Fifth Circuit, however, teaches that the *Atkins* inquiry should not be so narrow as to ignore that which an inmate can do, even if the psychological profession approaches the issue differently. . . . The law makes a holistic view of an individual, recognizing that a few reported problems may not negate an inmate's ability to

---

[11] As explained in the Petition, the District Court did cite to numerous Fifth Circuit decisions denying habeas relief to Texas prisoners whose *Atkins* claims had been rejected in state court, including those denied relief under the *Briseño* factors. Pet. ¶¶ 126–27.

communicate, to abstract from mistakes, to learn from experience, to engage in logical reasoning, and to have healthy relationships with others. Accordingly, *the federal inquiry into adaptive deficits takes on a much different flavor than that done by mental health professionals*.

*Bourgeois*, 2011 WL 1930684, at *32; *see also id.* at *33 ("The law will compare the

deficiencies to positive life skills, presuming that adaptive successes blunt the global effect of

reported insufficiencies.").

Undeterred by the court's plain language, the Government also contends that, in practice,

"[t]he court did not find that Bourgeois['s] perceived adaptive strengths counteracted the

evidence of his adaptive deficits." GR at 91. Once again, the Government ignores the District

Court's own words:

> The evidentiary hearing and record create a complex picture of Bourgeois' life, resulting in an entangled mosaic of strengths and limitations. . . . This Court's task in reviewing *Atkins*['s] second prong is to decide whether, on a global level, those problems amount to significant deficits in adaptive functioning. As previously mentioned, *this Court's review differs from that employed by the psychological community. The Court . . . compares the alleged deficiencies against his whole life experienc*e. . . .
>
> Bourgeois has not made a convincing showing that he suffers from significant adaptive deficits that would serve as a predicate for mental retardation. *The record shows strengths that more than coexist with weaknesses, they call into question the depth and accuracy of reports of those weaknesses*. The Court finds that Bourgeois has not shown substantial adaptive deficits by a preponderance of the evidence.

*Bourgeois*, 2011 WL 1930684, at *40, 44.

As it does in defense of the court's prong-one analysis, the Government attempts to

reframe the court's findings as the product of a credibility determination among competing

experts. Again, this ignores that the District Court expressly relied on its own lay assessment of

Mr. Bourgeois's functioning. *See, e.g.*, *Bourgeois*, 2011 WL 1930684, at *43 ("This Court's

observation of Bourgeois, both in the courtroom and in his video recordings, does not suggest

22

any impairment in the social domain."); *id.* at n.42 (Bourgeois "never gave the Court any impression that he functioned at an intellectual level equal to that of a child.").

And again, the Government ignores that the District Court's credibility determinations are unsupported by the diagnostic criteria. For instance, the Government first cites to the court's finding that Dr. Swanson failed to "make a full review of available evidence relating to Bourgeois's adaptive abilities." GR at 91. However, as discussed in the Petition, the court discounted Dr. Swanson's conclusion precisely because, unlike Dr. Moore, Dr. Swanson complied with diagnostic criteria. *See* Pet. ¶ 139. For instance, the court criticized Dr. Swanson for focusing on adaptive deficits rather than adaptive strengths, despite the court having acknowledged the medical community does the same. *See id.* Additionally, the court criticized Dr. Swanson for "refus[ing] to factor Bourgeois' long colloquies with the Court" into its assessment, even though Dr. Swanson explained that the AAIDD–2010 precludes reliance on "verbal behavior to infer level of adaptive behavior or about having ID." *Bourgeois*, at *42 n.69; Tr. 9/20/10 at 174. More generally, the court complained that a "persistent feature of the testimony from Bourgeois' experts"—including Dr. Swanson—"was a failure to consider fully his alleged intellectual limitations against the whole background of his life." *Bourgeois*, at *29. The court based this conclusion on the fact that "testimony from various individuals questioned his intellect when younger, [but] those who knew him as an adult did not suspect that he was mentally retarded." *Id.* However, *Moore–I* expressly struck down the *Briseño* factor that instructed courts to consider whether the person's "family, friends, teachers, [and] employers" thought he was ID. *Moore–I*, 137 S. Ct. at 1051 (citing *Briseño*, 135 S.W.3d at 8); *see also id.* ("[T]he medical profession has endeavored to counter lay stereotypes of the intellectually disabled.").

23

The Government also cites to the District Court's decision to credit the scores obtained by Dr. Moore's administration of the ABAS to "multiple respondents"—Mr. Bourgeois's sister, Michelle Armont; co-workers Danny Clark and Rhonda Davis; and friend Nathaniel Banks—over the scores obtained by Dr. Swanson's administration of the Vineland and ABAS to Beverly Frank. GR at 91–92.

The Government's reliance on the ABAS scores argument also runs contrary to diagnostic standards. As noted in the Petition, even under ideal circumstances, formal adaptive behavior testing is far less reliable that IQ, achievement, or neuropsychological testing.  For this reason, formal tests of adaptive behavior such as the ABAS are not meant to be the sole basis for an adaptive behavior assessment, but one piece of data alongside collateral reports from witness, record review, and more reliable neuropsychological and achievement testing.  *See* Pet. at ¶¶ 77–81 (citing the AAIDD–10 and DSM–5).

In this case, the circumstances are not ideal. All formal adaptive behavior tests are designed for the contemporaneous assessment of the individual in question—meaning the report is asked about the individual's functioning right now. In an *Atkins* case, by necessity, all formal adaptive behavior instruments must be administered retrospectively—meaning the reporter is asked about the individual's functioning in the past. This departure from the test protocol undermines the reliability of the results. *See* Pet. ¶ 77. Experts for both parties, as well as the District Court, acknowledged the shortcomings with the formal adaptive behavior testing in this case. *Id.*; *Bourgeois*, 2011 WL 1930684, at *33. The Government's attempt to rely on this testing now runs contrary to the diagnostic standards and the testing protocol upon which the tests were based.

24

However, even assuming, *arguendo*, that the tests were appropriately relied on by the Government, these test results *supported* a finding of intellectual disability as the only one of Dr. Moore's respondents who produced valid results returned scores in the intellectually disabled range. The ABAS–II consists of a series of questions regarding the functioning of the individual being assessed. The respondents (including the respondents used by Dr. Moore), are required to answer each one of these questions, even if they are guessing and do not know what the answer to that question is. If a respondent provides more than three guess in any one of the ten skill areas addressed by the ABAS–II, then the validity of that respondent's answers are in question and the administrator is instructed to interview the respondent as to the reason for the guesses and consider if the respondent has sufficient knowledge for the administration of the ABAS–II to proceed or the test administration should be abandoned. Harrison, P. L. & Oakland, T., *Manual: Adaptive Behavior Assessment System–2d Ed.*, The Psychological Corporation (2003) at 23.

Here, where more than three guesses in one skill area would have been cause for concern, Mr. Clark, Ms. Davis, and Mr. Banks exceeded the three-guess threshold in eight of ten areas (Clark and Davis) or seven of ten areas (Banks). Moreover, Dr. Moore failed to perform the required follow-up interviews on the reason for the large number of guesses on any of these respondents. In the end, the two respondents who were able to validly assess Mr. Bourgeois's adaptive behavior under diagnostic standards—Ms. Armont and Ms. Frank—each placed him in the impaired range for all three domains of functioning and the composite score.[12] And Dr. Swanson's explanation that she did not administer additional formal testing because she was

---

[12] Ms. Armont's scores were as follows: General Adaptive Composite: 61, Conceptual: 55, Social: 60, Practical: 70. Ms. Frank's scores on the Vineland were General Adaptive Composite: 66; Communication (Conceptual): 69; Socialization (Social): 66; Daily Living Skills (Practical): 66.

25

unable to find another reporter with enough knowledge of Mr. Bourgeois's life to merit such testing, aside from Ms. Armont (who had already been given testing by Dr. Moore), is supported by Dr. Moore's results. *See* Tr. 9/20/10 at 154–56. Hence, the District Court's decision to credit Dr. Moore's testing and disregard that conducted by Dr. Swanson violated diagnostic standards and was merely another manifestation of its unscientific approach to ID.

It is also worth noting that the ABAS's ten skill areas correspond to the ten areas that the DSM–IV–TR used to measure adaptive functioning[13] and under that definition, Mr. Bourgeois need only have demonstrated deficits in *two* of the ten areas to satisfy prong two. *See* DSM–IV–TR at 41. Thus, even if the testing results of Mr. Clark, Ms. Davis, and Mr. Banks were treated as valid, the fact that they were unable to knowledgeably assess Mr. Bourgeois's functioning in the majority of skill areas makes those test results *irrelevant* to a clinical diagnosis of ID.

Finally, the Government contends that the District Court's prong-two analysis was a product not only of its crediting Dr. Moore over Dr. Swanson, but also of the court "reasonably assess[ing] and weight[ing] the reliability of competing lay testimony." GR at 92. However, because all of the Government's lay witnesses were colleagues of Mr. Bourgeois who knew him only in a work setting,[14] and because Mr. Bourgeois need have only established adaptive deficits

---

[13] As the District Court explained, at the time of Mr. Bourgeois's § 2255 proceedings, the AAIDD and APA used different "subcategories of deficiencies" under prong two, but the two approaches "capture the same range of functional aptitude." *Bourgeois*, 2011 WL 1930684, at *31.

[14] As noted above, because Mr. Bourgeois was only required to establish deficits in two of the DSM–IV–TR's ten skill areas, or one of the AAIDD's three types of adaptive behavior (conceptual, social, or practical), the fact that the Government's lay witnesses knew him only in a work setting severely limited the relevance of their testimony. These witnesses' testimony was also limited by the fact that none knew Mr. Bourgeois during the developmental period, particularly given that all of the experts agreed Mr. Bourgeois had become skilled at masking his deficits by the time he reached adulthood. *See* Pet. § III.C.3.d.

in one of the three AAIDD domains or two of the APA's ten skill areas, even if the District Court had fully credited the testimony of each of the Government's lay witnesses, Mr. Bourgeois would still meet the definition of intellectual disability.

### 2. Mr. Bourgeois's current *Atkins* claim relies on the application of the medical community's diagnostic standards, which was not available to him at the time of his initial § 2255 proceedings.

Given the impossibility of demonstrating that the § 2255 District Court's decision complies with *Moore–I* and *Moore–II*, the Government alternatively argues that Mr. Bourgeois's Petition should be rejected because it is simply an improper attempt to relitigate or appeal the § 2255 Court's 2011 denial of relief. *See, e.g.*, GR at 72 ("[T]hough Bourgeois seeks to characterize his *Atkins* claim as new (or at least revised), in reality he seeks to relitigate his same 2011 *Atkins* claim in this § 2241 habeas petition."); *id.* ("[T]he Southern District of Texas judge's legal and factual *Atkins* determinations are not unreasonable merely because the Supreme Court, a circuit court, or this Court 'would have reached a different conclusion in the first instance.'"). But Mr. Bourgeois does not dispute that the District Court's legal analysis was compelled by Fifth Circuit precedent valid at the time of its decision. Indeed, that is precisely the reason that Mr. Bourgeois did not seek a Certificate of Appealability on his *Atkins* claim. *See* Pet. ¶¶ 125–26 (describing Fifth Circuit's pre-*Moore–I* jurisprudence); *see also Cathey v. Davis (In re Cathey)*, 857 F.3d 221, 231 (5th Cir. 2017) (recognizing that Fifth Circuit jurisprudence at the time of petitioner's initial habeas made an *Atkins* claim "unviable"). Rather, Mr. Bourgeois argues that he is constitutionally entitled to review of his *Atkins* claim under *Moore–I*, and that his claim relies on the application of standards not available under Fifth Circuit jurisprudence binding at the time of his § 2255 proceedings. And the Government's arguments against application of these current standards are unpersuasive.

27

a. **Mr. Bourgeois is entitled to *Atkins* review under diagnostic and legal standards constitutionally-mandated at the time of his execution.**

The Government's argument that Mr. Bourgeois has received his one and only shot at *Atkins* relief ignores that Supreme Court jurisprudence dating back to *Atkins* prohibits the *execution* of the intellectually disabled. In *Atkins*, the Court concluded that "[capital] punishment is excessive and that the Constitution 'places a substantive restriction on the State's power *to take the life*' of a mentally retarded offender." *Atkins*, 536 U.S. at 320 (quoting *Ford v. Wainwright*, 477 U.S. 399, 405 (1986), which likewise categorically prohibits the *execution* of a particular class of capital prisoners); *id.* at 321 ("We are not persuaded that the *execution of mentally retarded* criminals will measurably advance the deterrent or the retributive purpose of the death penalty.").

In the years that followed, the Supreme Court repeatedly confirmed that *Atkins* prohibited the *execution* of the intellectually disabled, not just the imposition of the death sentence on intellectually disabled defendants. In 2005, when announcing a categorical ban on the execution of individuals who committed crimes as juveniles, the Supreme Court noted that *Atkins* bars "the *execution* of a mentally retarded person." *Roper v. Simmons*, 542 U.S. 551, 559 (2005). In 2014, the Supreme Court rejected practices relating to the interpretation of intelligence testing in *Atkins* proceedings that violated diagnostic standards because those invalid practices would create in an "unacceptable risk that persons with intellectual disability will be *executed*." *Hall*, 572 U.S. at 704 (emphasis added). In 2015, *Brumfield v. Cain*, 135 S. Ct. 2269 (2015), again confirmed that "[i]n [*Atkins*], this Court recognized that the *execution* of the intellectually disabled contravenes the Eighth Amendment's prohibition on cruel and unusual punishment" and that the "Eighth Amendment places a *substantive restriction* on the State's power to *take the life* of a mentally retarded offender." *Id.* at 2273–74 (emphasis added, internal citations and quotations omitted).

28

**PA-349**

Finally, in 2017, *Moore–I* rejected invalid diagnostic practices, again because the use of such practices "creat[ed] and unacceptable risk that persons with intellectual disability will be *executed*." *Moore–I*, 137 S. Ct. at 1044 (quoting *Hall*, *supra*) (emphasis added).

The Government's argument also violates the right, created by *Moore–I*, to receive an *Atkins* adjudication under *current* diagnostic standards. As discussed in the Petition, *Moore–I* overturned the Texas CCA's outdated approach to ID, holding that courts must apply the "medical community's current standards" in making an *Atkins* determination. *Moore–I*, 137 S. Ct. at 1053. Citing manuals from the APA and AAIDD, *Moore–I* held that "[r]eflecting improved understanding over time, . . . current manuals offer the best available description of how mental disorders are expressed and can be recognized by trained clinicians." *Id.* (internal quotations omitted). In accordance with this holding, *Moore–I* did not assess the CCA's post-conviction assessment of Mr. Moore's intellectual functioning based on the clinical definitions that were in place at the time of trial, but the diagnostic authorities that were present at the time *Moore–I* was litigated. *Id.* at 1050–53.[15]

That Supreme Court jurisprudence categorically bars the *execution* of the intellectually disabled, as opposed to simply the *imposition* of a death sentence on someone who is ID, is significant. Procedural barriers that would normally be permissible become constitutionally invalid if they permit an unconstitutional *execution* to occur. The Seventh Circuit described this dynamic in *Webster v. Daniels*:

> In Webster's case, the problem is that the Supreme Court has now established that the Constitution itself forbids the execution of certain people: those who satisfy the criteria for intellectual disability that the Court has established, and those who were

---

[15] As discussed below, this Court likewise applied current diagnostic standards—as opposed to the standards applicable at the time of trial or § 2255 proceedings—in reviewing Bruce Webster's *Atkins* claim under § 2241. *See Webster*, 2019 WL 2514833, at *3 (citing *Moore–I*, 137 S. Ct. at 1045); *see also infra* § I.B.2.a.

below the age of 18 when they committed the crime.[] In virtually all other situations, Congress has almost unlimited discretion to select the penalty, or the range of penalties, that go along with a particular crime. If Congress selects 20 years, but because of some error that went undetected through direct appeals and an initial motion under section 2255 the defendant receives 25 years, there is no doubt a problem, but it is likely not one of constitutional dimension. Congress could have chosen 25 years to begin with, and the defendant would have had nothing to complain about.

784 F.3d 1123, 1139 (7th Cir. 2015).

The Seventh Circuit went on to describe the "'Kafkaesque' nature of a procedural rule that, if construed to be beyond the scope of the savings clause, would (or could) lead to an unconstitutional punishment." *Id*. at 1139. It accordingly recognized that, where (as here) a "structural problem" with § 2255 prevents a petitioner from establishing that he is categorically exempt from execution, the petitioner may bring a § 2241 petition. *Id*. "To hold otherwise," the Seventh Circuit explained, "would lead in some cases . . . to the intolerable result of condoning an execution that violates the Eighth Amendment." *Id.*; *see also id.* (noting that "a core purpose of habeas corpus is to prevent a custodian from inflicting an unconstitutional sentence").

> **b.** *Moore–I* **and** *Moore–II* **changed the legal landscape governing** *Atkins* **litigation in the Fifth Circuit, thereby making** *Atkins* **newly available to him.**

The Government also insists that Mr. Bourgeois could have relied on the principles enunciated in *Moore–I* and *Moore–II*, "in his first § 2255 motion," which was filed in 2007. GR at 63; *see also* GR at 75 ("[N]either *Hall* nor *Moore* can be understood to yield a result so novel that Bourgeois could not have advanced his legal theories earlier on appeal from the district court's denial of his *Atkins* claim."). But the Government defeats its own argument in its attempt to defend the § 2255 Court's contra-diagnostic analysis of Mr. Bourgeois claim in 2011. Specifically, in Section B of its Response, the Government repeatedly points out that the *Atkins* decision did not prescribe any particular approach to the assessment of ID. *See, e.g.*, GR at 77–

78 ("[T]he [District Court] properly concluded . . . that *Atkins* 'did not provide definitive procedural or substantive guides for determining when a person who claims mental retardation will be so impaired as to fall within the *Atkins* compass.'"); *id.* at 78 ("The district court correctly held that *Atkins* did not delegate to the psychologists the determination of whether an inmate was categorically exempt from execution, but left 'the contours of the constitutional protection to the courts.'"). As the Government concedes, *Atkins* did not mandate the application of diagnostic standards in the assessment of ID. That is precisely why the Government is *incorrect* when it argues that § 2241 is unavailable to Mr. Bourgeois because he could have appealed the District Court's "factual and legal determinations as an unreasonable application of *Atkins*." GR at 75. Prior to *Moore–I*, which *mandates* application of medical standards in the evaluation of *Atkins* claims, Mr. Bourgeois has no authority to challenge settled Fifth Circuit that supported the use of non-scientific factors in the disposition of an *Atkins* claim.

At the very least, there is no question that prior to *Moore–I*, the Fifth Circuit[16] applied the same contra-diagnostic standards that the CCA had applied in the case of Bobby Moore. *See* Pet. § IV.A.2. Indeed, when this Court reviewed Bruce Webster's § 2241 *Atkins* claim on remand in 2019, it applied the principles enunciated in *Moore–I* and reached starkly different conclusions than those reached by the Northern District Court of Texas and Fifth Circuit in Mr. Webster's § 2255 proceedings. *See Webster*, 2019 WL 2514833. For instance, in *Webster*, the § 2255 court supported its conclusion that Mr. Webster did not satisfy prong two by citing to testimony of his purported adaptive strengths and relying largely on erroneous stereotypes of ID. *See Webster v.*

---

[16] As explained in the Petition, § 2241 is available to petitioners if circuit precedent would have required the district court and appellate panel to erroneously reject petitioner's claim at the time of his § 2255 motion. *See* Pet. § IV.A.2 (citing *In re Davenport*, 147 F.3d 605, 611 (7th Cir. 1998)).

31

*United States*, 4:00–CV–1646, 2003 WL 23109787, at \*14 (N.D. Tex. Sept. 30, 2003), *aff'd* 392 F.3d 787 (5th Cir. 2004). By contrast, as required by *Moore–I*, this Court focused on adaptive deficits and gave no weight to evidence of purported strengths that are entirely consistent with a diagnosis of ID:

> The Government has pointed to evidence that Webster does exhibit areas of strength, including, but not limited to, his *musical ability, excellent hygiene, ability to drive, achievement test scores, and ability to engage in conversation*. . . . However, in accordance with guidance from the medical community and as instructed by the Supreme Court, the Court has focused its adaptive-functioning inquiry on adaptive deficits.

*Webster*, 2019 WL 2514833, at \*10; *see also* Pet. § IV.A.2 (describing that the Government presented similar evidence of purported strengths in Mr. Bourgeois's case, which the District Court improperly found defeated his ID claim). The § 2255 court in *Webster* had also relied on testimony of petitioner's adaptive functioning from prison guards and Government experts who had evaluated Mr. Webster while incarcerated. *See Webster*, 2003 WL 23109787, at \*13–14. This Court, however, gave "little weight" to evidence of Mr. Webster's adaptive functioning in prison, citing *Moore–I* for the proposition that "[c]linicians . . . caution against reliance on adaptive strengths developed in a controlled setting, as a prison surely is." *Id.* (citing *Moore–I*, 137 S. Ct. at 1050) (internal quotation marks omitted).

Mr. Webster also presented newly discovered evidence in support of his § 2241 *Atkins* claim. But, according to the Government, "much of what he produce[d] [was] cumulative to evidence produced at trial," and in any event, the "newly available evidence ha[d] insufficient gravitas to raise doubt about earlier fact-finding." *See Webster v. Lockett*, Case 2:12–cv–00086–JPH–MJD, ECF Doc. 17 at 11, 14 (filed Aug. 7, 2012). Hence, the application of diagnostic criteria as newly required by *Moore–I*, rather than the unscientific standards applied under pre-*Moore–I* Fifth Circuit jurisprudence, had a significant impact on Mr. Webster's ultimate success

32

in this Court. The results will be the same in Petitioner's case if he is permitted to proceed under § 2241.

Lastly, while the Government cites to *Shoop v. Hill*, 139 S. Ct. 504, 508 (2019), to support its claim that Mr. Bourgeois could have relied on *Moore–I* and *Moore–II* in 2011, *see* GR at 62, *Shoop* actually *defeats* the Government's argument. There, the Sixth Circuit had cited *Moore–I* in granting habeas relief to a petitioner under 28 U.S.C. § 2254 on the grounds that the state court's pre–*Moore–I* denial of *Atkins* relief unreasonably "overemphasized Hill's adaptive strengths" and "relied too heavily" on prison functioning. *Shoop*, 139 S. Ct. at 506. The Supreme Court reversed, explaining:

> Although the Court of Appeals asserted that the holding in *Moore* was "merely an application of what was clearly established by *Atkins*," the court did not explain how the rule it applied can be teased out of the *Atkins* Court's brief comments about the meaning of what it termed "mental retardation." While *Atkins* noted that standard definitions of mental retardation included as a necessary element "significant limitations in adaptive skills . . . that became manifest before age 18," *Atkins* did not definitively resolve how that element was to be evaluated but instead left its application in the first instance to the States.

*Id.* at 508 (internal citations omitted). In other words, the *Shoop* Court *rejected* the proposition advanced by the Government here, which is that *Moore–I* added nothing novel to *Atkins*. And in any event, *Shoop* was limited to the narrow question of whether *Moore–I* constitutes clearly established federal law for purposes of a § 2254(d) analysis, and does not address the issue of whether the petitioner may be constitutionally executed, which is the only issue relevant here.

### c. Constitutional cases involving a categorical ban against execution may provide the basis for § 2241 jurisdiction.

Next, the Government contends that Mr. Bourgeois cannot rely on *Moore–I* and *Moore–II* as bases for § 2241 jurisdiction because they are "constitutional cases," as opposed to changes in statutory law. *See* GR at 60 ("Constitutional claims, unlike statutory claims, do not reveal 'some kind of structural problem with § 2255' that forecloses a single round of judicial review.")

33

(quoting *Fulks*, 2019 WL 4600210, at \*10). In support of this position, the Government argues that if a petitioner could rely on a new, non-retroactive constitutional case to establish § 2241 jurisprudence, Bruce Webster would have simply relied on the Supreme Court's decision in *Hall v. Florida*, as opposed to newly discovered evidence. GR at 60 n.12. But the *Hall* decision relates specifically to the prong-one component of an ID analysis, whereas Mr. Webster's initial § 2255 *Atkins* claim was denied on the basis of prong two. *See Webster*, 784 F.3d at 1132 (noting that in Mr. Webster's initial § 2255 proceedings, the Fifth Circuit "was willing to accept that Webster had a low I.Q.," but "found that the government's evidence of his adaptive functioning had effectively countered those numbers"); *id.* at 1143 (noting that, contrary to the situation in *Hall*, the main area of dispute between the parties was primarily adaptive functioning, and describing Mr. Webster's case as "*the reverse* of the of the one the Supreme Court discussed in *Hall*"). Thus, *Hall* played no role in *Webster* not because it is a "constitutional case," but because *Hall* was of no use to Mr. Webster. Meanwhile, *Webster did* involve a constitutional case to the extent that, like Mr. Bourgeois, the Mr. Webster sought to relitigate a previously-unavailable claim under *Atkins* and its progeny.

The Government also cites to *Poe*, 834 F.3d at 772, in support of its claim that a constitutional case cannot be used to satisfy the Savings Clause. *See* GR at 60. But the *Poe* holding is based on the fact that petitioner could have brought his § 2241 claim under § 2255 but for his own failure to comply with the statute of limitations. Thus, as in other Seventh Circuit cases, *see* Pet. ¶¶ 104–09 & *supra* § I.A, the *Poe* court did not base its jurisdictional ruling on any particular characterization of the petitioner's argument; it merely considered whether the petitioner was able to establish that, *as a structural matter*, he was precluded from bringing his § 2241 claim under § 2255. *Poe*, 834 F.3d at 774 (distinguishing Mr. Poe's case from that of Mr.

34

Webster on the ground that Poe "was unable to bring his *Richardson* claim because *he* filed the wrong petition under § 2241 and his subsequent petition under § 2255 was untimely") (emphasis in original). Here, Mr. Bourgeois raises a claim of categorical exemption from execution that, like Mr. Webster's and in contrast to Mr. Poe's, could not have been successfully raised in § 2255 proceedings and could not be raised in a successor § 2255 motion.

> **d.   The application of current diagnostic standards will not "forever forestall[] a final decision" in Mr. Bourgeois's case.**

Next, the Government argues that Mr. Bourgeois should not be allowed to rely on new diagnostic standards as a basis for § 2241 jurisdiction because doing so "would permit him to 'refile his claims with each revision of the medical standards governing the diagnosis of intellectual disability' forever forestalling a final decision in this case." GR at 66 (citing *Fulks*, 2011 WL 1930684, at *14). But Mr. Bourgeois does not ask for § 2241 review based solely on his status as an intellectually disabled person. He bases his request for review on the fact that he is perhaps the only § 2255 litigant who raised a timely and meritorious *Atkins* claim, but was denied relief on the basis of circuit jurisprudence subsequently invalidated by *Moore–I*.

Notably, the Government also raised the specter of unending litigation in opposing this Court's jurisdiction under § 2241 in the *Webster* case:

> Webster has had the opportunity for one round of effective collateral review. If he is correct that he must be permitted a second chance to prove his mental retardation because of "new evidence," then will he be permitted a third or fourth chance if he produces still more evidence. For example, if Webster takes another IQ test or has another expert evaluate his adaptive skills, what prevents him from claiming that he must be allowed to proceed under section 2241 once again because he has "new evidence"?

Doc. 17 at 10. The Seventh Circuit rejected this argument based on a finding that Mr. Webster's case presented unique circumstances in that the new evidence existed at the time of trial, could not have been discovered by diligent trial counsel, and bore "directly on the constitutionality of

35

the death sentence." *Webster*, 784 F.3d at 1140 (noting that it "will be a rare case" that meets these requirements, "but not impossible").

Mr. Bourgeois also presents a "rare case." This is not a claim like the one presented in *Fulks*, in which the petitioner conceded that he would not have been ID under diagnostic standards in effect at the time of his § 2255 proceedings. *Fulks*, 2019 WL 4600210, at *11. Here, Mr. Bourgeois has established that, if his claim is assessed under the medical community's diagnostic standards—as of 2011 or as of today—he is undeniably ID. Yet the framework of § 2255 has no mechanism under which he can vindicate his claim.

### C. Mr. Bourgeois's Petition Is Neither an Abuse of the Writ Nor Barred by *Teague*.

Lastly, the Government argues that Mr. Bourgeois's Petition is an abuse of the writ and premised on a theory at odds with *Teague v. Lane*, 489 U.S. 288 (1989). GR at 66–71. This argument suffers from several flaws.

#### 1. Mr. Bourgeois's petition is not an abuse of the writ.

First, the Government cites to *Roundtree v. Krueger*, 910 F.3d 312 (7th Cir. 2018), to argue that Mr. Bourgeois's petition constitutes an abuse of the writ. Yet *Roundtree* provides no support for the Government's position. There, the petitioner successfully filed a second § 2255 motion in the Eighth Circuit based on a new retroactive rule of law, but was denied relief because his claim was procedurally defaulted. *Id.* at 312–13. Mr. Roundtree then raised the same claim in the Seventh Circuit under § 2241. After observing that § 2255 is "inadequate or ineffective" when it cannot be used to address novel legal developments, the Seventh Circuit dismissed the petition because Mr. Roundtree relied on no such new law. Rather, he was attempting to relitigate the exact same claim that was resolved in his § 2255 proceedings. *See id.* at 313 (finding nothing in Seventh Circuit jurisprudence that "permits relitigation under § 2241

36

of a contention that was actually resolved in a proceeding under § 2255, *unless the law changed after the initial collateral review*"). *Id.* at 313. In short, Mr. Roundtree's § 2241 petition was dismissed because he did not "contend that the law has changed in the slightest after the Eighth Circuit rejected his contentions," and his "problem [lay] not in § 2255 but in his own failure to object at trial." *Id.* at 313–14.

By contrast, Mr. Bourgeois's claim very clearly relies on changes in the law that postdate his initial collateral review; he cites to *Moore–I* and *Moore–II* throughout his Petition to establish that *Atkins* was not available to him until the Supreme Court invalidated the Fifth Circuit jurisprudence applicable at the time of his initial § 2255 proceedings. And, unlike Mr. Roundtree, Mr. Bourgeois is not precluded from obtaining successive § 2255 relief based on a procedural default, but rather because he was *too diligent* in bringing an *Atkins* claim at a time when Fifth Circuit jurisprudence made that claim unviable. *See* Pet. ¶ 10.

### 2. *Teague* is not relevant to either of Mr. Bourgeois's jurisdictional arguments.

Next, the Government argues that "*Teague* bars Bourgeois' reliance on *Moore* to revitalize his *Atkins* claim," as "*Moore* did not announce a new rule that could apply retroactively under *Teague*." GR at 68. As an initial matter, the Government cites to nothing to support the notion that *Teague* applies to claims brought under § 2241. *See* GR at 68 (citing *Horn v. Banks*, 536 U.S. 266 (2002), which holds federal courts must conduct *Teague* review in § 2254 cases if the state so requests, and *Van Daalwyk v. United States*, 21 F.3d 179, 180 (7th Cir. 1994), which holds that *Teague* is applicable to collateral challenges to federal convictions under § 2255).

In any event, Mr. Bourgeois has never argued that *Moore–I* is a new retroactive rule; he did not raise that argument in his petition for authorization to file a second § 2255 motion in the

37

Fifth Circuit, and he does not raise it now. Rather, his argument is that *Moore–I* made *Atkins*— which is indisputably retroactive—newly available to him by invalidating the Fifth Circuit precedent that had precluded him from successfully raising an *Atkins* claim in his initial § 2255 proceedings. *See* Pet. ¶ 10. The Fifth Circuit has permitted other, less diligent petitioners to raise untimely *Atkins* claims in successive petitions based on nearly identical theories, but Mr. Bourgeois was denied the same opportunity under § 2255 for procedural reasons. *See id.* (citing *In re Cathey*, 857 F.3d at 231–32 and *In re Johnson*, 2019 WL 3814384, at *5–6). Mr. Bourgeois then filed his § 2241 Petition with this Court, arguing that he is intellectually disabled and constitutionally exempt from execution, but without an avenue under § 2255 to vindicate his claim for relief.

In *Cathey*, the Fifth Circuit rejected an argument similar to the one the Government makes here, although the issue there was not *Teague*, but whether petitioner could bring a successor *Atkins* claim under § 2244(b)(2)(A).[17] Mr. Cathey relied on a change in the Fifth Circuit's approach to the intellectual-functioning prong of ID, announced in *In re Salazar*, 443 F.3d 430 (5th Cir. 2006), to argue that *Atkins* was "newly available" to him within the meaning of AEDPA. The state opposed this theory on the ground that circuit law did "not represent a new rule of constitutional law recognized by the Supreme Court" that would allow Mr. Cathey to escape the bar on successive petitions. The Fifth Circuit disagreed, explaining that Mr. Cathey was not arguing that *Salazar* was "a new rule of constitutional law for § 2244(b)(2) purposes," but rather was using the new law "to support his contention" that any *Atkins* claim filed in his initial habeas petition would have been "unviable." *In re Cathey*, 857 F.3d at 231.

---

[17] 28 U.S.C. § 2244(b)(2)(A) allows state prisoners to bring a successive § 2254 petition where the "claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable."

The same is true here: Mr. Bourgeois relies on *Moore–I*, which overruled the "legal" approach to ID employed by the Fifth Circuit at the time of his initial § 2255 proceedings, to support his contention that *Atkins* was previously unavailable to him.[18] Thus, Mr. Bourgeois is entitled to review of his newly-viable *Atkins* claim, and he has established that he is unable to obtain this review under § 2255 due to a structural problem with the statute, allowing him to pass through the Savings Clause and proceed under § 2241. *Teague* is irrelevant to this argument.

Nor does *Teague* bar Mr. Bourgeois from relying on *Moore–I* and *Moore–II* to establish that, under the medical community's diagnostic standards, he is intellectually disabled and categorically exempt from execution. Indeed, after determining that § 2241 jurisdiction was appropriate, the Seventh Circuit in *Webster* expressly directed this Court to consider Mr. Webster's claim on remand "under *Atkins* and *Hall*," even though *Hall* has not been declared retroactive by the Supreme Court. *Webster*, 784 F.3d at 1146. Furthermore, when this Court analyzed Mr. Webster's claim in 2019, it did so under the standards articulated in *Moore–I*, without any discussion of retroactivity or *Teague*. *See Webster*, 2019 WL 2514833, *3–11.[19] Similarly, once the Fifth Circuit had ruled that *Atkins* was "newly available" to the petitioner in

---

[18] In *Cathey*, the state also challenged the notion that *Atkins* was "unavailable" to Mr. Cathey in 2004 just because his claim would have been meritless under then-binding Fifth Circuit jurisprudence. The Fifth Circuit again disagreed, explaining that the "argument assumes the conclusion: that claims are 'available' despite being meritless." *In re Cathey*, 857 F.3d at 231; *see also id.* ("[T]he State's contention that a claim's legal availability 'does not depend on its prior success in lower courts' is not sound in the context of this particular *Atkins* claim.").

[19] Notably, the Government also applied *Moore–I* in the Proposed Findings of Fact and Conclusions of Law it submitted to this Court on remand in *Webster*, also without any discussion of retroactivity or *Teague*. *See Webster*, Case 2:12–cv–00086, ECF Doc. 195 (filed May 24, 2019).

39

*Cathey*, it conducted a prima facie merits determination of Mr. Cathey's *Atkins* claim under the

standards of *Hall* and *Moore*. *In re Cathey*, 857 F.3d at 236–40.

*Teague* is also irrelevant to Mr. Bourgeois's alternative basis for § 2241 jurisdiction,

which is that he is entitled to review under § 2241, as opposed to § 2255, because his challenge

goes not only to the imposition of his sentence,[20] but also to the *execution* thereof. *See* Pet. ¶¶

155–59. The Seventh Circuit has repeatedly held § 2241 is the appropriate vehicle for such

claims. *See id.* (citing *Kramer v. Olson*, 347 F.3d 214, 217 (7th Cir. 2003), and *Valona v. United

States*, 138 F.3d 693, 694 (7th Cir. 1998)).

The *Teague* doctrine was animated by "interests of comity and finality." *Teague*, 489

U.S. at 308. As the Supreme Court explained in announcing the rule:

> In many ways the application of new rules to cases on collateral review may be
> more intrusive than the enjoining of criminal prosecutions, for it continually forces
> the States to marshal resources in order to keep in prison defendants whose trials
> and appeals conformed to then-existing constitutional standards. Furthermore, as
> we recognized in *Engle v. Isaac*, "[s]tate courts are understandably frustrated when
> they faithfully apply existing constitutional law only to have a federal court
> discover, during a [habeas] proceeding, new constitutional commands."

*Id.* at 310 (internal citations omitted). Neither of these concerns is implicated by Mr. Bourgeois's

claim that he may challenge the *execution* of his sentence under § 2241, which is an argument

that rests on constitutional and federal statutory law prohibiting the Government from carrying

out an execution on an individual who is intellectually disabled at the time of that execution. *See

infra* § II. Indeed, this jurisdictional basis could be sustained under the FDPA alone, as it

---

[20] In its Response, the Government misleadingly states that "Bourgeois does not claim
that his sentence violated *Atkins* at the time it was imposed," citing to the portion of Mr.
Bourgeois's Petition setting for his alternative basis for jurisdiction. *See* GR at 66 (citing
Petition, p. 72 ¶156). In fact, as made clear in the Petition, Mr. Bourgeois challenges *both* the
imposition *and* the execution of his death sentence.

40

precludes the "carrying out" of an execution against a person who "is" ID, and the *Teague* rule

applies to new rules of constitutional law only. *See* 18 U.S.C. § 3596(c); *see also infra* § II.

> **3.** ***Teague* cannot preclude review of Mr. Bourgeois's claim that he is categorically ineligible for execution under the Constitution.**

Regardless of the jurisdictional basis for Mr. Bourgeois's Petition, *Teague* cannot be

applied here. *Teague* is a judge-made, prudential doctrine that was announced well before the

decision in *Atkins*. *See Danforth v. Minnesota*, 552 U.S. 264, 278 (2008) (stating that "*Teague* is

plainly grounded" in the authority of federal courts "to adjust the scope of the writ in accordance

with equitable and prudential considerations"). And "the problem is that the Supreme Court has

now established that the Constitution itself forbids the execution of certain people," including

"those who satisfy the criteria for intellectual disability." *Webster,* 784 F.3d at 1139.

As described above, *see supra* § I.B.2.a, the *Webster* court determined that, although

Congress has virtually unlimited discretion to set sentences for federal crimes and therefore can

statutorily preclude collateral challenges to those sentences, this is not the case where the

sentence is constitutionally prohibited. *Id.* at 1139 (stressing that "a core purpose of habeas

corpus is to prevent a custodian from inflicting an unconstitutional sentence"). While *Teague* is a

judge-made rule as opposed to a statutory one, the result is the same: applying *Teague* to

foreclose Mr. Bourgeois's claim of categorical ineligibility from execution would result in the

same "Kafkaesque" scenario as allowing the procedural language of § 2255(h) to foreclose Mr.

Webster's claim. Thus, just as the Seventh Circuit rejected the Government's argument in

*Webster* that the wording of § 2255(h) could render an *Atkins* claim "beyond the scope of the

savings clause" and "create the possibility of an unconstitutional punishment," *id.*, this Court

should reject the argument that *Teague* could do the same. *Cf. Hall*, (striking down Florida

statute imposing strict IQ cut-off because the rule "create[d] an unacceptable risk that persons

41

with intellectual disability will be executed, and thus [was] unconstitutional"); *Moore–I*, 137 S. Ct. at 1044 (rejecting invalid diagnostic practices because the use of such practices "creat[ed] and unacceptable risk that persons with intellectual disability will be executed").

## II. THE GOVERNMENT HAS NOT CHALLENGED THAT MR. BOURGEOIS MAY PROCEED UNDER § 2241 BECAUSE HE CHALLENGES THE EXECUTION, AS WELL AS THE IMPOSITION, OF HIS SENTENCE.

Despite submitting a lengthy Response opposing Mr. Bourgeois's Petition, the Government completely fails to challenge Mr. Bourgeois's claim that he is also entitled to review under § 2241 because his challenge goes not only to the imposition of his sentence, but also to the *execution* thereof. *See* Pet. ¶¶ 155–59.

As stated above, the plain language of the FDPA and of numerous Supreme Court decisions dating back to *Atkins* categorically bans *the carrying out of an execution* on an intellectually disabled person. *See* Pet. ¶¶ 156–57; *see also* 18 U.S.C. § 3596(c) ("A sentence of death *shall not be carried out* upon a person who *is* mentally retarded."); *supra* § I.B.2.b (summarizing Supreme Court jurisprudence). What is more, Congress forbids not only the *execution* of the intellectually disabled, but, more precisely, the imposition of that penalty against any person who "is" of that category. 18 U.S.C. § 3596(c). Petitioner's claim is that he "is" intellectually disabled and therefore ineligible for execution at this time, and therefore, that the legal measure of his disability under the Eighth Amendment must be the measure that applies today, which rests on the clinical standards of specialists in the field rather than the lay standards of judges, jurors, or even a prisoner's co-workers or jailers. *See Moore–I,* 137 S. Ct. at 1053.

The Government not only admits, but insists, that *Moore–I* has not been declared retroactive by the Supreme Court, and that Petitioner cannot seek relief in the form of a successive petition under 28 U.S.C. § 2255. *See* GR at 6–7, 61–63. But that is the point: Petitioner brings a compelling claim that he "is" intellectually disabled and that the Constitution

42

and the laws of the United States forbid his execution. This is necessarily a challenge to the *execution* of his death sentence rather than its *imposition*. *Compare* 18 U.S.C. § 3596(c) ("A sentence of death *shall not be carried out. . . .*"), *with* 28 U.S.C. § 2255(a) ("A prisoner . . . claiming the right to be released upon the ground that the sentence *was imposed* in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.").

Finally, as discussed above, *Atkins* categorically prohibits the *execution* of the intellectually disabled, and this holding has been repeatedly reaffirmed by the Supreme Court. *See supra* § I.B.2. Construing any *Atkins* challenge as a challenge to the *imposition* of the petitioner's death sentence would necessarily exclude challenges from petitioners like Mr. Bourgeois who were determined not to be ID under the legal standards prevailing at the time of § 2255 proceedings, but are ID under current standards. And this would create the precise situation that both the Supreme Court and the Seventh Circuit have sought to avoid: an unacceptable risk that an intellectually disabled person will be executed. *See Moore–I*, 137 S. Ct. at 1043; *Hall*, 572 U.S. at 704; *Webster*, 784 F.3d at 1139.

## III.   MR. BOURGEOIS IS ENTITLED TO A STAY OF EXECUTION.

Petitioner's request for a stay is simple: the Court should delay Mr. Bourgeois's imminent execution to allow for full and fair review of his *Atkins* claim under constitutionally-mandated diagnostic standards. In his Motion for Stay of Execution, Petitioner established that he meets each of the factors governing such requests: (i) a significant possibility of success on the merits; (ii) irreparable harm will result in the absence of the stay; (iii) the balance of harms is

43

in favor of the moving party; and (iv) the public interest supports a stay. The Government's Response in no way diminishes these arguments.

First, the Government repeats the same unconvincing allegations discussed above, namely that Mr. Bourgeois cannot proceed under § 2241 because he "does not meet the tests under either *Davenport* or *Webster*;" that Mr. Bourgeois already received a reliable judicial determination on his *Atkins* claim in his initial § 2255 proceedings; and that in any event he is not entitled to review of his claim under the medical community's diagnostic standards because *Moore–I* and *Moore–II* are not retroactively applicable. GR at 93–95. For all of the reasons discussed in the Petition and this Reply, these arguments do not weigh against Mr. Bourgeois's right to review under § 2241 or his likelihood of success on the merits of his *Atkins* claim.

The Government also asserts that it "has a strong interest in enforcing Bourgeois' death sentence," but as the Supreme Court has recognized, "[n]o legitimate penological purpose is served by executing a person with intellectual disability." *Hall*, 134 S. Ct. at 1992.

Finally, the Government incorrectly asserts that "Mr. Bourgeois does not claim that his sentence violated *Atkins* at the time the jury unanimously imposed it,"[21] and that "he does not fall within a class of persons the Eighth Amendment categorically exempts from execution." GR at 95. In fact, Mr. Bourgeois's claim is that he is now and has at all times been ID under the medical community's diagnostic standards. He has never been given the opportunity to establish the merits of that claim under the appropriate scientific standards, and is entitled to a stay of his execution so that he may do so now.

---

[21] As explained above, the Government misleadingly bases this argument on Mr. Bourgeois's claim that he is entitled to review under § 2241 based on the execution, *as well as the imposition*, of his death sentence. *See supra* n.20.

## REQUEST FOR ORAL ARGUMENT

Counsel for Mr. Bourgeois respectfully requests the opportunity to argue the pending petition for writ of habeas corpus and motion for stay of execution, in light of the factual and legal complexity surrounding the issues involved in this death penalty proceeding, and in particular, the questions concerning the Court's jurisdiction and authority to resolve the merits of Petitioner's claim and to stay, and ultimately prohibit, an execution that would violate the Eighth Amendment as well as Congress's directive that "a sentence of death shall not be carried out upon a person who is mentally retarded." 18 U.S.C. § 3596(c).

## CONCLUSION

For the reasons above and in his Petition, Mr. Bourgeois requests that the Court provide the following relief:

A) That an evidentiary hearing be conducted on the merits of Petitioner's claims, any procedural issues, and all disputed issues of fact;

B) That leave to amend this Petition be granted, if necessary, after further fact development through investigation and an evidentiary hearing;

D) That Petitioner be allowed a reasonable time to file a memorandum of law in support of this Petition following any further fact development or following the denial of fact development; that the Government be allowed a reasonable time to respond; and that Petitioner be allowed a reasonable time to reply;

E) That oral argument be held on the pending petition for writ of habeas corpus and motion for stay of execution; and

F) That habeas relief from Petitioner's sentence of death be granted.

45

Respectfully submitted,


/s/ Peter Williams
Peter Williams
Victor J. Abreu
Katherine Thompson
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West—The Curtis Center
Philadelphia, PA 19106
215–928–0520
Victor_Abreu@fd.org
Katherine_Thompson@fd.org
Pete_Williams@fd.org


Counsel for Petitioner


Dated: November 15, 2019

46

**PA-367**

**CERTIFICATE OF SERVICE**

I, Peter Williams, hereby certify that on this 15th day of November, 2019, a copy of the

forgoing was served via ECF filing on the following people:

Paula C. Offenhauser
Special Assistant United States Attorney
1000 Louisiana, Suite 2300
Houston, Texas 77002

Brian Reitz
Assistant United States Attorney
Office of the United States Attorney
Southern District of Indiana
10 West Market St., Suite 2100
Indianapolis, Indiana 46204-3048

/s/ Peter Williams
Peter Williams

**PA-368**

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION**

ALFRED BOURGEOIS,                §
     Petitioner,                §
v.                                         §   No. 2:19-cv-00392-JMS-DLP
                               §
SUPERINTENDENT,              §
     USP—Terre Haute,         §
UNITED STATES OF AMERICA,  §
     Respondents.               §

**MOTION TO RECONSIDER ORDER STAYING
EXECUTION OF ALFRED BOURGEOIS**

The Respondent respectfully requests that this Court reconsider its

Order Staying Execution of Alfred Bourgeois for the reasons stated in the

Respondent's Motion for Leave to File a Surreply and the Respondent's

Surreply filed simultaneously with this motion.

In its Order Staying Execution, this Court assumed, without

deciding, that Congress authorizes a habeas petitioner to invoke the

Federal Death Penalty Act (FDPA), 18 U.S.C. § 3596(c), as the basis for

relief under 28 U.S.C. § 2241, avoiding the requirements of the

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)

governing successive motions for collateral relief under 28 U.S.C. § 2255.

As detailed in the Respondent's Motion for Leave to File Surreply to

Petitioner's Reply and Surreply, filed simultaneously this this motion: (1) contrary to this Court's finding, Respondent did not waive this issue because it argued at length in its Return to Order to Show Cause that Bourgeois's claim cannot proceed under 28 U.S.C. § 2241; (2) parties cannot waive the proper interpretation of the law; (3) this Court must decide the correct construction of the governing law irrespective of the parties' arguments; and (4) this Court therefore made a manifest error of law in its Order.  In these circumstances, and in the interest of justice, the Respondent respectfully requests that the Court reconsider its Order Staying Execution. *See Publishers Resource, Inc. v. Walker-Davis Publications, Inc.*, 762 F.2d 557, 561 (7th Cir. 1985) ("Motions for reconsideration serve a limited function: to correct manifest errors of law or fact . . ." (internal quotation omitted)).

As argued in Respondent's Return to Order to Show Cause, "a stay of execution is an equitable remedy. It is not available as a matter of right, and equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Hill v. McDonough*, 547 U.S. 573, 584 (2006); *see* DE 10, at 105. To receive a stay, Bourgeois "must satisfy all of the requirements

2

for a stay, including a showing of a significant possibility of success on the merits." *Hill*, 547 U.S. at 584. When, as here, a habeas petition is not a prisoner's first, a stay of execution "should be granted only when there are 'substantial grounds upon which relief might be granted.'" *Garza v. Lappin*, 253 F.3d 918, 920-21 (7th Cir. 2001) (applying this standard to a 28 U.S.C. § 2241 petition).

Bourgeois has not shown a significant possibility that he will succeed on the merits of a claim that would deprive the United States of the authority to execute him. *See Lee v. Kelley*, 854 F.3d 544, 546 (8th Cir. 2017) (per curiam) (to receive a stay of execution, a defendant "must show a significant possibility that he will succeed on the merits of a claim that would deprive [the State] of the authority to execute him."). As discussed in the Respondent's Return to Order to Show Cause, DE 10, at 93-96, the Motion for Leave to File a Surreply, and the Surreply, filed simultaneously with this motion, Bourgeois's *Atkins* and FDPA intellectual disability claim was fully litigated and rejected in the Southern District of Texas.[1]   Bourgeois therefore cannot relitigate the

---

[1] This Court acknowledges that Bourgeois raised the same FDPA and the Eighth Amendment claims in his 28 U.S.C. § 2255 motion in the Southern District of Texas

3

constitutionality and statutory legality of the implementation and execution of his sentence in this proceeding, for at least three reasons.

*First*, Bourgeois raised this exact claim in his prior 28 U.S.C. § 2255 in the Southern District of Texas, as this Court acknowledges. The United States District Court for the Southern District of Texas rejected this claim on the merits. Bourgeois's current claim is a veiled attempt to challenge the legality and constitutionality of his sentence under 28 U.S.C. § 2241.  *Second*, section 3596(c) of the FDPA does not permit Bourgeois to raise an intellectual-disability claim that avoids the AEDPA's restrictions on successive collateral attacks.  And *third*, even if Bourgeois's claim could proceed, it is an abuse of the writ.

The Court should reconsider its order staying execution because, in light of the arguments made in the Respondent's Return to Order to Show Cause, the Respondent's Motion for Leave to File a Surreply, and its Surreply filed this date,[2] Bourgeois is not likely to succeed on the merits of his 28 U.S.C. § 2241 petition.

---

as he raises here, and the Southern District of Texas district court rejected those claims after it held a week-long evidentiary hearing. DE 18, at 3.

[2] In the event this Court denies the Respondent's Motion for Leave to File a Surreply and Surreply, the Respondent hereby incorporates by reference all arguments made therein.

4

PA-372

## CONCLUSION

For the foregoing reasons, this Court should reconsider and deny

Bourgeois' motion to stay his execution with prejudice.

Respectfully submitted,

JOSH J. MINKLER
United States Attorney

By:   s/ Paula C. Offenhauser
PAULA C. OFFENHAUSER
Special Assistant United States Attorney
1000 Louisiana, Suite 2300
Houston, Texas 77002
Telephone: (713) 567-9102
E-mail:   Paula.Offenhauser@usdog.gov
*Attorney for Respondent*

5

PA-373

**CERTIFICATE OF SERVICE**

I certify that on March 23, 2020, a copy of the foregoing Motion to Reconsider Order Staying Execution of Alfred Bourgeois was filed electronically.  Notice of this will be sentence to the following parties by operation of the Court's electronic filing system:

Victor J. Abreu
Federal Community Defender Office
For the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Victor_Abreu@fd.org

Katherine Thompson
Federal Community Defender Office
For the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Katherine_Thomson@fd.org

Peter Williams
Federal Community Defender Office
For the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Pete_Williams@fd.or

By:  s/ Paula C. Offenhauser
PAULA C. OFFENHAUSER
Special Assistant United States Attorney
E-mail:  Paula.Offenhauser@usdog.gov

6

PA-374

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# TERRE HAUTE DIVISION

ALFRED BOURGEOIS,                        §
    Petitioner,                          §
v.                                       §  No. 2:19-cv-00392-JMS-DLP
                                         §
SUPERINTENDENT,                          §
USP—Terre Haute,                         §
UNITED STATES OF AMERICA,  §
    Respondents.                        §

# MOTION FOR LEAVE TO FILE
# SURREPLY TO PETITIONER'S REPLY

The Respondent respectfully moves for leave to file a Surreply to Petitioner Albert Bourgeois's Reply in Support of Petition for Writ of Habeas Corpus and Motion for Stay of Execution.  In its Surreply, the Respondent seeks leave to address the issues identified by the Court in its Order Staying the Execution, specifically: whether Congress authorizes a habeas petitioner to invoke the Federal Death Penalty (FDPA), 18 U.S.C. § 3596(c), as a basis for relief under 28 U.S.C. § 2241, that is exempt from the requirements of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governing federal habeas corpus relief.

**PA-375**

In its Order Staying the Execution, the Court assumed without deciding this legal question by finding the Respondent had waived the issue.[1] As detailed herein, the Respondent respectfully asserts that it did not waive this point of law because it argued at length in its prior briefing that Bourgeois's claim cannot proceed under 28 U.S.C. § 2241. Moreover, parties cannot waive the proper interpretation of the law. Rather, the Court should decide the correct construction of the governing law irrespective of the parties' arguments.

As this Court has recognized, "the stakes of this litigation" are high. DE 18, at 6.[2]  A surreply addressing whether the FDPA provides an independent basis for § 2241 relief outside of the AEDPA is in the interests of justice and may aid the Court in deciding the underlying petition in this case. Moreover, the parties, as well as the public, have a substantial interest in ensuring that the Court correctly construes and applies the governing law on the federal death penalty.

---

[1] The Respondent does not seek leave to respond to other arguments in Bourgeois's reply that were already extensively addressed in Respondent's Return to Order to Show Cause, DE 10, but limits its discussion to the legal question the Court deems waived.  The Respondent is happy to address other arguments if the Court wishes.

[2] "DE" refers to the docket entry for the referenced document, followed by the page numbers included in the document's ECF header.

2

# I. BACKGROUND

On March 10, 2020, this Court issued an Order Staying Execution of Bourgeois, a federal prisoner incarcerated at the United States Penitentiary in Terre Haute, Indiana.  Bourgeois was convicted of capital murder in 2004 and sentenced to death in the United States District Court for the Southern District of Texas. The Court of Appeals for the Fifth Circuit affirmed his conviction and sentence in 2005, and United States District Court Judge Janice Graham Jack denied him post-conviction relief pursuant to 28 U.S.C § 2255 based on a claim he was intellectually disabled and therefore ineligible for execution under 18 U.S.C. § 3596(c), and *Atkins v. Virginia*, 536 U.S. 304 (2002). Thus, § 3596(c) was expressly raised and adjudicated in his § 2255 proceeding.

Judge Jack, who presided over the guilt and punishment phases of Bourgeois's trial and his § 2255 proceedings, determined that Bourgeois was not intellectually disabled under the *Atkins* criterion. Judge Jack made this determination after holding extensive evidentiary hearings in 2010 and 2011. *See United States v Alfred Bourgeois,* Nos. 2:02-cr-216, 2:07-cv-223, 2011 WL 1930684 (S.D. Tex. May 19, 2011), c*ertificate of appealability denied,* 537 F. App'x 604 (5th Cir. 2013), *cert. denied,* 547

3

U.S. 827 (2014).  Notably, Bourgeois did not appeal from the district court's ruling on his *Atkins* or § 3596(c) claims.

In 2018, the Fifth Circuit denied Bourgeois authorization to file a successive § 2255 motion under § 2255(h)(2) and 28 U.S.C. § 2244(b)(3)(A), wherein he tried to relitigate his *Atkins* and § 3596(c) claims based on *Moore v. Texas (Moore I)*, 137 S. Ct. 1039 (2017). The Fifth Circuit found that Bourgeois presented the same *Atkins* claim and evidence that he presented in his initial § 2255 motion, and that the strict litigation bar in 28 U.S.C. § 2244(b)(1) barred him from relitigating the same claim he had previously raised.  *In re Bourgeois*, 902 F.3d 446, 448 (5th Cir. 2018).

In 2019, Bourgeois filed the instant § 2241 petition and motion to stay execution, asserting that he is intellectually disabled and therefore ineligible for the death penalty, and that his execution is forbidden by the Eighth Amendment (*Atkins*) and the FDPA—the same claims he raised in his initial § 2255 petition. Relying on the AEDPA statutory provisions, he sought relief under the "savings clause" in 28 U.S.C. § 2255(e), arguing he should be allowed to proceed under § 2241 because the remedy under § 2255 is "inadequate and ineffective." Bourgeois relied on Supreme

Court cases (*Moore I*, and *Texas v. Moore (Moore II)*, 139 S. Ct. 666 (2019)) which the Supreme Court has not declared retroactive to federal habeas cases, and diagnostic criteria purportedly unavailable at the time of his initial § 2255 proceeding. In his substantive arguments, Bourgeois relied on the same evidence presented to Judge Jack in the prior proceeding.

At points in his 78-page petition, Bourgeois asserted that proceeding under § 2241 is appropriate in light of the FDPA's provision that "[a] sentence of death shall not be carried out upon a person who is mentally retarded," implicating the execution of his sentence not just the legality. *See* DE 1, at 7, 14, 76. Bourgeois, however, collectively referred to his constitutional and statutory claims as "his *Atkins* claim." DE 1, at 13, 14, 77. Likewise, his claim as presented in his reply—that the FDPA and Supreme Court decisions categorically ban carrying out the execution of an intellectually disabled person—was collectively referenced as "his *Atkins* claim." DE 11, at 5. Bourgeois's substantive arguments in both his petition and reply focused on his entitlement to § 2241 relief under the "savings clause" of § 2255(e), and how the previous courts erred in their approach to evaluating his *Atkins* claim. DE 1, at 49-74; DE 11, at 5-40. His reply also substantively briefed why

5

his § 2241 petition was not an abuse of the writ under *Teague v. Lane*, 489 U.S. 288 (1989), as argued by the Respondent. DE 11, at 40-47.

Because Bourgeois did not substantively develop an independent FDPA claim but rather relied on conclusory statements and the same arguments that pertained to his constitutional claim, the Respondent did not parse out a separate FDPA claim in its Return to Order to Show Cause. Instead, the Respondent read Bourgeois's petition to merge his FDPA and *Atkins* claims as one claim implicating the same legal standards. Addressing this claim, the Respondent argued that Bourgeois was subject to the AEDPA statutory provisions governing federal habeas corpus relief. Because Bourgeois did not meet the statutory requirements under § 2255(e)—as interpreted by the Seventh Circuit in *Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015) (en banc), and other cases—he could not proceed under § 2241. The Respondent further argued that even if Bourgeois was not limited by the AEDPA, his attempt to relitigate his claim was an abuse of the writ under pre-AEDPA law and the retroactive principles articulated in *Teague* (DE 10, at 77-108). The Respondent thus briefed two independent bases why Bourgeois cannot proceed under § 2241.

6

The Respondent did not brief whether Bourgeois could proceed under § 2241, independent of the above provisions, simply by invoking the FDPA. As this Court recognized in its stay order, there is nothing to suggest there is a substantive difference between the *Atkins* and FDPA standards, other than the source of the right.  See DE 18, at 6-7. Nor is there authority suggesting that the FDPA provides an independent procedural vehicle for access to § 2241 which would allow a petitioner to evade the AEDPA requirements. See DE 18, at 7. Consequently, the Respondent did not construe Bourgeois as raising and briefing a separate legal question. Instead, it rested on its well-supported argument that Bourgeois was barred from proceeding under § 2241.

However, in its Order Staying Execution, this Court found that the Respondent failed to explain why Bourgeois's FDPA claim cannot be brought under § 2241, and therefore waived such argument. DE 18, at 5-6. The Court found that the Respondent's failure to address the issue was "inexplicable and inexcusable, not only because of the stakes of this litigation, but also because there is no binding legal authority regarding whether FDPA claims can proceed in a § 2241 action" and the Court "may have benefitted from a response." DE 18, at 6. Indeed, the Court found

7

that the Respondent's failure to address the FDPA claim was intentional. DE 18, at 6. The Court further criticized the Respondent for failing to seek leave to file a surreply when Bourgeois highlighted the Respondent's failure to address the FDPA claim. DE 18, at 6.

The Court found that a party "can concede an underlying legal issue that would allow a claim to proceed in a § 2241 without the Court having to decide the legal issue." DE 18, at 6 (citing *Chazen v. Marske*, 938 F.3d 851, 863 (7th Cir. 2019)). From this authority, the Court concluded that the "Respondent can waive the legal issue of whether a claim can be brought in a § 2241 petition[,]" and held that "any argument that . . . Bourgeois's FDPA claim cannot proceed under § 2241 [is] waived." DE 18, at 6.

Based on this finding of waiver, the Court assumed that the FDPA provides Bourgeois a way to proceed under § 2241 without having to meet the AEDPA's procedural impediments. The Court therefore concluded that it can "apply the standards governing an *Atkins* claim" to Bourgeois's FDPA claim by relying on current law (*Moore I* and *Moore II*) without regard to whether such law is retroactive. DE 18, at 7 & n.4.

8

## II. THIS COURT SHOULD GRANT RESPONDENT LEAVE TO FILE A SURREPLY

### A.     Respondent Did Not Waive the Argument that Bourgeois's FDPA Claim Must Satisfy AEDPA Requirements

The Respondent's position was and is that Bourgeois's § 2241 petition is barred by AEDPA's provisions, and more specifically, § 2255(e)'s "savings clause" (DE 10, at 45-77); and that even if it is not so barred, he is subject to pre-AEDPA law governing relief under § 2241 (DE 10, at 77-108, citing *Teague* and other cases). Bourgeois's framing of his previously litigated § 2255 claim as a challenge to the execution of the sentence under the FDPA does not change the nature of his claim. It remains a challenge to the legality of his sentence and is barred by the AEDPA provisions.

The Respondent's failure to cite to § 3596(c) or the FDPA does not alter the legal position of the parties. Hence, Bourgeois cannot demonstrate that this is the type of claim that § 2255 is inadequate or ineffective to remedy (See DE 10, at 48-77). To be sure, Bourgeois's FDPA claim does not fit traditional § 2241 challenges to the "execution" of a sentence, which are focused on actions separate from the imposition of sentence or legality of detention—such as challenges to conditions of

9

confinement, aspects of detention, and calculation of good time credit or the release date.

Notwithstanding, the Respondent can raise "a new argument to support what has been [its] consistent claim:" that Bourgeois's § 2241 petition should be denied under the AEDPA provisions and *Teague.* *Citizens United v. FEC*, 558 U.S. 310, 330-31 (2010) (internal quotation omitted).  Hence, the argument that FDPA does not provide an independent basis for § 2241 relief outside of the AEDPA is simply another argument to support the Respondent's claim and is not waived or foreclosed. *Id.*; *see Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374, 379 (1995); *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 534-35 (1992).

**B.  Parties Cannot Waive the Law; the Court Should Decide the Correct Governing Legal Principles Irrespective of the Parties' Argument**

In its Order, the Court effectually ruled that the Respondent waived the argument that Bourgeois can seek review under § 2241, independent of the AEDPA requirements, simply by invoking the FDPA. DE 18, at 6. While the Court treated the purported waiver as being equivalent to a concession, the government did not concede such point.

10

Notwithstanding, parties cannot waive the correct application of the law. *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991). "When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Id.*; *see United States v. Carey*, 929 F.3d 1092, 1097 (9th Cir. 2019) (court should not determine a question of law based on a party's concession—especially if it is an erroneous view of the law); *United States v. Castillo*, 896 F.3d 141, 149 (2d Cir. 2018) ("[A] court cannot properly determine a question of law on the basis of a party's concession." (internal quotation omitted)); *Krieger v. United States*, 842 F.3d 490, 499 (7th Cir. 2016) (court is not bound to accept a concession on a question of law). Therefore, even if the Respondent had waived the relevant argument, the Court should decide the legal issue whether Congress authorized FDPA claims (or a subset of such claims) to avoid the procedural limitations on successive § 2255 motions, without assuming that it is so.

Assuming that the FDPA provides Bourgeois an avenue to proceed under § 2241 without AEDPA's procedural impediment contravenes

11

Congress's intent, as well as the common law abuse of the writ principles applied to § 2241.  It also undermines the public interest in the finality of a criminal judgment by allowing Bourgeois to circumvent AEDPA's requirements, as evidenced by this Court's application of Supreme Court cases interpreting *Atkins* without regard to whether they are retroactive. See DE 18, at 7 & n.4.

### C.   The Court Should Grant Leave to File a Surreply in the Interest of Justice

As the Court recognized in its stay order, "the stakes of this litigation" are high. DE 18, at 6. Bourgeois's petition and reply lack substantive briefing regarding whether the FDPA provides an independent basis for § 2241 relief outside of the AEDPA, and a surreply may aid the Court in deciding the underlying habeas petition in this case. See DE 18, at 6 (noting that a response from Respondent may have benefitted the Court). The parties, as well as the public, have a substantial interest in ensuring that the Court correctly construes and applies the governing law on the federal death penalty. *See generally Kamen*, 500 U.S. at 99. The Respondent, therefore, respectfully requests that the Court grant it leave to file a surreply to brief whether Congress

has authorized § 3596(c) claims to be brought under § 2241 without the

AEDPA procedural limitations.

### III. CONCLUSION

The Respondent requests that this Court grant its Motion for Leave

to File a Surreply to Petitioner's Reply.

Respectfully submitted,

JOSH J. MINKLER
United States Attorney

By:   s/ Paula C. Offenhauser
PAULA C. OFFENHAUSER
Special Assistant United States Attorney
1000 Louisiana, Suite 2300
Houston, Texas 77002
Telephone: (713) 567-9102
E-mail:  Paula.Offenhauser@usdog.gov
*Attorney for Respondent*

13

**PA-387**

## CERTIFICATE OF SERVICE

I certify that on March 23, 2020, a copy of the foregoing Motion for Leave to File a Surreply to Petitioner's Reply was filed electronically. Notice of this will be sentence to the following parties by operation of the Court's electronic filing system:

Victor J. Abreu
Federal Community Defender Office
For the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Victor_Abreu@fd.org

Katherine Thompson
Federal Community Defender Office
For the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Katherine_Thomson@fd.org

Peter Williams
Federal Community Defender Office
For the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Pete_Williams@fd.or

By:  s/ Paula C. Offenhauser
PAULA C. OFFENHAUSER
Special Assistant United States Attorney
E-mail:  Paula.Offenhauser@usdog.gov

14

PA-388

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

| | | |
|---|---|---|
| ALFRED BOURGEOIS, | § | |
| Petitioner, | § | |
| v. | § | No. 2:19-cv-00392-JMS-DLP |
| | § | |
| SUPERINTENDENT, | § | |
| USP—Terre Haute, | § | |
| UNITED STATES OF AMERICA, | § | |
| Respondents. | § | |

**SURREPLY TO PETITIONER'S REPLY BRIEF**

The United States of America respectfully submits Respondent's Surreply to Petitioner Albert Bourgeois's claim that the Federal Death Penalty Act of 1994 (FDPA), 18 U.S.C. § 3596(c), bars execution of his death sentence because he is intellectually disabled.

This Court has found that the Respondent waived arguments pertaining to whether Bourgeois can proceed under 28 U.S.C. § 2241 on his claim that the FDPA forbids his execution because Respondent failed to brief that issue. For the reasons discussed in the Respondent's Motion for Leave to File Surreply to Petitioner's Reply, the Respondent did not interpret Bourgeois as having raised a separate and distinct claim under the FDPA, and it respectfully maintains that it did not—and indeed, cannot—waive this point of law. Nevertheless, based upon this Court's

**PA-389**

Order on March 10, 2020, DE 18,[1] the Court has found that Bourgeois adequately raised a distinct issue that may be dispositive. Respondent has therefore sought the Court's leave to file this Surreply to address this issue and provide additional information which may aid the Court in deciding the Petition.

As detailed herein, Bourgeois's FDPA claim fails for the same reasons that his constitutional claims under *Atkins v. Virginia,* 536 U.S. 304 (2002), fail. Bourgeois raised this exact claim, under both *Atkins* and the FDPA, in his 28 U.S.C. § 2255 proceeding in the Southern District of Texas. The district court there held a lengthy evidentiary hearing and rejected Bourgeois's claim on the merits. Whether framed as a constitutional *Atkins* claim, or a statutory FDPA claim purportedly challenging the execution of his sentence, Bourgeois's claim is the exact same that he previously litigated: that he was intellectually disabled by the time he was eighteen years old. Indeed, because the case law provides that the onset of intellectual disability *must* occur before the age of eighteen, Bourgeois is today in the same condition with regard to

---

[1] "DE" refers to the docket entry for the referenced document, followed by the page numbers included in the document's ECF header.

intellectual disability as he was at the time of both the imposition of his sentence and the denial of his § 2255 motion. He cannot relitigate this claim here.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")—which imposes restraints upon successive motions for collateral relief by federal prisoners pursuant to 28 U.S.C. § 2255— applies to petitioner's statute-based claim in the same manner as it applies to his constitutional *Atkins* claim, and nothing suggests that section 3596(c) exempts Bourgeois from the AEDPA and its restraints. Regardless, even assuming Bourgeois could raise his statute-based claim under 28 U.S.C. § 2241, his claim would be an abuse of the writ because he raised and litigated a duplicative claim under that section of the FDPA in his 28 U.S.C. § 2255 proceeding in the Southern District of Texas. Bourgeois's claim—whether characterized as a constitutional claim, or a statutory claim under the FDPA—therefore cannot proceed under section 2241.

# I.

# Background

*Statutory Background:* Section 3596 of the Federal Death Penalty Act (FDPA), entitled "Implementation of a sentence of death," authorizes the Attorney General to carry out federal executions upon persons sentenced to death.  Section (a) provides that "[a] person who has been sentenced to death . . . shall be committed to the custody of the Attorney General until exhaustion of the procedures for appeal of the judgment of conviction." 18 U.S.C. § 3596(a). "When the sentence is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed." *Id.*

Sections (b) and (c) provide restrictions on implementing the sentence of death. Section 3596(b) provides that "[a] sentence of death shall not be carried out upon a woman while she is pregnant."[2] 18 U.S.C. § 3596(b). Section 3596(c) provides that: "A sentence of death shall not be

---

[2] This provision suspends the execution of the woman sentenced to death until termination of the pregnancy.

4

PA-392

carried out upon a person who is mentally retarded. A sentence of death shall not be carried out upon a person who, as a result of mental disability, lacks the mental capacity to understand the death penalty and why it was imposed on that person."

*Bourgeois's Claim*: Bourgeois contends that the plain language of the FDPA, 18 U.S.C. § 3591, *et seq.*, and numerous Supreme Court decisions dating back to *Atkins,* 536 U.S. 304, categorically ban the carrying out of an execution on an intellectually disabled person. DE 11, at 46-47. He asserts that, pursuant to § 3596(c), "Congress forbids not only the execution of the intellectually disabled, but, more precisely, the imposition of that penalty against any person who 'is' of that category." *Id.* at 46 (emphasis omitted). He contends that he "'is' intellectually disabled and therefore ineligible for execution at this time"; that "the legal measure of his disability under the Eighth Amendment must be the measure that applies today, which rests on the clinical standards of specialists in the field rather than the lay standards of judges, jurors, or even a prisoner's co-workers or jailers." *Id.* (citing *Moore v. Texas (Moore I),* 137 S. Ct. 1039, 1053 (2017)). Bourgeois argues that "[t]his is necessarily a challenge to the *execution* of his death sentence rather than

5

its *imposition.*" *Id.* at 47 (emphasis in original). He further argues that "[c]onstruing any *Atkins* challenge as a challenge to the *imposition* of the petitioner's death sentence would necessarily exclude challenges from petitioners like Mr. Bourgeois who were determined not to be ID [intellectually disabled] under the legal standards prevailing at the time of § 2255 proceeding, but are ID under current standards." *Id.*

## II.

**Bourgeois's FDPA claim challenges the legality of his sentence, is the exact claim that he litigated in his 28 U.S.C. § 2255 proceeding, and does not meet the requirements of the savings clause, 28 U.S.C. § 2255(e), to proceed under 28 U.S.C. § 2241.**

The exclusive vehicle for federal prisoners to challenge their conviction or sentence is 28 U.S.C. § 2255. *See Light v. Caraway*, 761 F.3d 809, 812 (7th Cir. 2014). A federal prisoner may only proceed with a habeas petition under 28 U.S.C. § 2241 if his claim meets the requirements of the savings clause, 28 U.S.C. § 2255(e). *See Light*, 761 F.3d at 812. That provision provides: "An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that . . . the court which sentenced him . . . has denied him relief, unless it

6

appears that the remedy by motion is inadequate or ineffective to test the legality of his detention." *Id.* (quoting 28 U.S.C. § 2255(e)). The Seventh Circuit has concluded that § 2255 is inadequate or ineffective in only limited circumstances, none of which is present here. Bourgeois's FDPA claim therefore cannot proceed under § 2241.

### A. Bourgeois's FDPA claim challenges the legality of his sentence, not the execution of his sentence.

Bourgeois claims that 18 U.S.C. § 3596(c) bars the "execution of sentence" of death upon an intellectually disabled person, and that *Atkins,* 536 U.S. 304, categorically prohibits his execution because he is intellectually disabled. Bourgeois raised the claim that both the FDPA and Eighth Amendment under *Atkins* bar his execution because he is intellectually disabled in his prior § 2255 proceeding. The United States District Court for the Southern District of Texas rejected those claims on the merits in *United States v. Bourgeois,* Nos. 2:02-cr-216, 2:07-cv-223, 2011 WL 1930684 (S.D. Tex. May 19, 2011). *See* DE 18, at 3.

Bourgeois attempts to relitigate the issues that he raised in his § 2255 proceeding by arguing that his claim that he "is" intellectually disabled is "necessarily" a challenge to the "execution of his death sentence," DE 11, at 47 (emphasis omitted).  While Bourgeois asserts that

7

he "is" intellectually disabled and therefore the FDPA bars the execution of his sentence, the law does not define his claim that way.  As briefed by the Respondent in its Return to Order to Show Cause, the Supreme Court has consistently confirmed *Atkins*'s three-prong criterion as the basis for determining whether a defendant is intellectually disabled: significantly subaverage intellectual functioning, deficits in adaptive functioning, and *onset of these deficits before the age of eighteen. Atkins*, 536 U.S. at 318; DE 10, at 46. Bourgeois's claim, per *Atkins*'s requirements, is not just that he *is* disabled, but that he *was* disabled before the age of eighteen.

Because Bourgeois was over the age of eighteen both at the time his sentence was imposed and when the district court in Texas denied his § 2255 motion, he is legally in the same condition regarding intellectual disability today as he was when he previously litigated this issue. Bourgeois's claim is therefore not that his sentence cannot be executed; it is that it was unlawful at the time it was imposed and at the time he filed his § 2255 motion.  The United States District Court for the Southern District of Texas already rejected those claims on the merits in *United States v. Bourgeois,* Nos. 2:02-cr-216, 2:07-cv-223, 2011 WL 1930684 (S.D. Tex. May 19, 2011). *See* DE 18, at 3.  Further

8

demonstrating this point, Bourgeois's Petition in this case largely relies upon the testimony given at the evidentiary hearing in the Southern District of Texas.

This Court has already effectively recognized that Bourgeois's FDPA claim is the same as the *Atkins* claim that he previously litigated when it found that "[t]he only apparent difference between [Bourgeois]'s *Atkins* claim and an FDPA claim is the legal source—the Constitution and a statute, respectively," and the standards governing an *Atkins* claim apply to his FDPA claim. DE 18, at 7. Therefore, Bourgeois's characterization of his claim as a challenge to the "execution of sentence," as opposed to the imposition of sentence, does not change the true nature of his claim because there is no daylight, factually or legally, between a constitutional *Atkins* claim and a statutory FDPA claim. *See United States v. Coonce*, 932 F.3d 623, 632-33 (8th Cir. 2019) (holding that the "mentally retarded" exception in the FDPA requires onset of intellectual disability before the age of eighteen), *petition for cert. filed*, No. 19-7862 (Mar. 3, 2020). Instead, Bourgeois's "execution of sentence" claim under § 3596(c) is a veiled attempt to relitigate the same challenge he lost in his § 2255 proceeding in this § 2241 proceeding.

While historically defendants have been allowed to challenge the execution of a sentence in § 2241 proceedings, *Atehortua v. Kindt,* 951 F.2d 126, 129 (7th Cir. 1991), those claims may proceed under § 2241 because most fulfill the requirements of the savings clause, do not challenge the legality of the imposition of the sentence, and thus cannot be raised in a § 2255 motion. *Compare Coady v. Vaughn,* 251 F.3d 480, 485 (3rd Cir. 2001) ("[F]ederal prisoners challenging some aspect of the *execution* of their sentence, such as denial of parole, may proceed under Section 2241.") (emphasis added; original emphasis omitted); *Lewis v. United States Parole Commission,* 132 F. App'x 659, 660 (7th Cir. 2005) (U.S. Parole Commission miscalculating a prisoner's parole date). Here, by contrast, Bourgeois raises the exact *Atkins* claims, based on the same facts, as he raised in his § 2255. This demonstrates that § 2255 was not inadequate or ineffective to test the legality of his detention. Finding otherwise undermines the validity of the judicial process underlying his sentence.[3]

---

[3] Alternatively, if the Court were to conclude otherwise and find that Bourgeois has presented a novel and independent claim challenging the execution of his sentence apart from its legality, that claim may not be ripe. Bourgeois' motion for stay of execution was granted in *In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-00145 (D.D.C.), DE 51, and the United States' appeal therefrom remains pending before the United States Court of Appeals for the D.C. Circuit. *See In re Federal Bureau of Prisons' Execution Protocol Cases*, No. 19-5322 (D.C. Cir.). As such, the date of Bourgeois's execution is not currently set. If the Court were to conclude—contrary to

**PA-398**

### B. The Seventh Circuit has limited the circumstances in which such claims may pass through the savings clause and proceed under § 2241, and Bourgeois's FDPA claim does not meet these standards.

The Seventh Circuit has established a three-part test to determine whether a defendant's challenge to his conviction or sentence satisfies § 2255(e)'s savings clause. *See, e.g.*, *Montana v. Cross*, 829 F.3d 775, 783-84 (7th Cir. 2016). "To pursue relief under § 2241, a petitioner must establish that (1) the claim relies on a statutory interpretation case, not a constitutional case, and thus could not have been invoked by a successive § 2255 motion; (2) the petitioner could not have invoked the decision in his first § 2255 motion and the decision applies retroactively; and (3) the error is grave enough to be deemed a miscarriage of justice." *Chazen v. Marske*, 938 F.3d 851, 856 (7th Cir. 2019) (internal quotation omitted); *see also In re Davenport*, 147 F.3d 605 (7th Cir. 1998) (intervening decision of statutory interpretation establishing that defendant was convicted of conduct no longer deemed criminal); *Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001) (decision by an international tribunal).

---

established precedent—that intellectual disability is fluid and may develop after the age of eighteen, Bourgeois's claim would only be ripe at the time execution is imminent.

The Court has recognized only one additional set of narrow circumstances in which § 2255 is inadequate or ineffective, in *Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015) (en banc). In that case, Webster was convicted of a capital offense and sentenced to death after the district court found, based on evidence presented at the sentencing hearing, that Webster was not "mentally retarded" and therefore was not exempt from eligibility for the death penalty under 18 U.S.C. § 3596(c). *Id.* at 1124-25, 1130-31. After the denial of Webster's *Atkins* claim in his § 2255 motion, he obtained new evidence in support of his intellectual-disability claim that existed at the time of trial but had been unavailable to him. *Id.* at 1132-34. Because Webster did not rely on new evidence of innocence or a new rule of constitutional law, he could not satisfy AEDPA's gatekeeping requirements for second or successive § 2255 motions. *Id.* at 1134-35. The Seventh Circuit determined that in these circumstances there was a "structural problem" or "lacuna" in § 2255 and therefore, the savings clause permitted Webster to proceed via § 2241. *Id.* at 1135-44. The court made clear, however, that this rule applied to newly discovered evidence that "existed before the time of the trial" and was unavailable "despite

**PA-400**

diligence on the part of the defense," not because of "missteps by" the defense. *Id.* at 1140 (emphasis omitted).

None of these circumstances are present in this case. Bourgeois's FDPA claim cannot meet the first two prongs of the Seventh Circuit's three-part test for proceeding under the savings clause. Nor does Bourgeois's claim meet the unique circumstances present in *Webster.*

a. Bourgeois cannot meet the first prong of the test because he is not attempting to rely on a new statutory interpretation case.

In order to proceed under the savings clause, the Seventh Circuit has held that a petitioner's claim must "rel[y] on a statutory interpretation case, not a constitutional case, and thus could not have been invoked by a successive § 2255 motion." *Chazen*, 938 F.3d at 856 (internal quotation omitted). Borgeois's FDPA claim does not meet this threshold requirement.

In his Petition, Bourgeois does not cite, let alone rely upon, any new case that substantively interprets the FDPA (or any other relevant statutory matter). Rather, Bourgeois claims that 18 U.S.C. § 3596(c) bars the "execution of sentence" of death upon an intellectually disabled person, and that *Atkins,* 536 U.S. 304, categorically prohibits his

13

execution because he is intellectually disabled. He asks this Court to apply the *constitutional* standard articulated by the Supreme Court in *Atkins*, *Moore I,* 137 S. Ct. at 1039, and *Moore v. Texas* (*Moore II*)*,* 139 S. Ct. 666 (2019) (per curiam). These cases pertaining to constitutional standards do not fulfill the requirement that Bourgeois "rel[y] on a statutory interpretation case."

The cases where the Seventh Circuit has held that the first prong of the test to proceed under the savings clause was met all involved an intervening change in the interpretation of a substantive statute, such as the Armed Career Criminal Act. *See, e.g.*, *Chazen*, 938 F.3d at 856; *Light*, 761 F.3d at 812-13; *Brown v. Caraway*, 719 F.3d 583, 586 (7th Cir. 2013). Bourgeois's FDPA claim—which attempts to rely on constitutional cases to relitigate a claim he brought in his § 2255 motion—is far afield of the types of claims the Seventh Circuit has allowed to proceed under the first prong.

      b. <u>Bourgeois cannot meet the second prong of the Seventh Circuit's test because he has not identified any statutory decision that is retroactive.</u>

To fulfill the second prong of the Seventh Circuit's savings-clause test, Bourgeois must demonstrate that he "could not have invoked the

[relevant statutory] decision in his first § 2255 motion and the decision applies retroactively." *Chazen*, 938 F.3d at 856 (internal quotation omitted). Bourgeois has failed to identify any retroactive new rule pertaining to the FDPA, so his claim likewise fails on this prong.

The only cases Bourgeois has identified that, in his view, create a new rule are *Moore I* and *Moore II*, but those cases do not come close to meeting the relevant standard. As an initial matter, the Supreme Court has not declared *Moore I* and *Moore II* retroactively applicable to post-conviction habeas review. DE 10, at 72-75, 79-82, 87-89. As fully briefed in the Respondent's Return to Order to Show Cause, *Moore I* and *Moore II* were derived directly from *Atkins* and merely expounded upon the definition of intellectual disability in *Hall* and *Moore. Shoop v. Hill,* 139 S. Ct. 504, 507 (2019) (per curiam); *see Atkins*, 536 U.S. at 308 n.3; *Hall v. Florida,* 572 U.S. 701, 710 (2014); *Moore I,* 137 S. Ct. at 1045; *Moore II,* 139 S. Ct. at 668. The Supreme Court in *Atkins* "declared 'a rule of general application . . . designed for the specific purpose of evaluating a myriad of factual contexts.'" *Smith v. Sharp,* 935 F.3d 1064, 1084-85 (10th Cir. 2019) (quoting *Chaidez v. United States,* 568 U.S. 342, 348 (2013)), *petition for cert. filed*, No. 19-1106 (Mar. 10, 2020). "The

15

application of this general rule to *Hall, Moore I*, and *Moore II* cannot be understood to 'yield[ ] a result so novel that it forges a new rule, one not dictated by precedent', [given] the Court's proclamation in *Hall* that '*Atkins* . . . provide[s] substantial guidance on the definition of intellectual disability.'" *Id.* at 1084 (citations omitted).

Regardless, even if *Moore I* and *Moore II* were retroactive to cases on collateral review, they would be retroactive *constitutional* cases that Bourgeois could potentially raise in a successive § 2255 motion. Moreover, Bourgeois cannot possibly argue that an FDPA claim is foreclosed or futile to be raised in a § 2255 motion because he in fact raised, litigated, and lost such a claim in his § 2255 motion.

  c. <u>Bourgeois's FDPA claim also cannot proceed under</u> <u>*Webster*.</u>

For the same reasons briefed in the Respondent's Return to Order to Show Cause, Bourgeois's FDPA claim does not meet the conditions laid out in the Seventh Circuit's *Webster* decision to proceed under the savings clause. DE 10, at 64-66. As the court made clear in that case, Webster could proceed under the savings clause because he presented newly discovered evidence that "existed before the time of the trial" and was unavailable "despite diligence on the part of the defense," not because of

16

"missteps by" the defense. *Webster*, 784 F.3d at 1140 (emphasis omitted).

Here, Bourgeois has presented no new evidence, and instead relies on the

same evidence presented in his § 2255 proceeding. Moreover, even if new

diagnostic standards somehow constituted new evidence (which they do

not), those standards were not available at the time of Bourgeois's trial

and thus cannot meet the *Webster* standard.

## III.

### Bourgeois's relitigation of his FDPA claim is an abuse of the writ.

Even if Bourgeois could somehow satisfy the savings clause's

requirements to proceed directly under § 2241, Bourgeois's *Atkins* claim

raised in the instant habeas petition constitutes an abuse of the writ for

the reasons briefed in the Respondent's Return to Order to Show Case.

DE 10, at 78-86. Bourgeois's *Atkins* and FDPA claim is the same claim

that he previously litigated under § 2255, and even apart from the

AEDPA procedural requirements, Bourgeois cannot repeatedly relitigate

the same claim.

There is no dispute that *Atkins* applies retroactively to § 2255

habeas proceedings, and there is no dispute that the Southern District of

Texas applied *Atkins* in making its intellectual disability determination.

17

Bourgeois's intent (and attempt) is to relitigate the Southern District's final factual and legal determinations with absolutely no deference to that court's findings. *See* DE 18, at 7-8 & nn.4, 5.

In fact, Bourgeois challenges the validity and legality of his death sentence on the same *Atkins* criterion and same evidence previously litigated. The Supreme Court's decisions in *Hall*, 572 U.S. 701, *Moore I,* 137 S. Ct. 1039, and *Moore II,* 139 S. Ct. 666, do not change that. Regardless of whether raised in a 2255, 2254, or 2241 proceeding—and even assuming AEDPA's restrictions were inapplicable—the Supreme Court has not declared *Moore I* and *Moore II* retroactively applicable to post-conviction habeas review. DE 10, at 72-75, 79-82, 87-89. *See supra* at 15. An attempt to relitigate a theory, in the absence of an intervening change of law, is an abuse of the writ.

## CONCLUSION

Bourgeois's argument that his FDPA claim can proceed in a § 2241 habeas writ petition does not satisfy the requirements of § 2255(e), *In re Davenport,* and *Webster* (en banc), and constitutes an abuse of the writ. Bourgeois's petition for writ of habeas corpus should be dismissed with prejudice.

Respectfully submitted,

JOSH J. MINKLER
United States Attorney

By:   s/ Paula C. Offenhauser
        PAULA C. OFFENHAUSER
        Special Assistant United States Attorney
        1000 Louisiana, Suite 2300
        Houston, Texas 77002
        Telephone: (713) 567-9102
        E-mail: Paula.Offenhauser@usdog.gov
        *Attorney for Respondent*

**PA-407**

**CERTIFICATE OF SERVICE**

I certify that on March 23, 2020, a copy of the foregoing Respondent's Surreply to Petitioner's Reply was filed electronically. Notice of this will be sentence to the following parties by operation of the Court's electronic filing system:

Victor J. Abreu
Federal Community Defender Office
For the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Victor_Abreu@fd.org

Katherine Thompson
Federal Community Defender Office
For the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Katherine_Thomson@fd.org

Peter Williams
Federal Community Defender Office
For the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Pete_Williams@fd.or

By:   s/ Paula C. Offenhauser
          PAULA C. OFFENHAUSER
          Special Assistant United States Attorney
          E-mail:  Paula.Offenhauser@usdog.gov

20

**PA-408**

# DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS

## FIFTH EDITION

# DSM-5®

PA-409

AMERICAN PSYCHIATRIC ASSOCIATION

# DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS

## FIFTH EDITION

# DSM-5®

# American Psychiatric Association

*Officers 2012–2013*
PRESIDENT DILIP V. JESTE, M.D.
PRESIDENT-ELECT JEFFREY A. LIEBERMAN, M.D.
TREASURER DAVID FASSLER, M.D.
SECRETARY ROGER PEELE, M.D.

*Assembly*
SPEAKER R. SCOTT BENSON, M.D.
SPEAKER-ELECT MELINDA L. YOUNG, M.D.

*Board of Trustees*
JEFFREY AKAKA, M.D.
CAROL A. BERNSTEIN, M.D.
BRIAN CROWLEY, M.D.
ANITA S. EVERETT, M.D.
JEFFREY GELLER, M.D., M.P.H.
MARC DAVID GRAFF, M.D.
JAMES A. GREENE, M.D.
JUDITH F. KASHTAN, M.D.
MOLLY K. McVOY, M.D.
JAMES E. NININGER, M.D.
JOHN M. OLDHAM, M.D.
ALAN F. SCHATZBERG, M.D.
ALIK S. WIDGE, M.D., PH.D.

ERIK R. VANDERLIP, M.D.,
MEMBER-IN-TRAINING TRUSTEE-ELECT

# DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS

## FIFTH EDITION

# DSM-5®





AMERICAN
**PSYCHIATRIC**
ASSOCIATION
**PUBLISHING**

PA-412

Copyright © 2013 American Psychiatric Association

DSM and DSM-5 are registered trademarks of the American Psychiatric Association. Use of these terms is prohibited without permission of the American Psychiatric Association.

ALL RIGHTS RESERVED. Unless authorized in writing by the APA, no part of this book may be reproduced or used in a manner inconsistent with the APA's copyright. This prohibition applies to unauthorized uses or reproductions in any form, including electronic applications.

Correspondence regarding copyright permissions should be directed to DSM Permissions, American Psychiatric Publishing, 1000 Wilson Boulevard, Suite 1825, Arlington, VA 22209-3901.

Manufactured in the United States of America on acid-free paper.

ISBN 978-0-89042-554-1 (Hardcover) 2nd printing June 2013

ISBN 978-0-89042-555-8 (Paperback) 4th printing July 2017

American Psychiatric Association
1000 Wilson Boulevard
Arlington, VA 22209-3901
www.psych.org

The correct citation for this book is American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition. Arlington, VA, American Psychiatric Association, 2013.

**Library of Congress Cataloging-in-Publication Data**
Diagnostic and statistical manual of mental disorders : DSM-5. — 5th ed.
    p. ; cm.
DSM-5
DSM-V
Includes index.
ISBN 978-0-89042-554-1 (hardcover : alk. paper) — ISBN 978-0-89042-555-8 (pbk. : alk. paper)
I. American Psychiatric Association. II. American Psychiatric Association. DSM-5 Task Force.
III. Title: DSM-5. IV. Title: DSM-V.
[DNLM: 1. Diagnostic and statistical manual of mental disorders. 5th ed. 2. Mental Disorders—classification. 3. Mental Disorders—diagnosis. WM 15]
RC455.2.C4
616.89'075—dc23

                                                                            2013011061

**British Library Cataloguing in Publication Data**
A CIP record is available from the British Library.

Text Design—Tammy J. Cordova

Manufacturing—LSC Communications

# Contents

DSM-5 Classification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii

Preface . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xli

## Section I
### DSM-5 Basics

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

Use of the Manual . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

Cautionary Statement for Forensic Use of DSM-5 . . . . . . . . . . . .25

## Section II
### Diagnostic Criteria and Codes

Neurodevelopmental Disorders . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

Schizophrenia Spectrum and Other Psychotic Disorders . . . . . .87

Bipolar and Related Disorders . . . . . . . . . . . . . . . . . . . . . . . . . . . .123

Depressive Disorders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .155

Anxiety Disorders. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .189

Obsessive-Compulsive and Related Disorders . . . . . . . . . . . . .235

Trauma- and Stressor-Related Disorders . . . . . . . . . . . . . . . . . .265

Dissociative Disorders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .291

Somatic Symptom and Related Disorders . . . . . . . . . . . . . . . . . .309

Feeding and Eating Disorders . . . . . . . . . . . . . . . . . . . . . . . . . . . .329

Elimination Disorders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .355

Sleep-Wake Disorders. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .361

Sexual Dysfunctions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .423

Gender Dysphoria . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .451

Disruptive, Impulse-Control, and Conduct Disorders . . . . . . . . 461

Substance-Related and Addictive Disorders . . . . . . . . . . . . . . 481

Neurocognitive Disorders. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 591

Personality Disorders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 645

Paraphilic Disorders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 685

Other Mental Disorders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 707

Medication-Induced Movement Disorders
  and Other Adverse Effects of Medication . . . . . . . . . . . . . . . 709

Other Conditions That May Be a Focus of Clinical Attention . . 715

# Section III
## Emerging Measures and Models

Assessment Measures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 733

Cultural Formulation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 749

Alternative DSM-5 Model for Personality Disorders . . . . . . . . . 761

Conditions for Further Study . . . . . . . . . . . . . . . . . . . . . . . . . . . 783

# Appendix

Highlights of Changes From DSM-IV to DSM-5 . . . . . . . . . . . . . 809

Glossary of Technical Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . 817

Glossary of Cultural Concepts of Distress . . . . . . . . . . . . . . . . 833

Alphabetical Listing of DSM-5 Diagnoses and Codes
  (ICD-9-CM and ICD-10-CM). . . . . . . . . . . . . . . . . . . . . . . . . . . 839

Numerical Listing of DSM-5 Diagnoses and Codes
  (ICD-9-CM) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 863

Numerical Listing of DSM-5 Diagnoses and Codes
  (ICD-10-CM) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 877

DSM-5 Advisors and Other Contributors . . . . . . . . . . . . . . . . . 897

Index. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 917

# DSM-5 Task Force

DAVID J. KUPFER, M.D.
*Task Force Chair*

DARREL A. REGIER, M.D., M.P.H.
*Task Force Vice-Chair*

William E. Narrow, M.D., M.P.H.,
*Research Director*

Dan G. Blazer, M.D., Ph.D., M.P.H.
Jack D. Burke Jr., M.D., M.P.H.
William T. Carpenter Jr., M.D.
F. Xavier Castellanos, M.D.
Wilson M. Compton, M.D., M.P.E.
Joel E. Dimsdale, M.D.
Javier I. Escobar, M.D., M.Sc.
Jan A. Fawcett, M.D.
Bridget F. Grant, Ph.D., Ph.D. *(2009–)*
Steven E. Hyman, M.D. *(2007–2012)*
Dilip V. Jeste, M.D. *(2007–2011)*
Helena C. Kraemer, Ph.D.
Daniel T. Mamah, M.D., M.P.E.
James P. McNulty, A.B., Sc.B.
Howard B. Moss, M.D. *(2007–2009)*

Susan K. Schultz, M.D., *Text Editor*
Emily A. Kuhl, Ph.D., *APA Text Editor*

Charles P. O'Brien, M.D., Ph.D.
Roger Peele, M.D.
Katharine A. Phillips, M.D.
Daniel S. Pine, M.D.
Charles F. Reynolds III, M.D.
Maritza Rubio-Stipec, Sc.D.
David Shaffer, M.D.
Andrew E. Skodol II, M.D.
Susan E. Swedo, M.D.
B. Timothy Walsh, M.D.
Philip Wang, M.D., Dr.P.H. *(2007–2012)*
William M. Womack, M.D.
Kimberly A. Yonkers, M.D.
Kenneth J. Zucker, Ph.D.
Norman Sartorius, M.D., Ph.D., *Consultant*

## APA Division of Research Staff on DSM-5

Darrel A. Regier, M.D., M.P.H.,
*Director, Division of Research*
William E. Narrow, M.D., M.P.H.,
*Associate Director*
Emily A. Kuhl, Ph.D., *Senior Science Writer; Staff Text Editor*
Diana E. Clarke, Ph.D., M.Sc., *Research Statistician*

Lisa H. Greiner, M.S.S.A., *DSM-5 Field Trials Project Manager*
Eve K. Moscicki, Sc.D., M.P.H.,
*Director, Practice Research Network*
S. Janet Kuramoto, Ph.D. M.H.S.,
*Senior Scientific Research Associate, Practice Research Network*

Amy Porfiri, M.B.A.
*Director of Finance and Administration*

Jennifer J. Shupinka, *Assistant Director, DSM Operations*
Seung-Hee Hong, *DSM Senior Research Associate*
Anne R. Hiller, *DSM Research Associate*
Alison S. Beale, *DSM Research Associate*
Spencer R. Case, *DSM Research Associate*

Joyce C. West, Ph.D., M.P.P.,
*Health Policy Research Director, Practice Research Network*
Farifteh F. Duffy, Ph.D.,
*Quality Care Research Director, Practice Research Network*
Lisa M. Countis, *Field Operations Manager, Practice Research Network*

Christopher M. Reynolds,
*Executive Assistant*

## APA Office of the Medical Director

JAMES H. SCULLY JR., M.D.
*Medical Director and CEO*

## Editorial and Coding Consultants

Michael B. First, M.D.                     Maria N. Ward, M.Ed., RHIT, CCS-P

## DSM-5 Work Groups

### ADHD and Disruptive Behavior Disorders
DAVID SHAFFER, M.D.
*Chair*

F. XAVIER CASTELLANOS, M.D.
*Co-Chair*

Paul J. Frick, Ph.D., *Text Coordinator*     Luis Augusto Rohde, M.D., Sc.D.
Glorisa Canino, Ph.D.                        Rosemary Tannock, Ph.D.
Terrie E. Moffitt, Ph.D.                     Eric A. Taylor, M.B.
Joel T. Nigg, Ph.D.                          Richard Todd, Ph.D., M.D. *(d. 2008)*

### Anxiety, Obsessive-Compulsive Spectrum, Posttraumatic, and Dissociative Disorders
KATHARINE A. PHILLIPS, M.D.
*Chair*

Michelle G. Craske, Ph.D., *Text Coordinator*     Scott L. Rauch, M.D.
J. Gavin Andrews, M.D.                             H. Blair Simpson, M.D., Ph.D.
Susan M. Bögels, Ph.D.                             David Spiegel, M.D.
Matthew J. Friedman, M.D., Ph.D.                   Dan J. Stein, M.D., Ph.D.
Eric Hollander, M.D. *(2007–2009)*                 Murray B. Stein, M.D.
Roberto Lewis-Fernández, M.D., M.T.S.              Robert J. Ursano, M.D.
Robert S. Pynoos, M.D., M.P.H.                     Hans-Ulrich Wittchen, Ph.D.

### Childhood and Adolescent Disorders
DANIEL S. PINE, M.D.
*Chair*

Ronald E. Dahl, M.D.                         James F. Leckman, M.D.
E. Jane Costello, Ph.D. *(2007–2009)*        Ellen Leibenluft, M.D.
Regina Smith James, M.D.                     Judith H. L. Rapoport, M.D.
Rachel G. Klein, Ph.D.                       Charles H. Zeanah, M.D.

### Eating Disorders
B. TIMOTHY WALSH, M.D.
*Chair*

Stephen A. Wonderlich, Ph.D., *Text Coordinator*     Richard E. Kreipe, M.D.
Evelyn Attia, M.D.                                    Marsha D. Marcus, Ph.D.
Anne E. Becker, M.D., Ph.D., Sc.M.                    James E. Mitchell, M.D.
Rachel Bryant-Waugh, M.D.                             Ruth H. Striegel-Moore, Ph.D.
Hans W. Hoek, M.D., Ph.D.                             G. Terence Wilson, Ph.D.
                                                      Barbara E. Wolfe, Ph.D. A.P.R.N.

## Mood Disorders

JAN A. FAWCETT, M.D.
*Chair*

Ellen Frank, Ph.D., *Text Coordinator*
Jules Angst, M.D. *(2007–2008)*
William H. Coryell, M.D.
Lori L. Davis, M.D.
Raymond J. DePaulo, M.D.
Sir David Goldberg, M.D.
James S. Jackson, Ph.D.

Kenneth S. Kendler, M.D.
   *(2007–2010)*
Mario Maj, M.D., Ph.D.
Husseini K. Manji, M.D. *(2007–2008)*
Michael R. Phillips, M.D.
Trisha Suppes, M.D., Ph.D.
Carlos A. Zarate, M.D.

## Neurocognitive Disorders

DILIP V. JESTE, M.D. (2007–2011)
*Chair Emeritus*

DAN G. BLAZER, M.D., PH.D., M.P.H.
*Chair*

RONALD C. PETERSEN, M.D., PH.D.
*Co-Chair*

Mary Ganguli, M.D., M.P.H.,
   *Text Coordinator*
Deborah Blacker, M.D., Sc.D.
Warachal Faison, M.D. *(2007–2008)*

Igor Grant, M.D.
Eric J. Lenze, M.D.
Jane S. Paulsen, Ph.D.
Perminder S. Sachdev, M.D., Ph.D.

## Neurodevelopmental Disorders

SUSAN E. SWEDO, M.D.
*Chair*

Gillian Baird, M.A., M.B., B.Chir.,
   *Text Coordinator*
Edwin H. Cook Jr., M.D.
Francesca G. Happé, Ph.D.
James C. Harris, M.D.
Walter E. Kaufmann, M.D.
Bryan H. King, M.D.
Catherine E. Lord, Ph.D.

Joseph Piven, M.D.
Sally J. Rogers, Ph.D.
Sarah J. Spence, M.D., Ph.D.
Rosemary Tannock, Ph.D.
Fred Volkmar, M.D. *(2007–2009)*
Amy M. Wetherby, Ph.D.
Harry H. Wright, M.D.

## Personality and Personality Disorders[1]

ANDREW E. SKODOL, M.D.
*Chair*

JOHN M. OLDHAM, M.D.
*Co-Chair*

Robert F. Krueger, Ph.D., *Text
   Coordinator*
Renato D. Alarcon, M.D., M.P.H.
Carl C. Bell, M.D.
Donna S. Bender, Ph.D.

Lee Anna Clark, Ph.D.
W. John Livesley, M.D., Ph.D. *(2007–2012)*
Leslie C. Morey, Ph.D.
Larry J. Siever, M.D.
Roel Verheul, Ph.D. *(2008–2012)*

---

[1] The members of the Personality and Personality Disorders Work Group are responsible for the alternative DSM-5 model for personality disorders that is included in Section III. The Section II personality disorders criteria and text (with updating of the text) are retained from DSM-IV-TR.

## Psychotic Disorders

WILLIAM T. CARPENTER JR., M.D.
*Chair*

Deanna M. Barch, Ph.D., *Text Coordinator*
Juan R. Bustillo, M.D.
Wolfgang Gaebel, M.D.
Raquel E. Gur, M.D., Ph.D.
Stephan H. Heckers, M.D.

Dolores Malaspina, M.D., M.S.P.H.
Michael J. Owen, M.D., Ph.D.
Susan K. Schultz, M.D.
Rajiv Tandon, M.D.
Ming T. Tsuang, M.D., Ph.D.
Jim van Os, M.D.

## Sexual and Gender Identity Disorders

KENNETH J. ZUCKER, PH.D.
*Chair*

Lori Brotto, Ph.D., *Text Coordinator*
Irving M. Binik, Ph.D.
Ray M. Blanchard, Ph.D.
Peggy T. Cohen-Kettenis, Ph.D.
Jack Drescher, M.D.
Cynthia A. Graham, Ph.D.

Martin P. Kafka, M.D.
Richard B. Krueger, M.D.
Niklas Långström, M.D., Ph.D.
Heino F.L. Meyer-Bahlburg, Dr. rer. nat.
Friedemann Pfäfflin, M.D.
Robert Taylor Segraves, M.D., Ph.D.

## Sleep-Wake Disorders

CHARLES F. REYNOLDS III, M.D.
*Chair*

Ruth M. O'Hara, Ph.D., *Text Coordinator*
Charles M. Morin, Ph.D.
Allan I. Pack, Ph.D.

Kathy P. Parker, Ph.D., R.N.
Susan Redline, M.D., M.P.H.
Dieter Riemann, Ph.D.

## Somatic Symptom Disorders

JOEL E. DIMSDALE, M.D.
*Chair*

James L. Levenson, M.D., *Text Coordinator*
Arthur J. Barsky III, M.D.
Francis Creed, M.D.
Nancy Frasure-Smith, Ph.D. *(2007–2011)*

Michael R. Irwin, M.D.
Francis J. Keefe, Ph.D. *(2007–2011)*
Sing Lee, M.D.
Michael Sharpe, M.D.
Lawson R. Wulsin, M.D.

## Substance-Related Disorders

CHARLES P. O'BRIEN, M.D., PH.D.
*Chair*

THOMAS J. CROWLEY, M.D.
*Co-Chair*

Wilson M. Compton, M.D., M.P.E., *Text Coordinator*
Marc Auriacombe, M.D.
Guilherme L. G. Borges, M.D., Dr.Sc.
Kathleen K. Bucholz, Ph.D.
Alan J. Budney, Ph.D.
Bridget F. Grant, Ph.D., Ph.D.
Deborah S. Hasin, Ph.D.

Thomas R. Kosten, M.D. *(2007–2008)*
Walter Ling, M.D.
Spero M. Manson, Ph.D. *(2007-2008)*
A. Thomas McLellan, Ph.D. *(2007–2008)*
Nancy M. Petry, Ph.D.
Marc A. Schuckit, M.D.
Wim van den Brink, M.D., Ph.D. *(2007–2008)*

# DSM-5 Study Groups

### Diagnostic Spectra and DSM/ICD Harmonization

STEVEN E. HYMAN, M.D.
*Chair (2007–2012)*

William T. Carpenter Jr., M.D.
Wilson M. Compton, M.D., M.P.E.
Jan A. Fawcett, M.D.
Helena C. Kraemer, Ph.D.
David J. Kupfer, M.D.

William E. Narrow, M.D., M.P.H.
Charles P. O'Brien, M.D., Ph.D.
John M. Oldham, M.D.
Katharine A. Phillips, M.D.
Darrel A. Regier, M.D., M.P.H.

### Lifespan Developmental Approaches

ERIC J. LENZE, M.D.
*Chair*

SUSAN K. SCHULTZ, M.D.
*Chair Emeritus*

DANIEL S. PINE, M.D.
*Chair Emeritus*

Dan G. Blazer, M.D., Ph.D., M.P.H.
F. Xavier Castellanos, M.D.
Wilson M. Compton, M.D., M.P.E.

Daniel T. Mamah, M.D., M.P.E.
Andrew E. Skodol II, M.D.
Susan E. Swedo, M.D.

### Gender and Cross-Cultural Issues

KIMBERLY A. YONKERS, M.D.
*Chair*

ROBERTO LEWIS-FERNÁNDEZ, M.D., M.T.S.
*Co-Chair, Cross-Cultural Issues*

Renato D. Alarcon, M.D., M.P.H.
Diana E. Clarke, Ph.D., M.Sc.
Javier I. Escobar, M.D., M.Sc.
Ellen Frank, Ph.D.
James S. Jackson, Ph.D.
Spiro M. Manson, Ph.D. *(2007–2008)*
James P. McNulty, A.B., Sc.B.

Leslie C. Morey, Ph.D.
William E. Narrow, M.D., M.P.H.
Roger Peele, M.D.
Philip Wang, M.D., Dr.P.H. *(2007–2012)*
William M. Womack, M.D.
Kenneth J. Zucker, Ph.D.

### Psychiatric/General Medical Interface

LAWSON R. WULSIN, M.D.
*Chair*

Ronald E. Dahl, M.D.
Joel E. Dimsdale, M.D.
Javier I. Escobar, M.D., M.Sc.
Dilip V. Jeste, M.D. *(2007–2011)*
Walter E. Kaufmann, M.D.

Richard E. Kreipe, M.D.
Ronald C. Petersen, Ph.D., M.D.
Charles F. Reynolds III, M.D.
Robert Taylor Segraves, M.D., Ph.D.
B. Timothy Walsh, M.D.

### Impairment and Disability

JANE S. PAULSEN, PH.D.
*Chair*

J. Gavin Andrews, M.D.
Glorisa Canino, Ph.D.
Lee Anna Clark, Ph.D.
Diana E. Clarke, Ph.D., M.Sc.
Michelle G. Craske, Ph.D.

Hans W. Hoek, M.D., Ph.D.
Helena C. Kraemer, Ph.D.
William E. Narrow, M.D., M.P.H.
David Shaffer, M.D.

### Diagnostic Assessment Instruments

JACK D. BURKE JR., M.D., M.P.H.
*Chair*

Lee Anna Clark, Ph.D.
Diana E. Clarke, Ph.D., M.Sc.
Bridget F. Grant, Ph.D., Ph.D.

Helena C. Kraemer, Ph.D.
William E. Narrow, M.D., M.P.H.
David Shaffer, M.D.

## DSM-5 Research Group

WILLIAM E. NARROW, M.D., M.P.H.
*Chair*

Jack D. Burke Jr., M.D., M.P.H.
Diana E. Clarke, Ph.D., M.Sc.
Helena C. Kraemer, Ph.D.

David J. Kupfer, M.D.
Darrel A. Regier, M.D., M.P.H.
David Shaffer, M.D.

## Course Specifiers and Glossary

WOLFGANG GAEBEL, M.D.
*Chair*

Ellen Frank, Ph.D.
Charles P. O'Brien, M.D., Ph.D.
Norman Sartorius, M.D., Ph.D.,
 *Consultant*
Susan K. Schultz, M.D.

Dan J. Stein, M.D., Ph.D.
Eric A. Taylor, M.B.
David J. Kupfer, M.D.
Darrel A. Regier, M.D., M.P.H.

# DSM-5 Classification

Before each disorder name, ICD-9-CM codes are provided, followed by ICD-10-CM codes in parentheses. Blank lines indicate that either the ICD-9-CM or the ICD-10-CM code is not applicable. For some disorders, the code can be indicated only according to the subtype or specifier.

ICD-9-CM codes are to be used for coding purposes in the United States through September 30, 2015. ICD-10-CM codes are to be used starting October 1, 2015. For DSM-5 coding and other updates, see the DSM-5® Update on www.PsychiatryOnline.org.

Following chapter titles and disorder names, page numbers for the corresponding text or criteria are included in parentheses.

**Note for all mental disorders due to another medical condition:** Indicate the name of the other medical condition in the name of the mental disorder due to [the medical condition]. The code and name for the other medical condition should be listed first immediately before the mental disorder due to the medical condition.

## Neurodevelopmental Disorders (31)

### Intellectual Disabilities (33)

| | | |
|---|---|---|
| \_\_.\_ | (\_\_.\_) | Intellectual Disability (Intellectual Developmental Disorder) (33) *Specify* current severity: |
| 317 | (F70) | Mild |
| 318.0 | (F71) | Moderate |
| 318.1 | (F72) | Severe |
| 318.2 | (F73) | Profound |
| 315.8 | (F88) | Global Developmental Delay (41) |
| 319 | (F79) | Unspecified Intellectual Disability (Intellectual Developmental Disorder) (41) |

### Communication Disorders (41)

| | |
|---|---|
| 315.32 (F80.2) | Language Disorder (42) |
| 315.39 (F80.0) | Speech Sound Disorder (44) |
| 315.35 (F80.81) | Childhood-Onset Fluency Disorder (Stuttering) (45) **Note:** Later-onset cases are diagnosed as 307.0 (F98.5) adult-onset fluency disorder. |
| 315.39 (F80.82) | Social (Pragmatic) Communication Disorder (47) |
| 307.9 (F80.9) | Unspecified Communication Disorder (49) |

cians an opportunity to document factors that may have played a role in the etiology of the disorder, as well as those that might affect the clinical course. Examples include genetic disorders, such as fragile X syndrome, tuberous sclerosis, and Rett syndrome; medical conditions such as epilepsy; and environmental factors, including very low birth weight and fetal alcohol exposure (even in the absence of stigmata of fetal alcohol syndrome).

# Intellectual Disabilities

## Intellectual Disability (Intellectual Developmental Disorder)

### Diagnostic Criteria

Intellectual disability (intellectual developmental disorder) is a disorder with onset during the developmental period that includes both intellectual and adaptive functioning deficits in conceptual, social, and practical domains. The following three criteria must be met:

A. Deficits in intellectual functions, such as reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience, confirmed by both clinical assessment and individualized, standardized intelligence testing.

B. Deficits in adaptive functioning that result in failure to meet developmental and socio-cultural standards for personal independence and social responsibility. Without ongoing support, the adaptive deficits limit functioning in one or more activities of daily life, such as communication, social participation, and independent living, across multiple environments, such as home, school, work, and community.

C. Onset of intellectual and adaptive deficits during the developmental period.

**Note:** The diagnostic term *intellectual disability* is the equivalent term for the ICD-11 diagnosis of *intellectual developmental disorders*. Although the term *intellectual disability* is used throughout this manual, both terms are used in the title to clarify relationships with other classification systems. Moreover, a federal statute in the United States (Public Law 111-256, Rosa's Law) replaces the term *mental retardation* with *intellectual disability*, and research journals use the term *intellectual disability*. Thus, *intellectual disability* is the term in common use by medical, educational, and other professions and by the lay public and advocacy groups.

*Specify* current severity (see Table 1):

　317 (F70)　Mild
　318.0 (F71) Moderate
　318.1 (F72) Severe
　318.2 (F73) Profound

## Specifiers

The various levels of severity are defined on the basis of adaptive functioning, and not IQ scores, because it is adaptive functioning that determines the level of supports required. Moreover, IQ measures are less valid in the lower end of the IQ range.

**TABLE 1** Severity levels for intellectual disability (intellectual developmental disorder)

| Severity level | Conceptual domain | Social domain | Practical domain |
|---|---|---|---|
| Mild | For preschool children, there may be no obvious conceptual differences. For school-age children and adults, there are difficulties in learning academic skills involving reading, writing, arithmetic, time, or money, with support needed in one or more areas to meet age-related expectations. In adults, abstract thinking, executive function (i.e., planning, strategizing, priority setting, and cognitive flexibility), and short-term memory, as well as functional use of academic skills (e.g., reading, money management), are impaired. There is a somewhat concrete approach to problems and solutions compared with age-mates. | Compared with typically developing age-mates, the individual is immature in social interactions. For example, there may be difficulty in accurately perceiving peers' social cues. Communication, conversation, and language are more concrete or immature than expected for age. There may be difficulties regulating emotion and behavior in age-appropriate fashion; these difficulties are noticed by peers in social situations. There is limited understanding of risk in social situations; social judgment is immature for age, and the person is at risk of being manipulated by others (gullibility). | The individual may function age-appropriately in personal care. Individuals need some support with complex daily living tasks in comparison to peers. In adulthood, supports typically involve grocery shopping, transportation, home and child-care organizing, nutritious food preparation, and banking and money management. Recreational skills resemble those of age-mates, although judgment related to well-being and organization around recreation requires support. In adulthood, competitive employment is often seen in jobs that do not emphasize conceptual skills. Individuals generally need support to make health care decisions and legal decisions, and to learn to perform a skilled vocation competently. Support is typically needed to raise a family. |

| Severity level | Conceptual domain | Social domain | Practical domain |
|---|---|---|---|
| Moderate | All through development, the individual's conceptual skills lag markedly behind those of peers. For preschoolers, language and pre-academic skills develop slowly. For school-age children, progress in reading, writing, mathematics, and understanding of time and money occurs slowly across the school years and is markedly limited compared with that of peers. For adults, academic skill development is typically at an elementary level, and support is required for all use of academic skills in work and personal life. Ongoing assistance on a daily basis is needed to complete conceptual tasks of day-to-day life, and others may take over these responsibilities fully for the individual. | The individual shows marked differences from peers in social and communicative behavior across development. Spoken language is typically a primary tool for social communication but is much less complex than that of peers. Capacity for relationships is evident in ties to family and friends, and the individual may have successful friendships across life and sometimes romantic relations in adulthood. However, individuals may not perceive or interpret social cues accurately. Social judgment and decision-making abilities are limited, and caretakers must assist the person with life decisions. Friendships with typically developing peers are often affected by communication or social limitations. Significant social and communicative support is needed in work settings for success. | The individual can care for personal needs involving eating, dressing, elimination, and hygiene as an adult, although an extended period of teaching and time is needed for the individual to become independent in these areas, and reminders may be needed. Similarly, participation in all household tasks can be achieved by adulthood, although an extended period of teaching is needed, and ongoing supports will typically occur for adult-level performance. Independent employment in jobs that require limited conceptual and communication skills can be achieved, but considerable support from co-workers, supervisors, and others is needed to manage social expectations, job complexities, and ancillary responsibilities such as scheduling, transportation, health benefits, and money management. A variety of recreational skills can be developed. These typically require additional supports and learning opportunities over an extended period of time. Maladaptive behavior is present in a significant minority and causes social problems. |

**TABLE 1** Severity levels for intellectual disability (intellectual developmental disorder) *(continued)*

| Severity level | Conceptual domain | Social domain | Practical domain |
|---|---|---|---|
| Severe | Attainment of conceptual skills is limited. The individual generally has little understanding of written language or of concepts involving numbers, quantity, time, and money. Caretakers provide extensive supports for problem solving throughout life. | Spoken language is quite limited in terms of vocabulary and grammar. Speech may be single words or phrases and may be supplemented through augmentative means. Speech and communication are focused on the here and now within everyday events. Language is used for social communication more than for explication. Individuals understand simple speech and gestural communication. Relationships with family members and familiar others are a source of pleasure and help. | The individual requires support for all activities of daily living, including meals, dressing, bathing, and elimination. The individual requires supervision at all times. The individual cannot make responsible decisions regarding well-being of self or others. In adulthood, participation in tasks at home, recreation, and work requires ongoing support and assistance. Skill acquisition in all domains involves long-term teaching and ongoing support. Maladaptive behavior, including self-injury, is present in a significant minority. |
| Profound | Conceptual skills generally involve the physical world rather than symbolic processes. The individual may use objects in goal-directed fashion for self-care, work, and recreation. Certain visuospatial skills, such as matching and sorting based on physical characteristics, may be acquired. However, co-occurring motor and sensory impairments may prevent functional use of objects. | The individual has very limited understanding of symbolic communication in speech or gesture. He or she may understand some simple instructions or gestures. The individual expresses his or her own desires and emotions largely through nonverbal, nonsymbolic communication. The individual enjoys relationships with well-known family members, caretakers, and familiar others, and initiates and responds to social interactions through gestural and emotional cues. Co-occurring sensory and physical impairments may prevent many social activities. | The individual is dependent on others for all aspects of daily physical care, health, and safety, although he or she may be able to participate in some of these activities as well. Individuals without severe physical impairments may assist with some daily work tasks at home, like carrying dishes to the table. Simple actions with objects may be the basis of participation in some vocational activities with high levels of ongoing support. Recreational activities may involve, for example, enjoyment in listening to music, watching movies, going out for walks, or participating in water activities, all with the support of others. Co-occurring physical and sensory impairments are frequent barriers to participation (beyond watching) in home, recreational, and vocational activities. Maladaptive behavior is present in a significant minority. |

## Diagnostic Features

The essential features of intellectual disability (intellectual developmental disorder) are deficits in general mental abilities (Criterion A) and impairment in everyday adaptive functioning, in comparison to an individual's age-, gender-, and socioculturally matched peers (Criterion B). Onset is during the developmental period (Criterion C). The diagnosis of intellectual disability is based on both clinical assessment and standardized testing of intellectual and adaptive functions.

Criterion A refers to intellectual functions that involve reasoning, problem solving, planning, abstract thinking, judgment, learning from instruction and experience, and practical understanding. Critical components include verbal comprehension, working memory, perceptual reasoning, quantitative reasoning, abstract thought, and cognitive efficacy. Intellectual functioning is typically measured with individually administered and psychometrically valid, comprehensive, culturally appropriate, psychometrically sound tests of intelligence. Individuals with intellectual disability have scores of approximately two standard deviations or more below the population mean, including a margin for measurement error (generally +5 points). On tests with a standard deviation of 15 and a mean of 100, this involves a score of 65–75 (70 ± 5). Clinical training and judgment are required to interpret test results and assess intellectual performance.

Factors that may affect test scores include practice effects and the "Flynn effect" (i.e., overly high scores due to out-of-date test norms). Invalid scores may result from the use of brief intelligence screening tests or group tests; highly discrepant individual subtest scores may make an overall IQ score invalid. Instruments must be normed for the individual's sociocultural background and native language. Co-occurring disorders that affect communication, language, and/or motor or sensory function may affect test scores. Individual cognitive profiles based on neuropsychological testing are more useful for understanding intellectual abilities than a single IQ score. Such testing may identify areas of relative strengths and weaknesses, an assessment important for academic and vocational planning.

IQ test scores are approximations of conceptual functioning but may be insufficient to assess reasoning in real-life situations and mastery of practical tasks. For example, a person with an IQ score above 70 may have such severe adaptive behavior problems in social judgment, social understanding, and other areas of adaptive functioning that the person's actual functioning is comparable to that of individuals with a lower IQ score. Thus, clinical judgment is needed in interpreting the results of IQ tests.

Deficits in adaptive functioning (Criterion B) refer to how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background. Adaptive functioning involves adaptive reasoning in three domains: conceptual, social, and practical. The *conceptual (academic) domain* involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others. The *social domain* involves awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; and social judgment, among others. The *practical domain* involves learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization, among others. Intellectual capacity, education, motivation, socialization, personality features, vocational opportunity, cultural experience, and coexisting general medical conditions or mental disorders influence adaptive functioning.

Adaptive functioning is assessed using both clinical evaluation and individualized, culturally appropriate, psychometrically sound measures. Standardized measures are used with knowledgeable informants (e.g., parent or other family member; teacher; counselor; care provider) and the individual to the extent possible. Additional sources of information include educational, developmental, medical, and mental health evaluations. Scores from standardized measures and interview sources must be interpreted using clinical judgment. When standardized testing is difficult or impossible, because of a variety of

factors (e.g., sensory impairment, severe problem behavior), the individual may be diagnosed with unspecified intellectual disability. Adaptive functioning may be difficult to assess in a controlled setting (e.g., prisons, detention centers); if possible, corroborative information reflecting functioning outside those settings should be obtained.

Criterion B is met when at least one domain of adaptive functioning—conceptual, social, or practical—is sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings at school, at work, at home, or in the community. To meet diagnostic criteria for intellectual disability, the deficits in adaptive functioning must be directly related to the intellectual impairments described in Criterion A. Criterion C, onset during the developmental period, refers to recognition that intellectual and adaptive deficits are present during childhood or adolescence.

## Associated Features Supporting Diagnosis

Intellectual disability is a heterogeneous condition with multiple causes. There may be associated difficulties with social judgment; assessment of risk; self-management of behavior, emotions, or interpersonal relationships; or motivation in school or work environments. Lack of communication skills may predispose to disruptive and aggressive behaviors. Gullibility is often a feature, involving naiveté in social situations and a tendency for being easily led by others. Gullibility and lack of awareness of risk may result in exploitation by others and possible victimization, fraud, unintentional criminal involvement, false confessions, and risk for physical and sexual abuse. These associated features can be important in criminal cases, including Atkins-type hearings involving the death penalty.

Individuals with a diagnosis of intellectual disability with co-occurring mental disorders are at risk for suicide. They think about suicide, make suicide attempts, and may die from them. Thus, screening for suicidal thoughts is essential in the assessment process. Because of a lack of awareness of risk and danger, accidental injury rates may be increased.

## Prevalence

Intellectual disability has an overall general population prevalence of approximately 1%, and prevalence rates vary by age. Prevalence for severe intellectual disability is approximately 6 per 1,000.

## Development and Course

Onset of intellectual disability is in the developmental period. The age and characteristic features at onset depend on the etiology and severity of brain dysfunction. Delayed motor, language, and social milestones may be identifiable within the first 2 years of life among those with more severe intellectual disability, while mild levels may not be identifiable until school age when difficulty with academic learning becomes apparent. All criteria (including Criterion C) must be fulfilled by history or current presentation. Some children under age 5 years whose presentation will eventually meet criteria for intellectual disability have deficits that meet criteria for global developmental delay.

When intellectual disability is associated with a genetic syndrome, there may be a characteristic physical appearance (as in, e.g., Down syndrome). Some syndromes have a *behavioral phenotype*, which refers to specific behaviors that are characteristic of particular genetic disorder (e.g., Lesch-Nyhan syndrome). In acquired forms, the onset may be abrupt following an illness such as meningitis or encephalitis or head trauma occurring during the developmental period. When intellectual disability results from a loss of previously acquired cognitive skills, as in severe traumatic brain injury, the diagnoses of intellectual disability and of a neurocognitive disorder may both be assigned.

Although intellectual disability is generally nonprogressive, in certain genetic disorders (e.g., Rett syndrome) there are periods of worsening, followed by stabilization, and in

others (e.g., San Phillippo syndrome) progressive worsening of intellectual function. After early childhood, the disorder is generally lifelong, although severity levels may change over time. The course may be influenced by underlying medical or genetic conditions and co-occurring conditions (e.g., hearing or visual impairments, epilepsy). Early and ongoing interventions may improve adaptive functioning throughout childhood and adulthood. In some cases, these result in significant improvement of intellectual functioning, such that the diagnosis of intellectual disability is no longer appropriate. Thus, it is common practice when assessing infants and young children to delay diagnosis of intellectual disability until after an appropriate course of intervention is provided. For older children and adults, the extent of support provided may allow for full participation in all activities of daily living and improved adaptive function. Diagnostic assessments must determine whether improved adaptive skills are the result of a stable, generalized new skill acquisition (in which case the diagnosis of intellectual disability may no longer be appropriate) or whether the improvement is contingent on the presence of supports and ongoing interventions (in which case the diagnosis of intellectual disability may still be appropriate).

## Risk and Prognostic Factors

**Genetic and physiological.**   Prenatal etiologies include genetic syndromes (e.g., sequence variations or copy number variants involving one or more genes; chromosomal disorders), inborn errors of metabolism, brain malformations, maternal disease (including placental disease), and environmental influences (e.g., alcohol, other drugs, toxins, teratogens). Perinatal causes include a variety of labor and delivery-related events leading to neonatal encephalopathy. Postnatal causes include hypoxic ischemic injury, traumatic brain injury, infections, demyelinating disorders, seizure disorders (e.g., infantile spasms), severe and chronic social deprivation, and toxic metabolic syndromes and intoxications (e.g., lead, mercury).

## Culture-Related Diagnostic Issues

Intellectual disability occurs in all races and cultures. Cultural sensitivity and knowledge are needed during assessment, and the individual's ethnic, cultural, and linguistic background, available experiences, and adaptive functioning within his or her community and cultural setting must be taken into account.

## Gender-Related Diagnostic Issues

Overall, males are more likely than females to be diagnosed with both mild (average male:female ratio 1.6:1) and severe (average male:female ratio 1.2:1) forms of intellectual disability. However, gender ratios vary widely in reported studies. Sex-linked genetic factors and male vulnerability to brain insult may account for some of the gender differences.

## Diagnostic Markers

A comprehensive evaluation includes an assessment of intellectual capacity and adaptive functioning; identification of genetic and nongenetic etiologies; evaluation for associated medical conditions (e.g., cerebral palsy, seizure disorder); and evaluation for co-occurring mental, emotional, and behavioral disorders. Components of the evaluation may include basic pre- and perinatal medical history, three-generational family pedigree, physical examination, genetic evaluation (e.g., karyotype or chromosomal microarray analysis and testing for specific genetic syndromes), and metabolic screening and neuroimaging assessment.

## Differential Diagnosis

The diagnosis of intellectual disability should be made whenever Criteria A, B, and C are met. A diagnosis of intellectual disability should not be assumed because of a particular

genetic or medical condition. A genetic syndrome linked to intellectual disability should be noted as a concurrent diagnosis with the intellectual disability.

**Major and mild neurocognitive disorders.**   Intellectual disability is categorized as a neurodevelopmental disorder and is distinct from the neurocognitive disorders, which are characterized by a loss of cognitive functioning. Major neurocognitive disorder may co-occur with intellectual disability (e.g., an individual with Down syndrome who develops Alzheimer's disease, or an individual with intellectual disability who loses further cognitive capacity following a head injury). In such cases, the diagnoses of intellectual disability and neurocognitive disorder may both be given.

**Communication disorders and specific learning disorder.**   These neurodevelopmental disorders are specific to the communication and learning domains and do not show deficits in intellectual and adaptive behavior. They may co-occur with intellectual disability. Both diagnoses are made if full criteria are met for intellectual disability and a communication disorder or specific learning disorder.

**Autism spectrum disorder.**   Intellectual disability is common among individuals with autism spectrum disorder. Assessment of intellectual ability may be complicated by social-communication and behavior deficits inherent to autism spectrum disorder, which may interfere with understanding and complying with test procedures. Appropriate assessment of intellectual functioning in autism spectrum disorder is essential, with reassessment across the developmental period, because IQ scores in autism spectrum disorder may be unstable, particularly in early childhood.

## Comorbidity

Co-occurring mental, neurodevelopmental, medical, and physical conditions are frequent in intellectual disability, with rates of some conditions (e.g., mental disorders, cerebral palsy, and epilepsy) three to four times higher than in the general population. The prognosis and outcome of co-occurring diagnoses may be influenced by the presence of intellectual disability. Assessment procedures may require modifications because of associated disorders, including communication disorders, autism spectrum disorder, and motor, sensory, or other disorders. Knowledgeable informants are essential for identifying symptoms such as irritability, mood dysregulation, aggression, eating problems, and sleep problems, and for assessing adaptive functioning in various community settings.

The most common co-occurring mental and neurodevelopmental disorders are attention-deficit/hyperactivity disorder; depressive and bipolar disorders; anxiety disorders; autism spectrum disorder; stereotypic movement disorder (with or without self-injurious behavior); impulse-control disorders; and major neurocognitive disorder. Major depressive disorder may occur throughout the range of severity of intellectual disability. Self-injurious behavior requires prompt diagnostic attention and may warrant a separate diagnosis of stereotypic movement disorder. Individuals with intellectual disability, particularly those with more severe intellectual disability, may also exhibit aggression and disruptive behaviors, including harm of others or property destruction.

## Relationship to Other Classifications

ICD-11 (in development at the time of this publication) uses the term *intellectual developmental disorders* to indicate that these are disorders that involve impaired brain functioning early in life. These disorders are described in ICD-11 as a metasyndrome occurring in the developmental period analogous to dementia or neurocognitive disorder in later life. There are four subtypes in ICD-11: mild, moderate, severe, and profound.

The American Association on Intellectual and Developmental Disabilities (AAIDD) also uses the term *intellectual disability* with a similar meaning to the term as used in this

manual. The AAIDD's classification is multidimensional rather than categorical and is based on the disability construct. Rather than listing specifiers as is done in DSM-5, the AAIDD emphasizes a profile of supports based on severity.

# Global Developmental Delay

## 315.8 (F88)

This diagnosis is reserved for individuals *under* the age of 5 years when the clinical severity level cannot be reliably assessed during early childhood. This category is diagnosed when an individual fails to meet expected developmental milestones in several areas of intellectual functioning, and applies to individuals who are unable to undergo systematic assessments of intellectual functioning, including children who are too young to participate in standardized testing. This category requires reassessment after a period of time.

# Unspecified Intellectual Disability (Intellectual Developmental Disorder)

## 319 (F79)

This category is reserved for individuals *over* the age of 5 years when assessment of the degree of intellectual disability (intellectual developmental disorder) by means of locally available procedures is rendered difficult or impossible because of associated sensory or physical impairments, as in blindness or prelingual deafness; locomotor disability; or presence of severe problem behaviors or co-occurring mental disorder. This category should only be used in exceptional circumstances and requires reassessment after a period of time.

# Communication Disorders

Disorders of communication include deficits in language, speech, and communication. *Speech* is the expressive production of sounds and includes an individual's articulation, fluency, voice, and resonance quality. *Language* includes the form, function, and use of a conventional system of symbols (i.e., spoken words, sign language, written words, pictures) in a rule-governed manner for communication. *Communication* includes any verbal or nonverbal behavior (whether intentional or unintentional) that influences the behavior, ideas, or attitudes of another individual. Assessments of speech, language and communication abilities must take into account the individual's cultural and language context, particularly for individuals growing up in bilingual environments. The standardized measures of language development and of nonverbal intellectual capacity must be relevant for the cultural and linguistic group (i.e., tests developed and standardized for one group may not provide appropriate norms for a different group). The diagnostic category of communication disorders includes the following: language disorder, speech sound disorder, childhood-onset fluency disorder (stuttering), social (pragmatic) communication disorder, and other specified and unspecified communication disorders.

# INTELLECTUAL DISABILITY

Definition, Classification, and Systems of Supports

THE 11TH EDITION OF THE AAIDD DEFINITION MANUAL



aaidd

PA-432

# Intellectual Disability

PA-433

# Intellectual Disability

## Definition, Classification, and Systems of Supports

*The AAIDD Ad Hoc Committee on
Terminology and Classification*

## 11th Edition



American Association
on Intellectual and
Developmental Disabilities

**PA-434**

Copyright © 2010 by the American Association on Intellectual and Developmental Disabilities

Published by
American Association on Intellectual and Developmental Disabilities
501 3rd Street, NW, Suite 200
Washington, DC 20001-2760

Printed in the United States of America

Library of Congress Cataloging-in-Publication Data

Intellectual disability : definition, classification, and systems of supports / The AAIDD Ad Hoc Committee on Terminology and Classification.—11th ed.
    p. cm.
 Includes bibliographical references and index.
 ISBN 978-1-935304-04-3 (alk. paper)
 1. Mental retardation—Classification.  I. American Association on Intellectual and Developmental Disabilities.
 RC570.C515 2010
 616.85'88—dc22                                    2009040030

PA-435

# CHAPTER 1

## DEFINITION OF INTELLECTUAL DISABILITY

> Intellectual disability is characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18.

## OVERVIEW

*Defining* refers to precisely explaining the term and establishing the meaning and boundaries of the term. Significant consequences can result from the way a term is defined. As discussed by Gross and Hahn (2004), Luckasson and Reeve (2001), and Stowe, Turnbull, and Sublet (2006), a definition can make someone eligible or ineligible for services, subjected to something or not subjected to it (e.g., involuntary commitment), exempted from something or not exempted (e.g., from the death penalty), included or not included (as to protections against discrimination and equal opportunity), and/or entitled or not entitled (e.g., as to Social Security benefits or other financial benefits). Our purpose in this chapter is to review briefly the historical approaches to defining *intellectual disability* (ID), present the current definition of ID and the assumptions that are essential to the application of the definition, discuss the historical consistency in regard to the three criteria used to operationally define the construct, and summarize how the boundaries of the construct have been operationalized over the past 50 years.

## HISTORICAL APPROACHES TO DEFINING INTELLECTUAL DISABILITY

Historically, four broad approaches (i.e., social, clinical, intellectual, and dual-criterion) have been used to define the construct now referred to as ID. Remnants of these four approaches are still evident in current discussions regarding who is (or should be) diagnosed as an individual with an ID (see, for example, Switzky & Greenspan, 2006a, 2006b).

### Social Approach

Historically, persons were defined or identified as having ID because they failed to adapt socially to their environment. Because an emphasis on intelligence and the role of intelligent people in society was to come later, the oldest historical definitional approach

PA-436

# CHAPTER 3

## ROLE OF ASSESSMENT IN DIAGNOSIS, CLASSIFICATION, AND SYSTEMS OF SUPPORTS

> **Assessment in the field of intellectual disability is conducted in order to diagnose a disability, classify by disability characteristics, and plan for individualized needed supports. In order to achieve specific assessment purposes, three criteria need to be met: (a) the assessment tools and process should match the purpose for assessment, (b) the assessment findings should be as valid as possible, and (c) the results should be both useful and purposefully applied.**

### OVERVIEW

Assessment in the field of *intellectual disability* (ID) involves systematically collecting information for decision making and communication related to three assessment functions: diagnosis, classification, and planning individualized supports. Within each of these functions, professionals conduct assessments for a variety of specific purposes. For example, a diagnosis might determine an individual's eligibility for services or legal protection, or it might establish whether a person could be included in a research sample. Some assessment measures, such as intelligence tests or adaptive behavior measures, are useful for more than one purpose but generally not for all three assessment functions.

This chapter has two purposes: first, to describe a framework for assessing individuals with ID; and second, to review several criteria for high quality assessment. If assessment information is to benefit people with an ID, it is necessary that these criteria be met.

### ASSESSMENT FRAMEWORK

In 2002, AAIDD proposed an assessment framework that was organized around the three functions of diagnosis, classification, and planning supports (Luckasson et al., 2002). An updated version of this framework is shown in Table 3.1. The intent of the framework is to illustrate that assessment tools and results may be useful for some purposes but not other purposes. For example, an earlier AAIDD *Manual* (Luckasson et al., 1992) was

**PA-437**

# PART II

## DIAGNOSIS AND CLASSIFICATION OF INTELLECTUAL DISABILITY

### OVERVIEW

A diagnosis of *intellectual disability* (ID) involves meeting three criteria: (a) significant limitations in intellectual functioning, (b) significant limitations in adaptive behavior, and (c) age of onset before age 18. As discussed more fully in Schalock, Luckasson, and Shogren (2007), there has been considerable consistency in these three criteria—and their operational definitions—for the last 50 years. As discussed more fully in chapters 4 and 5, the operational definitions of the first and second criteria are as follows:

- *Intellectual functioning*: an IQ score that is approximately two standard deviations below the mean, considering the standard error of measurement for the specific assessment instruments used and the instruments' strengths and limitations
- *Adaptive behavior*: performance on a standardized measure of adaptive behavior that is normed on the general population including people with and without ID that is approximately two standard deviations below the mean of either (a) one of the following three types of adaptive behavior: conceptual, social, and practical or (b) an overall score on a standardized measure of conceptual, social, and practical skills

The third criterion, *age of onset*, refers to the age at which the disability began. The purpose of the age of onset criterion is to distinguish ID from other forms of disability that may occur later in life. Intellectual disability typically originates close to the time of birth—either during fetal development, the birth process, or soon after birth. Sometimes, however, especially when the etiology of the disability indicates progressive damage (such as malnutrition) or damage related to an acquired disease or injury (such as infection or traumatic brain injury), the condition may originate later. Thus, disability does not necessarily have to have been formally identified, but it must have originated during the developmental period. The early onset criterion is apparent in the earliest formulation of

PA-438

the definition of the disability. As shown in Table 1.2, there has been very little change in the age of onset criterion (generally before age 18) over the last 50 years.

One may analyze the age of onset from both a neurological perspective and a social policy perspective. Neurologically, the primary time of brain development and change is the prenatal, infancy, and childhood years, although considerable change occurs during the teen years and thereafter. Thus, from a neurological perspective, 18 is generous for manifestation. From a social policy perspective, one currently finds both ages 18 and 21 used as the upper limit. Although there is historical consistency in the use of age 18, the criterion of 21 is found in the Developmental Disabilities Act of 1990 (although it too originally used the age of 18; Thompson & Wehmeyer, 2008). Although this discrepancy can cause some confusion, it is our position that 18 is still the best upper limit due to the following: (a) extending to the age of 21 may change the number of people eligible for diagnosis and thus impact prevalence rates because the class would include individuals with other cognitive disabilities (e.g., traumatic brain injury [TBI] and mental illness); (b) extending to age 21 would not be helpful in accurately diagnosing individuals who have not been diagnosed before 18 because any examination would most likely refer to school records to determine how the student was functioning at that time; (c) retaining age 18 is consistent with diagnostic practices in many countries (e.g., throughout Europe and the Pacific Rim); and (d) maintaining the current criterion of "originates before age 18" leaves open the possibility that when an accurate diagnosis of ID was not made during the developmental period, a retrospective diagnosis may be necessary in some situations (see chapter 8).

In the following five chapters, we discuss in detail factors impacting diagnostic best practices. These are an understanding of (a) intellectual functioning and its assessment (chapter 4), (b) adaptive behavior and its assessment (chapter 5), (c) the role of etiological factors in the diagnosis of ID (chapter 6), (d) a multidimensional approach to classification (chapter 7), and (e) the role of clinical judgment in diagnosis, classification, and developing systems of supports (chapter 8). Throughout these five chapters, readers will also find a discussion of best practices guidelines regarding the diagnosis and classification of ID. Chief among these guidelines are the following:

- A diagnosis of ID is based on three criteria: significant limitations in intellectual functioning and adaptive behavior as expressed in conceptual, social, and practical skills, and age of onset before age 18.

- ID is diagnosed using assessment information obtained from standardized and individually administered instruments that assess intellectual functioning and adaptive behavior.

- A valid diagnosis of ID is based on multiple data points that not only include giving equal consideration to significant limitations in adaptive behavior and intellectual functioning but also require evaluating the pattern of test scores and factors that affect the standard error of measurement for the standardized assessment instruments used.

- If the diagnostic criteria are met, the diagnosis may be applied to achieve several focused purposes, including, but not limited to, establishing the presence of the disability in an individual and confirming an individual's eligibility for services, benefits, and legal protections.

- Information about individuals with ID (or individuals themselves) can be grouped or classified for several purposes, such as providing service reimbursement/funding, developing individualized services and supports, conducting research, and/or communicating about selected characteristics.

- Clinicians and other users of this manual should select among multidimensional classification systems, consistent with a specific purpose. Additionally, one must be careful not to use classification information for inappropriate purposes.

- To prevent unsuitable grouping of individuals with ID, classification system(s) that lead to similar services, placements, or other outcomes for individuals in particular subcategories, must be based on strong evidence that the classification system(s) employed will be beneficial to every person in the group.

- Clinical judgment is essential, and a higher level of clinical judgment is frequently required in complex diagnostic and classification situations in which the complexity of the person's functioning precludes standardized assessment alone, legal restrictions significantly reduce opportunities to observe and assess the person, historical information is missing and cannot be obtained, or there are serious questions about the validity of the data. *Clinical judgment* is defined as a special type of judgment rooted in a high level of clinical expertise and experience and judgment that emerges directly from extensive training, experience with the person, and extensive data. The purpose of clinical judgment and the use of clinical judgment strategies is to enhance the quality, validity, and precision of the clinician's decision or recommendation in a particular case.

- A retrospective diagnosis should be based on multiple data points that not only involve giving equal consideration to adaptive behavior and intelligence but also require evaluating the pattern of test scores and factors that affect scores obtained from the assessment instruments used as the time of the assessment(s). If indicated, it might also be necessary to develop a contemporary assessment in order to show similarities and changes in functioning over the life span.

- If there is inconsistency in data sets or obtained information, clinicians need to explore the possible reasons for these differences, including mistakes, poorly trained examiner(s), improper selection of tests, administration of the same test too close in time, administering different editions of the same test and not using the most recent version, and/or not acknowledging the effects of personal characteristics and environmental factors that can affect test results.

**PA-440**

# CHAPTER 4

## INTELLECTUAL FUNCTIONING AND ITS ASSESSMENT

> For purposes of diagnosis, intellectual functioning is currently best conceptualized and captured by a general factor of intelligence. Intelligence is a general mental ability. It includes reasoning, planning, solving problems, thinking abstractly, comprehending complex ideas, learning quickly, and learning from experience. The "significant limitations in intellectual functioning" criterion for a diagnosis of intellectual disability is an IQ score that is approximately two standard deviations below the mean, considering the standard error of measurement for the specific instruments used and the instruments' strengths and limitations.

## OVERVIEW

The multidimensional model of human functioning presented in Figure 2.1 includes intellectual abilities as one of the five dimensions of human functioning. Intellectual functioning, which is a broader term than either intellectual abilities or intelligence, reflects the fact that what is considered intelligent behavior is dependent upon other dimensions of human functioning: the adaptive behavior that one exhibits, the person's mental and physical health status, the opportunity to participate in major life activities, and the context within which people live their everyday lives. Thus, as discussed throughout this chapter, commonly used measures/indices of intelligence need to be interpreted within a broader context than a single IQ score.

Although the primary focus in this chapter is on intelligence and its assessment, it is important that readers of this manual should note the following implications of intelligence on the multidimensionality of ID:

- Limitations in intelligence should be considered in light of four other dimensions of human functioning: adaptive behavior, health, participation, and context.
- The measurement of intelligence may have different relevance, depending on whether it is considered for purposes of diagnosis or classification.
- Although far from perfect, intellectual functioning is currently best represented by IQ scores when they are obtained from appropriate, standardized and individually administered assessment instruments.

PA-441

The assessment of intellectual functioning is essential to making a diagnosis of ID, as virtually all historical definitions of ID (formerly mental retardation) make reference to significantly subaverage intellectual functioning as one of the diagnostic criteria. Our three purposes in this chapter are to present discussions of (a) the definition and nature of intelligence, (b) the operational definition of significant limitations in intellectual functioning, and (c) challenging issues and related guidelines regarding the measurement of intelligence and the interpretation of IQ scores.

## DEFINITION AND NATURE OF INTELLIGENCE

Individuals vary in their ability to understand complexities and reason, adapt to the environment, and use thought to solve problems (Neisser et al., 1996). Although reasoning, adaptation, comprehension, and thinking are somewhat descriptive of intelligence, the construct itself has successfully eluded a definition that is acceptable to everyone. Over the past century, three broad conceptual frameworks have been used in an attempt to better define the construct of intelligence: intelligence as a single (i.e., unifactorial) trait; intelligence as a multitrait, hierarchical phenomenon; or intelligence as a multidimensional construct.

### Intelligence as a Single Trait

Because so many of the available measures of cognitive ability were highly correlated, Spearman (1927) concluded that the relationship among these various cognitive ability measures could be described as a single factor of general intelligence (i.e., $g$). Most of the more commonly used individual tests of intelligence, such as the Wechsler family of scales and the Stanford-Binet Intelligence Scale, 4th edition (SBIS-4; Thorndike, Hagen, & Sattler, 1986a), provide metrics of this $g$ factor. Although Thurstone (1938) was initially unable to replicate the results of Spearman's work, he later acknowledged that there was an error in his factor analytic calculations. When this miscalculation was corrected, Thurstone also obtained Spearman's general factor of intelligence (see Carroll, 1997). In general, this general factor framework is currently the most widely accepted conceptualization of intelligence (Gottfredson, 1997).

### Multitrait Hierarchical Phenomenon

Some theorists conceptualize intelligence as a hierarchical structure, with $g$ at the apex, supported by various more specialized cognitive abilities. Carroll (1993) reviewed hundreds of intelligence test factor analysis studies published between the 1920s and the 1990s. His analysis yielded a three strata hierarchical model, with the $g$ factor at the apex of a pyramidal structure. In Carroll's model, there were approximately 60 discrete narrow abilities at the base of the pyramid. These narrow cognitive abilities were highly correlated and were further factor analyzed into the 10 broader abilities that formed the

PA-442

second stratum of the hierarchy. Finally, these 10 broader abilities were submitted to factor analysis, which yielded a single factor of *g*.

## Multiple Intelligences

Critics (e.g., Ceci, 1990; H. Gardner, 1983; Gould, 1978) of the above two conceptual frameworks noted that the reliance on a single metric of intelligence ignores a number of important areas of mental ability. Gardner argued that most tests of intelligence assess only linguistics, logic, and some aspects of spatial intelligence; other forms and types of intelligence are largely ignored. He went on to note that the paper and pencil format of the typical intelligence test further narrows the focus of intelligence testing to those things that lend themselves to paper and pencil testing.

Recent theories of multiple intelligence have proposed anywhere from two to eight types of intelligence (see Cattell, 1963; Das, Naglieri, & Kirby, 1994; H. Gardner, 1983; Greenspan, 1981). A brief summary of the main theories of multiple intelligences follows.

Catrell (1963) and Horn and Cattell (1966) identified two main factors explaining intellectual ability: *crystallized intelligence* (*gc*) and *fluid intelligence* (*gf*). Crystallized intelligence was defined as those more global activities, such as knowledge and information, that were gained by the individual through life experiences and education. Fluid intelligence was explained in reference to abilities in reasoning and memory. Furthermore, Cattell defined *gc* as a stable trait, whereas *gf* may, in fact, decrease with age.

H. Gardner (1983, 1993) posited a theoretical model of multiple intelligences. Initially, his model consisted of seven different intelligences, each tapping distinctive problem-solving and information-processing capabilities and each with its own distinctive developmental trajectory. The original seven intelligences in Gardner's model were linguistic, logical-mathematical, spatial, musical, bodily kinestberic, interpersonal, and intrapersonal. In 1998, H. Gardner added an eighth independent ability, naturalistic intelligence, to his model. Of Gardner's eight types of intelligence, he claimed that only three (linguistic, logical-mathematical, and spatial) are assessed by contemporary intelligence tests. Gardner (see Chen & Gardner, 1997) advocated for the use of nonstandardized means of assessing the multiple intelligences; he viewed the process as an ongoing one in which personalized assessments in a variety of contexts should be used. The significant criticism remains valid and pertinent that Gardner's multiple intelligences model lacks an empirical base and psychometric validation.

Das et al. (1994) and Naglieri and Das (1997) proposed a four factor model of cognitive processes that underlie intelligence: planning, attention, simultaneous processing, and successive processing. Referred to as the *PASS model*, its origins may be found in the early work of the Russian neurologist Luria. The *planning* process includes self-regulation, analysis and evaluation of situations, and the use of knowledge to solve problems. The *attentional* process involves the regulation of activity, focusing on specific stimuli while inhibiting responses to other less relevant stimuli. *Simultaneous* processing involves the understanding of groupings of stimuli or the identification of commonalities of a

© American Association on Intellectual and Developmental Disabilities

grouping of stimuli. *Successive* processing involves the process of grouping a number of stimuli into a linear series that makes sense.

Sternberg (1988) and Sternberg and Detterman (1986) proposed a three factor model of intelligence that they called the triarchic theory of human intelligence. According to Sternberg (1988), the three fundamental aspects of intelligence are *analytical, creative*, and *practical*. Analytic abilities involve the capacity to analyze and be critical of ideas. Creativity is defined as a person's ability to generate novel ideas that offer a significant contribution, and practical intelligence is an individual's ability to convert ideas into practical application and to convince others of their utility. This sort of distinction between academic and practical intelligence has been offered by a number of theorists (cf. Neisser, 1976). Sternberg has also faced the challenge of developing a metric with which to assess each of his proposed aspects of intelligence; to date no such instrument exists.

Greenspan's (1981) model of multiple intelligences, which has some overlap with Sternberg's triarchic model as well as the current definition of adaptive behavior presented in chapter 5 of this manual, has evolved over time. The tripartite model of intelligence proposed by Greenspan and his colleagues (Greenspan, 1997, 2006b; Greenspan & Love, 1997; Greenspan, Switzky, & Granfield, 1996) defined *intelligence* as being composed of conceptual, practical, and social intelligence. *Conceptual intelligence* is essentially equivalent to the single factor of $g$, although Greenspan (1996, 1997) vehemently opposed the position of using only $g$ or a unitary IQ score as representing an individual's intellectual abilities. *Practical intelligence* involves the performance of everyday skills that are typically measured by adaptive behavior scales, with *social intelligence* being defined as an individual's social and interpersonal abilities (e.g., moral judgment, empathy, social skills). Gullibility and credulity have been added as critical elements of social intelligence (Greenspan & Granfield, 1992; Greenspan, Loughlin, & Black, 2001).

In summary, many of the aforementioned theories of multiple intelligences have not been validated via standardized and quantifiable measures. H. Gardner's multiple intelligences, with the exception of some useful application in educational settings, continues to remain theoretical. Sternberg failed in his attempts to develop a measure capable of reliably measuring his triarchical model of intelligence. The Greenspan and Sternberg models face the common challenge of operationalizing tasks to quantify the constructs of their tripartite models, particularly in the area of social intelligence.

A single dimension of intelligence continues to garner the most support within the scientific community (Carroll, 1997; Gottfredson, 1997; Hernstein & Murray, 1994). Thus, until such measures of multiple intelligences can be assessed reliably and validly, it is the position of AAIDD that intellectual functioning (as defined at the beginning of this chapter) is best conceptualized and captured by a general factor of intelligence ($g$).

**PA-444**

## SIGNIFICANT LIMITATIONS IN INTELLECTUAL FUNCTIONING: OPERATIONAL DEFINITION

In this *Manual*, and consistent with the 2002 *Manual* (Luckasson et al., 2002), the intellectual functioning criterion for a diagnosis of ID is approximately two standard deviations below the mean, considering the standard error of measurement for the specific assessment instruments used and the strengths and limitations of the instruments. In reference to this operational definition of significant limitations, consider the following guidance:

- The intent of this definition is not to specify a hard and fast cutoff point/score for meeting the significant limitations in intellectual functioning criterion of ID. Rather, one needs to use clinical judgment in interpreting the obtained score in reference to the test's standard error of measurement, the assessment instrument's strengths and limitations, and other factors such as practice effects, fatigue effects, and age of norms used (see following section). In addition, significant limitations in intellectual functioning is only one of the three criteria used to establish a diagnosis of ID.

- The use of "approximately" reflects the role of clinical judgment in weighing the factors that contribute to the validity and precision of a decision. The term also addresses statistical error and uncertainty inherent in any assessment of human behavior. In that regard, the decision-making process cannot be viewed as only a statistical calculation.

## CHALLENGING ISSUES AND RELATED GUIDELINES REGARDING THE MEASUREMENT OF INTELLIGENCE AND THE INTERPRETATION OF IQ SCORES

Just as defining intelligence has proven to be a challenging task, measuring or quantifying intelligence is equally difficult. It is important to note that IQ scores derived from an intelligence test are now developed on the basis of a deviation (from the mean) score and not on the older conception of mental age. Thus, in reference to the significant limitations in intellectual functioning criterion for a diagnosis of ID, a valid diagnosis of ID is based on how far the person's score deviates from the mean on the respective standardized assessment instrument and *not* on the ratio of mental age to chronological age.

There are a number of challenges and psychometric issues related to the measurement of intelligence and the interpretation of IQ scores. Although one potentially can take comfort from the fact that intelligence tests generally have good reliability and have demonstrated validity for some purposes, the typical intelligence test is not without psychometric challenges. In that regard, in this section of the chapter, we discuss 10 challenges and related guidelines regarding the measurement of intelligence and the interpretation of IQ scores: measurement error, test fairness, the Flynn Effect, comparability of scores from different tests, practice effect, the utility of scores at the extreme ends of a distribution,

© American Association on Intellectual and Developmental Disabilities

determining a cutoff score, evaluating the role that an IQ score plays in making a diagnosis, assessor credentials, and test selection.

## Measurement Error

The results of any psychometric assessment must be evaluated in terms of the accuracy of the instrument used and such is the case with the assessment of intelligence. An IQ score is subject to variability as a function of a number of potential sources of error, including variations in test performance, examiner's behavior, cooperation of test taker, and other personal and environmental factors. Thus, variation in scores may or may not represent the individual's actual or true level of intellectual functioning. The term *standard error of measurement*, which varies by test, subgroup, and age group, is used to quantify this variability and provide a stated statistical confidence interval within which the person's true score falls.

For well-standardized measures of general intellectual functioning, the standard error of measurement is approximately 3 to 5 points. As reported in the respective test's standardization manual, the test's standard error of measurement can be used to establish a statistical confidence interval around the obtained score. From the properties of the normal curve, a range of confidence can be established with parameters of at least one standard error of measurement (i.e., scores of about 66 to 74, 66% probability) or parameters of two standard error of measurement (i.e., scores of about 62 to 78, 95% probability).

Understanding and addressing the test's standard error of measurement is a critical consideration that must be part of any decision concerning a diagnosis of ID that is based, in part, on significant limitations in intellectual functioning. Both AAIDD and the American Psychiatric Association (2000) support the best practice of reporting an IQ score with an associated confidence interval. Both systems rely on the reported standard error of measurement that is derived from the standard deviation of the test and a measure of the test's reliability. Currently, the prevailing best practice standard in test construction, reporting, and interpretation is to use internal consistency measures of reliability (along with the test's standard deviation) to estimate a standard error of measurement. Reporting an IQ score with an associated confidence interval is a critical consideration underlying the appropriate use of intelligence tests and best practices; such reporting must be a part of any decision concerning the diagnosis of ID.

## Test Fairness

There are at least two areas in which test fairness may be of particular concern. The first is when tests requiring a verbal response are employed with individuals who have severely limited verbal abilities. In these situations, the test score may underestimate their level of intellectual functioning. The second area involves individuals of diverse ethnicity or culture, who may achieve markedly different results. Readers are referred to chapters 3 and 8 for a discussion of guidelines regarding test selection and test fairness.

**PA-446**

## The Flynn Effect

Flynn's research (1984, 1987, 2006, 2007) as well as that of others (e.g., Kanaya, Scullin, & Ceci, 2003; Scullin, 2006) found that IQ scores have been increasing from one generation to the next in the United States as well as in all other developed countries for which IQ data are available. This increase in IQ scores over time was called the *Flynn Effect* by Hernstein and Murray (1994). The Flynn Effect refers to the observation (Flynn, 1984) that every restandardization sample for a major intelligence test (e.g., SBIS-4 and Wechsler) from 1932 through 1978 resulted in a mean IQ that tended to increase over time. Flynn (1987) reported that this effect was also observed in samples from other countries. Although the cause of this effect is unknown, Neisser et al. (1996) suggested that potential factors might well be improved nutrition, cultural changes, testing experience, changes in schooling, and changes in child-rearing practices.

The Flynn Effect raises potential challenges for the diagnosis of ID (Kanaya et al., 2003). Because Flynn (1984) reported that mean IQ increases about 0.33 points per year, some investigators (e.g., Flynn, 2006) have suggested that any obtained IQ score should be adjusted 0.33 points for each year the test was administered after the standardization was completed. For example, if the Wechsler Adult Intelligence Scale (WAIS-III; 1997) was used to assess an individual's IQ in July 2005, the population mean on the WAIS-III was set at 100 when it was originally normed in 1995 (published in 1997). However, based on Flynn's data, the population mean on the Full-Scale IQ raises roughly 0.33 points per year; thus the population mean on the WAIS-III Full-Scale IQ corrected for the Flynn Effect would be 103 in 2005 (9 years × 0.33 = 2.9). Hence, using the significant limitations of approximately two standard deviations below the mean, the Full-Scale IQ cutoff would be approximately 73 (plus or minus the standard error of measurement).

There are also data suggesting that the Flynn Effect may not be a purely linear function of time and that the impact of the effect may asymptote or even reverse. Teasdale and Owens (2005), for example, reported on a large sample of Danish males in which the Flynn Effect peaked and subsequently reversed. In a Norwegian sample, Sundet, Barlaug, and Torjussen (2004) reported a slowing and eventual cessation of the Flynn Effect over time. These data would seem to suggest that while the Flynn Effect is evident, how one corrects for it is still a challenging issue.

As discussed in the *User's Guide* (Schalock et al., 2007) that accompanies the 10th edition of this *Manual*, best practices require recognition of a potential Flynn Effect when older editions of an intelligence test (with corresponding older norms) are used in the assessment or interpretation of an IQ score. As suggested in the *User's Guide* (Schalock et al., 2007, pp. 20, 21):

> The main recommendation resulting from this work [regarding the Flynn Effect] is that all intellectual assessment must use a reliable and appropriate individually administered intelligence test. In cases of tests with multiple versions, the most recent version with the most current norms should be used at all times. In cases where a test with aging norms is used, a correction for the age of the norms is warranted.

© American Association on Intellectual and Developmental Disabilities

## Comparability of Scores From Different Tests

Not all scores obtained on intelligence tests given to the same person will be identical. Specifically, IQ scores are not expected to be the same across tests, editions of the same test, or time periods (Evans, 1991). A number of studies have revealed significantly different results from appropriately selected tests. For example, Quereshi and Seitz (1994) reported that the Wechsler Preschool and Primary Scale of Intelligence-Revised (WPPSI), Wechsler Intelligence Scale for Children-Revised (WISC-R), and the Wechsler Preschool and Primary Scale of Intelligence-Revised (WPPSI-R) did not yield the same results when used on young children. Highest IQ scores were obtained on the WPPSI and lowest on the WPPSI-R. The SBIS-4 yielded significantly higher scores (by over 14 points) than did the WISC-R for students with lower IQ scores but yielded significantly lower scores for students with higher IQ scores. The two tests yielded similar scores for students with IQ scores between 70 and 90 (Prewett & Matavich, 1992). Scores on the WISC-III were significantly correlated with scores on the SBIS-4 with a population of students with mild mental retardation, but the average IQ on the WISC-III was 8 points lower (Lukens & Hurrell, 1996). Nelson and Dacey (1999) reported that in a sample of adults who had mild to moderate mental retardation an SBIS will yield a significantly lower score than a Wechsler test. Their results were consistent with earlier work published in the Stanford Binet Technical Manual (Thorndike, Hagen, & Sattler, 1986b).

Users of this *Manual* need to be aware of—and sensitive to—potential differences in scores obtained from two different tests. Sources of variation can result from (a) group versus individually administered tests; (b) the purposes for which the test was administered (e.g., administered initially to measure academic achievement but later used to derive an IQ score); (c) the properties of the test (e.g., using two tests with very disparate standard errors of measurement); (d) nonstandardized administration of the assessment instrument(s); (e) test content across different scales and between different age levels on the same scale; (f) scores obtained on verbal versus nonverbal tests; (g) differences in the standardization samples; (h) changes between different editions of the same scale/test; (i) use of an alternative scale as an individual's chronological age increases; and/or (j) variations in the person's abilities or performance.

## Practice Effect

The *practice effect* refers to gains in IQ scores on tests of intelligence that result from a person being retested on the same instrument. Kaufman (1994) noted that practice effect can occur when the same individual is retested on a similar instrument. For example, the WAIS-III *Manual* presents data showing the artificial increase in IQ scores when the same instrument is readministered within a short time interval. The WAIS-III *Manual* also reports the average increase between administrations with intervals of 2 to 12 weeks (Wechsler, 1997). For this reason, established clinical practice is to avoid administering the same intelligence test within the same year to the same individual because it will often lead to an overestimate of the examinee's true intelligence.

**PA-448**

## Extreme Scores

It is generally recognized that a psychometric instrument performs best when used with persons who score within two to three standard deviations of the mean. The diagnosis of ID, however, can involve the assessment of performance at the extreme tail of the IQ distribution (e.g., four to five standard deviations below the mean). Although the *Manuals* for the WISC-IV (Wechsler et al., 2004), WAIS-IV (Wechsler, 2008), and SSIB-4 (Thorndike et al., 1986b) indicate that these instruments can be used to classify ID, all caution about using the respective scale to assess extreme populations, noting that extrapolation was needed to create norm group data for persons who achieve very low scores (such as 25 or below).

We note, in reference to highlighting the fragility of tests for use with individuals who achieve extreme scores, that based on the properties of the normal distribution, the WISC-III standardization sample of 2,200 children would be expected to include only about 50 individuals whose IQ scores fall below 70 across all age groups. If one examines the number of individuals in the normative sample broken down by age strata (5-year-olds, 6-year-olds, etc.) and upon which IQ scores are derived, there may be fewer than three individuals below the cutoff score of 70. Despite these cautions, Sattler (1988) noted the utility of both the Wechsler scales and the SBIS-4 in making the diagnosis of ID. He did, however, mention that neither instrument was designed for use with persons whose test performance yields extremely low or high scores. Although standard practices certainly involve the use of these scales to help in the diagnosis of ID, it must be recognized that extreme scores are more subject to measurement error and are, perhaps, less trustworthy than scores closer to the mean of the test.

This reliance on the interpretation of extreme scores might be of a greater concern if ID were diagnosed solely on the basis of IQ score—which it is not. The three criteria are significant limitations in intellectual functioning, significant limitations in adaptive behavior, and age of onset before age 18. By having the two significant limitations criteria (i.e., significant limitations in intellectual functioning and adaptive behavior, which are given equal consideration) for diagnosing an individual as having ID, there are additional safeguards against falsely identifying an individual as having ID. There are those who would argue that the considerable correlation between IQ scores and adaptive behavior among persons who have ID, in effect, creates a redundant process to ensure better diagnosis. No such safeguards exist, however, for a false negative, a serious problem that demands the field's attention. The problems faced by people who have ID but do not receive the diagnosis of ID can be significant. These individuals are vulnerable to the denial of essential supports and exclusion from eligibility for important protections (see chapter 12).

## Determining a Cutoff Score

The significant limitations in intellectual functioning criterion for a diagnosis of ID is an IQ score of approximately two standard deviations below the mean, considering the

standard error of measurement for the specific instruments used and the instruments' strengths and limitations. It is clear from this significant limitations criterion used in this *Manual* that AAIDD (just as the American Psychiatric Association, 2000) *does not* intend for a fixed cutoff point to be established for making the diagnosis of ID. Both systems (AAIDD and APA) require clinical judgment regarding how to interpret possible measurement error. Although a fixed cutoff for diagnosing an individual as having ID is not intended, and cannot be justified psychometrically, it has become operational in some states (Greenspan & Switzky, 2006). It must be stressed that the diagnosis of ID is intended to reflect a clinical judgment rather than an actuarial determination. A fixed point cutoff score for ID is not psychometrically justifiable. The choice of an intelligence test will be driven by clinical judgment of the most appropriate instrument. The IQ scores obtained from different intelligence tests themselves are not necessarily equivalent. Given that the diagnostic process involves drawing a line of inclusion/exclusion, it is important to use a range as reflected in the test's standard error of measurement.

## Evaluating the Role That an IQ Score Plays in Making a Diagnosis

An IQ score should be reported with confidence intervals rather than a single score. Thus, in evaluating the role that an IQ score plays in making a diagnosis of ID, clinicians should (a) determine what the standard error of measurement is for the particular assessment instrument used, realizing that the standard of measurement is test-specific and is used to establish a statistical confidence interval within which the person's true score falls; (b) interpret the obtained score in reference to the test's standard error of measurement, the assessment instruments' strengths and limitations, and other factors (such as practice effect, fatigue effects, and age or norms used) that determine the size of the error involved in estimating the person's true score; (c) determine whether the assessment process was consistent with the first two assumptions of the definition of ID (see p. 1); (d) use an assessment process based on research-based knowledge, professional ethics, and professional standards (see chapter 8); and (e) assure that within reporting, standard error of measurement is properly addressed.

As discussed in reference to the operational definition of significant limitations in intellectual functioning, the intent of using approximately two standard deviations below the mean is to reflect the role of clinical judgment in weighing the factors that contribute to the validity and precision of a diagnostic decision. The term *approximately* also addresses statistical error and uncertainty inherent in any assessment of human behavior. In that regard, the diagnostic decision-making process cannot be viewed as only a statistical calculation.

## Assessor Credentials

The assessment of intellectual functioning is a task that requires specialized professional training. Assessment data should be reported by an examiner experienced with people who have ID; who is qualified in terms of professional and state regulations; and who has

PA-450

# CHAPTER 5

## ADAPTIVE BEHAVIOR AND ITS ASSESSMENT

Adaptive behavior is the collection of conceptual, social, and practical skills that have been learned and are performed by people in their everyday lives.

For the diagnosis of intellectual disability, significant limitations in adaptive behavior should be established through the use of standardized measures normed on the general population, including people with disabilities and people without disabilities. On these standardized measures, significant limitations in adaptive behavior are operationally defined as performance that is approximately two standard deviations below the mean of either (a) one of the following three types of adaptive behavior: conceptual, social, or practical or (b) an overall score on a standardized measure of conceptual, social, and practical skills. The assessment instrument's standard error of measurement must be considered when interpreting the individual's obtained scores.

## OVERVIEW

The inclusion of the concept of adaptive behavior in the diagnosis of persons with *intellectual disability* (ID) has a long history. Nihira (1999), for example, cited early leaders, such as Itard, Seguin, Voison, and Howe, who referred to signs of ID that included the absence of social competency, a need for skill training, an inability to meet social norms, and difficulty with fending for one's self. Although adaptive behavior did not play a formal role in the diagnosis of ID during the first half of the 20th century, the construct's importance to understanding ID was not completely abandoned. Doll, for example, introduced the Vineland Social Maturity Scale in 1936, an instrument that included 117 items focused on practical skills used in everyday situations.

When the intelligence test, resulting in an IQ score, was introduced in the early 1900s, it was embraced as an efficient and objective means to distinguish individuals with ID from the general population (Scheerenberger, 1983). The intelligence test not only produced a highly reliable score, but because it was normed on the general population, it yielded an unambiguous indicator of how much a person deviated from others. However, dissatisfaction with the IQ score as the sole indicator of ID emerged over time. Among the greatest concerns about intelligence testing was that IQ scores only provided a narrow measure of intellectual functioning related to academic tasks (i.e., linguistic, conceptual,

**PA-451**

and mathematical abilities and skills), thus ignoring important aspects of intellectual functioning that included social and practical skills. Also, the perception that IQ scores contributed to misdiagnosing children from poor and minority backgrounds shook people's confidence in using the IQ as the sole diagnostic measure (Reschly, Myers, & Hartel, 2002; Scheerenberger, 1983).

As a result of this dissatisfaction, adaptive behavior reemerged in 1959 as one of the three criteria used to diagnose ID. According to Heber in the AAIDD 1959 *Manual on Terminology and Classification*, "measured intelligence cannot be used as the sole criteria of mental retardation [the term in use then] since intelligence test performances do not always correspond ro level of deficiency in total adaptation" (pp. 55–56). *Adaptive behavior* was defined by Heber (1959) as

> the effectiveness with which the individual copes with the nature and social demands of his environment. It has two major facets: the degree to which the individual is able to function and maintain himself independently, and the degree to which he meets satisfactorily the culturally-imposed demands of personal and social responsibility. (p. 61)

Grossman (1973, 1983) reaffirmed the importance of adaptive behavior in the diagnosis of ID. Grossman's (1983) definition of adaptive behavior was "the effectiveness or degree with which individuals meet the standards of personal independence and social responsibility expected for his age and cultural group" (p. 1). The importance of adaptive behavior in the diagnosis of ID has been reaffirmed in each of the successive AAIDD *Terminology and Classification Manuals* (Luckasson et al., 1992, 2002).

Both Heber and Grossman recognized the multidimensionality of adaptive behavior and the influence of culture on the assessment of the construct. Heber conceptualized adaptive behavior as consisting of three primary factors: maturation, learning, and social adjustment. These three domains continue to be part of the most current conceptualization of adaptive behavior but are reframed as practical, conceptual, and social skills.

The consensus, based on considerable published research on the factor structure of adaptive behavior (e.g., Harrison & Oakland, 2003; McGrew, Bruininks, & Johnson, 1996; Thompson, McGrew, & Bruininks, 1999), is that adaptive behavior is multidimensional and includes the following:

- *Conceptual skills*: language; reading and writing; and money, time, and number concepts
- *Social skills*: interpersonal skills, social responsibility, self-esteem, gullibility, naïveté (i.e., wariness), follows rules/obeys laws, avoids being victimized, and social problem solving
- *Practical skills*: activities of daily living (personal care), occupational skills, use of money, safety, health care, travel/transportation, schedules/routines, and use of the telephone

In this chapter we discuss the role that adaptive behavior and its assessment plays in the diagnosis of ID. The seven sections of the chapter are (a) key factors to keep in mind

when reading the chapter, (b) the assessment of adaptive behavior, (c) the use of standard error of measurement in score interpretation, (d) adaptive behavior versus problem behavior, (e) special considerations in the assessment of adaptive behavior, (f) guidelines for selecting an adaptive behavior instrument, and (g) future considerations. Throughout the chapter, adaptive behavior is defined as the collection of conceptual, social, and practical skills that have been learned and are performed by people in their everyday lives. Material included in the chapter regarding assessment guidelines and the technical adequacy of adaptive behavior assessment instruments is based on the published work of Finlay and Lyons (2002), Greenspan (1999, 2006a), Harrison and Raineri (2008), and Reschly et al. (2002).

## KEY FACTORS TO KEEP IN MIND WHEN READING THIS CHAPTER

In this chapter we discuss in more detail the following 10 key factors about adaptive behavior and its assessment that are relevant to a diagnosis of ID:

1. There are three criteria for a diagnosis of ID: significant limitations in intellectual functioning, significant limitations in adaptive behavior, and age of onset before age 18. Adaptive behavior and intellectual functioning should be given equal consideration.

2. Adaptive behavior is a multidomain construct. The domains that have emerged from a long history of factor-analytic studies are consistent with a conceptual model of adaptive behavior that has three general areas of adaptive skills: conceptual, social, and practical.

3. Adaptive behavior as defined in this *Manual* is the collection of conceptual, social, and practical skills that have been learned and are performed by people in their everyday lives.

4. The concept of adaptive skills implies an array of competencies and provides a foundation for three key points: (a) the assessment of adaptive behavior is based on the person's typical (not maximum) performance, (b) adaptive skill limitations often coexist with strengths, and (c) the person's strengths and limitations in adaptive skills should be documented within the context of community and cultural environments typical of the person's age peers and tied to the person's need for individualized supports.

5. Although no existing measure of adaptive behavior completely measures all adaptive behavior skills, most provide domain scores that represent the three domains used in this *Manual*: conceptual, social, and practical. A comprehensive assessment of adaptive behavior will likely include a systematic review of the individual's family history, medical history, school records, employment records (if an adult), other relevant records and information, as well as clinical interviews with a person or persons who know the individual well.

6. For a person with ID, adaptive behavior limitations are generalized across the domains of conceptual, social, and practical skills. However, because subscale scores on adaptive behavior measures are moderately correlated, a generalized deficit is assumed even if the score on only one domain meets the operational criterion of being approximately two standard deviations below the mean. A total score of two standard deviations below the mean from an instrument that measures conceptual, social, and practical skills will also meet the operational definition of a significant limitation in adaptive behavior.

7. It is important to recognize that personal characteristics and environmental factors can present challenges to the assessment of adaptive behavior. These include (a) personal characteristics, such as concurrent sensory, motor, or mental disabilities; fatigue or illness; high anxiety levels; and the person's motivational history of interaction in assessment situations and (b) environmental factors, such as absence of participation in community settings.

8. Problem or maladaptive behavior is not a characteristic or domain of adaptive behavior, although it often influences the acquisition and performance of adaptive skills. The presence of problem behavior(s) is not considered to be a limitation in adaptive behavior, although it may be important in the interpretation of adaptive behavior scores for diagnosis. The distinction between adaptive behavior and problem behavior is discussed later in this chapter.

9. Adaptive behavior must be examined in the context of developmental periods of infancy and early childhood, childhood and early adolescence, late adolescence, and adulthood. A continuing theme is the importance of the developmental relevance of specific skills within the three adaptive areas.

10. It is sometimes necessary to assess the previous functioning of the individual in those situations where a diagnosis of ID becomes relevant. A retrospective diagnosis may be required, for example, when clinicians are involved in determining eligibility for adult rehabilitation services, evaluating individuals for Social Security disability, or evaluating individuals involved in legal processes, such as guardianship petitions, competence determinations, or sentencing eligibility questions. If adaptive behavior assessments are used and reported in the records reviewed, clinicians should weigh the extent to which (a) multiple informants were used and multiple contexts sampled; (b) that limitations in present functioning were considered within the context of community environments typical of the individual's age peers and culture; (c) important social behavioral skills, such as gullibility and naïveté, were assessed; (d) behaviors that are currently viewed as developmentally and socially relevant were included; and (e) adaptive behavior was assessed in reference to typical and actual functioning in the community. The use of previously administered adaptive behavior scales in a retrospective diagnosis should address these five assessment standards.

**PA-454**

## ASSESSMENT OF ADAPTIVE BEHAVIOR

### Use Standardized Measures

Significant limitations in adaptive behavior are established through the use of standardized measures and, like intellectual functioning, significant *limitations in adaptive behavior* are operationally defined as performance that is approximately two standard deviations below the population average on one of the three adaptive skills domains of conceptual, social, or practical. In evaluating the role that an adaptive behavior score—as assessed on a standardized measure—plays in making a diagnosis of ID, clinicians should (a) determine the standard error of measurement (see following section) for the particular assessment instrument used, realizing that the standard error of measurement is test-specific and is used to establish a statistical confidence interval within which the person's true score falls and (b) assure that within reporting, standard error of measurement is properly addressed.

### Focus on Typical Performance

The assessment of adaptive behavior focuses on the individual's typical performance and not their best or assumed ability or maximum performance. Thus, what the person typically does, rather than what the individual can do or could do, is assessed when evaluating the individual's adaptive behavior. This is a critical distinction between the assessment of adaptive behavior and the assessment of intellectual functioning, where best or maximal performance is assessed. Individuals with an ID typically demonstrate both strengths and limitations in adaptive behavior. Thus, in the process of diagnosing ID, significant limitations in conceptual, social, or practical adaptive skills is not outweighed by the potential strengths in some adaptive skills.

### Use Knowledgeable Respondents

Using standardized adaptive behavior measures to determine significant limitations in adaptive behavior usually involves obtaining information regarding the individual's adaptive behavior from a person or persons who know the individual well. Generally, individuals who act as respondents should be very familiar with the person and have known him/her for some time and have had the opportunity to observe the person function across community settings and times. Very often, these respondents are parents, older siblings, other family members, teachers, employers, and friends. Parents are often the best respondents available because they have known the individual the longest and observed attainment of developmental milestones, maturation, and the achievement of adaptive behavior skills. Because adaptive behavior assessment relies on third party respondents, it is important for clinicians to assess the reliability of any respondent providing adaptive behavior information. Obtaining information from multiple respondents and other relevant sources (e.g., school records, employment history, previous evaluations) is essential to providing corroborating information that provides a comprehensive picture of the individual's functioning.

**PA-455**

## When Standardized Assessments Cannot Be Used

If a standardized assessment measure cannot be used (e.g., if the assessment cannot be reliably administered per the test's recommended administrative procedures or if there are no reliable respondents to provide adaptive behavior information regarding the assessed person), other sources of adaptive behavior information can be used. In these infrequent cases, other information-gathering methods can be employed, such as direct observation (see chapter 8 for guidelines); review of school records, medical records, and previous psychological evaluations; or interviews with individuals who know the person and have had the opportunity to observe the person in the community but may not be able to provide a comprehensive report regarding the individual's adaptive behavior in order to complete a standardized adaptive behavior scale. In reference to any method used, when a standardized adaptive behavior assessment instrument cannot be used, the following guidelines should be followed:

- Use multiple types and sources of information to obtain convergence of information regarding the individual's limitations in comparison to same-age peers.
- Use reasonable caution when weighing qualitative information obtained from respondents, especially in the presence of conflicting information.
- Interpret results obtained from direct observations of adaptive skills with caution because these may not be reflective of the individual's typical behavior and may be a narrow measure of actual adaptive behavior. For example, having the person screw in a light bulb does not fully capture all aspects of the adaptive behavior of identifying when it is time to change a burnt light bulb, what wattage is needed for the replacement bulb, knowing how to get a replacement bulb, and safely accessing an electrical outlet and replacing the light bulb.
- Use clinical judgment (see chapter 8) to guide the evaluation of the reliability of information provided by respondents as well as possible sources of bias (positive or negative).
- Analyze critically all types of information for accuracy and pertinence. One should also consider the comparison group when determining significant limitations. For example, in some special education programs, a grade of C denotes something very different in achievement level than a C grade given in a general education classroom.

## USE OF STANDARD ERROR OF MEASUREMENT IN SCORE INTERPRETATION

The established procedure in psychological measurement, in which standardized measures are used, is to report results using a statistical confidence interval around the obtained score(s). As discussed in chapter 4, the standard error of measurement, which varies by test, subgroup, and age group, is used to estimate this statistical confidence interval.

**PA-456**

For example, the use of plus/minus one standard error of measurement yields a statistical confidence interval (around the obtained score) within which the person's true score will fall 66% of the time; whereas the use of plus/minus two standard error of measurement yields a statistical confidence internal (around the obtained score) in which the person's true score will fall 95% of the time. Thus, an obtained standard score on an adaptive behavior scale should be considered as an approximation that has either a 66% or 95% likelihood of accuracy, depending on the confidence interval used.

## ADAPTIVE BEHAVIOR VERSUS PROBLEM BEHAVIOR

Adaptive behavior is conceptually different from maladaptive or problem behavior, even though many adaptive behavior scales contain assessments of problem behavior, maladaptive behavior, or emotional competence (Thompson et al., 1999). Correlational relationships between domains of adaptive and maladaptive behavior are generally low, $r <$ 0.25, with a tendency to be higher in samples of persons with more severe forms of ID (Harrison, 1987). There is general agreement that the presence of clinically significant levels of problem behavior found on adaptive behavior scales does not meet the criterion of significant limitations in adaptive functioning (Greenspan, 1999; Borthwick-Duffy, 2007). Therefore, behaviors that interfere with a person's daily activities, or with the activities of those around him or her, should be considered problem behavior rather than the absence of adaptive behavior. It should also be recognized, however, that the function of inappropriate or maladaptive behavior may be to communicate an individual's needs and, in some cases, may even be considered adaptive. For example, research on the function of behavior problems in persons with severe disabilities (Durand & Crimmins, 1988; Durand & Kishi, 1987) demonstrates that such behavior may be an adaptation judged by others to be undesirable but often represents a response to environmental conditions and, in some cases, a lack of alternative communication skills. In the vast majority of cases, this would not apply to persons with higher levels of intelligence whose diagnosis is in question.

## SPECIAL CONSIDERATIONS IN THE ASSESSMENT OF ADAPTIVE BEHAVIOR

### Selection of Adaptive Behavior Measures

For the purpose of making a diagnosis or ruling out ID, a comprehensive standardized measure of adaptive behavior should be used in making the determination of the individual's current adaptive behavior functioning in relation to the general population. The selected measure should provide robust standard scores across the three domains of adaptive behavior: conceptual, social, and practical adaptive skills. The preferred adaptive behavior instrument should have current norms developed on a representative sample of the general population. The individual's adaptive behavior should be evaluated using

multiple respondents and multiple sources of converging data. Relevant archival data may include medical evaluations, school records, prior psychoeducational evaluations, Social Security Administration records, employment history, and family history.

## Technical Adequacy

General issues in the assessment of adaptive behavior derive in large part from those issues that relate to psychological measurement in general (American Educational Research Association, American Psychological Association, and National Council of Measurement in Education, 1999). Therefore, the demonstration of validity, reliability, stability of measures, generalization, prediction, and appropriateness of use are essential technical standards guiding the assessment of adaptive behavior. Although some available scales have been used for many years, longevity alone does not validate a test's results for diagnostic purposes. Many of the available adaptive behavior scales fall short of appropriate standards for norming (Kamphaus, 1987) and clarity of the construct of adaptive behavior (Evans, 1991). On the other hand, several measures have been developed and tested in recent years that do meet the criteria of a good diagnostic assessment instrument. Independent of these scales, a technologically sound adaptive behavior assessment instrument should meet the eight technical standards listed in Table 5.1. New instruments should be evaluated against these eight standards as well.

## Table 5.1

### Technical Standards for Adaptive Behavior Assessment Instruments

- Focus on identifying significant limitations in adaptive behavior for the diagnosis of ID.

- Assess specific dimensions that have emerged from factor analytic studies of adaptive behavior that have indicated that the three primary areas of adaptive behavior are conceptual, social, and practical skills.

- Include measures of some aspects of adaptive behavior that are not currently measured by existing standardized instruments. These aspects include naïveté, gullibility (i.e., wariness), and technology-based skills.

- Contain items that maximally differentiate between individuals with and without ID

- Use item response theory to reliably measure individual levels of performance across the continuum of adaptive skills and ages, with special attention to providing precise information around the cutoff point for determining significant limitations in adaptive behavior.

- Allow the interviewer to probe further those items whose scoring is influenced by the opportunity to perform the behavior or by cultural factors that influence the behavior's expression.

PA-458

TABLE 5.1 *(continued)*

- Use an interviewer who is a professional (e.g., psychologist, case manager, social worker), one who has training in assessment and direct work experience with people with ID, and one who has had previous assessment experience.

- Use respondents who know the individual being assessed very well and have had the opportunity to observe the person on a daily or weekly basis in a variety of community settings and over an extended period of time. Respondents should be adults and may be selected from family members, friends, teachers, coworkers, employers, direct-support staff, case managers, or other adults who meet the above criteria.

## Appropriateness of Measure for the Individual

Not only must professionals select instruments that are technically adequate, they must also be cautious to select ones designed for the particular individual or group (Harrison & Raineri, 2008). The potential user must employ adaptive behavior assessment instruments that are normed within community environments on individuals who are of the same age grouping as the individual being evaluated. Scales normed primarily on persons in segregated settings, including schools, work, or living arrangements, may have validity limited to those contexts that is useful for programming but are not acceptable for diagnostic purposes.

## Multimethod Approaches to Measurement

Although every effort must be made to select an instrument that is appropriate to the person being assessed, clinicians must recognize that adaptive behavior instruments are imperfect measures of personal competence that distinguish persons with and without ID as they face the everyday demands of life. For example, credulity and gullibility can provide key information for a diagnosis of ID. Greenspan (1981, 1999, 2006a; Greenspan, Loughlin, & Black, 2001) has long argued that the victimization of people with ID, observed in social and economic exploitation, is a central problem in diagnosing ID. Because there are currently no standardized measures that assess adaptive skills related to credulity and gullibility, these characteristics must be considered in the clinical judgment of adaptive behavior limitations.

## Use of Self-Ratings

Self-ratings of individuals—especially those individuals with higher tested IQ scores—may contain a certain degree of bias and should be interpreted with caution when determining an individual's level of adaptive behavior. The following cautions are warranted if self-ratings are used in establishing a diagnosis of ID: (a) persons with higher IQ scores

© American Association on Intellectual and Developmental Disabilities

are more likely to mask their deficits and attempt to look more able and typical than they actually are (Edgerton, 1967); (b) "mental retardation" has been a particularly stigmatizing and pejorative label that leads most individuals with this label to fight hard not to be identified as "MR"; (c) ID is a social status that is closely tied to how a person is perceived by peers, family members, and others in the community; and (d) persons with ID typically have a strong acquiescence bias (Finlay & Lyons, 2002) or a bias to please that might lead to erroneous patterns of responding. Based on these considerations, the authors of this *Manual* caution against relying heavily only on the information obtained from the individual himself or herself when assessing adaptive behavior for the purpose of establishing a diagnosis of ID.

## Individual's Physical Condition and Mental Health

Individuals who exhibit specific sensory, motor, or communicative limitations present special difficulties for accurate assessment. As a consequence, the evaluation of adaptive skills for an individual who may have vision, hearing, or motor impairments frequently becomes a complex process (Meacham, Kline, Stovall, & Sands, 1987). For example, the assessment of individuals with hearing impairments generally requires a nonverbal instrument, whereas the assessment of persons with visual impairments requires measures that do not include object manipulation or cards or pictures. An individual with severe motor limitations may have quite limited voluntary responses and, therefore, may need to respond via an eye scan or blink. Some individuals may exhibit multiple disabilities, thus compounding the task for the assessment specialist. In addition, some may simply lack test-taking skills. As a consequence, they may refuse to stay seated for the duration of an assessment session or may exhibit a high rate of stereotyped or self-stimulatory behavior. Individuals who rely on nonverbal communication may have difficulty making the requisite responses indicated for a given test. Additional problems may include fatigue, low levels of frustration, motivation, noncompliance, limited comprehension of instructions, drowsiness due to medication, and test anxiety (Evans, 1991; Pollingue, 1987). Finally, and significantly, a general principle is that the test results should not be unduly affected by limitations in receptive or expressive language capabilities. Such limitations may cause the test to be a measure of the problem rather than a valid assessment of adaptive skills.

## Identifying Factors That Influence Adaptive Behavior Scores

For purposes of diagnosis, it is also important to identify factors that typically affect the learning or performing of adaptive skills. Some of the more important factors are discussed below.

*Opportunities.* Opportunities to participate in community life must be considered in decisions about significant limitations in adaptive behavior. A person whose opportunities to learn adaptive skills has been restricted in comparison to same-age peers may have acquisition deficits unrelated to ID. For example, a person with ID who has a lower IQ

**PA-460**

and who has not been provided opportunities to make purchases is likely to lack the adaptive skills needed for shopping.

*Relevant context/environments.* Adaptive behavior needs to be evaluated in relation to contexts typical of the individual's age peers. However, in some cases, typical behavior is observed in "atypical" environments. This disconnect must be taken into account in the clinical interpretation of scores. A second issue is that in some contexts raters will have no direct information about the individual's typical performance of a specific behavior or a behavior that occurs in another setting. For example, the Adaptive Behavior Assessment System-II (Harrison & Oakland, 2003) allows the respondent the option to "guess" a rating for a specific behavior that might not have been observed directly by the respondent. Thus, the respondent is providing an estimate of the assessed individual's typical behavior based on their knowledge of the person. The reliability of ratings that are not based on personal observation of typical behavior must be evaluated cautiously. In fact, Harrison and Oakland (2003) recommend a cautious interpretation of any domain in which the respondent "guessed" on more than three items.

*Sociocultural considerations.* Clinicians considering a diagnosis of ID must take into account the cultural context of the individual. The key challenges are to describe important sociocultural differences and, subsequently, "to evaluate the individual's status in light of expectations and opportunities for the development of various competencies" (Reschly, 1987, p. 53). Behavioral expectations may differ across cultural groups, along with education and training in adaptive skills. Assessments, therefore, must consider relevant ethnic or cultural factors and expectations (Tassé & Craig, 1999). This issue, which some believe is not relevant for basic behaviors contained on adaptive behavior scales (e.g., persons in all ethnic or socioeconomic groups are expected to perform daily living skills with increasing independence as they get older), has received increasing attention. Because it would be impossible to obtain many standardization samples to represent all cultural variations in the United States, this may need to be dealt with in the clinical interpretation of scores rather than the actual scoring procedure. The authors of this *Manual* also strongly discourage any score corrections that are not part of test procedures that attempt to correct for any cultural or socioeconomic factors that are thought to impact the individual's scores on a standardized adaptive behavior scale. Until firmly supported by empirical evidence, we strongly caution against practices such as those recommended by Denkowski and Denkowski (2008).

## GUIDELINES FOR SELECTING AN ADAPTIVE BEHAVIOR SCALE FOR THE PURPOSE OF DIAGNOSING ID

Table 5.2 summarizes current best practice guidelines for selecting the best adaptive behavior measure for a particular individual or group. These guidelines should be used in conjunction with those guidelines discussed in the two previous sections on "Assessment

PA-461

TABLE 5.2

**Guidelines for Selecting an Adaptive Behavior Assessment Instrument**

- Select an instrument that is a comprehensive measure of conceptual, social, and practical adaptive behavior skills and is applicable to the population in question. In that regard, one should (a) read the *User's Manual*; (b) review all components of the instrument; (c) consult with colleagues who may have familiarity with the instrument; and (d) search the literature for research on its usage, particularly as related to validation of its use for the particular setting, population, and purpose in question.

- For the purpose of making or ruling out a diagnosis of ID, the instrument must be normed on the general population, including individuals with and without disabilities. The selected instrument's norms should be current.

- Determine, based on the publisher's specifications and state and professional regulations, who is properly trained to administer the instrument (e.g., instruments that require direct interaction with the client require greater expertise than rating scales completed by others, such as teachers or parents).

- Determine that the assessment instrument has acceptable reliability and established validity for its intended purpose. In this regard, one should read reviews of the instrument in manuals such as the *Mental Measurements Yearbook* or *Test Critiques*.

- Determine whether scoring software has been "error-trapped" to prevent the entering of impossible answers or to control for circumstances such as missing data that may yield errors.

of Adaptive Behavior" and "Special Considerations in the Assessment of Adaptive Behavior."

## FUTURE CONSIDERATIONS

Currently, adaptive behavior is defined and measured on the basis of the individual's typical present functioning. The person's performance is then compared to the norm of the general population that contains the individual's same-age peers. In that regard, there is some concern that the construct of adaptive behavior may violate some of the postulates of the normal distribution. It is relatively well accepted in the area of intelligence testing that there is a small but stable proportion of the population that falls more than two standard deviations above the population mean (in the genius range). It is, however, more difficult to ascertain a comparable size group of the general population that is greater than two standard deviations above the population mean on standardized measures of adaptive behavior. It is harder to imagine 2% of the population as geniuses when it comes to adaptive behavior. It is possible that one day we will move away from a normative evaluation and explore other methods of assessment strategies to define significant limitations in adaptive behavior.

**PA-462**

There is a growing need for research at the intersection of ID determination and forensic science, especially in relation to the measurement of adaptive behavior of individuals living in prisons and for whom it is challenging to assess their typical present adaptive functioning to meet societal demands in the community. Many professionals rely on a retrospective assessment approach to measure the adaptive behavior of these individuals. In addition, it may be relevant one day to broaden the realm of skills measured on adaptive behavior scales to continually evolve with societal expectations. Any changes in how we define, measure, or interpret adaptive behavior should be driven by empirical findings and sound research.

## SUMMARY

Our purpose in this chapter was to familiarize readers with current knowledge regarding the factor structure of adaptive behavior and key issues involved in the valid assessment of adaptive behavior. As discussed in the chapter, adaptive behavior is defined as the collection of conceptual, social, and practical skills that have been learned and performed by people in their everyday lives. For the diagnosis of ID, significant limitations in adaptive behavior should be established through the use of standardized measures normed on the general population, including people with disabilities and people without disabilities. On these standardized measures, significant limitations in adaptive behavior is approximately two standard deviations below the mean of either (a) one of the following three types of adaptive behavior: conceptual, social, or practical or (b) an overall score on a standardized measure of conceptual, social, and practical skills.

There are three criteria for a diagnosis of ID: significant limitations in intellectual functioning, significant limitations in adaptive behavior, and age of onset before age 18. Since 1959, these three criteria have been given equal consideration in the diagnostic process. Due to the equal consideration of adaptive behavior and intellectual functioning indices in the diagnosis of ID, it is critical that clinicians be familiar with—and employ—the guidelines discussed in this chapter regarding the assessment of adaptive behavior, the use of standard error of measurement in score interpretation, understanding the distinction between adaptive behavior versus problem behavior, important special considerations in the assessment of adaptive behavior, the technical standards regarding adaptive behavior assessment instruments, and the suggested guidelines for selecting an adaptive behavior instrument. As with the assessment of intellectual functioning, clinical judgment is involved in the interpretation of information regarding the assessment of adaptive behavior and the formulation of a valid diagnosis. Readers are referred to chapter 8 for a detailed discussion of clinical judgment strategies that enhance the validity and precision of the clinician's decision or recommendation.

**PA-463**

# CHAPTER 6

## ROLE OF ETIOLOGY IN THE DIAGNOSIS OF INTELLECTUAL DISABILITY

> **Etiology represents a multifactorial construct composed of four categories of risk factors (biomedical, social, behavioral, and educational) that interact across time and affect the individual's overall functioning. Diagnostic assessment and classification of the etiology consists of a description of all of the risk factors that are present in a particular individual and that contribute to the individual's present functioning and potential diagnosis of intellectual disability. Genotype-phenotype correlations may be useful, but caution is needed when applying these data to individual circumstances.**

## OVERVIEW

In this chapter we describe the multifactorial nature of the etiology of *intellectual disability* (ID) and how etiology is determined and classified based on biomedical, social, behavioral, and educational risk factors. The five sections of the chapter cover (a) the importance of etiology, (b) the multifactorial nature of etiology, (c) etiologic assessment, (d) etiologic diagnosis and classification, and (e) etiology and performance. These five sections incorporate genetic research advances and research about behaviors that are associated with specific etiologies. Additionally, the system for etiologic diagnosis and classification presented in the chapter is consistent with the multidimensional approach to ID presented in this *Manual* and facilitates the design and implementation of strategies for prevention and support (see chapter 10).

## IMPORTANCE OF ETIOLOGY

Consideration of the etiology of ID is important for several reasons. Chief among these are the following:

1. The etiology may be associated with other health-related problems that may influence physical and psychological functioning.

**PA-464**

2. The etiology may be treatable, which could permit appropriate treatment to minimize or prevent ID.
3. Accurate information is needed for the design and evaluation of programs to prevent specific etiologies of ID.
4. Comparison of individuals for research, administrative, or clinical purposes may depend on formation of maximally homogeneous groups composed of individuals with the same or similar etiologies.
5. The etiology may be associated with a specific behavioral phenotype that allows anticipation of actual, potential, or future functional support needs.
6. Information about the etiology facilitates genetic counseling and promotes family choice and decision making, including preconception counseling.
7. Individuals and families can be referred to other persons and families with the same etiologic diagnosis for information and support.
8. Knowing the etiology facilitates self-knowledge and life planning for the individual.
9. Understanding the etiology may clarify clinical issues for service providers.
10. Clarification of biomedical, social, behavioral, and educational risk factors that contribute to the etiology offers opportunities for prevention of the disability.

Performing a diagnostic evaluation to determine the etiology may be questioned by some providers. They may argue that the cost of testing is excessive and that the results will not change the individual's treatment. If the parents do not plan to have any more children, they may argue that testing for an inherited disorder is pointless. When the individual with ID is an adult, the parents may no longer have any interest in finding the etiology. Adult service providers may feel that the etiology is irrelevant to the development of the individual's plan of supports and services. These objections can be answered by considering the reasons for establishing the etiology listed earlier, and the cost of diagnostic testing can often be justified in specific situations. For example, knowing that an adult with cognitive decline has Down syndrome should alert the provider to look for hypothyroidism or depression. Knowing that a child with cognitive decline has Angelman syndrome should alert the provider to look for subclinical seizures. Knowing that an individual with new neurological findings has tuberous sclerosis should alert the provider to look for the characteristic brain tumor associated with this diagnosis. Knowing that an adult man has fragile X syndrome should alert the provider to offer genetic testing to the man's sisters who may be carriers and could have affected sons. Knowing that a child has a particular condition allows the family to search the Internet and to contact other families affected by this diagnosis, thereby learning more about it than their health care provider may know. These examples illustrate why testing to establish the etiologic diagnosis may be important for many individuals with ID.

## MULTIFACTORIAL NATURE OF ETIOLOGY

In this chapter we build on the approach to etiology described in previous AAMR *Manuals* (Luckasson et al., 1992, 2002). Etiology is conceptualized as a multifactorial

**PA-465**

construct composed of four categories of risk factors (biomedical, social, behavioral, and educational) that interact across time, including across the life of the individual and across generations from parent to child. This construct replaces prior approaches that divided the etiology of ID into two broad types: ID of biological origin and ID due to psychosocial disadvantage (Grossman, 1983). The two-group approach (biological and cultural-familial) was defended on the basis of developmental theory (Hodapp, Burack, & Zigler, 1990). Different developmental pathways were associated with ID due to identified biological disorders compared to ID for which no organic etiology is apparent (due to cultural-familial factors or psychosocial disadvantage). These researchers recommended a biological or genetic classification of etiology, in which there is either a demonstrated biological cause or there is not. This approach is consistent with the approach presented in this chapter. In fact, the risk factor approach can be seen as a fine-tuning of the developmental (two-group) approach. What was called "ID of biological origin" can be seen as involving individuals for whom biomedical risk factors predominate, while "ID of cultural-familial origin" can be seen as involving individuals for whom social, behavioral, or educational risk factors predominate.

The two-group distinction is often blurred in real life, however. The multiple risk factor approach correctly notes that biomedical risk factors may be present in persons with ID of cultural-familial origin, and social, behavioral, and educational risk factors may be present in persons with ID of biological origin. For example, individuals with the same biomedical genetic etiology often vary widely in functioning, presumably as the result of other modifying risk factors. The multiple risk factor approach to etiology thus is the logical extension of previous work in this area and provides a more comprehensive explanation of the many interacting causes of impaired functioning in persons with ID (Chapman, Scott, & Stanton-Chapman, 2008).

There has been an explosion of new genetic information in the past decade (cf. Butler & Meaney, 2005). This explosion has led some to consider the etiology of ID primarily in genetic terms. The recommendations of the American College of Human Genetics for the etiologic evaluation of ID (Curry, Stevenson, Aughton, & Byrne, 1997) emphasized genetic testing, as did the recommendations of the Committee on Genetics of the American Academy of Pediatrics (Moeschl & Shevell, 2006). The Child Neurology Society's practice parameter on the evaluation of children with global developmental delay (Shevell et al., 2003) also emphasized biomedical causes and included evidence-based recommendations for genetic testing. Although in a recent textbook on ID, Harris (2006) mentions AAIDD's multifactorial risk factor approach presented in the 2002 *Manual* (Luckasson et al.), the author discusses in depth primarily genetic and other biomedical causes.

Clearly, genetics cannot explain the cause of ID in every case. Individuals may be born with perfectly normal DNA and still develop ID due to a birth injury, malnutrition, child abuse, or extreme social deprivation. Understanding the cause of ID in these cases requires consideration of other biomedical, behavioral, and social risk factors. The guidelines reviewed above all note that even the most extensive and up-to-date genetic and biomedical testing will identify an etiology in less than half of all cases. Indeed, even if one could measure the entire genome in patients with ID (which should become

**PA-466**

feasible within the next 10 years), the results would not explain the cause when ID is due primarily to social or behavioral risk factors. On the other hand, at least one or more of the risk factors shown in Table 6.1 will be found in every case of ID. Thus a multifactorial approach to etiology (which incorporates all of the above genetic and biomedical testing,

### TABLE 6.1
### Risk Factors for Intellectual Disability

| Timing | Biomedical | Social | Behavioral | Educational |
|--------|-----------|--------|-----------|-------------|
| Prenatal | 1. Chromosomal disorders<br>2. Single-gene disorders<br>3. Syndromes<br>4. Metabolic disorders<br>5. Cerebral dysgenesis<br>6. Maternal illnesses<br>7. Parental age | 1. Poverty<br>2. Maternal malnutrition<br>3. Domestic violence<br>4. Lack of access to prenatal care | 1. Parental drug use<br>2. Parental alcohol use<br>3. Parental smoking<br>4. Parental immaturity | 1. Parental cognitive disability without supports<br>2. Lack of preparation for parenthood |
| Perinatal | 1. Prematurity<br>2. Birth injury<br>3. Neonatal disorders | 1. Lack of access to prenatal care | 1. Parental rejection of caretaking<br>2. Parental abandonment of child | 1. Lack of medical referral for intervention services at discharge |
| Postnatal | 1. Traumatic brain injury<br>2. Malnutrition<br>3. Meningoencephalitis<br>4. Seizure disorders<br>5. Degenerative disorders | 1. Impaired child-caregiver interaction<br>2. Lack of adequate stimulation<br>3. Family poverty<br>4. Chronic illness in the family<br>5. Institutionalization | 1. Child abuse and neglect<br>2. Domestic violence<br>3. Inadequate safety measures<br>4. Social deprivation<br>5. Difficult child behaviors | 1. Impaired parenting<br>2. Delayed diagnosis<br>3. Inadequate early intervention services<br>4. Inadequate special education services<br>5. Inadequate family support |

PA-467

as well as consideration of all of the other potential risk factors that might be operative) provides the most thorough way to evaluate the etiology of ID in a particular case.

The multifactorial approach to etiology presented in this chapter expands the list of causal factors in two directions: types of factors and timing of factors. The first direction expands the types or categories of factors into four groupings:

1. *Biomedical*: biologic processes, such as genetic disorders or nutrition
2. *Social*: social and family interaction, such as stimulation and adult responsiveness
3. *Behavioral*: potentially causal behaviors, such as dangerous (injurious) activities or maternal substance abuse
4. *Educational*: availability of educational supports that promote mental development and the development of adaptive skills

The second direction concerns the timing of the occurrence of causal factors according to whether these factors affect the parents of the person with ID, the person with ID, or both. This aspect of causation is termed *intergenerational* to describe the influence of factors present during one generation on the outcome in the next generation. The modern concept of intergenerational effects must be distinguished from the historical concept that ID was related to "weak genes" due to psychosocial, cultural, or familial factors (Scheerenberger, 1983). This modern concept recognizes that reversible environmental factors in the lives of some families may be related to the etiology of ID and stresses that the understanding of these factors should lead to enhanced individual and family supports. Because of the relationship to prevention and supports, these intergenerational effects are considered further in chapter 10 (see Table 10.1 in particular).

Table 6.1 lists risk factors for ID by category and by the time of occurrence of the risk factor in the life of the individual. Unlike classification systems based primarily on biomedical conditions (such as the *ICD-10* [World Health Organization, 1993]), the classification system outlined in Table 6.1 represents a multifactorial approach to the etiology of ID. It incorporates biomedical risk factors but places them in context by including other risk factors that may be of equal or greater importance in determining the individual's level of functioning. The list of risk factors in Table 6.1 is not exclusive and can be expanded as new risk factors are discovered. Research should result in continual revision and updating of these specific risk factors, but the basic structure of the table should be relevant for the foreseeable future.

Because ID is characterized by impaired functioning, its etiology is whatever caused this impairment in functioning. A biomedical risk factor may be present but by itself may not cause ID (as, for example, when a patient with a genetic disorder has average intelligence). Any risk factor causes ID only when it results in impaired functioning sufficient to meet the criteria for a diagnosis of ID as described in this *Manual*. Table 6.1 emphasizes that the impairment of functioning that is present when an individual meets the three criteria for a diagnosis of ID usually reflects the presence of several risk factors that interact over time. Thus, the search for the etiology of ID in a particular individual must consist of a search for all of the risk factors that might have resulted in impaired functioning for that person. This search involves obtaining as much historical medical

PA-468

information as possible, performing psychological and physical examinations, and pursuing sufficient laboratory investigations to consider reasonable possibilities.

## ETIOLOGIC ASSESSMENT

### Medical History

Diagnostic assessment begins with a complete history and physical examination to uncover all of the potential risk factors that may be present in each of the four categories shown in Table 6.1. The medical history begins at conception and includes detailed information about the prenatal, perinatal, and postnatal periods. Information needed about the prenatal period includes maternal age; parity and health (including maternal infections such as hepatitis, HIV, rubella, cytomegalovirus, group B streptococcus, etc.); the adequacy of maternal nutrition; the amount and quality of prenatal care (including results of prenatal screening, ultrasound examinations, and amniocentesis if performed); maternal use of drugs, alcohol, and other substances; maternal exposure to potential toxins or teratogens (such as lead or radiation); and occurrence of any significant maternal injuries during the pregnancy. Information needed about the perinatal period includes growth status at birth (gestational age at birth, birthweight, length, and head circumference); labor and delivery experiences (including onset, duration, route of delivery, presence of fetal distress prior to delivery, Apgar scores after birth, need for resuscitation); and the occurrence of any neonatal disorders after birth (such as seizures, infections, respiratory distress, brain hemorrhage, and metabolic disorders). Information needed about the postnatal period includes the history of any significant head injuries, infections, seizures, toxic and metabolic disorders (such as lead poisoning), significant malnutrition or growth impairment, and any indication of loss of previously acquired developmental skills that could indicate the presence of a progressive or degenerative disorder or a disorder on the autism spectrum.

A detailed family history is necessary to identify potential genetic etiologies (Curry et al., 1997). A detailed three-generation pedigree is recommended that includes information about the health status, medical and psychological disorders, and level of functioning of all known relatives. In particular, relatives who were affected by conditions that may be associated with ID (such as autism) or who were diagnosed with ID should be noted. Additional records concerning these individuals may be requested to provide further details. The occurrence of ID in other family members does not necessarily imply a genetic mechanism however. Multiple individuals in a family may be affected by fetal alcohol syndrome, for example, or ID in a relative may be due to childhood infections or head trauma. Results of genetic testing performed previously on any relatives should be sought and examined for completeness because testing performed more than 5 to 10 years earlier may have missed conditions diagnosable with current methods.

**PA-469**

## Psychosocial Evaluation

The psychosocial evaluation includes detailed information about the individual, family, school or work setting, and community or cultural milieu. Information about the psychosocial environment is needed to evaluate possible social, behavioral, and educational risk factors that may have contributed to the occurrence of ID. When an intergenerational perspective is used, information is needed about the parents' social, educational, and psychological history. Information is also needed about the structure, stability, and functioning of the immediate and extended family of the person with ID. Information about the roles and expectations of the person with ID and relatives within the extended community or culture may also be useful. The sociocultural milieu in which the individual develops is important because it may influence the psychosocial environment, including the local community; the country of origin; and specific ethnic, cultural, or religious factors that may affect environmental experiences and interactions.

The developmental history of the individual with ID includes early milestones, such as the age when the person started walking or talking. The age at entry into the educational system, the adequacy of the educational experience, and the duration of formal education should also be noted. The occurrence of other mental disorders, such as attention deficit/hyperactivity disorder, specific learning disability, or anxiety disorder should be noted because this may provide clues to a behavioral phenotype associated with a specific etiology.

Evaluation of the psychosocial environment may not yield any relevant information about causal factors in a particular individual. Even when the etiology appears straightforward, however, psychosocial factors may prove to be contributory. Reflecting the multiple risk factor approach to causation, known biomedical factors may be affected by social, behavioral, or educational factors. The ultimate etiology of ID in such cases reflects the interaction of all of these factors. For example, whether or not an individual with fetal alcohol syndrome develops ID may be influenced by environmental influences in early childhood, and the individual's level of functioning will likely reflect the adequacy of educational interventions.

## Physical Examination

The physical examination serves several distinct purposes. The usual purpose is to assist in the diagnosis of a medical problem, such as pneumonia or back pain, for which the individual has sought attention and that may require specific medical treatment. The purpose considered in this chapter is to assist in the identification of the etiology of ID. A single physical examination may serve both purposes, but the conceptual distinction between them needs to be retained.

The physical examination may provide evidence of an obvious etiology, such as Down syndrome. More often, however, it will provide only supportive evidence for an etiology suspected from other data (such as spastic diplegia associated with a history of premature birth), or it will not provide any useful information about etiology at all. For most

**PA-470**

Fulfilling one's professional responsibilities is among the highest, if not *the* highest, goal of a member of a profession. Being well trained in the current practices of one's profession, maintaining professional standards, and abiding by the code of ethics are all necessary, but not sufficient, in meeting one's professional responsibilities. This is because professionals working in the field of ID frequently encounter situations involving diagnosis, classification, and supports planning that require extensive data obtained from multiple sources, specialized training in assessment and test interpretation, familiarity with public policy and public laws, direct experience with those with whom the professional is working, and specific knowledge of the person and their environment. Additionally, this responsibility typically becomes more apparent where there is a difficult or complex case and when standard professional practices are insufficient. Over the last decade, the term clinical judgment has come to be used to refer to the special type of judgment that is required in such cases both to fulfill one's professional responsibility and to enhance the quality, validity, and precision of the professional's decision or recommendation in that case.

This chapter is focused on clinical judgment and the role that it plays in diagnosis, classification, and developing individualized supports for persons with ID. Our three purposes in this chapter are to (a) define clinical judgment, including its purpose and use; (b) discuss the role of clinical judgment in professional responsibility related to diagnosis, classification, and systems of supports; and (c) outline the parameters of four clinical judgment strategies that are the basis of clinical judgment and that, when used, enhance the validity and precision of the clinician's decision or recommendation. Throughout the chapter we stress the importance of avoiding thinking errors and using critical thinking skills.

## CLINICAL JUDGMENT: DEFINITION, PURPOSE, AND USE

### Definition

As defined by Luckasson et al. (2002) and Schalock and Luckasson (2005), clinical judgment is a special type of judgment rooted in a high level of clinical expertise and experience; it emerges directly from extensive data. It is based on the clinician's explicit training, direct experience with those with whom he or she is working, and specific knowledge of the person and the person's environment. Clinical judgment is characterized by its being (a) *systematic* (i.e., organized, sequential, and logical), (b) *formal* (i.e., explicit and reasoned), and (c) *transparent* (i.e., apparent and communicated clearly).

Clinical judgment is a key component—along with best practices in ID, professional standards, and professional ethics—of professional responsibility in the field of ID. Clinical judgment is different from either ethical or professional judgment based on one's professional ethics or standards. Ethical judgment is generally concerned with judgments of value and obligation focusing on justice (treating all people equitably), beneficence (doing good), and autonomy (respecting the authority of every person to control actions that primarily affect him or herself). Professional judgment is a process that follows

**PA-471**

general professional guidelines or standards by which a member of that profession collects, organizes, and weighs information. In distinction, clinical judgment is a special type of judgment rooted in a high level of clinical expertise and experience. It emerges directly from extensive data and is based on training, experiences, and specific knowledge of the person and his or her environment.

## Purpose

The overall purpose of clinical judgment is to enhance the quality, validity, and precision of the clinician's decision in a particular case. In addition, the use of clinical judgment strategies leads to more transparent analyses and increasingly logical and principled decisions and recommendations. Clinical judgment should not be thought of as a justification for abbreviated evaluation, a vehicle for stereotypes or prejudice, a substitute for insufficiently explored questions, an excuse for incomplete or missing data, or a way to solve political problems.

## Use

Clinical judgment is used in the field of ID for actions related to diagnosis, classification, and/or developing individualized supports. In our judgment, members of a variety of professions, such as psychologists, physicians, diagnosticians, expert educators, special education teachers, and social workers, use clinical judgment in one or more in these three actions. Throughout the chapter this group is referred to as *clinician in ID* if they (a) have relevant training, (b) engage in clinical activities (diagnosis, classification, planning supports), and (c) use professionally accepted best practices, such as those described in this *Manual*.

The specific functions performed by the clinician will be affected by his or her professional roles and responsibilities. For example, some state statutes stipulate that only a licensed clinical psychologist can make a diagnosis of ID; others require a diagnosis by an educational diagnostician. Under the Individuals With Disabilities Education Improvement Act of 2004 (IDEIA), for example, diagnostic flexibility is a team process. Actions related to classification (e.g., grouping for services, communication about selected characteristics, or the person's competency) are frequently prescribed by state and federal statutes, and the planning and the evaluation of individualized supports are frequently conducted through either a transdisciplinary or multidisciplinary team.

Furthermore, the amount of emphasis on clinical judgment exercised will also vary depending on what is expected of the professional within an organization or by his or her professional practice standards. For example, a special education teacher is expected to use cumulative data to evaluate the effectiveness of a particular education or support strategy; the clinical psychologist might be expected to contribute information about the level of assessed support needs in developing the person's individualized plan; the physician is expected to make a diagnosis of fetal alcohol syndrome; or the geneticist is expected to make a diagnosis of Trisomy 21.

PA-472

level of people with ID living on their own or with roommates is below the poverty level. "These individuals are simply too poor to afford even the most modest rental housing" (O'Hara & Cooper, 2005, as cited by Stancliffe & Lakin, 2007, p. 436). Although some flexible housing supports exist for people with ID (e.g., rental assistance under Section 8 voucher programs from the Department of Housing and Urban Development), waiting lists are excessive and the application process is particularly challenging ro these individuals. In comparison with adults who have disabilities other than ID, people with ID have lower rates of living independently. Although more women wirh ID who have higher IQ scores live independently than do men in the same category, this finding appears related to a higher marriage rate for these women than for the men (Blackorby & Wagner, 1996; Richardson & Koller, 1996). In other independent living areas, women with ID have less positive outcomes than men in the same category (Rousso & Wehmeyer, 2001).

## Health

People with ID and higher IQ scores tend to have higher rates of obesity, poorer nutrition, and be hospitalized more often for longer periods than are adults with no ID (Stancliffe & Lakin, 2007). Health-related challenges for these individuals include accessing health services, affordability, transportation to services, communicating health problems to medical personnel, identifying their disability and their need for support to follow health treatments, and inadequate or nonexistent medical histories (Spitalnik & White-Scott, 2000). Despite these problems appropriate health supports can make a positive difference in healthy lifestyles (Stancliffe & Lakin, 2007).

## Friendships and Social Behavior

Greater loneliness in adults with ID and higher IQ scores was reported when individuals lived in larger residences and expressed fear about their living condition, whereas less loneliness was reported when people liked where they lived and reported more social contact (Stancliffe et al., 2007). Boys with ID and higher IQ scores have been reported to exhibit antisocial and delinquent behaviors more frequently than do their male peers without ID (Douma, Dekker, Ruiter, Tick, & Koot, 2007). Despite these findings, behavioral interventions for challenging behavior have been demonstrated as being effective with this same group (Didden, Korzilius, van Oorsouw, & Sturmey, 2006).

## Family Well-Being

Similar to their peers without disabilities, a large majority of youth with ID (89%) were reported to be single 2 years after leaving high school (Wagner et al., 2005). Annual incomes of those who were married or living with a partner were $5,000 or less. Few of these people receive the social-sexual teaching that might assist them in their personal lives. Attempts to establish an intimate relationship with anotber person are often met with restrictions and fear (Walker-Hirsch, 2007).

The vast majority of children and almost half of adults with ID live with their family rather than on their own or with others (Braddock, Emerson, Felce, & Stancliffe, 2001; I. Brown, Renwick, & Raphael, 1999). When they do establish families of their own, it is well-documented that families in which one or both parents have ID/IDD face greater challenges than do other families in raising their children; however, positive outcomes can be enhanced if they receive appropriate supports to navigate adult living; maintain their family; and protect, support, and guide their children (Tymchuk, 2006).

## Rights

The ability to know one's rights and make those rights a reality depends on civic education and access to a stable pool of knowledgeable advocates. Limitations in overall education access described earlier result in many people who never have the opportunity to learn about democracy or personal rights with their classmates. A tendency by these individuals to deny their disability and reject services associated with ID may mean that their rights to supports or to fair treatment are not exercised. Assuring justice in the civil and criminal justice system and educating the police, lawyers, and judges who work with these individuals so that needed accommodations can be made (e.g., fair questioning) has not yet been accomplished (Perske, 2008). Moreover, very few legal resources exist for people with disabilities who do not have the finances or ability to hire a private lawyer.

Poverty and unemployment are realities in the lives of most people with ID who are living independently, with the following goals only rarely met: having a reasonable income and ongoing employment, circumventing the restrictive and potentially stigmatizing regulations for acquiring social services, accessing inexpensive transportation, and obtaining affordable housing.

## Social Judgment

Individuals with ID who have higher IQ scores are vulnerable to risks due to their sometimes inadequate response systems, interpersonal competence, social judgment, or decision-making skills (Greenspan, 2006a, 2006b; Khemka & Hickson, 2006; Nettelbeck & Wilson, 2001; Patton & Keyes, 2006; Spitalnik & White-Scott, 2000). These challenges are linked to reduced intellectual and adaptive abilities that make it difficult to problem solve and to be flexible in thinking; both limitations create a susceptibility to dangers that is shared among members of this group (Greenspan, 2006a). Some have argued that certain aspects of these characteristics may represent a socialization process and may sometimes be viewed as adaptive responses to stigmatizing and deficient environments (Bogdan & Taylor, 1994; Goffman, 1961). It is likely that both reduced abilities and adaptation to one's life circumstances are involved in these susceptibilities and vulnerabilities.

For some people in this group, these social judgment challenges may mask their disability temporarily, but ultimately these characteristics can contribute to their vulnerability. Research supports possible systematic interventions to counter these characteristics,

PA-474

# USER'S GUIDE

# INTELLECTUAL DISABILITY

Definition, Classification, and Systems of Supports

11TH EDITION

**aaidd**

PA-475

TABLE 3.3

**Guidelines for Synthesizing Obtained Information**

1. Show clearly that the obtained information is aligned to the critical diagnostic question: "Does the person meet the three criteria necessary for a diagnosis of intellectual disability?"

2. Integrate information from multiple data sources (i.e. broad-based assessments and a thorough history). A valid diagnosis of ID is based on multiple data points that not only include giving equal weight to significant limitations in adaptive behavior and intellectual functioning, but also requires evaluating the pattern of test scores and factors that affect the standard error of measurement of the standardized assessment instruments used.

3. Be aware that some factors might artificially inflate test scores, thus inaccurately suggesting higher scores than the individual's true score. These misleading factors include anomalies in the structural features of the norming sample, gaps in the development of spacing of item difficulties or sub-tests of a comprehensive adaptive behavior measure, and pure error variance (Jacobson & Mulick, 2006).

4. Be aware of the potential 'false positive' (where the person is diagnosed as an individual with ID but in actuality is not) and 'false negative' (where the person's true ID is not diagnosed as such) (Greenspan, 2006). To overcome a potentially incorrect diagnosis, clinicians need to: (a) equally consider (that is, equate the relative importance of) adaptive behavior and intellectual functioning in making a diagnosis of ID; (b) factor in the standard error of measurement of the assessment instrument as well as other technical properties of the instrument used; and (c) incorporate information from multiple sources, including a thorough history.

5. When a series of scores differ while purporting to measure the same construct, thoroughly explore and analyze the possible reasons for differences in data. Possible reasons include poorly trained examiner(s), improper generalizations of test scores administered for other purposes, improper selection of tests, making mistakes in scoring, administration of the same test too close in time, using different editions of the same test and not using the most recent version, examiner bias, and so forth. For example, there is evidence that IQ score estimates obtained from the WAIS may not be precisely equivalent to those obtained from the Stanford Binet (Lukens & Hurrell, 1996; Nelson & Dacey, 1999, Silverman et al., (2010).

6. Consider possible effects of personal characteristics and environmental factors that can affect test results.

7. In the synthesis of school related factors, determine whether the assessment(s) included classroom functioning and academic performance.

8. In the synthesis of information related to the evaluation of social competence, the focus should be whether the person: (a) interprets accurately others' emotions and intentions

**PA-476**

TABLE 3.3 *(continued)*

| |
|---|
| based on available cues; (b) generates appropriate social strategies in response to social problems, and (c) demonstrates knowledge and use of social skills such as anticipating the consequences of one's behavior or resolving particular social problems in a given social situation. |
| 9. Recognize the impact of practice effects, which refer to gains in IQ scores that result from a person being retested on the same test. Practice effect gains occur even when the examinee has not been given any feedback on his performance regarding test items. In addition, practice effects do not reflect growth or other improvement on the skills being assessed (Kaufman, 1994). |
| 10. Recognize that self-ratings have a high risk of error, since people with ID are more likely to attempt to look more competent and 'normal' than they actually are, as well as frequently exhibit an acquiescence bias. In addition, having ID is often a stigmatizing status that is tied closely to how a person is perceived by peers, family members, and others in the community; therefore, many people with ID and their families attempt to avoid the diagnosis and thus the stigma. |
| 11. Do not use past criminal behavior or verbal behavior to infer level of adaptive behavior. The diagnosis of intellectual disability is based on meeting three criteria: significant limitations in intellectual functioning; significant limitations in adaptive behavior as expressed in conceptual, social, and practical adaptive skills; and age of onset prior to age 18. The diagnosis of ID is not based on the person's 'street smarts', behavior in jail or prison, or 'criminal adaptive functioning.' |
| 12. Recognize that a number of reasons might explain the lack of an earlier, official diagnosis of ID including: (a) the individual was excluded from a full school experience; (b) the person's age precluded their access to specialized services such as special education programs; (c) the person was given no diagnosis or a different diagnosis for 'political purposes' such as protection from stigma or teasing, avoidance of assertions of discrimination, or because of the potential impact on benefits of a particular diagnosis; (d) the school's concern about over-representation for data reporting purposes of specific diagnostic groups within their student population; (e) parental concerns to avoid a label; (f) school-based political issues such as availability or non-availability of services and potential funding streams at that time; and (g) the lack of entry referral into the diagnostic-referral process due to cultural and linguistic differences or for other reasons. |

## RETROSPECTIVE DIAGNOSIS GUIDELINES

*The careful synthesis of information is required when a retrospective diagnosis is made.* Such a diagnosis should be based on multiple data points that not only give equal consideration to adaptive behavior and intelligence scores, but also reflect an evaluation of the pattern

## FOSTERING JUSTICE WHEN DEALING WITH FORENSIC ISSUES

Clinicians in the field of ID may be involved in forensic issues that arise when persons with ID are involved with the civil or criminal justice system. The more common of these forensic issues center around personal competence, guardianship, property and financial management, victimization in crime, or accusations of committing a crime. This section of the *User's Guide* discusses best practices and clinical judgment guidelines that address how clinicians can foster justice when dealing with these forensic issues. These practices and guidelines relate to: (1) interpreting assessment information, (2) understanding foundational aspects of ID that are critically important in fostering justice for people with ID, and (3) overcoming common stereotypes.

## Interpreting Assessment Information

There are five critical areas involving the valid interpretation of assessment information that have emerged from clinical experiences dealing with forensic issues. These five areas involve understanding the following: (1) the concept of a confidence interval (CI), (2) the concept of a cutoff score, (3) that corrections need to be made in an obtained IQ score if the score was based on aging norms (i.e., the Flynn effect; Flynn, 2006), (4) the influence of practice effects on test results, and (5) the potential effect on test results attributable to faking.

*Confidence interval (CI).* A score obtained on a standardized psychometric instrument that assesses intellectual functioning or adaptive behavior is not absolute because of variability in the obtained score because of factors such as limitations of the instrument used, examiner's behavior and expertise, personal factors (e.g., health status of the person), or environmental factors (e.g., testing environment or testing location). Thus, an obtained score may or may not represent the individual's actual or true level of intellectual functioning or adaptive behavior because of these aforementioned factors. *Standard error of measurement (SEM),* which varies by test, subgroup, and age group, is used to quantify the variability that is attributable to the test itself and *provides the basis for establishing a statistical CI within which the person's true score is likely to fall.*

- For well-standardized measures of general intellectual functioning, the SEM is approximately 3 to 5 points. As reported in the respective test's standardization manual, the test's SEM can be used to establish a *statistical confidence interval (CI) around the obtained score.* From the properties of the normal curve, a range of confidence can be established with parameters of at least one standard error of measurement (i.e. scores of about 66 to 74, 66% probability) or parameters of two standard error of measurement (i.e. scores of about 62 to 78, 95% confidence).
- For well-standardized measures of adaptive behavior the SEM for obtained scores is comparable to that of standardized tests of intelligence. Thus, the use of plus/minus one standard error of measurement yields a statistical confidence interval (around the obtained score) within which the person's true score will fall 66% of the time; the use of plus/minus two standard error of measurement yields a sta-

tistical confid
fall 95% of th
be considered
accuracy, dep
ing that the p
ing at a rate o
Flynn effect)
between inte
issue with sta
may be speci
viduals may o
behavior. For
2002; Greer
against relyii
out a diagno

*Cutoff score.* A ci
icant limitations ir

- For both cr
below the m
*interval)* for
instrument.
- A fixed poir
is intended

*Flynn Effect.* Th
points per year). T
norms. Both the I
in which a test wii
IQ upward of 3 p
Gresham & Resch
For example, if th
an individual's IQ
it was originally n
(2006), the popu!
would be 103 in
approximately 2 :
and not approxir

*Practice effect.*
result from a pe
practice is to avc
vidual because it

© American Assoc

tistical confidence (around the obtained score) in which the person's true score will fall 95% of the time. Thus, an obtained score on an adaptive behavior scale should be considered as an approximation that has either a 66% or 95% likelihood of accuracy, depending on the confidence interval used. There is no evidence suggesting that the population mean on standardized tests of adaptive behavior is increasing at a rate comparable to that observed on standardized tests of intelligence (i.e., Flynn effect). Because of the differences in test construction and administration between intellectual functioning and adaptive behavior, practice effect is not an issue with standardized adaptive behavior scales. One source of measurement error may be specific to measures of adaptive behavior and that is the concern that individuals may exaggerate their adaptive skills when asked to self-report their adaptive behavior. For this reason, numerous sources (e.g. Edgerton, 1967; Finlay & Lyons, 2002; Greenspan & Switzky, 2006; Schalock et al., 2010) have recommended against relying on self-reported measures of adaptive behavior when ruling-in or out a diagnosis of ID.

*Cutoff score.*   A cutoff score is the score(s) that determines the boundaries of the "significant limitations in intellectual functioning and adaptive criteria" for a diagnosis of ID.

- For both criteria, the cutoff score is approximately 2 standard deviations (SD) below the mean of the respective instrument, considering the SEM (see *Confidence interval*) for the specific instrument used, and the strengths and limitations of the instrument.
- A fixed point cutoff for ID is not psychometrically justifiable. The diagnosis of ID is intended to reflect a clinical judgment rather than an actuarial determination.

*Flynn Effect.*   The *Flynn Effect* refers to the increase in IQ scores over time (i.e., about 0.30 points per year). The Flynn Effect effects any interpretation of IQ scores based on outdated norms. Both the 11th edition of the manual and this *User's Guide* recommend that in cases in which a test with aging norms is used as part of a diagnosis of ID, a corrected Full Scale IQ upward of 3 points per decade for age of the norms is warranted (Fletcher et al., 2010; Gresham & Reschly, 2011; Kaufman, 2010; Reynolds et al., 2010; Schalock et al., 2010). For example, if the Wechsler Adult Intelligence Scale (WAIS-III; 1997) was used to assess an individual's IQ in July, 2005, the population mean on the WAIS-III was set at 100 when it was originally normed in 1995 (published in 1997). However, on the basis of Flynn's data (2006), the population mean on the WAIS-III Full-Scale IQ corrected for the Flynn Effect would be 103 in 2005 (9 years × 0.30 = 2.7). Hence, using the significant limitations of approximately 2 SDs below the mean, the Full-Scale IQ cutoff would be approximately 73 and not approximately 70 (plus or minus the SEM).

*Practice effect.*   The practice effect refers to gains in IQ scores on tests of intelligence that result from a person being tested on the same instrument. The established clinical best practice is to avoid administering the same intelligence test within a year to the same individual because it will often lead to an overestimation of the examinee's true intelligence.

PA-479

*Claims of faking.* Sometimes in a contested legal case an allegation of intentional "faking bad" is made, asserting that the individual is attempting to gain a benefit by deliberately faking a disability. Such claims of faking, when they are made, are usually in cases involving mental disorders because mental illness can have a later-life onset, subjective symptoms, and waxing and waning symptoms.

Allegations that an individual is intentionally faking bad, by faking ID, occur in some legal cases. The cases in which such allegations occur are cases in which rights such as eligibility for financial supports or exemption from the death penalty would come into play if the individual has an ID (Keyes, 2004). The term *malingering* is often used to refer to "faking bad." The *DSM-IV-TR* (APA, 2000) defined malingering as intentionally and purposefully feigning an illness to achieve some recognizable goal or tangible benefit (e.g., feigning ID to be spared the death penalty). Such allegations that a person is faking ID must be analyzed cautiously, however, for several reasons. First, the elements required for a diagnosis of ID must have been present from an early age (ID must originate before the age of 18), so there is almost always a documented lifetime history, usually beginning at birth or early childhood and extending through the school years, of significant limitations in intellectual functioning and adaptive behavior. Second, in cases in which an earlier diagnosis of ID cannot be documented because the individual grew up in another country and/or there are no assessment records, a clinician may conduct or access a current assessment of intellectual functioning and adaptive behavior, including a history, to determine current functioning, and together with clinical judgment make a retrospective diagnosis if indicated. Third, the more common faking direction when an individual with ID attempts to fake is to "fake good" so as to hide their ID and try to convince others that he or she is more competent (Edgerton, 1967).

Claims of faking ID in an individual should be addressed by a clinician in ID conducting a thorough evaluation for ID using the diagnostic and clinical strategies outlined in the 11th edition of the AAIDD manual and in this *User's Guide.* The authors of this *User's Guide* are aware of the concern that some (e.g., Doane & Salekin, 2008) have expressed about the potential to feign deficits on currently used adaptive behavior scales. Clinicians need to be aware of this potential and ensure that they interview multiple individuals who know the person well and who have had the opportunity to directly observe the person engaging in his or her typical behaviors across multiple contexts (i.e., home, community, school, and work).

Clinicians who similarly attempt to use specific "malingering" tests in individuals with ID must use considerable caution because of two factors: (1) the lack of a research base supporting the accuracy of such tests for persons with ID (Hayes et al., 1997; Hurley & Deal, 2006); and (2) the documented misuse of common malingering tests even when the test manual explicitly precludes use with individuals with ID (Keyes, 2004). Standardized assessment instruments used to inform the clinician whether the person is putting forth his or her best effort (i.e., malingering) have not, for the most part, been normed for persons with ID (MacVaugh & Cunningham, 2009). In addition, recent studies have documented unacceptable error rates (i.e., false positive for malingering) when used with persons with IQ scores from 50 to 78 (Dean et al., 2008; Hurley & Deal, 2006). Thus, the assessment of "faking bad" with individuals with low IQs (i.e., below 80) should be conducted with great prudence when relying on standardized measures that are not strictly normed or validated with persons being assessed for ID.

tentional "fak-
efit by deliber-
sually in cases
set, subjective

occur in some
hts such as eli-
come into play
ised to refer to
entionally and
ngible benefit
erson is faking
nents required
riginate before
ally beginning
nificant limita-
which an ear-
up in another
or access a cur-
ig a history, to
a retrospective
an individual
convince oth-

n ID conduct-
ies outlined in
iuthors of this
n, 2008) have
iehavior scales.
multiple indi-
lirectly observe
cts (i.e., home,

idividuals with
a research base
)97; Hurley &
ests even when
i, 2004). Stan-
person is put-
ost part, been
idition, recent
r malingering)
lurley & Deal,
Qs (i.e., below
lized measures
).

## Foundational Aspects of ID

Terminology and concepts used within one field or profession (such as ID) are frequently not understood clearly by members of another field or profession. As a result, confusion and misunderstanding can occur within the courtroom and impact legal decisions. Successfully addressing forensic issues requires that all key players understand the following foundational aspects of ID that are critically important in fostering justice for people with ID. First, limitations in the individual's present functioning must be considered within the context of community environments typical of the individual's age peers and culture. Thus, the standards against which the individual's functioning are compared are typical community-based environments, not environments that are isolated or segregated by ability or current placement. Typical community environments include homes, neighborhoods, schools, businesses, and other environments in which people of similar age ordinarily live, play, work, and interact.

Second, within an individual, limitations often coexist with strengths. Individuals may have capabilities and strengths that are independent of ID such as strengths in social or physical capabilities, some adaptive-skill areas, or in one aspect of an adaptive skill in which they otherwise show an overall limitation. Third, ID is not the same as an LD. An ID is characterized by significant limitations both in intellectual functioning and adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18 (Schalock et al., 2010, p. 1). In distinction, a learning disability (LD) is characterized by a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia (34 CFR sec. 300.8 [10]).

The fourth critically important foundational aspect is that adaptive behavior is conceptually different from maladaptive or problem behavior. This is true despite the fact that many adaptive behavior scales contain assessment of problem behavior, maladaptive behavior, or emotional competence. To be specific, (1) there is general agreement that the presence of clinically significant levels of problem behaviors found on adaptive behavior scales does not meet the criterion of significant limitations in adaptive functioning, (2) behaviors that interfere with the person's daily activities, or with the activities of those around him or her, should be considered problem behavior rather than the absence of adaptive behavior, and (3) the function of problem behavior may be to communicate an individual's needs, and in some cases, may even be considered an adaptive response to environmental conditions.

## Overcoming Common Stereotypes

Stereotypes are not unique to persons with ID. Indeed, most individuals or groups who are perceived as different on some basis are stereotyped based on the perceiver's mental model or image of such persons or groups. In reference to persons with ID, historical terminology contributes to stereotyping as reflected in such terms as idiot, imbecile, or moron. Physical appearance can also contribute to stereotypes as reflected in the state-

PA-481

ment that "if you don't have the look (as in Down syndrome) then you are not intellectually disabled." It should be noted that the vast majority of persons with an ID have no dysmorphic feature and generally walk and talk like persons without an ID.

Regardless of their origin, a number of incorrect stereotypes can interfere with justice. These incorrect stereotypes must be dispelled:

- Persons with ID look and talk differently from persons from the general population
- Persons with ID are completely incompetent and dangerous
- Persons with ID cannot do complex tasks
- Persons with ID cannot get driver's licenses, buy cars, or drive cars
- Persons with ID do not (and cannot) support their families
- Persons with ID cannot romantically love or be romantically loved
- Persons with ID cannot acquire vocational and social skills necessary for independent living
- Persons with ID are characterized only by limitations and do not have strengths that occur concomitantly with the limitations

These incorrect stereotypes are unsupported by both professionals in the field and published literature. Stereotypes are best addressed by understanding the characteristics of persons with ID, and especially those common characteristics of persons with ID with higher IQs that were summarized in Tables 3.1 and 3.2.

PX-402

# The DEATH PENALTY and INTELLECTUAL DISABILITY

## Edward A. Polloway, Editor



aaidd

American Association
on Intellectual and
Developmental Disabilities

PA-483

# 8 | Intelligence Testing

Dale G. Watson

## Nature of the Problem

The evaluation of intelligence is an essential component in establishing the diagnosis of an intellectual disability (ID). Clinical practice and professional standards require that, in high-stakes evaluations, an IQ test score be derived from an individually administered global measure of intellectual functioning. In most instances, this is represented by indexes of general cognitive (thinking) abilities (e.g., the full-scale IQ test score or its equivalent), though in certain circumstances, subcomponent elements or part scores may provide invaluable information.

In selecting a test to measure intellectual functioning or in understanding the adequacy of a test that has been administered, a number of important dimensions must be considered. For example, key considerations include the degree to which an IQ test score is saturated with a general factor of intelligence, known as "g," or is instead, a narrow measure of a more specific ability (e.g., fluid reasoning or crystallized intelligence—see Chapter 7); the number and mixture of specific intellectual abilities assessed by a particular IQ test; the influence of "practice effects" and norm obsolescence (Flynn effect) on the accuracy of the obtained scores (see Chapter 10); foundational psychometric characteristics such as reliability and validity (see Chapter 5); the adequacy of the standardization procedures; and the representativeness of the test norms. Additional issues relate to the use of current instruments, congruence of language between the test and the person to be assessed, the cultural fairness of the instrument, and the level of acculturation of the individual. The information presented in this chapter discusses these important issues related to IQ assessment, particularly as relevant to the diagnosis of ID.

113

**PA-484**

## Summary of Related Research

There are a multiplicity of definitions of intelligence and continuing debate over the nature of intelligence (Urbina, 2011; VandenBos, 2007). Most definitions recognize intelligence as a combination of cognitive abilities involved in the comprehension of complex ideas, problem solving, learning, reasoning, abstract thinking, and efficient adaptation to the environment (see also Chapter 7). For example, as described in the 11th edition of the American Association on Intellectual and Developmental Disabilities's *Intellectual Disability: Definition, Classification, and Systems of Supports* (Schalock et al., 2010), intellectual functioning is "best conceptualized and captured by a general factor in intelligence. [That is,] intelligence is a general mental ability. It includes reasoning, planning, solving problems, thinking abstractly, comprehending complex ideas, learning quickly, and learning from experience" (Schalock et al., 2010, p. 31).

The general factor of intelligence is correlated with a wide array of important individual characteristics and behavioral outcomes including, but not limited to: academic achievement measured by grade point average (GPA), risk of dropping out, and years of education; occupational achievement; risk for unemployment; risk for delinquency and criminal behavior (Gottfredson, 1997; Jensen, 1998); coping with ordinary life such as using maps, banking, and interpreting news articles; dealings with people (Gottfredson, 1997); biological characteristics including brain size, central nerve conductance velocity (Gignac, Vernon, & Wickett, 2003; Luders, Narr, Thompson, & Toga, 2009; Mackintosh, 2011; McDaniel, 2005), and efficiency of brain glucose metabolism (Haier, 2003); death rates from motor vehicle accidents (O'Toole, 1990); and life expectancy (Hart et al., 2003; Whalley & Deary, 2001; *cf.* Patja, Iivanainen, Vesala, Oksanen, & Ruoppila, 2000). A higher level of intelligence serves as a protective factor. In contrast, individuals with more limited intellectual resources are increasingly vulnerable to the vicissitudes of life.

IQ test scores, in the form of the composite full-scale IQ in particular, are commonly used to estimate and describe this general factor of intelligence. The dominant and most accepted view is that intellectual abilities are arranged in a hierarchical fashion with the general factor of intelligence at the apex, which in turn subsumes a number of broad intellectual abilities as well as more specific or narrow functions (Buckhalt, 2002; Carroll, 1993; Jensen, 1998; Mackintosh, 2011; Neisser et al., 1996; Schneider & McGrew, 2012; Spearman, 1927; *cf.* Stankov, 2005; *cf.* Sternberg & Grigorenko, 2002; see also Chapter 7).

Carroll's (1993) seminal meta-analytic study of the extant literature on the factor structure of intelligence identified the major components of general intelligence. This work was subsequently combined with that of Horn and Cattell to provide a structural model of intelligence termed the Cattell–Horn–Carroll (CHC) theory (Kaufman, 2009; McGrew & Flanagan, 1998; McGrew, 1997, 2005, 2009; Schneider & McGrew, 2012; see also Chapter 7). CHC theory posits a hierarchical structure of intelligence with a *general* ability factor (*g*) at the apex. In this taxonomy, abilities are differentiated at three

different levels (referred to as strata) of generalization or breadth. The most specialized abilities are classified as *narrow* abilities. Narrow abilities, in turn, are subsumed under more *broad* intellectual abilities. All broad abilities are subsumed by the *general* ability of general intelligence (*g*). The broad cognitive ability factors include fluid intelligence (*Gf*), quantitative knowledge (*Gq*), crystallized intelligence (*Gc*), reading and writing (*Grw*), short-term memory (*Gsm*) or short-term working memory (*Gwm*), visual processing (*Gv*), auditory processing (*Ga*), long-term storage and retrieval (*Glr*), processing speed (*Gs*), and decision/reaction time/speed (*Gt*; Flanagan, Ortiz, & Alfonso, 2007; McGrew, LaForte, & Schrank, 2014).

Composite IQ test scores are highly correlated with the general factor of intelligence (Jensen, 1998; National Research Council [NRC], 2002), even though they are only approximate proxy measures for the underlying general dimension (Colom, Abad, Garcia, & Juan-Espinosa, 2002; Fiorello et al., 2007; Mackintosh, 2011; Schneider, 2013a). Full-scale composite IQ scores are derived, in general, from admixtures of tasks more or less saturated with the general factor of intelligence. However, different full-scale IQ scores are also impacted by the specific combination of broad and narrow intellectual abilities measured by different IQ tests (see Chapter 7). To the extent that an IQ test can be judged a valid measure of general intellectual functioning, it must reasonably and accurately measure general intellectual ability rather than isolated specific components of intelligence. The general factor of intelligence is of particular import inasmuch as it has a greater impact on functioning at lower levels of intelligence, whereas factors that are more specific tend to become significant in higher IQ ranges (Detterman & Daniel, 1989; Reynolds, Keith, & Beretvas, 2010; Wechsler, 2008). Moreover, individuals with a mild level of ID perform more poorly on subtests that are better measures of general intelligence (Spitz, 1988) though the presence of "splinter skills" may not be uncommon (Bergeron & Floyd, 2006; Fiorello, et al., 2007; Fiorello, Hale, McGrath, Ryan, Quinn, 2001). In addition, the diagnosis of ID has traditionally focused on composite full-scale IQ scores that serve as proxies for the general factor of intelligence.

The "intelligence" measured by one IQ test is not necessarily the same as that measured by another test (Daniel, 2000; Stankov, 2002, 2005; see Chapter 7). However, although the general factor of intelligence may be "colored" by the specific mixture of broad and narrow abilities measured by different tests, research studies have demonstrated that a similar higher-level general intelligence factor or ability emerges whenever a sufficiently large and diverse array of intellectual abilities are assessed, mostly independent of the specific battery utilized (Carroll, 1993; Floyd, Shands, Rafael, Bergeron, & McGrew, 2009; Jensen, 1980, 1998, 2002; Johnson, Bouchard Jr., Krueger, McGue, & Gottesman, 2004; Johnson, te Nijenhuis, & Bouchard Jr., 2008; Mackintosh, 2011; Thorndike, 1987). Nonetheless, this is not to say that IQ test scores will be identical across tests. IQ tests differ in how and the extent to which they measure general intellectual ability and the component parts of intelligence (see Chapter 7). IQ tests also differ along a number of other important dimensions.

## Standards for Educational and Psychological Testing

The American Educational Research Association (AERA), the American Psychological Association (APA), and the National Council on Measurement in Education (NCME), published, in 2014, an updated version of the *Standards for Educational and Psychological Testing* (hereafter *Standards*). The purpose of these standards is "to provide criteria for the development and evaluation of tests and testing practices and to provide guidelines for assessing the validity of interpretations of test scores for the intended test uses" (AERA, APA, & NCME, 2014, p. 1). Standards have been established addressing issues of test construction, evaluation, and documentation; fairness in testing; and testing applications. The standards address issues of validity, reliability, normative standards, and other important criteria for the evaluation of tests. The standards also provide an overarching framework for examining issues relevant to test selection detailed below.

## Normative Standards

IQ test scores reference an individual's relative standing in comparison to a large sample of individuals (the normative sample) selected to be representative of the general population. The IQ test scores obtained from psychometrically sound IQ tests are normally distributed, forming the well-known bell-shaped curve. Composite IQ test scores for all major contemporary IQ tests (see Chapter 7) are reported as standard scores that have a mean (average) of 100 and a standard deviation of 15. Individuals with ID will generally have composite IQ test scores that are approximately two standard deviations or more below the mean of the population on a recently normed test, that is, an IQ standard score of 65 to 75 (70 ± 5) or below, allowing for measurement error (American Psychiatric Association, 2013; Schalock et al., 2010).

IQ test scores are not 100% reliable. The degree of measurement error associated with an IQ test score is based on the reliability of the IQ test score. The standard error of measurement (*SEM*; see Chapter 5) provides a measurement of the degree of error. The *SEM* allows users to place a band of confidence around the obtained IQ test score, most commonly operationalized as ±5 IQ test score points (95% confidence band). The IQ test score criteria for the diagnosis of ID may then include scores of 75 or below, considering the *SEM*.

Normative samples for measures of intelligence typically have exclusion criteria eliminating individuals with sensory-motor impairment; limited English language skills; and histories of severe medical, psychiatric, or neurological dysfunction that might affect cognition. Normative samples must be large enough to provide meaningful stratification of the sample based on the subject characteristics of age, gender, socioeconomic status, levels of education, geographic location, and other variables.

The adequacy and representativeness of an IQ test's normative sample is a critical variable in the selection of an IQ test. The major IQ tests are generally constructed to match the United States Census in terms of key demographic variables including

| TABLE 8 |
| --- |
| *Test/Sample* |
| Overall Samp |
| Sample Size |
| Sample Size |
| (Age Ran( |
| Intellectually |
| Sample S |

*Note.* WAI:
RIAS = Reynol(

gender, ra
level). Th
ered adec
sample si
range fro:
Johnson
subjects v
    As des
sible for c
(Standarc

    A test
    from i
    fair te:
    teristic
    tics of
    with r:
    backgi
    tratior
    reduce

    Inforn
ther, it is
be compa
adequacy
limitatio
considere
ables, suc
adjusted
for neuro
sis is dep

TABLE 8.1. Normative Sample Sizes for Selected IQ Tests

| Test/Sample Size | WAIS-IV | SB5 | WJ III NU | RIAS |
|---|---|---|---|---|
| Overall Sample Size | 2200 | 4800 | 8782 | 2438 |
| Sample Size (Age > 17) | 2000 | 1200 | 2997 | 1116 |
| Sample Size by Age | 1400 | 600 | 2530 | 982 |
| (Age Range) | (18:0 – 64:11) | (17:0 – 59:11) | (18:0 – 59:11) | (17:0-74:11) |
| Intellectually Disabled Comparison Studies | 104 | 119 | 93 | 26 |
| Sample Size (Age Range) | (16:0 – 63:11) | (3 – 25 | (< 19) | (18:0 +) |

*Note.* WAIS-IV = Wechsler Adult Intelligence Scale–IV; WJ III NU = Woodcock-Johnson III Normative Update; SB5 = Stanford Binet 5; RIAS = Reynolds Intellectual Assessment Scales. Data are from the respective technical manuals.

gender, race/ethnicity, geographic region, and education (as a proxy for socioeconomic level). The sizes of the normative samples for the major IQ tests are generally considered adequate (see Bridges & Holler, 2007; also Crawford & Garthwaite, 2008). Norm sample sizes, within the relevant adult age groups (approximately 18–60 years old), range from about 600 for the Stanford-Binet 5 (SB5) to about 2500 for the Woodcock-Johnson III (WJ III; see Table 8.1). As also reported in Table 8.1, clinical samples of subjects with ID are sometimes reported in IQ test manuals.

As described in the AERA, APA, and NCME standards, test publishers are responsible for creating tests that provide valid score interpretations across diverse individuals (Standard 3.1):

> A test that is fair . . . reflects the same construct(s) for all test takers, and scores from it have the same meaning for all individuals in the intended population; a fair test does not advantage or disadvantage some individuals because of characteristics irrelevant to the intended construct. To the degree possible, characteristics of all individuals in the intended test population, including those associated with race, ethnicity, gender, age, socioeconomic status, or linguistic or cultural background, must be considered throughout all stages of development, administration, scoring, interpretation, and use so that barriers to fair assessment can be reduced. (AERA, APA, & NCME, 2014, p. 50)

Information relevant to these issues is commonly available in the test manual. Further, it is the responsibility of the examiner to determine if the examinee can reasonably be compared to the normative reference group (Standard 10.5). In this context, the adequacy of the individual's English language skills, the presence of sensory and motor limitations (especially hearing and vision), and their level of acculturation should be considered. However, the use of subgroup norms based on other demographic variables, such as gender, race, and education, commonly referred to as demographically adjusted norms (Heaton, Miller, Taylor, & Grant, 2004), while potentially appropriate for neuropsychological evaluation, cannot be used to diagnose ID because the diagnosis is dependent on a comparison to the larger normative reference group.

## Standardization

The reliability and validity (discussed below and in Chapter 5) of an assessment for ID requires the use of standardized procedures for the administration and scoring:

> The usefulness and interpretability of test scores require that a test be administered and scored according to the developer's instructions. When directions, testing conditions, and scoring follow the same detailed procedures for all test takers, the test is said to be standardized. (AERA, APA, & NCME, 2014, p. 111)

There are a number of other relevant standards that are applicable to the appropriate administration of tests of intelligence. First, certain basic conditions relate to the environment in which the assessment takes place (e.g., quiet and free from distractions, absence of third-party observers, freedom of motion as needed for any task requiring motor movements) and deviations from these conditions should be considered during the interpretative process (Standard 10.8; American Academy of Clinical Neuropsychology [AACN], 2001; Axelrod et al., 2000; Committee on Psychological Tests and Assessment–American Psychological Association, 2007). Second, there is an apparent need for test administration and scoring to be accurate (Standard 9.5; AERA, APA, & NCME, 2014, p. 153). Third, accurate assessment assumes that the testee puts forth adequate effort (AERA, APA, & NCME, 2014, p. 154–155; Bush et al., 2005); this concern is particularly relevant in assessing individuals with ID (Dean, Victor, Boone, & Arnold, 2008; Salekin & Doane, 2009). The American Academy of Clinical Neuropsychology (2007) described relevant techniques for assessing motivation and effort:

> Approaches for assessing motivation and effort include: behavioral observations from interview or testing of behaviors such as avoidance, resistance, hostility, and lack of cooperation; examination of the pattern of performance among traditional neuropsychological measures; identification of cognitive profiles that do not fit with known patterns typical of brain disorder; and consideration of suspect performance on objective measures of effort. Clinicians utilize multiple indicators of effort, including tasks and paradigms validated for this purpose, to ensure that decisions regarding adequacy of effort are based on converging evidence from several sources, rather than depending on a single measure or method. (p. 221–222)

## Reliability

Issues of test reliability are central to the selection of an appropriate test for the measurement of intelligence (see Chapter 5 for an extensive discussion of this issue). Reliability is "the ability of a measurement instrument (e.g., a test) to measure an attribute consistently..." (VandenBos, 2007, p. 786). Reliable tests provide consistent results over

time and circumstances (Reynolds & Kamphaus, 2003). The scores obtained from IQ tests can be described by different forms of reliability; indices of internal consistency reliability and stability (or test-retest) reliability are presented here.

Internal consistency reliability addresses the degree to which items or subtests are homogeneous and measuring similar underlying abilities (Henson, 2001). The quantification of internal consistency relies on coefficients of the correlations between items or subsets of items. This type of reliability ensures that what is being measured is similar and provides the basis for valid interpretations of the underlying dimension or ability. Stability or test-retest reliability refers to the consistency of scores over time, that is, whether scores on a second administration of a test to the same group of individuals will be similar.

Reliability coefficients for the composite (full-scale) IQ test scores of the major intelligence tests are generally excellent with average or median coefficients in adults of .97 to .99. Reliability coefficients are generally higher for the full-scale scores than for part scores. Reliability coefficients should be .90 or greater for high-stakes decision making (Jensen, 1980; National Research Council [NRC], 2002; Wasserman & Bracken, 2012). The National Research Council observed, "Instruments used for the high-stakes purposes of diagnosing mental retardation . . . should approximate this minimal level of reliability, recognizing that the inverse of reliability is measurement error and that error only confounds correct decision making" (2002, p. 132). Reliabilities below .97 progressively widen the .95% confidence band beyond the ±5 points generally seen as acceptable for diagnosing ID.

The *SEM* is a more relevant and convenient means of using reliability information than are reliability statistics (AERA, APA, & NCME, 2014). The *SEM* has an inverse relationship with measures of reliability and is computed from the reliability coefficient and the standard deviation of the scale (Roid, 2003b). A more reliable test will result in a smaller *SEM* (Wechsler, 2008). The *SEM* represents the error in estimating a theoretical true score based upon the actual score on a test (VandenBos, 2007; Wechsler, 2008). The true score is the theoretical score that would be found if it were possible to administer the test thousands of times to the same individual (absent practice effects; Kaufman, 2009).

Because all test scores include error, it is critical to be able to quantify the magnitude of the error—*SEM* serves this purpose. Because of measurement error, it is important to recognize that obtained IQ test scores only estimate the theoretical true score; the obtained IQ test score is the approximate midpoint of the range in which a score is likely to fall. For example, with an obtained score of 72 and an *SEM* of 2.12, the true score is likely to fall, with a 68% degree of confidence, within a band of ±1 *SEM*, that is, approximately 70 to 74. Similarly, with a 95% degree of confidence, using ±2 *SEMs*, the score is likely to fall between 68 and 76. The *Standards* state, "When a test score or composite score is used to make classification decisions (e.g., pass/fail, achievement levels), the standard error of measurement at or near the cut scores has important implications

for the trustworthiness of these decisions" (AERA, APA, & NCME, 2014, p. 46). As the United States Supreme Court determined in *Hall v. Florida* (2014), the *SEM* of an IQ test score must be considered when making the diagnosis of ID in capital punishment cases. The use of "bright line" cutoffs for determining whether an individual has ID only reduces the trustworthiness of such decisions. Some instruments, notably the WAIS-IV and the SB5, use the standard error of estimate (*SEE*) instead of the *SEM* to construct confidence intervals. The *SEE* corrects for the probability that true scores are more likely to fall towards the middle of the distribution, i.e., regression to the mean effects. The *SEE* affects extreme scores to a greater extent than scores falling in the middle of the distribution and, thus, provides an asymmetrical confidence band around obtained IQ scores at the extremes (Roid, 2003b).

## *Validity*

Validity refers to the accuracy with which a test measures the underlying dimension or ability it is designed to assess (AERA, APA, & NCME, 2014; VandenBos, 2007). Validity "is the degree to which all the accumulated evidence supports the intended interpretation of test scores for the proposed use" (AERA, APA, & NCME, 2014, p. 14). It is the interpretation and not the test itself that is valid (AERA, APA, & NCME, 2014).

Validity is supported by different lines of evidence that commonly include data related to test content, response processes, internal structure, relations to other variables and measures, and the consequences of testing (AERA APA, & NCME, 2014; Reynolds & Kamphaus, 2003; see Chapter 5 for a more extensive discussion of these issues). The test manuals for each of the major IQ test instruments provide the specific lines of evidence supporting the interpretations of the test. In general, there is substantial evidence that the major IQ tests discussed in this chapter are valid measures of intellectual abilities. Nonetheless, because these instruments measure (and conceptualize) intelligence in somewhat different ways, differences exist between tests.

Braden and Niebling (2012) have used the previous edition (1999) of the *Standards* to "articulate a framework for judging the validity evidence provided by test developers" (p. 739), specifically as applied to contemporary intelligence tests. The authors have evaluated the validity claims made by the test developers of the Wechsler Intelligence Scale for Children, Fourth Edition (WISC-IV), the SB5, the Woodcock-Johnson III Tests of Cognitive Abilities (WJ III Cog), the Kaufman Assessment Battery for Children, Second Edition (KABC-II), and the Reynolds Intellectual Assessment Scales (RIAS).

## *Exchangeability*

Exchangeability refers to the degree to which IQs will be reasonably consistent across test batteries (Floyd, Bergeron, McCormack, Anderson, & Hargrove-Owens, 2005; Floyd, Clark, & Shadish, 2008; see also Chapter 7). The common assumption is that an IQ obtained on, for example, the WAIS-IV will be reasonably similar to an IQ obtained on another test. Such exchangeability can be broadly quantified by determining the degree to which the tests are measuring the same underlying abilities, that is, the proportion

TABLE 8.2. Select Composite Score Correlation Coefficients and Shared Variance Between IQ Tests

| | WAIS-IV FSIQ | WAIS-III FSIQ | SB5 FSIQ | WJ III GIA | RIAS CIX |
|---|---|---|---|---|---|
| WAIS-IV | | 88% | — | — | — |
| WAIS-III | .94 | | 67% | 45% | 56% |
| SB5 | — | .82 | | 61%/81% | — |
| WJ III | — | .67 | .78/.90* | | |
| RIAS | — | .75 | — | — | |

Note. WAIS-IV = Wechsler Adult Intelligence Scale–IV; WAIS-III = Wechsler Adult Intelligence Scale–III; WJ III NU = Woodcock-Johnson III Normative Update; SB5 = Stanford Binet 5; and RIAS = Reynolds Intellectual Assessment Scales. FSIQ = Full-scale IQ; GIA = General intellectual ability; and CIX = Composite intelligence index.
Data are from each IQ test's technical manuals. Correlation coefficients are displayed below the shaded diagonal line and the percent of shared variance above the diagonal. Data for the WJ III are for the 2001 version rather than the Normative Update. Dashes indicate that data is unavailable in the respective test manuals.
*A study using the same five factors across the SB5 and WJ III Cog found a substantially higher correlation of .90 (Roid, 2003b).

of shared variance. Shared variance is calculated as the square of the correlation coefficients (r) between the measures of global intelligence, multiplied by 100. For example, the SB5 Full Scale IQ (FSIQ) and the WAIS-III FSIQ have approximately 67% shared score variance (r = .82; See Table 8.2). Stankov (2005) has noted that correlations lower than about .60 suggest that two tests are not measuring the same underlying abilities. Because of the magnitude of the typical correlations reported between tests, composite IQ test scores on average can differ between instruments to a significant degree (see Chapter 7 for more detailed discussion). See Table 8.3 for examples of reported IQ test score differences ranging from one to approximately nine points.

TABLE 8.3. Example Composite Score Mean Differences Between IQ Tests With Flynn Effect Corrections (Below Diagonal)

| | WAIS-IV FSIQ | WAIS-III FSIQ | SB5 FSIQ | WJ III GIA | RIAS CIX |
|---|---|---|---|---|---|
| WAIS-IV | | +2.9 | — | — | — |
| WAIS-III | −.07 | | −3.6 | −8.5 | −.52 |
| SB5 | — | −1.8 | | +1.4 | — |
| WJ III | — | −7.6 | +.5 | | — |
| RIAS | — | +.98 | — | — | |

Note. WAIS-IV = Wechsler Adult Intelligence Scale–IV; WAIS-III = Wechsler Adult Intelligence Scale–III; WJ III NU = Woodcock-Johnson III Normative Update; SB5 = Stanford Binet 5; and RIAS = Reynolds Intellectual Assessment Scales. FSIQ = Full-scale IQ; GIA = General intellectual ability; and CIX = Composite intelligence Index.
Data are from each IQ test's technical manual. The values are presented as example differences from single studies and are not to be interpreted as the best single estimate of typical score differences between the different IQ tests— estimates that would require the synthesis of all available specific pairs of IQ-IQ test comparison studies. Average differences are displayed above the shaded diagonal and are based on the reported calculations that have subtracted the IQ scores from the test in the left column from the IQ scores in the top row, e.g., the WAIS-III provided higher scores than the WAIS-IV (+2.9) but the WJ III provided lower scores than the WAIS-III (−8.5). Difference scores below the diagonal are Flynn effect adjusted scores (see Chapter 10) providing the difference once Flynn effect adjustments are made. Data for the WJ III are from the 2001 technical manual (McGrew & Woodcock, 2001). Dashes indicate that data was unavailable from the respective IQ test technical manuals used to construct this table.

PA-492

IQ test score differences across instruments may stem from a variety of reasons (see Chapter 7 for further discussion). One major reason is that different IQ tests measure different mixes of abilities. The extant IQ-IQ test battery joint factor analysis research (see Keith and Reynolds, 2010) suggests that IQ tests measure somewhat overlapping broad intellectual abilities, but they also do not always measure the exact same set of parallel broad abilities. For example, the WAIS-IV has been found to measure the broad CHC abilities *Gf, Gc, Gv, Gsm,* and *Gs* (Lichtenberger & Kaufman, 2009). In contrast, the WJ III (Woodcock, McGrew, Schrank, & Mather, 2001, 2007) measures seven of the broad intellectual abilities identified by CHC theory (*Gf, Gc, Glr, Gv, Ga, Gs, Gsm, Grw,* and *Gq*; McGrew & Flanagan, 1998). Finally, the SB5 measures *Gf, Gc, Gq, Gv,* and *Gsm* (Keith & Reynolds, 2010; Roid, 2003b; Roid & Pomplun, 2012). Thus, exchangeability may be impacted by the degree to which an IQ test measures similar broad intellectual abilities as well as the balance between general intelligence versus more specific abilities (Floyd et al., 2008). Exchangeability is increased when instruments load highly on the general factor of intelligence (Floyd et al., 2008).

To summarize, despite evidence for a unitary general factor of intelligence across different IQ tests, within adult populations, different IQ tests measure somewhat different mixtures of intellectual abilities. As a result, different IQ tests will not always provide IQ test scores that are precisely the same (Floyd et al., 2008). IQ test scores between instruments are not perfectly "exchangeable." (See below for strategies to resolve apparent discrepancies across test batteries.)

### Practice Effects

Practice effects refer to the potential for inflated IQ scores due to the repeated administrations of the same test to the same individual. Considerations regarding practice effects should play a prominent role in the selection of an appropriate IQ instrument in cases in which the same IQ test (or an earlier version of the IQ test) has previously been administered. When the same tests are administered in close proximity in time, there is likely to be a gain in the obtained IQs on the second administration. Schalock et al. (2010) noted, ". . . established clinical practice is to avoid administering the same intelligence test within the same year to the same individual because it will often lead to an overestimate of the examinee's true intelligence" (p. 38).

However, the magnitude of potential practice effects is frequently insufficiently considered. For example, substantial practice effects have been shown to occur on the Wechsler Adult Intelligence Scale–Revised (WAIS-R; Matarazzo & Herman, 1984) and the Wechsler Adult Intelligence Scale–Third Edition (WAIS-III; Basso, Carona, Lowery, & Axelrod, 2002), with an average increase of 6 points on the full-scale IQ over periods ranging from 2 weeks to 6 months. Practice effects for the WAIS-IV have also been reported to be substantial (over 7 points in some populations at a 6-month retest interval; Brooks, Sherman, Iverson, Slick, Strauss, 2011; Brooks, Strauss, Sherman,

Iverson, & Slick, 2009; Estevis, Basso, & Combs, 2012; Wechsler, 2008). Smaller practice effects have been reported for the SB5 (Roid, 2003b) and the RIAS (Reynolds & Kamphaus, 2003).

IQ tests show considerable stability over time at the group level, represented by relatively high stability (test-retest) correlation coefficients. However, considerably less consistency has been reported at the individual level, particularly within low IQ groups (Whitaker, 2008). Considerable caution must be exercised in repeating similar IQ tests or, when interpreting past test findings with lower results, assuming them to be invalid. Practice effects may also be magnified when similar instruments are administered on multiple occasions. This practice can lead to "progressive error" in which subsequent tests become less and less accurate (Kaufman, 2009).

Statistical procedures are available to assist in determining whether subsequent administrations of the same instrument represent real differences or simple statistical artifact. For example, various reliable change indices (RCI), based upon stability coefficients, have been developed that inform the user of the magnitude of change expected to be found on retesting (Basso et al., 2002; Brooks et al., 2009; Brooks et al., 2011; Estevis et al., 2012; Heaton et al., 2001; Lineweaver & Chelune, 2003; Temkin, Heaton, Grant, & Dikmen, 1999). In cases in which the same test has been administered, the application of RCIs adjusted for practice effects may be used to determine whether significant differences actually exist between the obtained scores (Estevis et al, 2012; Heaton et al., 2001; Pearson, 2009; Temkin et al., 1999). As Lineweaver and Chelune (2003) reported,

> ... one cannot interpret scores from a repeat evaluation in the same manner and with the same meaning as those from an initial evaluation. The systematic bias inherent in retest scores, as well as measurement error, can dramatically alter the magnitude of the scores themselves, rendering them at best questionable and at worst misleading. (p. 332)

For some tests, scoring software is available to facilitate the calculation of RCIs.

Given the magnitude of practice effects, it is critically important to consider carefully the impact of repeat testing with the same test. Schalock et al. (2010) suggested avoiding the administration of the same intelligence test within the same year. However, data are limited as to the magnitude of practice effects over longer periods. Furthermore, retest interval time has not appeared to have a moderating effect across the intervals that have been studied (Basso et al., 2002; Estevis et al., 2012).

*Multiple IQ Scores Over Time*

It is not uncommon for individuals to have been administered multiple IQ tests over time. One might be tempted to simply average these scores to obtain a "true" IQ or conversely to adopt the highest score as the most accurate IQ. However, it is not

psychometrically sound to simply average IQ scores in order to form a composite score (Schneider, 2012, 2013a, 2013b). Furthermore, it is inappropriate to simply accept, in a rote fashion, the higher score in the false belief that one can never score higher than their true IQ but can always score poorer in the face of limited effort. Instead, at a minimum, such scores should be examined to determine whether the confidence intervals for the obtained scores overlap or not.

It is also possible, in accordance with reliable scientific methods and professional standards, to combine composite IQ test scores across batteries when the correlations between the instruments can be reasonably determined or estimated and the reliabilities for all test scores are available. When this psychometric information is available for all relevant IQ tests that have been administered, it is then possible to calculate a psychometrically defensible estimated "true" IQ score (Schneider, 2012, 2013a, 2013b; see also *Hall v. Florida*). Such techniques may serve to resolve apparent discrepancies that can occur when different IQ tests have been administered. Further, this procedure allows one to avoid the statistically untenable action of simply averaging scores.

However, this psychometrically sophisticated procedure may not be practical to implement. Frequently, the intercorrelations between all IQ tests administered to the individual are not available in current or old test manuals (e.g., correlation between SB-IV and WAIS-IV) and it would be a daunting task to search the literature for all possible independent research studies to develop a methodologically sound meta-analytic estimate of the various IQ-IQ test correlation combinations. Nonetheless, the procedure outlined and implemented by Schneider (2012, 2013a, 2013b) does allow the software template to substitute reasonable estimates for correlations or reliabilities that are not easily found (or do not exist), but this option should only be used judiciously.

Given problems in locating all necessary input for the Schneider (2012) software, the next best practice for estimating an "average" of multiple IQ test scores is to use the median value of the collection of scores (Sattler, 2001). The use of the psychometric method of Schneider (2012, 2013a, 2013b) or the use of the median score to represent the "average" estimate of collection of scores should only be done when the variability of IQ test scores across time is minimal. Discrepant IQ test scores over time often reflect possible real changes in intelligence and may be due to a variety of factors (see Chapter 7 for discussion of reasons why IQ-IQ test score discrepancies occur). When scientific-based plausible explanations can explain vastly different IQ scores over time, attempting to estimate an "average" score is not recommended. It is only when a collection of IQ scores demonstrates a reasonable degree of convergence (e.g., 95% *SEM* confidence bands for all scores overlap or are not far apart), that estimating a composite IQ test score may be appropriate.

### Norm Obsolescence: The Flynn Effect

The Flynn effect (see also Chapter 10) refers to the phenomenon of steady increases in intelligence levels within populations over time. This phenomenon has been

acknowledged by the major publishers of intelligence tests since the early 1990s and is, in part, the rationale for updating versions of most IQ tests due to norm obsolescence (Wechsler, 1991; Wechsler, 2002a). Although there has been some controversy regarding the application of the Flynn effect in high-stakes evaluations (Hagan, Drogin, & Guilmette, 2010), the scientific and professional consensus is that the Flynn effect is a real phenomenon (Gresham & Reschly, 2011; Hagan et al.; Schalock et al., 2010; Weiss, 2010). Disagreements have centered on the magnitude of the Flynn effect, whether it is disappearing, whether it differentially affects lower and higher IQ groups equally, and whether it should be applied in litigation (Hagan et al.; Trahan, Stuebing, Fletcher, & Hiscock, 2014; Zhou, Zhu, & Weiss, 2010; see Chapter 10 for detailed discussion). Courts have also treated these issues with different outcomes, with some accepting the use of Flynn effect adjustments (e.g., *Ex Parte Eric Dewayne Cathey,* 2012; *People v. Superior Court (Vidal),* 2005, 2007; *United States v. Davis,* 2009; *United States v. Hardy,* 2010; *United States v. Wilson,* 2013; N. Haydt, personal communication, May 22, 2013) while others have prohibited its use (e.g., *Beckworth v. State,* 2009; *Butler v. Quarterman,* 2008; *Pizzuto v. Blades,* 2012; *Thorson v. State,* 2011; N. Haydt, personal communication, May 22, 2013).

Professional standards require that examiners use up-to-date tests and norms. As the *Standards* indicate, "test publishers should assure that up-to-date norms are readily available or provide evidence that older norms are still appropriate. However, it remains the test user's responsibility to avoid inappropriate use of norms that are out of date and to strive to ensure accurate and appropriate score interpretations" (Standard 5.11; AERA, APA, & NCME, 2014, pp. 104–105). Best practice and professional standards mandate the use of up-to-date versions of individually administered IQ tests. Thus, in order to provide accurate and appropriate test interpretations, test users cannot reasonably rely on norms that are out of date and should acknowledge the potential impact of the Flynn effect in the assessment of intellectual disability (Gresham & Reschly, 2011; Schalock et al., 2007; Schalock et al, 2010; *cf.* Loring & Bauer, 2010).

The procedure for computing an adjustment for the Flynn effect has generally involved calculating the time between the administration of a test and the midpoint of the year(s) of norming (which is often 1 to 4 years prior to publication), multiplying that number by .3 points, and subtracting this amount from the obtained full-scale IQ test score of the test in question. See Table 8.4 for the publication and norming dates required for these calculations.

A recent meta-analysis of the Flynn effect reported a "mean of about 3 and a SEM of about 1 [that] supports the correction and is consistent with the Flynn correction of 3 points per decade" (Fletcher, Stuebing, & Hughes, 2010, p. 472). Another such meta-analysis of the Flynn effect provided similar results (Trahan et al., 2014). Given these findings, calculations of the Flynn effect can reasonably incorporate the 0.30 points annual inflation rate as the appropriate magnitude for the Flynn effect. Norm obsolescence is discussed in greater detail in Chapter 10.

PA-496

TABLE 8.4. Publication and Midyear Norming Dates for Selected IQ Tests

| Test | Publication Date | Mid-Year Norming Dates |
|------|------------------|------------------------|
| Wechsler Adult Intelligence Scale – IV | 2008 | 2007 |
| Wechsler Adult Intelligence Scale – III | 1997 | 1995 |
| Wechsler Adult Intelligence Scale – R | 1981 | 1978 |
| Wechsler Adult Intelligence Scale | 1955 | 1954 |
| Wechsler Abbreviated Scale of Intelligence – II | 2011 | 2010 |
| Wechsler Abbreviated Intelligence Scale | 1999 | — |
| Wechsler Intelligence Scale for Children – IV | 2003 | 2001 |
| Wechsler Intelligence Scale for Children – III | 1991 | 1989 |
| Wechsler Intelligence Scale for Children – R | 1974 | 1972 |
| Wechsler Intelligence Scale for Children | 1949 | 1947–1948 |
| Stanford – Binet 5 | 2003 | 2001 |
| Stanford – Binet 4 | 1986 | 1985 |
| Stanford – Binet LM (Updated Norms) | 1973 | 1972 |
| Stanford – Binet LM | 1960 | 1952 |
| Woodcock – Johnson IV | 2014 | 2010/2011 |
| Woodcock – Johnson III Normative Update | 2007 | 2007 |
| Woodcock – Johnson III | 2001 | 1998 |
| Woodcock – Johnson – Revised | 1990 | 1987 |
| Reynolds Intellectual Ability Scale | 2003 | 2000 |

*Note.* Norming dates were calculated as the mid-year of the normative data collection dates from the respective test manuals and adapted from Flynn (2009). The date provided by Flynn for the norming of the WAIS-IV was corrected to that reported in the *Technical and Interpretive Manual* (Wechsler, 2008). Wechsler scales's publication dates are also, in part, from Coalson and Weiss (2002) and Wechsler (2008). Stanford–Binet publication and norming dates are from Becker (2003) and Roid (2003b). WJ-R, WJ III, and WJ III Normative Update dates are for the adult norms (McGrew, Werder, & Woodcock, 1991; McGrew & Woodcock, 2001; McGrew, Schrank, & Woodcock, 2007). The WJ III NU norms are an updated recalculation of norms originally collected between September 1996 and August 1999. The WJ IV sample was collected between December 2009 and January 2012 (K. McGrew, personal communication, August 21, 2014). Dashes represent data not available.

## g-ness of IQ tests

The nature of the general factor of intelligence has remained elusive. Views have ranged from considering *g* to be an emergent property of the mind (Wechsler cited by Jensen, 1998) to little more than an artifact of factor analysis (Gould, 1996). Recent conceptualizations emphasize "the processes and abilities that define processing efficiency and capacity, such as processing speed, inhibition or control of processing, attention, and working memory" (Demetriou, 2002; *cf.* Detterman, 2002). Others suggest it to be the consequence of neural plasticity (Garlick, 2002), the result of elemental cognitive processes (Kranzler & Jensen, 1991), or the inter-relationships between basic cognitive processes (Detterman, 2002).

In any case, composite IQ test scores may differ in the extent to which they measure the general factor of intelligence and the manner in which they are calculated. For example, the full-scale IQ test scores for the WAIS-IV and the SB5 are derived from

equally weighted subtest which uses subtests that gence, is derived from a c ciple component analysis consistent with Jensen (1 (McGrew & Woodcock, :

There has additionally of a particular IQ test b within-battery determin proportion of variance d is commonly estimated nent in a factor analysis Ryan, 2009). However, R *g* from the square of the c to be downwardly biased nonetheless commonly r of the SB5 to range from 50% of its variance attrib versely, Jensen (1998) ar the actual *g* saturation of the *g*-saturation of the cc

The 'proportion of va the average of the var subtests. . . . The *g* lc scores), if it could be without affecting thei *g* loadings of the sepa

Completing the calc 1927), each of the majo than .90 with the WAIS than .95. However, thou are undoubtedly inflated Maynard et al., 2011). Jc tests to be in the .80s. Ul mined by cross or joint limited, hence, it is diffic given the apparent diffe intelligence is assessed, of the *g*-saturation versu

IQ Tests

lid-Year
ning Dates

2007
1995
1978
1954
2010
—
2001
1989
1972
l7–1948
2001
1985
1972
1952
l0/2011
2007
1998
1987
2000

live test manuals and
rted in the *Technical*
nd Weiss (2002) and
-R, WJ III, and WJ III
; McGrew, Schrank, &
ber 1996 and August
unication, August 21,

s have ranged
:ed by Jensen,
ent conceptu-
efficiency and
ittention, and
:st it to be the
:ognitive pro-
isic cognitive

they measure
ilculated. For
derived from

equally weighted subtest scores. In contrast, the WJ III General Index of Ability (GIA), which uses subtests that are only moderate measures of the general factor of intelligence, is derived from a combination of $g$-weighted subtests determined by a first principle component analysis. Such a procedure, according to the authors of the WJ III and consistent with Jensen (1998), "gives the best statistical estimate of general intelligence" (McGrew & Woodcock, 2001, p. 26).

There has additionally been disagreement as to how to best estimate the $g$-saturation of a particular IQ test battery (Flanagan, McGrew, & Ortiz, 2000). Most commonly, within-battery determination of the $g$-saturation of an instrument is based upon the proportion of variance derived from factor analytic studies. That is, the general factor is commonly estimated from the first unrotated principle factor or principle component in a factor analysis of the test battery (Flanagan et al., 2000; Roid, 2003b; Sattler & Ryan, 2009). However, Roid (2003b) estimated the proportion of variance attributed to $g$ from the square of the overall average $g$ loadings. Though such estimations are known to be downwardly biased and underestimate $g$-loadings (Maynard et al., 2011), they are nonetheless commonly reported. For example, Roid (2003b) estimated the $g$-saturation of the SB5 to range from 56% to 61%. In contrast, the WAIS-III was estimated to have 50% of its variance attributed to the general factor of intelligence (Roid, 2003b). Conversely, Jensen (1998) argued that this methodology would significantly underestimate the actual $g$ saturation of an instrument. Jensen reported that, rather than representing the $g$-saturation of the composite score,

The 'proportion of variance' attributed to a given factor in this case refers only to the average of the variances (the squared factor loadings) of each of the separate subtests. . . . The $g$ loading of the *composite* score (i.e., the sum of the subtest scores), if it could be included in the same factor analysis with all the subtests without affecting their $g$ loadings, would be much larger than the average of the $g$ loadings of the separate subtests, assuming a fair number of subtests. (p. 103)

Completing the calculations suggested by Spearman (Jensen, 1998; Spearman, 1927), each of the major intelligence batteries have composite IQ $g$-loadings greater than .90 with the WAIS-IV, SB5, and WJ III Extended GIA having $g$-loadings greater than .95. However, though these estimates can provide comparative information, they are undoubtedly inflated due to the presence of correlated group factors (Jensen, 1998; Maynard et al., 2011). Jensen (1998) estimated the average $g$-loadings of standard IQ tests to be in the .80s. Ultimately, the true $g$-ness of composite measures must be determined by cross or joint factor analyses of multiple batteries and such data is currently limited, hence, it is difficult to know what value to place on this research. Nonetheless, given the apparent differences across tests in the degree to which the general factor of intelligence is assessed, consideration may need to be given to the relative importance of the $g$-saturation versus domain specific functions of each instrument.

PA-498

### Domain Specific Abilities and Part Scores

Because the general factor of intelligence is domain neutral (nonspecific), a greater depth of information regarding functioning may be revealed by analyzing the domain-specific patterns of neurocognitive abilities. When these abilities diverge markedly within the individual's profile, differences in functional outcome may be seen (Fiorello et al., 2007; cf. Reynolds & Kamphaus, 2003). That is, patterns of intellectual strengths and weaknesses may best be understood by moving beyond the general factor of intelligence and focusing on the underlying broad intellectual abilities (i.e., Fiorello et al., 2001). However, care must be taken in such an approach, as it has been argued that within-person comparisons at the subtest/factor level may lack reliability or add little to the interpretation of the composite full-scale measure for the Wechsler scales (Canivez, 2013; Lichtenberger & Kaufman, 2009; Watkins & Canivez, 2004; cf. Fiorello et al., 2001). Further, as noted above, IQ tests differ in the factors that they measure.

Two of the CHC broad cognitive ability factors are considered most relevant in the assessment of global intelligence—crystallized intelligence (Gc) and fluid intelligence (Gf). Crystallized intelligence (Gc) refers to primarily verbally mediated abilities reflecting the breadth and depth of culturally specific knowledge and processing abilities related to the use of that knowledge (Flanagan et al., 2007). These abilities, including knowledge of vocabulary, fund of information, and facility with language, are acquired during the course of life and education. In contrast, fluid intelligence (Gf) refers to a type of "on the spot" problem-solving ability that allows one to effectively deal with novel problems that cannot be dealt with routinely (Flanagan et al., 2007). As Jensen (2002) observed, "Gf is aptly defined as what you use when you don't know what to do" (p. 47). This ability includes the recognition of patterns, inferential thought, concept formation, analysis, and problem solving—which is often measured using nonverbal stimuli. These factors appear to have a degree of centrality in relationship to other intellectual abilities and are the broad ability factors most closely associated with the general factor of intelligence. Gf and Gc are measured by each of the major intelligence tests.

However, there may also be value in the extent to which an IQ test measures the broad array of CHC factors both in terms of the impact of such factors on the general factor and in terms of understanding an individual's functioning beyond the molar level represented by the general factor. The WJ III Normative Update (Woodcock et al., 2001, 2007) holds the distinction of measuring seven CHC factors, whereas the WAIS-IV and SB5 each measure five such factors. Brief IQ tests typically only measure two factors beyond the general factor—commonly Gc and Gf.

There has been a long-held view that ID is marked by "flat" cognitive profiles. The prevalence of significant discrepancies between factor scores decreases at lower levels of intellectual ability (Wechsler, 2008). Because of this finding, in instances in which there is "part-score" variability (i.e., significant differences between factor scores), some have asserted this to be inconsistent with the diagnosis of ID (Bergeron & Floyd, 2006).

However, in the f
sociate such that
tual ability (Ande
Initial research
necessarily displa
sures of CHC ab
(Bergeron & Floy
that, in children
(scatter) than in
hesitant to dismi
otherwise meets
the diagnosis of
based on significa
ecologically valid
indicates genuine
may have broad i
Utilizing a ne
psychometric me
either a general
ments that funct
and adaptive fun
(2002) used a sys

... if a centra
widespread ef
on the central
from a defect
the effect of lc
central proces

By extension, in
cific, modular co
language functic
alter their develo
ID. In such insta
meaningful relat
dations for the p
score is question

### Comprehensive

There are only a
general factor of

However, in the face of certain neuropathologies, the domain-specific factors may dissociate such that discrepancies can occur between specific modular aspects of intellectual ability (Anderson & Miller, 1998).

Initial research with the WJ III has demonstrated that individuals with ID do not necessarily display a flat cognitive profile when assessed with comprehensive measures of CHC abilities, particularly when the measures vary in terms of g-saturation (Bergeron & Floyd, 2006; see also Van der Molen et al., 2010). These researchers found that, in children with ID, there were significantly greater intra-individual score ranges (scatter) than in average-achieving individuals. Given these findings, one should be hesitant to dismiss the diagnosis of ID because of profile scatter when the individual otherwise meets diagnostic criterion. As Bergeron and Floyd (2006) noted, regarding the diagnosis of ID in children, ". . . failing to make a diagnosis of mental retardation based on significant part score variability may do these children disservice when other ecologically valid evidence of mental retardation (e.g., adaptive behavior skill deficits) indicates genuine need" (p. 429). Therefore, the impact of specific, modular deficiencies may have broad impacts on behavior and adaptation consistent with ID.

Utilizing a neuropsychological model of intellectual functioning, in contrast to a psychometric model, it has been suggested that intellectual disability may arise from either a general deficit in thinking or as the result of more specific, modular impairments that function as gatekeepers to the development of broader intellectual abilities and adaptive functions (Anderson & Miller, 1998; Frith & Happé, 1998). Detterman (2002) used a systems explanation of general intelligence, noting

> . . . if a central process is congenitally weak or has been damaged, it will have a widespread effect on the system because so many other parts of the system rely on the central process. . . . [Deficits in general intellectual functioning may result] from a defect in one or more central processes. The damaged central process has the effect of lowering the efficiency of the entire system. In a sense, the damaged central process sets a limit on performance for the whole system. (p. 235)

By extension, in the case of brain dysfunction or deficiency, impairments in more specific, modular components of, for example, working memory, executive functions, or language functions, may compromise the overall functioning of the individual and alter their developmental trajectory—resulting in deficits in adaptive functioning and ID. In such instances, reliance on part scores may be appropriate when they have a meaningful relationship to the individual's adaptive functioning. Detailed recommendations for the proper use of part scores (when the validity of the full-scale general IQ score is questioned) are discussed in Chapter 7.

### Comprehensive IQ Tests

There are only a limited number of IQ tests available that provide an assessment of the general factor of intelligence as well as multiple broad ability domains. The most widely

PA-500

used instruments, assuming an English-speaking adult without significant sensory or motor impairments, include the SB5 (Roid, 2003a), the WAIS-IV (Wechsler, 2008), and the WJ III (Woodcock et al., 2001, 2007). Clinical practice has generally supported the use of these comprehensive assessment instruments (see also Chapter 7).

## Brief IQ Tests

The rationale for brief IQ tests is based upon the view that it may be most important to evaluate the general factor of intelligence and other central broad abilities, either verbal-crystallized or nonverbal-fluid factors, in terms of differential diagnosis and treatment planning (Glutting, Adams, & Sheslow, 2000). Some have suggested that multidimensional intelligence batteries lack sufficient reliability and validity at the subtest level to justify subtest level interpretation, and that brief measures can determine a full-scale IQ equally well and more efficiently (Canivez & Watkins, 2010; Nelson, Canivez, Lindstrom, & Hatt, 2007). Reynolds and Kamphaus (2003) wrote, "from our research, we have concluded that a strong measure of g coupled with strong measures of verbal and nonverbal intelligence, account for nearly all of the reliable and interpretable variance in the subtests of good intelligence measures" (p. 10). Still others have even questioned the multidimensional nature of tests such as the WAIS-IV as a measure of anything beyond the general factor of intelligence based upon divergent factor structures found with differing factor extraction methods (Canivez & Watkins, 2010).

Brief intelligence tests, such as the RIAS (Reynolds & Kamphaus, 2003), the Wide Range Intelligence Test (WRIT; Glutting et al., 2000), the Kaufman Brief Intelligence Test, Second Edition (KBIT-2; Kaufman & Kaufman, 2004), and the Wechsler Abbreviated Scale of Intelligence-II (WASI-II; McCrimmon & Smith, 2012; Wechsler, 2011), primarily provide evidence of intellectual functioning at the level of general intellectual ability without multidimensional elements of intellectual functioning beyond the broad verbal and nonverbal level. Careful consideration should be given to the role, if any, that such instruments might play in the comprehensive assessment of ID. These brief IQ tests may be most appropriate for screening purposes, to supplement the information from a comprehensive IQ test, or in circumstances in which restrictions to motor movements necessitate a test that has minimal motor demands. Considerable caution should be exercised in the use of brief IQ tests in the evaluation of ID. Because detailed reviews of these briefer tests are beyond the scope of this work, readers are referred to the specific test manuals and secondary works.

## Alternative IQ Tests

Other instruments, focusing on domain-specific measures of intellectual functioning include the BETA-III (Kellogg & Morton, 1999), the Test of Non-Verbal Intelligence-4 (TONI-4; Brown, Sherbenou, & Johnson, 2010), the Comprehensive Test of Nonverbal Intelligence, Second Edition (CTONI-2; Hammill, Pearson, & Weiderholt, 2009), the General Ability Measure for Adults (GAMA; Naglieri & Bardos, 1997), and the Raven's

Progressive Matr
dimensional inst
However, such in
or other issues
screeners (NRC,
tion parameters
source of inform

Other instru
speaking popula
de Inteligencia
2002b), a deriva
Muñoz (Muñoz
Woodcock-Johr
Fernández, & P
Care must be ex
by the examine

## Summary an

The assessment
sis of ID. An u
intelligence is
relied upon co
tioning in mak
decision as to
testing, instru
and specific fa
adequacy of th
tion might aff
Flynn effect to

More speci
For example:

- Is the ins
  measure
- Does the
  oppose
- Are the
  the curr
  ethnicit
- What is
  scores (

Progressive Matrices and related measures (Raven, Raven, & Court, 2000). These uni-dimensional instruments, if not "culture-fair," tend to be somewhat "culture-reduced." However, such instruments should only have a role in circumstances in which language or other issues preclude a comprehensive assessment of intelligence or as cognitive screeners (NRC, 2002). In addition, group IQ tests, because of uncertain administration parameters and limited breadth of coverage, should not be used as the primary source of information in the diagnosis of ID.

Other instruments have been developed to measure intelligence in non-English speaking populations, notably Spanish speakers. These instruments include the Escala de Inteligencia de Wechsler para Adultos–Tercera Edicion (EIWA-III; Wechsler, 2002b), a derivative of the WAIS-III with Puerto Rican norms; Batería III Woodcock-Muñoz (Muñoz-Sandoval, Woodcock, McGrew, & Mather, 2005), an alternative to the Woodcock-Johnson III; and Escalas de Inteligencia de Reynolds (Reynolds, Kamphaus, Fernández, & Pinto, 2009), a European Spanish translation of the RIAS with norms. Care must be exercised in the use of such instruments to ensure that the dialect spoken by the examinee matches that of the normative sample.

## Summary and Conclusion

The assessment of intellectual functioning is the first of the three prongs in the diagnosis of ID. An understanding of the available instruments used for the measurement of intelligence is essential to fairly identifying those with ID. Contemporary practice has relied upon comprehensive, individually administered measures of intellectual functioning in making the determination of possible deficits in intelligence. In making the decision as to which instrument(s) to utilize, or in critiquing the adequacy of prior testing, instruments can be evaluated according to which general intellectual abilities and specific factors are assessed; the psychometric properties of the instrument; the adequacy of the normative sample size; how language, culture, and level of acculturation might affect the findings; and the specific application of practice effects and the Flynn effect to obtained scores.

More specifically, IQ instruments can be evaluated across a number of parameters. For example:

- Is the instrument an individually administered, reliable, and valid comprehensive measure of general intellectual functioning?
- Does the instrument measure at least three or more broad intellectual abilities as opposed to only the general factor of intelligence?
- Are the normative comparison samples large and adequately representative of the current population according to the demographic characteristics of age, race/ethnicity, gender, education, socioeconomic status, and geographic location?
- What is the impact that language and culture might have on obtained IQ test scores (see also Chapter 16)?

PA-502

- Do the interpretive procedures avoid the use of demographically corrected sub-group norms, e.g., norms based on race/ethnicity, gender, and education (excepting age) in the determination of an IQ test score?
- Does the interpretive process allow for the use of composite (full-scale) IQ in order to provide the most reliable and valid information regarding an individual's general level of intellectual functioning as well as the use of subcomponent or part scores that may be of significance when they have meaningful relationships to the individual's adaptive functioning?

It is important to reiterate the fact that obtained IQ scores only approximate an underlying "true" score. Clinical, and now legal, standards emphasize consideration of the *SEM* when making diagnostic conclusions, and attention also should be given to potential practice effects as well as the influence of norm obsolescence in determining the accuracy of a given score. Finally, the results of IQ testing must be meaningfully integrated with the assessment of adaptive functions in order to accurately assess for the presence of ID.

Refer

Ameri-
  thii
  15(
Amer:
  ps'
  Th
Amei
  C
  te
Ame
  (!
And
  I
Axe

Ba

Be

B
B

1

PA-503

## References

American Academy of Clinical Neuropsychology. (2001). Policy statement on the presence of third party observers in neuropsychological assessments. *The Clinical Neuropsychologist*, *15*(4), 433–439. http://dx.doi.org/10.1076/clin.15.4.433.1888

American Academy of Clinical Neuropsychology. (2007). American Academy of Clinical Neuropsychology (AACN) practice guidelines for neuropsychological assessment and consultation. *The Clinical Neuropsychologist*, *21*(2), 209–231. http://dx.doi.org/10.1080/13825580601025932

American Educational Research Association, American Psychological Association, & National Council on Measurement in Education. (2014). *Standards for educational and psychological testing*. Washington, DC: American Educational Research Association.

American Psychiatric Association. (2013). *Diagnostic and statistical manual of mental disorders* (5th ed.; *DSM5*). Arlington, VA: American Psychiatric Association.

Anderson, M., & Miller, K. L. (1998). Modularity, mental retardation and speed of processing. *Developmental Science*, *1*(2), 239–245. http://dx.doi.org/10.1111/1467-7687.00037

Axelrod, B., Barth, J., Faust, D., Fisher, J., Heilbronner, R., Larrabee, G., . . . Silver, C. (2000). Presence of third party observers during neuropsychological testing: Official statement of the National Academy of Neuropsychology. *Archives of Clinical Neuropsychology*, *15*(5), 379–380. http://dx.doi.org/10.1093/arclin/15.5.379

Basso, M. R., Carona, F. D., Lowery, N., & Axelrod, B. N. (2002). Practice effects on the WAIS-III across 3- and 6-month intervals. *The Clinical Neuropsychologist*, *16*(1), 57–63. http://dx.doi.org/10.1076/clin.16.1.57.8329

Becker, K. A. (2003). *History of the Stanford-Binet intelligence scales: Content and psychometrics. (Stanford-Binet Intelligence Scales, Fifth Edition Assessment Service Bulletin No. 1)*. Itasca, IL: Riverside Publishing. http://www.assess.nelson.com/pdf/sb5-asb1.pdf

Beckworth v. State, 2009 Ala. Crim. App. LEXIS 64, 61–62 (Ala. Crim. App. May 1, 2009).

Bergeron, R., & Floyd, R. G. (2006). Broad cognitive abilities of children with mental retardation: An analysis of group and individual profiles. *American Journal on Mental Retardation*, *111*(6), 417–432. http://dx.doi.org/10.1352/0895-8017(2006)111[417:BCAOCW]2.0.CO;2

Braden, J. P., & Niebling, B. C. (2012). Using the Joint Test Standards to evaluate the validity evidence for intelligence tests. In D. P. Flanagan & P. L. Harrison (Eds.), *Contemporary intellectual assessment: Theories, tests, and issues* (3rd ed., pp. 739–757). New York, NY: Guilford Press.

Bridges, A. J., & Holler, K. A. (2007). How many is enough? Determining optimal sample sizes for normative studies in pediatric neuropsychology. *Child Neuropsychology*, *13*, 528–538.

Brooks, B. L., Sherman, E. M., Iverson, G. L., Slick, D. J., & Strauss, E. (2011). Psychometric foundations for the interpretation of neuropsychological results. In M. R. Schoenberg & J. G. Scott (Eds.), *The little black book of neuropsychology* (pp. 893–922). New York, NY: Springer.

Brooks, B. L., Strauss, E., Sherman, E. S., Iverson, G. L., & Slick, D. J. (2009). Developments in neuropsychological assessment: Refining psychometric and clinical interpretive methods. *Canadian Psychology/Psychologie Canadienne*, *50*(3), 196–209. http://dx.doi.org/10.1037/a0016066

Brown, L., Sherbenou, R. J., & Johnson, S. K. (2010). *Test of Nonverbal Intelligence, fourth edition (TONI-4)*. Austin, TX: Pro-Ed.

Buckhalt, J. (2002). A short history of *g*: Psychometrics' most enduring and controversial construct. *Learning and Individual Differences*, *13*(2), 101–114. http://dx.doi.org/10.1016/S1041-6080(02)00074-2

Bush, S., Ruff, R., Troster, A., Barth, J., Koffler, S., Pliskin, N., . . . Silver, C. (2005). Symptom validity assessment: Practice issues and medical necessity–NAN Policy & Planning

Committee. *Archives of Clinical Neuropsychology, 20*(4), 419–426. http://dx.doi.org/10.1016/j. acn.2005.02.002

Butler v. Quarterman, 576 F. Supp. 2d 805, 812 (S.D. Tex. 2008).

Canivez, G. L. (2013, May 6). Incremental criterion validity of WAIS-IV Factor Index Scores: Relationships with WIAT-II and WIAT-III subtest and composite scores. *Psychological Assessment.* Advance online publication. http://dx.doi.org/10.1037/a0032092

Canivez, G. L. & Watkins, M. W. (2010). Investigation of the factor structure of the Wechsler Adult Intelligence Scale—Fourth edition (WAIS-IV): Exploratory and higher order factor analyses. *Psychological Assessment, 22*(4), 827–36.

Carroll, J. B. (1993). *Human cognitive abilities: A survey of factor-analytic studies.* New York, NY: Cambridge University Press.

Coalson, D., & Weiss, L. (2002, Spring). The evolution of Wechsler intelligence scales in historical perspective. *Assessment Focus Newsletter, 11*, 1–3. Retrieved May 26, 2013, from http://www. pearsonassessments.com/NR/rdonlyres/6F6A90D0-9EF9-41CC-BF21-EB3FE7E9A5B2/0/ Assess_Focus_Spring_02.pdf

Colom, R., Abad, F. J., Garcia, L. F., & Juan-Espinosa, M. (2002). Education, Wechsler's Full Scale IQ, and *g. Intelligence, 30*, 449–462.

Committee on Psychological Tests and Assessment-American Psychological Association. (2007). *Statement on third party observers in psychological testing and assessment: A framework for decision making.* Retrieved from http://www.apa.org/science/programs/testing/ third-party-observers.pdf

Crawford, J. R., & Garthwaite, P. H. (2008). On the "optimal" size for normative samples in neuropsychology: Capturing the uncertainty associated with the use of normative data to quantify the standing of a neuropsychological test score. *Child Neuropsychology, 14*, 99–117. doi: 10.1080/09297040801894709

Daniel, M. H. (2000). Interpretation of intelligence test scores. In R. J. Sternberg (Ed.), *Handbook of intelligence* (pp. 477–491). New York, NY: Cambridge University Press.

Dean, A., Victor, T., Boone, K., & Arnold, G. (2008). The relationship of IQ to effort test performance. *The Clinical Neuropsychologist, 22*(4), 705–722. http://dx.doi.org/10.1080/13854040701440493

Demetriou, A. (2002). Tracing psychology's invisible giant and its visible guards. In R. J. Sternberg & E. L. Grigorenko (Eds.), *The general factor of intelligence: How general is it?* (pp. 3–18). Mahwah, NJ: L. Erlbaum Associates.

Detterman, D. K. (2002). General intelligence: Cognitive and biological explanations. In R. J. Sternberg & E. L. Grigorenko (Eds.), *The general factor of intelligence: How general is it?* (pp. 223–243). Mahwah, NJ: L. Erlbaum Associates.

Detterman, D., & Daniel, M. (1989). Correlations of mental tests with each other and with cognitive variables are highest for low IQ groups. *Intelligence, 13*(4), 349–359. http://dx.doi. org/10.1016/S0160-2896(89)80007-8

Estevis, E., Basso, M. R., & Combs, D. (2012). Effects of practice on the Wechsler Adult Intelligence Scale-IV across 3- and 6-month intervals. *The Clinical Neuropsychologist, 26*(2), 239–254. http://dx.doi.org/10.1080/13854046.2012.659219

Ex Parte Eric Dewayne Cathey, Cause No. 713189-B (Dist. Ct. Harris County, TX 2012).

Fiorello, C. A., Hale, J. B., Holdnack, J. A., Kavanagh, J. A., Terrell, J., & Long, L. (2007). Interpreting intelligence test results for children with disabilities: Is global intelligence relevant? *Applied Neuropsychology, 14*(1), 2–12. doi: 10.1080/09084280701280338

Fiorello, C. A., Hale, J. B., McGrath, M., Ryan, K., & Quinn, S. (2001). IQ interpretation for children with flat and variable test profiles. *Learning and Individual Differences, 13*(2), 115–125. http://dx.doi.org/10.1016/S1041-6080(02)00075-4

Flanagan, *theory:*
Flanagan, ed.). H
Fletcher, J
Flynn 473. ht
Floyd, R. ( .Are C *School*
Floyd, R. for prc http://
Floyd, R ability positic org/1(
Flynn, J. F appro:
Frith, U., develc dx.doi
Garlick, J indivi *109*(1;
Gignac, ( brain *ute to*
Glutting, Wilm
Gottfred: 79–13
Gould, S
Gresham penal
Hagan, I ing I( org/1
Haier, R. neurc *R. Jer*
Hall v. J opini
Hammil *Intell*
Hart, C. Chilc risk i

Flanagan, D. P., McGrew, K. S., & Ortiz, S. O. (2000). *The Wechsler intelligence scales and Gf-Gc theory: A contemporary approach to interpretation*. Boston, MA: Allyn and Bacon.

Flanagan, D. P., Ortiz, S. O., & Alfonso, V. C. (2007). *Essentials of cross-battery assessment* (2nd ed.). Hoboken, NJ: John Wiley & Sons.

Fletcher, J. M., Stuebing, K. K., & Hughes, L. C. (2010). IQ scores should be corrected for the Flynn Effect in high-stakes decisions. *Journal of Psychoeducational Assessment, 28*(5), 469–473. http://dx.doi.org/10.1177/0734282910373341

Floyd, R. G., Bergeron, R., McCormack, A. C., Anderson, J. L., & Hargrove-Owens, G. L. (2005). Are Cattell-Horn-Carroll broad ability composite scores exchangeable across batteries? *School Psychology Review, 34*(3), 329–357.

Floyd, R. G., Clark, M. H., & Shadish, W. R. (2008). The exchangeability of IQs: Implications for professional psychology. *Professional Psychology: Research and Practice, 39*(4), 414–423. http://dx.doi.org/10.1037/0735-7028.39.4.414

Floyd, R. G., Shands, E. I., Rafael, F. A., Bergeron, R., & McGrew, K. S. (2009). The dependability of general-factor loadings: The effects of factor-extraction methods, test battery composition, test battery size, and their interactions. *Intelligence, 37*(5), 453–465. http://dx.doi.org/10.1016/j.intell.2009.05.003

Flynn, J. R. (2009). The WAIS-III and WAIS-IV: Daubert motions favor the certainly false over the approximately true. *Applied Neuropsychology, 16*, 98–104. doi: 10.1080/09084280902864360

Frith, U., & Happé, F. (1998). Why specific developmental disorders are not specific: On-line and developmental effects in autism and dyslexia. *Developmental Science, 1*(2), 267–272. http://dx.doi.org/10.1111/1467-7687.00041

Garlick, D. (2002). Understanding the nature of the general factor of intelligence: The role of individual differences in neural plasticity as an explanatory mechanism. *Psychological Review, 109*(1), 116–136. http://dx.doi.org/10.1037//0033-295X.109.1.116

Gignac, G., Vernon, P. A., & Wickett, J. C. (2003). Factors influencing the relationship between brain size and intelligence. In H. Nyborg (Ed.), *The scientific study of general intelligence: Tribute to Arthur R. Jensen* (pp. 93–106). Amsterdam, Netherlands: Pergamon.

Glutting, J., Adams, W., & Sheslow, D. (2000). *WRIT: Wide Range Intelligence Test manual*. Wilmington, DE: Wide Range.

Gottfredson, L. S. (1997). Why g matters: The complexity of everyday life. *Intelligence, 24*(1), 79–132. http://dx.doi.org/10.1016/S0160-2896(97)90014-3

Gould, S. J. (1996). *The mismeasure of man*. New York, NY: Norton.

Gresham, F. M., & Reschly, D. J. (2011). Standard of practice and Flynn Effect testimony in death penalty cases. *Intellectual and Developmental Disabilities, 49*(3), 131–140.

Hagan, L. D., Drogin, E. Y., & Guilmette, T. J. (2010). Science rather than advocacy when reporting IQ scores. *Professional Psychology: Research and Practice, 41*(5), 420–423. http://dx.doi.org/10.1037/a0021077

Haier, R. J. (2003). Positron emission tomography studies of intelligence: From psychometrics to neurobiology. In H. Nyborg (Ed.), *The scientific study of general intelligence: Tribute to Arthur R. Jensen* (pp. 41–51). Amsterdam, Netherlands: Pergamon.

Hall v. Florida, No. 12-10882, slip op. (U.S. May 27, 2014), http://www.supremecourt.gov/opinions/13pdf/12-10882_kkg1.pdf

Hammill, D. D., Pearson, N. A., & Weiderholt, J. L. (2009). *Comprehensive Test of Nonverbal Intelligence—Second Edition (CTONI-2)*. Austin, TX: Pro-Ed.

Hart, C. L., Taylor, M. D., Smith, G. D., Whalley, L. J., Starr, J., Hole, D. J., . . . Deary, I. J. (2003). Childhood IQ, social class, deprivation, and their relationships with mortality and morbidity risk in later life: Prospective observational study linking the Scottish Mental Survey 1932 and

**PA-506**

the Midspan Studies. *Psychosomatic Medicine, 65*(5), 877–883. http://dx.doi.org/10.1097/01. PSY.0000088584.82822.86

Heaton, R. K., Miller, S. W., Taylor, M. J., & Grant, I. (2004). *Revised comprehensive norms for an expanded Halstead-Reitan Battery: Demographically adjusted neuropsychological norms for African American and Caucasian Adults.* Lutz, FL: Psychological Assessment Resources.

Heaton, R. K., Temkin, N., Dikmen, S., Avitable, N., Taylor, M. J., Marcotte, T. D., & Grant, I. (2001). Detecting change: A comparison of three neuropsychological methods, using normal and clinical samples. *Archives of Clinical Neuropsychology, 16*(1), 75–91. http://dx.doi. org/10.1093/arclin/16.1.75

Henson, R. K. (2001). Understanding internal consistency reliability estimates: A conceptual primer on Coefficient Alpha. *Measurement & Evaluation in Counseling and Development, 34*(3), 177–189.

Iverson, G. L. (2010). Detecting exaggeration, poor effort, and malingering in neuropsychology. In A. M. Horton, Jr. & L. C. Hartlage (Eds.), *Handbook of forensic neuropsychology, second edition* (pp. 91–135). New York, NY: Springer Pub.

Jensen, A. R. (1980). *Bias in mental testing.* New York, NY: Free Press.

Jensen, A. R. (1998). *The g factor: The science of mental ability.* Westport, CT: Praeger.

Jensen, A. R. (2002). Psychometric g: Definition and substantiation. In R. J. Sternberg & E. L. Grigorenko (Eds.), *The general factor of intelligence: How general is it?* (pp. 39–53). Mahwah, NJ: L. Erlbaum Associates.

Johnson, W., Bouchard, T. J., Jr., Krueger, R. F., McGue, M., & Gottesman, I. I. (2004). Just one g: Consistent results from three test batteries. *Intelligence, 32*(1), 95–107. http://dx.doi. org/10.1016/S0160-2896(03)00062-X

Johnson, W., te Nijenhuis, J., & Bouchard, T., Jr. (2008). Still just 1 g: Consistent results from five test batteries. *Intelligence, 36*(1), 81–95. http://dx.doi.org/10.1016/j.intell.2007.06.001

Kaufman, A. S. (2009). *IQ testing 101.* New York, NY: Springer Pub.

Kaufman, A. S., & Kaufman, N. L. (2004). *Kaufman Brief Intelligence Test* (2nd ed.). Bloomington, MN: Pearson.

Kellogg, C. E., & Morton, N. W. (1999). *Beta III.* San Antonio, TX: The Psychological Corporation.

Keith, T. Z., & Reynolds, M. R. (2010). Cattell–Horn–Carroll abilities and cognitive tests: What we've learned from 20 years of research. *Psychology in the Schools, 47*, 635–650. doi: 10.1002/ pits.20496

Kranzler, J. H., & Jensen, A. R. (1991). The nature of psychometric g: Unitary process or a number of independent processes? *Intelligence, 15*(4), 397–422.

Lichtenberger, E. O., & Kaufman, A. S. (2009). *Essentials of WAIS-IV assessment.* Hoboken, NJ: Wiley.

Lineweaver, T. T., & Chelune, G. J. (2003). Use of the WAIS-III and WMS-III in the context of serial assessments. Interpreting reliable and meaningful change. In D. S. Tulsky, D. H. Saklofske, G. J. Chelune, R. J. Ivnik, A. Prifitera, R. K. Heaton, et al. (Eds.), *Clinical interpretation of the WAIS III and WMS III* (pp. 303–337). New York, NY: Academic Press.

Loring, D. W., & Bauer, R. M. (2010). Testing the limits: Cautions and concerns regarding the new Wechsler IQ and Memory scales. *Neurology, 74*(8), 685–690. http://dx.doi.org/10.1212/ WNL.0b013e3181d0cd12

Luders, E., Narr, K. L., Thompson, P. M., & Toga, A. W. (2009). Neuroanatomical correlates of intelligence. *Intelligence, 37*(2), 156–163. http://dx.doi.org/10.1016/j.intell.2008.07.002

Mackintosh, N. J. (2011). *IQ and human intelligence* (2nd ed.). New York, NY: Oxford University Press.

Matarazzo, J. D., & Herman, D. O. (1984). Base rate data for the WAIS-R: Test-Retest stability and VIQ-PIQ differences. *Journal of Clinical Neuropsychology, 6*(4), 351–366. http://dx.doi. org/10.1080/01688638408401227

Maynard, J. L., Floyd, R. G., Acklie, T. J., & Houston, L., III. (2011). General factor loadings and specific effects of the Differential Ability Scale, Second Edition composites. *School Psychology Quarterly, 26*(2), 108–118. doi: 10.1037/a0023025

McCrimmon, A., & Smith, A. (2012). Review of the Wechsler Abbreviated Scale of Intelligence, Second Edition (WASI-II). *Journal of Psychoeducational Assessment*. Retrieved from http://jpa.sagepub.com/content/early/2012/12/04/0734282912467756.citation

McDaniel, M. (2005). Big-brained people are smarter: A meta-analysis of the relationship between in vivo brain volume and intelligence. *Intelligence, 33*(4), 337–346. http://dx.doi.org/10.1016/j.intell.2004.11.005

McGrew, K. S. (1997). Analysis of the major intelligence batteries according to a proposed comprehensive Gf-Gc framework. In D. P. Flanagan, J. Genshaft, & P. L. Harrison (Eds.), *Contemporary intellectual assessment: Theories, tests, and issues* (pp. 151–179). New York, NY: Guilford Press.

McGrew, K. S. (2005). The Cattell–Horn–Carroll theory of cognitive abilities. In D. P. Flanagan & P. L. Harrison (Eds.) *Contemporary intellectual assessment: Theories, tests, and issues* (2nd ed., pp. 136–181). New York, NY: Guilford Press.

McGrew, K. S. (2009). Editorial: CHC theory and the human cognitive abilities project: Standing on the shoulders of the giants of psychometric intelligence research. *Intelligence, 37*, 1–10. doi:10.1016/j.intell.2008.08.004

McGrew, K. S., & Flanagan, D. P. (1998). *The intelligence test desk reference (ITDR): Gf-Gc cross-battery assessment*. Needham Heights, MA: Allyn and Bacon.

McGrew, K. S., LaForte, E. M., & Schrank, F. A. (2014). *Technical manual. Woodcock-Johnson IV.* Rolling Meadows, IL: Riverside.

McGrew, K. S., Woodcock, R. W., & Schrank, K. A. (2007). *Woodcock-Johnson III normative update technical manual.* Rolling Meadows, IL: Riverside.

McGrew, K. S., Werder, J. K., & Woodcock, R. W. (1991). *Woodcock-Johnson technical manual.* Allen, TX: DLM.

McGrew, K. S., & Woodcock, R. W. (2001). *Technical manual. Woodcock-Johnson III Tests of Cognitive Abilities.* Itasca, IL: Riverside Pub.

Muñoz-Sandoval, A. F., Woodcock, R. W., McGrew, K. S., & Mather, N. (2005). *Batería III Woodcock-Muñoz.* Itasca, IL: Riverside Publishing.

Naglieri, J. A., & Bardos, A. N. (1997). *GAMA (General Ability Measure for Adults) manual.* Minneapolis, MN: National Computer Systems.

National Research Council. (2002). *Mental retardation: Determining eligibility for social security benefits* (Committee on Disability Determination for Mental Retardation—D. J. Reschly, T. G. Myers, & C. R. Hartel, Eds.). Washington, DC: National Academy Press.

Neisser, U., Boodoo, G., Bouchard, T. J., Boykin, A. W., Brody, N., Ceci, S. J., . . . Urbina, S. (1996). Intelligence: Knowns and unknowns. *American Psychologist, 51*(2), 77–101. http://dx.doi.org/10.1037//0003-066X.51.2.77

Nelson, J. M., Canivez, G. L., Lindstrom, W., & Hatt, C. V. (2007). Higher-order exploratory factor analysis of the Reynolds Intellectual Assessment Scales with a referred sample. *Journal of School Psychology, 45*(4), 439–456. http://dx.doi.org/10.1016/j.jsp.2007.03.003

O'Toole, B. I. (1990). Intelligence and behaviour and motor vehicle accident mortality. *Accident Analysis & Prevention, 22*(3), 211–221. http://dx.doi.org/10.1016/0001-4575(90)90013-B

Patja, K., Iivanainen, M., Vesala, H., Oksanen, H., & Ruoppila, I. (2000). Life expectancy of people with intellectual disability: A 35-year follow-up study. *Journal of Intellectual Disability Research, 44*(5), 591–599. http://dx.doi.org/10.1046/j.1365-2788.2000.00280.x

Pearson. (2009). *Advanced clinical solutions for WAIS-IV and WMS-IV: Administration and scoring manual.* San Antonio, TX: Author.

People v. Superior Court (Vidal), 129 Cal. App. 4th 434, 471 (Cal. App. 5th Dist. 2005)

People v. Superior Court (Vidal), 40 Cal. 4th 999, 1007 (Cal. 2007)

Pizzuto v. Blades, 2012 U.S. Dist. LEXIS 2786, 23–24 (D. Idaho Jan. 10, 2012)

Raven, J., Raven, J. C., & Court, J. H. (2000). *Manual for Raven's progressive matrices and vocabulary scales (including the parallel and plus versions)*. Oxford, England: OP Limited.

Reynolds, C. R., & Kamphaus, R. W. (2003). *RIAS (Reynolds Intellectual Assessment Scales) and the RIST (Reynolds Intellectual Screening Test): Professional manual*. Lutz, FL: Psychological Assessment Resources.

Reynolds, C. R., Kamphaus, R. W., Fernández, P. S., & Pinto, I. F. (2009). *RIAS: Escalas de Inteligencia de Reynolds y RIST: Test de Inteligencia Breve de Reynolds*. Madrid, Spain: TEA.

Reynolds, M. R., Keith, T. Z., & Beretvas, S. N. (2010). Use of factor mixture modeling to capture Spearman's law of diminishing returns. *Intelligence, 38*(2), 231–241. http://dx.doi.org/10.1016/j.intell.2010.01.002

Roid, G. H. (2003a). *Stanford–Binet Intelligence Scales, fifth edition*. Itasca, IL: Riverside Publishing.

Roid, G. H. (2003b). *Stanford–Binet Intelligence Scales, fifth edition, technical manual*. Itasca, IL: Riverside Publishing.

Roid, G. H., & Pomplun, M. (2012). The Stanford–Binet Intelligence Scales, fifth edition. In D. P. Flanagan & P. L. Harrison (Eds.), *Contemporary intellectual assessment: Theories, tests, and issues* (pp. 249-268). New York, NY: Guilford Press.

Salekin, K., & Doane, B. (2009). Malingering intellectual disability: The value of available measures and methods. *Applied Neuropsychology, 16*(2), 105–113. http://dx.doi.org/10.1080/09084280902864485

Sattler, J. (2001). *Assessment of children: Cognitive applications* (4th ed.). San Diego, CA: Jerome M. Sattler, Publisher, Inc.

Sattler, J. M., & Ryan, J. J. (2009). *Assessment with the WAIS-IV*. San Diego, CA: Jerome M. Sattler, Publisher, Inc.

Schalock, R. L., Borthwick-Duffy, S. A., Bradley, V. J., Buntinx, W. H., Coulter, D. L., Craig, E. M., Gomez, S. C., Lachapelle, Y., Luckasson, R., Reeve, A., Shogren, K. A., Snell, M. E., Spreat, S., Tasse, M. J., Thompson, J. R., Verdugo-Alonso, M. A., Wehmeyer, M. L., & Yeager, M. H. (2010). *Intellectual disability: Definition, classification, and systems of supports* (11th ed.). Washington, DC: American Association on Intellectual and Developmental Disabilities.

Schalock, R. L., Buntinx, W., Borthwick-Duffy, S., Luckasson, R., Snell, M., Tassé, M. J., & Wehmeyer, M. (2007). *User's guide: Mental retardation: Definition, classification, and systems of supports* (10th ed.). Washington, DC: American Association on Intellectual and Developmental Disabilities.

Schneider, W. J. (2012, January 13). *Can't decide which IQ is best? Make a composite IQ score* (Issue brief). Retrieved from http://assessingpsyche.wordpress.com/2012/01/13/cant-decide-which-iq-is-best-make-a-composite-iq-score/

Schneider, W. J. (2013a). What if we took our models seriously? Estimating latent scores in individuals. *Journal of Psychoeducational Assessment, 31*(2), 186–201. http://dx.doi.org/10.1177/0734282913478046

Schneider, W. J. (2013b). Principles of assessment of aptitude and achievement. In D. H. Saklofske, C. R. Reynolds, & V. L. Schwean (Eds.), *The Oxford handbook of child psychological assessment* (pp. 286–330). Oxford: Oxford University Press.

Schneider, W. J., & McGrew, K. (2012). The Cattell-Horn-Carroll model of intelligence. In D. Flanagan & P. Harrison (Eds.), *Contemporary intellectual assessment: Theories, tests, and issues* (3rd ed. pp. 99–144). New York, NY: Guilford.

Spearman, C. (1927). *The abilities of man; their nature and measurement.* New York, NY: Mac-millan, reprinted by Kessinger Publishing.

Spitz, H. H. (1988). Wechsler subtest patterns of mentally retarded groups: Relationship to *g* and to estimates of heritability. *Intelligence, 12*(3), 279–297.

Stankov, L. (2002). *g:* The diminutive general. In R. J. Sternberg & E. L. Grigorenko (Eds.), *The general factor of intelligence: How general is it?* (pp. 19–37). Mahwah, NJ: L. Erlbaum Associates.

Stankov, L. (2005). *g* factor - Issues of design and interpretation. In O. Wilhelm & R. W. Engle (Eds.), *Handbook of understanding and measuring intelligence* (pp. 279–293). Thousand Oaks, CA: Sage Publications.

Sternberg, R. J., & Grigorenko, E. L. (Eds.). (2002). *The general factor of intelligence: How general is it?* Mahwah, NJ: L. Erlbaum Associates.

Tellegen, A., & Briggs, P. F. (1967). Old wine in new skins: Grouping Wechsler subtests into new scales. *Journal of Consulting Psychology, 31*(5), 499–506. http://dx.doi.org/10.1037/h0024963

Temkin, N. R., Heaton, R. K., Grant, I., & Dikmen, S. S. (1999). Detecting significant change in neuropsychological test performance: A comparison of four models. *Journal of the International Neuropsychological Society, 5*(4), 357–369. http://dx.doi.org/10.1017/S1355617799544068

Thorndike, R. (1987). Stability of factor loadings. *Personality and Individual Differences, 8*(4), 585–586. http://dx.doi.org/10.1016/0191-8869(87)90224-8

Thorson v. State, 76 So. 3d 667, 671-672 (Miss. 2011)

Trahan, L. H., Stuebing, K. K., Fletcher, J. M., & Hiscock, M. (2014, June 30). The Flynn effect: A meta-analysis. *Psychological Bulletin.* Advance online publication. http://dx.doi.org/10.1037/a0037173

United States v. Davis, 611 F. Supp. 2d 472, 488 (D. Md. 2009)

United States v. Hardy, 762 F. Supp. 2d 849, 866 (E.D. La. 2010)

United States v. Wilson, 2013 U.S. Dist. LEXIS 16872, 43-44 (E.D.N.Y. Feb. 7, 2013)

Urbina, S. (2011). Tests of intelligence. In R. J. Sternberg & S. B. Kaufman (Eds.), *The Cambridge handbook of intelligence* (pp. 20–38). Cambridge: Cambridge University Press.

VandenBos, G. R. (2007). *APA dictionary of psychology.* Washington, DC: American Psychological Association.

Van der Molen, M., Huizinga, M., Huizenga, H., Ridderinkhof, K., Van der Molen, M., Hamel, B., . . . Ramakers, G. (2010). Profiling Fragile X Syndrome in males: Strengths and weaknesses in cognitive abilities. *Research in Developmental Disabilities, 31*(2), 426–439. http://dx.doi.org/10.1016/j.ridd.2009.10.013

Wasserman, J. D., & Bracken, B. A. (2012). Fundamental psychometric considerations in assessment. In I. B. Weiner, J. R. Graham, & J. A. Naglieri (Eds.), *Handbook of Psychology, Volume 10: Assessment Psychology.* (2nd ed., pp. 153–229). Hoboken, NJ: John Wiley & Sons.

Watkins, M. W., & Canivez, G. L. (2004). Temporal stability of WISC-III subtest composite: Strengths and weaknesses. *Psychological Assessment, 16*(2), 133–138. http://dx.doi.org/10.1037/1040-3590.16.2.133

Wechsler, D. (1991) *Wechsler Intelligence Scale for Children, third edition (WISC-III): Manual.* San Antonio, TX: Psychological Corporation.

Wechsler, D. (2002a). *WAIS-III, Wechsler Adult Intelligence Scale, third edition: WMS-III, Wechsler Memory Scale, third edition: Technical manual. Updated.* San Antonio, TX: Psychological Corporation.

Wechsler, D. (2002b). *WAIS-III. Escala de Inteligencia para Adultos de Wechsler—Tercera Edición.* Buenos Aires, Brazil: Paidos.

Wechsler, D. (2008). *WAIS-IV: Technical and interpretive manual.* San Antonio, TX: Pearson.

Wechsler, D. (2011). *Wechsler Abbreviated Scale of Intelligence, Second Edition*. San Antonio, TX: NCS Pearson.

Weiss, L. G. (2010). Considerations on the Flynn effect. *Journal of Psychoeducational Assessment, 28*(5), 482–493. http://dx.doi.org/10.1177/0734282910373572

Whalley, L. J., & Deary, I. J. (2001). Longitudinal cohort study of childhood IQ and survival up to age 76. *British Medical Journal, 322*(7290), 819. Retrieved from http://www.ncbi.nlm.nih.gov/pmc/articles/PMC30556/pdf/819.pdf

Whitaker, S. (2008). The stability of IQ in people with low intellectual ability: An analysis of the literature. *Intellectual and Developmental Disabilities, 46*(2), 120–128. http://dx.doi.org/10.1352/0047-6765(2008)46[120:TSOIIP]2.0.CO;2

Woodcock, R. W., McGrew, K. S., Schrank, F. A., & Mather, N. (2001, 2007). *Woodcock-Johnson III normative update*. Rolling Meadows, IL: Riverside Pub.

Zhou, X., Zhu, J., & Weiss, L. G. (2010). Peeking inside the "black box" of the Flynn Effect: Evidence from three Wechsler instruments. *Journal of Psychoeducational Assessment, 28*(5), 399–411. http://dx.doi.org/10.1177/0734282910373340

# The DEATH PENALTY and INTELLECTUAL DISABILITY

## Edward A. Polloway, Editor



**aaidd**
American Association
on Intellectual and
Developmental Disabilities

PA-512

# 10 | Norm Obsolescence: The Flynn Effect

Kevin S. McGrew

## Nature of the Problem

A person's IQ test score is based on the comparison of the person's tested performance to an age-appropriate norm reference group. The *norms* for an IQ test are developed to represent the snapshot of the general U.S. population (at each age level the test covers) at the time the norm or standardization data are collected (American Educational Research Association, American Psychological Association, & National Council on Measurement in Education [AERA, APA, NCME], 1999). (VandenBos, 2007, defines a norm as "a standard or range of values that represents the typical performance of a group or of an individual [of a certain age, for example] against which comparisons can be made" [p. 631]). The person's test performance is compared to this standard reference group. For example, the WISC-R IQ test was published in 1974 and the WISC-R norm data was gathered on children ages 6 through 16 from 1971 through 1973 (Wechsler, 1974). (1972 is thus considered the official date of the WISC-R norm/standardization sample.) Thus, a child who is 7 years, 2 months old who was administered the WISC-R in 1974 would have the calculation of his or her IQ test score based on a comparison to the performance of children from ages 7 years, 0 months through 7 years, 3 months in the year 1972. (The WISC-R norm tables are provided in 3 month intervals within each year of age.) If the WISC-R was administered to a child of the same age (7 years, 2 months) in 1984, rather than being compared to other children of the same age in 1984, this child's performance would still be evaluated against similarly aged children from 1972. This second comparison results in a test-date/test-norm *mismatch* of 12 years (1984 − 1972 = 12). As explained next, comparing an individual's performance on an IQ test with outdated test norms results in *a comparison to a historical reference group from the past—not the person's contemporary peers.* This *norm obsolescence* problem is more commonly referred to as the *Flynn effect* (Flynn, 1984,

PA-513

1985, 2000, 2006, 2007a, 2009). The Flynn effect produces inflated and inaccurate IQ test scores.

In simple terms, psychologists and psychological measurement experts typically describe the Flynn effect as the result of a "softening" of IQ tests norms with the passage of time. That is, individuals tested today on an IQ test normed many years earlier will obtain artificially inflated IQ test scores, because the older test norms reflect a level of overall performance that is lower than that of individuals in contemporary society. This is one of the primary reasons why authors and publishers of IQ tests make every effort to periodically provide "freshened" norms by collecting new nationally representative sample data for IQ test batteries. The professional consensus among test developers is that the "shelf life" of an IQ test's norms is approximately 10 years. According to Weiss (2010), Vice President of Pearson Clinical Assessment, the company and division that develops and publishes the various Wechsler IQ batteries, "there is no definition of when a test becomes obsolete. When asked privately, most Flynn effect researchers have 10 years in mind" (p. 492). If new norms are not provided, individuals tested using IQ tests with outdated norms will typically obtain inflated and inaccurate IQ test scores.

The Flynn effect recognizes that the normal curve distribution of intelligence shifts upward over time. Thus, the same raw score performance on an IQ test, when compared to outdated norms, will produce a markedly different IQ score when it is compared to updated norms based on a contemporary sample of abilities for a person of the same age. The person's tested performance (i.e., the number of correct responses across all parts of the IQ test) does *not* change, but the person's relative standing in the distribution of IQ scores across the population *does* change as a function of which norm reference group his or her performance is compared against. The same performance that is considered average in the contemporary norm sample, yielding an IQ test score of 100 in the distribution, will result in a higher IQ test score when using older norms (Schalock, 2012).

As a result of the Flynn effect, it is possible that one or more IQ test scores reported for an individual being considered for a diagnosis of intellectual disability (ID) may be inaccurate and inflated estimates. Given the high-stakes nature of *Atkins*, ID cases and their tendency to artificially focus on specific "bright line" cutoff scores, the impact of the Flynn effect must be recognized and an adjustment to the inflated scores is recommended.

## Summary of Related Research

### Origins of the Flynn Effect

Probably the first widely recognized scholarly report of IQ norm obsolescence was published by Lynn in 1983. Reflecting Lynn's early writings, some intelligence scholars refer to IQ norm obsolescence as the *Lynn-Flynn effect* (Woodley, 2012a). Recently, Lynn

(2013) provided evi
the phenomenon o
(1984). Lynn (2013
should be the "Run
(based on the custc
the term *Flynn effe*
research and *Atkins*

Seventeen years
in the *American Jou*
*and Developmental*
We Really Have Cr
"adjustment" in the
the "canary in the cc
a significant impac
identified as ID. At
tests norms, althou;
Flynn effect adjustn

Flynn (1985) pr
score of 70 on a "
*criterion for menta*
definition). Then, t
published there wo
whenever a new IQ
reference IQ test (e.
the new test and th
to the old cutting l
standard Flynn effe
an individual's total
to a person who w
Flynn's 1985 propo
effect adjustment p

Fifteen years late
sounded the alarm
nosis and classificat

It is certain that
label of mentall;
was good or bad
avoided stigma.
and classroom te
needed (p. 197).

(2013) provided evidence that 24 studies, the first being Runquist (1936), reported on the phenomenon of norm obsolescence before the "effect was rediscovered by Flynn" (1984). Lynn (2013) argued that the proper designation of IQ test norm obsolescence should be the "Runquist effect." Although Lynn (2013) provided a compelling argument (based on the customary practices in the history of science for naming phenomena), the term *Flynn effect* is used here given its prominent and frequent use in intelligence research and *Atkins* court cases.

Seventeen years prior to the 2002 *Atkins* decision, Flynn (1985) published an article in the *American Journal on Mental Deficiency* (now the *American Journal on Intellectual and Developmental Disabilities*). This article, titled "Wechsler Intelligence Tests: Do We Really Have Criterion of Mental Retardation?" first raised the issue of a possible "adjustment" in the context of an ID diagnosis. In hindsight, Flynn's 1985 article was the "canary in the coal mine" in that it first demonstrated that the Flynn effect may have a significant impact on the proportion of the population of individuals that would be identified as ID. At that time, Flynn proposed a form of adjusting for the softening of tests norms, although it was in a slightly different form than the current recommended Flynn effect adjustment procedure.

Flynn (1985) proposed that to account for the softening of test norms, an IQ test score of 70 on a "reference" IQ test (i.e., WAIS-R) would be set in as the *absolute criterion for mental retardation* (that is, on the intellectual functioning prong of the definition). Then, to account for norm obsolescence, each time a new IQ test was published there would be a lowering of the MR cutting line. Flynn's 1985 idea was that whenever a new IQ test was published, it would be given together with the established reference IQ test (e.g., WAIS-R) and the average mean IQ test score difference between the new test and the reference test would be used to "derive a new score equivalent to the old cutting line" (p. 243). Although different from what is now considered the standard Flynn effect adjustment approach (i.e., subtracting 3 IQ test score points from an individual's total IQ test score for every 10 years for which the test was administered to a person who was normed prior to the date of individual's testing), conceptually Flynn's 1985 proposal accomplished the same goal as the currently employed Flynn effect adjustment procedure.

Fifteen years later, and still 2 years prior to the *Atkins* decision, Flynn (2000) again sounded the alarm regarding the implication of norm obsolescence related to the diagnosis and classification of mental retardation:

> It is certain that over the past 50 years, literally millions of Americans evaded the label of mentally retarded designed for them by the test manuals. Whether this was good or bad depends on what one thinks of the label. Some will say millions avoided stigma. Others will say that millions missed out on needed assistance and classroom teachers were left unaided to cope with pupils for whom aid was needed (p. 197).

The potential impact of the Flynn effect on other diagnoses was also reported in 2001 and 2003. Truscott and colleagues (Sanborn, Truscott, Phelps, & McDougal, 2003; Truscott & Frank, 2001) reported on the impact of the Flynn effect on learning disability (LD) identification, not identification of individuals with ID. Although these authors did not offer or endorse any IQ test score adjustment procedure, these researchers concluded that

> A critical finding of this study is that the FE probably contributes to misdiagnosis of LD. If this research is combined with previous reports that academic achievement may be unaffected by the FE (Neisser, 1998) it strongly suggests that, over the life of a test version, IQ-achievement discrepancies, the most salient LD criterion, are exaggerated. One potential result of such an exaggeration of IQ-achievement discrepancies would be that, as test norms aged, fewer students would score in the mentally retarded range (Flynn, 2000) and more students would qualify for LD based on inflated severe discrepancies (p. 300).

In conclusion, the recognition of the impact of *norm obsolescence* (i.e., the Flynn effect) on IQ test scores, and more importantly, the potential for misdiagnosis of ID and other conditions (e.g., LD), has been recognized and documented as early as the 1980s. It continued to be discussed prior to and after the 2002 ID-related *Atkins* decision by researchers and professionals who did not anticipate nor were influenced by the 2002 *Atkins* decision. For obvious reasons (i.e., the life-or-death implications of the *Atkins* decision), there has been increased interest in the Flynn effect adjustment procedure since the *Atkins* decision. The facts indicate that the recognition of the impact of norm obsolescence on IQ test scores (and the idea of a norm obsolescence IQ test score adjustment) was established prior to the *Atkins v Virginia* (2002) U.S. Supreme Court decision.

## Scientific Basis of the Flynn Effect

There is a scientific and professional consensus that the Flynn effect is a scientific fact. A complete reading of the extant Flynn effect research literature leads to the conclusion that, despite debates regarding the causes of the Flynn effect, differences in the rate of Flynn effect change in different countries. Whether the Flynn effect has started to plateau in Scandinavian countries or whether the Flynn effect differs by different levels of intelligence and different methodological issues in various studies, *the consensus of the relevant scientific community is that the Flynn effect is real* (Cunningham & Tassé, 2010; Fletcher, Stuebing & Hughes, 2010; Flynn, 2009; Greenspan, 2006, 2007; Gresham & Reschly, 2011; Kaufman, 2010a, 2010b; McGrew, 2010; Rodgers, 1999; Trahan, Stuebing, Fletcher, & Hiscock 2014; Weiss, 2010; Zhou, Zhu, & Weiss, 2010). The robustness of this conclusion may best be represented by Rogers' (1999) statement where, after raising valid methodological issues regarding various statistical analysis and conclusions across Flynn effect studies, that even with a "healthy dose of

skepticism, the
have substantive

The research
found over 4,00
obsolescence re
*Effect Archive*
capital-punishm
190 publication
the current cha
ID diagnosis in
*of Psychoeduca*
scientific conse
Kaufman (2010
interpretation

The Flynn e
now than th
of increase i
per decade

The consen
(Fletcher et al
2010a, 2010b;
Rosenn, 2010;
obsolescence (
quotes from r
opinion regard

The Flynn
decade on
2010, p. 49

The point
scores as e
3 points p

The FE, w
ences. Stud
for a test s
subtracted

The Flynn
increases
Reschly, 2

ported in
lcDougal,
ι learning
Although
ure, these

ignosis
:hieve-
ver the
terion,
rement
core in
lify for

the Flynn
osis of ID
s early as
ted *Atkins*
nfluenced
cations of
djustment
on of the
solescence
2002) U.S.

ntific fact.
conclusion
n the rate
started to
rent levels
*consensus*
ingham &
oan, 2006,
; Rodgers,
., & Weiss,
ers' (1999)
s statistical
hy dose of

skepticism, the effect rises above purely methodological interpretation, and appears to have substantive import" (p. 354).

The research literature regarding the Flynn effect is extensive. Trahan et al. (2014) found over 4,000 articles in their comprehensive literature review. (Most all norm obsolescence references and articles can be found at the regularly updated *Flynn Effect Archive Project* [http://www.atkinsmrdeathpenalty.com/2010/01/atkins-mrid-capital-punishment-flynn_11.html]. As of 2014, this archive includes approximately 190 publications.) A thorough treatment of all this research is beyond the scope of the current chapter. Fortunately, key contemporary Flynn effect issues bearing on an ID diagnosis in the *Atkins* context were covered in a special 2010 issue of the *Journal of Psychoeducational Assessment* (JPA). A variety of invited scholars confirmed the scientific consensus regarding the validity of the Flynn effect. For example, Dr. Alan Kaufman (2010a), arguably the most prominent scholar on intelligence testing and interpretation of the various Wechsler IQ tests, stated that

> The Flynn effect (FE) is well known: Children and adults score higher on IQ tests now than they did in previous generations (Flynn, 1984, 2007, 2009b). The rate of increase in the United States has apparently remained a fairly constant 3 points per decade since the 1930s (p. 382).

The consensus of almost all authors who contributed to the *JPA* Flynn effect issue (Fletcher et al., 2010; Flynn, 2010; Hagan, Drogin, & Guilmette, 2010a; Kanfman, 2010a, 2010b; Kaufman & Weiss, 2010; McGrew, 2010; Reynolds, Niland, Wright, & Rosenn, 2010; Sternberg, 2010; Weiss, 2010; Zhou et al. 2010) was that IQ test norm obsolescence (i.e., the Flynn effect) is an established scientific fact. The following select quotes from recent peer-reviewed articles capture the essence of the convergence of opinion regarding the validity of the Flynn effect.

> The Flynn effect (FE) is real. The FE has been shown to be nearly 3 points per decade on average across a large number of studies, countries, and tests (Weiss, 2010, p. 491).

> The point is that a person tested on an outdated test will earn spuriously high scores as each year goes by, and the amount of the spuriousness amounts to about 3 points per decade for Americans (Kaufman, 2010b, p. 503).

> The FE, whatever its cause, is as real as virtually any effect can be in the social sciences. Studies have observed an increase of 0.3 points per year in average IQs; thus, for a test score to reflect accurately the examinee's intelligence, 0.3 points must be subtracted for each year since the test was standardized (Reynolds et al., 2010, p. 478).

> The Flynn effect is a well-established psychometric fact documenting substantial increases in measured intelligence test performance over time (Gresham & Reschly, 2011, p. 131).

Since the publication of the 2010 special *JPA* Flynn effect issue, many additional Flynn effect research and commentary articles have appeared (e.g., Battarjee, Khaleefa, Ali, & Lynn, 2013; Baxendale, 2010; Cunningham & Tassé, 2010; Hagan, Drogin, & Guilmette, 2010b; Kanaya & Ceci, 2011, 2012; Lynn, 2013; Nijenhuis, 2013; Nijenhuis, Cho, Murphy, & Lee, 2012; Nijenhuis, Murphy, & van Eeden, 2011; Nijenhuis & van der Flier, 2013; Pietschnig, Voracek, & Formann, 2011; Nijman, Scheirs, Prinsen, Abbink, & Blok, 2010; Rindermann, Schott, & Baumeister, 2013; Rönnlund, Carlstedt, Blomstedt, Nilsson, & Weinehall, 2013; Skirbekk, Stonawski, Bonsang, & Staudinger, 2013; Trahan et al., 2014; Wai & Putallaz, 2011; Woodley, 2011, 2012a, 2012b; Young, 2012). The continued flow of the Flynn effect related to peer-reviewed articles confirms the consensus that the Flynn effect is a scientifically important and studied phenomenon among intelligence scholars.

### Adjusting IQ Test Scores for the Flynn Effect in Atkins Cases Is Best Practice

Not only is there a scientific consensus that the Flynn effect is a valid and real phenomenon, there is also a consensus that individually obtained IQ test scores derived from tests with outdated norms must be adjusted to account for the Flynn effect, particularly in *Atkins* cases. (The use of a Flynn effect correction in clinical settings is less of an issue given that psychologists in such settings typically have more leeway to interpret scores as ranges, invoke clinical judgment, and incorporate information regarding measurement error in interpretation of the scores when making a diagnosis. In contrast, certain high stakes settings [e.g., *Atkins* cases; eligibility for Social Security Disability benefits] may have strict point-specific cut-scores [i.e., "bright line" criteria] where examiners, or the recipients of the scores [e.g., the courts], do not allow for such clinical interpretation. Thus, the Flynn effect adjustment is more relevant, appropriate, and primarily discussed in literature and law dealing with this type of high stakes IQ testing.) The most prominent and relevant professional consensus-based guidelines for ID diagnosis (Schalock et al., 2007, 2010, and 2012) support a Flynn effect adjustment for scores based on obsolete IQ test norms. *Intellectual Disability: Definition, Classification, and Systems of Supports* (11th ed.; Schalock et al., 2010), based on an expert-consensus process, provides a written guideline that endorses the appropriateness of the Flynn effect adjustment in the diagnosis of ID. (The 11th edition was created using a group-based consensus process conducted by the AAIDD Ad Hoc Committee on Terminology and Classification [Schalock et al., 2010]). AAIDD recommends that psychologists use the most recent versions of IQ tests and, if scores are reported from an IQ test with outdated norms, a correction for the age of norms is warranted (Schalock et al., 2007). The 11th edition states

> As discussed in the *User's Guide* (Schalock et al., 2007) that accompanies the 10th edition of this *Manual*, best practices require recognition of a potential Flynn effect when older editions of an intelligence test (with corresponding older norms) are used in the assessment or interpretation of an IQ score. (p. 37)

y additional
e, Khaleefa,
, Drogin, &
; Nijenhuis,
is & van der
, Abbink, &
Blomstedt,
)13; Trahan
2012). The
nfirms the
enomenon


*Practice*

d and real
res derived
ynn effect,
:al settings
ore leeway
formation
diagnosis.
al Security
e" criteria]
w for such
propriate,
stakes IQ
delines for
stment for
*ssification,*
consensus
the Flynn
; a group-
minology
ogists use
test with
al., 2007).


ie 10th
Flynn
older

As suggested in the *User's Guide to Mental Retardation: Definition, Classification, and Systems of Supports* (Schalock, 2007, pp. 20–21),

> The main recommendation resulting from this work [regarding the Flynn effect] is that all intellectual assessment must use a reliable and appropriate individually administered intelligence test. In cases of tests with multiple versions, the most recent version with the most current norms should be used at all times. In cases where a test with aging norms is used, a correction for the age of the norms is warranted. (p. 37)

The AAIDD's more recent *User's Guide to Intellectual Disability: Definition, Classification, and Systems of Supports* (Schalock et al., 2012) states

> The *Flynn effect* refers to the increase in IQ scores over time (i.e., about 0.30 points per year). The Flynn effect affects any interpretation of IQ scores based on outdated norms. Both the 11th edition of the manual and this *User's Guide* recommend that in cases in which a test with aging norms is used as part of a diagnosis of ID, a corrected Full Scale IQ upward of 3 points per decade for age of norms is warranted. (p. 23)

A consensus among the professional and scientific community of intelligence and ID scholars has emerged. This consensus is that given the high-stakes nature of *Atkins* ID cases and their tendency to artificially focus on specific "bright line" cutoff scores, *a Flynn effect correction to a person's scores in this setting is now considered best or standard practice.* This conclusion is supported by a significant number of scholars and researchers in the areas of intelligence and ID (Cunningham & Tassé, 2010; Fletcher et al., 2010; Flynn, 2006, 2007b; Flynn & Widaman, 2008; Greenspan, 2006, 2007; Gresham & Reschly, 2011; Kaufman, 2010b; McVaugh & Cunningham, 2009; Reynolds et al., 2010; Schalock, 2007; Schalock, 2012). One example of this support is the statement of Reynolds et al. (2010) that "as a generally accepted scientific theory that could potentially make the difference between a constitutional and unconstitutional execution, the Flynn effect must be applied in the legal context" (p. 480). Reynolds et al. (2010) go as far as to state that "the failure to apply the Flynn correction as we have described it is tantamount to malpractice. No one's life should depend on when an IQ test was normed" (p. 480).

A minority of scholars have offered a different approach to the issue of correcting IQ test scores due to the Flynn effect. Weiss (2010), while acknowledging the scientific validity of the Flynn effect, advocates that experts should simply inform the fact finder of what the research shows and the trier-of-fact should evaluate and decide if and how to apply it when interpreting individual scores. Hagan et al. (2010h) also agree with the need to consider the Flynn effect in capital cases but their disagreement "lies in how psychologists should convey IQ scores in light of the observation that mean scores drift over time" (p. 420). It is important to note that the more conservative positions of Weiss (2010) and Hagan et al. (2010a, 2010b) represent a minority position in the professional literature. More importantly, they do not argue against the scientific validity of the Flynn

effect or even the need to consider the effect in *Atkins* cases. Rather, their difference of opinion with the majority is only as to whether a specified score adjustment should be made to the original score or whether testifying experts should instead address the Flynn effect in narrative form.

Recently, legal scholars have also supported the application of the Flynn effect correction in *Atkins* cases. Young's (2012) recent law review article ("A More Intelligent and Just *Atkins:* Adjusting for the Flynn Effect in Capital Determinations of Mental Retardation or Intellectual Disability") concluded that

> adjusting for the Flynn effect reflects a practice consistent with both *Atkins* and the known world of IQ measurements. While a freakish strike of lightning is difficult to avoid, the potentially deadly and unconstitutional consequences of refusing to account for the Flynn effect are wholly preventable. Thus, for the intelligent and just enforcement of *Atkins*, courts and juries should adjust IQ score from outdated tests for the Flynn effect. (p. 663)

### What Is the Correct Flynn Effect Adjustment for Norm Obsolescence?

The AAIDDs' *User's Guide* (Schalock, 2012) recommends a Flynn effect correction of 3 points per decade (0.3 points per year). The 3 points per decade rule-of-thumb is consistent with the previously cited comments of Kaufman (2010a, 2010b) and Weiss (2010), and is also consistent with the recommendation of most scholars in the areas of intelligence and ID (e.g., Fletcher et al., 2010; Gresham & Reschly, 2011; Trahan, et al., 2014; Widaman, 2007).

The 3 points per decade rule-of-thumb is based primarily on Flynn's (2009) seminal article where he synthesized the results of 14 estimates of IQ test score gains over time. Flynn reported an average IQ test score change, across the 14 studies, of 0.311 points per year. An average mean score of 0.299 points was reported for the Wechsler comparisons only. Flynn concluded that "the evidence suggests that a rate of 0.30 is about right, and varying it from case to case lacks any rationale" (p. 104).

More recently Fletcher et al. (2010) applied more precise quantitative meta-analytic procedures to Flynn's (2009) data and reported a weighted mean of 2.80 points per decade. After removing two outlier studies, the weighted mean per decade was 2.96. These researchers concluded that "the level of precision we reported of a mean of about 3 and a *standard error of the mean* (SEM) of about 1 supports the correction and is consistent with the Flynn correction of 3 points per decade" (p. 472). In the most comprehensive meta-analysis research synthesis of 285 studies, Trahan et al. (2014) found that for modern intelligence tests the Flynn effect size was a similar 2.93 points per decade. These researchers concluded that their "findings are consistent with previous research and with the argument that it is feasible and advisable to correct IQ scores for the Flynn effect in high-stakes decisions" (p. 22).

The best available research syntheses consistently converge on a Flynn effect rule-of-thumb of 3 IQ test score points per decade (of IQ test norm obsolescence). Although

scientific journals may report Flynn effect results to the second decimal place (e.g., 3.11 per decade or 0.311 per year), the psychometrics of IQ testing and research cannot partition human behavior with such precision. As noted by Widaman (2007), much of the variation between scores from different Flynn effect studies is due to sampling and measurement error. Using Flynn effect adjustment formulae that use numbers to the second decimal place would be akin to slicing butter with a laser beam. Consequently, the current best estimate of IQ norm obsolescence, and the recommended Flynn effect adjustment, is 3 IQ points per decade, or 0.3 points per year.

### Researching the Flynn Effect "Black Box": Implications for Practice

Recently a significant portion of Flynn effect research has shifted from a focus on the secular changes in the global IQ test scores over time to changes on more specific intellectual abilities, possible differential effects by level of intelligence, and a search for the cause of the Flynn effect (Kaufman, 2010a). Zhou et al. (2010) characterized this shift to a focus on the "black box" of the Flynn effect.

The cause of the Flynn effect. In the context of the special articles in the 2010 *JPA* Flynn effect issue, Weiss (2010) stated that "Except for Flynn, there is general agreement … that we know precious little about the causes of the effect" (p. 487). Explanations and theories have touched on such causative variables as genetics, environmental factors (e.g., nutrition, education, improved public health, increased use of computer games), ethnicity, and different societal risks and benefits associated with different generations (Kaufman & Weiss, 2010; Weiss, 2010). Flynn (2007a), in his book *What Is Intelligence? Beyond the Flynn Effect*, suggests that the effect that bears his name is due to systematic shift in societies from concrete to abstract scientific thinking. Confounding the search for the cause(s) of the Flynn effect has been idiosyncratic and armchair-based speculations (Weiss, 2010).

In the current context, knowing that the Flynn effect exists trumps a lack of consensus regarding causation. The impact of norm obsolescence on IQ test scores is real and the professional consensus is that it should be accounted for in *Atkins* ID determination. Understanding the "why" of the Flynn effect is beyond the scope of the current chapter and is not necessary for recognizing the scientifically and professionally based consensus that IQ test scores suffering from norm obsolescence need to be adjusted in *Atkins* cases. As stated by Kaufman (2010b), "The Flynn effect is a fact, even if its cause is elusive, and it must be considered carefully when making high stakes decisions such as the death penalty" (p. 503).

Differential Flynn effects by specific intellectual abilities. The foundation of Flynn's (2007a) theoretical explanation of the Flynn effect is based primarily on the interpretation of differential rates of score changes as a function of different specific intellectual abilities (e.g., smaller gains on verbal and crystallized ability tasks and larger changes on visual-spatial and abstract fluid reasoning tasks—not a singular focus on the global IQ test score). If differential specific ability Flynn effects are eventually found to be valid, the potential implication is that different Flynn effect adjustments

may be recommended for different composite or cluster "part" scores in IQ tests, and not just the global IQ score. This would introduce a new layer of complexity in the interpretation of IQ test scores (and part scores) in *Atkins* cases.

Although the recent methodologically sophisticated attempt by Zhou et al. (2010) to examine differential ability Flynn effects within the Wechsler tests represents an important step forward in this area of inquiry, their research produced inconsistent and contradictory findings. Although differential specific ability Flynn effect findings may eventually be identified, currently the supporting research results are sparse, mixed in results, and suffer from significant measurement and methodological flaws (McGrew, 2010). The foundation of Flynn effect causal theory, which hinges on the presence of differential specific ability Flynn effects, has been questioned on logical, theoretical, measurement and methodological grounds (Kaufman, 2010a, 2010b; McGrew, 2010; Weiss, 2010). Currently the extant research is not mature enough to support differential specific-ability Flynn effect adjustments in clinical or forensic contexts.

Differential Flynn effects by level of intelligence. The use of the 3 IQ test score points per decade Flynn effect adjustment rule-of-thumb has been questioned by research suggesting that the Flynn effect may not be uniform across all levels of general intelligence (Kanaya & Ceci, 2007; Kanaya, Ceci, & Scullin, 2003; Sanborn et al. 2003; Zhou et al., 2010). More important has been the suggestion that the Flynn effect may be larger at the IQ score range at the threshold for ID diagnosis. Cunningham and Tassé (2010) have referred to this research as the investigation of the Flynn effect in the "zone of ambiguity" (IQ test scores from 71–80). Studies reviewed by Cunningham and Tassé (2010) report IQ per decade changes ranging from roughly 4 to 5 points in the zone of ambiguity. Zhou et al. (2010) also reported differential Flynn effects by level of intelligence, but the results were inconsistent in the directions of the variation and may differ for different tests or age groups.

Similar to the differential Flynn effect by specific ability research, the ability-specific research has not been fully vetted through a sufficiently large number of studies and has been questioned on methodological grounds (McGrew, 2010; Widaman, 2007; Zhou et al., 2010). As summarized by Weiss (2010), "a small number of studies have suggested differential Flynn effect by ability level, but not enough is known about this at present" (p. 492). Reynolds et al. (2010) reinforce this conclusion, when after commenting on the Zhou et al. (2010 differential Flynn effects by levels of intelligence findings, that the results were inconsistent and "for now, best practice is the application of the Flynn correction as a constant by year across the distribution" (p. 480). Until more studies replicate the possibility of larger Flynn effects near the ID diagnostic threshold, the 3 points per decade Flynn effect rule-of-thumb should be employed across all levels of general intelligence.

## Implications for Practice

The following implications are based on the integration of the content of the current chapter as well as the recommendations from the *User's Guide to the 10th edition,* the *11th edition,* and the *User's Guide to the 11th edition* (Schalock et al., 2007, 2010, 2012):

First,
eliminat
When a
assessme
Assessm
cation of
ferent IQ
of each p
selection

Secon
obsolesce
of ID in /
norms sh
norm obs

Third,
*ment = (I*
the date t
administe
Flynn effe
IQ score.
treatment
of "roundi
employed
application
IQ tests or
profession
the contra
should be
across all l

Fourth,
should be i
by assessm

Fifth, th
supporting
as an authc

Sixth, v
reports, leg
of the term
a much m
Flynn effec

Seventh
difference

First, the potential problem of norm obsolescence can be minimized, but not always eliminated, by assessment professionals using IQ tests with the most up-to-date norms. When a new version of an IQ battery is published (e.g., WAIS-IV replaces WAS-III), assessment professionals should use the newest version (WAIS-IV) in *Atkins* cases. Assessment professionals have an ethical responsibility to stay abreast with the publication of new versions of IQ batteries and when the option exists to select among different IQ tests to administer to an individual. The relative degree of norm obsolescence of each possible IQ test should be one important factor incorporated into the IQ test selection decision.

Second, in cases where current or historical IQ test scores are impacted by norm obsolescence (i.e., Flynn effect), and the scores are to be used as part of the diagnosis of ID in *Atkins* or other high stakes decisions, the global scores impacted by outdated norms should be adjusted downward by 3 points per decade (0.3 points per year) of norm obsolescence.

Third, the recommended formula for the Flynn effect adjustment is: *FE adjustment = (Date test administered – date test was normed) × 0.3*. Stated simply, subtract the date the IQ test was normed (see point seven below) from the date the test was administered to the individual, multiply the obtained difference by 0.3. The obtained Flynn effect adjustment value should then be subtracted from the inflated obtained IQ score. The final Flynn effect adjustment value should be an integer value. Thus, the treatment of decimals in the final value should adhere to standard mathematical rules of "rounding to the nearest integer." The rationale for the particular rounding strategy employed should be described in the report. Current research does not support the application of different Flynn effect adjustment values for different part scores on IQ tests or at different levels of general intelligence. The best scientific evidence and professional consensus is that until sufficient research evidence produces evidence to the contrary, the 3 points per decade (0.3 points per year) adjustment rule-of-thumb should be used only on the global IQ test score and should be employed uniformly across all levels of general intelligence.

Fourth, both the original obtained (unadjusted) and Flynn effect adjusted scores should be included in all reports or court related statements or declarations provided by assessment professionals.

Fifth, the rationale for employing a Flynn effect correction should be described with supporting references. This chapter is intended to serve this function and can be cited as an authoritative source for the use of the Flynn effect adjustment in reports.

Sixth, when writing and discussing the Flynn effect, such as in psychological reports, legal declarations, or expert testimony, professionals should make frequent use of the term *norm obsolescence* when explaining the Flynn effect. Norm obsolescence is a much more descriptive and understandable means for conveying the essence of the Flynn effect.

Seventh, the calculation of the years of norm obsolescence should be based on the difference between the year the test was administered to an individual and the best

estimate of the year the IQ test was *normed* (see also Chapters 7 and 8). The data of publication of an IQ test does not accurately capture the time period when the test norm data were gathered. For example, the WISC-R IQ test was published in 1974 and the WISC-R norm data was gathered on children from 6 through 16 years of age from 1971 through 1973 (Wechsler, 1974). Thus, the middle most year of the actual norm data collection period is 1972. For the WISC-R, the year 1972 should be subtracted from the date of testing to determine the number of years of norm obsolescence. The test norm years reported for the different IQ tests by Flynn (2009) are recommended for uniformity purposes. For tests not reported in Flynn (2009), professionals need to consult the technical mannals for the IQ test in question and establish the best year estimate that is at the middle of the norm data collection period. If not readily available, professionals should seek the expertise of the test authors, publisher, or other intelligence test experts who may possess this information.

This chapter concludes with an example from an *Atkins* case. In 1998 an individual was administered the WAIS-R and obtained a Full Scale IQ of 80. Despite knowing that the WAIS-R had been revised and published as the WAIS-III in 1997, the psychologist administered the WAIS-R despite 20 years of norm obsolescence. The WAIS-R was published in 1981 and the best estimate of the date the actual test norms were gathered, as per the recommended procedures above, is 1978. Thus, the difference between the date of WAIS-R testing (1998) and date of test norming (1978) was 20 years, Using the 0.3/year Flynn effect adjustment, the best estimate of the magnitude of IQ test score inflation due to norm obsolescence is 6 IQ test score points ($0.3 \times 20 = 6.0$). Thus, this individual's Flynn effect adjusted WAIS-R score is 74 ($80 - 6 = 74$). This example represents one of the most dramatic instances of norm obsolescence (20 years) and also reflects the fact that the examiner did not engage in proper practice by administering the WAIS-III which was available at the time the individual was assessed.

Refere

America
    Coun
    *testin*
Atkins v.
Batterjee
    Arabi
Baxendal
    *tal N*
Cunning
    ing I(
    413–4
Fletcher,
    in hig
Flynn, J.
    *letin,*
Flynn, J.
    tion?
Flynn, J.
    *Psych*
Flynn, J.
    *Publi*
Flynn, J.
    Univ(
Flynn, J.
    *Psych*
Flynn, J.
    appro
Flynn, J.
    datior
    *reviev*
Greensp,
    MR. j
Greensp,
    Moo(
Gresham
    penal
    1934
Hagan, I
    the Fl
    474–
Hagan,
    repor
Kansya,
    intell
    dot: 1

data of pub.
he test norm
1974 and the
ge from 1971
orm data col-
cted from the
The test norm
ed for unifor-
to consult the
stimate that is
professionals
ce test experts

an individual
: knowing that
e psychologist
: WAIS-R was
were gathered,
:e between the
ears. Using the
f IQ test score
) = 6.0). Thus,
. This example
years) and also
· administering
d.

## References

American Educational Research Association, American Psychological Association, & National Council on Measurement in Education. (1999). *Standards for educational and psychological testing*. Washington, DC: American Educational Research Association.

Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242 (2002).

Batterjee, A. A., Khaleefa, O., Ali, K., & Lynn, R. (2013). An increase in intelligence in Saudi Arabia, 1977–2010. *Intelligence, 41*(2), 91–93. doi: 10.1016/j.intell.2012.10.011

Baxendale, S. (2010). The Flynn effect and memory function. *Journal of Clinical and Experimental Neuropsychology, 32*(7), 699–703. doi: 10.1080/13803390903493515

Cunningham, M. D., & Tassé, M. J. (2010). Looking to science rather than convention in adjusting IQ scores when death is at issue. *Professional Psychology: Research and Practice, 45*(5), 413–419. doi: 10.1037/a0020226

Fletcher, J., Stuebing, K., & Hughes, L. (2010). IQ scores should be corrected for the Flynn effect in high stakes decisions. *Journal of Psychoeducational Assessment, 28*(5), 469–473.

Flynn, J. R. (1984). The mean IQ of Americans: Massive gains 1932 to 1978. *Psychological Bulletin, 95*, 29–51.

Flynn, J. R. (1985). Wechsler Intelligence Tests: Do we really have a criterion of mental retardation? *American Journal of Mental Deficiency, 90*(3), 236–244.

Flynn, J. R. (2000). The hidden history of IQ and special education: Can the problems be solved? *Psychology Public Policy and Law, 6*(1), 191–198.

Flynn, J. R. (2006). Tethering the elephant: Capital cases, IQ, and the Flynn effect. *Psychology, Public Policy, and Law, 12*, 170–189. doi:10.1037/1076-8971.12.2.170

Flynn, J. R. (2007a). *What is intelligence? Beyond the Flynn effect*. New York: Cambridge University Press.

Flynn, J. R. (2007b). Capital offenders and the death sentence: A scandal that must be addressed. *Psychology in Mental Retardation and Developmental Disabilities, 32*(3), 3–7.

Flynn, J. R. (2009). The WAIS-III and WAIS-IV: *Daubert* motions favor the certainly false over the approximately true. *Applied Neuropsychology, 16*, 98–104. doi: 10.1080/09084280902864360

Flynn, J. R., & Widaman, K. F. (2008). The Flynn effect and the shadow of the past: Mental retardation and the indefensible and indispensible role of IQ. In L. M. Glidden (Ed.), *International review of mental retardation* (Vol. 35, pp. 121–149). Boston, MA: Elsevier.

Greenspan, S. (2006). Issues in the use of the "Flynn effect" to adjust IQ scores when diagnosing MR. *Psychology in Mental Retardation and Developmental Disabilities, 31*(3), 3–7.

Greenspan, S. (2007). Flynn-adjustment is a matter of basic fairness: Response to Roger B. Moore, Jr. *Psychology in Mental Retardation and Developmental Disabilities, 32*(3), 7–8.

Gresham, F., & Reschly, D. J. (2011). Standard of practice and Flynn effect testimony in death penalty cases. *Intellectual and Developmental Disabilities, 49*(3), 131–140. doi: 10.1352/1934-9556-49.3.131

Hagan, L. D., Drogin, E. Y., & Guilmette, T. J. (2010a). IQ Scores should not be adjusted for the Flynn effect in capital punishment cases. *Journal of Psychoeducational Assessment, 28*(5), 474–476. doi: 10.1177/0734282910373343

Hagan, L. D., Drogin, E. Y., & Guilmette, T. J. (2010b). Science rather than advocacy when reporting IQ scores. *Professional Psychology Research and Practice, 41*(5), 420–423.

Kanaya, T., & Ceci, S. J (2007). Mental retardation diagnosis and the Flynn effect: General intelligence, adaptive behavior, and context. *Child Development Perspectives, 1*(1), 62–63. doi: 10.1111/j.1750-8606.2007.00013.x

Kanaya, T., & Ceci, S. J (2011). The Flynn effect in the WISC subtests among school children tested for special education services. *Journal of Psychoeducational Assessment, 29*(2), 125–136. doi:10.1177/0734282910370139

Kanaya, T., & Ceci, S. (2012). The impact of the Flynn effect on LD diagnoses in special education. *Journal of Learning Disabilities, 45*(4), 319–326. doi: 10.1177/0022219410392044

Kanaya, T., Ceci, S. J., & Scullin, M. H. (2003). The rise and fall of IQ in special ed: Historical trends and their implications. *Journal of School Psychology, 41*(6), 453–465. doi:10.1016/j.jsp.2003.08.003

Kaufman, A. (2010a). "In what way are apples and oranges alike?": A Critique of Flynn's Interpretation of the Flynn effect. *Journal of Psychoeducational Assessment, 28*(5), 382–398. doi: 10.1177/0734282910373346

Kaufman, A. (2010b). Looking through Flynn's rose-coloured scientific spectacles. *Journal of Psychoeducational Assessment, 28*(5), 494–505. doi: 10.1177/0734282910373573

Kaufman, K., & Weiss, L. (2010). Guest editor's Introduction to the special issue of *JPA* on the Flynn effect. *Journal of Psychoeducational Assessment, 28*(5), 379–381. doi:10.1177/0734282910373344

Lynn, R. (1983). IQ in Japan and the United States shows a growing disparity. *Nature, 306*, 291–292.

Lynn, R. ( 2013). Who discovered the Flynn effect? A review of early studies of the secular increase in intelligence. *Intelligence,41*(6), 765–769. doi: 10.1016/j.intell.2013.03.004

McGrew, K. (2010). The Flynn effect and its critics: Rusty linchpins and "lookin' for g and Gf in some of the wrong places." *Journal of Psychoeducational Assessment, 28*(5), 448–468. doi:10.1177/0734282910373347

McVaugh, G. S., & Cunningham, M. D. (2009). Atkins v. Virginia: Implications and recommendations for forensic practice. *The Journal of Psychiatry and Law, 37*, 131–187.

Nijenhuis, J. T. (2013). The Flynn effect, group differences, and g loadings. *Personality and Individual Differences, 55*, 224–228. doi:10.1016/j.paid.2011.12.023

Nijenhuis, J. T., Cho, S. H., Murphy, R., & Lee., K. H. (2012). The Flynn effect in Korea: Large gains. *Personality and Individual Differences, 53*(2), 147–151. doi: 10.1016/j.paid.2011.03.022

Nijenhuis, J. T., Murphy, R., & van Eeden, R. (2011). The Flynn effect in South Africa. *Intelligence, 39*(6), 456–467.

Nijenhuis, J. T., & van der Flier, H. (2013). Is the Flynn effect on g? A meta-analysis. *Intelligence, 41*, 802–807.

Nijman, E. E., Scheirs, J. G., Prinsen, M. J., Abbink, C. D., & Blok, J. B. (2010). Exploring the Flynn effect in mentally retarded adults using a nonverbal intelligence test for children. *Research in Developmental Disabilities, 31*, 1404–1411. doi: 10.1016/j.ridd.2010.06.018

Reynolds, C., Niland, J., Wright, J., & Rosenn, M. (2010). Failure to apply the Flynn correction in death penalty litigation: Standard practice of today maybe, but certainly malpractice of tomorrow. *Journal of Psychoeducational Assessment, 28*(5), 477–481.

Rindermann, H., Schott, T., & Baumeister, A. (2013). Flynn effect in Turkey: A comment on Kagitcibasi and Biricik (2011). *Intelligence, 41*, 178–180. doi: 10.1016/j.intell.2013.02.003

Rodgers, J. L. (1999). A critique of the Flynn effect: Massive IQ gains, methodological artifacts, or both? *Intelligence, 26*(4), 337–356.

Rönnlund, M., Carlstedt, B., Blomstedt, Y., Nilsson, L. G., & Weinehall, L. (2013). Secular trends in cognitive test performance: Swedish conscript data 1970–1993. *Intelligence, 41*(1), 19–24.

Runquist, E. A. (1936). Intelligence test scores and school marks in 1928 and 1933. *School and Society, 43*, 301–304.

Sanborn, K. J., Truscott, S. D., Phelps, L., & McDougal, J. L. (2003). Does the Flynn effect differ by IQ level in samples of students classified as learning disabled? *Journal of Psychoeducational Assessment, 21*(2), 145–159.

Schalock, R. L., Buntinx, W. H. E., Borthwick-Duffy, S. A., Luckasson, R., Snell, M. E., Tassé, M. J., & Wehmeyer, M. L. (2007). *User's guide to mental retardation: Definition, classification, and systems of supports (10th ed.)*. Washington, DC: American Association on Intellectual and Developmental Disabilities.

Schalock, R. L., Borthwick-Duffy, S. A., Bradley, V. J., Buntinx, W. H. E., Coulter, D. L., Craig, E. M., Gomez, S. C., Lachapelle, Y., Luckasson, R., Reeve, A., Shogren, K. A., Snell, M. E., Spreat, S., Tassé, M. J., Thompson, J. R., Verdugo-Alonso, M. A., Wehmeyer, M. L., & Yeager, M. H. (2010). *Intellectual disability: Definition, classification, and systems of supports (11th ed.)*. Washington, DC: American Association on Intellectual and Developmental Disabilities.

Schalock, R. L., Luckasson, R., Bradley, V., Buntinx, W. H. E., Lachapelle, Y., Shogren, K. A., Snell, M. E., Thompson, J. R., Tassé, M. J., Verdugo-Alonso, M. A., and Wehmeyer, M. L. (2012). *User's guide to intellectual disability: Definition, classification, and systems of supports*. Washington, DC: American Association on Intellectual and Developmental Disabilities.

Skirbekk, V., Stonawski, Bonsang, E., & Staudinger, U. M. (2013). The Flynn effect and population aging. *Intelligence, 41*(3), 169–177. doi: 10.1016/j.intell.2013.02.001

Sternberg, R. (2010). The Flynn effect: So what? *Journal of Psychoeducational Assessment, 28*(5), 434–440. doi: 10.1177/0734282910373349

Trahan, L. H., Stuebing, K. K., Fletcher, J. M., & Hiscock, M. (2014, June 30). The Flynn effect: A meta-analysis. *Psychological Bulletin*. Advance online publication. http://dx.doi.org/10.1037/a0037173

Truscott, S. D., & Frank, A. J. (2001). Does the Flynn effect affect IQ scores of students classified as LD? *Journal of School Psychology, 39*(4), 319–334.

Wai, J., & Putallaz, M. (2011). The Flynn effect puzzle: A 30-year examination from the right tail of the ability distribution provides some missing pieces. *Intelligence, 39*(6), 443–455. doi:10.1016/j.intell.2011.07.006

Wechsler, D. (1974). *The Wechsler Intelligence Scale for Children—Revised (WISC-R)*. San Antonio, TX: Psychological Corporation.

Weiss, L. G. (2010). Considerations on the Flynn effect. *Journal of Psychoeducational Assessment, 28*(5), 482–493. doi: 10.1177/0734282910373572

Widaman, K. (2007). Stalking the roving IQ score cutoff: A commentary on Kanaya and Ceci (2007). *Child Development Perspectives, 1*(1), 57–59. doi: 10.1111/j.1750-8606.2007.00011..x

Woodley, M. A. (2011). Heterosis doesn't cause the Flynn effect: A critical examination of Mingroni (2007). *Psychological Review, 118*(4), 689–693. doi: 10.1037/a0024759

Woodley, M. A. (2012a). A life history model of the Lynn-Flynn effect. *Personality and Individual Differences, 53*(2), 152–156. doi: 10.1016/j.paid.2011.03.028

Woodley, M. A. (2012b). The social and scientific temporal correlates of genotypic intelligence and the Flynn effect. *Intelligence, 40*(2), 189–204. doi:10.1016/j.intell.2011.12.002

Young, G. W. (2012). A more intelligent and just *Atkins*: Adjusting for the Flynn effect in capital determinations of mental retardation or intellectual disability. *Vanderbilt Law Review*, 615–755.

Zhou, X., Zhu, J., & Weiss, L. (2010). Peeking inside the "blackbox" of the Flynn effect: Evidence from three Wechsler instruments. *Journal of Psychoeducational Assessment, 28*(5), 399–411.

Vandenbos, G. (2007). *APA dictionary of psychology*. Washington, DC: American Psychological Association.

**CERTIFICATE OF SERVICE**

I, Peter Williams, hereby certify that on 16th day of July, 2020, I electronically filed the foregoing appendix with the Clerk of Court for the Seventh Circuit by using the appellate CM/ECF system. I further certify that I will cause 10 paper copies of this appendix to be received by the Clerk within seven days of the Notice of Docket Activity generated upon acceptance of this document.

Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ *Peter Williams*
Peter Williams