No. 20–1891

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

ALFRED BOURGEOIS,
*PETITIONER-APPELLEE,*

v.

SUPERINTENDENT,
USP—TERRE HAUTE,
UNITED STATES OF AMERICA,
*RESPONDENTS-APPELLANTS.*

_____

On Appeal from the United States District Court
for the Southern District of Indiana
No. 2:19–cv–00392, Hon. Jane Magnus-Stinson, Chief J.

**PETITIONER-APPELLEE'S REPLY BRIEF IN
SUPPORT OF PETITION FOR REHEARING**

**THIS IS A DEATH PENALTY CASE**

Peter Williams
  *Counsel of Record*
Victor J. Abreu
Katherine Thompson
Assistant Federal Defenders
Federal Community Defender Office for
  the Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215–928–0520

*Counsel for Petitioner-Appellee Alfred
Bourgeois*

Dated: November 2, 2020

**TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................ i

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ..................................................................................................... 1

ARGUMENT ............................................................................................................. 2

    A.  The FDPA Bars the Execution of Intellectually Disabled Prisoners Such as Mr. Bourgeois. ................................................................................................. 2

    B.  The Analysis Employed by the 2255 Court Was Rejected by *Moore-I* and *Moore-II*, and Is Invalid Under Current Diagnostic Standards. ...................... 7

CONCLUSION ........................................................................................................ 11

# TABLE OF AUTHORITIES

**Federal Cases**

*Atkins v. Virginia*, 536 U.S. 304 (2002) ...................................................................... 6

*Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020) ............................. 4-5

*Busby v. Davis*, 925 F.3d 699 (5th Cir. 2019) ...................................................... 6

*Carr v. United States*, 560 U.S. 438 (2010) ................................................ 2-3, 4

*Clark v. Quarterman*, 457 F.3d 441 (5th Cir. 2006) ............................................ 9

*Moore v. Texas*, 137 S. Ct. 1039 (2017) ("*Moore-I*") ............................... 1, 7, 8, 9

*Moore v. Texas*, 139 S. Ct. 666 (2019) ("*Moore-II*") ............................................ 7

*United States v. Webster*, 421 F.3d 308 (5th Cir. 2005) ........................................ 9

*Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015) ........................................... 2, 6

*Williams v. Kelley*, 858 F.3d 464 (8th Cir. 2017) ................................................. 6

*Williams v. Quarterman*, 293 F. App'x 298 (5th Cir. 2008) ................................. 9

**Federal Statutes**

1 U.S.C. § 1 ........................................................................................................ 2

18 U.S.C. § 3594 ................................................................................................ 4

18 U.S.C. § 3596 ....................................................................................... *passim*

**State Cases**

*Lard v. State*, 595 S.W.3d 355 (Ark. 2020) ......................................................... 6

**Other**

134 Cong. Rec. H7259-02, 1988 WL 175612 ....................................................... 5

**INTRODUCTION**

The Federal Death Penalty Act forbids the "carry[ing] out" of a death sentence upon any prisoner who "is" intellectually disabled (ID) under current legal and diagnostic standards. 18 U.S.C. § 3596(c). The district court found that because Mr. Bourgeois made a strong showing that he is intellectually disabled under current standards, he was entitled to an evidentiary hearing to prove his claim. But the Government would deny Mr. Bourgeois any opportunity to prove his intellectual disability under current standards as the Federal Death Penalty Act (FDPA) requires. To that end, the Government's response ignores the plain language of the FPDA, mischaracterizes its legislative history, and wrongly asserts that the 2255 court's analysis was not in conflict with *Moore v. Texas*, 137 S. Ct. 1039 (2017) ("*Moore-I*").[1]

Ultimately, however, the Government contends that even if the 2255 court employed the outdated and unscientific standards that were subsequently repudiated in *Moore-I*, Mr. Bourgeois is not entitled to seek the protections of the FDPA through § 2241 because he previously litigated his ID claim. The

---

[1] The United States District Court that presided over Mr. Bourgeois's § 2255 proceedings shall be referred to as the "2255 court." Citations to "GA" refer to the Government's Appendix; citations to "PA" refer to Petitioner-Appellee's Appendix; citations to "PFR" refer to the Petition for Rehearing; and citations to "GR" refer to the Government's October 30, 2020 response to the Petition for Rehearing.

Government's extreme and inflexible view, which echoes the panel opinion, is Kafkaesque. Indeed, if this view were to be accepted, no change in the diagnostic standards for assessing ID and no defect in § 2255 proceedings, no matter how sweeping or extreme, would justify § 2241 review. Even the factual and legal basis for this Court's en banc holding in *Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015), would be called into question.

En banc review should be granted to determine if this is correct and if the protections of the Eighth Amendment, this Court's analysis in *Webster*, and the plain language of the FDPA can be so easily ignored.

## ARGUMENT

### A. The FDPA Bars the Execution of Intellectually Disabled Prisoners Such as Mr. Bourgeois.

The Government takes the position that it is permissible to execute Mr. Bourgeois regardless of whether he is ID under current standards. According to the Government, the fact that he raised an ID claim in his § 2255 proceedings is sufficient to preclude § 2241 review, regardless of the standards employed by the reviewing 2255 court or Mr. Bourgeois's impairments. GR 8-15.

This argument fails to address the FDPA's plain statement that no death sentence shall be "carried out" on anyone who "is" intellectually disabled. 18 U.S.C. § 3596(c). The Dictionary Act, 1 U.S.C. § 1, "ascribes significance to verb

2

tense" when determining the meaning of a federal statute and "[b]y implication . . . instructs that the present tense generally does not include the past." *Carr v. United States*, 560 U.S. 438, 448 (2010). In *Carr*, the Supreme Court addressed the Sex Offender Registration and Notification Act (SORNA), which mandates that any offender must register whenever he or she "travels" interstate. *Id.* at 445-46. The question was whether this requirement applied to travel before SORNA became law; because the requirement was phrased in the present tense, the Court concluded that the language "is not readily understood" to refer to past travel. *Id.* Just as in *Carr*, Congress enacted a present tense prohibition in the FDPA, and this language is "not readily understood" to refer to past determinations.

The *Carr* Court found contextual support for its conclusion in two ways. First, the Court found the present tense of the contested clause to be a "striking indicator" of the clause's "prospective orientation" because the statute used the word "travels" amidst a series of other present tense verbs that could trigger SORNA's registration requirements. *Id.* at 449. Second, because other elements of the statute that only applied prospectively were also set forth in the present tense, those elements represented "powerful evidence" that the contested clause was forward looking as Congress "presumably would have varied the verb tenses" if it had intended to convey a different meaning. *Id.* at 450.

Here, the relevant language of the FDPA focuses on the carrying out of a

3

death sentence and is phrased in the present tense. The ID-related language is grouped with other time-of-execution exemptions—for mentally incompetent and pregnant defendants—and placed in a section, 18 U.S.C. § 3596, devoted to and entitled "Implementation of a death sentence." "Imposition of a death sentence," by contrast, is governed by § 3594. Just as in *Carr*, these are all "striking indicator[s]" of the "prospective orientation" of § 3596(c). *See Carr*, 560 U.S. at 450. Had Congress intended the FDPA's prohibition on the execution of the intellectually disabled to turn on whether the defendant had been found to be ID in the past, it could have "varied the verb tenses to convey this meaning." *See id.* The plain language of the FDPA bars *execution* of a prisoner who meets the definition in place *at that time*, regardless of whether they have met a previously-accepted definition in the past.

Citing a single phrase from Representative Levin's statements from debate surrounding the Anti-Drug Abuse Act of 1988 (ADAA), from which § 3596(c)'s ID-related language was imported, the Government claims that the "FDPA's legislative history cuts against Mr. Bourgeois' argument." GR 13. Of course, even if that were true (which it is not), the legislative history cannot supersede the plain language and structure of the statute. *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731, 1738 (2020) (a statute must be interpreted "in accord with the ordinary public meaning of its terms," as "only the words on the page constitute the law

adopted by Congress and approved by the President").

Furthermore, even if the legislative history were relevant given the plain language of the statute, the legislative history of both the FDPA and the ADAA *confirms* Mr. Bourgeois's interpretation of the FDPA. Senator Hatch recognized that the FDPA would allow defendants to raise ID claims "at any time." PFR 18. The Government attempts to distinguish Senator Hatch's commentary by pointing out that he was arguing for an amendment to allow the execution of the intellectually disabled, and that amendment was rejected. GR 13 n.5. This fact only strengthens Mr. Bourgeois's point: Congress, aware of Senator Hatch's concern that the FDPA's prohibition on the execution of ID prisoners could be raised at "any time," nonetheless rejected Senator Hatch's amendment and chose instead to retain this prohibition.

The sole comment from Representative Levin upon which the Government relies here—that an ID claim "would be handled as any other defense," GR13—was made in response to a question of whose *burden* it was to establish that any particular defendant was ID, not when that claim could be raised. 134 Cong. Rec. H7259-02, 1988 WL 175612, at *64 (Rep. Gekas) (commenting that the "burden" of establishing ID would be on the defense). And, Representative Levin made clear that the purpose of the ID provision was "to prohibit *execution* of those who *are* mentally retarded." *Id.* (Rep. Levin) (emphasis added).

Citing *Williams v. Kelley*, 858 F.3d 464 (8th Cir. 2017), and *Busby v. Davis*, 925 F.3d 699 (5th Cir. 2019), the Government argues that "courts have rejected similar attempts to relitigate intellectual disability claims." GR 14. First, the cited cases involve the Eighth Amendment, and other courts have disagreed with the Fifth and Eighth Circuits to hold that, consistent with *Atkins v. Virginia*, 536 U.S. 304 (2002), a prisoner's Eighth Amendment challenge ripens with his execution date. *See Webster*, 784 F.3d at 1139 (avoiding "the intolerable result of condoning an execution that violates the Eighth Amendment"); *Lard v. State*, 595 S.W.3d 355, 356-57 (Ark. 2020) (*Atkins* "categorically prohibited the execution of mentally disabled individuals," and Lard's claim of illegal execution was unripe on post-conviction review and could be reasserted "[w]hen an execution date has been scheduled"). More fundamentally, in this case, it suffices that Congress created a statutory right measured by the prisoner's status at the time of the "[i]mplementation of a sentence of death." 18 U.S.C. § 3596. At that point, "[a] sentence of death shall not be carried out upon a person who is mentally retarded." 18 U.S.C. § 3596(c). Neither *Williams* nor *Busby* involves federal death penalty cases, the FDPA, or this Court's savings clause jurisprudence. They are neither precedential nor persuasive here.

Because Mr. Bourgeois "is" ID under current scientific and, by extension, legal standards, the FDPA prohibits the government from proceeding with his

6

execution. 18 U.S.C. § 3596(c). The Government's position that the § 2255 proceedings in Mr. Bourgeois's case were sufficient—regardless of his ID status or the 2255 court's flawed approach—runs afoul of the FDPA's plain language, structure, and history.

B. **The Analysis Employed by the 2255 Court Was Rejected by *Moore-I* and *Moore-II*, and Is Invalid Under Current Diagnostic Standards.**

Echoing the Panel, the Government argues that the 2255 court applied a diagnostically appropriate standard because it made findings on the three prongs of ID, rejected Mr. Bourgeois's IQ tests based on a supposed lack of effort, and "did not view Bourgeois's other childhood problems as evidence that he was not intellectually disabled." GR 6, 11. This argument fails. The 2255 court explicitly rejected the "psychological" standard in favor of an unscientific, purported "legal" standard, and then went on to engage in a number of practices that were later invalidated in *Moore-I*. GA 88, 104; PFR 3-4. Simply ruling on the three prongs does not mean that a court complies with current diagnostic standards. In Moore's case, the lower courts addressed the three prongs two separate times, yet its methodology was rejected each time as diagnostically inappropriate. *Moore-I*, 137 S. Ct. at 1050-53; *Moore v. Texas*, 139 S. Ct. 666, 670-72 (2019) ("*Moore-II*").

Furthermore, the 2255 court did not "invalidate" Mr. Bourgeois's IQ test scores, but recognized that these test results would have satisfied the IQ

7

requirement under the standards "employed by the psychological profession." GA 88. Nevertheless, under the distinct "legal" standard it employed, the court determined that Mr. Bourgeois's "true" IQ did not "fall within the lower end of the confidence interval" for each of his scores. GA 87-89, 98.

*Moore-I* squarely rejected this approach. An IQ score is an ID-level score whenever the "standard error of measurement range" has a "lower end that includes scores of 70 or below." *Moore-I*, 137 S. Ct. at 1049-50. As the 2255 court acknowledged, both of Mr. Bourgeois's two IQ scores—75 and 70—meet this threshold because the measurement error range of ± 5 for each of them includes scores of 70 or below. *See* PFR 3-4; PA 427; GA 87-88. The *Moore-I* Court rejected any attempt to "discount[] the lower end of the standard-error range" in an ID determination as a violation of current diagnostic standards. *Moore-I*, 137 S. Ct. at 1047, 1049. By discounting the lower end of the confidence interval for Mr. Bourgeois's IQ scores, the 2255 court engaged in the very analysis later rejected in *Moore-I*. And because the 2255 court based its assessment of Mr. Bourgeois's "true" IQ on medically inappropriate stereotypes regarding the intellectually disabled, it repeatedly engaged in an approach that *Moore-I* rejected. *See* PFR 13-14.

The Government's commentary regarding Mr. Bourgeois's "other childhood problems" was also invalidated by *Moore-I*. GR 11. Both the Panel and the 2255

8

court required that Mr. Bourgeois *exclude* his "other childhood problems" as causes for his deficits. As *Moore-I* acknowledged, these "childhood problems" are in fact risk factors or *causes* for ID. *See* PFR 15; *Moore-I*, 137 S. Ct. at 1051. Even if they were the source of all of Mr. Bourgeois's deficits, that would not undermine his diagnosis.

Nor could Mr. Bourgeois have brought a non-futile appeal of this determination. Prior to *Moore-I*, then-binding Fifth Circuit precedent endorsed a legal standard that was contrary to the scientific one and precluded any appeal from Mr. Bourgeois at that time. *See* PFR 15 (discussing the Fifth Circuit's denial of Webster's ID claim in *United States v. Webster*, 421 F.3d 308 (5th Cir. 2005)); *Clark v. Quarterman*, 457 F.3d 441, 446-47 (5th Cir. 2006) (endorsing the same diagnostically inappropriate practices that the 2255 court employed); *Williams v. Quarterman*, 293 F. App'x 298, 313-14 (5th Cir. 2008) (rejecting the diagnostic standards' "deficits only" model of assessing adaptive behavior).

The Government claims that the Fifth Circuit's 2005 denial of Webster's ID claim "merely affirmed a district court's fact-bound analysis," GR 12, but this is incorrect. *Moore-I* rejected a number of medically inappropriate practices that some courts had employed in making ID determinations. PFR 3-4. As in *Clark* and *Williams*, in *Webster*, 421 F.3d 308, the district court used, and the Fifth Circuit endorsed, the same diagnostically inappropriate methodology that the 2255 court

9

employed with Mr. Bourgeois. *See* PFR 15.

*Moore-I* repudiated this non-clinical approach. By rendering *current* diagnostic standards binding and specifically rejecting several diagnostically inappropriate practices—all of which had been employed by the 2255 court— *Moore-I* rejected the Fifth Circuit's precedent and the analysis employed in Mr. Bourgeois's § 2255 proceedings. Under the Panel's opinion and according to the Government, none of that matters. The Panel did not base its opinion on a determination that the 2255 court's analysis was valid, but found that *any* legal or diagnostic developments would be irrelevant, no matter what they were. This broad holding is contrary to *Atkins*, *Moore-I*, *Moore-II*¸ and the plain language of the FDPA.

## CONCLUSION

For the foregoing reasons and the reasons set forth in the rehearing petition brief, this Court should grant Petitioner-Appellee's motion for rehearing.

Respectfully submitted,

/s/ *Peter Williams*
Peter Williams
    *Counsel of Record*
Victor J. Abreu
Katherine Thompson
Assistant Federal Defenders
Federal Community Defender Office for
    the Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215–928–0520

Dated: November 2, 2020

**CERTIFICATE OF COMPLIANCE**

This brief contains 2,282 words excluding the parts of the brief exempted by Fed. R. App. P. 32(f). The Federal Rules of Appellate Procedure and the Seventh Circuit's Rules do not address the filing of a reply in support of a petition for rehearing or the word limitations that would accompany that reply. Petitioner-Appellee has filed a motion simultaneously with this brief requesting permission to file it.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5),the type style requirements of Fed. R. App. P. 32(a)(6), and Seventh Circuit Rule 32(b), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman.

/s/ *Peter Williams*
Peter Williams

**CERTIFICATE OF SERVICE**

I, Peter Williams, hereby certify that on November 2, 2020, I electronically filed the foregoing brief with the Clerk of Court for the Seventh Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ *Peter Williams*
Peter Williams